PROCEEDINGS

**FILED**

APR 3 0 2013

SUP COURT, APP. DIV
FIRST DEPT.

652

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF BRONX:   CRIMINAL TERM:   PART T14
    - - - - - - - - - - - - - - - - -

3   THE PEOPLE OF THE STATE OF NEW YORK,

4                                       Indictment No.

5         -against -                    27/2010

6   DAVID DELGADO,                      **PROCEEDINGS**

7                     Defendant.
    - - - - - - - - - - - - - - - - - - -

8                              265 East 161st Street
                               Bronx, New York 10451
9                              June 25, 2012

10  B E F O R E:

11        THE HONORABLE  DOMINIC R. MASSARO,

12                       J U S T I C E and jury

13          (Appearances as previously noted.)

14                 *    *    *    *    *

15          COURT CLERK:  This is case on trial *People of the*

16  *State of New York versus David Delgado*.  Let the record

17  reflect the presence of the District Attorneys office,

18  defense attorney, defendant.  Sworn jurors are not present

19  at this time.

20          MR. CANTOR:  May we just step up, Judge?

21          THE COURT:  You may.

22          (Whereupon there is an off-the-record

23  discussion.)

24          (The crime scene sketch and eight photographs

25  were received and marked for identification as People's



**SCANNED**

DATE: MAY 13, 2013
BY: S.C. Owens

## PROCEEDINGS

653

1    Exhibit one through eight, respectively.)

2         MR. CANTOR: Judge, I am starting with People's

3    one, the crime scene sketch of the subjected premises. It

4    says homicide and I certainly object to that because our

5    defense is just justifiable justification. So either we

6    put justifiable homicide or we redact that. This is not a

7    homicide.

8         THE COURT: I know, you don't have to get carried

9    away.

10        MR. CANTOR: Okay.

11        THE COURT: You have anything to say?

12        MR. ROSENFELD: The reason it is written this way

13   is this is the exact copy of the sketch when the homicide

14   crime unit comes its labeled a homicide scene. The squad

15   that comes  is called a Homicide Squad. It's not a

16   question of what the proof is at trial it's just the name

17   of what they call the scene as opposing to a rape scene or

18   an assault scene or a burglary, robbery scene, that's what

19   they would entitle the sketch, that's all.

20        MR. CANTOR: They were entitled, but they don't

21   have to label it a homicide --

22        THE COURT: I know.

23        MR. CANTOR: -- it's the ultimate issue.

24        THE COURT: why do you keep talking, I want to

25   speak? Please remove the word homicide.

## PROCEEDINGS

654

1    MR. ROSENFELD: We can't do that it's apart of
2    the sketch. What I will do for now is I will take a little
3    piece of paper and put it over the word homicide and later
4    we can remove the word.
5              THE COURT: Very good.
6              MR. ROSENFELD: I will cross over the word so it
7    can't be seen.
8              THE COURT: Thank you, Mr. Rosenfeld, thank you.
9    Next Mr. Cantor?
10             MR. CANTOR: There are pictures, Judge, that
11   Mr. Rosenfeld intends to introduce through --
12             THE COURT: Of the deceased?
13             MR. CANTOR: Yeah.
14             THE COURT: Okay.
15             MR. CANTOR: Of the interior, I don't oppose all
16   the pictures.
17             THE COURT: All right.
18             MR. CANTOR: First picture, hallway, I have no
19   objection, it's People's two for Id. Second picture,
20   Judge, I think I need the court officer. Three Id. blood
21   on the walls, blood on the couch, body of the deceased.
22             THE COURT: Okay. Let me see it.
23             MR. CANTOR: Can be seen by the Court. It's
24   unduly gory, prejudicial and outweighs it's probative
25   value.

**PROCEEDINGS**

655

1    THE COURT: Let me see the rest, I am not going

2    to rule on this for a moment.

3    MR. CANTOR: Okay. The other one, the next one

4    is four, I'll take no objection to that even though it does

5    show a portion of the lower torso of the body and with

6    respect to People's five in evidence it just shows a room

7    with a table, chair, beer cans, cranberry juice, I have no

8    objection with that one.

9    THE COURT: No objection.

10    MR. CANTOR: The next one is a picture, I guess,

11    of the living room with a leg of the deceased, no

12    objection.

13    THE COURT: No objection.

14    MR. CANTOR: The next one is People's seven for

15    Id. premarked, the living room blood all over the wall and

16    a gory shot of the deceased lying down with his upper

17    garment open displaying blood. Please take a look at that,

18    your Honor, and the most offensive one of all is a close up

19    of the body of the deceased. People's eight for

20    identification, which is quite inflammatory and will arouse

21    the passions of the jury and certainly outweighs any

22    probative value that might be offered for the introduction

23    of that photograph. That's eight I think.

24    MR. ROSENFELD: People will be heard whenever the

25    Court is ready.

PROCEEDINGS

656

 1    THE COURT:  All right.  With regard to People's
 2  four you stated no objection, you may take that back.
 3    MR. CANTOR:  May I see it?
 4    MR. ROSENFELD:  (Complies.)
 5    MR. CANTOR:  No objection.  I am trying to strike
 6  a fair balance, Judge, even though it contains a portion of
 7  the body of the deceased.
 8    MR. ROSENFELD:  People do have an argument,
 9  Judge, I don't know if you want time to review it and I
10  will argue or --
11    THE COURT:  One second.
12    (Whereupon there is a pause in the proceedings.)
13    THE COURT:  You may argue on three, seven and
14  eight .
15    MR. ROSENFELD:  Your Honor, first of all as to
16  People's Exhibit one the People have placed a piece of
17  white paper with tape over the word homicide so it cannot
18  be seen, we've taken care of that issue.
19    THE COURT:  Thank you.
20    MR. ROSENFELD:  There are eight photographs --
21  there are seven photographs.  Seven photographs and the
22  three that are in contention are marked People's Exhibits
23  three, seven and eight for identification.
24    THE COURT:  Well, I haven't ruled them in yet, I
25  want to hear.

## PROCEEDINGS

657

1    MR. ROSENFELD: I am saying marked for

2    identification, that's all just marked. All three do show

3    the deceased body from different angles. People's number

4    three shows a picture of the apartment taken from a corner

5    the apartment towards the doorway, but shows the couch

6    where the incident occurred and the blood on the couch was

7    a result of the stabbing by the defendant, the deceased at

8    the area of the couch. The deceased after being stabbed

9    stood up, staggered over to the wall where he was against

10   the wall and collapsed over there, which is why his body is

11   positioned at that location of People's number seven.

12   Also, another different angle of the apartment looking

13   across this, the left-hand corner of the apartment where

14   the stereo equipment it's showing the deceased and neither

15   People's Exhibits three or seven are close up of the

16   deceased. You do see the body lying there. You do see the

17   shirt open, but they are not close ups. People's number

18   seven, as I said, is a different angle to the apartment

19   showing a floor area, showing where the deceased collapsed.

20   Finally, People's Exhibit eight shows a little closer up

21   photograph of the deceased. Although it is not a direct

22   close up it does show his body. It does show the blood on

23   the wall, it is a different angle of the apartment taken

24   towards the dining room table and does show the area with

25   blood.

PROCEEDINGS

658

1      Your Honor, the standard for introduction of

2  photographs is *People's v. Wood*, 79 N.Y. 2d 958 and, in

3  fact, in that case the defendant was claiming that he was

4  under the influence of extreme emotional disturbance when

5  the acts were committed and the People were permitted to

6  introduce photographs of the victim, which may be argued

7  were gruesome in nature.  The Court of Appeals noted as in

8  *People v. Pobliner*, P-O-L-I-N-E-R, 32 N.Y. 2d 356, *People*

9  *v. Stevens* 76 N.Y. 2d 833 photographs are admissible if

10  they tend to prove or disprove a disputed or material

11  issue, to illustrate or elucidate other relevant evidence,

12  or to corroborate or disprove some other evidence offered

13  or to be offered.  They are not being introduced solely to

14  arouse emotions of the jury or to prejudice the defendant.

15      The nature and manner of the killing is material

16  and relevant to the prosecution of the murder indictment.

17  The exhibits illustrate the severity and calculated nature

18  of the wounds.  In that case it was -- it was claimed

19  emotional disturbance when they admitted all of the

20  photographs tended to disprove defendant's claim that he

21  was totally out of control at the time of the killing,

22  factors critical in assessing defendant's defense of

23  extreme emotional disturbance.  In that case they found the

24  exhibits were related to material issues in the case and

25  were all admissible under those cases.

PROCEEDINGS

1    Also, *People v. Pobliner*, P-O-L-I-N-E-R, and

2    *Stevens* photographs and slides should not have been

3    excluded merely because they portrayed a gruesome spectacle

4    or entitled to arouse passion and resentment when the sole

5    purposes of offering exhibits is not to arouse the emotions

6    or prejudice of the defendant.  *People v. Franco*, 268 A.D.

7    2d was a videotape of the crime scene and we'll be offering

8    a videotape, your Honor, which included a depiction of the

9    deceased body and that was admissible because of probative

10   value of evidence that outweighed it's potential

11   prejudicial effects.

12        So based on those cases and those issues, your

13   Honor, the People would argue that these photographs are

14   all admissible.

15        MR. CANTOR:  Judge.

16        THE COURT:  Please pass them back.

17        MR. CANTOR:  I'm sorry.

18        THE COURT:  Please, Officer, may I have them

19   back.  Yes, Mr. Cantor, you want to add something to what

20   you have already stated?

21        MR. CANTOR:  Yeah, and that is eight especially

22   is gruesome, so gruesome and speaks of such wanton attempt

23   to elicit undue and inflate emotion amongst jurors that it

24   clearly should not be presented.  The photograph marked

25   seven, likewise with blood smeared all over the wall and

PROCEEDINGS

1  the body of the deceased with his upper garment open

2  displaying his chest, his tattoo and blood on his body, all

3  of these, including People's number three.  Again, blood on

4  the couch, blood on the walls, the upper garments of the

5  deceased opened, blood on his upper torso, the purpose of

6  this, Judge, is no one is going to deny or argue that he

7  didn't receive five stab wounds to his upper torso, to his

8  neck.  That is not a bone of contention.  What is a bone of

9  contention in this case is the mens rea and those pictures,

10  Judge, are designed solely and exclusively to arouse

11  emotion, passion and empathy for the deceased and the

12  deceased family.  They have absolutely de minimus probative

13  value because we will not be arguing that they were not

14  five stab wounds and these stab wounds included aortic and

15  carotic, we will not argue that, Judge, that is a fact and

16  the medical examiner is going to testify to that.  Why do

17  we need this?  Why do we need this graphic display of blood

18  and severe wounds, which only appeals to base instinct?

19           THE COURT:  Okay.  Thank you, Mr. Cantor.  With

20  regard to number three I will allow it.  With regard to

21  number seven and number eight we will strike those from the

22  presentation.

23           MR. CANTOR:  So only three comes in.  Now?

24           THE COURT:  In addition to all the others that we

25  already --

## PROCEEDINGS

661

1   MR. CANTOR: Yeah, yeah, in addition, okay. So
2   seven and eight.

3       Now, I need your Honor, since the People have
4   confessed to your Honor more represented to your Honor that
5   there will be video, which could even be more inflammatory
6   of the crime scene, I don't know how close they got to the
7   body of the deceased, I don't know what it displays.

8       THE COURT: Haven't you reviewed it?

9       MR. CANTOR: Not for over -- for such a long time
10  I need the Court to review it. It's a short crime scene
11  video. What I am concerned about are these zooming of the
12  body of the deceased for your Honor to see because you've
13  already struck two and now, you are going to see it in much
14  more graphic form. So I am going to suggest that you are
15  going to need that to make a knowing and intelligent
16  decision.

17      THE COURT: How long is that tape?

18      MR. ROSENFELD: Just a few minutes. I didn't
19  realize Freddy had left. I am going on ask him to come
20  back and play it for the Court and while we are concerned
21  about that I just want to mention the case of *People v.*
22  *Franco*, 270 A.D. 2d, 160, Judge Tonetti ruled that the
23  admission of the videotape of the crime scene unit and the
24  homicide victim was proper. This --

25      THE COURT: Okay.

PROCEEDINGS

662

1    MR. ROSENFELD:  The homicide video will have the

2    same shots that are in these photographs in addition to

3    what we will probably see as close ups.

4    THE COURT:  Then we will then see them and rule

5    accordingly.

6    Is he around, that gentleman?

7    MR. ROSENFELD:  He will be here in a second, I

8    didn't realize he had left.

9    THE COURT:  Okay.  Very good.

10   MR. ROSENFELD:  Your Honor, should we just take

11   off the number seven and eight, just for identification?

12   THE COURT:  Yes, yes.

13   MR. ROSENFELD:  So these are no longer --

14   MR. CANTOR:  So seven and eight are still open to

15   be used for further exhibits.

16   THE COURT:  Seven and eight.

17   MR. CANTOR:  Thank you.

18   THE COURT:  Are those not the ones I saw?

19   MR. CANTOR:  Yes, we are just striking the

20   numbers so they can be employed.

21   THE COURT:  The numbers?

22   MR. CANTOR:  Yes, they can be employed for

23   whatever else the People want.

24   (where upon there is a pause in the proceedings.)

25   THE COURT:  Let's do some order to this.  When

PROCEEDINGS

663

1    you see something objectionable tell me.

2              MR. CANTOR:  Yes, sir.  Has there been marked?

3              THE COURT:  No.

4              MR. CANTOR:  Should it been marked for Id.,

5    Judge?

6              MR. ROSENFELD:  Would you like to deem it?

7              THE COURT:  We can mark it as the DA wishes to

8    mark it.

9              MR. CANTOR:  You can deem it marked for Id. then.

10             THE COURT:  All right.

11             MR. CANTOR:  You can deem --

12             THE COURT:  So deemed, yes, number seven.

13             MR. CANTOR:  Seven for Id.

14             (The videotape is deemed marked for

15    identification as People's Exhibit seven.)

16             (Whereupon the crime scene video is shown at this

17    time.)

18             MR. CANTOR:  Right there, Judge, that and the

19    preceding two or three.  That for sure.  That and

20    preceding.

21             THE COURT:  Not for sure.

22             MR. CANTOR:  No, from my point of view.

23             THE COURT:  Yes.

24             MR. CANTOR:  You asked me to raise --

25             THE COURT:  Yeah, I did, I did.  I did.

PROCEEDINGS

664

1          MR. CANTOR:  So that, that.

2          THE COURT:  That's the same one as I have already

3     discarded.

4          MR. CANTOR:  Yeah.

5          THE COURT:  So wait now, can you stop that for a

6     second?

7          MR. CANTOR:  And going back about six, seven

8     centimeters.

9          THE COURT:  Mr. Rosenfeld, I am going to rule as

10    we go along.

11         MR. ROSENFELD:  Well, I rather.

12         THE COURT:  I am going to rule as we go along so

13    this way we can end, we don't have to elongate these

14    objections.  So when I say "yes" or "no" -- if I say "yes"

15    please delete that sequence, okay.

16         MR. ROSENFELD:  Can we still argue it at the end

17    again, your Honor?

18         THE COURT:  If you wish at the end, but we will

19    carry on with that and then I will allow you to argue at

20    the end.

21         MR. CANTOR:  This goes back about five, six

22    seconds, your Honor.

23         THE COURT:  Yeah, I know.  Well, this would be

24    included.

25         MR. CANTOR:  That would.

PROCEEDINGS

665

1       THE COURT:  However, your keeping it by minute or

2   by second, I don't know, but that would certainly be

3   included as to the exorcized.

4               MR. CANTOR:  That the end of it.

5               THE COURT:  You may continue.

6               MR. CANTOR:  That.

7               THE COURT:  That still comes under the same

8   heading.

9               MR. CANTOR:  That, certainly that.

10              THE COURT:  No, I allowed that already in the

11  picture.

12              MR. CANTOR:  I have no objection unless you hear

13  from me.

14              MR. ROSENFELD:  And the People just reserved,

15  your Honor, argument to the end.

16              THE COURT:  Yes.

17              MR. ROSENFELD:  I understand you want to rule as

18  we go along.

19              THE COURT:  Yes.

20              MR. ROSENFELD:  But my --

21              THE COURT:  Only as to the Court's inclination,

22  no final.

23              MR. ROSENFELD:  Right, once you are pointing out,

24  the parts of it then I will argue it.

25              THE COURT:  Yes.

**PROCEEDINGS**

666

1          MR. CANTOR: Yes, that.

2          THE COURT: Okay. The Court's inclination is to

3     delete that.

4          MR. CANTOR: That for sure, it falls under the

5     encompassed of your ruling. That.

6          THE COURT: Not necessarily, I have already

7     allowed that.

8          MR. CANTOR: Okay. Well, the body then, the

9     corpus.

10          THE COURT: The body I -- I would tend to --

11          MR. CANTOR: There we go again. Yes.

12          MR. ROSENFELD: Your Honor, I don't think we need

13     each time the body. So we understand, the objections are

14     as to any screen showing the body of the deceased.

15          THE COURT: Yes, I would lean towards excluding

16     that.

17          MR. CANTOR: Okay.

18          MR. ROSENFELD: And again, your Honor. You asked

19     me to note it and I am just doing it. Yes. Yes. Yes.

20          THE COURT: I would tend to agree.

21          MR. CANTOR: Yes. That's my position, the wall

22     too, your Honor.

23          THE COURT: The Court has already ruled on wall.

24          MR. CANTOR: The wall comes in?

25          THE COURT: The blood on the wall, yes.

PROCEEDINGS

1        MR. CANTOR:  Well, that.

2        THE COURT:  No, the Court has already allowed

3   that in on the photograph, that's part of the wall and the

4   body on the floor collapsed.  As a matter of fact that's

5   exactly the photograph.

6        MR. CANTOR:  There we go again.

7        MR. ROSENFELD:  That's the same shot.

8        MR. CANTOR:  The body.

9        THE COURT:  That's the same as the photograph.

10       MR. CANTOR:  There.  There.

11       THE COURT:  Yeah, I would tend to agree with that

12   one.

13       MR. CANTOR:  Yes.

14       THE COURT:  I would tend to agree with that one.

15       MR. CANTOR:  Oh, for sure, yes.  Your Honor,

16   close up of the head, the neck.  Yes.

17       THE COURT:  I tend to agree.

18       MR. CANTOR:  Yes.

19       THE COURT:  I tend to agree, that's it.

20   Mr. Rosenfeld.

21       MR. ROSENFELD:  Yes, your Honor.  Again, your

22   Honor, these -- this video is obvious an exact depiction of

23   the crime scene and the position of the deceased, the

24   position -- the nature of his injuries, a close up of his

25   hand, an injury obviously to his neck.  Again, under *People*

## PROCEEDINGS

668

1    *versus Franco* where video of the homicide victim has been

2    allowed in by a judge here in the year 2000, Judge Tonetti,

3    that it was proper to admit it, all those photos.  They're

4    all probative of all the incidents occurred, the nature of

5    the violence to the victim, the lack of other wounds on the

6    victim and the presence of those wounds, which caused his

7    death they're all probative.

8         MR. CANTOR:  Only thing that I have to say is

9    your Honor has ruled and they are going to have to sanitize

10   this video and they are going to have to sanitize it to

11   your satisfaction before it's shown to a jury.  You have

12   made various rulings as we have gone along the record, he

13   won't reflect what portion so, what it needs is it needs to

14   be edited and then replayed for your Honor so that it

15   comports with the thrust of your rulings.

16        THE COURT:  Anything that the Court has already

17   said that it tends to agree with or is inclined to agree

18   with should from that moment been removed of the subject

19   matter of the moment that the --

20        MR. CANTOR:  Yes, what I -- I am?

21        THE COURT:  I understand what they have said and

22   after that you would like the Court to again --

23        MR. CANTOR:  Absolutely, so it passes the

24   mustered.

25        THE COURT:  It's not a problem.

## PROCEEDINGS

669

1        MR. CANTOR: Judge, we got to step up. May we?

2        MR. ROSENFELD: And just for the record the

3   People will follow the judge's instructions and between now

4   and I guess the next time we may it have it presented for

5   the Court with its edit.

6        THE COURT: Thank you, Mr. Rosenfeld.

7        (Whereupon there is an off-the-record

8   discussion.)

9        THE COURT: All right. Let us bring in the jury.

10        COURT OFFICER: Jury entering.

11        (The jury enters at this time.)

12        THE COURT: Madam Forelady and ladies and

13   gentlemen of the jury. I will refer to you, ma'am, as

14   Madam Forelady. Traditionally the first juror sworn

15   assumes the position of foreperson of the jury. Should you

16   wish to make a change later, should you find it necessary,

17   you will come and see me, but in any event it doesn't give

18   you extra votes here, but it does give you the running of

19   the jury deliberation, all right.

20        All right. Ladies and gentlemen, I trust every

21   one had a nice weekend. We are now about to commence the

22   serious part which is the actual trial of this issue and I

23   want to give you all some preliminary instructions that

24   will guide your comportment during the course of the time

25   these next few days that we shall meet together. It is

## PROCEEDINGS

1    your duty to find facts and you find facts from evidence

2    and evidence give rise to only three things:  One,

3    testimony of witnesses who are sworn under oath sit right

4    here.  Tell us what they know, what they saw, what they

5    heard, what they remembered, what they did.  Two, any

6    exhibits that are proffered into and admitted into

7    evidence.  Three, should there be any agreements between

8    and among counsel what we call stipulations as what they

9    wish you to consider as evidence, the only evidence in a

10   trial and, of course, that's the only thing at the end of

11   the trial on which you will rule as to the guilt or

12   nonguilt of Mr. Delgado.  Anything the Court says during

13   the course of trial should never be considered by you as

14   indicative of the Courts leaning or expectation of the

15   outcome of this case.  The Court honestly has no opinions

16   as to the guilt or nonguilt of this gentleman.  That is why

17   you have been impaneled, the Court has no right to tell

18   you.  what is more important -- less important you are

19   required to review at the end of the trial after you hear

20   all of the testimony, after you see all of the exhibits,

21   after you consider, if any, stipulations.  After you hear

22   the closing remarks of counsel on the evidence or the lack

23   or insufficiency, after you hear the law from the Court and

24   after you hear each other in the jury room.

25           Concerning things that are not evidence let's go

## PROCEEDINGS

1    over them so you don't get confused.  Opening statements by

2    counsel is not evidence.  The People are required to make

3    an opening statement consistent with the facts.  As you

4    already know the defense has no obligation at all and they

5    do not have to make an opening statement.  Mr. Cantor and

6    his client will listen carefully to what the People say in

7    their opening statement and decide whether or not they wish

8    to make a response at that moment.  Questions, questions

9    are not evidence.  It's the answers to questions that

10   constitutes evidence.  There is an exception, an obvious

11   one, when the question is posed in a manner as to elicit a

12   positive or a negative answer, that is a "yes" or a "no"

13   then, obviously, you may consider the question as well as

14   the answer as constituting evidence.  Objections to

15   question is not evidence.  Counsel here are seasoned trial

16   practitioners, they know the formal rules which apply

17   procedurally to the conduct of a trial and they have an

18   obligation when they feel the other side is not following

19   those rules to stand and to object and they will do that.

20   Utter one or two words indicating the nature of the

21   objections.  The Court will rule on the objection.  If the

22   Court sustains the objections, that is, agrees with the

23   objection the question is never asked.  That's not an

24   invitation for you to speculate what might have been the

25   answer or could have been the answer.  It's never asked,

## PROCEEDINGS

1  it's not in evidence period. If the Court on the other

2  hand overrules the objection, that is, disagrees with the

3  objection then the question is asked, but remember again,

4  it's the only the answers to questions that constitute

5  evidence. That the Court may some time during the course

6  of trial strike something from the record or tell you to

7  disregard a certain answer, what have you, obviously, you

8  follow that ruling when the moment comes and that the Court

9  utters it. Anything you see or hear outside of the

10  courtroom, obviously, has nothing to do with this case.

11  Once in a while the Court may have other attorneys here on

12  some other matters that you may overhear has nothing to do

13  with this case.

14          (Continues next page.)

15

16

17

18

19

20

21

22

23

24

25

Court's Preliminaries

1          THE COURT:  It's up to you to decide what

2     witnesses you wish to believe, who you think is

3     trustworthy, accurate, truthful, and who you think doesn't

4     come up to that standard.  And, of course, always remember

5     the three fundamental rules in a criminal case; number one,

6     the defendant, even as he sits there now, you already know

7     is presumed innocent.  That presumption goes all the way to

8     the jury room and stays with him unless or until a jury,

9     you in your wisdom, in deliberations, sequestrated alone in

10    the jury room, decide because of the evidence that has been

11    placed on the table, it does destroy that presumption of

12    innocence, takes away that cloak that he now carries around

13    him.

14          Second, the burden of proof never shifts.  You

15    already know the defendant has no obligation to say

16    anything at all.  The burden is totally, wholly on the

17    shoulders of the People, the State, the district attorney.

18    Never does a defendant, or is a defendant, required to

19    prove anything at all, let alone his non-guilt.

20          Thirdly, the People must prove guilt, you know

21    the standard, the highest one that we have, proof of guilt

22    beyond a reasonable doubt.  Let's go over that, proof of

23    guilt beyond a reasonable doubt.  What is reasonable doubt?

24    What does the law mean "reasonable doubt"?

25          A reasonable doubt is a doubt for which you can

Court's Preliminaries

1    give a reason and at the very same moment, you believe that

2    you are acting reasonably in view of the evidence that has

3    been placed before you.  Reasonable doubt is a doubt for

4    which you can give a reason and at the same moment, you

5    believe that you're acting reasonably in view of the

6    evidence that has been placed before you.

7         It doesn't mean the People have to come in here

8    and show guilt to some mathematical certainty or to some

9    scientific certitude.  No.  They must prove guilt beyond a

10   reasonable doubt.  A doubt which a reason can be given and

11   at the same moment, you believe you're acting reasonably in

12   view of what has been presented to you.

13        You know that the defendant herein is charged

14   with murder, manslaughter and possession of a weapon.

15   We'll go over that at the appropriate time, which is not

16   now, but at the appropriate time as the Court indicated to

17   you, all of these charges, all of those have certain

18   elements, three and four elements.  At the appropriate

19   moment the Court will instruct you and educate you with

20   respect to the elements of these particular crimes that are

21   charged against this particular gentleman so it may guide

22   you in your deliberations.

23        Now, a few words about your personal conduct.

24   You already know preliminarily, I told you last week, no

25   discussions with anyone, not amongst yourselves.  In the

Court's Preliminaries

1    unlikely event anyone approaches you, you'll have to report

2    that to the Court.  You know that you are to have no

3    interaction with any of the principals.  Should you run

4    into them anywhere, no hello, no goodbye, no passing the

5    time.  Just go about your business.  They will not respond

6    to you.  You already know that.  Not because they are not

7    civil, but because they are under the Court's directions.

8    For obvious reasons, no interaction between sworn jurors

9    and principals in the case.

10            You are not detectives.  You're not researchers.

11   You're not investigators.  Therefore, you don't check

12   things out so to speak.  You hear an address this morning

13   and on the way home tonight you just happen to stop by that

14   location to check it out.  You're not any of those things.

15   You will be given all the information you need to make an

16   intelligent, an objective determination.  You don't check

17   addresses, you don't check the law books.  You don't do

18   anything like that.  You will be educated accordingly as is

19   required, so you can come to a fair determination.

20            You form no opinion.  You keep a totally open

21   mind.  No matter what is said about Mr. Delgado, you don't

22   rush to judgment, he's guilty, he's not guilty.  No.  You

23   have to wait until you hear everything that we said that

24   you have to hear; the testimony of witnesses, the exhibits

25   that you will review, any agreements between counsel,

1    closing arguments, the instructions from the Court on the

2    law, your own fact finding that you do as a body as to what

3    occurred here.  Then and only then, after all of those

4    steps, do you come to a final determination which must be

5    unanimous, as to the guilt or non-guilt of Mr. Delgado of

6    the crimes charged against him and the way the Court will

7    explain them in how you are to consider them at the end of

8    the case.

9         As unlikely as this may sound, and this is a

10   murder case, you don't know, someone may mosey in here, see

11   who you are, downstairs on the 161st Street exit, out on

12   the street, maybe in the elevator, approach you, a member

13   of the media, the press, what do you think of this case,

14   what do you think of the Judge, what do you think of the

15   courtroom, what do you think about this and that and the

16   other thing.  You're to have no business with those people.

17   Sometimes they offer you remuneration, money, and tell you

18   they'll give it to you later so you won't get in trouble

19   and so forth and so on.  Don't believe any of that.  They

20   are under -- you are under the same rule with regard to

21   anyone else, including members of the media.  More

22   particularly, members of the media, not to have any kind of

23   public statements or reactions.

24        Once the case is over, you're free to discuss it

25   with anyone.  Oprah Winfrey may invite you to her show,

1   make a lot of money, to comment.  But until that moment

2   comes, no interaction whatsoever.

3        We are now going to begin the case.  Move

4   directly into the case in chief as we say.  In a moment I

5   will call upon Mr. Rosenfeld to make an opening statement.

6   As you know, we just told you moments ago, he is required

7   on behalf of the State to make an opening statement and he

8   will stand and tell you exactly in chapter form how he

9   intends to bring in proof for the conviction of Mr. Delgado

10  of these crimes.

11       Once he has completed that, we will turn to

12  Mr. Cantor.  By that time he will make up his mind if he

13  wishes to make an opening statement.  And after that, we

14  will look at our schedule and begin in earnest with

15  witnesses until we've completed the case.

16       So the opening statement.  I call upon the State,

17  Mr. Rosenfeld.

18       MR. ROSENFELD:  Thank you, your Honor.

19       Good morning, ladies and gentlemen.  First, I

20  wish to thank you for accepting this responsibility to sit

21  here on this jury, to give up your time from work or

22  family, to make whatever arrangements you need to, to be

23  present in court during this entire trial.

24       I hope you also will follow the Judge's

25  instructions throughout the trial, especially at the end

Opening/People

1    when he explains the law to you, and the promises you made

2    to listen to the evidence, look at the witnesses and review

3    the evidence and come to a just decision.

4              December 24th, 2009, the day before Christmas,

5    going into Christmas Eve, that day was to be a day of fun,

6    of celebration.  Carmen Diaz was hosting a Christmas Eve

7    party in her apartment at 2033 McGraw Avenue here in Bronx

8    County, Apartment 3D.  And she planned for this party.  She

9    invited friends.  She invited Melissa Dempsey, her husband

10   Alberto Vasquez and their children who lived across the

11   hall.  She invited Mercedes Rodriguez.  She invited a lot

12   of friends.  She invited her friend Carmen Matos, also

13   known as Margie, and she invited George Talarvera, known to

14   everyone as Sosa, S-O-S-A, to the party.

15             The party was to begin the evening of December

16   24th, 2009 and continue into the early morning hours of

17   December 25th, 2009, Christmas Day.  In preparation for

18   that, Carmen Diaz, Melissa Dempsey, the other friends, they

19   went about the day, shopping, cooking, preparing food for

20   the party.  Buying drinks.  Buying alcohol, beer, whatever

21   they wanted, whatever they needed to celebrate that party.

22             Attending that party, come the evening, were all

23   these people with their children.  There were eleven year

24   olds there, thirteen year olds.  The younger children were

25   there with grown-ups.  All the people I mentioned, plus

Opening/People

1    some more people, all at Carmen Diaz's party for a family

2    gathering, family, friends, close friends, family gathering

3    to celebrate Christmas.

4              They arrived at different times beginning around

5    eight or nine o'clock in the evening up through midnight.

6    And George Talarvera, known as Sosa came by himself.   He

7    was known to everyone.   He was a friend of everyone.   They

8    knew each other for a while.

9              At some point, Carmen Matos, Margie, came to the

10   party.   But she brought someone who was not known to the

11   other people at the party, a man she had been dating for a

12   short while, the defendant, David Delgado.

13             By the time midnight rolled around, people were

14   eating the food that had been prepared.   There was music.

15   They were drinking beer.   They were drinking liquor.   They

16   were dancing.   The children were all there.   Everyone was

17   having fun.   Instead of a celebration, this turned into a

18   day of mourning.

19             Around two o'clock in the morning George

20   Talarvera, Sosa, wound up being the victim of a violent,

21   ruthless attack from David Delgado.   You will see, ladies

22   and gentlemen, there is overwhelming evidence beyond a

23   reasonable doubt that David Delgado committed the crimes he

24   is charged with.

25             All everyone was doing was having a good time.

Opening/People

1      Sosa, George Talarvera, was drunk.  There's no denying

2      that.  Everyone was drinking and he was drunk.  And he was

3      walking around the party and he was being very loud and he

4      was talking to everybody, including the defendant.  And the

5      defendant was dating Carmen Matos, Margie, who was a friend

6      of Sosa's, and you'll hear from the witnesses' conversation

7      of what Carmen Matos said, what George Talarvera said, what

8      was going on in the party.

9          At one point even Alberto Vasquez took Sosa out

10     of the party because he was drunk and he was just acting

11     out.  There was no violence.  There was no arguments.  He

12     was just one of those people, and you've probably seen them

13     at parties, who was very loud, noisy, and getting into

14     other peoples' faces, including David Delgado.

15         When he returned back to the party after going to

16     Alberto Vasquez's house after a short while, it was getting

17     close to two o'clock in the morning, some people were

18     getting ready to say good-bye, including Sosa, when David

19     Delgado pulled out a knife and stabbed Sosa multiple times

20     in the neck, the face and the back of the head.

21         So, ladies and gentlemen, what I'm going to ask

22     you to do during this trial is focus on the testimony and

23     in your mind, make piles of evidence.  Think of what's

24     material to this case, what things are important, and think

25     about what things are unimportant.  You'll hear a lot of

Opening/People

1    testimony of different things.  Not all of it may be

2    relevant to the exact elements of each charge, but may be

3    important to understanding the situation, where people were

4    at the party, what was going on.  You'll look at all the

5    evidence in your mind, separate them into different piles,

6    however you want to do it, but focus on the main points and

7    avoid distraction on immaterial facts.

8              Right from the beginning of this case right until

9    now, the evidence gathered by the detectives pointed

10   directly at David Delgado as the man who committed this

11   murder.  Right from the beginning.  And you'll hear

12   witnesses testify.  As the Judge told you, you will decide

13   whether they're testifying truthfully or not by deciding

14   whether they have anything to gain or lose from this case.

15   Why would someone take this witness stand and lie to you?

16   They're not getting money.  You'll see if they have any

17   reason to lie or are they just here to tell what they saw

18   back on December 25th, 2009.  It's as simple as that.  No

19   ulterior motive for being a witness other than that they

20   were there.

21             Try to understand how they reacted as David

22   Delgado stabbed Sosa and blood came pouring out of Sosa's

23   neck all over the place.  How horrifying this was that they

24   watched David Delgado commit this murder.  Please treat

25   them and evaluate their testimony the way you would want to

Opening/People

1    be treated, the way you would want to be understood if you

2    had been at such a party and witnessed such an attack.

3            MR. CANTOR:  I'm going to object to that, Judge.

4    Self identification by the jury.

5            THE COURT:  That's what he expects the evidence

6    to show.

7            MR. ROSENFELD:  Use your life experiences and

8    understanding of people to see the quality of the testimony

9    of the witnesses.  David Delgado attacked Sosa, George

10   Talarvera, stabbed him multiple times right in front of

11   these men, women and children at the party.

12           Police were called.  You'll hear from Police

13   Officer Ross shortly, the first police officer to respond.

14   They came to the apartment and they saw Sosa lying there.

15   You'll hear and see photographs of what police officers saw

16   at the apartment.  Detectives arrive, people were spoken

17   to, information was gathered.  Crime Scene Unit responded.

18           Detective Florio, who you'll hear towards the end

19   of the trial due to scheduling, this is how things work

20   out, you'll hear from Detective Florio from the Crime Scene

21   Unit, the unit that specializes in examining crime scenes

22   and photographing it, looking at evidence.

23           Detective Kenneth Banker was the assigned

24   detective from the 43 Precinct.  You will hear from him as

25   to the nature of the investigation.  What did they do.  No

Opening/People

1   weapon was recovered.  You'll hear testimony that David

2   Delgado fled the building, fled the area.  They searched

3   the building, but there was no weapon.

4          You will hear testimony that the deceased was

5   stabbed with an item that appeared to be a knife.  But it

6   shouldn't be surprising to you that it wasn't found.  It's

7   gone.  I submit to you, it was thrown away, hidden.  I

8   don't know.  And there's no evidence as to what happened to

9   that knife.

10         MR. CANTOR:  Well, then I object to it.

11         THE COURT:  Please, Mr. Cantor.  This is what he

12   expects the evidence to show.

13         MR. CANTOR:  That there is no knife?

14         THE COURT:  That's correct.

15         MR. CANTOR:  Very well.

16         MR. ROSENFELD:  There's no knife recovered.

17         You'll hear from the medical examiner as to the

18   cause of death, stab wounds of the left side of the neck

19   with injury to the corroid artery, the jugular vein and

20   larynx, in addition to stab wounds to the nose and the ear

21   and the back of the head.  George Talarvera was stabbed and

22   cut and left to die by David Delgado who just left the

23   apartment, fled.  Not even looking behind to see how badly

24   he injured George Talarvera or even if he died.  He left

25   him there in a pool of blood and he fled to Brooklyn.

1     You'll hear about the investigation from

2     Detective Banker that led them to find the defendant in

3     Brooklyn and arrest him there.  You'll hear about line-ups

4     that are conducted by Detective Kenneth Banker and the

5     identification of the defendant by some of the people who'd

6     been at the party.

7     The defendant is charged with murder in the

8     second degree and manslaughter in the first degree and

9     possession of a weapon, criminal possession of a weapon.  I

10    submit to you, that it is clear from the facts -- it will

11    be clear from the facts that you will hear, that David

12    Delgado's intent was to kill George Talarvera.  And I'm

13    sure in your mind you've heard the word "motive."  In fact,

14    when you walked into this courtroom the first day you

15    didn't know anything about the case.  So you wondered who,

16    what, why, when, where, how did these events take place.

17    All these questions will be answered for you by the

18    testimony of the witnesses at trial.

19    But one thing that doesn't have to be proved is

20    motive or premeditation.  These words are not necessary

21    words for proving the elements of the crimes.  The Judge

22    will give you these instructions at the end of the trial.

23    I'm just going to ask you, ladies and gentlemen,

24    not to sit here and say to yourself, well, he didn't go

25    there with the intent to kill, or he didn't have any

Opening/People

1    motive, or try to analyze premeditation or motive.

2    Understand, it doesn't need to be proved.  It's not an

3    element of the crimes.  You will be able to see from the

4    evidence how at the moment David Delgado stabbed George

5    Talarvera, Sosa, he intended to kill him.

6          Based on the evidence that you will hear, the

7    testimony and the things you will see, you will see by the

8    end of the trial the People have proven each and every one

9    of the elements of the crimes charged, demonstrating that

10   David Delgado is the one who committed the crime.  And the

11   Judge will instruct you if you believe -- and we brought

12   this up on voir dire and I asked you this question -- that

13   the People have proven each element of the crimes beyond a

14   reasonable doubt, you must find David Delgado guilty.

15         So I'm going to ask you to listen, pay attention,

16   use all your abilities to understand people and events,

17   analyze the evidence.  Then you'll be able to review the

18   evidence.  You'll look at all the photos, review all the

19   testimony that will have been prepared during the trial and

20   evaluate the witnesses together and I believe when it comes

21   to the end of this case, you will see beyond any reasonable

22   doubt, that it was the defendant, David Delgado, who

23   murdered George Talarvera, that David Delgado is guilty of

24   the charges against him.

25         THE COURT:  Thank you for your opening statement,

Opening/Defense

1   sir.

2            Mr. Cantor, do you wish to make an opening

3   statement?

4            MR. CANTOR:  With your kind permission I will,

5   your Honor.

6            THE COURT:  Please proceed.

7            MR. CANTOR:  If it please, your Honor,

8   Mr. Justice Massaro, Madam Forelady, ladies and gentlemen

9   of the jury.  Every coin has two sides.  Every stick has

10  two ends.  You heard the prosecutor describe but one side

11  of the coin and one end of the stick.  So let me tell you

12  right now about the other side of the coin, the other end

13  of the stick.

14           David Delgado is charged with three crimes,

15  murder in the second degree, which requires an intent to

16  kill someone and acting with that intent, you kill someone.

17           Manslaughter in the first degree, which requires

18  you have an intent to inflict serious physical injury, cut

19  off the person's arm, puncture a person's kidney, cut out a

20  person's liver, really serious physical injury.  Acting

21  with the intent to cause serious physical injury, you

22  caused the death of a person.

23           And criminal possession of a weapon in the fourth

24  degree, and that is that you possess a weapon with the

25  intent to use it unlawfully against another.

Opening/Defense

1        Now, that's the indictment.  You may at the end

2    of this case hear this Judge submit additional charges for

3    your consideration.  Yes.  Each and every charge that will

4    be placed in your lap for consideration in the jury room

5    requires one or more elements, but each and every one has

6    two common elements and that is the act itself.  In this

7    case, it's the act of a knife entering the body of Sosa

8    five times.

9        But along with that, there's the element of state

10   of mind of my client, David Delgado.  Was he frightened?

11   Was he scared?  Did he think harm was about to be visited

12   upon him?  Was harm visited upon him?  It's called a fancy

13   word in law, it's called justification, but you and I both

14   know it as self-defense.  And in assessing this man, my

15   client, the defendant, David Delgado, you must take him as

16   he comes to you, as I explained to you in voir dire.

17       Who is David Delgado?  Well, he's a man who is

18   five-foot-six inches tall.  The deceased was six feet tall,

19   a very larger figure than Mr. Delgado.  Mr. Delgado, who I

20   believe is thirty-five or thirty-six now, so was then about

21   thirty-three approximately, at the time of incident.  He

22   had attempted suicide on three occasions and the evidence

23   will -- I left my glasses home so they're useless -- he had

24   attempted suicide three times in his life.  Three times.

25   He had been twice confined to mental institutions.  Twice.

1        He had been diagnosed as bipolar, meaning that he
2    suffered from rapid and dramatic swings in his mind, from
3    highs to low, from being manic, from which we get the word
4    "maniac," to being low.  If one is manic, one goes out -- I
5    don't mean to pick on women, but one might go out and buy
6    twenty pairs of shoes.  They're high.  They're manic.  And
7    the same day, if you're bipolar, you can be low, depressed,
8    not wanting to eat, not wanting to get out of bed, not
9    willing to bath, not willing to speak to anyone.  Crawling
10   into one's shell.  And he had been diagnosed as depressed
11   and bipolar.

12       Bipolar is such a serious disease and can cause
13   such pain, and you will hear proof of this.  You see, it's
14   not like a toothache.  A toothache can be excruciating, but
15   you have to wait the one or two days until you get in to
16   see the dentist and then it's extracted, but it's painful.
17   But depression is so painful that it can cause a human
18   being to take his or her life.  That's how painful the
19   depression is he suffered.

20       The time in question, it was a party and he did a
21   foolish thing.  He took his medications and took
22   antidepressants and mood stabilizers, took them, but
23   unfortunately, he drank.  You'll see pictures of alcohol.
24   There was hard alcohol, hard liquor and there was beer, and
25   these are medications that are so strong that any alcohol

Opening/Defense

1    is contraindicated.  It's the worst thing you can have.

2              So here we have David Delgado, thirty-three,

3    thirty-four, and what will come out, he was a youngster

4    living with his mother and his stepfather.  He was

5    physically and sexually abused by his stepfather.  All of

6    that will come out.  You're going to have to take the

7    defendant as you find him.

8              So on December 25th, 2009, David Delgado was a

9    man with a very delicate, fragile, weak mind.  Insane?  No.

10   Please.  There's no defense of insanity here.  He was not

11   insane.  He was a man who was mentally infirmed and not

12   insane.  A person can be mentally infirmed, but not insane.

13   He was a very frightened man.  He's easily frightened.

14             So he goes with his girlfriend who he had been

15   going out with, Margie, who was a friend of everyone else

16   in the apartment because Margie lived I believe in the next

17   building.  So she knew everyone at the party, including

18   Sosa, George Talarvera, the deceased.

19             The testimony will be unequivocal, uncontroverted

20   that Mr. Sosa was behaving obnoxiously, rudely, and

21   disruptive at the party.  He was drunk.  When he was

22   autopsied and they took a sample of his blood, he had 0.23

23   percentage of alcohol in his blood.  0.23 of one percent.

24   The legal minimum, minimum not maximum, for driving while

25   intoxicated in New York State is 0.8.  So he had three

1     times more alcohol in his blood than the minimum, not the

2     maximum, than the minimum requirement for driving while

3     intoxicated.

4             He was so drunk that he was making a pest of

5     himself.  He was bothering people.  He was interrupting

6     conversations.  He was stumbling around.  And thus, he was

7     removed from the party.  Yes, he was removed from the

8     party.  And you heard the prosecutor admit that in his

9     opening statement, one of the few things that he told you

10    by way of the scenario in this case.  He was removed by a

11    friend of his, Alex Rodriguez.

12            What the prosecutor didn't tell you, that being

13    drunk and being unruly and being obnoxious during the

14    course of the time that my client arrived at the party with

15    Margie, Sosa, the deceased, kept on telling the man, kept

16    on interfacing, interrupting the man and telling him words

17    to the effect:  Margie is a good friend of mine.  You don't

18    treat her right, I'm going to hurt you.  You fuck around

19    with Margie, I'm going to fuck you up.  You hurt Margie and

20    I'm going to hurt you.  This is the six-foot tall Sosa

21    telling the five-six David Delgado.

22            David Delgado did have, and still does have, a

23    very impressionable mind, very weak mind.  He took those

24    threats to heart.  He didn't come there -- and he was the

25    only stranger at the party because everyone else was

1    neighbors and friends, the only person he knew was his

2    girlfriend who was taking him to a party amongst members of

3    that apartment building and the next door apartment

4    building. That's where Margie lived. He was very scared

5    for his own physical wellbeing and given his background,

6    that's consistent with this weak, fragile, delicate mind

7    that he was possessed of.

8        So he did something stupid given his mind, but

9    he's committed a lot of stupid acts given the history of

10   his mental state, of his molestation, of his

11   institutionalizations, of his attempted suicides. When

12   they ran out of cranberry juice, and you're going to see in

13   the crime scene videotape you're going to see a bottle of

14   cranberry juice, Margie said she's going to get some more

15   cranberry juice. And my client had been threatened

16   repeatedly by -- at this time by the larger Sosa. So he

17   accompanied Margie and you'll hear that -- and he picked

18   up, while Margie got the bottle of cranberry juice, he

19   picked up a kitchen knife with a blade of about four

20   inches. He thought that trouble was brewing, that he was

21   once again about to be physically abused as he had been as

22   a youth. Once again his bipolarity, highs and lows, took

23   over once again.

24       So with this weak, fragile and wrong set of mind,

25   you know, he took the knife and he went back to the party

1    and Margie brought the cranberry juice and he's drinking

2    and he's got all these meds, these antidepressants and mood

3    stabilizers and his mind is just swirling.  He goes back to

4    the apartment and once again, Sosa says, you don't take

5    care of her right, the right way, I'm going to take care of

6    you in a way you don't like.  Words to the effect, you hurt

7    her, I'm going to hurt you.

8         He gets ready to go with Margie home.  The last

9    thing in the world he wants to do is have a confrontation

10   with Mr. Sosa, with Sosa.  He just wants to get out of

11   there, put him behind him.  What does Sosa do?  He grabs

12   his shirt, pulls him towards him, starts leaning into him

13   and says:  Remember, you hurt Margie, I hurt you.

14        Now, these were words from Sosa's mouth, drunk or

15   not, but he's telling it to a man with a very feeble,

16   delicate impressionable mind.  So what does my client do?

17   Oh, he could have taken the knife by the handle and done

18   boom, boom, boom, but he wasn't looking.  He didn't have

19   the intent to kill him, to cause serious physical injury.

20   So what did he do?  So what he did is that he took the

21   knife and he put it between his fingers, between his

22   fingers so that the whole blade wasn't protruding.  And his

23   intent at that time was just to get out of there, to put

24   space between he and Sosa, to extricate himself from what

25   he thought was a life threatening situation.

Opening/Defense

1          So with the knife, not by the handle, but in his

2     fist so the full blade was not exposed, he punched Sosa

3     after Sosa grabbed his shirt after my client had put on his

4     jacket and had leaned into him.  You see, with this

5     disease, fragile, impressionable mind, he thought once

6     again, he was on the precipice, on the edge of what his

7     father had done to him years ago physically and sexually

8     abused him.  And he punched him.  Of course, he punched him

9     like this with the knife here, that you'll hear from

10    witnesses, but his intent was not to kill him.  His intent

11    was to get out of there without Sosa's drink all over him,

12    to put space between he and Sosa.  He didn't want to hurt

13    Sosa, but he did not want to be hurt.  He did not want to

14    be damaged.  He had had enough of that in his life.

15         So he did that, he punched him in the back of the

16    head, the ear.  He had no idea.  Did he aim for the heart?

17    No.  Did he aim for any vital organ?  No.  All he was still

18    doing was swinging widely and he made contact five times.

19    Did he know where?  This man is hardly a physician.  He's

20    hardly a medical examiner or pathologist.

21              (Continued on next page...)

22

23

24

25

```
 1                    MR. CANTOR:  So that he could extricate himself.

 2     Leave.  Go.  Put it behind him.  So where do you think he

 3     goes if he feels guilt, if he feels that he's murdered a

 4     man or committed manslaughter, he flees the jurisdiction,

 5     he goes back to Puerto Rico.  He had lived in Puerto Rico

 6     before. No, he goes to his home where he was living in

 7     Brooklyn.  And when the very next day the cops found him,

 8     brought him back to the Bronx and questioned him -- they

 9     didn't question him, they gave him his rights, gave him two

10     pieces of paper --

11                    MR. ROSENFELD:  Objection.

12                    THE COURT:  He's suggesting statements to the

13     jury.

14                    MR. CANTOR:  He made a statement, was told, write

15     down what happened -- and it will be introduced in evidence

16     in this case -- and it begins, 12/26, 3:05 p.m. This is

17     what Detective Banker had given him, two blank sheets.  So

18     he says:  I, David Delgado --

19                    MR. ROSENFELD:  Objection, your Honor.  He's

20     reading from things not in evidence.

21                    THE COURT:  You're correct.

22                    MR. CANTOR:  But you told me I could because I

23     intend to prove this.

24                    THE COURT:  You can intend to prove it but you're

25     not to be reading the document.
```

1          MR. CANTOR:  This is what I intend to prove.

2          THE COURT:  This is for somebody to get these

3     documents in evidence.

4          MR. CANTOR:  Let me tell you, this document,

5     verbatim, will come into evidence.  I make that

6     representation.  He said:  I, David Delgado -- this is with

7     the police, he wasn't looking to avoid the police.  They

8     found him where they were expecting to find him, in his

9     home.  And he gave him two blank pieces of paper and he

10    wrote:  I, David --

11         MR. ROSENFELD:  Objection, your Honor.  Reading

12    from items not in evidence.

13         THE COURT:  Yes.  That's correct.

14         MR. CANTOR:  You told me that I could if I --

15         THE COURT:  You may make reference to it but it's

16    not in evidence at this moment.

17         MR. CANTOR:  Okay.  Well, I'm going to make a

18    representation that this entire document will come into

19    evidence, because my client will take the stand and he will

20    tell you that:  I, David Delgado, state that Christmas Eve,

21    met my girl friend --

22         MR. ROSENFELD:  Objection, your Honor. He's

23    reading from --

24         THE COURT:  There is an objection.  I must rule.

25         MR. CANTOR:  Yes.  And you told me preliminarily,

1      since it's part --

2              MR. ROSENFELD:  This colloquy is not proper.

3              THE COURT:  You may not read it.

4              MR. ROSENFELD:  May we approach?

5              THE COURT:  Yes.  Approach.

6              MR. CANTOR:  With the reporter?

7              THE COURT:  Yes.

8              MR. CANTOR:  With the reporter.  I don't want to

9      be hampered in putting in a case.

10             THE COURT:  There is no need to editorialize.

11     Please approach.

12             (Whereupon, there was a side-bar discussion as

13          follows:

14             MR. CANTOR:  You told me --

15             THE COURT:  Let me hear the objection first.

16             MR. ROSENFELD:  First of all, defense counsel,

17     they were about to bring the defendant over to participate,

18     defense counsel stopped them and said this is law.  So the

19     defendant is not present at the side-bar, just so it's

20     clear in case there is any claim later on he was denied his

21     opportunity to be here.

22             MR. CANTOR:  Because it's law.

23             MR. ROSENFELD:  I understand.  I just want to put

24     that on the record.

25             Second, your Honor said to the jury in the

1   beginning that either attorney may object, one or two

2   words.  I object to the colloquy that Mr. Cantor starts to

3   get involved in once an objection is made, he turns to the

4   Court and starts explaining and arguing the point when you

5   said just have one or two words.  So I'm objecting to that

6   constant colloquy.  If it's needed, I ask that the Court

7   have us approach and then we can discuss it, like we are

8   doing now, not in front of the jury.  Let me finish,

9   please.

10              Finally, I made my objection.  Mr. Cantor was

11   clearly -- and he has the papers here -- reading from

12   documents not in evidence.  They may not be in evidence,

13   they may be in evidence.  But to do that at this point is

14   totally improper, and that's the basis of my objection.

15              MR. CANTOR:  I intend to prove this, and you told

16   me --

17              THE COURT:  Yes, I told you, but not to quote.

18              MR. CANTOR:  I can read from it because I made

19   the representation --

20              MR. ROSENFELD:  Because if he doesn't --

21              MR. CANTOR:  Don't interrupt me.  I'm making an

22   objection.  You told me, because, you see, the district

23   attorney wants to pick and choose those portions of the

24   statements that he wants in evidence.  I intend to put in

25   all --

1          MR. ROSENFELD:  Can we have our voices down,

2     please.  He's talking right to the jury.  They hear every

3     word, Judge.

4          MR. CANTOR:  Judge, I don't want to be

5     interrupted once more by this assistant.

6          THE COURT:  But if you keep your voice up --

7          MR. CANTOR:  The statement should go in because I

8     intend to put my client on the stand and he will testify to

9     them, and you told me that I could.

10         THE COURT:  Well, then, if you misinterpreted

11    what I said, or maybe I did say that, I'm now telling you,

12    you may make reference to this document, you may even talk

13    substantively about it, but you cannot read it into your

14    opening statement.

15         MR. CANTOR:  Verbatim.

16         THE COURT:  Yes.

17         MR. ROSENFELD:  I'm going to be objecting to even

18    parts of it.

19         THE COURT:  And the colloquy, that's true, that's

20    right, after I make a ruling, you don't start arguing.

21         MR. CANTOR:  But he speechifies when he makes an

22    objection.

23         THE COURT:  He's entitled to make more than one

24    or two words if it helps the Court.

25         MR. CANTOR:  You told me I can open on this.

1              THE COURT:  You can, but I'm telling you that you

2     can't read it verbatim.

3              MR. CANTOR:  I won't read it verbatim, I'll

4     summarize it.

5              THE COURT:  You can summarize it.

6              (Whereupon, the following was held in open

7     court:)

8              MR. CANTOR:  See, my client did not flee to

9     Puerto Rico, Argentina, Paraguay.  He just went home.  And

10    it was not a big deal, the police found out where he was

11    living.  In a matter of a few hours, they went there, they

12    arrested him.

13             Now he's in the car with the police going back to

14    the Bronx and he tells the cop, Detective Banker, that the

15    guy, referring to Sosa, kept fucking with him all night.

16    That the guy, Sosa, was drunk and they, the party members,

17    the people who were at the party, took him outside, Sosa,

18    referring to.  And then when he came back in, he grabbed my

19    client's arm, and my client had a knife.  He had seen it on

20    a table and he grabbed it.  And he swung it at Sosa, and

21    the people at the party grabbed him and he ran.

22             So now Detective Banker has heard my client's

23    statement in the car.  He goes back to the precinct, the 43

24    Precinct, and he gives the defendant two blank pieces of

25    paper, and my client makes out a statement.  In summary, he

1    states that his girl friend took him to a Christmas party

2    at 2033 McGraw, Apartment 3D, and he walked into the

3    apartment and he was introduced, because he was a stranger,

4    he was introduced to people.  And that's -- and he's

5    writing this all down.

6                  MR. ROSENFELD:  Your Honor, again, I'm objecting

7    to writing and what's being read from, the reading.

8                  MR. CANTOR:  He's writing it.  I'm not reading

9    from it.

10                 THE COURT:  That's all right.  Go ahead.

11                 MR. CANTOR:  And he's writing all of this down

12   because Banker had already heard the admission in the car.

13   And he writes down that Sosa began telling him that he

14   should not be disrespecting Margie.  That he, the

15   defendant, would have lots of problems, according to Sosa,

16   if my client disrespected Margery.

17                 My client wrote down and told the police that he

18   understood that that was an admonition that Sosa was giving

19   him.  My client, not wanting trouble, just said okay, I get

20   it, I understand.  And my client wrote down, admitted to

21   the police, that he had been drinking.  Very poor decision

22   to be drinking on medications that are addressed to

23   depression and mood stabilization.  It even says so on the

24   vial, not to be taken with liquor.

25                 Okay.  And my client told the police that it was

1    associating him being introduced to people at the party and

2    that Sosa again came at him saying the same thing, that he,

3    my client, was going to have problems. He was going to get

4    fucked up if he did not show due respect to Margie .

5    Margie and Sosa were friends, but Sosa was inebriated, very

6    inebriated.  And he was constantly telling these things to

7    my client at the party, and my client got nervous.

8            My client got nervous, and he saw Sosa in action

9    at the party, who was being disrespectful, rude and

10   obnoxious to other people.  And he was kicked out of the

11   party, according to my client, but then he was brought back

12   in. And my client became fearful of this man because he was

13   bigger than my client.  And my client was scared to the

14   point that he was going to be attacked by this larger,

15   obnoxious, unruly, threatening man, Sosa.

16           So he took a knife from Margie's kitchen, when

17   Margie went to get the Cranberry juice, and put it away on

18   the person.  He didn't walk back into the apartment

19   displaying the knife.  He was already scared of this

20   fellow, and they stayed just a few minutes, he and Margie,

21   at the apartment.  And he was about to leave, and he put on

22   his coat and the man came at him and told him, again, that

23   if he fucked around with Margie that he was going to get

24   hurt, he was going to get hurt by Sosa.

25           And when my client, according to what he wrote to

1    the police, he said there came a time when he was prepared

2    to leave, had his jacket on, Sosa had grabbed him, grabbed

3    him.  You'll hear it from the words of my client.  And

4    given his mind state; frightened, fear, nervous, feeble of

5    mind, he took the knife out of the pocket.  He was very,

6    very nervous, very, very frightened for his person.  And he

7    told -- he told or he wrote and, therefore, told the police

8    that he was scared, that he was nervous for his own

9    wellbeing, and I'm not the type of person who goes around

10   harming other people, but I felt it was him or me, and I

11   didn't want to be killed.

12            MR. ROSENFELD:  I'm going to object to him

13   reading from a document that's not in evidence.

14            MR. CANTOR:  I'm not reading.

15            THE COURT:  Okay.  Don't read.

16            MR. CANTOR:  And he was nervous for his own

17   safety.  And he said he wasn't the type of person to go

18   around, and he said he was sorry for what happened.  I was

19   scared for my life.  And after I leave the party, I ran

20   out, he said, of the apartment, took a cab and went home

21   and he doesn't remember what he did with the knife.  And he

22   signed it.  He was given Miranda rights and he signed it.

23            And they called an assistant district attorney

24   shortly thereafter, with a videotape technician, and he was

25   once again advised of his rights; you have the right to

1    remain silent.  Anything you say can and will be used
2    against you in a court of law.  You have a right to an
3    attorney, and if you cannot afford an attorney, one will be
4    provided for you free of charge.  Now that I have advised
5    you of your rights, are you willing to answer my questions?
6    And on each and every question, because he felt in his own
7    mind, and you have to take the defendant as he comes to
8    you, that all he had done was act in self defense.  And, in
9    you coming to that determination, and the People have the
10   responsibility of disproving that defense beyond a
11   reasonable doubt.

12          MR. ROSENFELD:  I'm going to object, your Honor.
13   It's not self defense, it's justification.

14          THE COURT:  Yes.  In any case, the Court will
15   give the appropriate instruction.

16          MR. CANTOR:  Of course it will.  My client was
17   acting justifiably, what we call in the street
18   self-defense.  And the People have the burden of disproving
19   that beyond a reasonable doubt.

20          I'm going to suggest, given my client's history,
21   his background, his torturous past, they will never be able
22   to do that.  So, the assistant district attorney comes and
23   she reads it.  It's a lawyer, the assistant district
24   attorney.  And she reads him his rights and, the same way
25   as with the detective, he said, yes, I understand.  I

1     understand.  I'm willing to answer any and all questions

2     that you put to me.  And in excruciating detail, he says

3     what he wrote, what he had told the cops in the car on the

4     way to the precinct.  He then expanded upon it in writing,

5     and then the DA who was questioning him and he was

6     videotaped and you'll see it, he told them that.

7            In dealing with crimes, and I'm going to suggest

8     to you that there will be other charges, based upon the

9     evidence, that his Honor will be placing before the jury

10    for their consideration.

11           MR. ROSENFELD:  Objection.

12           THE COURT:  The objection was stated.  The Court

13    will make that determination.

14           MR. CANTOR:  And oh, yes, and if the Court

15    determines to produce --

16           THE COURT:  Let's not speculate, however.  Move

17    on.

18           MR. CANTOR:  All right.  If there are other

19    charges --

20           MR. ROSENFELD:  Objection.

21           MR. CANTOR:  -- if there are other charges along

22    with these charges, every charge that you will be asked to

23    consider will have the element of what the law calls mens

24    rea, m-e-n-s r-e-a; plain English, state of mind.  Right.

25    State of mind.  My client, given his state of mind at the

1          time, that he wildly flung this knife into the neck, head,

2          back and ear of Sosa, was instinctively, reflexively,

3          acting in self defense, according to the way he thinks .

4                    You see, you have to take my client, the

5          defendant, as he comes to you.  I told you in voir dire he

6          was not a PhD, he was not a CEO.  He was not an Ivy league

7          graduate.  He's a humble man with a feeble mind.  Can't say

8          insane, no, no, no, that would insulting.  It's not insane.

9          I'm not going to argue that to you, but is he a feeble,

10         humble, weak-minded human being?  Yes.  Anyone would be

11         with his background.

12                   So, I'm going to suggest to you, that the People

13         cannot possibly establish beyond -- I think the word used

14         by the People, I think the word was "any", they said in

15         their opening, we are going to prove beyond any reasonable

16         doubt that Mr. Delgado was guilty, guilty as charged.  And

17         I'm going to tell you, there is much food for thought.  The

18         district attorney, of course, didn't comment upon it,

19         you're --

20                   MR. ROSENFELD:  Objection, your Honor.

21                   MR. CANTOR:  -- you're going to be here.

22                   THE COURT:  Yes, no obligation, counsel.

23                   MR. CANTOR:  You are going to be here when the

24         defense is interposed.  You're going to see and hear and

25         evaluate and assess the other side of the coin.  You're

1      going to be able to see and hear and assess and evaluate

2      the other end of the stick.  And when you do so, there is

3      not a prosecutor who I have never heard, in 45 years in the

4      bar, who has not asked for a conviction in both their

5      opening and closing statements.  But what I ask of you is,

6      to render that most elusive commodity, the rarest of the

7      commodities; justice.  Justice.  Justice.

8              Thank you for your time.  Thank you for your

9      patience.

10             May we approach, your Honor?

11             THE COURT:  Thank you, Mr. Cantor, for your

12     opening statement.

13             MR. CANTOR:  You're welcome.

14             THE COURT:  You may.

15             (Whereupon, there was an off the record

16     discussion held at the bench.)

17             THE COURT:  Madam Forelady, ladies and gentlemen

18     of the jury, that completes the opening statements.  I've

19     just conversed with counsel, we will be taking our first

20     witness right after lunch.  I excuse you now for lunch.

21     Remember all the cautions and we will see you, be outside

22     these doors 2 o'clock.  We will have the first witness

23     ready to go at that time.

24             Have a pleasant lunch.  See you there, follow the

25     officer.

```
 1                          (Whereupon, the jury exited the courtroom.)
 2                     MR. ROSENFELD:  Can we approach.
 3                          (Whereupon, an off the record discussion was
 4                held at the bench.)
 5                     THE COURT:  The jury, having been excused, we are
 6           now leaving Mr. Cantor, I will give you these extra 45
 7           minutes to get your glasses which have been misplaced this
 8           morning.
 9                          (Whereupon, an off the record discussion was held
10                at the bench.)
11                          (Pause in the proceedings.)
12                          (Continued on next page.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          A F T E R N O O N   S E S S I O N
2                    COURT OFFICER:  Jury entering.
3                    (The jury enters at this time.)
4                    THE COURT:  Good afternoon.
5                    MR. ROSENFELD:  Good afternoon.  May we approach
6        for a moment, Judge?
7                    THE COURT:  Okay.
8                    (Whereupon there is an off-the-record
9        discussion.)
10                   THE COURT:  Madam Forelady, ladies and gentlemen
11       of the jury, we now call upon the district attorney to
12       commence their case.
13                   Sir.
14                   MR. ROSENFELD:  People call Police Officer Andre
15       Ross.
16                   THE COURT:  Police Officer Ross to the witness
17       stand.
18                   (Witness enters at this time.)
19            P.O.  A N D R E    R O S S, having been called as a
20       witness on behalf People, having first been duly sworn,
21       testified as follows:
22                   COURT OFFICER:  Witness gives his name as Police
23       Officer Andre Ross, A. R-O-S-S, shield number 28162 of the
24       Yankees Stadium detail, New York City Police Department.
25                   MR. CANTOR:  Judge, could you encourage the

D-ljb

People - P.O. ANDRE ROSS - direct

708

1    witness to keep his voice up?

2              THE COURT:  Good afternoon, sir.

3              THE WITNESS:  How you do.

4              THE COURT:  Just sit back, be comfortable, listen

5    carefully to what is being asked of you.  Please answer

6    only the question that is asked.  Please keep your voice

7    up.

8              You may inquire.

9              MR. ROSENFELD:  Thank you, your Honor.

10   DIRECT EXAMINATION

11   BY MR. ROSENFELD:

12        Q.   Good afternoon, Officer Ross.

13        A.   Good afternoon.

14        Q.   Officer Ross, how long have you been with the New York

15   City Police Department?

16        A.   It will be nine years on July first.

17        Q.   Okay.  And before you entered the police department

18   what was your education background?

19        A.   I had four years at the University of Connecticut.

20        Q.   And then what did you do after that?

21        A.   I came to the police department.

22        Q.   Okay.  Were you ever in the military?

23        A.   Yes.

24        Q.   When was that?

25        A.   2001 to 2007.

D-1jb

People - P.O. ANDRE ROSS - direct

709

1   Q.   And what?

2              MR. CANTOR:   2001?

3              THE WITNESS:   To 2007.

4   Q.   What did you do in the military?

5   A.   I was in the Marine Corp.

6              MR. CANTOR:   Marine Corp.

7              THE WITNESS:   (No verbal response.)

8   Q.   What did you do in the Marine Corp?

9   A.   I was a squad leader and infantryman.

10             MR. CANTOR:   You got to ask him to keep his voice

11   up, but the last word --

12             THE WITNESS:   And I was infantryman and a squad

13   leader.

14             MR. CANTOR:   I got that.

15   Q.   And when you first entered the police department when

16   was that?

17   A.   July 1, 2003.

18   Q.   And what did do you in the police department when you

19   first entered?

20   A.   I was assigned to the Police Academy and then I was

21   assigned to Operation Impact and 43rd Precinct and then in

22   January of 2005, I went to patrol.

23   Q.   And you said you were also in the Marines how did that

24   work?

25   A.   I was in the reserves.

D-ljb

People - P.O. ANDRE ROSS - direct

1     Q.    Okay.  So how did you also work in the Marines and the
2   police?

3     A.    Once a month, I did my weekend a month and then I did
4   my two weeks in the summer.

5     Q.    Let's take your first assignment in the police
6   department, where was that?

7     A.    The 43rd Precinct.

8     Q.    And what did you do when you were first assigned to
9   the 43rd Precinct after the academy?

10    A.    I was assigned to foot patrol in Sector Eddie and
11  Sector Idea.

12              MR. CANTOR:  Sector?

13              THE WITNESS:  E, E as in Eddie.

14    Q.    Please explain what Sector Eddie Impact Zone means?

15    A.    It's just foot patrol, high crime precinct for all
16  newly assigned police officers.

17              MR. CANTOR:  I can't --

18              MR. ROSENFELD:  Judge, I can hear him fine.  If

19        Mr. Cantor needs, I have no objection to him sitting

20        closer.

21              MR. CANTOR:  I will do that.  If I could just

22        have the last answer read back.  There should be no further

23        problems, if I could just have the last answer read back.

24              THE COURT:  You may.

25              (Whereupon the last question was read back by the

                                                            D-ljb

People - P.O. ANDRE ROSS - direct

711

1      reporter.)

2      Q.   And how long did you do that for?

3      A.   One year.

4      Q.   Okay.   What did that involve -- what type of

5  assignments and activities did that assignment --

6            MR. CANTOR:   Objection, most collateral and

7      remote.

8            THE COURT:   I will allow it.

9      Q.   You may answer.

10     A.   Just observing crime conditions, reports, you know,

11 handling people's complaints, issuing summonses, acting as a

12 presence and just being trained on how to be a police officer.

13     Q.   Did you have to respond to crimes or crime scenes

14 during that time?

15     A.   Yes, I did.

16     Q.   Did you also participate in arrests either as a main

17 officer making arrests or assisting officers?

18     A.   Yes, I did.

19     Q.   And what type of crimes scenes did you respond to?

20           MR. CANTOR:   Objection.

21           THE COURT:   Yes, sustained.

22     Q.   After your first year of doing that what did you do

23 afterwards?

24     A.   I was transferred to a patrol squad.

25     Q.   What does that mean?

D-ljb

People - P.O. ANDRE ROSS - direct

712

1    A.    I was assigned to midnights, midnight tour.

2    Q.    In what precinct?

3    A.    In the 43rd Precinct.

4    Q.    And was that on foot or in a police car?

5    A.    That was in a car.

6    Q.    Were you in uniform or plain clothes?

7    A.    Uniform.

8    Q.    And what year was that, approximately?

9    A.    January of '05.

10   Q.    And how long did you remain in this assignment?

11   A.    Until March of 2011.

12   Q.    Okay. And from the time you were first assigned

13   patrol in the four three until March of 2011, what was your

14   assignment?

15   A.    I was assigned to Sector John king.

16   Q.    What does that mean?

17   A.    That was the sector number for the area of the four

18   three that was my responsibility.

19   Q.    And what did you do in that sector during those years

20   you were assigned there in the patrol car?

21   A.    Responded to calls for assistance, crime scenes,

22   anything that -- any call for police service that took place.

23   Q.    And did you have to respond to crime scenes during

24   that time period?

25   A.    Yes.

D-ljb

People - P.O. ANDRE ROSS - direct

713

1    Q.   What type of crime scenes did you respond to?

2              MR. CANTOR:  Objection.

3              THE COURT:  Yes, same as before.  Let's move on.

4    Q.   Well, did you respond to felony scenes?

5    A.   Yes.

6              MR. CANTOR:  Objection.

7              THE COURT:  All right.  I will allow it.

8              MR. CANTOR:  What were you --

9              THE COURT:  I will allow it.

10             MR. CANTOR:  Okay.

11             THE COURT:  Go on.

12             MR. CANTOR:  I take --

13             MR. ROSENFELD:  Your Honor, may --

14             THE COURT REPORTER:  One at a time, please.

15             THE COURT:  Please.

16             MR. CANTOR:  Will you please instruct the witness

17   when there is an objection to forebear to answering?

18             MR. ROSENFELD:  Objection to the colloquy, your

19   Honor.

20             THE COURT:  That's a good observation, please do

21   that, Officer.

22             Now move on.

23   Q.   Did you ever have to respond to homicide scenes?

24             MR. CANTOR:  Objection.

25             THE COURT:  I will allow that.

D-1jb

People - P.O. ANDRE ROSS - direct

714

1    A.    Yes.

2    Q.    And did you ever assist in making arrests or as the

3    main officer making arrests during that time period?

4               MR. CANTOR:  Objection.

5               MR. ROSENFELD:  He is dealing with homicide.

6               THE COURT:  Subject to connection.

7    A.    Yes.

8    Q.    And what type of crimes were you involved in --

9               MR. CANTOR:  Objection.

10   Q.    -- in making arrests --

11              MR. CANTOR:  Your Honor --

12              THE COURT:  Let him finish.

13   Q.    -- as the main officer or --

14              MR. CANTOR:  Objection.

15              THE COURT:  Let him finish his question.

16              MR. CANTOR:  He did.

17              THE COURT:  I sustained the objection.

18              MR. CANTOR:  Yes.

19              THE COURT:  I did for that question before.

20              MR. ROSENFELD:  I couldn't hear over counsel.

21              THE COURT:  Yes, I can understand.

22   Q.    Directing your attention to December 24, 2009, where

23   were you assigned at that time?

24   A.    I was assigned to the 43rd Precinct Sector John King.

25   Q.    And what time or what tour of duty were you working

D-1jb

People - P.O. ANDRE ROSS - direct

715

1  beginning December 24, 2009?

2      A.    11:15 p.m. to 7:50 a.m.

3      Q.    That would take you to the next day, Christmas day,

4  December 25, 2009; is that correct?

5      A.    That's correct.

6      Q.    And when you began your tour of duty the evening of

7  December 24, 2009; what was your assignment?

8      A.    I was assigned to Sector John King.

9            MR. CANTOR:   John king?

10           THE WITNESS:   Uh-hum.

11     Q.    Just explain what you mean when you are using these

12 letters, what area is that specifically?

13     A.    It's basically a -- they break up all the sectors in

14 each precinct, broken up into each letters and we just use the

15 phonetic alphabet instead of saying J we say John.

16     Q.    So when -- those letters represent a certain street

17 area?

18     A.    Certain street area, yes.

19     Q.    And when you received that assignment on the eve of

20 December 24, 2009, were you assigned a partner that day?

21     A.    Yes, I was.

22     Q.    And who was your partner?

23     A.    Officer Kurian.

24     Q.    And did you and Officer Kurian have any specific

25 assignments or is it just routine patrol in that sector you just

D-ljb

People - P.O. ANDRE ROSS - direct

716

1   mentioned?

2       A.   Routine patrol.

3       Q.   Were you in uniform or plain clothes?

4       A.   Uniform.

5       Q.   And did there come a time you actually began to patrol

6   in the sector you just described back on the evening of

7   December 24th into the morning of December 25, 2009?

8       A.   Yes.

9       Q.   Approximately, when was that you began patrolling?

10      A.   Approximately, quarter to midnight.

11      Q.   Okay.  Now, Officer, going back to December 25, 2009,

12   while you were out on patrol do you recall where you were

13   immediately before approximately two o'clock or 2:05 in the

14   morning on December 25th of 2009?

15      A.   Can I just consult my notes, Counsel?

16      Q.   If you need to.

17           THE COURT:  You may, Officer.  Just tell us what

18      it is you are looking at and the date thereof.

19           THE WITNESS:  I am just looking at a photocopy of

20      my memo book for the date in question.

21           THE COURT:  You may look.  Review, refresh and

22      then answer.

23           MR. CANTOR:  Can we have it marked for

24      identification, your Honor?

25           MR. ROSENFELD:  I am not introducing --

D-1jb

1    MR. CANTOR:  Judge, it still --

2    THE COURT:  It still will be marked.

3    MR. CANTOR:  I am sorry.  Still we should mark it

4    for identification.

5    MR. ROSENFELD:  Whatever you wish, your Honor.

6    THE COURT:  What number are we up to?

7    MR. ROSENFELD:  Eight.

8    THE COURT:  Number eight for identification.  So

9    deemed.

10   (The memo book of Officer Ross was deemed marked

11   for identification as People's Exhibit eight.)

12   Q.   Does that refresh your recollection, Officer Ross?

13   A.   Yes, it does.

14   Q.   Where were you around that time?

15   A.   I had just finished responding to a call for a family

16   domestic incident at 1266 Olmstead Avenue.

17   Q.   About what time was that?

18   A.   I responded to that job initially at 1:70 hours.

19   Q.   What time did you finish with that job?

20   A.   Approximately, 2:05.

21   Q.   And when you were finished with that job what, if

22   anything, happened?

23   A.   We received a call for a --

24   MR. CANTOR:  I am going to object to the contents

25   of any call.

D-ljb

People - P.O. ANDRE ROSS - direct

718

1              THE COURT: Overruled.

2     Q.  You may continue.

3     A.  We received a call --

4               MR. CANTOR: I object to the "we".

5               THE COURT: Yes, just what you did, Officer.

6     A.  I received a call for a 34 in progress, which is a

7  male --

8               MR. CANTOR: Judge, I am going to object to that.

9               THE COURT: Overruled.

10    A.  A male stabbed.

11    Q.  And when you say you received a call where were you

12  and what does it mean you received a call?

13    A.  Sitting in the car over the radio.

14            MR. CANTOR: Judge, I would like to go to sidebar

15  with your position with the reporter.

16            THE COURT: I reserve for you.

17            MR. CANTOR: No, Judge, it seems there is an

18  appropriate time to call this to your attention.

19            THE COURT: I told you I would reserve for you,

20  Mr. Cantor, it's reserved. Your record will be reserved.

21            Move on.

22    Q.  And as a result of receiving that call did you receive

23  a location?

24    A.  Yes.

25    Q.  What was the location?

D-1jb

People - P.O. ANDRE ROSS - direct

1     A.   2033 McGraw.

2     Q.   And when you received that call did you and your

3 partner respond to that call?

4     A.   Immediately.

5     Q.   What did you do?

6     A.   We responded to the location as quickly as we possibly

7 could.

8     Q.   Well, were you in your police vehicle?

9     A.   Yes.

10     Q.   Did you drive over to that location?

11     A.   Yes, we drove there.

12     Q.   And, approximately, how long did it take you to drive

13 over to 2033 McGraw Avenue from the time you received the radio

14 call?

15     A.   Approximately, two minutes.

16     Q.   How far away were you from that location

17 approximately?

18     A.   Approximately, quarter to a half a mile.

19     Q.   And when you arrived at 2033 McGraw Avenue what, if

20 anything, did you and your partner do?

21     A.   Parked the police vehicle, exited the vehicle, went to

22 the front of the building where an individual by the name of

23 Alberto Vasquez met us in front of the building?

24     Q.   Were you familiar with that location?

25     A.   I have done that many times.

People - P.O. ANDRE ROSS - direct
720

1          MR. CANTOR:  I'm sorry?

2              THE COURT:  What was the address of that

3     building?

4     A.    2033 McGraw Avenue.

5              THE COURT:  2033?

6     Q.    I'm sorry, the end of that answer you might have

7  gotten cut off.  I said, are you familiar with that building?

8     A.    Many times, I have been to that location many times

9  over the years.

10    Q.    So were you familiar with the building?

11    A.    Yes.

12    Q.    And when you met with an individual downstairs,

13 Alberto Vasquez, did you have a discussion with him?

14    A.    Yes, briefly.

15    Q.    Have you ever met him before?

16    A.    No.

17    Q.    And as a result of your discussion with Alberto

18 Vazquez what, if anything, did you do?

19            MR. CANTOR:  I object to the result.  What did

20       you do after the conversation?

21            THE COURT:  It appears to be the same to me.

22            MR. CANTOR:  No, the result gives rise to

23       contents of the conversation.  It should be what did you do

24       thereafter.

25            MR. ROSENFELD:  Your Honor, I am going to object

D-ljb

People - P.O. ANDRE ROSS - direct

721

1    to the colloquy.  Again, you said one or two words
2    objections.
3              THE COURT:  I agree.  The objection is overruled.
4    Q.   You may answer.
5    A.   Mr. Vazquez.
6              MR. CANTOR:  I am going to object to what
7    Mr. Vazquez said.
8              MR. ROSENFELD:  He never indicated he is saying
9    anything.
10             THE COURT:  You are overruled.  You are overruled
11    on that.
12    Q.   Go ahead, please continue.
13    A.   Mr. Vazquez escorted us into the building elevator and
14    upstairs to apartment 3D.
15    Q.   And when you first encountered this Alberto Vazquez
16    how did he appear?
17    A.   He appeared upset.
18    Q.   And what was he doing?
19    A.   He was standing in front of the building apparently
20    waiting for us.
21    Q.   No, I mean in terms of his demeanor?
22             MR. CANTOR:  Judge, I am going to object,
23    apparently waiting for us, how could he know that?
24             THE COURT:  Well, so much of the answer
25    apparently is stricken.

                                                    D-ljb

People - P.O. ANDRE ROSS - direct

1      Q.   Go ahead.

2      A.   He seemed distraught.

3      Q.   And as you went up to the building, 2033 McGraw

4   Avenue, did you continue to speak with Mr. Vazquez?

5      A.   Yes.

6      Q.   And did there come a time you arrived at apartment 3D?

7      A.   Yes.

8      Q.   And when -- how did you get up there?

9      A.   Took the elevator.

10      Q.   When you go off the elevator what did you see in the

11   hallway?

12      A.   There was different people in the hallway screaming,

13   upset?

14      Q.   Okay.  When you say different people just in general

15   what types of people?

16      A.   Males, females.

17           MR. CANTOR:  I'm sorry?

18           THE WITNESS:  Males, females.

19      Q.   Okay.  And describe the scene.

20      A.   Chaotic.

21      Q.   And what did you do as you, your partner, Mr. Vazquez

22   exited the elevator?

23      A.   We exited the elevator and we were directed to

24   apartment 3D.

25      Q.   Okay.  Did you go down to the doorway of apartment 3D?

People - P.O. ANDRE ROSS - direct

723

1    A.   Yes, I did.

2    Q.   And what happened when you got to the doorway?

3    A.   When I got to the doorway I observed that the door was

4  opened.  As I proceeded to cross the threshold into the

5  apartment I noticed an individual on the floor, his head was

6  canted at approximately 45-degree angle.  He was lying against

7  the wall and there was blood, pools of blood on the floor and

8  blood smeared on the wall.

9             MR. ROSENFELD:  Indicating, your Honor, when the

10    witness said canted he kind of tilted his head to the side

11    a little.

12    Q.   Is that correct, Officer?

13    A.   That's correct.

14             THE WITNESS:  I ask that the witness be shown

15    what has been marked People's Exhibit two for

16    identification.

17             MR. CANTOR:  I would like to see it, Judge.

18             THE COURT:  Marked as --

19             MR. CANTOR:  Identification, so I would like to

20    see it.

21             THE COURT:  It is not really proffered but I will

22    allow you to look at it.

23             COURT OFFICER:  (Complies.)

24             MR. CANTOR:  One moment, your Honor.

25             THE COURT:  Yes, sir.

People - P.O. ANDRE ROSS - direct

724

1    (Whereupon there is a pause in the proceeding.)

2    MR. ROSENFELD:  Has the witness been shown the

3    exhibit?

4    Q.   Officer, looking at People's Exhibit two marked for

5    identification could you please identify what is the item that

6    you are holding?

7    A.   It's a photograph.

8    Q.   Show it, please.  Just indicate what it is that you

9    are holding?

10   A.   It's a photograph of the hallway of the building in

11   question.

12   Q.   Okay.  You say of the building, does it show anything

13   specifically?

14   A.   Well, there is blood on the floor.

15   Q.   No, I am saying what is the area that is shown in that

16   photograph?

17   A.   It's the third floor of 2033 McGraw Avenue.

18   Q.   Is that the same floor you are saying you got to the

19   elevator of --

20   A.   Yes.

21   Q.   And walked to the doorway of apartment 3D?

22   A.   Yes.

23   Q.   Is that a fair and accurate photograph of the way the

24   hallway and the doors looked and were located in terms of fixed

25   items such as the doors, the walls, the ceiling, door knobs back

D-1jb

People - P.O. ANDRE ROSS - direct

725

1   on December 25, 2009?

2       A.   Yes, it is.

3       Q.   Now, Officer, did you take any photograph that

4   morning?

5       A.   I did not.

6       Q.   Were you met when detective or detectives from what is

7   known as the Crime Scene Unit came to apartment 3D of 2033

8   McGraw Avenue that morning?

9       A.   I was present.

10      Q.   Okay.  And did you observe them taking photographs of

11  the area outside the apartment?

12      A.   I did.

13      Q.   You observed them taking photographs of the area

14  inside of the apartment?

15      A.   I did.

16              MR. ROSENFELD:  Your Honor, at this time I would

17          move People's Exhibit one -- People's Exhibit two in

18          evidence.

19              THE COURT:  Share it with Mr. Cantor.

20              MR. CANTOR:  I would like a voir dire, your

21          Honor.

22              THE COURT:  You may.

23  VOIR DIRE EXAMINATION

24  BY MR. CANTOR:

25      Q.   Officer, you had earlier described when you arrived in

D-ljb

People - P.O. ANDRE ROSS - voir dire

726

1  the hallway, the third floor hallway where 3D was as a chaotic

2  scene of males and females, correct?

3      A.   Uh-hum.

4      Q.   You have to say "yes" or "no".

5      A.   Yes.

6      Q.   Thank you.

7           This picture which I am holding in my hand,

8  People's 2d for identification, shows no people; am I

9  correct?

10          MR. ROSENFELD:  Objection, your Honor, it was

11 offered merely for the fixed item such as the hallway.

12          MR. CANTOR:  Judge, I thought we just said

13 objection one word or two.

14          MR. ROSENFELD:  That's one word or two.

15     Q.   This photograph does not show any people; is that

16 correct?

17          MR. ROSENFELD:  Objection, your Honor, improper

18 voir dire.

19          THE COURT:  Overruled.

20     A.   That's correct.

21     Q.   And you were present when the picture was taken?

22     A.   Yes.

23     Q.   So was that after you and your colleagues had cleared

24 the hallway of men and women?

25     A.   Yes.

D-1jb

People - P.O. ANDRE ROSS - voir dire

727

1    Q.   And do you see apartment 3D in this photograph?

2    A.   It's the door on the right-hand side, all the way in

3    the corner.

4    Q.   The right?

5    A.   Yes.

6    Q.   The one you are facing --

7             MR. ROSENFELD:  Your Honor.

8             MR. CANTOR:  I would like to complete my

9    question --

10            MR. ROSENFELD:  Your Honor.

11            MR. CANTOR:  -- so your Honor can rule

12   intelligently.  You deserve have that courtesy.

13            THE COURT:  Yes.

14   Q.   The door that you see straight on in this photograph

15   is not 3D?

16   A.   No, it's not.

17   Q.   Okay.

18            MR. CANTOR:  I have no objection, your Honor.

19            THE COURT:  There being no objection what

20   previously was deemed People's two for identification is

21   now deemed as having been proffered and is received into

22   evidence as such.

23            It will be marked at the end of the session.

24   Move on.

25            MR. CANTOR:  This is two?

D-1jb

People - P.O. ANDRE ROSS - voir dire

728

1    THE COURT: Mr. Rosenfeld.

2        (The photograph having been previously marked for

3    identification is hereby marked in evidence as People's

4    Exhibit two.)

5        MR. ROSENFELD: Thank you. May I have it back,

6    please.

7  BY MR. ROSENFELD:

8    Q.   Officer, look at the television screen next to you.

9        MR. ROSENFELD: I am publishing, your Honor,

10   People's Exhibit two.

11   Q.   Okay. Officer, and you can stand up and point if you

12  need to. You had indicated that you got off the elevator and

13  you walked towards apartment 3D. Where is apartment 3D?

14       MR. CANTOR: Judge, I thought it's only you who

15       gives permission for witnesses to rise and move out of that

16       witness box, not the People.

17            THE COURT: The Court accepts.

18            MR. CANTOR: I'm sorry, your Honor?

19            THE COURT: The Courts accepts what Mr. Rosenfeld

20       said; namely, that he could get up to aid in identifying

21       for the jury.

22            MR. CANTOR: Well, I am familiar, how about for

23       me and my client?

24            THE COURT: And for the Court.

25            MR. CANTOR: Of course.

D-ljb

People - P.O. ANDRE ROSS - direct

729

1          THE COURT:  Go ahead.

2    A.   Could you repeat the question, please?

3    Q.   Where on this photograph, People's Exhibit two, is

4 apartment 3D?

5    A.   (Indicating).

6          MR. ROSENFELD:  Indicating for your Honor.

7    Q.   On the right middle of the photograph it appears to be

8 a doorway in the exact middle of the photograph is another

9 doorway that is not it, right?

10   A.   No.

11   Q.   Right side and you can see the doorway; is that

12 correct?

13   A.   Yes.

14         MR. CANTOR:  I don't know if your Honor can see

15   it.

16         THE COURT:  I see it.

17         MR. CANTOR:  You do?

18   A.   I have seen it.

19         MR. CANTOR:  Very well.

20   Q.   Thank you.  You can sit down, Officer.

21   Now, Officer, you said as you got to the doorway you looked

22 in and you described seeing someone on the floor; is that

23 correct?

24   A.   That's correct.

25   Q.   As you first opened the door and looked in the

D-ljb

People - P.O. ANDRE ROSS - direct

730

1   apartment, you looked straight ahead, you recall what you saw

2   there?

3        A.    It was a table in front of me.

4        Q.    Okay.

5        A.    There is different objects on the table such as beer

6   cans and there was blood on the table.

7        Q.    Okay.

8             MR. CANTOR:  I'm sorry?

9             THE WITNESS:  There was blood on the table.

10            MR. ROSENFELD:  I ask the witness be shown

11       People's Exhibit five marked for identification.

12            THE COURT:  You may display it.  For

13       identification so deemed.

14            MR. ROSENFELD:  I ask that it be shown to the

15       witness, please.

16            (The requested exhibit is shown to the witness.)

17       Q.    Officer, first of all, indicate what it is that you

18   are holding in your hand; that's People's Exhibit five.

19       A.    It's a photograph of the inside of the apartment.

20       Q.    Okay.  And what particular part of the apartment is

21   contained in that photograph People's Exhibit five?

22       A.    It's the threshold of the doorway, the table and the

23   kitchen beyond.

24       Q.    Does that appear to be a fair and accurate photograph

25   of the way the apartment appeared back on December 25, 2009,

D-ljb

People - P.O. ANDRE ROSS - direct

731

1    when you walked up to the apartment and looked through the open

2    door?  In general, in terms of location of fixed objects such as

3    the table, the walls, the ceiling and if there are any other

4    objects in there that you recall seeing?

5         A.   Yes.

6         Q.   Okay.  What things do you recall making an observation

7    of when you first opened the door of the apartment before seeing

8    the body?

9         A.   Just seeing the blood on the table and the splatter on

10   the floor.

11        Q.   And also objects on the table you mentioned, did those

12   appear to be approximately where they were when you first looked

13   in the apartment?

14        A.   Yes, approximately.

15        Q.   And are there any chairs in that photograph?

16        A.   There is one chair.

17        Q.   Okay.  And do you recall if the chair was in that

18   position, if you know, when you first came into the apartment?

19        A.   I don't, I don't recall.

20        Q.   Okay.  So except as to that particular chair the

21   position of the table, the position of the rooms, the walls, the

22   floor and any of the fixed objects is that a fair and accurate

23   photograph of the way that area appeared back on December 25,

24   2009?

25        A.   Yes, it is.

People - P.O. ANDRE ROSS - direct

732

1            MR. ROSENFELD:  Your Honor, People would offer

2    People's Exhibit five into evidence.

3            MR. CANTOR:  I would like a voir dire.

4            THE COURT:  Share it with Mr. Cantor.

5    VOIR DIRE EXAMINATION

6    BY MR. CANTOR:

7       Q.   Officer, does People's number five for identification

8    does that depict any portion of the kitchen or is it a room

9    separate and apart from the kitchen?

10      A.   No, it depicts the kitchen and part --

11      Q.   I'm sorry?

12      A.   It depicts the kitchen and part of the living room.

13      Q.   Okay.  And there is a table in this photograph,

14   correct?

15      A.   Yes, there is.

16      Q.   And there appear to be four cans of Coors beer; is

17   that correct?

18           MR. ROSENFELD:  Your Honor, I am going to object.

19   This is voir dire, I haven't introduced the evidence.

20           THE COURT:  You are correct.

21           MR. CANTOR:  Well, I want to see if it's

22   authentic.

23           THE COURT:  The objection is sustained.  You will

24   have cross examination for that.

25           MR. CANTOR:  Well --

D-ljb

People - P.O. ANDRE ROSS - voir dire

733

1    THE COURT:  The objection is sustained.  Your

2  exception is noted.  Move on.

3    Q.   You were asked questions as to whether or not this

4  fairly and accurately depicts objects that you saw, correct?

5    A.   That's correct.

6    Q.   And you said, yes, you saw a table, correct?

7    A.   That's correct.

8    Q.   You saw objects on that table?

9    A.   That's correct.

10   Q.   And you saw a chair, correct?

11   A.   That's correct.

12   Q.   And you saw what appeared to be blood on the floor?

13   A.   That's correct.

14   Q.   Now, I'm asking you in -- for purposes of fullness and

15  authenticity did you see approximately five cans of Coors beer

16  on the table?

17   MR. ROSENFELD:  Again, this goes to the evidence

18  itself, not the admissibility.

19   THE COURT:  Yes, you are correct.  Sustained.

20   MR. CANTOR:  He can pick and choose what he --

21   MR. ROSENFELD:  Objection, your Honor.

22   THE WITNESS:  I don't need the editorial.

23   MR. CANTOR:  Can we go to the side?

24   THE COURT:  No, I reserved for you.

25   MR. CANTOR:  Well, when?  When is it reserved for

D-1jb

People - P.O. ANDRE ROSS - voir dire

734

1    me, I have to make --

2              MR. ROSENFELD:  Objection.

3              MR. CANTOR:  I have to make contemporaneous

4    objections.

5              THE COURT:  You do and the Court has recognized

6    that and that's why it's reserved for you.

7              MR. CANTOR:  Till when, your Honor?

8              THE COURT:  Till the appropriate moment.

9              MR. CANTOR:  And you will tell us when that is?

10             THE COURT:  I shall.

11             MR. ROSENFELD:  Objection.

12             MR. CANTOR:  I am sorry, I can't hear you when

13   the DA talks over you.

14             THE COURT:  I shall.

15             MR. CANTOR:  I'm sorry.

16             THE COURT:  I shall.

17             MR. CANTOR:  Oh.

18             THE COURT:  Anything else as to the admissibility

19   of the picture?

20   Q.    This is a full and complete and accurate depiction of

21   what you saw?

22   A.    Approximately, in terms of -- what are you asking me

23   in terms?

24   Q.    Beer cans on the table?

25             MR. ROSENFELD:  Objection.

D-ljb

People - P.O. ANDRE ROSS - voir dire

735

1    A.   There were beer cans on the table when I came in.

2    Q.   I am sorry?

3    A.   There were beer cans on the table.

4    Q.   Take a look?

5    A.   I didn't have time to count them.

6         MR. ROSENFELD:  Objection.

7    Q.   Take a look at the photograph.

8         MR. ROSENFELD:  This is voir dire.

9    Q.   Take a look --

10        THE COURT:  On the admissibility, yes.

11   Q.   Take a look, count the beer cans.

12   A.   (Complies.)  Appear to be five in the picture.

13   Q.   Okay.  Thank you.

14        MR. CANTOR:  No objection.

15        THE COURT:  There being no objection what

16   previously was deemed People's number five for

17   identification is now deemed as having been proffered into

18   and is received in evidence as People's number five.

19        Mr. Rosenfeld.

20        (The photograph having been previously marked for

21   identification is hereby marked in evidence as People's

22   Exhibit five.)

23   BY MR. ROSENFELD:

24   Q.   By the way, Officer, do you recall how much later

25   after you arrived there that the Crime Scene Unit arrived.  In

D-ljb

People - P.O. ANDRE ROSS - direct

736

1  general terms, best guess?

2          MR. CANTOR: I'm sorry, just guess.

3      Q. I said your best guess or estimate.

4          MR. CANTOR: No, I am going to object to guessing

5  on the stand.

6          MR. ROSENFELD: I will withdraw.

7      Q. Your best estimate?

8      A. Two hours approximately.

9      Q. And from the time you got there to the time crime

10 scene arrived do you recall whether or not anybody had moved any

11 objects inside the apartment, I am referring to anything other

12 than the deceased?

13     A. I don't recall.

14     Q. Okay.

15         MR. ROSENFELD: Your Honor, the People -- the

16 People were moving People's five into evidence. I asked

17 that it be so marked or deemed.

18         THE COURT: Five we just did.

19         MR. ROSENFELD: Five?

20         THE COURT: We did that, sir.

21         MR. ROSENFELD: Okay. Was it -- we didn't mark

22 it so we are just deeming it marked?

23         THE COURT: Yes.

24         MR. CANTOR: I have no objection.

25         MR. ROSENFELD: I understand.

People - P.O. ANDRE ROSS - direct

737

1      MR. CANTOR:  Let it come in as five.  Let it be

2  marked.

3      MR. ROSENFELD:  Well, your Honor, you prefer it

4  be marked later or now?

5      THE COURT:  Later, at the edge of the session.

6      MR. ROSENFELD:  Okay.  Your Honor, publishing

7  People's five.

8  Q.  And looking at People's Exhibit five, Officer, on the

9  right-hand side, I am going to use my pen to point, what are we

10 observing here (indicating)?

11 A.  That is the door.

12 Q.  And over there (indicating)?

13 A.  And that's the threshold of the door.

14      MR. CANTOR:  Can you keep your voice up because

15 he is facing towards the picture.

16      MR. ROSENFELD:  Your Honor, I have no trouble

17 hearing him.  If Mr. Cantor needs to move another inch

18 forward I don't mind.

19      MR. CANTOR:  I just asked him since his voice is

20 directed in that direction to please keep his voice up.

21      THE COURT:  Yeah, move on.

22 Q.  So as you say, you looked into the apartment, you,

23 made some observation.  Now, you can be specific and you can

24 indicate where and what it is that you observed?

25 A.  I observed the table.

D-ljb

People - P.O. ANDRE ROSS - direct

738

1    Q.    Okay.  I am using my pen to point that area right here
2    (indicating)?

3    A.    I observed the blood on the table.

4    Q.    And where was that?

5    A.    The discoloration on the top of the table by the beer
6    cans?

7          MR. ROSENFELD:  If it assists, I am asking if the
8          witness may stand up and any other witnesses that need to
9          stand up.

10         THE COURT:  Surely.

11   Q.    And you can use anything to point, your finger.

12   A.    This discoloration right here (indicating).

13         MR. ROSENFELD:  Indicating right on the middle,
14         front, left side of the table.

15   A.    On the white of the table cloth.

16   Q.    And what is that?

17   A.    Blood.

18   Q.    And how about on the side?

19   A.    Same thing here (indicating).

20   Q.    Okay.  And how about on the floor of the apartment, is
21   there anything unusual as you first looked into the floor and I
22   point to the lower part of the photograph?

23   A.    This  (indicating) is what I believed to be blood.

24   Q.    Okay.  And looking straight ahead you said there was a
25   table; what is beyond that table?

D-ljb

People - P.O. ANDRE ROSS - direct

739

1    A.    This is the kitchen.

2    Q.    Okay.  And to the area to the left here (indicating?)

3    A.    Over here (indicating) is the living room with

4    different furniture in it.

5    Q.    We have -- that's an area down here (indicating) on

6    the left side of People's Exhibit five; is that correct?

7    A.    That's correct.

8    Q.    Okay.  Thank you, Officer.

9    All right.  Officer, as you made that observation you stood

10   in that threshold of the door, you looked down to your left and

11   that's where you observed the body?

12   A.    That's correct.

13   Q.    What did you do after you stood there and made that

14   first observation?

15   A.    After I made that initial observation I approached the

16   individual on the floor and I made an attempt to assess what his

17   condition was.

18          MR. CANTOR:  You made an attempt --

19          THE WITNESS:  To assess his condition.

20   Q.    Please explain what that means.

21   A.    Basically, I was looking to see if he was breathing,

22   if he was responsive.  So I bent over the body and got as close

23   to it as I could.

24   Q.    And what, if anything, did you notice about the

25   condition as the individual that was lying there?

D-ljb

People - P.O. ANDRE ROSS - direct

740

1    A.    He wasn't breathing and was unresponsive.

2    Q.    Where exactly, if you can describe, were you

3    positioned at that point?

4    A.    I was basically standing.  His -- do you have a

5    picture?

6    Q.    You can explain.  Please explain first.

7    A.    He was laying on his back, head canted against the

8    wall.  His feet were stuck, were sticking out, I guess

9    (indicating).

10              MR. CANTOR:  I can't hear when the question --

11              MR. ROSENFELD:  The witness --

12              MR. CANTOR:  Look, Judge, I would like to have

13        the benefit of the witness' complete answer and

14        Mr. Rosenfeld overrides --

15              THE COURT REPORTER:  One at a time, please.

16              MR. ROSENFELD:  Objection to this colloquy, your

17        Honor.

18              MR. CANTOR:  I would like to hear the answer as I

19        am sure everyone would.

20              MR. ROSENFELD:  Objection to the colloquy, you

21        asked for one or two words.

22              THE COURT:  I asked for colloquies -- sit down,

23        please.

24              MR. CANTOR:  Can I have the reporter read the

25        answer that was in so far.

D-1jb

People - P.O. ANDRE ROSS - direct

741

1       THE COURT:  You want to read it back?

2       MR. CANTOR:  Yeah because you will see it was

3   interrupted by a question.

4       THE COURT:  Well, let's hear it exactly.

5       MR. CANTOR:  Thank you.  The answer.

6       (Whereupon the last answer was read back by the

7   reporter.)

8       MR. CANTOR:  There was an interruption by the

9   D.A. and --

10      THE COURT:  It appears there was no interruptions

11  from the witness.

12      MR. CANTOR:  Oh, there certainly was.

13      THE COURT:  Oh, we will see if Mr. Rosenfeld

14  wishes.

15      MR. ROSENFELD:  Yes, your Honor, and I wish to

16  point out that as the officer made that statement he raised

17  his left and his right hand, pointed them out to his sides

18  on a 50-degree angle in front of him to indicate how the

19  legs were displayed.

20  Q.   Is that correct, Officer?

21  A.   That's correct.

22      THE COURT:  So indicated.

23      MR. CANTOR:  He is not the judge.

24  Q.   And where were you positioned with regards to the

25  legs?

People - P.O. ANDRE ROSS - direct

741 A

1    A.    I put one foot on one side of his left leg, my right

2 foot on the other side of his left leg and then I bent down and

3 made an assessment of his condition.

4              (Continues next page.)

D-ljb

PO Ross-People-Direct

1    Q.    And in addition to observing the person on the floor,

2    did you observe anything on the walls and the surrounding area?

3    A.    There was blood on the walls.  There was also, pools

4    of blood around the individual on the floor.

5    Q.    And after you made this observation of the individual

6    on the floor, did you -- were you able to look around the

7    apartment and observe the rest of the apartment?

8    A.    Yes.

9    Q.    Okay.  Were you able to observe the couch that was in

10   the apartment?

11   A.    Yes, I did.

12   Q.    And I'm referring to the couch that was closest to a

13   wall unit in the apartment.  Were you able to observe that?

14   A.    Yes, I did.

15   Q.    What did you notice about that couch?

16   A.    There was a large blood stain on the right-hand side

17   of the couch.

18            MR. ROSENFELD:  Your Honor, at this time I'd ask

19         the witness be shown People's Exhibit 3 marked for

20         identification.

21            THE COURT:  Display it.

22            (Whereupon, the exhibit was handed to the

23         witness.)

24   Q.    Okay.  Looking at what's been marked People's Exhibit

25   4 for identification, just indicate what you're holding in your

PO Ross-People-Direct

1   hand?

2                   THE COURT:  Did you say 4?

3                   MR. ROSENFELD:  3.  I misspoke.

4                   THE COURT:  3.

5       A.   It's a photograph of the inside of the apartment with

6       the individual on the floor, the couch, and what appears to be

7       the blood on the wall.

8       Q.   And what is the angle that that photograph was taken?

9   Where are you looking from?  Where are you standing when the

10  photograph was taken?

11                  MR. CANTOR:  If he knows.  If he was present when

12          the photograph was taken.

13                  THE COURT:  It's understood.

14                  MR. CANTOR:  It's not understood unless he says

15          so.

16      Q.   Were you able --

17                  MR. ROSENFELD:  I'll repeat it or I'll rephrase.

18      Q.   Were you able to -- can you state where that

19  photograph is taken from, from your seeing the apartment and

20  what is being viewed in the apartment?

21                  MR. CANTOR:  If he was present.  I object.

22                  MR. ROSENFELD:  He said he was in the apartment.

23                  THE COURT:  Please, Mr. Rosenfeld, let me

24          respond.  The objection is overruled.

25      Q.   You may answer.

PO Ross-People-Direct

1   A.   From the far corner of the apartment facing out

2   towards the door.

3   Q.   Okay.  So is that photograph a fair and accurate

4   representation, first of all, of the fixed objects in the

5   apartment, the doorway, the walls, the ceiling, the floor --

6   A.   Yes.

7   Q.   -- as it appeared then?

8   A.   Yes, it is.

9   Q.   Okay.  And you say you can also see other -- can you

10  see other furniture in that photograph?

11  A.   Yes, I can.

12  Q.   What other furniture can you see in that photograph?

13  A.   I can see the couch.  I see the wall unit, chairs, the

14  table.

15  Q.   Okay.  So are the chairs and the table, is that a fair

16  and accurate photograph of where the chairs and the table looked

17  at the time the Crime Scene Unit took that photograph, you

18  mentioned a couple of hours after you were in the apartment?

19  A.   Yes.

20  Q.   Okay.  And as far as the wall unit is involved, is

21  that where the wall unit was involved when the picture was taken

22  also when you were there?

23  A.   Yes.

24  Q.   And you say you notice a couch in that photograph and

25  some blood on the couch?

PO Ross-People-Direct

1      A.    Yes.

2      Q.    Okay.  Do you know if the couch was in that position

3  if you recall, when you first entered the apartment?

4      A.    I don't recall.

5      Q.    Was the couch present?

6      A.    Yes.

7      Q.    Did you observe on that couch as you just mentioned,

8  what appeared to be blood?

9      A.    Yes.

10     Q.    Okay.  And the position of the deceased in that

11  photograph, was that the approximate position he was in and how

12  he appeared when you first entered?

13     A.    Yes, it is.

14     Q.    Is there anything different about his appearance in

15  this photograph than when you first entered?

16     A.    No.

17     Q.    How about in terms of his clothing?

18     A.    Just that his jacket is more open than it was and his

19  chest is exposed.

20     Q.    So that's different from when you were first there

21  looking over him?

22     A.    Yes.

23     Q.    But again, this picture was not taken by you.  It was

24  taken by the Crime Scene Unit you believe a couple of hours

25  later, correct?

PO Ross-People-Direct

1    A.   Yes, that's correct.

2    Q.   How about the position of any chairs in that

3    photograph?  Can you recall out of the chairs in the photograph,

4    if that's how they appeared when you first entered?

5    A.   I don't recall if that's where they were when I first

6    came in.

7    Q.   Were they present in the apartment?

8    A.   Yes.

9         MR. ROSENFELD:  Your Honor, People would move

10        People's Exhibit 4 into evidence given --

11        THE COURT:  You mean 3.

12        MR. ROSENFELD:  Again, I'm sorry.  3 into

13        evidence for the purpose I've indicated and for the objects

14        I've indicated.

15        THE COURT:  Share it with Mr. Cantor.

16        MR. CANTOR:  I'd like a voir dire.

17   VOIR DIRE EXAMINATION

18   BY MR. CANTOR:

19        Q.   Officer, were you present and did you see a

20   representative, a police representative of the Crime Scene Unit

21   take this exact picture which is marked 3 for identification?

22        A.   Yes.

23        Q.   You were there?

24        A.   Yes.

25        Q.   And where did the Crime Scene officer stand, sir?

PO Ross-People-Direct

1      A.   In the far corner of the room facing the doorway.

2      Q.   You mean where my thumb might be?

3      A.   Where your left thumb.

4      Q.   My left thumb.

5      A.   Toward from where your left thumb is.

6      Q.   Were you present -- all right.  I'll save that

7   question for another day.

8                  MR. CANTOR:  No objection, other than the

9           objections that I have voiced earlier.

10                 THE COURT:  All right.  There being no further

11          objection, previously seen People's Number 3 for

12          identification is now being proffered in and received in

13          evidence as People's Number 3.  Again, you will mark these

14          all correctly at the end of the day.

15                 MR. ROSENFELD:  Your Honor, at this time I am

16          publishing People's Exhibit 3 to the jury.

17   DIRECT EXAMINATION (CONT'D.)

18   BY MR. ROSENFELD:

19      Q.   Officer, looking at People's Exhibit 3, now again,

20   please indicate specifically, the objects and the things that

21   you observed.

22                 MR. CANTOR:  Judge, that's repetitious.  We just

23          had it.

24                 THE COURT:  I'll allow it.

25      A.   I observed --

PO Ross-People-Direct

1    Q.   You can go ahead and stand up again.  No problem.

2                (Whereupon, the witness leaves the witness

3          stand.)

4                MR. CANTOR:  I can't see if he's blocking it,

5          Judge.

6                THE COURT:  You may move, Mr. Cantor.

7                MR. CANTOR:  Well, I don't believe my client can

8          move.

9                THE WITNESS:  Is that good?

10               MR. CANTOR:  Thank you.

11   A.   The individual on the floor.

12   Q.   Indicating the right-hand side of the photograph?

13   A.   Correct.

14        Blood stain, blood spatter on the wall.

15   Q.   Indicating again, on the right side of the photograph

16   above the victim.

17               THE COURT:  So indicating.

18   A.   The couch.

19   Q.   Indicating the bottom middle and left of the

20   photograph.

21               THE COURT:  Likewise.

22   A.   Blood stains on the couch.

23   Q.   Indicating the bottom middle left.  The area he's

24   pointing to there's something red on top of it and areas of the

25   couch.  Is that correct?

PO Ross-People-Direct

1            MR. CANTOR:  Judge, I don't need the description.

2       The photograph speaks for itself.  What Mr. Rosenfeld is

3       doing is improper.

4            MR. ROSENFELD:  No, your Honor, I'm pointing to

5       the item.

6            MR. CANTOR:  It's improper.

7            THE COURT:  Your exception is noted.

8            MR. CANTOR:  What is the ruling?

9            THE COURT:  Overruled.

10           MR. CANTOR:  Yes.  Okay.  So you have my

11      exception.

12           THE COURT:  Noted.

13      Q.   You just indicated the couch, there's a blood stain,

14 and referred to a wall unit.

15      A.   Yes.

16      Q.   Please indicate again, the wall unit and other

17 objects.

18      A.   Left-hand side of the photograph, right here.

19      Q.   People's Exhibit 3, the left-hand side.  And the

20 table?

21      A.   The table I first saw when I came in with the beer

22 cans on top is right there more or less in the center of the

23 photograph.

24      Q.   This chair that's almost directly in the middle of the

25 photograph, do you recall if that was in the same position as

PO Ross-People-Direct

1   it's in now, when you first arrived?

2       A.   I don't recall.

3       Q.   There's some items on the chair.  I don't know if you

4   can see them at all.  Do you recall what they are?

5       A.   Those are rubber gloves.

6       Q.   Were they present when you first arrived in the

7   apartment?

8       A.   No.

9       Q.   You indicated that you entered the apartment from this

10  doorway.  I'm pointing to the middle right of the photograph.

11  Where did you end up standing?

12      A.   When I stood over the victim?

13      Q.   Yes.

14      A.   I had one foot here, one foot here and I bent down to

15  assess the victim.

16          MR. ROSENFELD:   The witness is pointing to the

17          bottom right quadrant of the photograph over the victim's

18          left leg.

19          THE COURT:   So indicated.

20      Q.   Thank you, Officer.

21          (Whereupon, the witness resumed the witness

22          stand.)

23          MR. ROSENFELD:   I asks the witness be shown

24          People's Exhibit 4 for identification.

25          THE COURT:   So deemed.

PO Ross-People-Direct

1          (Whereupon, the exhibit was handed to the

2     witness.)

3     Q.   Officer, please look at People's Exhibit 4 and explain

4     what the item is you're holding in your hand?

5     A.   It's a photograph, another photograph of the interior

6     of the apartment, but it's from a different angle.

7     Q.   Do you recognize from this different angle what items

8     or objects are displayed in that photograph?

9     A.   Yes, I do.

10    Q.   What items or objects are displayed in the photograph?

11    A.   The wall unit.  The couch with the blood stain, the

12    victim, the table, the entrance to the kitchen.

13    Q.   Okay.  How about any chairs in the photograph?

14    A.   The chair in the center with the rubber gloves.  The

15    chairs that were around the table.

16    Q.   Is that a fair and accurate photograph of the way the

17    apartment looked at the time the Crime Scene Unit detectives

18    took the photograph back on December 25th, 2009?

19    A.   Yes, it is.

20    Q.   In any way is it different from the way it looked or

21    appeared to look when you first entered the apartment?

22    A.   Yes.

23    Q.   What items are different in this photograph then when

24    you first entered?

25    A.   The rubber gloves.

PO Ross-People-Direct

1      Q.   Again, that same chair, the position of that chair, do

2   you know if that's where it was when you first entered?

3      A.   I don't recall.

4      Q.   So would this be a fair and accurate representation of

5   all the fixed items in the apartment as they appeared when the

6   detective took the photograph?

7      A.   Yes, it is.

8           MR. ROSENFELD:  Your Honor, the People would move

9      People's Exhibit 4 into evidence.

10           MR. CANTOR:  Voir dire, please.

11           THE COURT:  Share it with Mr. Cantor.

12   VOIR DIRE EXAMINATION

13   BY MR. CANTOR:

14      Q.   And beer cans on the table, correct?

15      A.   Yes.

16      Q.   I want you to look very closely on top of the table.

17   Right in the middle of the table there appears to be a plastic

18   jug?

19           MR. ROSENFELD:  Your Honor, objection.  It's not

20      in evidence yet.

21           THE COURT:  Yes, that's correct.

22           MR. CANTOR:  Well, he asked him about the objects

23      in the picture.

24           THE COURT:  He did.

25           MR. CANTOR:  And I'd like to ask about the

PO Ross-People-Direct

1    objects in the picture.

2              THE COURT:  This is only to qualify it for its

3    admissibility.  You'll have ample time to --

4              MR. CANTOR:  Well, what happens if he answers in

5    the negative?

6              THE COURT:  Let's see.

7              MR. CANTOR:  So let's see if he does because it

8    may distort, it may undercut its admissibility.  He asked

9    him about --

10             MR. ROSENFELD:  Your Honor, I would object to

11   this colloquy between --

12             THE COURT:  Only with respect to admissibility.

13             You may answer.

14   Q.   Take a look at the top of the table where you said

15   there were beers cans and I'll direct your attention virtually

16   in the middle of the table.

17   A.   Yes.

18   Q.   Does there appear to be a plastic container?

19   A.   There does appear to be --

20             MR. ROSENFELD:  Objection.  Not in evidence.

21             MR. CANTOR:  But he's elicited --

22             THE COURT:  This is only with respect to

23   admissibility.

24   Q.   Is there a plastic jug there?

25   A.   There is a plastic jug.

PO Ross-People-Direct

1    Q.    Have you seen such plastic jugs in your experience?

2                MR. ROSENFELD:  Objection, your Honor.

3                THE COURT:  Sustained.

4    Q.    Have you seen such plastic jugs containing cranberry

5    juice --

6                MR. ROSENFELD:  Objection.  Improper voir dire.

7                THE COURT:  Objection is sustained.

8                Any objection, Mr. Cantor, as to admissibility?

9                MR. CANTOR:  No.

10                THE COURT:  There being no objection, what was

11           previously deemed People's 4 for identification is now

12           likewise, deemed as Number 4 and received in evidence.

13           We'll mark it at the close of the session.

14                MR. ROSENFELD:  May the record please reflect

15           that I'm displaying People's Exhibit 4, publishing People's

16           Exhibit 4 now in evidence.

17    DIRECT EXAMINATION (CONT'D.)

18    BY MR. ROSENFELD:

19    Q.    Officer, again using People's 4, and you may please

20    rise again and point out the various items that you've described

21    before in this photograph for purposes of exhibition.

22                (Whereupon, the witness leaves the witness

23           stand.)

24                THE COURT:  Yes, Mr. Cantor?

25                MR. CANTOR:  I said the officer has made every

PO Ross-People-Direct

1       effort he can to allow me to see the full picture.

2                   THE COURT:  If you'd like to move, you're free

3           to.

4                   MR. CANTOR:  He moved, so I wanted to say thank

5           you.  That's all.

6                   THE COURT:  I said if you would like to move,

7           feel free to do so.

8                   MR. CANTOR:  But where he is now is perfect, if

9           he can do it from that point.

10      A.      Lower right-hand corner of the photograph, this is the

11      victim.  Chair with the rubber gloves in the center of the

12      photograph.  Wall unit on the left-hand side of the photograph.

13      Couch with the blood.  Table with the blood and beer cans.  And

14      the entrance to the kitchen.

15      Q.      Okay.  Now, again looking at the table, if you look at

16      the front of the table do you recall what, if anything, you

17      notice about the front of the table there, that white curtain

18      part?

19      A.      More blood.

20      Q.      And on top of the table there's some objects in there?

21      A.      Yes.

22      Q.      Can you estimate what those items were, if you can

23      recall?

24      A.      Those were beers cans.

25      Q.      What else is on the table if you recall?

PO Ross-People-Direct

1    A.    There's a plastic jug.

2    Q.    Okay.  And can you tell if anything else is there?

3    A.    I can't really make it out.

4    Q.    Okay.  Now, how about there's some blue items in there

5    and I direct your attention to the chair that you pointed to in

6    the middle of the photograph and below the chair what are we

7    looking?

8    A.    Those are rubber gloves.

9    Q.    That's on the chair that you're pointing to?

10   A.    Yes.

11   Q.    What about on the floor?

12   A.    Rubber gloves as well, on the floor.

13   Q.    Were they there when you first came in?

14   A.    Initially?

15   Q.    Yes.

16   A.    No.

17   Q.    Do you know how those gloves got there, from your own

18   knowledge?

19   A.    From my own knowledge, E.M.S.

20   Q.    Okay.  After you made the observation of the deceased

21   and looked around the apartment, did you remain in that position

22   over the deceased that you described?

23   A.    Just enough to make the assessment and then I backed

24   away from the individual.

25   Q.    Okay.  Did you have an opportunity to look around the

1 │ entire apartment at that point?

2 │     A.    Yes.

3 │     Q.    Were there any people inside the apartment that you

4 │ recall seeing?

5 │     A.    Yes, towards the back bedroom.

6 │            MR. ROSENFELD:   Okay.   Your Honor, at this time I

7 │     ask this People's Exhibit 6 be shown to the witness.

8 │            THE COURT:   So deemed.

9 │            (Whereupon, the exhibit was handed to the

10 │        witness.)

11 │     Q.    Officer, looking at People's Exhibit 6, could you

12 │ please indicate what the item is that you're holding?

13 │     A.    This is a photograph of another angle, view of the

14 │ interior of the apartment.

15 │     Q.    What items are illustrated in that photograph?

16 │     A.    In the lower left-hand corner the individual's foot is

17 │ visible, along with different blood splatter.  Couch is visible

18 │ with the blood stains on the right-hand side of the couch.   The

19 │ door leading to the back bedroom is in the center of the

20 │ photograph.  On the right-hand side of the photograph is the end

21 │ of the wall unit and in the center of the photograph is the

22 │ chair with the rubber gloves.

23 │     Q.    Okay.   And is that a fair and accurate photograph of

24 │ the way the apartment appeared at the time the Crime Scene

25 │ detectives took the photograph back on December 25th, 2009?

1 A. Yes, it is.

2 Q. And in terms of general appearance of fixed items, is

3 that how it appeared when you first entered the apartment back

4 on that day?

5 A. Approximately.

6 Q. Again, I think you indicated before, there's some

7 items that you're not sure that may have been moved?

8 A. Yes.

9 Q. Which items are those?

10 A. The chair and the rubber gloves.

11 Q. What about the couch, was it in the same position as

12 when you first entered?

13 A. I don't recall.

14   MR. ROSENFELD: Based upon that, the People move

15  People's Exhibit 6 into evidence.

16   THE COURT: Share it with Mr. Cantor.

17   MR. CANTOR: Voir dire, please.

18 VOIR DIRE EXAMINATION

19 BY MR. CANTOR:

20 Q. Officer, were you actually present when People's

21 Number 6, the picture, the photograph was taken?

22 A. Yes.

23 Q. And you saw it being taken?

24 A. Yes.

25 Q. And when you say "blood," you're not a serologist.

PO Ross-People-Direct

1    You mean what appeared to be blood?

2         A.    What appeared to be blood in my experience.

3         Q.    Yes.  Okay.

4              MR. CANTOR:  No objection.

5              THE COURT:  What was deemed People's Exhibit

6    Number 6 is now likewise, proffered in and is received into

7    evidence as such.  No objection.  We'll mark it at the

8    close of the session.

9              MR. ROSENFELD:  At this time the People are

10   publishing People's Exhibit 6 in evidence.

11        Q.    Officer, again, if you don't mind for this photograph,

12   please indicate the items that you just described before for the

13   record.

14        A.    Lower left-hand corner is the individual's foot.

15             MR. ROSENFELD:  People are pointing in that area

16   to the lower left quadrant.

17             THE COURT:  So indicated.

18        A.    Around the foot you see different blood splatter.

19        Q.    Is that where you're pointing, the lower left corner?

20        A.    That's correct.

21        Q.    Go ahead.

22        A.    Lower left middle is the door leading to the back

23   bedroom.

24        Q.    Right here?

25        A.    That's correct.

1       Q.    Okay.

2       A.    In the center of the photograph is the couch with the

3    blood stain on the right-hand side of the couch.

4       Q.    That's exactly where you're pointing, a little above

5    the chair there?

6       A.    That's correct.

7       Q.    Go ahead.

8       A.    Right-hand side is the wall unit.

9       Q.    Okay.

10      A.    And then the chair in the center with the rubber

11   gloves on the top of the chair and underneath.

12      Q.    Okay.   Thank you very much.

13                  (Whereupon, the witness resumed the witness

14         stand.)

15      Q.    Now, Officer, after you say you had moved out of the

16   apartment what, if anything, did you do?

17      A.    Can you repeat the question, please?

18      Q.    When you say you viewed the victim, looked around the

19   apartment and moved away from the victim, what did you do?

20      A.    I made a radio transmission calling for E.M.S. and for

21   my supervisor.

22      Q.    Explain what that means, what the letters and initials

23   mean?

24      A.    E.M.S. stands for Emergency Medical Services.

25      Q.    Would that be the same as requesting an ambulance?

PO Ross-People-Direct

1      A.    Yes.

2      Q.    And you also called who else?

3      A.    My lieutenant.

4      Q.    When you say you made a call, how were you doing that?

5   Who are you calling?

6            MR. CANTOR:  Objection.  It's two questions, who

7      are you calling, how did you do it.

8      Q.    How are you doing that?

9      A.    I'm transmitting with my department issued radio.

10     Q.    Who are you calling specifically?

11           MR. CANTOR:  Asked and answered.  Supervisor.

12           THE COURT:  Move on.

13     Q.    Now, you mentioned there were people in the apartment.

14  Approximately, where were these people while you were inside the

15  apartment observing the victim?

16     A.    Looking towards the back bedroom.

17     Q.    This door here?

18     A.    That's correct.  There were people -- the door was

19  open when I came in and there were people, and I don't know how

20  many, but there were people in the back part of the apartment

21  and by the couch.

22     Q.    The couch.  This couch here?

23     A.    Yes.

24     Q.    There are two couches.

25     A.    The far couch.

PO Ross-People-Direct

1     Q.   This one?

2     A.   Not the one with the blood stain.

3     Q.   That's a little above the middle, the couch again, the

4  left where I'm pointing?

5     A.   That's correct.

6     Q.   You said people were they?

7     A.   Roughly where you were pointing with your finger.

8     Q.   Right in front of the doorway?

9     A.   Yes.

10    Q.   Do you remember if they were men, women, children?  Do

11  you remember who they are?

12    A.   They appeared to be older women and children.  I don't

13  recall if there was a man present.

14    Q.   And what was happening?  What were they doing as you

15  were standing there?

16    A.   They were yelling.  They were agitated.

17    Q.   So did you leave them standing there as you stepped

18  out of the apartment?

19    A.   We told them to --

20              MR. CANTOR:  I object to "we."

21    A.   I told them to exit the apartment without disrupting

22  the individual on the floor or to stay in the back bedroom.

23    Q.   And do you recall what they did?

24    A.   They did what I said, told them to do.

25    Q.   Did they all exit or did they stay in the back

1  bedroom?

2       A.    I don't recall exactly who stayed where, but the area

3  was cleared of people.

4       Q.    Well, do you recall if some people went into the back

5  bedroom?

6       A.    Yes.

7       Q.    And did some of the people exit the apartment?

8       A.    Yes.

9       Q.    Okay.  And where did you remain?

10      A.    I remained in the apartment.

11      Q.    Okay.

12      A.    In the living room inside the threshold.

13      Q.    Please continue.  What happened after you asked the

14  people to move and you remained at that location?

15      A.    That's correct.  After that I just waited for

16  Emergency Medical Service to respond and my supervisor to

17  respond, trying to maintain the integrity of the crime scene.

18      Q.    While this was going on, were you talking to any of

19  the people in the apartment?

20      A.    I don't recall.

21      Q.    At any point did you put any type of description over

22  the radio?

23      A.    Yes, I did.

24      Q.    And do you recall what that description was?

25            MR. CANTOR:    Just yes or no, your Honor.  I'm

1    going to object to the content.  That would be hearsay.

2                THE COURT:  I'll allow it.

3                MR. CANTOR:  You'll allow what, whether he put a

4         description over the radio?

5                THE COURT:  Yes.

6         A.    I don't recall the exact description that I gave.

7         Q.    Okay.  What in sum and substance do you recall about

8    the description?

9                MR. CANTOR:  Objection.

10                THE COURT:  If he remembers.

11                MR. CANTOR:  He says he doesn't.

12                THE COURT:  He's asking him a different question.

13        Q.    Do you recall in sum and substance the description you

14   gave, yes or no?

15        A.    In sum and substance, male Hispanic wearing -- with

16   tattoos.

17        Q.    Can you describe any clothing at all, if you remember?

18        A.    I don't recall the clothing description.

19        Q.    Do you recall who you received that from?

20        A.    People, individuals that were present at the scene.

21        Q.    Do you remember the names of any of them?

22        A.    I don't recall the individuals' names, no.

23        Q.    Were you present when --

24                MR. CANTOR:  I'm going to ask that be stricken.

25        That is rank hearsay.  That is rank hearsay.

1          THE COURT:  The objection is sustained.

2          MR. CANTOR:  Will you strike it then please, sir.

3          MR. ROSENFELD:  Objection to the colloquy, your

4     Honor.

5          MR. CANTOR:  What colloquy?  You sustained the

6     objection.

7          THE COURT:  I sustained the objection about rank

8     hearsay and I'm going to allow it to come in and you'll

9     have your opportunity on cross-examination on your

10    exception to that and if you wish to make a record, by all

11    means.

12         MR. CANTOR:  Judge, you're depriving me of

13    allowing me to make a contemporaneous record?  I'd like to

14    go on the sidebar with the reporter.

15         THE COURT:  Mr. Cantor, perhaps other courts

16    entertain you that way.  This one doesn't.  Your rights

17    will be ensured and continued at the appropriate time

18    should it become necessary.

19         MR. CANTOR:  It is.  I asked for it.  You said

20    you'd give it to me at the appropriate time.

21         THE COURT:  I will.

22         Please continue, Mr. Rosenfeld.

23    Q.   Did other police personnel arrive?

24    A.   Yes, they did.

25    Q.   Which police personnel arrived, if you remember the

1   number or the types of officers who arrived?

2       A.   Other patrol officers and my supervisor.

3       Q.   Okay.   When you say "supervisor," what rank are you

4   talking about?

5       A.   She's a lieutenant.

6       Q.   Okay.   And in addition to lieutenant and patrol

7   officers, did other police officers or police personnel arrive?

8       A.   Eventually Crime Scene arrived, the Detective Bureau

9   arrived, Detective Night Watch arrived, the duty captain, the

10  duty chief.

11      Q.   What were you doing during all of this?

12      A.   Securing the crime scene and if they asked me

13  anything, I gave them the answer.

14      Q.   Okay.   Did there come a time after the civilians left

15  the apartment that E.M.S. arrived, Emergency Medical Services?

16      A.   Yes.

17      Q.   What did you observe them do when they arrived at the

18  apartment?

19      A.   I observed them assess the victim.

20      Q.   Explain what you saw.

21      A.   I observed them assess the victim.

22      Q.   What did they do?   Did you see them go in the

23  apartment?

24      A.   They came in the apartment.   They got out their

25  equipment, donned their rubber gloves and attempted to treat the

PO Ross-People-Direct

1  victim.

2     Q.   What, if anything, did you notice that happened?

3     A.   They weren't able to revive him and they pronounced

4  him --

5            MR. CANTOR:  Objection to pronouncements.  That's

6       hearsay.  That is hearsay.

7            THE COURT:  Did you hear that?

8            THE WITNESS:  They gave me the time.

9            THE COURT:  The objection is overruled.

10    Q.   And approximately, what time was that?

11    A.   02:28 hours.

12    Q.   Does that correspond to 2:28 in the morning?

13    A.   That's correct.

14    Q.   And where were the civilians during all this as E.M.S.

15 was attending to the victim?

16    A.   In the back bedroom and in the hallway.

17    Q.   And when you said the E.M.S. was attending to him, do

18 you recall if they did anything to the body or to his clothing?

19    A.   I don't recall exactly what they did to him.

20    Q.   Was the clothing or the body in the same condition

21 when they finished as it was before they started?

22    A.   No.

23    Q.   What was different?

24    A.   His shirt was open and his jacket was open.

25    Q.   And approximately, how long did you remain at the

PO Ross-People-Direct

1  crime scene?

2       A.   Can I consult my notes?

3       Q.   If you need to refresh your recollection you may.  Let

4  us know.

5            THE COURT:  Tell us what you're looking at and

6       the date thereof.

7            THE WITNESS:  I'm just consulting my memo book

8       from that date.

9            THE COURT:  Please do so.  Refresh your

10      recollection.  Then answer as you best see fit.

11      A.   I remained at the scene until approximately 08:00

12  hours or eight o'clock in the morning.

13           MR. CANTOR:  Judge, since that's been marked for

14      identification, can I look at it?

15           MR. ROSENFELD:  Counsel has a copy of it.

16           MR. CANTOR:  Can I look at it?

17           THE COURT:  If you wish to take a moment to look

18      at it.

19           MR. CANTOR:  Thank you.  What I have or what I

20      don't have is none of the D.A.'s business.

21           MR. ROSENFELD:  Objection to the colloquy.

22           THE COURT:  Well, that's absolutely correct and

23      the objection is sustained.  I will give you the courtesy

24      of looking at it before it's proffered into evidence, which

25      would be the appropriate time to view it.

1    Q.    Officer, from the time, after E.M.S. attended to the

2    victim until the time you left that area, did you remain in that

3    approximate position you were telling us about before in the

4    apartment?

5         A.    Yes.

6         Q.    Did you participate in anything else while you were at

7    that crime scene, any searches of the building or anything else?

8         A.    No.

9         Q.    How about your partner, do you recall what, if

10   anything, he did?

11        A.    I don't recall.

12        Q.    Okay.

13        A.    Exactly.

14        Q.    And when you said you, I believe you used the word

15   before, maintained or guarded the crime scene.  What word did

16   you use?

17        A.    I don't remember what I said.

18        Q.    You were at the crime scene, correct?

19        A.    Yes.

20        Q.    What was your job as remaining in that?

21        A.    To safeguard the crime scene.

22        Q.    Safeguard the crime scene.  Thank you.

23              What does it mean to safeguard the crime scene?

24        A.    It means nobody interferes with evidence or tampers

25   with evidence in any way, or potential evidence.

1    Q.    I apologize, did you finish?

2    A.    I said potential evidence.

3    Q.    Okay.  So did you keep your eyes on the items in the

4   apartment, such as the items we see on the table here and the

5   blood area and those other areas of the apartment?

6    A.    The victim, the couch.

7    Q.    After returning to the precinct, did there come a time

8   later on that morning that you went to the Medical Examiner's

9   Office?

10    A.    Yes, there was.

11    Q.    And what was your purpose in going to the Medical

12   Examiner's Office?

13    A.    To identify the deceased.

14    Q.    Okay.  And did there come a time that you arrived at

15   the Medical Examiner's Office?

16    A.    Yes, there was.

17    Q.    And when you got there, did you view an individual at

18   the Medical Examiner's Office?

19    A.    I did.

20    Q.    Was a case number assigned to that, medical examiner's

21   case number assigned to that individual?

22    A.    Yes, there was.

23    Q.    Do you recall what that number was?

24    A.    Can I view the paperwork?

25         THE COURT:  Yes.  Just tell us what it is that

PO Ross-People-Direct

1    you're reviewing and the date thereof.

2                MR. ROSENFELD:  I ask this paper be handed to the

3    officer to see if it refreshes his recollection.

4                MR. CANTOR:  I ask it be marked for

5    identification and I would like to see it.

6                MR. ROSENFELD:  I'm not introducing it.  I'm only

7    using it to refresh his recollection.

8                THE COURT:  I think we'll adhere to the

9    appropriate rules.

10               MR. CANTOR:  I have a right to see it.

11               THE COURT:  Show it to the officer.

12               MR. CANTOR:  Judge, it's been moved for I.D.

13               MR. ROSENFELD:  I'm not moving it for I.D.

14               THE COURT:  It hasn't been moved into evidence.

15               MR. CANTOR:  But it should be if a witness is

16   using it.

17               MR. ROSENFELD:  Objection to the colloquy, your

18   Honor.

19               THE COURT:  If he's going to move it for

20   evidence, I'll give it to you.

21               MR. CANTOR:  But you said anything a witness

22   views should be offered for identification.

23               MR. ROSENFELD:  Objection to the colloquy, your

24   Honor.

25               THE COURT:  All right.  You may.  Do you

1    recognize it, number one.

2              THE WITNESS:  Yes, I do.

3              THE COURT:  What do you recognize it to be?

4              THE WITNESS:  This is a Police Identification of

5         Body Form.

6              THE COURT:  You may review it and then answer as

7         you best see fit.

8              MR. CANTOR:  Can I see it before he answers so I

9         can intelligently --

10             THE COURT:  Not at this moment.

11   Q.   Does that refresh your recollection, Officer?

12   A.   Yes.

13             MR. CANTOR:  How can I follow whether or not he's

14        actually doing that?

15             MR. ROSENFELD:  Objection to this colloquy, your

16        Honor.

17             MR. CANTOR:  I can't even see it.  I'm not a

18        potted plant, Judge.  I participate here.

19             MR. ROSENFELD:  Objection.

20             THE COURT:  And that should be applauded by

21        everybody.

22             MR. CANTOR:  Can I look at something?

23             THE COURT:  However, the reviewing of material

24        that is proffered into evidence is displayed to opposing

25        counsel at the point that it is moved, not when it is used

PO Ross-People-Direct

1    for identification or to refresh recollection.  That is the

2    strict rule.  We relax sometimes on that rule, it's true,

3    but I'm not relaxing on that in this instance.

4             MR. CANTOR:  Will you mark it for identification?

5             THE COURT:  I will do that.  What would it be?

6             MR. ROSENFELD:  Number 9, your Honor.

7             THE COURT:  Number 9 for identification so

8    deemed.

9             MR. CANTOR:  And if the witness is going to use

10   it to refresh --

11            MR. ROSENFELD:  Objection to this colloquy, your

12   Honor.

13            MR. CANTOR:  Can I look at it?

14            THE COURT:  You can look at it when it comes to

15   being proffered into evidence.

16            MR. CANTOR:  If it does not, I don't get to look

17   at it and he gets to testify to it?

18            MR. ROSENFELD:  Objection to this colloquy.

19            (Continued on next page...)

20

21

22

23

24

25

JO-F                        **P.O. ROSS-PEOPLE-DIRECT**

1              THE COURT:  Yes, the objection is sustained.

2     Well-stated.

3              All right.  That refreshes your recollection?

4              THE WITNESS:  Yes it, does.

5              THE COURT:  Just answer the question.

6        Q.    Can you answer the question as to the number that was

7     assigned?

8        A.    The medical examiner's number, yes.  It's B, as in boy,

9     095090.

10       Q.    And the individual that you viewed under that medical

11    examiner case number, who is that?

12       A.    The deceased, George Talarvera.

13       Q.    After making this identification at the medical

14    examiner's case -- medical examiner's office, did you have

15    anything further to do with the investigation of this case?

16       A.    Can I consult my notes?

17       Q.    Sure.

18              MR. CANTOR:  What notes, Judge?

19              THE WITNESS:  The notes of my memo book.  The

20    photocopy I have been looking at.

21              MR. ROSENFELD:  People's exhibit 9 that your Honor

22    marked.

23              THE COURT:  Yes.  Just tell us what it is again

24    and the date thereof.

25              THE WITNESS:  December 25th.

1    Q.    You don't have to show it.

2    A.    Note in my memo book, photo copy of my memo book note.

3              THE COURT:  Review, refresh and then answer as you

4    best see fit.

5              (Whereupon, the witness perused the document.)

6    A.    After leaving the medical examiner's office at

7    approximately 11:15 in the morning I returned to the

8    43rd Precinct, finished all necessary paperwork and completed my

9    assignment at exactly 12 noon.

10   Q.    That be the eve of Christmas day of December 25, 2009?

11   A.    That's correct.

12   Q.    And after that did you have anything further to do with

13   the investigation of this case?

14   A.    I did not.

15   Q.    Prior to testifying here today did you have an

16   opportunity to come to the District Attorney's Office to discuss

17   this case, review notes?

18             MR. CANTOR:  Is he testifying cause that's not a

19   question that's an explication, and I am objecting.

20             THE COURT:  I will allow it.

21   Q.    Prior to testifying in court did you have an

22   opportunity to come to the District Attorney's Office and review

23   this case with me?

24   A.    Yes, I did.

25   Q.    What items did you review?

JO-F                            **P.O. ROSS-PEOPLE-DIRECT**

1      A.     My memo book entries, photographs, the 911 tapes, crime

2      scene photos, the complaint report and the detective's follow-up

3      reports.

4      Q.     And did you have an opportunity to look at what's known

5      as the Crime Scene Unit sketch?

6      A.     Yes, I did.

7                  MR. ROSENFELD:  I ask the witness be shown

8             People's Exhibit 1 marked in evidence -- marked for

9             identification.  My mistake.

10                 THE COURT:  So deemed.

11                 MR. CANTOR:  I would like to look at

12            Identification No. 9, Judge, so I can intelligently follow

13            these proceedings.  You marked it for identification.

14                 THE COURT:  That's correct.  It was never moved

15            into evidence.

16                 MR. CANTOR:  Yeah, but he testified from it so how

17            do I know --

18                 THE COURT:  He refreshed his recollection.

19                 MR. CANTOR:  Yes.  I have to look at it to see --

20                 MR. ROSENFELD:  Objection to the colloquy.

21                 MR. CANTOR:  -- to see it before

22            cross-examination.  It's basically Hornbook law.

23                 MR. ROSENFELD:  Objection to this colloquy, your

24            Honor.

25                 THE COURT:  The objection is correct and

JO-F                     **P.O. ROSS-PEOPLE-DIRECT**

1    sustained.

2              MR. ROSENFELD:  I ask the People be -- People's

3    Exhibit 1 --

4              MR. CANTOR:  So I don't get to see it, I guess?

5              THE COURT:  Not at this moment.

6              MR. CANTOR:  But he can testify from it?

7              MR. ROSENFELD:  Objection.

8              THE COURT:  We are repeating what we went through

9    before.

10             COURT OFFICER:  Judge, show it to the witness?

11             (Whereupon, the exhibit is shown to the witness.)

12             MR. CANTOR:  This is a trial.  This is the

13   blind --

14             MR. ROSENFELD:  Objection, your Honor.

15             THE COURT:  Please.

16             MR. ROSENFELD:  This is outrageous.

17             MR. CANTOR:  This is the blind --

18             THE COURT:  Stop encumbering the record.

19             MR. CANTOR:  You know, Judge, he testifies from

20   something and I can't even look at it.

21             MR. ROSENFELD:  Your Honor, this is totally

22   improper.

23             MR. CANTOR:  It's totally proper.

24             THE COURT:  The objection is overruled.  Your

25   exception is noted.

1      Q.     Officer, look at People's Exhibit 1.  Do you recognize

2   what that is?

3      A.     Yes, I recognize it.

4      Q.     What is it?

5      A.     It's a crime scene sketch.

6      Q.     Okay.  Now, you used the word crime scene.  Do you know

7   who prepared the sketch?  Who prepared the sketch?

8      A.     The Crime Scene Unit.

9      Q.     You know who prepared the sketch?

10     A.     I do not.

11     Q.     You had an opportunity to review that sketch?

12     A.     Yes, I did.

13     Q.     Did you have an opportunity to review that sketch in

14  terms of items that are noted in terms of fix items such as

15  walls, floors, doorway area and any other fixed items?

16     A.     Yes.

17     Q.     Okay.  And does that appear to be a fair and accurate

18  sketch of the apartment with the exception of knowing distances

19  or any other measurements that are indicated on that sketch?

20     A.     Yes, it does.

21     Q.     Okay.  Does that appear to be a fair and accurate

22  sketch of approximately where the victim's body was in the

23  apartment?

24     A.     It is.

25     Q.     Does that appear to be a fair and accurate sketch as to

1      the location of the couches and the tables and the door and the

2      kitchen and the entrance to the bedroom area?

3          A.    Yes, it does.

4                    MR. ROSENFELD:   Your Honor, I would move this into

5      evidence as People's Exhibit 1 subject to connection by the

6      Crime Scene Unit.

7                    THE COURT:   Share it with Mr. Cantor.

8      VOIR DIRE EXAMINATION BY

9      MR. CANTOR:

10         Q.    Were you present when this sketch was drawn?

11         A.    No.

12         Q.    You have described on direct examination what appeared

13     to be blood on a couch, on a floor, on walls, correct?

14         A.    That's correct.

15         Q.    You are not a serologist?

16                   MR. ROSENFELD:   Objection, your Honor.   This is

17     voir dire.

18                   MR. CANTOR:   I would like to have the courtesy,

19     the common courtesy --

20                   THE COURT:   One second.

21                   MR. CANTOR:   -- of completing a question.

22                   THE COURT:   Yes, by all mean, you should have

23     that.  But now we are speaking about the admissibility of

24     this in evidence.

25         Q.    Do you see any of what appears to be blood noted on

1    this?

2        A.    Can I see the picture again?

3        Q.    No.  By virtue of your independent recollection since

4    you saw it in Mr. Rosenfeld's office.

5        A.    No.

6                  MR. ROSENFELD:  Objection, your Honor.

7        Q.    You don't, okay.  Fair enough.  And do you know when

8    this was drawn, the date?

9        A.    No.

10       Q.    And do you know whether it's drawn to scale?  If you

11   know, don't guess.

12       A.    It's an approximation, I am sure.

13       Q.    I am not interested in what you're sure.  Is it or is

14   this not drawn to scale, if you know?

15       A.    I don't know.

16                  MR. CANTOR:  I object subject to connection.  It

17           cannot come in until it is well-founded and it has a

18           foundation, evidentiary foundation.

19                  THE COURT:  Subject to connection.

20                  MR. CANTOR:  Subject to connection what?

21                  THE COURT:  Reserved on your application to

22           receive it in evidence.

23                  MR. CANTOR:  So it's not presently in?

24                  THE COURT:  It's not presently in.

25                  MR. ROSENFELD:  Your Honor, may I be heard on that

1    please, and I will explain.  May I be heard at sidebar on

2    this?

3                    MR. CANTOR:  Oh, he can be heard at the sidebar --

4                    MR. ROSENFELD:  Objection.

5                    MR. CANTOR:  -- but I can't?  On the three

6    occasions that I asked --

7                    THE COURT:  No, on the contrary.  As a matter of

8    fact, I was going to allow you to make a sidebar right now.

9                    Come forward, counselors and madame reporter.

10                   (Whereupon, the following takes place at sidebar,

11   on the record, with the presence of the defendant, out of the

12   hearing and presence of the jury.)

13                   THE COURT:  First, I will take the opportunity to

14   take the application, those comments about trial by ambush

15   and all of those kinds.  If you have those types of

16   complaints put them on the record, you don't --

17                   MR. CANTOR:  I will do that now.

18                   THE COURT:  You don't --

19                   MR. CANTOR:  I will do that now.

20                   THE COURT:  You don't insert them in front of the

21   jury.

22                   MR. CANTOR:  What I find very hard --

23                   THE COURT:  Now, we are here for several reasons.

24                   Now, firstly, the Court reserves for Mr. Cantor

25   which made -- who made its contemporaneous objection for

1    making of the record and follow-up on two occasions as the

2    Court said at inappropriate moments.  This being an

3    appropriate moment since we are here, likewise, with other

4    matters, you may now flush out that record.

5         MR. CANTOR:  Thank you.  Firstly, you allowed this

6    witness to testify that over the radio in his sector car he

7    heard a 34.  When asked what that signified the witness said

8    male stabbed.  That is rank hearsay.  From whom?  I do not

9    know.  Who is the author of that comment?  I do not know.

10   What knowledge that author and that comment had?  I do not

11   know.  There -- that is pure rank hearsay.  The outcome in my

12   application presently is that you strike it and inform the

13   jury to disregard it; that's firstly.

14        THE COURT:  Okay.  Now, hold on.  What do you wish

15   to say, if anything, on that?

16        MR. ROSENFELD:  People are allowed to bring that

17   information that explains the police officer's action in

18   responding to a call and what the call is.  It's legitimate

19   evidence to explain why they were at one location and went to

20   another location and what information they had received.

21        MR. CANTOR:  The balance of the witness' answer

22   showing that he was there is at the scene of mayhem and

23   perhaps murder.  So when you have this coming in before he

24   even arrives and makes any visual observations, 34 in

25   progress, male stabbed, that's hearsay.  I didn't object to

1    what he saw.  I didn't object to that at all, and any of my

2    statements concerning pictures were without objections.  You

3    should not let that in.  It's rank hearsay.  Why does it come

4    in?

5                 THE COURT:  The Court adheres to its earlier

6    determination and notes your exception.

7                 Now, the second.

8                 MR. CANTOR:  I will go to the second, okay.

9                 Secondly, you don't have this witness, who is not

10   an expert and not qualified in serology, and I objected once

11   or twice, and in my voir dire have suggested that what he saw

12   by way of red stain had the appearance of blood.  He should

13   not be allowed to testify that there were pools of blood on

14   the floor, blood on the wall, blood on the couch.  He can

15   certainly testify that what he saw was red and had the

16   appearance of blood, but he is not a serologist, and what is

17   like on the ground of competency all of this testimony is

18   that it was blood.  I mean, you instruct the jury that he is

19   not competent to testify as not being a serologist or any

20   sort of blood expert.

21                THE COURT:  What do you wish to say?

22                MR. ROSENFELD:  I think that is a type of

23   observation that any lay person can make.  This officer,

24   certainly based upon his experience, his response to crime

25   scene and knowledge, and I tried to ask a couple of questions

1    about that, but your Honor sustained an objection about his

2    experience, he indicated based on his experience that it

3    appeared to be blood.  I think that's a fair and appropriate

4    answer.

5              THE COURT:  The Court adheres to its earlier

6    determination and notes your continuing exception.

7              All right.  Now --

8              MR. CANTOR:  The most outrageous -- thirdly, the

9    most outrageous error that you have allowed to be perpetrated

10   by the People over my objection is not the fact that this

11   witness spoke to civilians at the scene, that's perfectly

12   admissible.  But it's what the civilian told him and what he

13   in term imparted over the radio as a description of the

14   perpetrator.  Male, Hispanic, tattoos.

15             Now, you know my client is male, you know he is

16   Hispanic, and you have viewed pictures of the lineup and you

17   know that he has tattoos.  That is rank hearsay.

18             How can you allow the People to have this officer,

19   after conversations with unidentified individual or

20   individuals testify that based upon those conversations or

21   conversations he transcribed a description male, Hispanic

22   with tattoos.  I can't -- that's my right of confrontation.

23   It's totally abridged.  Totally.

24             MR. ROSENFELD:  First of all, he can cross-examine

25   the officer on the information.  However, the propriety of

JO-F                    **PROCEEDINGS**

1    the officer -- what's the word?  Not announce.  The word is

2    dispatching or sending out a description of the perpetrator

3    received at the crime scene is perfectly proper in evidence.

4              THE COURT:  Yes.

5              MR. ROSENFELD:  Explains the police's action and

6    reaction.

7              THE COURT:  The Court continues with its earlier

8    determination.  The Court incidentally does not know if he

9    has tattoos, but that's not of the moment.

10             MR. CANTOR:  Well, excuse me, Judge.  The People

11   know that he has tattoos.  And any other proponent of that

12   question, most outrageously I am in the dark here.  This

13   witness says, I cannot answer a question without referring to

14   something.

15             MR. ROSENFELD:  The witness didn't say that.

16             MR. CANTOR:  The witness said, I need to refresh

17   my recollection.  And I would appreciate not being

18   interrupted by this prosecutor at this time or at any time.

19   In any event, you let him look at the document, which

20   according to your rules anyone that uses a document to

21   refresh their recollection would be marked for

22   identification.  This one was marked or deemed marked 9.  I

23   am sitting there, and I don't know what's on 9.  I can hear

24   what he says, but how can I challenge him on

25   cross-examination concerning the subject matter that appears

JO-F                                **PROCEEDINGS**

1     in People's No. 9 for identification unless I have an

2     opportunity to see it.

3              THE COURT:  Well, let me --

4              MR. CANTOR:  Any Court who allows a witness --

5              MR. ROSENFELD:  Your Honor, may I ask to keep his

6     voice down.  The jury clearly hears all this, Judge.

7              MR. CANTOR:  Judge, any Court that allows a

8     witness to refresh his or her recollection by way of a

9     document has permitted intelligently for me to represent my

10    client to see that document.  That may be varied between the

11    testimony that this witness is giving --

12             MR. ROSENFELD:  Judge, his voice is up.  Keep your

13    voice down.

14             MR. CANTOR:  -- after refreshing his recollection,

15    and there may be a contradiction on the document.  You are

16    keeping me in the dark.  I don't know what to do.

17             MR. ROSENFELD:  May I be heard, your Honor.  The

18    witness said it was the police identification or body

19    identification of which Mr. Cantor has a copy of or known

20    about it for years.  Certainly has it in his file.  I gave it

21    to him.

22             MR. CANTOR:  I want to see --

23             THE COURT:  You can use it on cross-examination

24    should you wish to use it at a later time.

25             MR. CANTOR:  I want what the witness used.

JO-F                    **PROCEEDINGS**

1          THE COURT:  However, what the witness used was for

2     the purpose --

3          MR. CANTOR:  -- of refreshing his recollection.

4          THE COURT:  That's correct.  It was not proffered

5     into evidence.

6          MR. CANTOR:  No.

7          THE COURT:  But when something is proffered into

8     evidence then that's the opportunity for counsel.

9          MR. CANTOR:  To review.  I am puzzled.  This to

10    you, Judge, he testifies after reviewing document, does he

11    not?

12          THE COURT:  He does.

13          MR. CANTOR:  What happens if the material on the

14    document which I have not been allowed to see so far is

15    contrary to his verbal testimony then I can't call him to

16    account on him?

17          THE COURT:  On cross-examination, yes.

18          MR. CANTOR:  But I would like to see the document

19    presently.

20          THE COURT:  Well, apparently you have the

21    document.

22          MR. CANTOR:  No, no.  I want to see --

23          THE COURT:  Over and above that.

24          MR. CANTOR:  -- what he views.

25          THE COURT:  If the document is not proffered into

1      evidence --

2                    MR. CANTOR:  That's wrong.  I am allowed to see

3      any document marked for identification so I can test the

4      witness' answer that's forthcoming based upon his or her

5      review of that document.

6                    THE COURT:  Hold on, okay.  What do you wish to

7      say on that legal?

8                    MR. ROSENFELD:  Nothing further.  He has the copy

9      of it.  Same copy.  Same document.

10                   MR. CANTOR:  I don't take anyone's word for it.  I

11     want to see --

12                   THE COURT:  If you can get it, that's good.

13                   MR. CANTOR:  Well, I can only get it if you give

14     me permission.

15                   THE COURT:  Of course.  Of course.  I maintain my

16     earlier determination and your exception is noted.

17                   MR. CANTOR:  Let me ask you this, Judge, as an

18     Officer of the Court are you not, in doing that, disallowing

19     me or prohibiting me from cross-examining this witness

20     concerning any errors I might discover in terms of his verbal

21     testimony and the document which has been used to refresh his

22     recollection?

23                   THE COURT:  No.  As you just stated you will have

24     that opportunity at cross-examination.

25                   MR. CANTOR:  So I will see the document?

1          THE COURT:  And that document is already in your

2      possession, but should it not be --

3          MR. CANTOR:  No, I want to look at what the

4      witness looked at.

5          THE COURT:  Should it not be, I am sure we will

6      get another one from the District Attorney.

7          MR. CANTOR:  I want the one he used, the witness

8      used.  I am entitled to that.  He testified based to that.

9          THE COURT:  Okay.  Anything further you wish to

10     say?

11         MR. CANTOR:  Can I have that on cross-examination?

12         THE COURT:  On cross-examination it's a different

13     story.

14         MR. CANTOR:  All right.

15         THE COURT:  Okay.  You have anything to add

16     Mr. Rosenfeld?

17         MR. ROSENFELD:  Why did we come up?  No, sorry.

18     When we approached --

19         THE COURT:  It was very elongated.

20         MR. ROSENFELD:  It was very elongated.

21         When we approached for this case, that's why we

22     came up here, your Honor, we attempted to have

23     Detective Florio to testify as our first witness here, and

24     your Honor is aware because of scheduling problems that he is

25     away this week on vacation.  I would have introduced the

JO-F                          **PROCEEDINGS**

1    sketch through him and he will finish subject to connection

2    as to scale distance and all the things on there.

3              THE COURT:  Yes.

4              MR. ROSENFELD:  But for purposes of using for

5    display for witnesses to able to point at locations in the

6    apartment, I'd ask that this sketch be admitted subject to

7    connection by the detective.  That's what he will be using to

8    where items are located in the apartment on the sketch not

9    for -- let me finish.  Not for distances or not for any other

10   numbers or things that are on there.  Just for location of

11   fix items in the apartment sketch.

12             MR. CANTOR:  You have ruled.  I trust that you

13   will adhered to each and every ruling without making this

14   application at the sidebar.

15             MR. ROSENFELD:  Will you let me hear.

16             MR. CANTOR:  He can't hear.  Well, you want me to

17   raise my voice?  First he says I am too loud.  Now he says

18   too low.

19             THE COURT:  You love these stage plays.  I do not

20   tolerate them.  I give you lots of latitude.

21             MR. CANTOR:  You've ruled on the admissibility of

22   that sketch.

23             THE COURT:  Yes.

24             MR. CANTOR:  You said not coming in presently.

25             THE COURT:  That's what I said subject to

1    connection.

2              MR. CANTOR:  Okay.

3              THE COURT:  Now, I could have very easily said we

4    will admit it subject to connection.

5              MR. CANTOR:  But you did not.

6              MR. ROSENFELD:  I am asking you to reconsider.

7              THE COURT:  I did not say it that way, and as long

8    as he has the other witnesses to come and testify as to what

9    he wishes to obtain from the use of that sketch then that's

10   why my ruling will stay as it is.  However, if he says to me

11   that all of a sudden they decide not to have, for instance,

12   that other officer come and only I can work through this then

13   I might revise my determination.

14             MR. CANTOR:  But --

15             THE COURT:  But I am not revising it at this

16   point.

17             MR. CANTOR:  But your ruling is not coming in

18   presently; is that correct?

19             THE COURT:  That's correct.

20             MR. CANTOR:  Fine.  I have nothing to argue about.

21             MR. ROSENFELD:  Your Honor, I was going to use

22   this with my other civilian witnesses.

23             THE COURT:  Yes.

24             MR. ROSENFELD:  Detective is not testifying until

25   next week.

1              THE COURT:  I think I will adhered to my earlier

2       determination that at the appropriate time you can reapply to

3       have it moved into evidence, okay.

4              (Whereupon, the following takes place on the

5       record, in open court, in the hearing and presence of the

6       jury.)

7              THE COURT:  Let us continue.

8              MR. ROSENFELD:  People have no further questions.

9       Thank you, officer.

10             THE COURT:  Thank you.  Mr. Cantor, your witness.

11             MR. CANTOR:  I don't want to stand on stop of the

12      witness when I question out of the respect to his office.

13             THE COURT:  Thank you.

14      CROSS-EXAMINATION BY

15      MR. CANTOR:

16      Q.     Officer, do you have with you People's 9 for

17      identification?  You were asked questions about a body ID at the

18      ME's Office and you refreshed your recollection from that?

19      A.     Do you mean do I have it right now?

20      Q.     Yeah.

21      A.     No.

22      Q.     No?  Well, where did you get it from?  You looked at

23      something when you were being questioned about, about an

24      identification at the ME's Office, a body identification, you

25      gave a number, case number; do you remember that?

1    A.    That's when I had it to look at it.

2    Q.    Okay.  So where is it?

3    A.    Where is the copy?

4    Q.    Where is what you looked at?

5    A.    It's right over there.

6    Q.    Right over where?

7    A.    Right next to the ADA.

8         MR. CANTOR:  I'd like to have that, Judge.

9         MR. ROSENFELD:  May the record indicate I am

10   showing to the witness -- to defense counsel what the witness

11   used to refresh his recollection known as People's Exhibit 9

12   not in evidence marked for identification.

13        (Whereupon, the document is shown to counsel.)

14        THE COURT:  Yes, thank you for your courtesy.

15   Very good.

16   Q.    You gave a name to the body that you saw at the Medical

17   Examiner's Office, did you not?

18   A.    Yes.

19   Q.    When you looked at the Department of Health Office of

20   Chief Medical Examiners --

21        MR. ROSENFELD:  Objection.  The item is not in

22   evidence.  Can't be referred to since not in evidence.

23        MR. CANTOR:  I haven't even begun the question,

24   begun it and he is up.

25   Q.    First of all --

1          THE COURT:  Let me hear the question.

2          MR. CANTOR:  First of all, this has to be

3    literally marked for identification as No. 9.

4          THE COURT:  We have already done that.

5          MR. CANTOR:  No, you haven't done that.

6          THE COURT:  It was deemed --

7          MR. CANTOR:  It was deemed.  Has to be marked for

8    identification.  There is no marking on it, your Honor.

9          THE COURT:  All right.  At the appropriate time.

10          MR. CANTOR:  Can it be marked now?

11          THE COURT:  It could, but I said it should be

12    marked with everything else at the close of the session, and

13    I expect counsel, whether it be yourself or Mr. Rosenfeld, to

14    do that.

15    Q.    You used the name, did you not?  I can't hear you, sir?

16    A.    Which name.

17    Q.    The deceased?

18    A.    Yes, I used the name.

19    Q.    Does that name appear on what has been marked as

20    People's 9 for identification?

21    A.    I don't know.  I would have to look at the form again.

22    Q.    Please take a look at it.

23          (Whereupon, the document is shown to the witness.)

24    A.    I am looking at the ME form to refresh my memory.

25    Q.    Sir, the only question to you is please look at it.

1   After you've looked at it, tell me when you've completed looking

2   at it.

3       A.   I have now completed looking at the form.

4       Q.   Do you see the name of the deceased on that form?

5            MR. ROSENFELD:  Objection.  The item is not in

6   evidence, your Honor.

7            THE COURT:  I will allow the question.

8       Q.   Did you see the name of the deceased on People's No. 9

9   for identification?

10      A.   I did not.

11      Q.   Yet you used the name, did you not?

12      A.   Yes, I did.

13      Q.   And where did you gather that information as to the

14  appropriate name of the deceased, did someone tell you that?

15      A.   I looked at his identification.

16      Q.   I cannot hear you, sir.

17      A.   I looked at his identification at the crime scene.

18      Q.   You did?

19      A.   Yes.

20      Q.   That identification was in a wallet?

21      A.   I don't recall.

22      Q.   What?  Was it in a pocket of any garment that he was

23  wearing?

24      A.   It could have.  I don't recall.

25      Q.   But somehow you came to gain identification of the

1    body?

2         A.    Yes.

3         Q.    By looking at something?

4         A.    Yes.

5         Q.    That was on the person of the body, correct?

6         A.    That's correct.

7         Q.    But you can't tell this jury the circumstances under

8    which that happened, can you?  I am waiting.

9         A.    No, I don't recall.

10        Q.    When you gave that information, however you gained that

11   information, did you write it down in your memorandum book?

12        A.    No.

13        Q.    Was that information, namely in the name of the

14   deceased, fed to you, told to you by Mr. Rosenfeld?

15        A.    No, it wasn't.

16        Q.    How many times have you spoken to Mr. Rosenfeld either

17   over the telephone or in person concerning the subject matter of

18   this case?

19        A.    Approximately five times.

20        Q.    And are any of those five times that you spoke to

21   Mr. Rosenfeld did he tell you the name of the deceased?

22        A.    Did he directly tell me?

23        Q.    Did he directly tell you the name of the deceased, of

24   course?

25        A.    I don't recall.  He might of.  I don't recall.

1      Q.     I don't want you to get --

2                    MR. ROSENFELD:  Objection, your Honor.

3                    MR. CANTOR:  I haven't even begun the question.  I

4      would like the common courtesy of completing it.

5      Q.     Do you have any firm and certain recollection of

6      Mr. Rosenfeld telling you the name of the deceased?

7      A.     No, I don't.

8      Q.     Okay.  And this was a crime scene that you were present

9      at some 29 months ago approximately, correct?

10     A.     Yes.

11     Q.     How you came to take the identification from the body

12     of the deceased you cannot remember and now you do in this

13     Court, 29 months later on direct examination, recite the name of

14     the deceased, correct?

15     A.     That's correct.

16     Q.     Can you recite it again?

17     A.     George Talarvera.

18     Q.     You don't know how -- well, you do know how you gained

19     that, you looked at something that had that name on it that was

20     associated with the body?

21     A.     That's correct.

22     Q.     The circumstances under which you can't recall,

23     correct?

24     A.     That's correct.

25     Q.     Now, you've looked at a scene --

1           MR. CANTOR:  And can I have every single

2    photograph that has been received in evidence, Judge?

3           THE COURT:  You may.

4           MR. ROSENFELD:  Counsel, that is all over there

5    for counsel.

6           MR. CANTOR:  They are all over?

7           MR. ROSENFELD:  Where you are standing.

8           MR. CANTOR:  I am not standing on a table.  I am

9    standing on a floor, Judge.

10      Q.    Now, this scene -- and we have all the scene, the

11   pictures of it on the screen, and where you were kind to point

12   it out in vivid detail.  This was a scene in what apartment

13   number?

14      A.    Apartment 3D, D as in David.

15      Q.    Would it be a fair characterization to say that the

16   interior of 3D was in a state of disarray?

17      A.    That would be a fair characterization.

18      Q.    Articles of furniture, beer cans, plastic jugs, a body,

19   what appeared to be a blood on a couch, what appeared to be

20   blood on a floor, what appeared to be blood on a ceiling, these

21   were all consistent and I think you described it earlier as a

22   chaotic situation?

23      A.    That's a fair characterization, yes.

24      Q.    Do you know the names of the people that you put out a

25   transcription -- a transmission -- do you know -- withdrawn.

1           Do you know the name that the deceased commonly went

2    by, he didn't go commonly by his name, his actual first and last

3    name, it was a name that people who knew him referred to him as.

4    Do you know that?

5           A.    No, I didn't know him personally.  So I wouldn't know.

6           Q.    No, not personally.  By speaking to anyone at the scene

7    or by interacting with any of your brother officers, do you know

8    what he was called commonly?

9           A.    I don't recall.  I don't know.

10          Q.    Okay.  After you removed the ID from the deceased, did

11   you place it back where you found it?

12          A.    I don't recall.

13          Q.    Now, people I am talking about -- people spoke to you.

14   As a result of these people speaking to you, you put out a radio

15   transcription of male, Hispanic, tattoos, correct?

16          A.    That's correct.

17          Q.    Do you know the name or names of the people who gave

18   you that?

19          A.    I just know that they were people at the scene.  I

20   don't recall their names.

21          Q.    Well, do you know how many, by number, was it one, two,

22   three, four, five?

23          A.    I don't recall.  I will give you an approximation, but

24   I can't give you an exact number.

25          Q.    So one or more person had told you male, Hispanic,

JO-F                          **P.O. ROSS-PEOPLE-CROSS**

1   tattoos?

2        A.    That's correct.

3        Q.    And you put out that radio transmission?

4        A.    That's correct.

5        Q.    Did you say in the radio transmission where the tattoos

6   were located?

7        A.    I don't recall.

8        Q.    Did you say anything about the age of the male,

9   Hispanic?

10       A.    I don't recall.

11       Q.    Did you say anything about facial hair of the male,

12   Hispanic?

13       A.    I don't recall.

14       Q.    Did you say anything about the height or weight of the

15   male, Hispanic?

16       A.    I don't recall.

17       Q.    Did you say anything -- I don't know if I asked you

18   this, but you will correct me about the skin tone, light,

19   medium, dark of the male, Hispanic?

20       A.    I don't recall exactly.

21       Q.    So here you are, you and your partner, the first

22   officers at the scene, primary function to observe the scene and

23   safeguard the scene and secure it, its integrity, correct?

24       A.    That's correct.

25       Q.    And now you are getting a description of an alleged

JO-F                    **P.O. ROSS-PEOPLE-CROSS**

1    perpetrator, correct?

2         A.    That's correct.

3         Q.    From whom you don't recall, you never marked down their

4    names; am I correct?

5         A.    That's correct.

6         Q.    Any further descriptions beyond male, Hispanic, tattoos

7    you didn't get?  Can't hear you?

8         A.    That's correct.

9         Q.    Okay.  You've answered the question.  Place of the

10   tattoos, you didn't get?

11        A.    No.

12        Q.    When you went to the ME's office did you actually see

13   the body of the deceased or a picture of the deceased?

14        A.    I saw the body.

15        Q.    Did anyone at the ME's office tell you the name of the

16   deceased, if you recall?

17        A.    I don't recall.

18                   (Cont'd onto the next page.)

19

20

21

22

23

24

25

People - P.O. ANDRE ROSS - cross

802

1    Q.   There were people:  Men, women and children in the

2  hallway as you first arrived outside of 3D, correct?

3    A.   That's correct.

4    Q.   There were men, women and children in the back bedroom

5  and by the sofa when you first entered, correct?

6    A.   That's correct.

7    Q.   And do you have any of the names of the people who

8  were there in the hallway or inside of the apartment by the sofa

9  or in the back bedroom?

10   A.   In my possession, no.

11   Q.   In your memory?

12   A.   No.

13   Q.   Did you ever write them down?

14   A.   I don't recall, I might have.

15   Q.   I am not asking for your guess, I am asking if you

16 have any certain --

17   A.   No, I don't have --

18   Q.   -- exact memory of writing it down?

19   A.   An exact memory, no, I don't.

20   Q.   So would it be fair to say that your essential duty at

21 the scene was merely to safeguard the integrity of any evidence

22 or potential evidence; would that be a fair statement?

23   A.   That's a fair statement.

24   Q.   And the rest of the investigation would go on with

25 detectives who are specialized in investigating homicides and

G-ljb

People - P.O. ANDRE ROSS - cross

1   other violent felonies; would that be a fair statement?

2        A.   That's a fair statement.

3        Q.   Didn't you think it important since you had seen the

4   body of a man who you knew was deceased, you had assessed that,

5   didn't you think it important to take names of prospective

6   witnesses and synopsis, meaning a summary of what they had to

7   say by way of what they saw previously; did you think that

8   important?

9        A.   It's not my job to write a synopsis of what is going

10  on.

11       Q.   No?

12       A.   That's a detective's job.

13       Q.   You are there just to observe and safeguard?

14       A.   That's a detective's job.

15       Q.   Right, were you a frozen statute?

16            MR. ROSENFELD:  Objection, your Honor.

17            THE COURT:  As to the comment, yes.

18       Q.   The question still remain -- you've answered it.  You

19  said it's not your job to interview and take down the names,

20  addresses of witnesses, correct, that's what you said?

21       A.   You asked me a synopsis.

22       Q.   Son, is that what you said, that's the question?

23            MR. ROSENFELD:  Your Honor, the witness answered

24       it.

25            MR. CANTOR:  No, he didn't.

People - P.O. ANDRE ROSS - cross

804

1  Q.   Did you say in this court under oath that it wasn't
2  your job to take down the names and address of prospective
3  witnesses or actual witnesses and a summary of what they saw?
4  A.   I believe, sir, with all due respect, you are
5  rephrasing the question, that's not what you asked me.
6  Q.   Did you say by way of answering it that's not your
7  job, did you utter that phrase in court here today?
8          MR. ROSENFELD:  Objection, your Honor.
9  Q.   "Yes" or "No"?
10 A.   You asked --
11         MR. ROSENFELD:  Sir --
12         MR. CANTOR:  Sir --
13         THE COURT:  I will allow the question.
14 Q.   That's the only question, did you utter the phrase
15 "it's not my job?"
16 A.   I said --
17         MR. ROSENFELD:  Objection.
18         MR. CANTOR:  "Yes" or "no"?
19 A.   I said the phrase.
20         MR. ROSENFELD:  Your Honor, may the witness
21     please answer?
22 Q.   "Yes" or "no", did you utter the phrase, "it's not my
23 job", "yes" or "no"?
24         MR. ROSENFELD:  Objection.
25         THE COURT:  "Yes" or "no"?

G-ljb

People - P.O. ANDRE ROSS - cross

805

1    A.   Yes, I uttered that phrase.

2              MR. CANTOR:   I have no further questions of this

3    good witness, your Honor.

4              THE COURT:   Mr. Rosenfeld?

5    REDIRECT EXAMINATION

6    BY MR. ROSENFELD:

7    Q.   In regards to defense counsel's last question were you

8    trying to explain something?

9              MR. CANTOR:   I object to that form of the

10   question, it's opened ended.

11             THE COURT:   Yes, but you may rephrase it.

12             MR. ROSENFELD:   Sure.

13   Q.   Defense counsel just referred to an answer, it's not

14   my job, what are you referring to?

15             MR. CANTOR:   Objection, it speaks for itself.

16             MR. ROSENFELD:   This is redirect.

17             THE COURT:   Overruled.

18             MR. CANTOR:   Judge --

19   A.   The gentleman asked me if it was my job to give a

20   synopsis of the case, it is not my job.  It is my job to

21   safeguard the crime scene and transmit a description.  It's not

22   my job to give a synopsis of what occurred, that's not my job.

23   Q.   And with whom were you present at the crime scene, you

24   indicated other police personnel arrived and detectives arrived?

25   A.   That's correct.

G-ljb

People - P.O. ANDRE ROSS - redirect

806

1     Q.   Were you -- did you observe these other -- these

2  detectives or other police personnel interviewing witnesses?

3     A.   Yes, I did.

4     Q.   And later on did you have to fill out paperwork?

5     A.   Yes, I did.

6     Q.   And in order to fill out that paperwork did you have

7  to give out information?

8               MR. CANTOR:  I object, this is outside --

9               MR. ROSENFELD:  Your Honor --

10              MR. CANTOR:  I can't even voice an objection?

11              THE COURT:  Subject to connection.

12              MR. CANTOR:  Subject to what connection, it's

13  outside the scope?

14              THE COURT:  We will see.  We will see.

15     Q.   Later on you have to fill out police paperwork?

16     A.   Yes.

17     Q.   And where did you get the information to fill --

18              MR. CANTOR:  Outside the scope of redirect.

19              MR. ROSENFELD:  Subject to connection, your

20  Honor.

21              THE COURT:  I will allow it.

22     A.   My partner, the other detectives at the scene.

23     Q.   Okay.  Now, Officer, you mentioned before when asked

24  by Mr. Cantor about first obtaining the name of the deceased.

25     A.   Yes.

G-ljb

People - P.O. ANDRE ROSS - redirect

807

1    Q.    Okay.  And you had a memo book?

2    A.    Yes.

3    Q.    And do you know for certain whether or not you wrote

4    anything down in your memo book concerning the name of the

5    deceased?

6              THE WITNESS:  Can I consult my memo book?

7              THE COURT:  Yes, you may, of course.  Just tell

8    us again what it is your looking at.

9              THE WITNESS:  It's a copy of my memo book entries

10   for that date.

11             MR. CANTOR:  That has been marked eight for

12   identification, Judge.

13   A.    And right on the bottom --

14   Q.    Just indicate whether or not you made a notification.

15   A.    I did make a notification in my memo book about the

16   deceased's name.

17   Q.    About what time was that; if you recall?

18   A.    About 28 hours in the morning.

19   Q.    Before Mr. Cantor asked you the question about writing

20   in your memo book you indicated you did not write anything down;

21   what's the final answer?

22   A.    I did write it down after consulting my notes.

23   Q.    No, further questions.

24             THE COURT:  Mr. Cantor?

25   RECROSS EXAMINATION

G-ljb

People - P.O. ANDRE ROSS - recross

808

1   BY MR. CANTOR:

2       Q.    Sir, you just made a mistake, common, ordinary mistake

3   when you said you didn't write it down?

4       A.    That's correct.

5       Q.    After all, we are all human, we all make mistakes,

6   correct?

7       A.    That's correct.

8       Q.    So, when you wrote that down you got that off the Id

9   of the deceased, correct?

10      A.    I don't recall exactly.

11      Q.    Well, you told us that you extracted some Id. from the

12  deceased; you remember telling us that?

13                  MR. ROSENFELD:  Objection, asked and answered.

14                  THE COURT:  No, I will allow it.  Overruled.

15      Q.    You remember telling us that "yes" or "no"?

16      A.    Yes.

17      Q.    The circumstances of which you could not tell us; am I

18  correct?

19      A.    That's correct.

20      Q.    And whether you put the Id. back and where you put it

21  back you could not tell us, correct?

22                  MR. ROSENFELD:  Objection, outside the scope of

23          redirect.

24                  THE COURT:  No, I will allow it.

25      Q.    Correct?

                                                            G-ljb

People - P.O. ANDRE ROSS - recross

809

1    A.    That's correct.

2              MR. CANTOR:   I have no further questions, your

3    Honor.

4              THE COURT:   Nothing?

5              MR. ROSENFELD:   Nothing further.

6              Thank you, Officer Ross.

7              THE COURT:   Officer, thank you, you may stand

8    down.   You are excused, thank you.

9                   (Whereupon the witness is excused.)

10             THE COURT:   Please approach.

11             (Whereupon there is an off-the-record

12   discussion.)

13             THE COURT:   Madam Forelady, ladies and gentlemen

14   of the jury, that completes our witnesses for today.   You

15   may recall from when we were on the voir dire we are not in

16   session tomorrow on this case.   You are free to return to

17   work or do whatever you think you should be doing.   It is

18   not a jury day, there will be no jury compensation nor is

19   there any jury requirements so I will leave it to your best

20   judgment.

21             Wednesday morning please be here sharp 9:30.

22   9:30 right outside the doors on Wednesday morning we will

23   continue with our witnesses.

24             Have a pleasant afternoon.   Have a pleasant

25   tomorrow.   We will see you on Wednesday outside these doors

G-1jb

810

1      9:30.

2              Remember the cautions.  You are excused, follow

3      the officers.

4              (Jury exits.)

5              THE COURT:  The jury having been excused we will

6      see each other on Wednesday.

7              MR. ROSENFELD:  What time would you like us here,

8      your Honor?

9              THE COURT:  I told them 9:30, 9:45 to give the

10     sergeant time to bring up the gentleman, Mr. Delgado.

11             Counselors, approach, please.

12             (Whereupon there is an off-the-record

13     discussion.)

14             (Whereupon the trial is adjourned to Wednesday,

15     June 27, 2012 at 9:45 a.m.)

16

17

18

19

20

21

22

23

24

25

G-ljb

811

1   SUPREME COURT OF THE STATE OF NEW YORK

2   COUNTY OF BRONX:  CRIMINAL TERM:  PART T14
    - - - - - - - - - - - - - - - - - - - -
3   THE PEOPLE OF THE STATE OF NEW YORK,

4                                   Indictment No.

5            -against -               27/2010

6   DAVID DELGADO,                    **PROCEEDINGS**

7                      Defendant.
    - - - - - - - - - - - - - - - - - - - -
8                             265 East 161st Street
                              Bronx, New York 10451
9                             June 27, 2012

10  B E F O R E:

11            THE HONORABLE  DOMINIC R. MASSARO,

12                         J U S T I C E and jury

13            (Appearances as previously noted.)

14                 *    *    *    *    *

15            (Out of the presence of the jury.)

16            THE COURT:  Good morning.

17            MR. ROSENFELD:  Good morning.

18            MR. CANTOR:  Good morning.

19            THE COURT:  Mr. Clerk.

20            COURT CLERK:  This is the case on trial People of

21      the State of New York against David Delgado.  Let the

22      record reflect the presence of the District Attorney's

23      office, the defense attorney.  The defendant is not

24      produced and jurors are not in the courtroom at this time.

25            THE COURT:  The Court is in receipt of an

                                                        A-1jb

PROCEEDINGS

812

1  undelivered defendant's notice and on further information

2  obtained and collected by the clerk it looks like

3  Mr. Delgado will not be produced today because of some lock

4  down that has occurred in Rikers Island over an unrelated

5  matter.  So...

6          MR. CANTOR:  Shall we go visit the facility?

7          THE COURT:  You are welcome to it.

8          MR. CANTOR:  Your Honor, has statewide

9  jurisdiction.

10         THE COURT:  I know we can convene there; that is

11 correct.  Perhaps one day I will entertain such a move, but

12 today is not that day.  So it's now practically --

13         MR. CANTOR:  Judge, the DA --

14         THE COURT:  -- 11:30, we have been waiting two

15 hours and now we received this official notice.

16         MR. CANTOR:  Okay.  Subject to your approval, my

17 client is not here.  The DA says that he is perfectly

18 willing for my edification to play the redacted crime scene

19 video and the redacted Q and A taken by the assistant

20 district attorney.  That Will satisfy me -- assuming it

21 satisfies me, but we'll have a need and the D.A. recognizes

22 it and agrees to it, we will have a need to redo it for

23 purposes of my client's viewing it.

24         THE COURT:  Well, this actually was on for the

25 Court to review.

A-ljb

**PROCEEDINGS**

813

1      MR. CANTOR:  No, I know.

2      THE COURT:  Needless to say.

3      MR. CANTOR:  And now we have to see that it is --

4  it strictly adheres.

5      THE COURT:  We are going to see that if a few

6  moments.

7      MR. CANTOR:  Okay but he has to see it.  He has

8  to see it and the DA recognizes that and is willing to play

9  that again.

10      THE COURT:  Fine.

11      MR. CANTOR:  Okay.  Fine.  I'm ready to see it.

12      THE COURT:  All right let's view it.

13      MR. ROSENFELD:  May I be heard, Judge?

14      THE COURT:  Yes, of course.

15      MR. ROSENFELD:  Perhaps, I believe the jury is

16  sitting here waiting to see what happens today.  I

17  recommend to the Court at this point we at least let them

18  go since, since there is no purpose in them sitting in that

19  small room for two hours.

20      THE COURT:  Right, after.

21      MR. CANTOR:  Then we can all leave and it can be

22  an empty courtroom and you can deal with it because I don't

23  want the jury to see an empty seat.

24      THE COURT:  That's fine.  All I want them to see

25  is a empty --

A-ljb

**PROCEEDINGS**

814

1    MR. CANTOR: I still don't want them to see an

2    empty chair so we will all vacate with your permission.

3    THE COURT: That's fine.

4    MR. CANTOR: Fine.

5    THE COURT: Is that all right with you,

6    Mr. Rosenfeld?

7    MR. ROSENFELD: Fine, your Honor.

8    Now, first thing the People had the crime scene

9    tape marked as People's Exhibit seven for identification.

10    THE COURT: Yes, sir.

11    MR. ROSENFELD: We played it for the Court and

12    defense attorney and the defendant and there were certain

13    objections made by the counsel, agreed to by the Court and

14    you requested that my office redact certain portions of

15    People's Exhibit seven.

16    THE COURT: That is correct.

17    MR. ROSENFELD: So I will ask --

18    MR. CANTOR: You ordered, you didn't request.

19    MR. ROSENFELD: Direct.

20    THE COURT: Yes, that's correct.

21    MR. ROSENFELD: Whichever word. We now have a

22    CD, I would ask be deemed marked People's Exhibit 7A.

23    MR. CANTOR: For identification.

24    THE COURT: 7A it is.

25    MR. ROSENFELD: For identification at this point.

A-ljb

**PROCEEDINGS**

815

1          THE COURT: For identification.

2          MR. CANTOR: Which one is that?

3          MR. ROSENFELD: Crime scene unit CD will be 7A

4     for identification, that's the redacted version.

5          THE COURT: Okay. You want to mark this 7A; what

6     is going to be seven?

7          MR. ROSENFELD: Seven is the original.

8          MR. CANTOR: Unredacted.

9          MR. ROSENFELD: Unredacted.

10          THE COURT: Okay.

11          MR. ROSENFELD: Crime scene unit video that we

12     saw the other day. So we are dealing with 7A, okay.

13          THE COURT: Very good.

14          MR. ROSENFELD: Would you like us to play it now?

15          THE COURT: Yes.

16          MR. ROSENFELD: May the record reflect that the

17     People are playing People's Exhibit 7A.

18          (The video is played at this time.)

19          MR. CANTOR: Well, the narrative shouldn't be

20     part of the exhibit, Judge. I assume that when it's played

21     the narrative can be lowered so no one hears it.

22          Do you want me, Judge, if I see something I

23     object to?

24          THE COURT: Yes.

25          MR. CANTOR: At that very point?

A-1jb

**PROCEEDINGS**

816

1       THE COURT: Yes, I think any of us can feel free

2   to do that.

3       MR. CANTOR: Okay. Was that allowed, Judge, that

4   portion?

5       THE COURT: Yes.

6       MR. CANTOR: It was?

7       THE COURT: Yes.

8       MR. CANTOR: The portion I am referring to shows

9   the deceased body, but from a distant.

10      THE COURT: That's correct.

11      MR. CANTOR: Of about ten feet I would imagine.

12  Lying on a floor with blood on the floor and underneath,

13  blood on the wall. Once again it shows the deceased from a

14  good ten feet away on the floor bloody floor, splattered

15  blood on the walls. To which I have objected earlier on

16  both occasions.

17      MR. ROSENFELD: Let the record indicate that

18  People's Exhibit 7A has been played in its entirety.

19      THE COURT: The Court finds it in conformance

20  with --

21      MR. CANTOR: I'm sorry.

22      THE COURT: The Court finds it in conformance

23  with its earlier direction.

24      MR. CANTOR: Okay.

25      THE COURT: Thank you, Mr. District Attorney.

A-ljb

PROCEEDINGS

817

1          MR. CANTOR:  But I do ask that the verbiage that
2     we hear for about 10, 15 seconds before --
3          THE COURT:  Yes.
4          MR. CANTOR:  -- that that not be played.
5          MR. ROSENFELD:  Your Honor, the verbiage is
6     merely the person taking it identifying himself, the
7     location and the time, I think that is relevant.  I don't
8     see why that should be excluded?
9          MR. CANTOR:  No, let it come in by way of
10    testimony.
11         THE COURT:  Let me hear it again.
12         MR. CANTOR:  Okay.
13         MR. ROSENFELD:  I just took it out.  It has
14    already been placed --
15         MR. CANTOR:  Well, let's hear it again so your
16    Honor can make an intelligent decision.
17         THE COURT:  I agree.
18         (Whereupon the video narrative is replayed at
19    this time.)
20         MR. CANTOR:  He is testifying as to the time and
21    where he is and who he is, I have no basis of confronting
22    him, that should be out.
23         THE COURT:  What?
24         MR. CANTOR:  The picture should speak for itself
25    or the video.  It does speak for itself graphically.

A-ljb

PROCEEDINGS

818

1    MR. ROSENFELD:  Your Honor, I see no problem with

2    the part that identifies when the video is being taken, was

3    made at the time the video was taken and I think that is

4    certainly part of the video itself.

5    MR. CANTOR:  Well, let him call the technician

6    and he can testify what time it was.  I am not going to

7    argue the time, but that's an unsworn witness testifying.

8    THE COURT:  Well, can we have a stipulation?

9    MR. CANTOR:  No, I am not stipulating, no, but

10    there is no reason for it.  The purpose is to show what the

11    scene looked like, that's all and the picture.

12    THE COURT:  Who is going to bring it in?

13    MR. CANTOR:  Which witness?

14    MR. ROSENFELD:  I don't know, your Honor.  I was

15    going to have the officer yesterday testify to it.  Maybe I

16    will have the assistant D.A. testify to it.  I asked

17    Mr. Cantor if he will stipulate that this was a clear -- if

18    this was accurate --

19    MR. CANTOR:  Judge, I can't do this.

20    MR. ROSENFELD:  -- videotape of the crime scene.

21    Just stipulate, we play it, but I won't stipulate with the

22    redactions.

23    MR. CANTOR:  Let the witness --

24    THE COURT:  Why do we have to have a witness when

25    it is such a mundane thing?

A-ljb

**PROCEEDINGS**

819

1         MR. CANTOR: Okay. Fine let him.

2         THE COURT: Can we stipulate?

3         MR. CANTOR: Let him play it. I will stipulate

4    that it's a true and accurate portrayal of what is shown.

5         THE COURT: Thank you, Mr. Cantor.

6         MR. CANTOR: Don't need it in writing, I will

7    just stand up and say it after its played.

8         MR. ROSENFELD: Okay. That's fine.

9         THE COURT: Fine. Okay. Now, are you looking --

10        MR. CANTOR: Now, we are looking at the Q and A.

11        THE COURT: Yes.

12        MR. CANTOR: By the D.A.

13        THE COURT: How long is this?

14        MR. ROSENFELD: May I make a record so we can

15   properly have this played?

16        THE COURT: Yes.

17        MR. ROSENFELD: Your Honor, at this point, People

18   would ask this be deemed marked People's ten.

19        THE COURT: People --

20        MR. ROSENFELD: Ten for identification.

21        THE COURT: For identification.

22        MR. ROSENFELD: This is.

23        MR. CANTOR: The Q and A by the A.D.A.

24        MR. ROSENFELD: This is it, videotape statement

25   taken by an assistant D.A on December 26, 2009, redacted.

A-ljb

**PROCEEDINGS**

820

1      MR. CANTOR:  Okay.

2           MR. ROSENFELD:  The original one was not played

3      for the Court -- was played for the Court the other day,

4      but was not officially deemed an exhibit.

5           THE COURT:  Okay.

6           MR. ROSENFELD:  So what we have here --

7           THE COURT:  So we will deem that as People's ten

8      for identification.

9           MR. ROSENFELD:  We will deem the redacted version

10     People's Exhibit ten for identification only.

11          THE COURT:  Okay.

12          MR. ROSENFELD:  That contains the entire

13     statement except the portion that Mr. Cantor objected to

14     that he asked be redacted concerning the questions and

15     answers that were done after the defendant indicated he

16     worked at a laundromat.  After that there was a question

17     about his past and he mentions being in Puerto Rico jails

18     and gangs that was redacted.

19          MR. CANTOR:  He was questioned by the D.A. about

20     gangs and he responded.

21          MR. ROSENFELD:  What I am saying that whole

22     question and answer part that Mr. Cantor put on the record

23     the other day has been redacted, that is what People's 10A

24     is the entire statement.

25          THE COURT:  Ten A?

A-ljb

**PROCEEDINGS**

821

1           MR. ROSENFELD:  Ten.

2           MR. CANTOR:  You just said 10A.

3           MR. ROSENFELD:  I misspoke.

4           THE COURT:  Ten.

5           MR. ROSENFELD:  We only have one CD at this time

6    People's Exhibit 10 with the redaction.  Can we just play

7    it even we have --

8           MR. CANTOR:  No, no, Judge.

9           MR. ROSENFELD:  It's the same entire tape.

10          MR. CANTOR:  No, I am trying --

11          THE COURT:  Just what do you want to say?

12          MR. ROSENFELD:  Redaction part --

13          MR. CANTOR:  I wanted to say something.

14          THE COURT:  Yes.

15          MR. CANTOR:  I represent the man who is

16   charged --

17          THE COURT:  We don't have to go into --

18          MR. CANTOR:  I want to see the whole thing.

19          THE COURT:  How long is it is.

20          A VOICE:  Twenty-one minutes.

21          MR. ROSENFELD:  Can we let the jury go first,

22   that's my only concern.  I am happy if he wants to sit and

23   watch --

24          MR. CANTOR:  If you want to, Judge, I will agree.

25   It's merely a ministerial action to have the sergeant who

A-ljb

PROCEEDINGS

822

1   is in charge of the security court here simply tell the

2   jury they're free.

3            THE COURT:  I will take care of that.

4            MR. CANTOR:  Fine, whatever way.  If your Honor

5   wants to go with the court reporter I will waive --

6            THE COURT:  No, no.  No, we are going to --

7            MR. CANTOR:  So we will do it after.

8            THE COURT:  They are going to wait 21 minutes.

9            MR. CANTOR:  Great, whatever you say is fine.

10           THE COURT:  Let's go.

11           (Whereupon the video is played at this time.)

12           MR. ROSENFELD:  Stop.  Your Honor, the concern is

13   if we raise the volume --

14           THE COURT:  Yes.

15           VIDEO TECHNICIAN:  They might hear it outside of

16   this room because the volume would be very loud and --

17           THE COURT:  Don't make it too loud just make it a

18   little more for Mr. Cantors convenience.

19           MR. CANTOR:  Thank you.

20           THE COURT:  Is that all right, Mr. Cantor?

21           MR. CANTOR:  No one is going to hear anything,

22   Judge, can it be raised?

23           THE COURT:  Raise it a bit.

24           VIDEO TECHNICIAN:  (Complies.)

25           THE COURT:  All right.  Thank you.

A-ljb

PROCEEDINGS

823

1          MR. ROSENFELD:  Your Honor, may the record
2     indicate that People's Exhibit ten has been played in it's
3     entirety with the redacted portion omitted.
4          THE COURT:  Yes, yes, the record will be so
5     indicate.
6          MR. CANTOR:  Yes, in the absence of my client.
7          THE COURT:  And the Court directs, in
8     accommodation with both counsel with each other and this
9     record of the interview, the question and answer as well as
10    the survey of the apartment be arranged so that the
11    defendant may see it before we are next convened in front
12    of the jury.
13          MR. CANTOR:  Thank you.
14          THE COURT:  The Court need not be present for
15    that.
16          MR. CANTOR:  These are matters of evidence.
17          THE COURT:  The Court has reviewed.
18          MR. CANTOR:  They won't come in subject to your
19    imposing certain redactions.  Judge, you are going to do
20    what you are going to do, I am just going to take an
21    exception to your being absent when my client views it.
22          THE COURT:  Fine, your exception is noted.
23          MR. CANTOR:  Thank you.
24          THE COURT:  All right.  And once again that will
25    have to be before we convene, which will be next --

PROCEEDINGS

824

1    tomorrow as the day is.  So as soon as we get Mr. Delgado

2    up, the sergeant brings him up, let's have this all ready

3    to be played, okay.  Do that first thing tomorrow.

4            MR. CANTOR:  Well, we are going to have a witness

5    on the stand though; are we not?

6            THE COURT:  No, this is for your private review

7    with him, as you requested?

8            MR. CANTOR:  Right, in your absence.

9            THE COURT:  The Court has already seen it and it

10   conforms with the Court's direction and there has been no

11   further objection so the Court --

12           MR. CANTOR:  Well, I object to your absence.

13           THE COURT:  No, no, that's all right as to the

14   absence, however, you --

15           MR. CANTOR:  It does conform.

16           THE COURT:  You had no further objection with

17   regard to the film?

18           MR. CANTOR:  I took objection.

19           THE COURT:  Of either film, just "yes" or "no"?

20           MR. CANTOR:  I took objection to the crime scene

21   photos of the deceased mutilated.

22           THE COURT:  Yes, you did.

23           MR. CANTOR:  And bleeding body.

24           THE COURT:  Yes.

25           MR. CANTOR:  You ruled.  Does this conform to

PROCEEDINGS

825

1  your ruling.

2       THE COURT:  Yes.

3       MR. CANTOR:  I noted my exception at that point.

4       THE COURT:  No problem, you should have.  The

5  Court is correct, which you did.

6       MR. CANTOR:  So with your permission we should

7  vacate, I believe, and you should discharge the jury.

8       THE COURT:  We will and the Court will take the

9  weight.  We will see each other tomorrow morning.  Tomorrow

10  is Thursday.  Please, in view of the new schedule who do

11  you expect to have tomorrow?

12       MR. ROSENFELD:  It is just pushing everybody back

13  one.  Ms. Dempsey will be tomorrow morning.

14       THE COURT:  Wait a second, Dempsey will be

15  Thursday.  Go ahead.

16       MR. ROSENFELD:  And I guess Mr. Vasquez would be

17  Thursday afternoon.

18       THE COURT:  Okay.  Go ahead.

19       MR. ROSENFELD:  Ms. Dempsey in the morning,

20  Mr. Vasquez in the afternoon.

21       MR. CANTOR:  Friday.  What is his first name,

22  Alberto?

23       MR. ROSENFELD:  Yes and I have to discuss with

24  various other people scheduling.

25       THE COURT:  Okay.

A-ljb

PROCEEDINGS

826

1       MR. ROSENFELD:  I may have to put somebody else

2   on -- I may have to put Ms. Rodriguez on Friday.  I have to

3   see, Judge.  People have to see their schedule now because

4   of the delay.

5       MR. CANTOR:  We can find that out tomorrow.

6       THE COURT:  Yes, we know who we will have on

7   Thursday and that's fine.  Could you have a third witness

8   on Thursday?

9       MR. ROSENFELD:  No, I think those two witnesses

10  will really take up the morning and afternoon.

11      MR. CANTOR:  Melissa?

12      THE COURT:  Melissa Dempsey.

13      MR. CANTOR:  Melissa Dempsey and then Alberto

14  Vasquez?

15      THE COURT:  That's what he said.

16      MR. CANTOR:  Okay.

17      MR. ROSENFELD:  Actually, your Honor, if we could

18  have, maybe we'll try to get the crime scene unit played.

19  I will see if a witness is available.

20      THE COURT:  And who would that be?

21      MR. ROSENFELD:  Well, you said you would

22  stipulate.

23      MR. CANTOR:  If he has the crime scene -- I am

24  going to say if he has a witness, the witness if you just

25  use the word portrayed; is that a true and accurate

A-ljb

**PROCEEDINGS**

827

1   depiction of what it portrays and then the witness should

2   say yes and that will be the end of that.  They'll move it

3   and I will say no objection, you know.

4          THE COURT:  All right.

5          MR. CANTOR:  You already have my objections on

6   the record.

7          THE COURT:  Yes.

8          MR. ROSENFELD:  Maybe we will get that in at some

9   point, your Honor.

10          MR. CANTOR:  With respect to the Q and A he will

11   put in -- we need a witness.

12          MR. ROSENFELD:  That's Detective Banker.

13          MR. CANTOR:  That's fine.  And he will offer it

14   and I will say no objection.

15          MR. ROSENFELD:  The only thing with the statement

16   is there is a cut.  The purpose of having a clock and the

17   statement is to show a jury that there has been no cuts or

18   redaction.  There is nothing they could infer would be a

19   missed, so-to-speak.  There is a clear jump.

20          MR. CANTOR:  It's not clear.

21          MR. ROSENFELD:  May I finish?

22          THE COURT:  I didn't see it.

23          MR. CANTOR:  I didn't see it and I am not going

24   to argue.

25          MR. ROSENFELD:  Doesn't matter.  May I just

A-ljb

**PROCEEDINGS**

828

1    finish my statement then you can decide how to handle.  My

2    point being if you are watching the part when the part is

3    cut out for however long it was, whether it was 10 seconds

4    or 15, however many seconds was cut on there is a cut on

5    the clock of the second hands.  You can see there is a cut

6    and all of a sudden the defendant is talking and then he is

7    in a different position.  I would just if ask if we talk

8    before its played that when the tape is being played there

9    is a cut or a redacted by the Court I don't want the jury

10   to infer in any way that the D.A. cut out some evidence or

11   there might have been something there.

12              MR. CANTOR:  I am not going to argue that.  I

13   didn't see a cut and I am not going to stipulate.  I didn't

14   see a cut and it's not going to be mentioned by me.

15              THE COURT:  I did see it.  I am sure it's there,

16   but you know films have a way of sometimes jumping.

17              MR. CANTOR:  I am not going to argue that.

18              MR. ROSENFELD:  The only other thing, Judge, I

19   would ask when you dismiss the jury and if you didn't, I

20   ask you tell them they shouldn't go onto the internet or

21   Google.  Did you already give them?

22              THE COURT:  I told them they were not detectives

23   not investigators or researchers.

24              MR. ROSENFELD:  I understand, but we have had

25   cases with jurors where recently on their own gone onto the

A-ljb

PROCEEDINGS

829

1   internet Googled people involved in the case, news on the
2   case I would just ask the Court, please whenever dismisses
3   the jury remind them and other judges have acceded,
4   remember not to look through newspapers, read anything
5   about it, or go on the internet or in any way try to search
6   out any of the parties involved, that could be the Court,
7   the defense attorney, the defendant or any information
8   about this case.
9           MR. CANTOR:  I will join in that application.
10          THE COURT:  All right.  I will say it.
11          MR. ROSENFELD:  Thank you.
12          THE COURT:  Very good.  All right.  Gentleman,
13   ma'am, we will see each other tomorrow morning.
14          Sergeant, how quickly can we get him up tomorrow
15   morning?
16          THE SERGEANT:  As soon as he is here.
17          THE COURT:  You will have someone positioned by
18   the door there?
19          THE SERGEANT:  Sure, we'll be ready.
20          MR. ROSENFELD:  What time?
21          MR. CANTOR:  We will play it by ear.
22          THE COURT:  I will tell them 9:30, but for us
23   9:45, 9:45.
24          MR. CANTOR:  I will be here at 9:30.  Clear the
25   well.

A-ljb

**PROCEEDINGS**

830

1    (Whereupon the attorneys leave are excused.)

2    THE COURT: All right. Bring in the jury.

3    COURT OFFICER: Jury entering.

4    (Jury enters at this time.)

5    THE COURT: Good morning, ladies and gentlemen of

6    the jury.

7    THE JURY: Good morning.

8    THE COURT: We have had and I am sorry that you

9    had to wait so long. We could not tell you earlier, we had

10   a little difficulty in scheduling witnesses which,

11   unfortunately, happens from time-to-time, but I think it

12   has all been straightened out and we will be proceeding not

13   today any longer, I am going to excuse you for the

14   remainder of the day. Tomorrow morning and I direct that

15   you be here tomorrow morning at 9:30. We hope to have our

16   witnesses lined up and to go right into their testimony.

17   Please, you are free to do what you want for today.

18   Please remember the caution and no discussions

19   with anyone, not amongst yourselves. In the unlikely event

20   that you are approached report that to the Court.

21

22

23

24

25

A-ljb

## PROCEEDINGS

830A

1           Remember you are not detectives or investigators

2      or researchers.  You make no effort to find things outside

3      about people, pass by street addresses anything like that.

4      You already know that the Court will give you everything

5      you need to know so that you can come to a fair and honest

6      determination as to the outcome of the case.  We will see

7      you tomorrow morning 9:30.

8                  Have a pleasant afternoon.  You are excused.

9                  (Whereupon the jury exits and the trial is

10     adjourned until Thursday, June 28, 2012, at 9:45.)

831

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF BRONX:  CRIMINAL TERM:  PART T14
     - - - - - - - - - - - - - - - - - -
3    THE PEOPLE OF THE STATE OF NEW YORK,

4                                      Indictment No.

5         -against -                   27/2010

6    DAVID DELGADO,                    **PROCEEDINGS**

7                      Defendant.
     - - - - - - - - - - - - - - - - - -
8                          265 East 161st Street
                           Bronx, New York 10451
9                          June 28, 2012

10   B E F O R E:

11         THE HONORABLE  DOMINIC R. MASSARO,

12                            J U S T I C E and jury

13         (Appearances as previously noted.)

14              *    *    *    *    *

15         COURT CLERK:  This is case on trial *People of the*

16   *State of New York against David Delgado* let the record

17   reflect the presence of the District Attorneys office,

18   defense attorney, defendant and all sworn jurors at this

19   time.

20         THE COURT:  Counsels, Mr. Defendant and Madam

21   Forelady and ladies and gentlemen of the jury, we continue

22   where we left off last time we were convened and that is on

23   the People's case and we turn to the People now with

24   respect to its next witness, People's next witness?

25         MR. CANTOR:  Judge, are there any protected

                                                    A-ljb

PROCEEDINGS

1    People's witnesses in the courtroom?

2                MR. ROSENFELD:  No.

3                .    THE COURT:  The name of that witness is,

4    Mr. Rosenfeld?

5                MR. ROSENFELD:  I am sorry, the officer was about

6    to ask, Judge, I apologize.  I am sorry what, Judge?

7                THE COURT:  Your next witness?

8                MR. ROSENFELD:  Yes, People call Melissa Dempsey.

9                THE COURT:  Melissa Dempsey to the witness stand.

10               MR. ROSENFELD:  Your Honor, may we approach for a

11   moment, please, while we're waiting?

12               THE COURT:  Yes, you may.

13               (Whereupon there is an off-the-record

14   discussion.)

15               (Witness entering.)

16          M E L I S S A   D E M P S E Y, having been called as a

17   witness on behalf of the People, having first been duly sworn,

18   testified as follows:

19               COURT OFFICER:  Witness gives her name as Melissa

20   Dempsey, D-E-M-P-S-E-Y, resident of Bronx County.

21               THE COURT:  Good morning, Ms. Dempsey.

22               THE WITNESS:  Good morning, your Honor.

23               THE COURT:  Just sit back, be comfortable, Ma'am,

24   listen carefully to the questions that will be posed to

25   you.  Please answer only what is asked and please keep your

PROCEEDINGS

1    voice up.

2                    THE WITNESS:  Okay.

3                    THE COURT:  You may inquire.

4                    MR. ROSENFELD:  Thank you, your Honor.

5    DIRECT EXAMINATION

6    BY MR. ROSENFELD:

7        Q.   Good morning, Ms. Dempsey.

8        A.   Good morning.

9        Q.   Ms. Dempsey, how old are you?

10       A.   Thirty-five.

11       Q.   Where were you born and where did you grow up?

12       A.   Brooklyn, New York.

13       Q.   And did you go to school in Brooklyn?

14       A.   Yes.

15       Q.   And what grade of school did you complete?

16       A.   To the 11th grade.

17       Q.   And what happened after you completed the 11th grade?

18       A.   Um, um -- what happened when I completed 11th grade I

19   gave birth to my son.

20       Q.   About what year was that?

21       A.   Ninety-four.

22       Q.   All right.  Please continue.  Did you continue school

23   after that or work after that?

24                   MR. CANTOR:  I object to the leading, your Honor.

25                   THE COURT:  I will allow it.

A-1jb

People - MELISSA DEMPSEY - direct

834

1    A.   I continued work.

2    Q.   What type of work did you do?

3    A.   I was a counselor for the kids at the YMCA club.

4    Q.   And how long did you work at YMCA club?

5    A.   I worked there for like a year-and a-half and then I

6    also worked for the Parks Department for like two years and

7    a-half.

8    Q.   And what years were those approximately?

9    A.   That was 2004 to 2006.

10   Q.   And during that time you indicated you had a son born

11   to you, you have any other children?

12   A.   Yes, I have two small daughters also.

13   Q.   And when were they born, approximately?

14   A.   My oldest daughter, 14-year old, she was born in 1998

15   and my youngest daughter, Selena, she was born in 1996.

16   Q.   You married?

17   A.   No.

18   Q.   Do you have a common-law relationship?

19   A.   Yes.

20   Q.   What was the -- what is the name of the person you

21   have a common-law relationship?

22   A.   Alberto Vasquez.

23   Q.   How long have you had a relationship with Alberto

24   Vasquez?

25   A.   For 15 years.

People - MELISSA DEMPSEY - direct

835

1    Q.   Now, you indicated you worked in 2004, I'm sorry?

2    A.   Yes, correct.

3    Q.   For where?

4    A.   I was -- I worked for the Parks Department in the

5    Bronx.

6    Q.   Okay.  And did you work after that?

7    A.   Yes, I am now, currently, a home aide.

8    Q.   And how long have you been a home aide?

9    A.   Two years.

10   Q.   So, that's since, approximately, 2010?

11   A.   Yes.

12   Q.   What did you do from about 2008 after you were with

13   the Parks Department until you worked --

14             MR. CANTOR:  It's 2006 when she left.

15   A.   I was --

16             THE COURT:  There is no need to interrupt.

17             MR. CANTOR:  Yes, there is if it is incorrect.

18             THE COURT:  If you have an objection --

19             MR. CANTOR:  Yes.

20             MR. ROSENFELD:  If I misstated --

21             MR. CANTOR:  He said 2008 and it's 2006, I

22   object.

23             THE COURT:  You accept that?

24             MR. ROSENFELD:  I may have misstated.  I will ask

25   her the question.  I withdraw it.

A-1jb

People - MELISSA DEMPSEY - direct

836

1     THE COURT: Thank you.

2     Q.   You worked for the Parks Department from what years?

3     A.   I worked for the Parks Department in 2004 to 2006.

4     Q.   Okay. And after 2006 what did you do?

5     A.   I am, currently, now on my job, a home aide.

6     Q.   Well, did you work as a home aide in 2006, 2007?

7     A.   Yes, but only for six months.

8     Q.   Okay. So that was your first job as a home aide?

9     A.   Yes.

10    Q.   Okay. After you worked for those six months did you

11    continue working?

12    A.   No, I took off six months and went back a year later.

13    Q.   Okay. So when did you start working after that?

14    A.   2010.

15    Q.   What did you do in 2010?

16    A.   Same thing, home aide.

17    Q.   Okay. When you say you worked as a home aide is that

18    on your own or for some type of agency?

19    A.   For a type of agency.

20    Q.   And currently how many days a week and what hours do

21    you work as a home aide?

22    A.   I work 25 hours a week, 5 dates a week and every other

23    weekend.

24    Q.   And where have you been living for the last 10 or 15

25    years?

A-1jb

People - MELISSA DEMPSEY - direct

837

1    A.    Bronx, New York in Parkchester Condominiums.

2    Q.    How long have you been living in Parkchester?

3    A.    Fifteen years.

4    Q.    And where do you currently live?

5    A.    In Parkchester.

6    Q.    What address do you live at?

7    A.    2033 McGraw Avenue, Apartment 3H, on the third floor.

8    MR. CANTOR:  3H?

9    THE WITNESS:  Yes, correct.

10    Q.    You mentioned you were in a common-law relationship

11  what was your husband's name?

12    A.    Alberto Vasquez.

13    Q.    And you call him or is he known by any other name?

14    A.    Tango.

15    Q.    You know someone whose name nickname was Sosa?

16    A.    Yes, that was a good friend of mine.

17    MR. CANTOR:  I'm sorry.

18    THE WITNESS:  Excuse me?

19    MR. CANTOR:  Can I have the last answer reread,

20  your Honor?

21    (Whereupon the last answer was read back by the

22  reporter.)

23    Q.    And you know what Sosa's real name is?

24    A.    George Talavera.

25    Q.    T-A-L-A-V-E-R-A?

People - MELISSA DEMPSEY - direct

1    A.   Yes, I think so.  I basically call him Sosa so...

2    Q.   T-A-L-A-R-V-E-R-A?

3    A.   I think so.

4    Q.   So, approximate, spelling, okay.

5    And how long had you known this person, Sosa, George

6  Talavera?

7    A.   I know Sosa since I was pregnant with my younger

8  daughter, over 11 years.

9    Q.   And where did you know George Talavera from?

10   A.   From my neighborhood in Parkchester.

11   Q.   And were you friends with him?

12   A.   Yes, very good friends.

13   Q.   And did you know his family?

14   A.   Yes.

15   Q.   Or members of George Talavera Sosa --

16           MR. CANTOR:  Objection, Judge.

17           THE COURT:  I'm sorry.

18           MR. CANTOR:  Objection to what members of the

19   family of George Talavera she knew, that is collateral.

20           THE COURT:  I will allow it subject to

21   connection.

22           MR. CANTOR:  Will you inform the witness when

23   an --

24           MR. ROSENFELD:  Your Honor, objection to this

25   colloquy.

People - MELISSA DEMPSEY - direct

839

1    THE COURT:  There is no need for colloquy.  How
2    many times must I tell you, you have an objection you say
3    objection.  I don't want any editorial at all unless I ask
4    for it; do we understand each other?
5                MR. CANTOR:  She began --
6                THE COURT:  Do we understand each other?
7                MR. CANTOR:  Yes.
8                THE COURT:  Okay.
9                MR. CANTOR:  Can I have your ruling that a
10   witness ought not speak when an objection is made until you
11   rule?
12               THE COURT:  That is also a correct observation.
13               MR. CANTOR:  Can you tell that to the witness?
14               THE COURT:  Ma'am, if there is an objection made
15   will you stop at that moment?
16               THE WITNESS:  Okay.
17               THE COURT:  Now sit down, Mr. Cantor.  No more
18   editorializing whatsoever.
19               Go ahead, Mr. Rosenfeld.
20   Q.    You may answer the question.
21   A.    Can you repeat the question?
22   Q.    Yes, did you know members of George Talavera Sosa
23   family?
24   A.    Yes, I knew.
25   Q.    And who did you know?

A-1jb

1        MR. CANTOR:  Objection.

2        THE COURT:  Overruled, subject to connection.

3    A.   Speak?

4        THE COURT:  You may answer.

5    A.   I knew -- I met his mother.  I met his brother.  I met

6    one of his sisters and then throughout the years I started

7    meeting the rest of the members of the family.

8    Q.   Did you socialize with George Talavera over those

9    years?

10   A.   Yes, constantly.

11   Q.   And do you know if George Talavera was working?

12       MR. CANTOR:  Objection.

13       THE COURT:  If she knows.

14   A.   Yes, he was.

15   Q.   What type of work did he do?

16   A.   He used to work at a pizza shop and he used to do

17   construction.

18   Q.   In --

19       MR. CANTOR:  Judge, I am going to move to strike

20       unless we have a time.

21       THE COURT:  As I said, subject to connection.  We

22       will see if a connection is made.

23   Q.   Do you know, approximately, around what time period he

24   was working in those areas?

25   A.   He was working for construction in 2011.

People - MELISSA DEMPSEY - direct

841

1    MR. CANTOR:  Judge, I am going to move to strike,
2    it's irrelevant.
3    A.   I made a mistake, I am sorry.
4              THE COURT:  It appears so.
5              MR. CANTOR:  I am sorry.
6              THE COURT:  It appears so up to this point,
7    however, I made it subject to connection.
8              Go ahead.
9              MR. ROSENFELD:  The witness has indicated, your
10   Honor, she made a mistake.
11   Q.   You may correct it.
12   A.   Yes, he was working for construction, I believe it was
13   2008 and also I believe 2007.
14   Q.   And around December of 2009, do you know if he was
15   working anywhere?
16   A.   I am not sure.
17   Q.   Thank you.
18   Do you know where George Talavera lived?
19   A.   Yes.
20   Q.   Where did he live?
21   A.   He used to stay with his daughter's mother, I believe,
22   it was on Leland Avenue.
23   Q.   That's here in the Bronx?
24   A.   Yes, in the Bronx.
25   Q.   Now, before December 25, 2009, Christmas day, had you

A-ljb

People - MELISSA DEMPSEY - direct

842

1  made any plans with anybody for anything concerning celebrating

2  Christmas Eve or Christmas Day?

3      A.   Yes, with my next door neighbor, Carmen.

4      Q.   What is her full name?

5      A.   Carmen Diaz.

6      Q.   And how long had you known or have you known Carmen

7  Diaz?

8      A.   I know Carmen over 15 years.

9      Q.   And what is the nature of your relationship?

10     A.   We're very close friends.

11     Q.   So, what plans have you made before December 24th into

12  December 25th of 2009, regarding Christmas Eve?

13     A.   We was going to have a family Christmas Eve get

14  together at Ms. Carmen Diaz's home.

15     Q.   And where was Carmen Diaz's home?

16     A.   2033 McGraw Avenue, Apartment 3D, on the third floor.

17     Q.   Is that the same floor that your apartment is on?

18     A.   Yes, she lives down the hall from me.

19     Q.   Well, approximately, how do you get to your apartment

20  and how do you get to her apartment from the elevators?

21     A.   We only like three, four feet away from each door.

22     Q.   Well --

23         MR. CANTOR:   From each door?

24         THE WITNESS:   From the door from 3H, 3D is only a

25     couple of steps -- feet.

A-1jb

People - MELISSA DEMPSEY - direct

843

1    Q.    Well, if you come up on the elevator onto the third
2    floor --
3    A.    You make a left.
4    Q.    To go to whose apartment?
5    A.    3D, Carmen Diaz.
6    Q.    How do you get to your apartment?
7    A.    I make a right coming out of the elevator to 3H.
8    Q.    And how close is the elevator to your apartment?
9    A.    I am very close, like two steps right away.
10   Q.    And who lived in Carmen Diaz's apartment at that time?
11   A.    Carmen Diaz and her daughter.
12   Q.    And what is her daughter's name?
13   A.    Gabriella Doumas (phonetic).
14   Q.    And what specifically were the plans for the Christmas
15   party?
16              MR. CANTOR:  I object, Judge, that's hearsay.
17              MR. ROSENFELD:  Well, I will rephrase, Judge,
18       fair.
19              THE COURT:  Yes, sustained.
20   Q.    What plans did you specifically make with Carmen Diaz
21   regarding Christmas Eve?
22   A.    Well --
23              MR. CANTOR:  Objection, Judge.
24              THE COURT:  I will allow it in gross, but not
25       particulars.  You may just tell us what plans:  when the

A-1jb

People - MELISSA DEMPSEY - direct

844

1   party was planned, what time and so forth.

2   A.   The party was planned for Christmas Eve.  Me and

3   Carmen was making preparations to have a nice Christmas Eve

4   party with family and close friends.  The party approximately

5   started around six o'clock.

6               MR. CANTOR:  Judge, that's beyond the bounds of

7       your rulings.

8               No, it's not.  As a matter of fact that's what I

9       told her to say.

10              Go ahead.

11  Q.   And before --

12              THE COURT:  What time did you say?

13              MR. CANTOR:  I can't hear you, Judge.

14              THE COURT:  What time?

15              THE WITNESS:  Around six p.m.

16              THE COURT:  Six p.m., all right.

17  Q.   What had you been doing during the day of December 24,

18  2009, prior to the party?

19              MR. CANTOR:  Objection, irrelevant.

20              THE COURT:  Sustained.

21  Q.   What preparations did you make for that party?

22              MR. CANTOR:  Same question, same objection.

23              THE COURT:  Yes, same ruling.

24  Q.   Were you home during the day of December 24, 2009?

25  A.   Yes, because me and Carmen Diaz --

People - MELISSA DEMPSEY - direct

845

1    MR. CANTOR:  Objection, Judge, to anything

2    further.

3    THE COURT:  The answer is yes.

4    Q.   What were you doing at home during the day of

5    December 24th?

6    MR. CANTOR:  Third time.

7    Q.   In 2009?

8    MR. CANTOR:  He asked that question and third

9    time I object.

10    THE COURT:  And your objection is sustained for

11    the third time.

12    Q.   Who else was home with you on December 24, 2009?

13    A.   Me, Mr. Alberto Vasquez and my three children.

14    Q.   Okay.  And had you invited anybody else to the party

15    that was taking place at Carmen Diaz's apartment that evening?

16    A.   I didn't invite anybody because it wasn't my home, but

17    Ms. Diaz did invite everybody.

18    Q.   Okay.  Were you bringing anything to the party?

19    A.   Yes.

20    MR. CANTOR:  Objection, irrelevant, collateral.

21    MR. ROSENFELD:  Your Honor, I will subject to

22    connection.

23    THE COURT:  All right.  I will listen to the

24    connection.

25    MR. CANTOR:  Judge --

A-1jb

People - MELISSA DEMPSEY - direct

846

1     THE COURT:  I will listen to the connection.

2     MR. CANTOR:  Can we hear the connection at the

3     sidebar because it seems --

4     THE COURT:  Let me see what the connection is

5     here.  It's subject to all being stricken.

6     Go ahead, Miss.

7     MR. CANTOR:  Can I have the question reread,

8     Judge?

9     THE COURT:  Sure, you can.  Please reread it for

10    Mr. Cantor.

11    (Whereupon the last question was read back by the

12    reporter.)

13    MR. CANTOR:  Judge, I press my objection really.

14    THE COURT:  All right.  Subject to connection.

15    You may answer.

16    A.    The answer what I was bringing to the party?  We was

17    bringing sodas and at my house I was cooking a pork shoulder to

18    bring to Carmen Diaz's home?

19    Q.    Were you bringing --

20    MR. CANTOR:  I asked that it be stricken, Judge,

21    it's totally irrelevant.

22    MR. ROSENFELD:  It's not irrelevant.

23    THE COURT:  Let --

24    MR. CANTOR:  Judge, why are we having colloquy, I

25    did what you said.

A-1jb

## People - MELISSA DEMPSEY - direct

847

1          THE COURT:  I said subject to connection.

2          MR. CANTOR:  Pork roast and soda is irrelevant.

3          THE COURT:  Lets see if she has anything else to

4  add anything else or was that your assignment?

5          THE WITNESS:  That was it.

6          THE COURT:  All right.  Move on.

7          MR. CANTOR:  Will you strike that?

8          THE COURT:  Yes, okay.  Jury may disregard that.

9          MR. CANTOR:  Pork roast and soda.

10         MR. ROSENFELD:  Your Honor, just for the record

11  the defense attorney just turned to me and said in

12  direction to the jury pork roast and soda.

13         MR. CANTOR:  How can I turn to him and be in the

14  direction of the jury?

15         THE COURT:  Go ahead.

16         MR. ROSENFELD:  Just making a note of that.

17  Q.    That evening did there come a time that you went from

18  your apartment to Carmen Diaz's apartment?

19  A.    Yes.

20  Q.    And who went with you?

21  A.    Me, Alberto Vasquez and my three children.

22  Q.    Approximately, what time did you get to Carmen Diaz's

23  apartment?

24  A.    Around six o'clock.

25  Q.    And what was going on when you got there at about six

People - MELISSA DEMPSEY - direct

848

1    o'clock?

2        A.    Carmen was setting up the table for the get together

3    and setting up the food, dividing the meals?

4        Q.    Was anybody else in your apartment, if you remember,

5    when you first got there?

6        A.    No, it was just me at that moment.

7        Q.    What about the rest of your family?

8        A.    Yeah, I mean me and my family, I'm sorry.

9        Q.    Was there any alcohol that was setup in the apartment?

10       A.    Yes.

11       Q.    And what type of alcohol was present?

12       A.    We had Hennessy, we had Bacardi, we had vodka and

13   juice, cranberry juice, soda, that's it.

14       Q.    Were there any beers?

15       A.    Oh, we had beers too.

16       Q.    Okay.  Had you brought any of that or was that already

17   there?

18       A.    That was already there.

19       Q.    Was there any music in the apartment?

20       A.    Yes.

21       Q.    I show you what has been marked People's Exhibit four

22   in evidence.  Please, look over at the television here.  You

23   recognize what this is a photograph of?

24       A.    Yes, Ms. Carmen Diaz's apartment.

25       Q.    And you said when you came in you -- food was being

A-ljb

People - MELISSA DEMPSEY - direct

849

1  set up and prepared?

2     A.   Yes.

3     Q.   Where was that?

4     A.   In the kitchen.

5     Q.   And where is the kitchen in this photograph?

6     A.   Right in here (indicating).

7          MR. ROSENFELD:   Indicating the witness is

8     pointing in the middle of the photograph to a doorway.

9          THE COURT:   So indicated.

10    Q.   Is that correct?

11    A.   Yes.

12    Q.   Okay.   Looking at People's Exhibit five in evidence,

13    you see the area that you were just pointing to?

14    A.   The kitchen right over here (indicating).

15    Q.   Where was the food being placed?

16    A.   In the kitchen.

17    Q.   In front of the kitchen there is a table in the

18    photograph?

19    A.   yes.

20    Q.   Was there anything on the table?

21    A.   Yes, um, the people that was drinking the drinks that

22    the people that was sitting down they all over here (indicating)

23    at the table.

24    Q.   The what?

25    A.   The drinks are here (indicating) on the table that the

A-ljb

People - MELISSA DEMPSEY - direct

850

1    people that were drinking were sitting down here (indicating).

2        Q.    Was that when you first got there or later on?

3        A.    That was after the night continued.

4        Q.    When you first got there was there anything out on the

5    table?

6        A.    No.

7        Q.    And the chairs that you see in People's Exhibit four

8    you remember how they were setup when you first arrived?

9        A.    Yes, all the chairs was on the table.

10       Q.    Now, looking at this photograph, People's Exhibit

11   again four there is a chair in the middle of the photograph

12   where was that chair during the party?

13       A.    That chair was placed right in here (indicating).

14       Q.    Indicating middle, right, of the photograph?

15       A.    Yes.

16            MR. ROSENFELD:  She is pointing at the white

17        table cloth with some red on it.

18            THE COURT:  So indicated.

19       Q.    And the couch over to the left was that couch in the

20   same position when you first arrived at the party?

21       A.    It was a couple of feet, maybe right here

22   (indicating).

23       Q.    Indicating the witness is pointing to the lower left

24   quadrant of the floor area; is that correct?

25       A.    Yes.

A-1jb

People - MELISSA DEMPSEY - direct

851

1    Q.   Let's use People's Exhibit six, if you will, and try
2    to indicate using your finger drawing a line where approximately
3    the couch was when you first got there?
4    A.   The couch was there (indicating) when we first got
5    there and then it moved like a couple of feet right here
6    (indicating).
7    Q.   Okay.  Again pointing to the middle of the photograph.
8    A.   Yes (indicating).
9    Q.   I am holding my hands here (indicating) you saying
10   that's where the back of the couch --
11   A.   Just a little bit.
12           MR. CANTOR:  I can't hear when she is
13       articulating with her face towards the wall picture.
14           MR. ROSENFELD:  Just speak up.
15           MR. CANTOR:  May I have that answer reread.
16           (Whereupon the following questions and answers
17       were read back by the reporter:
18           "QUESTION:  Let's use People's Exhibit six, if
19       you will, and try to indicate using your finger drawing a
20       line where approximately the couch was when you first got
21       there.
22           "ANSWER:  The couch was there (indicating) when
23       we first got there and then it moved like a couple of feet
24       right here (indicating).
25           "QUESTION:  Okay.  Again, pointing to the middle

A-ljb

People - MELISSA DEMPSEY - direct

852

1    of the photograph?

2            "ANSWER:  Yes (indicating).

3            "QUESTION:  I am holding my hands here

4    (indicating), you saying that's where the back of the

5    couch --

6            "ANSWER:  Just a little bit."

7            MR. CANTOR:  Judge, can you please instruct the

8    witness to when she answers verbally to face forward so my

9    client and I can hear?

10           THE COURT:  Yes.

11   Q.    Looking back at the photograph when you first got

12   there was the couch in this position in the photograph or in a

13   different position?

14   A.    It was in that position that's in the photograph.

15   Q.    And during the party where was the couch?

16   A.    During the party the couch moved a little bit because

17   people was dancing in front of the couch.  So the couch probably

18   moved a couple up to like here (indicating).

19   Q.    Again, indicating putting the pen around a little

20   below the midline?

21   A.    Yes.

22   Q.    To the left of the chair and behind where the couch

23   is?

24   A.    Yes.

25           THE COURT:  So indicated.

A-1jb

People - MELISSA DEMPSEY - direct

853

1    MR. ROSENFELD:  Thank you.

2    Q.  All right.  You can sit down for a moment, thank you.

3    So once you and your family arrived there and Carmen Diaz

4    was setting up did there come a time other people arrived?

5    A.  Yes, other people started showing up afterwards.

6    Q.  Around what time did other people start showing up,

7    approximately?

8    A.  Approximately seven, eight o'clock, nine o'clock.

9    Q.  Okay.

10    A.  Ten.

11    Q.  Can you name some of the people?

12    MR. CANTOR:  I think she didn't complete her

13    answer.

14    THE COURT:  Did you complete your answer?

15    THE WITNESS:  Yes.

16    THE COURT:  She did.

17    Q.  Could you name some of the people who showed up during

18    that time period, please?

19    A.  Um, it was Ms. Carmen Matos, her boyfriend at the

20    time, David Delgado; Robert Walker, Ari Jimenez, Carmen's uncle,

21    which I don't know his name.

22    MR. CANTOR:  I'm sorry.

23    THE WITNESS:  Carmen's uncle, Carmen Diaz uncle.

24    A.  My friend Mercedes and a friend of ours named Hector

25    was there, um, and a guy named Wilfredo.

People - MELISSA DEMPSEY - direct

854

1    Q.   Now, you mentioned a friend of yours, Margie; is that
2  the name you used?

3    A.   That's the name we call her by.

4    Q.   Do you know her real name?

5    A.   Carmen Matos.

6    Q.   And you said she came along with somebody else?

7    A.   Yes.

8    Q.   Do you know, approximately, what time she arrived with
9  that other person?

10    A.   I think, approximately, nine or ten.

11    Q.   Do you know?

12    A.   I am not too sure.

13    Q.   Okay.  Did they arrive before these other people

14  arrived or afterwards; if you recall?

15    A.   Afterwards.

16    Q.   Now, during the time the people were arriving what was

17  happening at the party?

18    A.   We was all dancing, talking, eating, drinking and

19  having a good time.

20    Q.   All right.  Was there alcohol that was being drunk?

21    A.   Yes.

22    Q.   And you indicated at some point Margie or Carmen Matos

23  came with a person you said name was David Delgado?

24    A.   Correct.

25    Q.   Have you ever seen that person before David?

A-ljb

People - MELISSA DEMPSEY - direct

855

1    A.    Have I ever seen Mr. David?

2    Q.    Before that moment?

3    A.    Yes.

4    Q.    How many times before that moment at the party had you

5  seen the person, David?

6    A.    Approximate -- about two times or three times, no more

7  than that.

8    Q.    Over -- when was the first time that you had seen this

9  person with Margie?

10   A.    Would you -- the first time I had saw her with him?

11   Q.    Approximately, yes, before the party?

12   A.    I saw them that day.

13   Q.    Okay.  Was that the first time or had you seen them

14  before that?

15   A.    No, that wasn't the first time before that I seen

16  them, I think two months before that I think it was, I am not

17  too sure.

18   Q.    Well, was it in December or November that you saw them

19  for the first time?

20   A.    October, October.

21   Q.    You think you saw them in October?

22   A.    Yes.

23   Q.    For the first time and who was he with?

24   A.    Margie.

25   Q.    And where were they when you first saw him with her?

                                                      A-ljb

People - MELISSA DEMPSEY - direct

856

1    A.   Um --

2              MR. CANTOR:  Objection, totally irrelevant.

3              THE COURT:  Overruled.

4    A.   Answer?

5    Q.   You may.

6    A.   They was in front of her building.

7    Q.   And where is Margie or Carmen Matos' building?

8    A.   It's where I live.  I don't remember the building

9    number, it's like three buildings down from where I live in 2033

10   McGraw.

11   Q.   And when you first saw Margie with this person David

12   did you have any conversation with him or her at that time?

13   A.   She introduced me to him and we just met and said

14   hello.

15   Q.   Other than that did you have any further conversation

16   with him?

17   A.   Not really too much conversation.  One time we was

18   at --

19   Q.   We're only talking about the first time.

20   A.   Oh, no, no, sir.

21   Q.   Did there come a second time after you first saw

22   Margie with David in front of her building?

23   A.   No, I saw them at the supermarket.

24   Q.   That was the second time?

25   A.   Yes.

People - MELISSA DEMPSEY - direct

857

1      Q.   And when did you see them at the supermarket?

2      A.   That was the day of the Christmas Eve.

3      Q.   Okay.

4      A.   2009.

5      Q.   The day of the party?

6      A.   Yes.

7      Q.   Okay.  December 24, 2009, was the second time you saw

8   this person David?

9      A.   Yes.

10     Q.   And where did you see Margie and David on December 24,

11  2009?

12     A.   In the supermarket in our neighborhood.

13     Q.   So you had left your apartment during the day of

14  December 24th, 2009?

15     A.   Yes.

16          MR. CANTOR:  Judge, I object to the leading.  He

17     is telling the witness what to say.

18          MR. ROSENFELD:  Your Honor, objection to colloquy

19     again, that's totally improper.

20          THE COURT:  Yes, yes.

21          MR. CANTOR:  I object to the leading.

22          THE COURT:  Yes, okay.  Be guided, Mr. Rosenfeld.

23          MR. ROSENFELD:  Okay.

24          MR. CANTOR:  Will you rule on the objection?

25          THE COURT:  Be guided.

A-1jb

People - MELISSA DEMPSEY - direct

858

1                MR. CANTOR: Be guided?

2                THE COURT: That's correct.

3                MR. CANTOR: I don't know what it means, but I

4    will take an exception.

5                THE COURT: Well, Mr. Rosenfeld knows what it

6    means.

7                MR. CANTOR: Really?

8    A.   Can you repeat the question?

9    Q.   Did there come a time that you left your house during

10  the day of December 24, 2009?

11              MR. CANTOR: Asked and answered, we had that.

12              MR. ROSENFELD: You objected.

13              THE COURT: Yes, you objected.

14              MR. CANTOR: Judge --

15              THE COURT: You may answer again.

16    A.   Yes, to go to the store to get little ends: Paper

17  plates, paper cups, a couple more sodas, napkins.

18    Q.   And what store did you go to?

19    A.   To Key Food.

20    Q.   Okay.

21    A.   The supermarket.

22    Q.   And when you got to the Key Food Supermarket who did

23  you see that you recognized?

24    A.   Margie and David, they was also shopping. She was

25  suppose to bring some things to the party.

A-ljb

People - MELISSA DEMPSEY - direct

859

1     Q.   Okay.  And did you have any conversation with Margie

2 or this person David at that point?

3     A.   Yes, I just told her --

4            MR. CANTOR:  I just told her what she said at the

5 supermarket, it's hearsay.

6            THE COURT:  I will allow it.

7     Q.   What did you say?

8     A.   I told her Carmen was calling me to see if she was

9 bringing the paper plates, the paper cups and napkins.  So she

10 gave them -- she bought them, she gave them to me and I took

11 them upstairs because she had to go get ready.

12     Q.   Did you have any conversation with this person David

13 in the supermarket?

14     A.   Just hi, I will see you later at the party.

15     Q.   I ask you to look around this courtroom.  Do you see

16 this person David that you mentioned?

17     A.   Yes.

18     Q.   And where is he seated and what is he wearing?

19     A.   He is wearing a gray suit with a tie, black shoes and

20 glasses.

21            MR. ROSENFELD:  Indicating the defendant.

22     A.   I'm sorry, beige tie.

23            MR. ROSENFELD:  So indicated?

24            THE COURT:  So indicated.

25     Q.   All right.  Getting back to the party, you indicated

A-ljb

**People - MELISSA DEMPSEY - direct**

1    there came a time that Margie and the defendant arrived at the

2    party?

3          A.    Correct.

4          Q.    Okay.  And after Margie and David arrived at the

5    party -- withdrawn, I'm sorry.

6          Did there come a time Sosa Talavera arrived at the party?

7          A.    Yes.

8          Q.    You know at what point, approximately, that was?

9          A.    Approximately around 10:30.

10         Q.    Okay.  And did you talk to George Talavera or Sosa at

11    the party?

12         A.    Of course.

13         Q.    And can you describe his demeanor, his condition, if

14    anything, that you noticed while he was at the party?

15         A.    He was just happy, getting ready to eat, have a couple

16    of drinks and just mingling with everybody there.

17         Q.    What happened when Margie arrived -- withdrawn.

18         Did Margie and David arrive before or after Sosa?

19         A.    After Sosa.

20                    (Continues next page.)

21

22

23

24

25

A-ljb

B mc                          Dempsey - People - Direct

1      Q.   And when Margie and the defendant arrived, did you

2   notice if there was any interaction between Sosa, George

3   Talarvera and Margie and David?

4      A.   No, Margie introduced Sosa to David, "This is my

5   friend," and she introduced David to Sosa.

6      Q.   Were you right there when that happened?

7      A.   Yes, we all was right there, everybody was meeting him

8   that day for the first time that was there.

9      Q.   Meeting who?

10     A.   David.

11     Q.   And after Margie or Carmen Matos introduced the

12   defendant at the party, did you notice if there was any reaction

13   on Sosa's part?

14     A.   Sosa was just being the friendly guy that he is.  He

15   met David for the first time at that party.  He knew Margie for a

16   lot of years, and he was telling David this is a good woman, take

17   care of her, she's not alone, that was the only thing.

18                   MR. CANTOR:  Can I have that reread, Judge?

19                   THE COURT:  Reread, yes, of course.

20     A.   Those were Sosa's words.

21                   THE COURT:  You may reread it.

22                   (Whereupon, the court reporter read back the

23          requested testimony.)

24                   MR. CANTOR:  Can I have a second, Judge?

25                   THE COURT:  I'm sorry, Mr. Cantor?

B mc

Dempsey - People - Direct

1    Q.    You indicated --

2              MR. CANTOR:  Can I have a moment?

3              THE COURT:  Yes.

4              (Short pause in the proceedings.)

5              MR. CANTOR:  Can I have a moment, please?  I'd

6    like to have just one moment.

7              (Short pause in the proceedings.)

8              MR. CANTOR:  Thank you.

9              THE COURT:  You're welcome.

10             Please continue, Mr. District Attorney.

11             MR. ROSENFELD:  Thank you.

12   Q.    Did you notice at that point, when Sosa first met the

13   defendant, was there any physical interaction, use of any part of

14   the body?

15   A.    No.

16   Q.    What was Sosa doing with his friends?

17   A.    Sosa was tapping David on the shoulder, like this.

18   Q.    That's what I meant by physical interaction.  Let's go

19   back.  Was there a physical contact?

20             MR. CANTOR:  Well, the witness tapped her left

21   shoulder.

22             MR. ROSENFELD:  Yes, the witness used her right

23   hand to tap her shoulder.

24   Q.    Just to be clear, what happened, and please indicate,

25   explain, using your hands, anything about the touching.  Go

B mc                    Dempsey - People - Direct

1   ahead.

2       A.    Well, like I said before, when Sosa met David, he

3   tapped him on the shoulder, was like going like this.

4                MR. ROSENFELD:  Again, right hand to left

5       shoulder.

6       A.    (Continuing)  Saying this, Margie is not alone, she's a

7   good woman, we all know her, take care of her.

8       Q.    And did the defendant David react to that touching at

9   that time?

10      A.    No, he just stepped back a little.

11      Q.    When Sosa made this statement to the defendant, did he

12  appear angry or sound angry?

13      A.    Sosa?

14      Q.    Yes.

15      A.    No, he wasn't angry at all, he's friendly, smiling,

16  friendly way, that's the way he is.

17               MR. CANTOR:  Judge, I'm going to move, "That's the

18      way he is," to be stricken.

19               THE COURT:  It's her characterization of how she

20      knows him, I'll allow it.

21      Q.    Did either Sosa or David or anybody else in that

22  initial moment that you're talking about raise their voices or

23  shout?

24      A.    No, Sosa's just loud, is always loud.

25      Q.    What happened after that?

B mc

Dempsey - People - Direct

1    A.    Excuse me, what happened after they met?

2    Q.    Yes, what happened at the party after that?

3    A.    We was mingling, talking.  The guys was in the kitchen.

4  They was all, David and them, was in the kitchen with Alberto,

5  and all the other guys that was there.  The kitchen was where

6  people could smoke cigarettes, so they was basically in the

7  kitchen half of the time.

8    Q.    And who, I'm sorry, who are you indicating was in the

9  kitchen during that time?

10    A.    David, Sosa, Alberto and Robert.

11    Q.    And were you able to see them inside the kitchen?

12    A.    Only if I walked towards the table from the living room

13  I would be able to look in the kitchen.

14    Q.    Okay, were there times you looked into the kitchen?

15    A.    Yes, here and there.

16    Q.    Did you notice anything unusual happening between them?

17    A.    No.

18    Q.    What were they doing that you observed?

19    A.    They was just standing there talking, I don't know

20  about what.

21    Q.    Did you ever have to leave the apartment at that -- any

22  point from the time you got there to about this time of the

23  party?

24    A.    Throughout the party?

25    Q.    Well, did you have to leave the apartment, Carmen

B mc                        Dempsey - People - Direct

1   Diaz's apartment?

2        A.   Yes, I went home to get something.

3        Q.   To get what?

4        A.   To get something, to change my shoes I think it was.

5        Q.   At what point in the party was that?

6        A.   A little -- I think midnight I think it was.

7        Q.   So you went home to get shoes.  Did you go back to the

8   party?

9        A.   Yes.

10       Q.   Party continue after that?

11       A.   Of course.

12       Q.   Did there ever come a time that you observed Margie or

13  the defendant leave the apartment?

14       A.   Yes.

15       Q.   Do you know approximately what time it was, using

16  midnight as a guideline?

17       A.   I think maybe it was eleven.  We didn't have cranberry

18  juice, so Margie and David went to go get a bottle of cranberry

19  juice.

20       Q.   You're saying eleven o'clock?

21       A.   I'm not sure, maybe around eleven.  I don't remember.

22       Q.   Do you remember or you're not --

23            MR. CANTOR:  Objection, Judge, it's been explored,

24       she said about eleven o'clock.

25       A.   I don't remember the time.

B mc                          Dempsey - People - Direct

1                      THE COURT: Move on.

2          Q.   And had you said anything to them or had somebody else

3     said anything to Margie or David before they left the apartment?

4                      MR. CANTOR:  I certainly object to anyone else

5          talking.

6          Q.    That you heard?

7                      MR. CANTOR:  I object.

8                      THE COURT:  You just asked --

9                      MR. CANTOR:  Two questions he's asked him; one is

10         compound.

11                     THE COURT: All right, break them up.

12                     MR. ROSENFELD:  Sure.

13         Q.   Did you or -- did you hear anybody say anything to

14    Margie or David before they left the apartment?

15                     MR. CANTOR:  Is that a yes or no question, your

16         Honor?

17                     THE COURT:  Let's see how the witness answers.

18         A.   No.

19         Q.   Did Margie or David say anything when they left the

20    apartment?

21         A.   No, they'll be right back, they was going to go get the

22    cranberry juice.

23         Q.   Did Margie or David indicate where they were going to

24    get the cranberry juice?

25         A.   Yes, at Margie's apartment.

1      Q.    So once they left the apartment, did there come a time

2  they returned to the apartment?

3      A.    Yes.

4      Q.    Do you know approximately how long they were gone for?

5      A.    I think approximately twenty minutes.

6      Q.    And did anything happen in the apartment during that

7  twenty minutes?

8      A.    That they was out?

9      Q.    While they were gone?

10     A.    No.

11     Q.    Were all the same people --

12     A.    Yes.

13     Q.    Let me finish my question, please.  Were all the same

14  people that you told us about before still at the apartment when

15  Margie and the defendant left?

16     A.    Yes.

17     Q.    And you indicated there came a time Margie and the

18  defendant returned to the apartment?

19     A.    Yes.

20     Q.    Had you had any alcohol to drink at the party that

21  night up until this point?

22     A.    Yes.

23     Q.    Approximately, if you can recall, what did you have to

24  drink that evening?

25     A.    I had some Hennessy.

B mc

Dempsey - People - Direct

1    Q.    And you remember how many Hennessy's you had?

2    A.    Maybe like four shot cups.

3    Q.    How big is a shot cup?

4    A.    Like this.

5          MR. ROSENFELD:   Indicating the witness is holding

6    up a Dixie cup that is on the platform in front of her with

7    the water.

8          THE COURT:   So indicating.

9          MR. CANTOR:   Approximately three and a half to

10   four inches in length, the width circumference of

11   approximately four inches.

12         MR. ROSENFELD:   As it appears, your Honor.

13         THE COURT:   As it appears.

14   Q.    Were those full cups?

15   A.    Not full cups.

16   Q.    How much Hennessy was --

17   A.    Half, half cups.

18         MR. ROSENFELD:   Indicating the witness is holding

19   her thumb and second finger at the bottom part of the cup,

20   as the jury can see, she's pointing to an area on the Dixie

21   cup.

22         MR. CANTOR:   About an inch, an inch and a quarter

23   from the bottom.

24         THE COURT:   So indicating.

25   Q.    And you had how many of those?

B mc                          Dempsey - People - Direct

1                    MR. CANTOR:  Objection, asked and answered.

2                    THE COURT:  I'll allow it.

3          A.    Around three to four cups.

4          Q.    Were you drunk at that point?

5          A.    No, I wasn't drunk.

6          Q.    Had you drunk Hennessy before that?

7          A.    Plenty of times, yes.

8          Q.    Now once the defendant and Margie returned to the

9     apartment, did the party continue?

10         A.    Yes.

11         Q.    What was going on at the party at that point, in

12    general?

13         A.    Dancing, having a good time, kids eating, reminiscing,

14    we was dancing with Sosa.

15         Q.    Did you observe Sosa during the course of the evening

16    have any alcohol to drink?

17         A.    Yes.

18         Q.    What, if anything, did you notice him drinking?

19         A.    He was drinking Bacardi.

20         Q.    And did you notice how he was drinking Bacardi, from

21    where?

22         A.    How he was drinking it?

23         Q.    I mean what he was using to drink?

24         A.    It was just in a cup.

25         Q.    Same type of cup you were using?

B mc                       Dempsey - People - Direct

1     A.    Yes.

2     Q.    Were you able to observe approximately, if you recall,

3  how many Bacardi's Sosa was drinking?

4     A.    He had approximately like two or three cups because he

5  kept putting down his cup and then making a new cup.

6              MR. ROSENFELD:   Indicating the witness picked up

7        the Dixie cup and put it down once or twice.

8     Q.    And how was Sosa acting during this time?

9     A.    He was happy, a little loud.  That's the way Sosa is.

10             MR. CANTOR:   I object to that's the way he was.

11    A.    That's the way he was.

12             MR. CANTOR:   I object.

13             THE COURT:   That's the way she characterizes --

14             MR. CANTOR:   I'm sorry?

15             THE COURT:   That's her impression of the

16       characterization, I'll allow it.

17    Q.    Was Sosa drunk?

18    A.    Yes.

19    Q.    And how was he acting, what was he doing?

20    A.    He was over friendly, happy, playing with the kids,

21  talking to the family, just mingling with everybody at the party.

22    Q.    Was he dancing at all?

23    A.    Yes, he was dancing.

24    Q.    So when Margie and David return to the apartment and

25  the party continued, what happened after that?

B mc                          Dempsey - People - Direct

1      A.   What happened after that?  Well, a couple of hours, I
2  thought -- we was in the living room, all the ladies and the
3  kids, and the fellows was in the kitchen.  All of a sudden Sosa's
4  sitting on the armrest of the sofa.
5      Q.   Before -- if I may, before this moment, did you --
6              MR. CANTOR:  Judge, I would like a complete answer
7         without interruption.
8              THE COURT:  He withdrew and he's asked her another
9         question.
10             MR. CANTOR:  I don't think she was through, he
11        interrupted the answer.
12             THE COURT:  Did you wish to withdraw?
13             MR. ROSENFELD:  Yes.
14             MR. CANTOR:  How can he withdraw when she's
15        partially answered?
16             THE COURT:  Move on.
17     Q.   Did there ever come a time that you again left the
18  apartment?
19     A.   Yes.
20     Q.   With who?
21     A.   With Carmen, Sosa and Tango.
22     Q.   Carmen, Sosa --
23     A.   And Tango.
24     Q.   And Tango.  I'm sorry, I didn't hear.  And why did --
25             MR. CANTOR:  I'm sorry?

B mc

Dempsey - People - Direct

1    Q.   Why did you leave the apartment?

2              THE COURT:  I'm sorry, Mr. Cantor?

3              MR. CANTOR:  Carmen, Sosa --?

4              THE WITNESS:  And Tango.

5    Q.   Why did you leave the apartment with Carmen, Sosa and

6    Tango?

7    A.   Because Carmen wanted Sosa to rest up a little bit in

8    my house.

9    Q.   Why was that, what did you observe?

10   A.   He was tired all day, then he had a couple of drinks

11   and he was just feeling a little dizzy.  So there was too many

12   people at Miss Diaz's house, so we was going to bring him to my

13   house to sleep.

14             MR. CANTOR:  Can I have that read back?

15             MR. ROSENFELD:  Your Honor, he can have it reread

16      later.

17             MR. CANTOR:  Judge.

18             THE COURT:  Please, I haven't ruled.

19             MR. CANTOR:  Yes, I know, I rise to await your

20      ruling, a matter of courtesy.

21             THE COURT:  You may read it back.

22             MR. CANTOR:  Thank you.

23             (Whereupon, the court reporter read back the

24      requested testimony.)

25   Q.   Before that moment that you took Sosa out of the

B mc                          Dempsey - People - Direct

1   apartment, had you noticed or observed any interaction right

2   around that time between Sosa and David?

3        A.   No.

4        Q.   Had anything at all happened that was of a fight

5   nature, angry nature between anybody at the party up until that

6   moment?

7        A.   No.

8        Q.   And what happened when you got Sosa to your apartment?

9        A.   He sat down on my sofa, we talked for a couple of

10  minutes and he didn't want to stay there long, so we came right

11  back to Miss Diaz's house.

12       Q.   How was he acting?

13       A.   He just -- just, "I want to go back, I want to party,

14  I'm okay."  So we bring him right back to Miss Diaz's house.

15       Q.   How would you describe his demeanor at that point?

16       A.   He was just being his regular self, friendly and

17  outgoing and just mingling with everybody, that he knew everybody

18  there except David.

19       Q.   I'm talking about your apartment?

20       A.   Oh, my apartment?

21            MR. CANTOR:  What did she say, "Except David?"

22            THE WITNESS:  Yes.

23       Q.   Specifically asking you while he was in your apartment?

24       A.   Yes.  He just -- he wanted to go back to the party.  He

25  said, "I'm family, why I got to be here, I want to go back, I

B mc                          Dempsey - People - Direct

1   want to mingle."  So we said, "Okay, Sosa," and we bring him back

2   to Miss Carmen Diaz's home.

3        Q.   When he was in your apartment, was he acting drunk?

4        A.   No, no.

5        Q.   Did he have anything to drink in your apartment?

6        A.   No, we didn't have no drinks in my apartment.  We

7   didn't walk out with no drinks from Carmen's house to my

8   apartment.

9        Q.   So approximately how long were you gone from Carmen

10  Diaz's apartment with Sosa until you return to her apartment?

11       A.   Like ten minutes.

12       Q.   All four of you?

13       A.   Yes.

14       Q.   And there come a time you came back into Carmen Diaz's

15  apartment?

16       A.   Correct.

17       Q.   What happened when you got back to Carmen Diaz's

18  apartment?

19       A.   When we got back to Carmen Diaz's apartment, we started

20  mingling and talking, and that's when the situation between David

21  and Sosa happened.

22       Q.   Up until that moment had you noticed any sharp knives

23  around the apartment, if you recall?

24       A.   No, Miss Diaz keeps her sharp knives in her kitchen

25  drawers.

B mc                        Dempsey - People - Direct

1      Q.   Were there any out on that table that is in People's

2   Exhibit 5, if you remember?

3      A.   No, there was no knives there.

4      Q.   What is on the table?  If you can just go over, you can

5   recognize what items --

6                MR. CANTOR:  She's already answered that, your

7        Honor.

8      Q.   Look at People's --

9                MR. CANTOR:  I object on grounds of repetition.

10               THE COURT:  I think we did have this.

11               MR. ROSENFELD: I don't think we pointed.

12               MR. CANTOR:  Why do we have to have a response

13       from the D.A.?

14               THE COURT:  The Court is being illuminated.

15               MR. CANTOR:  So, I object.

16               THE COURT:  Something else you want her to point

17       out?

18               MR. ROSENFELD:  The specific items on the table.

19               MR. CANTOR:  We've had that.

20               MR. ROSENFELD:  Judge, we never did this.

21               MR. CANTOR:  Judge, I object.

22               THE COURT:  All right, your objection is noted.

23               You may point out what it is that was on the

24       table.

25     Q.   That you recognize?

B mc

Dempsey - People - Direct

1   A.   These are the plates of food that people left.

2        MR. CANTOR:   I can't hear.

3        THE WITNESS:   These are the plates of food, people

4   left their beers, and the cranberry juice that Miss Margie

5   brung to the party.

6   Q.   What are the other items on the far end, just in

7   general, point to them all?

8   A.   These are plates, gloves, the Coor's Light, the

9   cranberry juice and more cups here.

10  Q.   Those blue gloves, were they at the party?

11  A.   No, those was not at the party.

12  Q.   That was afterwards, after the incident?

13  A.   That's the ambulance that came.

14  Q.   And also, if you notice, on the far left of the table,

15  on the white tablecloth, there's something that appears to be

16  liquidy, you know what that is?

17  A.   Yes, that is blood.

18  Q.   That wasn't there at the time of the party?

19  A.   Of course not.

20       MR. ROSENFELD:   Thank you.   You may sit down.

21  Q.   All right, so you came back into the apartment with

22  Sosa, Tango and Carmen, party continued?

23  A.   Yes.

24  Q.   Were children still there?

25  A.   Yes, all the children was there.

B mc                          Dempsey - People - Direct

1      Q.    Everybody else was there that you named?

2      A.    Yes.

3      Q.    Did something happen at some point as the party

4    continued?

5      A.    Yes.

6      Q.    Please tell us.

7      A.    A couple of -- the incident between him and David?

8            MR. CANTOR:  I'm sorry?

9            THE WITNESS:  The incident between him and David?

10     Q.    Whatever happened, please tell us?

11     A.    Okay, they -- Sosa -- I got to get up.

12     Q.    Yes.

13     A.    Kids was sitting here.

14           MR. CANTOR:  Judge, if she's talking that way,

15    certainly my client can't hear and I can't hear.

16     A.    Kids was sitting on this sofa, all the kids.

17     Q.    Indicating the sofa in the middle of the photograph

18    against the wall?

19     A.    Yes.

20     Q.    Go ahead.

21           THE COURT:  Who was sitting there, did you say?

22           THE WITNESS:  The children.

23           THE COURT:  They were all seated together?

24           THE WITNESS:  Yes, it wasn't that many kids there.

25           THE COURT:  Okay.

B mc                         Dempsey - People - Direct

1       A.    I was standing here in front of the window.

2             MR. ROSENFELD:  Indicating the witness is pointing

3       to the right side of the photo where the curtains are?

4       A.    Yes.  Miss Diaz was standing right here.

5             MR. ROSENFELD:  Same area in front of the couch by

6       the window.

7             THE COURT:  So indicating.

8       A.    Sosa was sitting right here on the armrest of the sofa.

9       Q.    I'm sorry to interrupt.  Indicating -- the witness is

10      pointing on People's Exhibit 6, I need to put this on the record,

11      Miss Dempsey, on the area of the sofa, which appears to be the

12      arm of the sofa, on the right side where I'm pointing?

13      A.    Yes.

14      Q.    Please, continue.

15      A.    Sosa was sitting there.  All of a sudden I see

16      Mr. David come out of the kitchen and he's in front of Sosa.  I

17      thought he was arguing.  So I see David hitting him, but -- I

18      thought he was hitting him.  I screamed for my husband Tango,

19      "Tango, Tango, David is fighting Sosa."  When my husband ran out

20      of the kitchen, Tango, he grabbed David by his two arms.  When he

21      grabbed David, he said, "What are you doing, David, just move."

22            MR. CANTOR:  He said what?

23            MR. ROSENFELD:  May I ask the witness?

24            MR. CANTOR:  She's talking too low.

25            THE COURT:  All right.

B mc                          Dempsey - People - Direct

1              MR. CANTOR:  I can't hear.

2              MR. ROSENFELD: I'm standing back by the jury, I

3     hear her fine.

4              MR. CANTOR:  If I was facing --

5              THE COURT:  Let's hear that at the point where you

6     said he was sitting on the sofa?

7              THE WITNESS:  On the armrest.

8              THE COURT:  On the armrest.  These gentlemen came

9     out of the kitchen, they started arguing, and?

10             THE WITNESS  What I thought, David was hitting

11    Sosa.  So I screamed for my husband Tango, "Tango, Tango,

12    David's hitting Sosa."  So when Tango ran out of the

13    kitchen, all we saw was David --

14             MR. CANTOR:  Objection to what Tango saw.  How can

15    she testify to that?

16             THE COURT:  Yes, only what you saw.

17             THE WITNESS:  What I saw, David hitting Sosa.  I

18    screamed for Tango.  "David's hitting Sosa."  Tango took

19    David off of Sosa.  When he told -- I can't say what he

20    said?

21    Q.   No, what happened?

22             THE COURT:  Go on.

23    Q.   You can say what was said?

24             THE COURT:  Go a little slower.

25             MR. CANTOR:  I can't hear your ruling when the

B mc

Dempsey - People - Direct

1    D.A. talks.  What did your Honor say?

2                THE COURT:  I asked her to speak a little slower.

3                MR. CANTOR:  And loudly please, your Honor.

4                THE COURT:  Yes.

5    A.    Tango said, "What did you do to my friend?"

6                MR. CANTOR:  Judge, I'm objecting to that.

7                THE COURT:  Overruled.

8    Q.    You may continue?

9    A.    He said, "Why did you do that to my friend?"  That

10   moment, that's when he looked at Sosa when Sosa --

11   Q.    Who looked?

12   A.    Tango.  When he went to see if Sosa was bleeding in

13   the -- in the face or something, we thought he was getting

14   punched.  When Sosa stood up holding his neck, that's when we saw

15   all the blood flying from his neck.

16   Q.    Please continue, where was David at that moment?

17   A.    David ran out of the apartment.

18   Q.    Where was Tango at that moment?

19   A.    Running after David.

20   Q.    Where were you at that moment?

21   A.    Running after Tango.

22   Q.    So let's -- if you don't mind backing up a little bit,

23   you indicated you were standing by these curtains here on the

24   right?

25   A.    Correct.

B mc                      Dempsey - People - Direct

1      Q.    Sosa was sitting on this area by the chair?

2      A.    Yes.

3      Q.    What was Sosa doing at that moment when was sitting in

4    that spot?

5      A.    He was just sitting there, he wasn't doing nothing,

6    just sitting there.

7      Q.    Did you notice if he had anything in his hand then?

8      A.    No, he didn't have nothing in his hand at that moment.

9      Q.    You ever see Sosa at that night with any type of

10   weapons in his hand?

11     A.    No, he did not have no weapon, I did not see no weapon

12   on him.

13     Q.    And you said David came out from the kitchen area?

14     A.    Yes.

15     Q.    And did you hear whether or not David said anything to

16   Sosa?

17     A.    I didn't, nothing.  I thought he was just hitting Sosa,

18   I didn't hear anything, no words.

19     Q.    Was the music playing at this point?

20     A.    Yes, the music was playing.

21     Q.    And before David, the defendant, started hitting Sosa,

22   did you notice any exchange between the two?

23     A.    No, only besides the exchange in the kitchen when he

24   said take care of Margie, we all know her.

25     Q.    When was that?

Dempsey - People - Direct

882

1    A.    That was earlier in the party.

2    Q.    That's what you told us about?

3    A.    Yes, yes.

4    Q.    I'm talking about at this moment?

5    A.    No.

6    Q.    By the couch?

7    A.    No.

8    Q.    You didn't hear anything?

9    A.    No.

10    Q.    Did you see Sosa do anything to the defendant before

11    the defendant started attacking him?

12    A.    No.

13    Q.    Did you notice at the time when this person David, the

14    defendant, came over to Sosa, did you see anything in his hand at

15    that moment?

16    A.    No.

17    Q.    How was he holding his hand, if you could show us?

18          MR. CANTOR:  Which hand?  And I object, what

19    particular moment?  I object.

20          THE COURT:  All right, let's make it -- repose the

21    question.

22          MR. ROSENFELD:  I was trying not to lead, your

23    Honor.

24          MR. CANTOR:  Judge, why do we have colloquy?  I

25    can't have colloquy, but he can apparently.

B mc

Dempsey - People - Direct

1          THE COURT:  Everyone cannot have colloquy.

2          MR. CANTOR:  Address to the District Attorney who

3     just did it.

4          THE COURT:  Please continue, Mr. Rosenfeld.

5          MR. ROSENFELD:  Sure, I'll be happy to.

6     Q.   Can you please indicate how David approached Sosa and

7     what he did with his hand?

8          MR. CANTOR:  She's already answered the question.

9          THE COURT:  I will allow it.

10    Q.   Go ahead?

11    A.   He was going like this, that's when I thought he was

12    punching him.

13    Q.   Who was punching?

14    A.   David.

15    Q.   You're using two hands right now?

16    A.   Yes.

17    Q.   You indicated --

18         MR. ROSENFELD:  The witness indicated with her

19    right hand up, moving it forward and back and --.

20    Q.   Looks like your left hand?

21    A.   No, not the left, the right hand.

22    Q.   You recall specifically the right hand?

23    A.   Yes.

24    Q.   Show us what you saw David doing specifically?

25         MR. CANTOR:  She's already just done that, it's

B mc                                                                              884

                              Dempsey - People - Direct

1        repetitious.

2                        THE COURT: Overruled.

3        Q.    Be very specific and clear, what did you see David do

4    in his hand motion towards Sosa?

5        A.    I saw him hitting Sosa.

6        Q.    Show us?

7        A.    Like this.

8                        MR. ROSENFELD:  Indicating she's moving her right

9        hand with her fist from her shoulder in a forward and back,

10       forward and back action.

11                       THE COURT:  So indicating.

12       Q.    Do you recall approximately how many times you observed

13   him doing that?

14       A.    I think it was like five times.

15       Q.    What was Sosa doing at the time --

16       A.    Sosa --

17       Q.    Let me finish.  What was Sosa doing when the defendant

18   was attacking him like that?

19       A.    Sosa wasn't doing nothing but sitting there, he

20   couldn't even get up.

21       Q.    Did he react with his hands or his body?

22       A.    No, he didn't have a chance to react.

23       Q.    How quickly or --

24                       MR. ROSENFELD: Withdrawn.

25       Q.    How long did that whole thing take?

B mc                        Dempsey - People - Direct

1      A.    It took I think less than five minutes, it was so

2 quick.

3      Q.    Five minutes?

4      A.    Yes, it was quick.  I said less than five minutes.

5      Q.    The whole hitting?

6      A.    Yes, it was quick, it was very quick.

7      Q.    Well, how quick is five minutes?

8            MR. CANTOR:  Objection, Judge.

9      A.    I don't know, two minutes, three minutes.

10            MR. CANTOR:  Can she not answer when there's an

11 objection pending?

12            THE COURT:  First of all, when you hear an

13 objection, just wait.

14            THE WITNESS:  Okay.

15            MR. CANTOR:  Can she sit?

16            THE COURT:  No, she doesn't have to sit.

17            THE COURT:  Secondly, the objection is overruled.

18            Thirdly, you may now answer the question.

19      Q.    Can you show us how long, and demonstrate how long

20 David was making that motion towards Sosa from beginning -- from

21 when he first started that motion to the end, show us?

22      A.    I don't know how long.

23            MR. CANTOR:  She's already done that.

24            THE COURT:  One second.

25            Are you asking her to just measure time?

886

B mc                          Dempsey - People - Direct

1                  MR. ROSENFELD:  Just to do it and not measure.

2                  THE COURT:  To do it and clock the time?  What are

3       you asking her?

4                  MR. CANTOR:  She's done it already.

5                  MR. ROSENFELD:  I'm asking her to demonstrate for

6       us exactly how many times it took for that motion.

7                  THE COURT:  How do you wish to do that, by

8       standing mute for the time, or clocking it, or how?

9                  MR. ROSENFELD:  Here's what I would like to do.

10      Q.    Please use your hand.  Wait when I say, then go, how

11      the defendant attacked Sosa from beginning to end, and I'll look

12      at the clock, okay?

13                 MR. CANTOR:  I'm objecting, she's already

14      demonstrated.  She said less than five minutes.  Why do we

15      have to have repetition?  It is the direct examination.

16                 THE COURT:  He's looking for specificity.

17                 MR. CANTOR:  And she said less than five minutes.

18                 MR. ROSENFELD:  I think this is colloquy, your

19      Honor.

20                 THE COURT:  The objection is overruled.

21                 MR. CANTOR:  Exception.

22      Q.    Again, please, when I'm ready, just demonstrate and

23      show us the amount of time it took, using your hand, for the

24      defendant to make those motions towards Sosa.  Ready?

25                 MR. CANTOR:  I'm objecting, your Honor.

B mc

Dempsey - People - Direct

1         THE COURT:  Yes.

2         MR. CANTOR:  By way of time.

3         THE COURT:  Yes, you've noted that.

4    Q.   I'm waiting for the hand -- just start and stop.

5   Ready, go.

6         (Witness complied.)

7         MR. ROSENFELD:  Indicating about four seconds,

8   your Honor, on the clock.

9         THE COURT:  So indicating on the clock.

10        MR. CANTOR:  On the clock, but she said less than

11  five minutes.

12   Q.   And --

13        THE COURT:  Well now having demonstrated, do you

14  still maintain that it was five minutes?

15        THE WITNESS:  No, the time that Mr. Rosenfeld

16  said.

17        THE COURT:  Five seconds, four seconds, whatever

18  he said?

19        THE WITNESS:  Yes.

20   Q.   And after --

21        THE COURT:  May she be seated?

22        MR. ROSENFELD:  Sure.

23   Q.   You can sit down.

24   A.   Thank you.

25   Q.   And after the defendant made those motions, what

B mc

Dempsey - People - Direct

1   exactly did he do?

2       A.   David?

3       Q.   Yes.

4       A.   He ran.

5       Q.   Okay, before David ran from the apartment, did he say

6   anything?

7       A.   No, he did not say nothing at all.

8       Q.   So how did he leave the apartment?

9           MR. CANTOR:   Objection, asked and answered, he

10      ran.

11      Q.   Did he do anything before he left the apartment?

12      A.   No.

13      Q.   Did he say anything to anybody before he left the

14  apartment?

15          MR. CANTOR:   Judge, I'm going to object.  She's

16      already testified.

17          MR. ROSENFELD:   He keeps objecting.

18          MR. CANTOR:   Of course.

19          THE COURT:   I'll rule on the objection.   You're

20      entitled to that.   The objection is overruled.

21          Mr. Rosenfeld.

22      Q.   When the defendant left the apartment, did he say

23  anything to anybody?

24      A.   No.   My friend Mercedes --

25          MR. CANTOR:   Objection, she's answered the

B mc                          Dempsey - People - Direct

1      question.

2                  THE COURT:  Yes.

3      Q.    Did the defendant say anything to anybody?

4                  THE COURT:  One second, Mr. Rosenfeld.   The answer

5      is yes or no, and you said?

6                  THE WITNESS: I said, yes.

7                  THE COURT:  He said something to somebody?

8                  THE WITNESS: In the hallway to somebody.

9                  THE COURT:  Okay, in the hallway.  Go ahead.

10     Q.    I'm still in the apartment?

11     A.    No, no.

12     Q.    In the apartment the defendant did not say anything to

13     anybody?

14     A.    No.

15     Q.    And when you say he left the apartment, he went out the

16     door of the apartment?

17     A.    Yes.

18     Q.    What happened as the defendant went out the door of the

19     apartment?

20     A.    He was running and then my friend --

21     Q.    Who was running?

22     A.    David.

23     Q.    Yes?

24     A.    Mercedes chased him.  To somebody?

25                 THE WITNESS: In the hallway.

B mc                          Dempsey - People - Direct

1                    THE COURT:  Okay, in the hallway.  Go ahead.

2         Q.   I'm still in the apartment?

3         A.   No, no.

4         Q.   In the apartment the defendant did not say anything to

5    anybody?

6         A.   No.

7         Q.   And when you say he left the apartment, he went out the

8    door of the apartment?

9         A.   Yes.

10        Q.   What happened as the defendant went out the door of the

11   apartment?

12        A.   He was running and then my friend --

13        Q.   Who was running?

14        A.   David.

15        Q.   Yes?

16        A.   Mercedes chased him.

17        Q.   Mercedes was?

18        A.   Another friend of ours that was there.

19        Q.   Where was she when this -- when the defendant attacked

20   Sosa, if you recall?

21        A.   She was sitting on the table.

22        Q.   Sitting by the table on People's Exhibit --

23        A.   By the door.

24        Q.   -- 4, approximately?

25        A.   Yes, she was sitting right here.

B mc                          Dempsey - People - Direct

1              MR. ROSENFELD:   Indicating a chair by --

2       Q.   That's by the door now?

3       A.   Yes.

4              THE COURT:   So indicating.

5       Q.   Was the door open?

6       A.   No, the door was closed.

7       Q.   Who opened the door?

8       A.   David.

9       Q.   And tell us again, show us what you saw Mercedes do?

10      A.   She was sitting right here so when David ran out like

11   this, Mercedes chased him.  At that time Sosa was already on the

12   floor.  Mercedes chased him in the hallway.  He pushed Mercedes

13   on the floor and he told her to get off me.

14      Q.   Were you there when that happened?

15      A.   Yes, I was there, I check her.  She was full of blood.

16   I thought maybe he had cut her too.

17              THE COURT:   Was Mercedes the first one after him

18       or after Tango, who was the first then?

19      A.   She was the first one, Mercedes.

20              THE COURT:   And who was the second one.

21              THE WITNESS:   Tango.

22              THE COURT:   And who was the third one.

23              THE WITNESS:   Me.

24              MR. ROSENFELD:   I was getting to all that.  Thank

25       you.

B mc                              Dempsey - People - Direct                    892

1      Q.   Now Sosa, after David made those motions to him, he was

2   over here by this couch you indicated before?

3      A.   Yes.

4      Q.   Show us again, you can use the pointer, what Sosa did

5   and where he went after David made those motions to him?

6               MR. CANTOR:   That's a compound question, Judge.

7               THE COURT: All right, back it up.

8               MR. ROSENFELD:   It's one question, your Honor.

9      Q.   Show us what Sosa did?

10     A.   After David stabbed him?

11     Q.   Right.

12               MR. CANTOR:   Objection, she never saw David stab

13       him.

14               THE COURT:   I'll allow that to be clarified.

15               MR. CANTOR:   I'm sorry?

16               THE COURT:   I'm allow Mr. Rosenfeld to clarify

17       that.

18               MR. CANTOR:   Well --

19     Q.   Did you ever see, when David was making that motion

20   toward Sosa, anything in his hand?

21     A.   No.

22               MR. CANTOR:   So I ask that "stabbing" be stricken

23       from the record.   That's not mentioned by this witness.

24               THE COURT:   The word stabbing at this point, yes,

25       okay.

B mc

892a

Dempsey - People - Direct

1          MR. CANTOR:  Will you instruct the jury to

2    disregard it?

3          THE COURT:  At this moment the jury will disregard

4    testimony, that she did not actually see the stabbing.

5    Q.    After David made those motions to Sosa, what did you

6    notice about Sosa?

7    A.    He couldn't talk, he couldn't.

8    Q.    Why?

9    A.    He was holding his throat.

10   Q.    What did you observe about him at that moment?

11   A.    He was going backward and he fell on the floor, he

12   couldn't breathe.

13                    CONTINUED NEXT PAGE.........

14

15

16

17

18

19

20

21

22

23

24

25

Ms. Dempsey - for People - Direct

cm/c

1          MR. CANTOR:  Judge, objection to that on grounds

2     of competency, he couldn't breathe.

3          THE COURT:  That's what she observed.

4          MR. CANTOR:  She's not a doctor.  She's not a

5     paramedic.

6          THE COURT:  Yes, that's absolutely true.

7     Q    What did you observe on Sosa's body while this was

8  happening?

9     A    It looked like he was in shock, like he didn't know

10 what was going on.

11         MR. CANTOR:  I'm going to object to that on

12    grounds of competency.

13         THE WITNESS:  That's what she observed.  This is

14    her interpretation of the observation.

15    Q    Was anything happening to his body, that you observed?

16    A    He was bleeding.  He was shaking.

17    Q    I'm sorry?

18    A    He was shaking as he was going down.

19    Q    Where was he bleeding from?

20    A    From his throat.

21    Q    Can you show us the areas, if you recall?

22    A    Around here.

23         MR. ROSENFELD:  Indicating the witness pointing

24    with her right hand to the left side of her throat.

25         THE COURT:  So indicating.

Ms. Dempsey - for People - Direct

cm/c

1    Q    That's where the blood was coming from?

2    A    Yes.

3    Q    Can you describe the blood that was coming, how much?

4    A    A lot of blood.  It got all over me.  It got all over

5    the children.  Carmen's face was covered with blood.

6              MR. CANTOR:  Judge, I'm going to ask that that be

7         stricken.

8              MR. ROSENFELD:  It's her observation.

9              THE COURT:  You've asked for it to be stricken,

10        and that request is denied.

11             MR. CANTOR:  Why do we have to have colloquy?

12        What is good for the goose is good for the gander.

13             THE COURT:  No question Mr. Rosenfeld knows that.

14             MR. ROSENFELD:  Thank you.  I'm trying to finish

15        this.

16    Q    Show us what Sosa did from the time he was sitting on

17    the couch on that arm to the time he ended up on the floor.

18             MR. CANTOR:  Judge, we've had that.

19             MR. ROSENFELD:  We've not been able to establish

20        that with all the interruptions.

21             MR. CANTOR:  No colloquy.  He goes on.  I'm not a

22        potted plant.  I'm representing a man charged with murder.

23        That's reprehensible, and I object and I ask that you

24        address it.

25             MR. ROSENFELD:  I ask this be stopped.

Ms. Dempsey - for People - Direct

```
cm/c
 1              MR. CANTOR:  Instruct the assistant to follow the

 2     same instructions that I've been issued.  That's all I ask.

 3              THE COURT:  Are you quite finished?

 4              MR. CANTOR:  Thank you.

 5              THE COURT:  The objection is overruled.  Please

 6     continue.

 7              MR. ROSENFELD:  Do we need a side bar or do we

 8     have to keep going?

 9              MR. CANTOR:  That's what I mean, these hostile

10     comments.

11              THE COURT:  Mr. Rosenfeld, please.  No

12     editorializing.  There is no more.

13              MR. CANTOR:  How hungry is he for a conviction?

14              MR. ROSENFELD:  Your Honor, this is totally wrong.

15     Can we stop the proceedings at this point?  This is totally

16     wrong.

17              THE COURT:  The jury will totally disregard any of

18     these comments and the overexuberance and enthusiasm of

19     counsel.

20              Please continue.

21              MR. ROSENFELD:  Thank you.

22     Q    Miss Dempsey, I'm trying to ask you to please show us,

23     using the photograph and yourself, what did Sosa do from the

24     time he was on the end of the sofa when you saw the blood coming

25     out.  Tell us.
```

cm/c

1    A    Sosa had got off --

2               MR. CANTOR:  I can't hear when she's facing that

3         way.

4               THE COURT:  All right, ma'am.  Please be kind

5         enough to keep your voice a little louder.  Face this way.

6               THE WITNESS:  I have to point here.

7               THE COURT:  Yes, I understand.  Do your best.

8    Q    Do your best.  Thank you.

9    A    Do you want me to step down?

10   Q    Sure.  If that would help.

11   A    Sosa was standing right here after that happened.  He

12   grabbed his throat.  He was staggering going backwards,

13   backwards, backwards until he fell on the floor.

14   Q    Okay.  I'm showing you People's Exhibit 3.

15              MR. CANTOR:  Can the witness be seated, your

16        Honor?

17              THE COURT:  If Mr. Rosenfeld is finished with that

18        line of questioning.

19              MR. ROSENFELD:  One moment, Judge.  I'm having a

20        little technological difficulty.

21              THE COURT:  Take your time.

22              MR. ROSENFELD:  I have a technical glitch.  Let's

23        see.  I think we're okay.  All right.  Thank you.

24   Q    Using People's Exhibit 3, go ahead, Sosa went?

25              MR. CANTOR:  What's the question, your Honor?

Ms. Dempsey - for People - Direct

cm/c

1    Q    What happened to Sosa after he moved off the couch?

2              MR. CANTOR:  She answered it.  He fell to the

3    floor.

4              MR. ROSENFELD:  I'm using a different photograph.

5              MR. CANTOR:  It's still repetitious, your Honor.

6              THE COURT:  I will allow it.

7              MR. ROSENFELD:  Please continue.

8              THE WITNESS:  Okay.

9              THE COURT:  If you could step down and do it from

10   the other way.

11   Q    Using this photo now, you indicated he moved backwards

12   towards an area.

13             THE COURT:  This is People's 3.

14   Q    Show us where he moved back towards.

15   A    As the incident happened, he had got up from here

16   holding his throat, looking around, wondering what was going on.

17             MR. CANTOR:  Objection.  I object to that

18   "wondering what was going on."  How can she peer into the

19   mind of the man?

20             THE COURT:  Did he appear dazed to you?

21             THE WITNESS:  Yes, he did.

22             THE COURT:  Indicate what you saw.

23             THE WITNESS:  He was holding his throat going

24   back, going back, going back until he collapsed and fell

25   down.

cm/c

1    Q    If you look on the wall to the right here, what's on

2    the wall there?

3    A    That's all Sosa's blood.

4    Q    How did the blood get on the wall?

5    A    It squirted out his neck.

6    Q    Thank you.

7    Now, you were standing where?

8    A    I was standing over here.

9    Q    Indicating to the left of the photo?

10    A    Yes.

11    Q    As Sosa was staggering back, show us what you did?

12    A    I was running this way, Oh, my God; oh, my God; Oh, my

13    God; somebody help him; somebody help him.  Somebody else had

14    gave him CP -- mouth to mouth.

15    Q    Show us what you did then as you ran in that direction.

16    A    I was just standing here screaming hysterical.

17    MR. CANTOR:  Screaming what?

18    THE WITNESS:  Hysterical.

19    MR. ROSENFELD:  Indicating the middle of the

20    photo.

21    Q    Go ahead.  Then what?

22    A    I called 911.

23    Q    Well, did you stay at that moment or did you leave the

24    apartment?

25    A    No, I stood there.

Ms. Dempsey - for People - Direct

cm/c

1    Q   Who went out of the apartment?

2    A   What you mean, who went out of the apartment?

3    Q   You indicated before that David left the apartment.

4    A   Oh, yeah, David left.

5    Q   Who left after him?

6    A   Margie.

7    Q   And where were you at that moment?

8    A   I was standing right here screaming and crying.

9    Q   Show us where Margie was.

10   A   Margie ran.  Margie was sitting back here.  Margie ran

11   out after David.

12   Q   What did you do?

13   A   Nothing.  I was screaming standing there.  Then

14   Mercedes ran.  That was before, though.

15       MR. CANTOR:  That was what?

16       THE WITNESS:  Before.

17   Q   David ran out of the apartment.  The second person to

18   run out was who?

19   A   Was Margie.

20   Q   Did she say anything?

21   A   No. She didn't say nothing.  Mercedes said --

22       MR. CANTOR:  Judge, the question has been answered

23   no.

24   A   I told her, "You need to come back and bring David

25   upstairs."

Ms. Dempsey - for People - Direct

cm/c

1             MR. CANTOR:  I object to this.  It's outside the

2     bounds of the question.

3             THE COURT:  There was no question, ma'am.

4             MR. CANTOR:  Can that be stricken?

5             THE COURT:  For the moment, yes.

6             MR. ROSENFELD:  Should I continue?  Thank you.

7     Q   You say the second person to leave -- the first person

8  to leave after David was Margie?

9     A   Yes.

10    Q   As Margie ran out of the apartment, did you say

11 anything to her?

12    A   I told her, "You need to hurry up and bring David back

13 upstairs.  Look what he did to Sosa."

14    Q   And did you see where David went?

15    A   No.  He ran out.  I don't know.  He went down the

16 stairs in the hallway.

17    Q   So, when Margie ran out, did anyone run after Margie?

18    A   Yes.  My husband was running to try and catch David.

19    Q   What happened to Mercedes?

20    A   Mercedes went later, way later to Margie's house.

21    Q   No.  No.  We are talking about the moment after.

22    A   Oh, she ran after David, yes, before Margie.

23    Q   The moment we are talking about now is the moment after

24 the defendant left the apartment, correct?

25    A   Uh-huh.

Ms. Dempsey - for People - Direct

cm/c

1    Q    The next person out was who?

2    A    David and Mercedes.

3    Q    Who was the person after David?

4    A    Mercedes.

5    Q    You said Margie before?

6    A    Yes, but they all ran.

7    Q    Okay.

8         THE COURT:  We want to clarify it.  David ran out?

9         THE WITNESS:  Yes.

10   Q    Who immediately ran after David?

11   A    Mercedes.

12        THE COURT:  You originally said Mercedes ran out

13   followed by your husband Tango followed by you.

14        THE WITNESS:  Yes.

15        THE COURT:  Now, did Margie run out after you or

16   in between?

17        THE WITNESS:  She ran out before I ran out.

18        THE COURT:  So, it was therefore David, Mercedes,

19   Tango, Margie, you?

20        THE WITNESS:  Yes.

21        THE COURT:  Is that correct?

22        THE WITNESS:  Yes.

23   Q    Okay.  So, Margie runs out.  After Margie runs out, who

24   goes out next?

25        MR. CANTOR:  She just answered your Honor's

cm/c

1      question.

2              MR. ROSENFELD:  I was leading into the next

3      question as to what happened, not just the order.

4              THE COURT:  I will allow him to follow up.

5              MR. CANTOR:  It's repetitious and he's gone over

6      it and over it, your Honor.

7              THE COURT:  There was a point that needed

8      clarification.  Now we've clarified and he's following up

9      his question.

10     Q     Tell us what Mercedes did and where she went.

11     A     Mercedes got up from the chair, ran out the door, ran

12     after David.

13             MR. CANTOR:  She saw this?

14             THE WITNESS:  Yes, I did.

15             THE COURT:  Go ahead.  What did you see?

16             THE WITNESS:  I saw Mercedes running after David.

17     I got up, ran.

18             THE COURT:  Did she catch up to him?

19             THE WITNESS:  She got to grab his arm and he

20     pushed her on the floor and I'm the one that picked up

21     Mercedes off the floor because I thought she was hurt

22     because she was full of blood.

23     Q     Okay.  Thank you.

24             Where were you when you saw David push Mercedes to the

25     floor?

cm/c

1    A    Right here in the doorway.

2    Q    Looking at People's Exhibit 2, where were you standing

3    when David pushed Mercedes?

4    A    Right here in the doorway and Mercedes fell right here.

5    Q    Indicating the left of the middle of the photograph?

6    A    Yes.

7    Q    If you'll turn towards me and show us and demonstrate

8    what you saw David do.

9    A    He said, "Get off me.  Get off me."  He pushed her

10   hard.  He pushed her hard off him, yeah.

11            MR. ROSENFELD: Again, the witness, your Honor, has

12        both her hands open in front of her pushing them out away

13        from her.

14   Q    Okay.  You say Mercedes fell down.  Where was Margie at

15   this point?

16   A    Carmen?  Margie?

17   Q    Margie.

18   A    Margie was in her apartment after that.  Margie, she

19   didn't say nothing.  She just ran out, and then we told Margie,

20   "You need to come back."

21            MR. CANTOR: Objection to what "we" said.

22   Q    Yes.  Please just indicate what you said.

23            MR. CANTOR: Judge, will you rule, please?

24            THE COURT: Yes, I will rule of course.  I will

25        allow him to break it up, and she can say what she said and

Ms. Dempsey - for People - Direct

cm/c

1      then he can ask what anybody else said.

2          Q     As Margie was running out of the apartment, did you say

3      anything?

4          A     Yes.  I told her "You need to bring David back

5      upstairs.  Look what he did to Sosa."

6          Q     Did anybody else say anything at that moment?

7          A     Mercedes told her, "You need to bring David.  Your

8      boyfriend just killed our friend."

9              MR. CANTOR:  What?

10             THE WITNESS:  "You need to bring David.  Your

11         boyfriend just finished killing our friend."

12             MR. CANTOR:  I'm going to ask that that be

13         stricken.  It's third-party hearsay.

14             THE COURT:  Please wait when there is an

15         objection.

16             The objection is overruled.  Your exception is

17         noted, and the district attorney can continue.

18         Q     Did Margie respond when Mercedes said these things to

19     her?

20         A     She said, "I'll be right back."

21         Q     Where did she go?

22         A     To her house.

23         Q     You saw her go to her house?  Where did she go at that

24     moment?

25         A     Out of the building.

Ms. Dempsey - for People - Direct

cm/c

1    Q    Did she leave the hallway?

2    A    Yeah, she left the hallway out the building.

3    Q    Where did she go?

4    A    Home to her house.

5    Q    Did you see her go home?

6    A    No.  I don't know where she went.  She went out in the

7    building, in the hallway.  I don't know where.

8              MR. CANTOR:  Objection.

9    Q    So, she didn't stay in the hallway?

10    A    No.

11    Q    Did she leave the hallway area either by stairs or

12    elevator?

13    A    By stairs.

14    Q    You saw her?

15    A    Yes.

16    Q    That's what I'm asking.  What happened after Margie

17    went down the stairs?  Where did you go?

18    A    Back in the apartment crying.

19    Q    What about Mercedes?

20    A    In the apartment crying.

21    Q    Now, what was happening back inside the apartment when

22    you went back in?  You may sit down.

23    A    We was all screaming, crying, the kids.

24    Q    At any point, when you saw David in the hallway pushing

25    Mercedes, do you know if he had anything in his hand?

cm/c

1    A    He had a weapon in his hand.

2    Q    What did you see?  Can you describe it?

3    A    I saw like a beige, brown handle.  He was holding it

4    like this.

5              MR. ROSENFELD:  Again, the witness has her right

6         fist in front of her with the thumb pointing towards her

7         body.

8              THE COURT:  So indicated.

9    Q    What part of it did you see?

10   A    I saw the end part and the handle of the knife and then

11   the pointy part itself of the knife.  It had like a hook.

12   Q    Had you ever seen that object before?

13   A    No. No.

14   Q    Okay.  Your husband Tango, what did Tango do after

15   Mercedes was on the ground and Margie was running?  Where was

16   your husband?

17   A    Where was he?  After that he was in the house and then

18   he ran out, out the house.

19   Q    He ran out of the apartment?

20   A    Out of the apartment.

21   Q    You keep using the word "house."  Out of the apartment?

22   He came out the door that's in the photograph?

23   A    Yes.

24   Q    Where did he go?

25   A    Down the stairs to try to find David.

Ms. Dempsey - for People - Direct

cm/c

1           MR. CANTOR:  Objection to what he tried to find.

2   How does she know?

3           THE COURT:  Do you know of your own knowledge?

4           THE WITNESS:  Yes, I do know of my own knowledge,

5   because I was stopping my husband from trying to chase

6   David.

7       Q   What, if anything, did you say as your husband went out

8   of the apartment?

9           MR. CANTOR:  Objection.

10      A   I said, "Don't go nowhere."

11          MR. CANTOR:  Objection.

12          THE COURT:  Objection is noted.  Overruled.

13          MR. CANTOR:  Will you tell the witness once again

14   to forego answering until you rule on an objection?

15          THE COURT:  Yes, if you'd be good enough, ma'am.

16      Q   You may answer.  What, if anything, did you say to your

17   husband?

18      A   I told him, "Don't go after him.  Wait until the police

19   come."

20      Q   So, what happened when you went back inside the

21   apartment?  What, if anything, did you do?

22      A   We was all -- I was calling 911.  I couldn't talk on

23   the phone, so then Mercedes grabbed my cell phone, was talking

24   to the 911.  My husband, Tango, grabbed the phone also, was

25   talking to 911 telling them what happened.

Ms. Dempsey - for People - Direct

cm/c

1  Q   Okay.  And where were the kids?

2  A   In the house.  In the house.

3  Q   In the apartment?

4  A   Yes, in the apartment.

5  Q   What were they doing?

6  A   Standing there screaming by the sofas.

7  Q   So, what did you do with the kids?

8  A   We took all the kids out, closed their eyes, walked

9  them out into Mercedes' apartment to the next building.

10  Q   You went with them out of the building?

11  A   I didn't go down with them.  I walked them to the

12  hallway and we told them to go down the stairs to go to

13  Mercedes' house.

14  Q   Okay.  Did you go back into the apartment after he

15  left?

16          MR. CANTOR:  It's leading.

17          MR. ROSENFELD:  I'm setting a time frame.

18          THE COURT:  I will allow it.

19          MR. CANTOR:  What won't you allow?

20          THE COURT:  You may set the time frame.

21          MR. ROSENFELD:  I want to make sure the phrase

22      counsel said is on the record, "What won't you allow"

23      toward the Court.

24          MR. CANTOR:  I don't know what he's talking about,

25      but I certainly did show my displeasure with the constant

Ms. Dempsey - for People - Direct

cm/c

1    overruling of my objections.

2             THE COURT:  All right.

3      Q    Did you remain in the apartment at that point?

4      A    Yes.

5      Q    Did there come a time that the police arrived at the

6    apartment?

7      A    Yes.

8      Q    Now, during the time you returned to the apartment,

9    where was Sosa?

10     A    On the floor in the living room.

11     Q    And did you see him?  Did you observe him?

12     A    Yes, of course.

13     Q    What is happening when -- what did you observe about

14   his body at that point?

15     A    He was just still.  He was just still.  He was dead.

16   He couldn't move.

17     Q    I'm sorry?

18     A    He was still.  He didn't move.  We knew he was gone.

19     Q    Did he say anything at all at any point?

20     A    He couldn't talk or nothing.

21     Q    What did you notice about his body or around his body?

22     A    All his blood.

23     Q    And when you were back in the apartment, did you stay

24   in this main room where the party was?

25     A    No.

Ms. Dempsey - for People - Direct

cm/c

1                 MR. CANTOR:  Is that leading or is it not, your

2   Honor?

3                 MR. ROSENFELD:  How is it leading?

4                 THE COURT:  I will allow it.

5   A   We all stood in Miss Carmen Diaz' room.

6                 MR. CANTOR:  I'm sorry?

7                 THE WITNESS:  We were in Miss Carmen Diaz' room.

8   Q   And what happened when the police came?

9   A   They was questioning us, asking us what happened.  They

10  interviewed us in the bathroom one by one.

11   Q   And so did you speak to them?

12   A   Yes.

13   Q   Did you ever tell any of the police officers --

14                 MR. CANTOR:  Judge, I'm going to object at this

15  point.

16                 THE COURT:  I didn't hear the question.

17                 MR. CANTOR:  "Did you ever tell any of the police

18  officers" and now he's going to get into substance and

19  that's a prior consistent statement.

20                 THE COURT:  I will allow it.

21                 MR. CANTOR:  It's inadmissible.

22                 THE COURT:  Your exception is noted.

23                 MR. CANTOR:  What she told the police post

24  homicidal event?

25                 THE COURT:  We'll see.

Ms. Dempsey - for People - Direct

cm/c

1      MR. CANTOR:  It is post.

2      THE COURT:  All right.

3   Q   Did you give --

4      THE COURT:  How long did it take the police to

5   arrive?

6      THE WITNESS:  Oh, it took them a while.  We called

7   numerous times.  We were trying to tell them hurry up.

8      THE COURT:  When you say "we called" --

9      THE WITNESS:  The people:  Mercedes, then Tango

10  and Carmen.  We was trying to tell the police hurry up,

11  bring an ambulance.

12     THE COURT:  All right.  And that's with cell

13  phones that you mentioned before?

14     THE WITNESS:  Yes, cell phones.

15     THE COURT:  Please continue.

16  Q   At any point did you give the police a description of

17  David?

18  A   Yes.

19     MR. CANTOR:  Objection.

20     THE COURT:  Whether she gave a description?

21  Overruled.

22     MR. CANTOR:  This is post homicide what she's

23  telling police.

24     THE COURT:  Yes.  It could only be post.

25  Q   What, if anything, was the description that you gave to

Ms. Dempsey - for People - Direct

cm/c

1   the police of David, if you recall?

2       A   If I recall, he had on jeans.  I gave them his

3   complexion.  I believe I said he had on glasses or no glasses.

4   I'm not sure about it.

5       Q   Did you say anything about his race?

6       A   Oh, he was Hispanic.

7       Q   Did you give them anything more about his physical

8   description?

9       A   Yes, I believe I did so.  I'm not too sure.

10      Q   Did you notice anything that David had on his body,

11  anything about his body?

12      A   No.

13      Q   Anything on his neck or anything on his face?

14      A   No.

15          MR. CANTOR:  Objection.  She's already answered

16      the question, and once again she answers before you rule.

17          THE COURT:  Overruled.

18          MR. CANTOR:  Tell her again not to answer before

19      you rule.

20          THE COURT:  Yes, ma'am.  Please be guided.

21      Q   Did you remain in the apartment after speaking with the

22  police officers?

23      A   Correct.

24      Q   And what, if anything, did you do in the apartment

25  after speaking with the police officers?

Ms. Dempsey - for People - Direct

cm/c

1    A    We had to stay there until they cleared this out.

2    Q    So, were you there throughout the morning?

3    A    Yes.

4    Q    Where did you stay?

5         MR. CANTOR:  Objection.  This is all irrelevant in

6    the morning.

7         MR. ROSENFELD:  This is afterwards, your Honor.

8         MR. CANTOR:  What does that have to do with it?

9         THE COURT:  Overruled.

10   Q    You can continue.

11   A    In Miss Carmen Diaz' room.

12   Q    And what happened after that?

13   A    After Miss Carmen Diaz' room, well, when they finally

14   decided to remove Sosa, I went to my house to change my clothes,

15   me and my husband; feed the kids; come back into Miss Carmen

16   Diaz' apartment and help her clean up the whole apartment.

17   Q    What did you have to do?

18   A    Clean all that blood off the wall, off the sofa, all

19   over the place.

20   Q    How long did that take?

21   A    It took a lot of hours.

22   Q    Did there come a time a little later in the morning

23   that Detective Banker spoke with you?

24   A    Yes.  He came to my apartment.

25   Q    Okay.  Did you speak with him?  Yes or no?

Ms. Dempsey - for People - Direct

cm/c

1       A      Yes.

2       Q      Where did you stay the rest of the day?

3       A      In my apartment.

4       Q      And was your husband there also?

5       A      Yes.

6       Q      Tango?

7       A      Yes.

8       Q      Did there come a time later that day that you received

9  a called from the detective?

10      A      Yes.

11      Q      As a result of that telephone call, did you go

12  somewhere?

13      A      Yes.

14      Q      Where did you go?

15      A      They took us to a place.  I think it was a precinct.

16             MR. CANTOR:  Where did she go?  It's not we,

17      Judge.  The question is where did she, the witness, go.

18             THE COURT:  Go ahead, Mr. Rosenfeld.

19      A      They took me to a place to, I think it was Apache

20  building, a precinct somewhere.

21      Q      Were you alone?

22      A      No.

23      Q      Who went with you?

24      A      Me, my husband, my children, Miss Diaz, her daughter,

25  Mercedes, Wilfredo, Robert Walker, Ari Jiminez.

cm/c

1          MR. CANTOR:  Who?

2          THE WITNESS:  Ari.

3          MR. ROSENFELD:  Jiminez.

4     Q     Did you all go together in one vehicle?

5     A     They picked us up in one, big police van.

6     Q     He took you to a building, like a precinct, you

7  indicated?

8     A     Yes.

9     Q     Now, did there come a time after you were at the

10 precinct that Detective Banker took you to see what's known as a

11 lineup?

12    A     Yes, he did.

13    Q     And what happened when you went to view this lineup?

14    A     He asked me did I see the person at this lineup and to

15 look at it and to pick the number that I thought was the person.

16    Q     And did you, in fact, pick a number?

17    A     Yes, I did.

18    Q     What number was that?

19    A     Number 3.

20    Q     And after you picked number 3, did you tell the

21 detective anything?

22          MR. CANTOR:  Objection.  You see how he leads.

23    What happened next would be the appropriate question.

24          THE COURT:  All right.  Be guided, Mr. Rosenfeld.

25    Q     After you picked the number 3, what happened?

Ms. Dempsey - for People - Direct

cm/c

1    A    I told the police, "That's the one that killed Sosa

2    right there."

3             MR. CANTOR:   Objection.   Move to strike.

4             THE COURT:   Overruled.

5    Q    Is there any doubt in your mind that the person you

6    picked, number 3, the person is the person who you saw attack

7    Sosa on December 25, 2009?

8             MR. CANTOR:   Objection, your Honor.

9             THE COURT:   Overruled.

10            MR. CANTOR:   She's already answered it.

11            THE COURT:   Yes, she has.

12            MR. CANTOR:   Why do we have to have it repeated?

13   I'm asking your Honor.

14            THE COURT:   He's asking for her certainty.   Please

15   proceed.   Your objection is overruled.   Your exception is

16   noted.

17   Q    Is there any doubt in your mind?

18   A    No doubt at all.

19   Q    Now, Miss Dempsey, prior to your coming to court today,

20   have you met in my office to discuss this case?

21   A    Yes.

22   Q    Approximately how many times?

23   A    Like three times.

24   Q    Did you have an opportunity to review the photographs

25   that we've seen here in court?

Ms. Dempsey - for People - Cross

cm/c

1      A    Yes.

2                 MR. ROSENFELD:  I have no further questions.

3      Thank you, Miss Dempsey.

4                 THE COURT:  Thank you, Mr. District Attorney.

5                 Mr. Defense Counsel, Mr. Cantor.

6                 MR. CANTOR:  I need a minute, Judge.

7                 THE COURT:  Surely.

8                 (Brief pause in the proceedings.)

9      CROSS-EXAMINATION

10     BY MR. CANTOR:

11     Q    Miss Dempsey, you recognize the fact that you're under

12     oath, do you not?

13     A    Yes.

14     Q    And Mr. Sosa or Sosa was a very good friend of yours?

15     A    Yes.

16     Q    And his family was a very good friend --

17     A    Yes.

18     Q    -- of yours, right?

19     A    Yes, correct.

20     Q    And you want to see the man who was responsible for

21     Sosa's death punished, do you not?

22     A    Yes.

23                MR. ROSENFELD:  Objection.

24                THE COURT:  I will allow it.

25     Q    And that man would be the man who you pointed out at

Ms. Dempsey - for People - Cross

cm/c

1    the table, David Delgado, correct?

2         A     Correct.

3         Q     And by "punished," I mean sent to jail for a good long

4    time?

5         A     Yes.

6                    MR. ROSENFELD:  Objection.  Relevancy, your Honor.

7                    THE COURT:  I will allow it.

8         Q     Is that correct?

9         A     Yes.

10        Q     Perhaps for life, correct?

11        A     Yes.

12        Q     Now, you say that there was Hennessy, vodka and Bacardi

13   rum as well as beer at the party, correct?

14        A     Yes, correct.

15        Q     And you also told the assistant district attorney that

16   Sosa was drunk?

17        A     Yes.

18        Q     Now, and you told us earlier that Sosa by nature was

19   always a very loud individual; is that correct?

20        A     Yes, yes, correct.

21        Q     When you say "loud," you mean loud in voice and tone?

22        A     And expression, yes.

23        Q     And his hands gesticulating and moving about?

24        A     Yes.

25        Q     Correct?

Ms. Dempsey - for People - Cross

cm/c

1        A     Yes, correct.

2        Q     So, when Margie introduced David to Sosa, Sosa began

3     tapping David on the left shoulder, right?

4        A     Yes.

5        Q     And he told, he being Sosa, told David that Margie is a

6     good woman, she's not alone, treat her good, take care of her

7     well because she's not alone and there are people who will look

8     after her?

9        A     Correct.

10       Q     That was sort of an implied -- do you understand what

11    the word "implied" means?

12       A     Yes.

13       Q     That was sort of an implied threat, was it not?

14             MR. ROSENFELD:   Objection.

15       Q     If you don't take care of Margie, we'll --

16             THE COURT:   Overruled.

17       Q     -- either I or the people with Margie will take care of

18    you?

19       A     No, it was no threat.

20       Q     It was no threat?

21       A     No.

22       Q     But he did say to my client, David, Margie is not

23    alone, correct?

24       A     Yes.

25       Q     Referring to the fact that Margie had support?

Ms. Dempsey - for People - Cross

cm/c

1     A   Yes.

2     Q   In the neighborhood, in the community?

3     A   Yes, yes.

4     Q   That there were people who would not want to see her

5   hurt?

6     A   Yes.

7     Q   Or, if I can used the expression, "fucked over,"

8   correct?

9     A   Yes.

10          MR. ROSENFELD:  Objection.  I believe that word

11      was never used.

12          MR. CANTOR:  I'm cross-examining.

13          MR. ROSENFELD:  Objection.

14          THE COURT:  All right.  Cross-examination.

15     Q   Or fucked over, correct?

16     A   Yes.

17     Q   That's what Sosa was telling my client as he was

18   tapping him on the shoulder, correct?

19          MR. ROSENFELD:  Objection.

20     A   I didn't hear Sosa curse.

21     Q   Okay.  But, he said that Margie is not alone and you,

22   referring to David, have to take good care of her because she's

23   not alone there?

24     A   Yes.

25     Q   There are other people who support and will come to her

Ms. Dempsey - for People - Cross

cm/c

1    aid?

2         A    Yes.

3         Q    To your knowledge, my client, he was the only stranger

4    at the party, correct?

5         A    Yes, he was.

6         Q    To your knowledge, had you ever seen Sosa and my client

7    together?

8         A    Not until the party.

9         Q    Okay.  Do you know what motivated Sosa to go over to my

10   client, tap him on the shoulder and say, you be good to Margie,

11   she's not alone, she is a good woman, if something happens she

12   has friends and supporters?

13        A    Yes.

14             MR. ROSENFELD:  Objection.  Calls for speculation.

15        Q    You heard that, did you not?

16             THE COURT:  I will allow it.

17        Q    Did you not, ma'am?

18        A    Do I speak?

19        Q    Can I hear you?

20        A    I'm trying to see if I speak now because he's

21   objecting, he's talking.

22        Q    Okay.  Is that not correct?

23        A    Can you repeat the question?

24             MR. CANTOR:  The court reporter will be ever so

25   happy to read it back.

cm/c

1          THE COURT:  You may.

2              (Whereupon, the requested portion was read by the

3      reporter.)

4      Q    So, what motivated Sosa?

5      A    He was a stranger.  Margie hasn't been with a boyfriend

6  in a lot of years.

7      Q    So, Sosa, who was very close to Margie, right, correct?

8      A    Yes, correct.

9      Q    Was warning this gentleman David, who he had now met

10  for the first time, to be good to this woman, she has friends,

11  she has supporters?

12     A    Yes.

13     Q    Take good care of her; is that correct?

14              MR. ROSENFELD:  Objection to the term "warning."

15     A    Yes.

16              MR. ROSENFELD:  Objection.

17              THE COURT:  To what?

18              MR. ROSENFELD:  "Warning."

19              THE COURT:  I will allow her to give a

20      characterization.

21              MR. CANTOR:  She's already answered it in the

22      affirmative.

23              THE COURT:  There is no need to editorialize.

24      She's answered.

25              MR. CANTOR:  She did.  She said yes.

Ms. Dempsey - for People - Cross

cm/c

```
 1     Q    Correct, ma'am?

 2     A    Yes.

 3     Q    Now, the guys were in the kitchen, correct?

 4     A    Yes.

 5     Q    And they were smoking, right?

 6     A    Yes.

 7     Q    Was Sosa smoking any marijuana?

 8     A    Not in the house.  There was children in the house.

 9     Q    I'm asking you if he was in the kitchen smoking

10   marijuana?

11     A    No, no.  There was no drugs but cigarette smoke in the

12   kitchen.

13     Q    Was he smoking any cocaine?

14     A    No.

15     Q    Would it surprise you to learn when he was autopsied

16   that there were controlled substances found in his blood?

17               MR. ROSENFELD:  Objection.  Totally irrelevant.

18               THE COURT:  I will allow it.

19     Q    Would that surprise you?

20               MR. ROSENFELD:  Objection.

21               MR. CANTOR:  Judge, you ruled.

22               THE COURT:  I'm going to allow it subject to

23          connection.  The objection is overruled.

24     Q    Would that surprise you, ma'am?

25     A    Yes.
```

cm/c

1     Q   Okay.  Ma'am, the guys were just smoking ordinary

2  cigarettes or cigars in the kitchen, correct?

3     A   Yes.

4     Q   You think second-hand smoke is harmful to children,

5  kids?

6          MR. ROSENFELD:  Objection.  Relevancy.

7     Q   I'm asking you, yes or no?

8     A   Yes, of course.

9          MR. ROSENFELD:  Objection.

10     Q   Okay.  Thank you.

11        Now, you've come back to the apartment after changing

12  your shoes, right?

13     A   Yes.

14     Q   And you had drunk half of one of those Dixie cups four

15  times filled with Hennessy; is that correct?

16     A   Yes.

17     Q   Were you feeling high?

18     A   Yes, yes.

19     Q   Okay.  I appreciate your answer.

20     A   Thank you.

21          (Continued on the next page.)

22

23

24

25

People - MELISSA DEMPSEY - cross

925

1    Q.    Now, Sosa had been drinking Bacardi that's Rum,
2    correct?

3    A.    Yes, yes, that's correct.

4    Q.    And he was drinking from the same type of paper cup
5    that you were using?

6    A.    Yes.

7    Q.    And he had about three or four cups of Bacardi Rum?

8    A.    Yes.

9    Q.    But you already told us he was drunk; you remember
10   saying that?

11   A.    Yes, I remember that.

12   Q.    And so there he was having consumed alcohol, loud, his
13   (indicating) as he always did moving his hands about
14   (indicating), correct?

15   A.    Uh-hum, yes.

16   Q.    And drunk as you told us, correct?

17   A.    Yes, correct.

18   Q.    And there came a time when Sosa was removed from the
19   party, correct?

20   A.    Yes, correct.

21   Q.    That was by whom primarily?

22   A.    That was by Carmen Diaz and my husband, Alberto
23   Vazquez.

24   Q.    Okay.  And they removed him, did they not, in all
25   fairness and in all honesty because he was being loud?

D-1jb

People - MELISSA DEMPSEY - cross

926

1     A.    Yes.

2     Q.    And obnoxious and interfering with other people at the

3   party?

4     A.    He wasn't interfering with other people.

5     Q.    He was loud, correct?

6     A.    Yes, yes, correct.

7     Q.    He was obnoxious?

8     A.    He was wasn't obnoxious.

9     Q.    He wasn't.  He was loud and he was gesticulating with

10  his hands, correct?

11    A.    Correct.

12    Q.    And he was interfacing with other people at the party?

13    A.    Yes.

14    Q.    And he was drunk, of course?

15    A.    Yes.

16    Q.    So Carmen -- was it not Carmen?

17    A.    Carmen Diaz.

18    Q.    I'm sorry?

19    A.    Carmen Diaz.

20    Q.    Carmen Diaz and your husband because of his demeanor

21  and state removed him and took him --

22    A.    To my apartment.

23    Q.    -- to your apartment.  And he was feeling, as you said

24  earlier, dizzy and he claimed that there were two many people at

25  the party and he was unsteady, if you will, if I could use that

D-ljb

People - MELISSA DEMPSEY - cross

927

1   phrase, too many people dizziness; is that correct?

2       A.   Yes.

3       Q.   So you let him rest for a while?

4       A.   Yes.

5       Q.   And then eventually he was insistent upon going back

6   to the party?

7       A.   Yes.

8       Q.   So you allowed him to go back to the party, correct?

9       A.   Correct.

10      Q.   So now at the party once again there was Sosa loud and

11  gesticulating and interfacing with the people, correct?

12      A.   Yes.

13      Q.   Still in a drunken condition, correct?

14      A.   Correct.

15      Q.   And then a situation developed, right?

16      A.   Yes.

17      Q.   Now, what you said there at the time of this incident

18  Sosa was seated on the armrest of the sofa, right?

19      A.   Yes.

20      Q.   David came out of the kitchen, correct?

21      A.   Yes.

22      Q.   And David and Sosa began arguing, that's what you

23  testified to?

24      A.   No, I didn't say arguing.

25      Q.   You said arguing on direct examination, ma'am, between

                                                              D-ljb

People - MELISSA DEMPSEY - cross

1   Sosa and David; is that not a fact?

2       A.   I don't remember saying arguing.

3       Q.   You don't?

4       A.   No.

5       Q.   Fine.

6            MR. CANTOR:   Judge --

7       A.   I --

8            MR. CANTOR:   Ma'am, I have no question pending.

9            MR. ROSENFELD:   Your Honor, may the witness --

10           MR. CANTOR:   Judge, I am the questioner and I

11  have no question pending.  I am going to ask, your Honor,

12  to suspend this morning's proceedings so I can go to the

13  record, Judge, and confront the witness with her testimony.

14           MR. ROSENFELD:   Objection.

15           THE COURT:   That application is denied.

16      Q.   Well, you testified under oath in front of this jury,

17  correct?

18      A.   Correct.

19      Q.   And you said David came out of the kitchen and went

20  over to Sosa?

21      A.   Yes.

22      Q.   And they had words you couldn't hear, but they had

23  words?

24      A.   Probably, yes.

25      Q.   And you used the word arguing, but didn't spell out

                                                        D-ljb

People - MELISSA DEMPSEY - cross

929

1    the actual words, correct?

2        A.   I don't remember using the word arguing.

3        Q.   But did it appear in all fairness --

4        A.   I don't --

5        Q.   Ma'am, I have to complete a question.

6        Did it appear in all honesty and truthfulness, although you

7    couldn't hear the words, that both Sosa and David were arguing?

8        A.   It didn't appear to me that they was arguing at all.

9        Q.   So it appeared to you that they were just talking one

10   to the other?

11       A.   Yes.

12       Q.   I see.  And if they were talking why did you scream

13   for your husband to come over?

14       A.   Because David was hitting Sosa.

15       Q.   With his fist?

16       A.   Yes.

17       Q.   I see.  And would that be his right fist?

18       A.   I believe so.

19       Q.   And so you screamed for your husband to come over?

20       A.   Yes.

21       Q.   This was after they had been -- well, when they were

22   talking was Sosa being animated as he usually was?

23       A.   No, he was holding on sitting on the arm of the chair.

24       Q.   Sitting on the arm?

25       A.   On -- of -- of the armrest.

D-ljb

People - MELISSA DEMPSEY - cross

930

1    Q.   The sofa?

2    A.   Of the sofa, yes.

3    Q.   And they were talking?

4    A.   Maybe --

5    Q.   Ma'am, I get to complete a question.

6    A.   You just --

7              MR. ROSENFELD:  I object.

8              MR. CANTOR:  No, I get to complete a question.

9              THE COURT:  She said how long --

10   Q.   So give me the same courtesy that you gave to

11   Mr. Rosenfeld.

12   A.   I am trying to.

13             MR. ROSENFELD:  Objection.

14             THE COURT:  One second.

15   Q.   Here is the question --

16             THE COURT:  One second.  Ma'am, wait for the

17   question.

18             THE WITNESS:  He doesn't give me a chance.

19             THE COURT:  He will.

20   Q.   I will give you a whole question before you answer.

21   A.   Okay.

22   Q.   How long did David and Sosa appear to be exchanging

23   words before David, as you say, hit him with his right fist?

24   A.   A couple of minutes, a couple of seconds.

25   Q.   Well, there is a difference between seconds and

D-ljb

People - MELISSA DEMPSEY - cross

931

1    minutes; do you realize that?

2         A.    Of course, I know that.

3         Q.    Well, I am going to ask you was it seconds or minutes?

4         A.    Probably --

5         Q.    Hold it, ma'am, you don't get -- I get to complete the

6    question.

7         Was it seconds or minutes that David and Sosa were talking

8    to one another before David began to hit him?

9         A.    Minutes.

10        Q.    How many 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, you stop

11   me?

12        A.    Maybe three, four minutes.

13        Q.    Okay.   Now, during this three, four minute period of

14   time that the defendant and Sosa were talking to one another, I

15   am not talking about the words, but could you make out that each

16   one was uttering words one to the other?

17        A.    No.

18        Q.    How far a distance were you as they were talking?

19        A.    I wasn't --

20        Q.    Ma'am, I get to complete the question.

21        A.    Okay.

22        Q.    How far were you from Sosa and my client as they were

23   talking for three to four minutes?

24        A.    A couple of feet away, couple of steps.

25        Q.    Well, from where you are to the edge right over here

                                                        D-1jb

People - MELISSA DEMPSEY - cross

932

1   (indicating)?

2        A.   No, a little further.

3        Q.   To where you are to this bar (indicating)?

4        A.   Yeah, probably.

5             MR. CANTOR:   Approximately five and a half feet,

6        Judge.

7             MR. ROSENFELD:   Approximately eight to ten feet,

8        your Honor.

9             THE COURT:   It will be a little closer.

10            MR. CANTOR:   It would be, wouldn't it, Judge?

11       Well, we will let the jury make the determination how far

12       the witness is from this bar.

13       Q.   And you are telling me that you couldn't make out any

14   words during this three to four minute?

15            THE COURT:   For the record, eight feet.

16            MR. CANTOR:   Eight feet, you have a sketch?

17            THE COURT:   Yes.

18       Q.   Okay.   Let's say your eight feet, am I approximately

19   eight feet from you now about?

20       A.   About, yes.

21       Q.   Okay.   Now, they're talking for about three, four

22   minutes and from where you -- were you standing by the curtains?

23       A.   Yes.

24       Q.   You couldn't hear anything?

25       A.   Any --

D-ljb

People - MELISSA DEMPSEY - cross

933

1     Q.    "Yes" or "no", Ma'am?

2     A.    No.

3     Q.    Now, were anyone, either David or Sosa's voice raised

4  as you stood the distance that separates you from I presently?

5     A.    No.

6     Q.    So they finished talking for these three to four

7  minutes.   You are approximately eight feet away, you couldn't

8  make out any of the words, correct?

9     A.    Correct.

10          MR. ROSENFELD:  Objection, asked and answered

11     twice.

12          THE COURT:  Caution.

13     Q.    And their tone was -- was it totally conversational as

14  I am using it right now?

15          MR. ROSENFELD:  Objection, she can't hear.

16     Objection.

17          THE COURT:  I said I will allow it.

18          MR. CANTOR:  It's cross examination.

19     Q.    Was it a totally conversational tone that I am using

20  with the --

21     A.    I couldn't hear them.

22     Q.    So if you couldn't hear them it would be a fair

23  statement to say they were talking at a normal level?

24          MR. ROSENFELD:  Objection.

25

D-1jb

People - MELISSA DEMPSEY - cross

934

BY MR. CANTOR:

1

Q.   Is that correct, ma'am?

2

A.   Probably.

3

Q.   Okay.

4

THE COURT:   I will allow it.   Objection
overruled.

5

6

Q.   And then after they are talking in their normal
conversational level you say that out of nowhere my client began
to punch in the head Sosa five times, correct?

7

8

9

A.   Yes.

10

Q.   Correct, "yes" or "no"?

11

A.   Correct I said.

12

Q.   Earlier that evening either before Sosa was removed
from the party or after he was brought back to the party did you
hear Sosa say anything to David?

13

14

15

A.   No, sir.

16

Q.   Did you hear David say anything to Sosa?

17

A.   No, sir.

18

Q.   So the first time, other than when Sosa put his hand
on my client's shoulder, did it remain on his shoulder or was he
removing it and constantly --

19

20

21

A.   He was removing it.

22

Q.   He was removing it back and --

23

A.   Yes.

24

Q.   About how many times?

25

D-ljb

People - MELISSA DEMPSEY - cross

935

1    A.    About four times.

2    Q.    About four times he was passing the shoulder of my

3    client, correct?

4    A.    Yes, yes.

5    Q.    And he was telling my client about Margie was not

6    alone, she had friends and supporters?

7    A.    Yes.

8          MR. ROSENFELD:   Objection, asked and answered.

9    Q.    And that he, Mr. Delgado, would be well advised to

10   treat Margie the right way, correct?

11         MR. ROSENFELD:   Objection, asked and answered.

12         THE COURT:   Overruled.

13   Q.    Correct?

14   A.    Yes, correct.

15   Q.    And all during that time he was patting the man's

16   shoulder, correct?

17         MR. ROSENFELD:   Objection, asked and answered

18   three times.

19         THE COURT:   Overruled.

20   Q.    Correct?

21   A.    Correct.

22   Q.    So now after three to four minutes worth of a normal

23   conversational tone level all of a sudden my client strikes the

24   head and face of Sosa five times with his -- what is it his

25   right hand?

D-1jb

People - MELISSA DEMPSEY - cross

936

1    MR. ROSENFELD:  Objection, two questions, mixed
2    questions and she never said a normal conversation.
3    MR. CANTOR:  I withdraw.
4    Q.    Did my client strike Sosa with his right fist?
5    A.    Yes.
6    Q.    But you saw nothing in that right fist?
7    A.    No.
8    Q.    I'm correct?
9    A.    You're correct.
10    Q.    Okay.  And immediately before that striking began they
11   were simply talking, but you couldn't make out what they were
12   saying, correct?
13    A.    Correct.
14    Q.    And they were talking in a normal conversational level
15   that you couldn't hear the words?
16    MR. ROSENFELD:  Objection.  Same objection.
17    THE COURT:  Overruled.
18    Q.    Now, what I would like to know is when you spoke to
19   Mr. Rosenfeld in his office on three times did he tell you that
20   Sosa had received five stab wounds?
21    A.    No.
22    Q.    But that's what you estimated it, correct?
23    A.    Correct.
24    Q.    Now, on cross examination Mr. Rosenfeld at first asked
25   you how long did the punching take place and you responded less

D-1jb

People - MELISSA DEMPSEY - cross

937

1   than five minutes, correct?

2       A.   Correct.

3       Q.   And you as a grown, mature woman know the difference

4   between seconds and minutes; do you not?

5       A.   Yes.

6       Q.   So when you first answered Mr. Rosenfeld's questions

7   as to how long the five blows took you used as the yardstick of

8   measurement minutes by saying less than five minutes, correct?

9       A.   Correct.

10      Q.   And then Mr. Rosenfeld stood up and quickly made a

11  motion with his right hand (indicating) five times?

12           MR. ROSENFELD:   Objection, your Honor, as to what

13       the People did.

14      Q.   And then --

15           THE COURT:   Jury's recollection.

16      Q.   And then he asked you, well, how long did that take

17  and you said oh, about four seconds, correct?

18      A.   Correct.

19      Q.   There is a huge, monumental, Grand Canyon gap between

20  four seconds and up to five or less than five minutes, which is

21  four minutes; do you recognize that?

22      A.   Yes.

23      Q.   You who weren't coached during any one of the three

24  occasions that you spoke to Mr. Rosenfeld, were you, as to what

25  you were to say in the courtroom, were you?

People - MELISSA DEMPSEY - cross

938

1    A.   No, sir.

2    Q.   When Sosa was patting my client and telling how Margie
3 was a good woman and she had friends and supporters and that my
4 client ought to take good care of her you had seen Margie and my
5 client earlier shopping in the supermarket earlier that day?

6    A.   Yes.

7    Q.   They seem peaceful and at ease; did they not?

8    A.   Yes.

9    Q.   And you had even seen them one time prior to that,
10 correct?

11   A.   Correct.

12   Q.   And Margie simply, matter of factually, courtesy
13 introduced you to her boyfriend, David?

14   A.   Yes.

15   Q.   It was nothing that my client was doing that was of a
16 harassing, annoying, threatening manner to either you or Margie
17 on those two occasions, was there?

18   A.   No.

19   Q.   He just seemed like an ordinary fellow, correct?

20   A.   Correct.

21   Q.   So, the first one out the door was David?

22   A.   Yes.

23   Q.   He was followed by whom, the second person, out the
24 door?

25   A.   Mercedes.

D-ljb

People - MELISSA DEMPSEY - cross

939

1    Q.   And you stood -- you stood -- you stood at the
2    doorway?
3    A.   Yes.
4    Q.   And you were looking down the hallway?
5    A.   Correct.
6    Q.   And did Mercedes catch up with David?
7    A.   Yes.
8    Q.   And David moved her off -- moved her off of him?
9    A.   Yes.
10   Q.   Okay.   And when he moved her off of him he said get
11   off of me?
12   A.   Yes.
13   Q.   Did he punch Mercedes?
14   A.   No.
15   Q.   And eventually Mercedes, by virtue of David's actions,
16   came to be off of him, correct?
17   A.   Yes, correct.
18   Q.   And was it at that point that you claim you saw a
19   brown and beige handle?
20   A.   Yes.
21   Q.   You saw it for about a second?
22   A.   Yes.
23   Q.   How far a distance were you?
24           MR. CANTOR:   Could I have a moment, Judge, if I
25        could have a picture of the exhibit of the hallway?

D-ljb

People - MELISSA DEMPSEY - cross

940

1          THE COURT:  Sure.

2          MR. ROSENFELD:  Counsel has all of the exhibits

3    right next to him.

4          MR. CANTOR:  All right.

5    Q.   This is the hallway, right?

6    A.   Yes.

7          THE COURT:  That's People's number?

8          MR. CANTOR:  Two.

9    Q.   You can sit down.

10   A.   Oh, okay.

11   Q.   You can see it clearly, right?

12   A.   Yes.

13   Q.   About the middle of the picture, slightly to the right

14   on the side of the hallway is the entrance door to the apartment

15   where the party was taking place, right?

16   A.   Yes.

17   Q.   3D, right?

18   A.   Yes.

19   Q.   And you stood in that doorway, right?

20   A.   Yes.

21   Q.   Does that picture capture, meaning does it photograph

22   the spot where Mercedes got onto the body or the person of

23   David?

24   A.   Yes.

25   Q.   And that's at the very bottom of the photograph,

D-ljb

1  right?

2      A.   Yes.

3      Q.   And if I were to take my pen it would be somewhere in

4  this area (indicating) correct?

5      A.   No, a little more down.

6      Q.   Which down, about (indicating)?

7      A.   More, more, more, more about the middle line.

8      Q.   This line (indicating)?

9      A.   Yeah.

10     Q.   So that was about how many feet, 15 feet from the

11 doorway?

12     A.   Yes.

13     Q.   I'm sorry, I couldn't hear you?

14     A.   Yes, sir.

15     Q.   And --

16          THE COURT:   Indicating 15 feet.

17     Q.   And you stood in the doorway and there was David and

18 there was Mercedes and she had briefly attached her body to his

19 body, correct?

20     A.   Yes.

21     Q.   And he with one hand (indicating) pushed her off,

22 correct?

23     A.   Yes.

24     Q.   What hand did he use to push her off?

25     A.   He used, I believe, it was his right because --

People - MELISSA DEMPSEY - cross

942

1    Q.    Right hand?

2    A.    Yes.

3    Q.    And what hand did you see this brown and beige handle

4    with a metal tip?

5    A.    I think it was the left.

6    Q.    The left.  Do you know whether David was right handed

7    or left handed?

8    A.    I have no idea.

9    Q.    Okay.  Now, from that distance, I don't know, 15, 20

10   feet what would you recollect it to be 15, 20 feet?

11   A.    Yes.

12   Q.    And were you feeling tipsy as you told us that

13   earlier, high?

14   A.    Yes.

15   Q.    And now there had been this traumatic, horrible

16   incident that had unfolded in the apartment and you were there

17   and saw it?

18   A.    Correct.

19   Q.    Would it be a fair statement that you were shook up?

20   A.    Yes.

21   Q.    Very shook up?

22   A.    Yes.

23   Q.    You had never seen anything like that in your life?

24   A.    No.

25   Q.    And so now, you are telling us from a distance of

D-ljb

People - MELISSA DEMPSEY - cross

943

1   20 -- 15, 20 feet being somewhat tipsy from having the three,

2   four half cups of Hennessy and having witnessed this horrendous

3   event you were able to see a tip -- metal tip of an object,

4   correct?

5       A.   Yes.

6       Q.   And this metallic tip what color was it is, was it

7   black, was it silver or was it copper color?

8       A.   I don't remember.

9       Q.   And you saw literally only (indicating)?

10      A.   A little.

11      Q.   Less than an inch of it?

12      A.   Yes.

13      Q.   So from that distance, 15 to 20 feet, having drunk

14  what you drunk, having witnessed an incident for the likes of

15  which you have never seen in your life you were able to see less

16  than an inch, a half an inch of a tip of something that took the

17  configuration of a hook, correct?

18      A.   Yes, yes.

19      Q.   Well, who followed Mercedes out, was it your husband?

20      A.   It was me.

21      Q.   You, okay.  And then who followed you, your husband?

22      A.   Yes.

23      Q.   And then who followed your husband?

24      A.   Um, nobody -- oh Margie.

25      Q.   Margie?

D-1jb

People - MELISSA DEMPSEY - cross

944

1    A.    Yes.

2    Q.    So Margie was the last one out?

3    A.    Yes.

4    Q.    And you had told Margie and Mercedes had hold Margie

5    you got to get him back here, you got to get him back here, look

6    what just happened?

7    A.    Yes.

8    Q.    But yet you told your husband and -- how tall --

9    withdrawn.

10   How tall is your husband about?

11   A.    About 5'10".

12   Q.    About 5'10".

13            MR. CANTOR:   May my client just stand for a

14       moment, Judge, in place?

15            THE COURT:   He may.

16            MR. CANTOR:   Stand up, David.   Judge, would you

17       say David Delgado is about 5'6"?

18            MR. ROSENFELD:   Objection.

19            MR. CANTOR:   Approximately, would you say that?

20   A.    Yes.

21            MR. CANTOR:   Please be seated, David.

22   Q.    And your husband is about 5'8" and after seeing what

23   you did you told your husband stop chasing him, stop chasing

24   him, correct?

25            MR. ROSENFELD:   Objection, your Honor.   She

D-ljb

People - MELISSA DEMPSEY - cross

945

1    indicated her husband was 5'10", he just stated the

2    question as saying your husband was 5'8".

3                MR. CANTOR:  I will correct --

4                MR. ROSENFELD:  I object about the question.

5    Q.   Your husband is about 5'10", I'm sorry?

6    A.   Correct.

7    Q.   David is about 5'6" and yet you told your husband

8    don't chase him, don't chase him, correct?

9    A.   Correct.

10   Q.   Was Mercedes injured in any way, any cuts, bruises

11   abrasions on her?

12   A.   No.

13   Q.   Okay.  And then everyone returned back to the

14   apartment 3D, correct?

15   A.   Correct.

16   Q.   And calls were made to the police, correct?

17   A.   Correct.

18   Q.   Now, if you know since you've told us you were

19   drinking and Sosa was drinking, was likewise David drinking

20   during the conversation at the party?

21   A.   I never saw David with a drink.

22   Q.   You didn't?

23   A.   No.

24   Q.   It's just a coincidence that you can tell us that Sosa

25   was drinking?

D-ljb

People - MELISSA DEMPSEY - cross

946

1    A.    Of course.

2              MR. ROSENFELD:  Objection, objection to form.

3              MR. CANTOR:  I see.

4              THE COURT:  Your objection is well stated.

5    Q.    Well, who else was drinking?

6    A.    Everybody else that was there except the children.

7    Q.    And you didn't see David drink at all?

8    A.    No, not with my eyes I didn't see him.

9    Q.    Do you know whether David was on any medication?

10   A.    No.

11   Q.    Did he appear to be up -- until the time he began

12   punching did he appear to be acting in a normal, everyday, civil

13   fashion amongst the group?

14   A.    He wasn't with the group.

15   Q.    He was with the men in the kitchen?

16   A.    Yes.

17   Q.    Did he appear to be normal and ordinary?

18   A.    I wasn't in the kitchen.

19   Q.    Well, you looked into the kitchen?

20   A.    Maybe for a second, he was just standing there.

21   Q.    On direct examination you told us that the men were in

22   the kitchen smoking, right?

23   A.    Yes.

24   Q.    And did he appear there too?

25   A.    He was in the kitchen, I said, with the men.

D-ljb

People - MELISSA DEMPSEY - cross

947

1    Q.   Right and every one appeared to be normal and ordinary

2  in the kitchen?

3    A.   Yes.

4    Q.   And that includes David, correct?

5    A.   Yes.

6    Q.   Okay.  Now, since Sosa was always loud it's still your

7  position when he and David were interacting and they were face

8  to face; were they not?

9    A.   Yes.

10   Q.   Could you speak up?

11   A.   Yes.

12   Q.   You never -- and Sosa always would speak with a loud

13  voice and moving his hands (indicating) about as some people do?

14   A.   Yes.

15   Q.   But yet you didn't hear that loud voice from that

16  distance and you didn't see Sosa's hands moving about?

17   A.   No.

18         MR. ROSENFELD:  Objection.

19   Q.   The next thing that you saw of any apparent

20  significance --

21         THE COURT:  Overruled.

22   Q.   -- was my client punching five times Sosa in the face

23  or the head?

24   A.   Yes.

25   Q.   Well, when this punching of approximately five times

D-ljb

People - MELISSA DEMPSEY - cross

948

1    was taking place there were other people in that room; were
2    there not?
3         A.    Yes.
4         Q.    Who?
5         A.    In the living room was the children.
6         Q.    Yes?
7         A.    Me.
8         Q.    Yes?
9         A.    And Carmen Diaz.
10        Q.    Any other adults?
11        A.    They was in the kitchen.
12        Q.    Who was there?
13        A.    Tango, my husband.
14        Q.    Yes?
15        A.    Robert, I believe Wilfredo and that's about it.
16        Q.    And those were the only people at the party at that
17   time in the kitchen?
18        A.    Yes.
19        Q.    So it was you and Carmen in the living room with the
20   kids?
21        A.    Uh-huh.
22        Q.    "Yes" or "no"?
23        A.    Yes.
24        Q.    And four male adults?
25        A.    In the kitchen.

D-ljb

People - MELISSA DEMPSEY - cross

949

1    Q.    In the kitchen and Sosa on the armrest and my client
2    face to face with him?
3    A.    Correct.
4    Q.    When my client struck Sosa did Sosa before --
5    immediately before the striking did Sosa stand up from the
6    armrest?
7    A.    No.
8    Q.    So all of the strikes were while Sosa was sitting on
9    the armrest, correct?
10   A.    Yes.
11   Q.    And it was only you and who, Margie?
12   A.    No, me and Carmen was standing in the living room with
13   the windows up and the children was sitting.
14   Q.    And about how many feet were you from my client and
15   Sosa approximately?
16   A.    Approximately, maybe a couple of feet?
17   Q.    Okay.  Couple of feet means two, three, four feet?
18   A.    Yeah.
19   Q.    Okay.  And my client, David, and Sosa were talking for
20   about four minutes before the striking began, correct?
21   A.    Correct.
22           MR. ROSENFELD:  Objection, asked and answered
23       several times, your Honor.
24           THE COURT:  I will allow it.
25   Q.    Now, at the time the striking began you saw it, you

D-1jb

People - MELISSA DEMPSEY - cross

950

1    were a witness, correct?

2        A.    Correct.

3        Q.    Was there any other adult witness to the striking that

4    you know of?

5        A.    Yes.

6        Q.    Who?

7        A.    Carmen Diaz.

8        Q.    Any of the people in the kitchen were they able, from

9    their position in the kitchen, to see the armrest on the couch

10   where the striking took place?

11       A.    No.

12             MR. ROSENFELD:  Objection as to what other

13       people?

14             THE COURT:  Sustained.

15       Q.    Well, if one stood in the kitchen could one see the

16   armrest?

17             MR. ROSENFELD:  Objection as to where.

18       Q.    The armrest on the sofa where the striking took place?

19             THE COURT:  I will allow that.

20       A.    No.

21       Q.    Okay.  So you had to be in that living room?

22       A.    Correct.

23       Q.    So it's only you and who?

24       A.    The children.

25       Q.    How old is the oldest child?

D-ljb

People - MELISSA DEMPSEY - cross

951

1   A.   The oldest child now --

2   Q.   No, then two -- 30 months ago approximately?

3   A.   My son.

4   Q.   How old was he then about?

5   A.   Fourteen.

6   Q.   Okay.

7   A.   Fourteen, 15.

8   Q.   So it was you and what other adults?

9   A.   And Carmen Diaz.

10  Q.   So you were the only two adult witnesses to the

11  striking?

12  A.   Yeah, besides the children.

13  Q.   I said adults.

14  A.   Yes, yes.

15  Q.   Are any of the children adults?

16  A.   No, they're not adults.

17  Q.   How old is the next oldest after 14?

18  A.   Nobody.

19  Q.   Were they all much younger?

20  A.   Yes.

21  Q.   Like four, five, six, seven, eight?

22  A.   No.

23  Q.   How old?

24  A.   Nine, 10, 11, 12.

25  Q.   And the oldest at that time was then your son and he

D-ljb

People - MELISSA DEMPSEY - cross

952

1   was then approximately 13 or 14?

2       A.   Yes, 14 to 15.

3       Q.   Fourteen?

4       A.   And he is 17 now.

5       Q.   Was 14 going onto 15?

6       A.   Yes.

7       Q.   Okay.  And what's your son's name?

8       A.   Justin.

9       Q.   Justin, and his last name, please?

10      A.   Fermin.

11      Q.   How do you spell that?

12      A.   F-E-R-M-I-N.

13      Q.   And was Justin Fermin, who was then 14, was he as far

14  as you know, interviewed by the police, if you know?

15           MR. ROSENFELD:  Objection, your Honor.

16      A.   Not that I know of.

17           THE COURT:  I will allow it.

18      A.   Yes, yes, he was.

19      Q.   In your presence?

20      A.   Not in my presence.

21      Q.   So you really was not present --

22      A.   No.

23      Q.   -- when the police spoke to him?

24      A.   No.

25      Q.   So, you don't know what he said and what the --

D-ljb

People - MELISSA DEMPSEY - cross

953

1    A.   My son?

2    Q.   "Yes" or "no"?

3    A.   No.

4    Q.   You have no personal knowledge?

5    A.   You don't let me explain.

6    Q.   It's a "yes" or "no" question.

7    A.   My son is deaf.

8    Q.   Ma'am, you've answered the question.

9    A.   Okay.

10   Q.   There is no question presently pending.

11           THE COURT:  Counsel, I am sorry to interrupt,

12   please approach.

13           (Whereupon there is an off-the-record

14   discussion.)

15   Q.   Okay.  You had told Mr. Rosenfeld on direct

16   examination that you had never seen that beige or brown handle

17   and the little hook on the end before, correct?

18   A.   Correct.

19   Q.   When you last saw David was he at the staircase on the

20   third floor?

21   A.   I didn't see him at the staircase.

22   Q.   You only saw him when he was interacting with

23   Mercedes?

24   A.   Yes.

25   Q.   And then you no longer saw him?

D-ljb

People - MELISSA DEMPSEY - cross

954

1    A.   I saw him when he ran out?

2    Q.   That's what I am asking, did you see him run towards

3    the stairs?

4    A.   Yes.

5    Q.   And then you went back in the apartment?

6    A.   Correct.

7    Q.   So you didn't see whether he descended, went down the

8    stairs?

9    A.   No, I have not.

10   Q.   You saw him on the third floor and then in the area of

11   the stairway, if I could use that term?

12   A.   Yes.

13   Q.   Okay.  So you were there until the -- you went back to

14   your house and fed your children, you remember saying that

15   afterwards?

16   A.   No, I didn't go back to my house.

17   Q.   Eventually, did you go back to your apartment?

18   A.   After everything happened, yes.

19   Q.   Of course, that's my question.

20   A.   You didn't --

21   Q.   Ma'am, I get to complete the question.

22       Meaning afterwards, subsequently, you went back to your

23   apartment, correct?

24   A.   Correct.

25   Q.   And you fed your children, correct?

954a

1    A.    Correct.

2                THE COURT:   Excuse me.

3                A JUROR:   Bathroom emergency.

4                A JUROR:   Can he please go to --

5                THE COURT:   Yes, go ahead.

6                (Whereupon there is a pause in the proceedings.)

7                (Continues next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D-ljb

e MC                          Dempsey - People - Cross

1                  THE COURT:  Mr. Cantor, Mr. Rosenfeld.

2                  MR. ROSENFELD:  Come up?

3                  MR. CANTOR:  Judge, if you give me sixty seconds,

4       I think we can break.

5                  THE COURT:  All right.

6                  MR. CANTOR:  Sixty seconds or less.

7                  THE COURT:  Mr. Cantor.

8       Q.    Okay, so after you finished feeding your kids, you went

9       back and you cleaned the apartment and police began arriving,

10      correct?

11      A.    Yes.

12      Q.    There were a lot of police eventually who arrived?

13      A.    Yes.

14      Q.    More than fifteen, just looking for an approximation,

15      for an estimate?

16      A.    I wasn't there when all the police was there.

17      Q.    Well eventually you did see a lot of police?

18      A.    I did not see a lot of police eventually.

19      Q.    Well, did you see police?

20      A.    I seen a couple of police, yes.

21      Q.    Okay, and that was before you got the call from

22      Detective Banker who took you to the precinct?

23      A.    That was way --

24                 MR. ROSENFELD:  Your Honor, may we have a time

25      reference as to all this?

e MC                          Dempsey - People - Cross

1      A.    I don't understand.

2            MR. CANTOR:   Judge -- withdrawn.

3      Q.    There came a time when you left your apartment and went

4    to a precinct in a van, correct?

5      A.    I know that, yes.

6      Q.    And before you left, did you see cops at the scene?

7      A.    No.

8      Q.    You didn't see a single cop?

9      A.    They just picked us up to go to the truck.

10     Q.    No, I'm talking about while you were still --

11     A.    Yes, there was cops there, obviously.

12     Q.    Obvisouly.   There were a lot of cops there, they were

13   doing lots of work, correct?

14     A.    Correct.

15     Q.    Did you see any cops searching for the knife?

16     A.    No.

17     Q.    Did you see any cops find the knife?

18     A.    No, I wasn't -- no.

19     Q.    Yes or no?

20     A.    No.

21           MR. CANTOR:   All right, Judge, this might be a

22     propitious moment for me to end for the session until we

23     meet again.

24           MR. ROSENFELD:   I only have a minute of redirect.

25           THE COURT:   One second.

e MC                          Dempsey - People - Cross

1                MR. CANTOR:  I have lots more.

2                THE COURT:  Please approach.

3                (Whereupon, there was a discussion held off the

4       record, at the bench, among Court and Counsel.)

5                (Whereupon, the following takes place on the

6       record, in open court:)

7                MR. CANTOR:  Your Honor, you run the Court, the

8       Court is an institution and you are the presiding officer

9       and I'll be here when you tell me to be here.

10               THE COURT:  All right, continue, you have any

11      other questions of this lady?

12      Q.   What's Mr. Jiminez's first name?

13      A.   There was no Mr. Jiminez.

14      Q.   Didn't you tell us that you went to the precinct --

15      didn't you tell Mr. Rosenfeld that you went to the precinct and

16      your husband went?

17      A.   Yes.

18      Q.   And well you got a call from a detective and then you

19      went in a van, right?

20      A.   Yes.

21      Q.   To the precinct, correct?

22      A.   Correct.

23      Q.   You went, your husband went, right?

24      A.   Yes.

25      Q.   Your kids?

e MC                          Dempsey - People - Cross

1    A.    Yes.

2    Q.    Miss Diaz?

3    A.    Yes.

4    Q.    Mercedes?

5    A.    Yes.

6    Q.    Wilfredo?

7    A.    Yes.

8    Q.    What's Wilfredo's last name?

9    A.    I don't know his last name.

10   Q.    Robert went?

11   A.    Yes.

12   Q.    What's Robert's last name?

13   A.    Walker.

14   Q.    Jiminez went?

15   A.    Yes.

16   Q.    What's his last?

17   A.    What's her last name, Jiminez.

18   Q.    That's his last --

19   A.    Her's.

20   Q.    What's her first name?

21   A.    Ary.

22   Q.    Ary?

23   A.    Ary, A-r-y, yes.

24   Q.    Now --

25              THE COURT:  All right, ladies and gentlemen, Madam

e MC

Dempsey - People - Cross

1      Forelady, we're going to break now.

2                 MR. ROSENFELD:   Please, may I approach to explain

3      something?   There's a reason, may I please?

4                 THE COURT:   Come forward.

5                 (Whereupon, there was a discussion held off the

6      record, at the bench, among Court and Counsel.)

7                 (Whereupon, the following takes place on the

8      record, in open court:)

9                 THE COURT:   Please continue and finish.

10     Q.    When you looked at the lineup, were any of these people

11     with you that you mentioned who had been taken in the van?

12     A.    Was they with me when I looked at the lineup?

13     Q.    Yes?

14     A.    No.

15     Q.    You were alone?

16     A.    With the cops, yes.

17     Q.    With the cop, with Detective Banker?

18     A.    Yes.

19     Q.    And did he tell you what seat the man was in?

20     A.    No, he did not.

21     Q.    Okay, you looked at how many men in the lineup?

22     A.    I believe it was six.

23     Q.    Six men?

24     A.    I believe, yes.

25     Q.    And you picked out number three?

e MC                          Dempsey - People - Redirect

1      A.    Yes.

2                  MR. CANTOR:   I have no further questions on cross.

3                  THE COURT: Mr. D.A.?

4    REDIRECT EXAMINATION

5    BY MR. ROSENFELD:

6      Q.    Looking at People's Exhibit 4, you indicated when

7    Mr. Cantor asked you the question who was present, what adults

8    were present in the living room?

9      A.    Yes.

10     Q.    Where was Mercedes?

11     A.    Mercedes was sitting on this chair right here.

12     Q.    And where was Margie?

13     A.    Margie was sitting over here.

14     Q.    But that's not considered the living room?

15     A.    No, that's the dining room.

16     Q.    So when you answered his questions what adults were

17   present, what area were you referring to, using People's Exhibit

18   3?

19     A.    I was more by the window in front of the sofa.

20     Q.    He asked you about the living room, what adults were in

21   the living room?

22     A.    Me and Carmen.

23     Q.    But by the table area was Margie and Mercedes?

24     A.    Yes.

25                  MR. ROSENFELD:   Thank you.

e MC                    Dempsey - People - Redirect

1            THE COURT:  Mr. Cantor --

2       Q.   And Mr. Cantor asked you whether I coached you about

3   anything to say in court, remember that question?

4       A.   Yes.

5       Q.   Did I tell you anything to say in court?

6       A.   No.

7       Q.   Did I give you any instructions?

8       A.   No.

9       Q.   What, if anything, did I tell you?

10            MR. CANTOR:  Objection.

11            MR. ROSENFELD:  He asked.

12            THE COURT:  I'll allow that.

13            MR. CANTOR:  He then becomes a witness.

14            THE COURT:  No, within the context of her

15   preparation, I'll allow it.

16       A.   He told me to speak up, speak clearly and use people's

17   names.

18            MR. ROSENFELD:  Thank you.

19       Q.   And although you had several things to drink,

20   and -- I think you said three or four cups?

21       A.   Yes.

22       Q.   At the time that you saw the defendant strike Sosa, did

23   you have any difficulty seeing because you were drunk?

24       A.   No, not at all.

25       Q.   Did you have any difficulty hearing things?

e MC                          Dempsey - People - Redirect

1    A.    No.

2    Q.    What was the music like at the moment when David was

3    striking --

4              MR. CANTOR:   Objection, that is outside the bounds

5         of cross-examination.   I didn't touch it.   Didn't touch it.

6              MR. ROSENFELD:   Talk about conversing.

7              MR. CANTOR:   Judge, I object.

8              MR. ROSENFELD:   I'll withdraw, I'll ask another

9         question.

10             THE COURT:   Sustained.

11   Q.    What was the music like at the time Sosa and David were

12   at the couch?

13             MR. CANTOR:   Objection.

14   A.    It was loud.

15             MR. CANTOR:   And she's talking.

16             THE COURT:   The objection is sustained.

17             MR. CANTOR:   So she cannot talk.

18             This is the thirty seconds?

19             THE COURT:   There's no need for editorializing.

20             MR. CANTOR:   But I cut short --

21             MR. ROSENFELD:   We said that at the bench.

22   Q.    When David and Sosa, David, the defendant, and Sosa

23   were talking at the time that they're at the couch, right before

24   the incident, were you timing it with a watch?

25             MR. CANTOR:   Objection.

e MC                              Dempsey - People - Recross

1      A.    No.

2                  THE COURT: Overruled.

3                  MR. ROSENFELD:   Thank you.   I have no further

4      questions.

5                  MR. CANTOR:   What's her answer?

6                  THE COURT: No.

7                  Do you have any questions of her, sir?

8    RECROSS-EXAMINATION

9    BY MR. CANTOR:

10     Q.    Because when you saw David and Sosa talking, it

11   appeared perfectly ordinary and plain to you, did it not?

12     A.    Yes.

13     Q.    And therefore, it came as a huge surprise after two men

14   were just talking normally, in a normal conversational tone, it

15   came as a huge surprise to you that my client suddenly, out of

16   the blue, struck Sosa five times in the face, correct?

17     A.    Yes.

18                 MR. CANTOR:   I have no further questions.

19                 MR. ROSENFELD:   Nothing further, thank you.

20                 THE COURT:   Ma'am, thank you.

21                 Madam Forelady, ladies and gentlemen -- you may

22     go.

23                 (WITNESS EXCUSED.)

24                 THE COURT:   Madam Forelady, ladies and gentlemen

25     of the jury, we have now completed the morning session.   We

e MC

964

Proceedings

1   have a witness lined up for this afternoon.  Please be back

2   sharp, right after your lunch, be outside the doors at two

3   o'clock.  We'll get immediately underway as quickly as we

4   can and finish with the afternoon's witness.

5           You are excused.  Remember all of the cautions.

6   Follow the officer.

7           (Whereupon, the jury exits the courtroom.)

8           THE COURT:  All right, jury having been excused,

9   gentlemen, ma'am, we'll see each other, to give the sergeant

10  time to bring up the gentleman, be here at 2:15.

11          (Luncheon recess taken.)

12          AFTERNOON SESSION

13          (Whereupon, the following takes place on the

14  record, in open court, in the presence of the Court, the

15  defendant, Mr. Cantor and Assistant District Attorneys

16  Rosenfeld and Mason:)

17          COURT CLERK:  This is the case on trial, People of

18  the State of New York against David Delgado.  Let the record

19  reflect the presence of the district attorney's office,

20  defense attorney and defendant.  Sworn jurors are not

21  present at this time.

22          THE COURT:  All right, Mr. Cantor.

23          MR. CANTOR:  Judge, there is an application.

24          THE COURT:  Yes?

25          MR. CANTOR:  The People have supplied me with a

e MC                         Proceedings

1    handwritten arrest date, the charge and the conviction, all

2    of them by way of guilty pleas concerning Alberto Vasquez.

3          Also, in good part, at your suggestion, they've

4    supplied me with the formal NYSIS sheet.

5          Now I have spoken to Mr. Rosenfeld before you took

6    the bench, Judge, and there is an August 1, 1991, arrest for

7    Robbery in the First Degree, forcible theft, armed with a

8    deadly weapon.  Mr. Rosenfeld tells me that based upon --

9    and it says, "No court reported information."

10         Mr. Rosenfeld tells me that based upon his

11   conversation with Mr. Vasquez, he has written next to that

12   entry, "Acquittal."  And I tell you why I find that a bit

13   strange.  Mr. Vasquez has been arrested twenty-nine times

14   and Mr. Vasquez has always pled guilty and he has never gone

15   to trial.  So I would think that this notion -- and Mr.

16   Rosenfeld candidly admits it to me, that's based upon what

17   he is told by Mr. Vasquez that the August '91 arrest for

18   Robbery in the First degree resulted in an acquittal.

19         Now an acquittal can only mean that the trier of

20   fact found him not guilty.  It is not in keeping with all of

21   the arrests, the multitude of other arrests and convictions

22   which come about by way of guilty plea.

23         If this was a mere dismissal and not on the

24   merits, I have a right, under People versus Sorge, to

25   inquire as to the underlying charges.  And I am not

e MC

Proceedings

1   satisfied with the basis of Mr. Rosenfeld's representation

2   to me that this arrest of August 1, 1991, for Robbery in the

3   First Degree, resulted in acquittal, which by necessary

4   implication inextricably means that the fellow, Mr. Vasquez,

5   went to trial and the trier of fact found him not guilty.

6          So I am asking, Judge, that there be further

7   inquiry made by the People, and not of Mr. Vasquez, because

8   he is certainly an interested party, he is the subject of

9   this arrest, and the word "A-c-q" is written by Mr.

10  Rosenfeld. It nowhere appears in a printed fashion on this

11  NYSIS sheet.  I am not satisfied with Mr. Vasquez's unsworn

12  representation to the prosecution.  And unless the People

13  can bring forth something of a more solid foundation that

14  serves as the basis for their concluding that this matter

15  resulted in acquittal, I intend to question the gentleman

16  about it.

17         MR. ROSENFELD:  Your Honor, the People brought to

18  counsel's attention Mr. Vasquez went to trial in this case

19  and he was acquitted after trial.

20         I also ran it through our E-justice system on

21  June 21st of 2012.  That's recently.  And it came back with,

22  "No court reported information."

23         That was the 1991 arrest.  He had several arrests

24  and convictions after that.  Those are all recorded duly on

25  the E-justice sheet.

e MC                          Proceedings

1          I also went and checked in my computer to see if

2     there was any record of the case, and there is no record of

3     the case.

4          So I submit to the Court -- and as counsel

5     indicated, I turned over to him, as is proper, a record of

6     Mr. Vasquez's convictions that he, of course, can examine

7     him on; probably eleven or twelve, however many arrest

8     incidents.  And it would be improper to question him on

9     something where he was acquitted after trial.

10          MR. CANTOR:  How do we know he was acquitted?

11     Because he merely says so?  This is a gentleman who's

12     credibility is very much in question.  This is a gentleman

13     who has been arrested twenty-nine times.

14          MR. ROSENFELD:  That's not correct.  There are

15     charges.  The actual incident --

16          MR. CANTOR:  The arrests, if I may complete my

17     thought to the Court without interruption, the arrests are

18     twenty-nine, the convictions are twelve, three felonies, two

19     violent felonies, eight misdemeanors, and it also says total

20     open charges.  This is what is supplied to me by the People

21     at your urging.  It says open charges, total open charges

22     three, felony open charges three.

23          THE COURT:  What's the basis again of the

24     acquittal, you ran it in two different systems?

25          MR. ROSENFELD:  Yes.

e MC

968

Proceedings

1    MR. CANTOR:  This is what Vasquez says.

2    MR. ROSENFELD:  I ran it in two different systems,

3  your Honor.  There are no open cases.  His last case was

4  from 1998.

5    THE COURT:  That's quite different from Vasquez

6  himself saying it.  You ran it through two systems?

7    MR. ROSENFELD:  Two systems, yes, your Honor.

8    MR. CANTOR:  But Vasquez could very well have had

9  a dismissal, not an acquittal.  And if it's a dismissal not

10  on the merits, I would be entitled to inquire as to the

11  underlying facts.

12    You see, that's what disturbs me.  It disturbs me

13  that Mr. Rosenfeld speaks to Mr. Vasquez and says, "What is

14  this all about," and Vasquez says, "Acquittal," and Mr.

15  Rosenfeld writes, "Acquittal."

16    THE COURT:  When do we intend to call Vasquez?

17    MR. ROSENFELD:  Now, he's coming in right now.

18    MR. CANTOR:  He's the next witness, and I intend

19  to ask him whether or not he was acquitted or it was

20  dismissed.  And if it was dismissed, I'm entitled to ask

21  him, since it was not on the merits, as to the underlying

22  facts of that case.  It's a serious case.

23    MR. ROSENFELD:  Also, your Honor, Mr. Cantor is

24  not allowed to ask a witness about any arrests, only about

25  convictions, he knows that, under the standing law.  So I

Proceedings

1    assume he'll be asking him, as I gave him the information,

2    about the proper arrests and convictions.

3              This is not a conviction, this was an acquittal

4    after trial, therefore he cannot ask him.

5              THE COURT:  I will allow Mr. Cantor to inquire of

6    him was he convicted on that date of that crime.

7              MR. CANTOR:  May I have a copy?

8              THE COURT:  If he says no, that's the end of it.

9              MR. CANTOR:  Very well.  May I have a copy so I

10   can ask him with specificity?

11             THE COURT:  Yes, okay.  Very good.  All right,

12   we'll make a copy for you.

13             Anything else?  Anything else at this moment?

14             MR. CANTOR:  No.  I want to see the copy.

15             THE COURT:  Anything else at this moment?

16             MR. CANTOR:  Not until I see the copy, Judge.

17             THE COURT:  You just had it in your hand.

18             MR. CANTOR:  No, he has, he being Mr. Rosenfeld,

19   is only Xeroxing part of it.

20             THE COURT:  The part dealing with Mr. Vasquez.

21             MR. CANTOR:  I hope so.  That's what I want to be

22   able to see and confirm.

23             THE COURT:  Okay.

24             MR. ROSENFELD:  I'll show it to the Court so the

25   Court knows what I'm turning over.

e MC                              Proceedings

1              (Whereupon, there was a discussion held off the

2       record, at the bench, among Court and Counsel.)

3              (Whereupon, the following takes place on the

4       record, in open court:)

5              THE COURT:  All right, your next witness, Mr.

6       Rosenfeld.

7              (Whereupon, the jury enters the courtroom and the

8       following takes place:)

9              THE COURT:  Good afternoon, Madam Forelady, ladies

10      and gentlemen of the jury.

11             We continue on the People's case.  I inquire of

12      you, can you all assure the Court you followed its

13      instructions, as you know, no discussion with anyone, not

14      amongst yourselves, no one in turn talks to any of you,

15      you're not playing detectives, investigators or researchers,

16      you can assure the Court of that?

17             THE JURORS:  Yes.

18             THE COURT:  All of that?

19             THE JURORS: Yes.

20             THE COURT:  Very good.

21             We call the next witness on the People's case,

22      sir?

23             MR. ROSENFELD:  People call Alberto Vasquez.

24             THE COURT:  Alberto Vasquez to the witness stand.

25             MR. CANTOR:  Judge, I just ask when the witness

e MC                      A. Vasquez - People - Direct

1       takes the stand, you instruct him that he should not answer

2       a question when the objection is raised until your Honor

3       rules.

4                   MR. ROSENFELD:  Your Honor, I'm going to object to

5       colloquy.

6                   MR. CANTOR:  And if you sustain the objection, he

7       should not answer it.

8                   MR. ROSENFELD:  It's improper.

9                   MR. CANTOR:  If you overrule it, of course he can

10      answer.  I ask that you so instruct the witness so we can go

11      smoothly

12  A L B E R T O   V A S Q U E Z,  a witness called by and on behalf

13      of the People, having first been duly sworn, testified as

14      follows:

15                  COURT OFFICER:  Witness gives his name as Alberto

16      Vasquez.  V-a-s-q-u-e-z.  Resident of Bronx County.

17                  THE COURT:  Good afternoon, Mr. Vasquez.

18                  THE WITNESS: Good afternoon.

19                  THE COURT:  Just sit back, be comfortable.  Sir,

20      listen carefully to the questions, answer only the question

21      that is asked of you.  Please keep your voice up.

22                  Should an objection be made to one of the

23      questions, just wait until the Court rules on the objection

24      before answering.

25                  THE WITNESS:  Okay.

e MC                          A. Vasquez - People - Direct

1                    THE COURT:  You may inquire.

2                    MR. ROSENFELD:  Yes.

3    DIRECT EXAMINATION

4    BY MR. ROSENFELD:

5         Q.   Good afternoon, Mr. Vasquez.

6         A.   Good afternoon.

7         Q.   Mr. Vasquez, do you need your glasses to see or can you

8    take them off?

9         A.   Yes, they're prescripted.

10        Q.   Mr. Vasquez, how old are you?

11        A.   I'm forty-three.

12        Q.   And what is your date of birth?

13        A.   March 12, 1969.

14        Q.   And where were you born and where did you grow up?

15        A.   I was born in Puerto Rico, I grew up in the Bronx.

16        Q.   How long -- when did you come from Puerto Rico to the

17   United -- to the Bronx, I'm sorry?

18        A.   When I was eight months old.

19        Q.   When you were eight months old.  And then you came

20   right to the Bronx?

21        A.   That is correct.

22        Q.   Did you go to school here in the Bronx?

23        A.   Yes.

24        Q.   And did you complete high school?

25        A.   No.

e MC                          A. Vasquez - People - Direct

1      Q.    What was the last grade of school that you achieved?

2      A.    Eleventh.

3      Q.    And after you went to eleventh grade, what did you do?

4      A.    Pertaining in my life?

5      Q.    Yes, did you work, did you continue school?

6      A.    No, I started working.

7      Q.    What type of work did you start doing?

8      A.    I was working for Waste Masters.

9      Q.    That was what year, approximately?

10     A.    Long time ago.

11     Q.    What decade?

12     A.    Yes, it was a couple of decades ago.

13     Q.    What type of work did you do?

14     A.    I was a garbage sorter, like I sort the garbage in the

15  Waste Master plant.

16     Q.    How long did you continue to do that work?

17     A.    I did that for about a year.

18     Q.    Then what?

19     A.    Then I moved on to other jobs.

20     Q.    What type of other jobs did you do over the years?

21     A.    I did jobs like messenger jobs.  Longest job I had was

22  when I worked for the Department of Environmental Protection,

23  DEP.

24     Q.    When did you work for DEP?

25     A.    I worked for DEP from 2001 to 2011 -- 2010.

e MC                    A. Vasquez - People - Direct

1       Q.    And did there come a time that you engaged in a

2    common-law relationship with someone?

3       A.    Yes.

4       Q.    And who was that?

5       A.    My wife, Melissa Dempsey.

6       Q.    And when you and your wife got together, were you

7    working at that time?

8             MR. CANTOR:  Judge, it's so --

9       A.    Yes.

10             MR. CANTOR:  -- remote, that I'm going to be

11        objecting.  What does that have to do with the price of tea

12        in China?

13             MR. ROSENFELD:  Again, this is colloquy.

14             MR. CANTOR:  I object.

15             THE COURT:  The objection is overruled.

16             MR. CANTOR:  Very well.  What is the question

17        because he began to answer it, I had raised an objection and

18        before I could complete --

19             THE COURT:  I don't know if Mr. Rosenfeld wishes

20        to press it.

21             MR. CANTOR:  Can we have the answer read back?

22             THE COURT: It's up to the district attorney.

23        Whatever answer there is, you may hear back.

24             MR. CANTOR:  Please, thank you.

25             (Whereupon, the court reporter read back the

e MC                      A. Vasquez - People - Direct

1     requested testimony.)

2              MR. CANTOR:   You overruled the objection,

3     correct?

4              THE COURT:   Yes.

5     Q.   Go ahead?

6     A.   Yes.

7     Q.   What type of work were you doing around then?

8     A.   I was a maintenance worker for a laboratory, testing

9     laboratory in Brooklyn.

10    Q.   And you just indicated you worked up until 2010?

11    A.   That is correct.

12    Q.   What have you been doing since 2010?

13    A.   Collecting unemployment, looking for work.

14    Q.   Where are you currently living?

15    A.   At 2033 McGraw Avenue in the Bronx.

16    Q.   How long have you been living at 2033 McGraw Avenue,

17    approximately?

18    A.   About fourteen years.

19    Q.   Now, Mr. Vasquez, do you use any controlled substance?

20    A.   No.

21    Q.   Do you use any marijuana?

22    A.   Yes.

23    Q.   And how long have you been using or smoking marijuana?

24    A.   Since the age of fourteen.

25    Q.   And how long have you smoked marijuana for, till when?

e MC                           A. Vasquez - People - Direct

1    A.   Till yesterday.

2    Q.   You didn't smoke any today, did you?

3    A.   No.

4    Q.   When you smoke marijuana, tell us what do you smoke,
5    how much?

6    A.   I smoke a couple of blunts a day.

7         MR. CANTOR:  Blunts, is that the word?

8         THE WITNESS:  Blunts.

9    Q.   Explain what a blunt is?

10   A.   It's the marijuana rolled up in a cigar.

11   Q.   You've been doing that on a daily basis or intermittent
12   basis how long?

13   A.   Every day.

14   Q.   For how many years?

15   A.   Since I was fourteen.

16   Q.   Now, Mr. Vasquez, I'm going to direct your attention to
17   May 26th of 1986, here in the Bronx, the 44 Precinct, recall
18   being arrested for Attempted Grand Larceny in the First Degree,
19   criminal possession of a credit card, possession of stolen
20   property?

21        MR. CANTOR:  Can I have a moment, Judge, and have
22   the reporter read those three back to me?

23        THE COURT:  Yes.

24        (Whereupon, the reporter read back the requested
25   testimony.)

e MC

A. Vasquez - People - Direct

1      Q.    And did there come a time you pled guilty around

2  September 13th of 1998, to a disorderly conduct?

3      A.    Yes.

4              MR. CANTOR:  What was the date, please?

5              MR. ROSENFELD:  September 13th of 1998.

6      A.    Yes.

7      Q.    You received a violation and conditional discharge?

8      A.    Yes.

9      Q.    What was that about?

10     A.    Can you say that again?

11     Q.    What did that incident involve, if you recall?

12     A.    I stole a T.V. set or something from somebody.

13             MR. CANTOR:  I'm sorry, I stole --?

14             THE WITNESS:  Yes.

15     Q.    This is 1986, do you recall any time about being

16  involved in a stolen car or breaking into a car?

17     A.    Yes, I broke into a car.  At that time I broke a car

18  window, took a car radio.

19     Q.    That was the September 13th of 1988 case?

20     A.    Yes.

21     Q.    And then did there come a time in November 2nd of --

22  I'm sorry, yes, November 2nd of 1986 --

23             MR. CANTOR:  Hold it.

24     Q.    -- that you were arrested for Robbery in the First

25  Degree?

978

e MC

A. Vasquez - People - Direct

1          MR. CANTOR:  That's November 2nd, Mr. Rosenfeld?

2          Can I have it read back, Judge?

3          MR. ROSENFELD:  Your Honor, may we approach?

4          MR. CANTOR:  No, I just want the date so that I

5     can be accurate when I cross-examine.

6          MR. ROSENFELD:  May we approach?

7          THE COURT:  You have all this material.

8          MR. CANTOR:  Okay, then give me a moment, okay.

9          (Short pause.)

10         MR. CANTOR:  Thank you.

11         MR. ROSENFELD:  May I continue?

12    Q.   On November 2nd of 1986, in the 44 Precinct, you were

13    arrested for Robbery in the First Degree?

14    A.   Yes.

15    Q.   And there came a time that you pled guilty on

16    February 6th of 1987, to petit larceny, an A misdemeanor, and

17    received three years probation?

18    A.   Yes.

19    Q.   That involved a robbery.  Remember what that involved?

20    A.   Excuse me?

21    Q.   You remember what that involved, the case?

22    A.   I think that's when I robbed someone in their

23    apartment.

24    Q.   Following that, on September 3rd of 1987, here in the

25    44 Precinct in the Bronx, were you arrested for criminal mischief

e MC                          A. Vasquez - People - Direct

1   and did you plead guilty on September 13th of 1988, to criminal

2   mischief, an A misdemeanor?

3        A.   Yes.

4        Q.   Did that also involve a car?

5        A.   Yes.

6        Q.   What did you do to that car?

7        A.   Broke the window.

8        Q.   Did there come a time in August 24th of 1988, that you

9   were arrested for Burglary in the Third Degree?

10       A.   Yes.

11       Q.   Did you plead guilty on September 13th of 1988, to

12  criminal mischief, an A misdemeanor, and receive a sentence of

13  four months?

14       A.   Yes.

15       Q.   And what did that involve, do you recall?

16       A.   I got caught on the roof of a building.

17            MR. CANTOR:   I'm sorry?

18            THE WITNESS:   I got caught on a roof on top of a

19       building.

20       Q.   Is that a club?

21       A.   Yes.

22       Q.   I direct your attention to November 14th of 1988, were

23  you arrested for Burglary in the Third Degree on that case?

24       A.   Yes.

25       Q.   And did you plead guilty on February 6th of 1989, to

e MC

A. Vasquez - People - Direct

1   Burglary in the Third Degree, a D Felony, and receive a sentence

2   of approximately three hundred and fifteen days or ten months?

3       A.   Yes.

4       Q.   Did that involve a burglary of a factory?

5       A.   Yes.

6       Q.   What happened in that case?

7       A.   I broke into a factory and got caught.

8       Q.   Now I direct your attention to November 5th of 1989,

9   were you arrested for Criminal Possession of Stolen Property, a D

10  felony, in the Third Degree?

11      A.   Yes.

12      Q.   Did you plead guilty on November 21st of 1989, to

13  Criminal Possession of Stolen Property in the Fifth Degree, an A

14  misdemeanor, and receive a sentence of one year?

15      A.   Yes.

16      Q.   Was that acting in concert with another person?

17      A.   Yes.

18      Q.   Remember what you possessed or stole at that point?

19      A.   I think it was like a big copy machine.

20      Q.   Was that here in Bronx housing?

21      A.   Yes.

22      Q.   Now I direct your attention to an arrest on November

23  26th of 1990, were you arrested for Criminal Possession of a

24  Controlled Substance in the Seventh Degree inside New York City

25  Housing?

e MC                          A. Vasquez - People - Direct

1      A.    Yes.

2      Q.    And did you plead guilty on February 13th of 1991, to

3    Criminal Possession of a Controlled Substance in the Seventh

4    Degree, an A misdemeanor, and receive a sentence of conditional

5    discharge?

6      A.    Yes.

7      Q.    What did that case involve?

8      A.    I was in possession of a small quantity of cocaine.

9      Q.    Now I direct your attention to an arrest of February

10   7th of 1991, were you arrested for Criminal Possession of Stolen

11   Property in the Fifth Degree, a B misdemeanor -- an A

12   misdemeanor, I'm sorry?

13     A.    Yes.

14     Q.    And did you plead guilty to Criminal Possession of

15   Stolen Property in the Fifth Degree, an A misdemeanor, and

16   receive a sentence of thirty days and a seventy-five dollar fine?

17     A.    Yes.

18     Q.    Did that involve taking property from an individual?

19     A.    Yes.

20     Q.    What did you take and where?

21     A.    I was in the subway and I seen a drunk man --

22           MR. CANTOR:    I'm sorry?

23     A.    I was in the subway station and I seen a drunk guy and

24   I took off his chain and he was a undercover cop.    It was a

25   sting, I got arrested.

A. Vasquez - People - Direct

1    Q.    I direct your attention to an arrest of March 27th of

2  1991, were you arrested for Robbery in the First Degree in the 49

3  Precinct here in the Bronx?

4    A.    Yes.

5    Q.    Did you plead guilty on April 14th of 1993, to

6  Attempted Robbery in the First Degree?

7    A.    Yes.

8    Q.    A C felony?

9    A.    Yes.

10    Q.    Did you receive a sentence of forty-two months to seven

11  years?

12    A.    Yes.

13    Q.    You actually served a portion of that?

14    A.    Yes.

15    Q.    And you recall when you were paroled?

16    A.    I don't recall.

17    Q.    And what was the circumstances of that incident?

18    A.    I robbed a Chinese restaurant with a shotgun at

19  gunpoint.

20              MR. CANTOR:   I shopped --

21              THE WITNESS:   With a shotgun.

22    Q.    Now did you also have a second case around the same

23  time?

24    A.    Yes.

25    Q.    What did that involve?

e MC                          A. Vasquez - People - Direct

1      A.    It was a robbery, armed robbery.

2      Q.    What happened to that case?

3      A.    I was acquitted.

4            MR. CANTOR:  I'm sorry?

5            THE WITNESS: I was acquitted.

6      Q.    You also have another attempted robbery case in 1991?

7      A.    Yes.

8      Q.    What happened to that one?

9      A.    It got dismissed.

10     Q.    Was that the -- was that the same time you were

11  sentenced to the forty-two months to the seven years?

12     A.    Yes.

13     Q.    What did that case involve?

14     A.    Say that again?

15     Q.    What did that case involve?

16     A.    It was an armed robbery.  What happened was when I got

17  locked up for armed robbery, they put me in a lineup of different

18  robberies and it got dismissed.

19     Q.    That was at the same time you got sentenced to

20  forty-two months to seven years?

21     A.    Yes.

22     Q.    Did there come a time on May 31st of 1998, you were

23  arrested for Assault in the Third Degree?

24     A.    Yes.

25     Q.    Did you plead guilty on June 5th of 1998, to Assault in

e MC

A. Vasquez - People - Direct

1   the Third Degree, an A misdemeanor, and receive a sentence of

2   four months?

3        A.   Yes.

4        Q.   What did that involve?

5        A.   Altercation with my wife.

6        Q.   Miss Dempsey?

7        A.   Yes.

8        Q.   What happened then?

9        A.   We got into an altercation and I physically assaulted

10  her.

11       Q.   That was June 4th of 1998, you pled guilty?

12       A.   Yes.

13       Q.   Have you had any other convictions since June 5, 1998?

14       A.   No.

15       Q.   Mr. Vasquez, did you know someone named Sosa?

16       A.   Yes.

17       Q.   And did you know his real name?

18       A.   Yes.

19       Q.   What was that?

20       A.   Jose Tavarez, something like that, I really don't know

21  how to pronounce the last name.   George.

22       Q.   George?

23       A.   Yes.

24       Q.   And the last name, spell it?

25       A.   Tavarez something like that, I don't really know his

 1   last name.

 2        Q.   How -- what did you call him?

 3        A.   I called him Sosa.

 4        Q.   And when did you first meet Sosa?

 5        A.   I met Sosa when I first moved into my neighborhood.

 6        Q.   So approximately how many years did you know him for?

 7        A.   Like fourteen years.

 8        Q.   What was the nature of your relationship, how did you

 9   know him?

10        A.   I met Sosa, I would buy my marijuana off of him.

11        Q.   Off of Sosa?

12        A.   Yes.

13        Q.   Did you become friends?

14        A.   We became good friends.

15        Q.   Did you socialize with him?

16        A.   Yes.

17        Q.   Did you know his family?

18        A.   Yes.

19        Q.   Did you ever socialize with his family?

20        A.   Yes.

21        Q.   And for those fourteen years or fifteen years how often

22   would you see Sosa?

23        A.   I would see Sosa at least four or five times a week.

24        Q.   Was that all in the same neighborhood?

25        A.   Yes.

e MC                          A. Vasquez - People - Direct

1       Q.   Now directing your attention to December 24th of 2009,

2   right before Christmas Eve, were you working that day?

3       A.   No.

4       Q.   Were you employed around that time of December of 2009?

5       A.   I was still employed, yes.

6       Q.   Did you work that day?

7       A.   No.

8       Q.   Had you worked the day before?

9       A.   Yes.

10       Q.   What was your normal work hours?

11       A.   Seven in the morning to four p.m.

12       Q.   Who were you working for?

13       A.   I was working for the City of New York, DEP, Department

14   of Environmental Protection.

15       Q.   And on December 24th of 2009, where were you?

16       A.   I was home.

17       Q.   Did you go to work at all that day?

18       A.   No, I was off.

19       Q.   Did you and your wife have plans for that evening?

20       A.   Yes.

21       Q.   What were your plans for that evening?

22       A.   We was going to throw a Christmas gathering at our

23   neighbor's house in our building.

24       Q.   Who was that?

25       A.   Carmen.

e MC                    A. Vasquez - People - Direct

1      Q.    How long had you known Carmen?

2      A.    Fourteen years.

3      Q.    And did there come a time that you went to Carmen's

4   apartment for the party?

5      A.    Yes.

6      Q.    And who did you go with?

7      A.    I went with my wife and my three kids.

8      Q.    And when you got to the party, do you recall whether

9   other people were there yet?

10     A.    Yes.

11     Q.    Do you recall over the period of time, after you got to

12  the party, did other people arrive at the party?

13     A.    Yes.

14     Q.    Do you remember the names of any of the people who were

15  at the party?

16     A.    Yes.

17     Q.    Some of the names that you can remember?

18     A.    I remember Robert Walker, Mercedes, Ary, Carmen, my

19  wife, Sosa, it was a friend that came from Mercedes' friends, two

20  other people, I didn't know who they were.  They left, they came

21  for awhile and left.  Yes, basically it was about maybe like

22  fifteen people, the most, there.

23     Q.    Were there other children at the party besides your

24  own?

25     A.    Yes.

e MC                          A. Vasquez - People - Direct

1        Q.   By the way, are you known by any other name besides

2   Alberto Vasquez?

3        A.   Yes.

4        Q.   And what name are you known by?

5        A.   Tango.

6        Q.   And when you got to the party, what, if anything, did

7   you do?

8        A.   We just -- when I got to the party, it was still

9   early.  We was just, you know, we cooked, we ate, had played

10  music, kids was running around having a good time, couple of

11  people was dancing.

12       Q.   Had you had any marijuana that day?

13       A.   Yes, I did.

14       Q.   When did you have marijuana?

15       A.   I had marijuana about five o'clock that evening.

16       Q.   Where did you smoke it?

17       A.   Outside.

18       Q.   How much marijuana did you smoke on December 24, 2009?

19       A.   I smoked one blunt.

20       Q.   And how much marijuana is in a blunt, if you know?

21       A.   Yeah, like five dollars worth, a nickel bag.

22       Q.   And did that have any effect upon you after you smoked

23  that blunt?

24       A.   No.

25       Q.   And when you were at the party, did you smoke any

e MC

A. Vasquez - People - Direct

1   marijuana?

2       A.   No.

3       Q.   Did you smoke anything else at the party?

4       A.   No.

5       Q.   Was anybody else smoking anything at the party?

6       A.   Cigarettes.

7       Q.   Did you smoke cigarettes?

8       A.   Yeah.

9       Q.   Did you -- was there alcohol at the party?

10      A.   Yes.

11      Q.   Did you have any alcohol to drink at the party?

12      A.   Yes.

13      Q.   How much?

14      A.   About two cups, I'm not a drinker.

15      Q.   Two cups of what?

16      A.   Hennessy.

17      Q.   When you say cups, what are you referring to?

18      A.   Cups a little bit bigger than this.

19      Q.   And how much liquor was in those cups that you drank?

20      A.   Half a cup of liquor, the other half soda.

21      Q.   Indicating the witness pointed to a Dixie cup with his

22  fingers in front of the middle mark as he said half a cup, is

23  that correct?

24      A.   That's correct.

25           THE COURT:  So indicating.

e MC                          A. Vasquez - People - Direct

1      Q.   How many of those cups, I'm sorry?

2      A.   I had about two cups.

3      Q.   Did that make you drunk in any way?

4      A.   No, I'm not a drinker, I don't drink, I just had two

5   cups.

6      Q.   Did that have any effect on you at all being able to

7   see?

8      A.   No.

9      Q.   Being able to hear?

10      A.   No.

11      Q.   Being able to walk or move around?

12      A.   No.

13      Q.   Any affect at all?

14      A.   No.

15      Q.   As the party went on, did there come a time other

16   people arrived?

17      A.   Yes.

18      Q.   Who else arrived?

19              MR. CANTOR:  We've already had it, repetitious.

20              MR. ROSENFELD:  I said who else later.

21              MR. CANTOR:  He was asked who was at the party and

22      he testified.

23              THE COURT:  He did.  Now he's asking about later

24      on if anyone else came.

25      Q.   You can answer?

e MC                          A. Vasquez - People - Direct

1      A.   Yes.

2      Q.   Who else came to the party later on?

3      A.   My wife's friend Margie and David Delgado.

4      Q.   Now your wife's friend Margie, did you know her?

5      A.   Yes, I know her.

6      Q.   How long had you known her?

7      A.   About fourteen years.

8      Q.   You ever socialize with her?

9      A.   It's my wife's friend, I don't socialize with her, but

10   I say hello and stuff like that.

11     Q.   You personally weren't friends?

12     A.   No.

13     Q.   Close friends?

14     A.   That's my wife's friend, that's not my friend.

15     Q.   And you said she brought someone with her?

16     A.   Yes.

17     Q.   Had you ever seen that person before that day?

18     A.   Yes.

19     Q.   And you used the name David Delgado?

20     A.   Yes.

21     Q.   Did you know his name from before that day?

22     A.   I just knew his name was David.

23     Q.   If you can recall, when had you first seen this guy

24   David?

25     A.   I seen him, I'd say, maybe like the first time saw him

e MC                          A. Vasquez - People - Direct

1   was like a week before, before December 24th, I seen him in the

2   neighborhood.

3        Q.   With who?

4        A.   With Margie.

5        Q.   Did you go up and talk to Margie or David at that

6   point?

7        A.   No.

8        Q.   Where did you see him from?

9        A.   I saw him walking with Margie.  My wife told me that

10  that was Margie's --

11              MR. CANTOR:  Objection to what his wife told him.

12       A.   Okay.

13              THE COURT:  I'll allow it.

14              THE WITNESS:  What?

15       Q.   You saw Margie?

16       A.   Yeah.

17       Q.   And you saw this guy David?

18       A.   Yes.

19       Q.   Did you go talk to them when you first saw them?

20       A.   No.

21              THE COURT:  Were you with your wife?

22              THE WITNESS: Yes.

23       Q.   Did there come another time that you saw him after that

24  first time before the party?

25       A.   Yes.

e MC                          A. Vasquez - People - Direct

1      Q.    Where was that?

2      A.    In the neighborhood.

3      Q.    Again, did you go talk to him?

4      A.    No.

5      Q.    Who was he with the second time you saw him?

6      A.    With Margie.

7      Q.    How many times in total did you see this guy David

8   before the party, if you could estimate?

9      A.    A total of three or four times.

10     Q.    And the other two times, you mentioned two times, what

11  about the next two times, where did you see him?

12     A.    In Carmen's house, that's when I saw him.

13     Q.    Before the party?

14     A.    No.   Before the party I just saw him in the

15  neighborhood, outside, from the neighborhood, in the

16  neighborhood.

17     Q.    All the time you saw him --

18     A.    All the time.

19     Q.    -- was he always with Margie?

20     A.    Yes.

21     Q.    Did you ever talk to him during any of those few times?

22     A.    No.

23     Q.    Now going back to the party, December 24, 2009, and you

24  indicated Margie came to the party with this guy David?

25     A.    Yes.

e MC                        A. Vasquez - People - Direct

1       Q.    And what happened when they came into the party?

2       A.    They came in and she started introducing David to

3    certain people at the party because no one knew him.

4       Q.    Did you get introduced to him?

5       A.    Yes.

6       Q.    And how did she introduce him, by what name?

7       A.    David.

8       Q.    Did she use a last name at that time?

9       A.    No.

10      Q.    Did you know his last name at that time?

11      A.    No.

12      Q.    I ask you to look around the courtroom now, do you see

13   this person you call David?

14      A.    Yes.

15      Q.    Please indicate by pointing where he's sitting and what

16   he's wearing?

17      A.    He's right there, wearing the suit and the tie.

18            THE COURT:   Indicating the defendant herein.

19      Q.    After Margie came in with the defendant to the party,

20   did you talk to him?

21      A.    Yes.

22      Q.    And did you -- what was Sosa doing at that time, if you

23   recall?

24      A.    He was dancing, he was in the living room dancing.

25      Q.    Were other people dancing or just Sosa?

e MC                         A. Vasquez - People - Direct

1       A.    No, a few people dancing.

2       Q.    So there was music playing?

3       A.    Yes.

4       Q.    What was the sound level of the music, if you can

5    estimate?

6       A.    It was pretty loud.

7       Q.    And approximately, if you know, before Margie and the

8    defendant came to the party, how long had Sosa been at the party,

9    if you know what time he came?

10      A.    Yeah, I think Sosa came to the party about nine

11   o'clock.

12      Q.    And when Sosa came to the party, did you talk to him?

13      A.    Yes.

14      Q.    And what else do you recall observing Sosa doing at the

15   party after he got there?

16      A.    When Sosa got to the party, Sosa was extremely

17   intoxicated.  He got there intoxicated, he could barely walk.

18              MR. CANTOR:  From what?

19              THE WITNESS:  He could barely walk, he was really,

20       really intoxicated.

21      Q.    And when he was at the party, could you indicate what

22   he was doing if anything unusual that you noticed about him?

23      A.    He was upset.

24              MR. CANTOR:  He was what?

25              THE WITNESS:  Upset.

e MC                          A. Vasquez - People - Direct

1      Q.   And did you notice whether or not he had any alcohol to
2    drink at the party, if you recall?

3      A.   Sosa came with his own alcohol, are you asking?

4      Q.   I'm asking you if you observed Sosa, after he came to
5    the party, drink any alcohol?

6      A.   Yes.

7      Q.   Do you know what he was drinking or how much?

8      A.   Yes, I remember -- I remember he got two drinks and
9    Carmen said she wasn't going to give him no more drinks because
10   he couldn't hold a cup up, he kept spilling his drink, he was
11   intoxicated.

12     Q.   You remember what he was drinking?

13     A.   Yeah, he was drinking -- I think it was vodka and soda,
14   it was alcohol with soda, it was a mixed drink.

15     Q.   Over how long a period was he drinking that, did he
16   drink it all at once or over a period of time?

17     A.   Like I said, he wasn't able to finish the drink, he
18   couldn't hold the drink up.

19     Q.   And did this continue as the party went on?

20     A.   Yes.

21     Q.   And after Margie and David came into the party, did you
22   notice any interaction between Sosa and Margie and David?

23     A.   No.

24               MR. CANTOR:   What was the answer?

25               THE WITNESS: No.

e MC                     A. Vasquez - People - Direct

1    Q.   What were you doing?

2    A.   I was just -- I was just there.

3    Q.   What happened after Margie and the defendant came to

4    the party?

5    A.   When they got to the party, Sosa was visibly upset,

6    having some problems with --

7    Q.   What --

8              MR. CANTOR:   I'd kind of like to hear the balance

9         after having some problems.

10             THE WITNESS:   He was upset.

11             THE COURT:   One second.

12             MR. CANTOR:   He was interrupted.

13             THE COURT:   All right.

14             MR. CANTOR:   He said having some problems with?

15             THE WITNESS:   With his baby's mother.

16   Q.   What did you observe happen?

17   A.   I observed Sosa came visibly upset, he was having a

18   problem with his baby's mother and he was really depressed about

19   that.

20   Q.   Did you observe anything happen after Margie and the

21   defendant came to the party with Sosa, any interaction?

22   A.   I know Sosa was upset and I took him over to my house

23   to try to talk to him because he was real upset.  Then we went

24   back to the party.  When we got back to the party, that's when

25   everything went crazy.

e MC                    A. Vasquez - People - Direct

1       Q.    Let's back up a little bit.  After Margie and the

2   defendant came into the apartment, did you observe the defendant

3   David have any interaction with Sosa at any point?

4       A.    The only interaction that I'd seen that night was when

5   Sosa told him that Margie was a good friend of his and that he

6   better do right by her or that him and his brothers is going

7   to --

8       Q.    I'm sorry?

9       A.    -- fuck him up, beat him up, you know.

10                  MR. CANTOR:  Can I have that answer reread, your

11          Honor?

12                  THE COURT:  Yes.

13                  (Whereupon, the court reporter read back the

14          requested testimony.)

15                  MR. ROSENFELD:  Did you get all that?

16                  Can I continue, your Honor?

17                  THE COURT:  You may.

18      Q.    And approximately when was that that you heard Sosa say

19   this to the defendant?

20      A.    That was maybe -- might have been like maybe like half

21   an hour after Margie and David got to the house.

22      Q.    And when Sosa was making that statement to David, where

23   were you standing?

24      A.    I was standing a few feet from him.

25      Q.    And did you notice whether Sosa had any physical

e MC                    A. Vasquez - People - Direct

1   contact --

2        A.   No.

3        Q.   -- with him as he was talking?

4        A.   No, because when he said that --

5             MR. CANTOR:   The answer is no, Judge.   Could we go

6        to the next question.

7             THE COURT:   All right.

8        Q.   Did you ever observe Sosa during that conversation that

9   you just told us about touch the defendant in any manner, if you

10  recall?

11       A.   No.

12       Q.   Do you recall what Sosa was doing with his hands while

13  he was talking?

14       A.   Just moving his hands around as he spoke, you know,

15  gestures, like hand gestures.

16             MR. ROSENFELD:   Indicating the witness has his two

17       hands up, fingers pointed to the ceiling, waving them around

18       back and forth, as he was talking and describing how Sosa

19       was gesturing.

20       Q.   Is that correct?

21             THE COURT: So indicating.

22       Q.   Did anything happen between the defendant, this guy

23  David, and Sosa when David said that to him?

24       A.   No, at that moment, no.

25             MR. CANTOR:   It's when Sosa said that to David,

e MC                          A. Vasquez - People - Direct

1     not when David said that to him.

2                 MR. ROSENFELD:  Sosa said that to David, that's

3          what I said.

4                 MR. CANTOR:  No, that's not what you said.

5                 MR. ROSENFELD: I'll ask the question again, your

6          Honor.

7          Q.   Did anything happen between David and Sosa after Sosa

8     said that to him?

9          A.   The moment the words came out of his mouth you mean?

10         Q.   Yes?

11         A.   No, nothing happened.

12         Q.   How about afterwards, once Sosa finished saying that,

13    did anything happen?

14         A.   No.

15         Q.   Did you notice the defendant or David react any way

16    when Sosa was saying that to him?

17         A.   No.

18         Q.   Do you recall if their voices were -- the level of

19    their voices, Sosa's voice when he said that?

20         A.   No.

21         Q.   You don't recall.  Did at any point Sosa appear angry?

22         A.   Yes.

23         Q.   At what point?

24         A.   He was angry, there wasn't like a discussion before

25    everything happened, he was angry, but he calmed down.  When I

A. Vasquez - People - Direct

1  took him to my house, everything was calmed down after that.

2      Q.   This conversation you just told us about where Sosa

3  told David the words you just told us, that was before he went to

4  your house or afterwards?

5      A.   No, that -- Sosa was in my house before they had that

6  conversation.

7      Q.   Okay.  So up until you took Sosa out of the party, had

8  you noticed any conversation between Sosa and the defendant?

9      A.   No.

10     Q.   Had you seen any interaction, anything happen between

11 Sosa and the defendant before you took Sosa out of the apartment?

12     A.   No.

13     Q.   What had you been doing up until that time that you

14 took Sosa out of the apartment?  What were you doing?

15     A.   I was just in the party, talking to one of my friends.

16     Q.   What part of -- what area of the apartment were you

17 hanging out in?

18     A.   In the kitchen.

19     Q.   What were you doing in the kitchen?

20     A.   Smoking cigarettes.

21     Q.   And who else was in the kitchen with you?

22     A.   It was me, Robert was in the kitchen, some guy named

23 Pachinko.

24              MR. CANTOR:   Chinko?

25              THE WITNESS:   Pachinko, yes.

e MC

A. Vasquez - People - Direct

1   A.   That's as far as I remember.

2   Q.   Was there ever a time that the defendant David was

3   inside the kitchen?

4   A.   Yes.

5   Q.   Was this before you took Sosa out or afterward?

6   A.   This was before I took Sosa out.

7   Q.   And did you talk to David when you were in the kitchen?

8   A.   Yes.

9   Q.   And did you notice if he was doing anything, drinking,

10  smoking, anything you recall?

11  A.   He wasn't drinking.

12  Q.   Did you ever see the defendant drinking alcohol at the

13  party?

14  A.   No.

15  Q.   Did he ever smoke?

16  A.   No.

17  Q.   So you had a conversation with him in the kitchen?

18  A.   Yeah.

19  Q.   And while you were talking to the defendant in the

20  kitchen, did he show you anything?

21  A.   Yeah.

22              CONTINUED NEXT PAGE.............

23

24

25

cm/f

1      Q    What did he show you?

2      A    When he was fumbling with his belt, I seen a brown

3   handle sticking by the way his belt was at.  I knew it was a

4   weapon, but I don't know what it was.

5              MR. CANTOR:  I object to "I knew it was a weapon."

6         I ask that it be stricken.

7              THE COURT:  If that's what he saw, he saw.

8              MR. CANTOR:  He saw a brown handle.

9              THE WITNESS:  I saw a brown handle.

10             MR. CANTOR:  I move to strike "I knew it was a

11        weapon" based upon a brown handle.  It could have been a

12        brush.  It could have been any one of a host of things.

13             THE COURT:  I will allow more inquiry.

14             MR. CANTOR:  Okay.  But will you strike it at this

15        moment?

16             THE COURT:  Subject to connection.

17     Q    Please continue.  What happened as you saw him fumble

18   and you saw a handle?

19     A    He kept fumbling and fixing his belt.  When he saw I

20   was looking down, he stated he always carries something.  And I

21   stated to him he didn't need to have anything in this apartment

22   because this was a family gathering and everyone was friends

23   here, so he shouldn't be feeling --

24     Q    Let's get back to watching him fumble.  Could you tell

25   exactly what the object was that he was fumbling with?

cm/f

1     A    Can I stand up?

2     Q    Sure.  Please show us, if that helps.

3     A    He kept fumbling with something in his belt buckle.

4          MR. ROSENFELD:  The witness is standing up with

5     his hand at his waist with his hand inside of his belt

6     buckle.

7     Q    Remain standing.  Show us what you saw as he was doing

8     that?

9     A    When he was fixing, he moved the handle this way like

10    this.

11         MR. ROSENFELD:  Indicating the witness with a

12    closed fist moved his fist across his belt from left to

13    right.

14    Q    That's when you're saying you saw this handle?

15    A    That's correct.

16    Q    Did you see what the handle was attached to?

17    A    No.

18    Q    Could you tell what it was a handle of from seeing

19    that?

20         MR. CANTOR:  Asked and answered.  He said he

21    couldn't see what it was attached to.

22         THE COURT:  I will allow it.

23    A    The handle to me, the handle looked like --

24         MR. CANTOR:  I'm going to object, Judge.  It's

25    speculative, the answer.  He can testify as to what he saw,

cm/f

1    not what the handle was attached to, because he didn't see

2    that.  That's the basis of the objection.

3              THE COURT:  Your objection is noted.  Overruled.

4    Q    Could you tell what that object was?

5              MR. CANTOR:  If he saw it.

6    Q    If you saw.

7    A    I just saw the handle.

8    Q    Okay.  After you made that statement to the defendant,

9    did he react in any way?

10   A    No.

11   Q    And while you were in the kitchen with the defendant,

12   did he ever appear angry?

13   A    No.

14   Q    Did he ever appear intoxicated?

15   A    No.

16   Q    And are you familiar with people who are high on drugs?

17   A    Yes.

18   Q    Did the defendant appear high on drugs while you were

19   in the kitchen?

20   A    No.

21   Q    Any problem at all during that entire time you were in

22   the kitchen with the defendant up until -- excuse me -- up until

23   the time you left with Sosa?

24             THE COURT:  One second, Mr. Rosenfeld.

25             (Brief pause in the proceedings.)

A. Vasquez - for People - Direct

1          MR. CANTOR:  Judge, when you're ready, can I have

2    the last answer, please.

3          THE COURT:  Sure.

4          (Whereupon, the requested portion was read by the

5    reporter.)

6    Q   You can answer.

7    A   No.

8    Q   Had you ever observed, up until the time you left the

9  apartment with Sosa, anything transpire at all physically

10  between Sosa and the defendant?

11    A   No.

12    Q   When you left the party to go back to your apartment,

13  what was your reason for leaving?

14    A   I just wanted to try to call Sosa a cab because he was

15  upset and I wanted to send him home.

16    Q   And so when you left the apartment, Carmen's apartment,

17  where did you go?

18    A   I went over to my apartment across the hall.

19    Q   And when you got back to your apartment, what happened?

20    A   Well, we stood in my apartment for about 20 minutes.  I

21  tried to get him to go to sleep.  He didn't want to go to sleep.

22  We tried to call him a cab, and it was Christmas Eve and it was

23  just no cabs available, so we end up just going right back to

24  Carmen's house.

25    Q   And while Sosa was in your apartment, did he have

cm/f

1    anything to drink?

2       A    No.

3       Q    Did he still appear intoxicated at that time?

4       A    Yes.

5            MR. CANTOR:  What's the answer?

6            THE WITNESS:  Yes.

7       Q    How was he acting?

8       A    He was just drunk.

9       Q    And after you were in your apartment, you indicated you

10   went back to Carmen Diaz' apartment?

11      A    Yes.

12      Q    With Sosa?

13      A    Yes.

14      Q    And what was going on when you got back to Carmen's

15   apartment?  Was the party still going?

16      A    Yeah.  The party was still going.  We walked in the

17   apartment and the party was still going.  Everything was

18   basically the same.

19           MR. CANTOR:  I'm sorry?

20           THE WITNESS:  The party was still going.

21      Everything was basically the same in the party.

22      Q    How about the music?

23      A    Yes, it was still playing.

24      Q    How loud was it at that point?

25      A    It was about the same.

cm/f

1    Q    By that you mean?

2    A    It was loud, but -- it was loud, but it wasn't loud

3    where you can't hear no one talking if they are in front of you.

4    You understand?  It was loud, but it wasn't that loud, loud.

5    It's a radio.

6    Q    When you got back to the apartment after having left

7    the with Sosa and returning, what did you do?

8    A    I went immediately straight to the kitchen to smoke a

9    cigarette.

10   Q    Did you see where Sosa went?

11   A    He went straight -- when we walked into the apartment,

12   Sosa went into the living room and I went into the kitchen.

13   Q    So, who else was in the kitchen at that time?

14   A    At that time?

15   Q    If you remember.

16   A    At that time in the kitchen was me, Robert Walker and

17   Carmen's uncle.  I don't know his name.

18   Q    Now, you told us before something that Sosa said to the

19   defendant.

20   A    Yeah.

21   Q    That was when you returned to the apartment?

22   A    Yeah.

23   Q    Okay.  So, at what point did you leave the kitchen to

24   hear this conversation?

25   A    Well, I didn't leave the kitchen.  I'm standing in the

A. Vasquez - for People - Direct

1   doorway of the kitchen.  The doorway of the kitchen will be like

2   this, like here, and then it's right there.  There is no door,

3   so it's like if you're standing in the same room, you're just

4   into the doorway of the kitchen.

5           MR. ROSENFELD:  I'm publishing People's Exhibit 4.

6       Q   Can you indicate to us where you were standing,

7   approximately?

8       A   Right there.

9       Q   Where specifically?

10      A   I was standing right here.

11      Q   Indicating the doorway to the kitchen?

12          THE COURT:  So indicating.

13      Q   When Sosa had that conversation with David that you

14   told us about before, where approximately were they?

15      A   Okay.  When we came in, Sosa went this way.  I went

16   this way.  Like right here.

17      Q   Where that chair is now?

18      A   Like right here.

19      Q   That chair wasn't there at that time, was it?

20      A   No.

21      Q   And you heard the conversation from there?

22      A   Yes.

23      Q   Okay.  After that conversation, did anything happen?

24      A   No.  When Sosa said what he said, you know, he just --

25   they just walked away.

A. Vasquez - for People - Direct

cm/f

1    Q    And what did he start doing after he walked away, Sosa?

2    A    He just went back to start dancing again.

3    Q    What did you do?

4    A    I maintained myself in the kitchen and was smoking my

5    cigarette.

6    Q    So, what happened after that?

7    A    I heard Mercedes scream.  She was screaming, "Leave him

8    alone.  Leave him alone."  So, when I turned around from the

9    kitchen, I saw David Delgado punching Sosa by the sofa.

10   Q    Do you see the sofa in this picture?

11   A    Yes.

12   Q    Can you indicate, first of all, was the sofa in that

13   position at the time of the party?

14   A    No, no.  The sofa was in that position facing the

15   window, but it was more --

16            MR. CANTOR:  I can't hear.

17   A    (Continuing) The sofa was here facing the window, but

18   it was more towards the door.  The sofa looks like this was,

19   slide down this way, but it was more towards the door.

20   Q    What about if we use this photograph People's Exhibit

21   6?  Does that help indicate where it was?

22   A    Yes.

23   Q    Where was it?

24   A    Where the sofa is at now, it was maybe just maybe like

25   three feet more coming out this way.

A. Vasquez - for People - Direct

cm/f

1          MR. ROSENFELD:  Indicating the witness is moving

2     his hand right to left.

3     Q    Would that mean back?

4     A    Yeah.

5          MR. CANTOR:  He's going forward away from the

6     picture.

7          MR. ROSENFELD:  Moving from the TV to his left,

8     his right to left.

9          MR. CANTOR:  No, Judge.  He took his right hand

10    and he moved it away from the TV.

11         THE WITNESS:  Listen.  The sofa is this way.  I'm

12    standing here.

13         MR. CANTOR:  I can't hear.

14         THE WITNESS:  The sofa is this way.

15         MR. CANTOR:  I can't hear a word.  His back is to

16    me.

17         MR. ROSENFELD:  Your Honor, can we approach?

18         MR. CANTOR:  It's terrible.  Who gave him

19    permission to turn his back in the witness stand?

20         MR. ROSENFELD:  Can we approach?

21         MR. CANTOR:  Not without the reporter.

22         MR. ROSENFELD:  May we approach with the reporter

23    at the side bar so we can take care of this?

24         THE COURT:  All right.

25              (Whereupon, the following takes place at the side

A. Vasquez - for People - Direct

cm/f

1    bar; defendant is not present:)

2         MR. ROSENFELD:  Your Honor, this morning when the

3    witness was on the stand, we had approximately 74

4    interruptions by Mr. Cantor.

5         THE REPORTER:  Mr. Rosenfeld, I didn't hear you.

6         MR. CANTOR:  Don't push me.  And the record should

7    reflect Mr. Rosenfeld took his right hand and pushed me.

8         MR. ROSENFELD:  This is juvenile.

9         MR. CANTOR:  It really is.

10         THE COURT:  Gentlemen, please.

11         MR. CANTOR:  I don't want to be pushed.

12         THE COURT:  All he did was put his hand so he can

13    speak to the reporter.

14         MR. CANTOR:  He pushed me and I'd appreciate him

15    not placing his hand on me.

16         THE COURT:  If you'd consider it a push, you

17    pushed him.

18         MR. ROSENFELD:  May I speak so the reporter can

19    hear.  You're blocking literally.

20         MR. CANTOR:  I'm not.

21         MR. ROSENFELD:  We had interruptions approximately

22    74 times.  Some of it was legitimate objections.  Most of

23    the time there were objections claiming he couldn't hear

24    things, needed it reread, needed time, and we had to sit

25    there and wait while he was writing things down and

A. Vasquez - for People - Direct

cm/f

1    scribbling.

2         He's doing it again, your Honor.  He is being -- I

3    can't think of the word.  Disruptive is the best word, I

4    think.  I think he's being disrespectful.  He constantly

5    gets up, argues with the Court in front of the jury when

6    your Honor said just make one or two-word objections, and

7    he keeps going after you've made your ruling.  The jury is

8    sitting --

9         MR. CANTOR:  You know what Mr. Rosenfeld did.

10        THE COURT:  First --

11        MR. CANTOR:  I have to respond.

12        THE COURT:  I want to say something entirely

13   different.  I said I'm speaking.  Okay.  When I finish,

14   you'll be very pleased to speak.

15        You know I really will not tolerate confrontations

16   with the Court where there is even a suggestion of the

17   Court's authority.  Just a moment ago Mr. Rosenfeld asked

18   if we could approach.  I'm sure he was going to make the

19   complaint he just made or some other complaint.  You

20   absolutely refused on the record to come.

21        MR. CANTOR:  Without the reporter.

22        THE COURT:  Yes.  You said that.

23        MR. CANTOR:  Without the reporter.

24        THE COURT:  There is no such thing as refusing the

25   Court's direction.  You can come.  You could stand here.

cm/f

1    You could say you don't wish to say anything because there

2    is no reporter. You can handle it any way you want and

3    indeed I will entertain it, but I will not tolerate or

4    stand for any type of confrontation with the authority of

5    this Court.

6         MR. CANTOR: I meant none.

7         THE COURT: And you did it in front of the jury

8    which of course you are always prone to do and for whatever

9    reason, I don't know, because all you raise is the ire of

10   the Court and you know I don't like to get excited about

11   things.

12        MR. CANTOR: Of course you don't.

13        THE COURT: Don't provoke the Court.

14        MR. CANTOR: I haven't provoked the Court. I just

15   want everything on the record.

16        THE COURT: You can make it on the record. Now

17   respond if you wish.

18        MR. CANTOR: Okay. This witness stood and then he

19   stood in the witness box. Your Honor didn't give him

20   permission. Mr. Rosenfeld is leading this witness, having

21   him jump through hoops. The witness then turns to the

22   television and he spoke and he testified while his face was

23   looking at the television. I'm representing a client

24   charged with Murder in the Second Degree. I have an

25   absolute right to hear what a witness is saying. You

A. Vasquez - for People - Direct

cm/f

1    didn't give the witness permission to stand and you

2    certainly didn't give the witness --

3              MR. ROSENFELD:  The jury can hear him.

4              THE COURT:  You're going on and on like a madman

5    here.

6              MR. CANTOR:  You know something, you know

7    something, I have a right, I have a right to respond to the

8    spurious allegations made.

9              THE COURT:  Mr. Cantor.

10             MR. CANTOR:  I just want to make my record, and

11   then you can say whatever you want.

12             This witness stood in the witness box.  The Court

13   didn't give him permission.  The witness turned to the

14   television.  His back was to me and his back was to my

15   client and he began testifying.  I could not hear him.  My

16   client could not hear him.  Thus, I complained to the

17   Court.  The Court quelled my protestation.  Then Mr.

18   Rosenfeld said --

19             MR. ROSENFELD:  His voice can be heard by the jury

20   the entire time.

21             MR. CANTOR:  Mr. Rosenfeld asked to approach.

22   Since this is a record that I think if there is a

23   conviction is worthy of close scrutiny by the Appellate

24   Division, I want to memorialize Mr. Rosenfeld's improper

25   directions to a witness.  Only the Court can give a witness

A. Vasquez - for People - Direct

cm/f

1        permission to stand, only the Court.

2                MR. ROSENFELD:  He's raising his voice again.

3                MR. CANTOR:  Only the Court can give a witness

4        permission to turn his back to a defendant and to a defense

5        counsel, and Mr. Rosenfeld led this witness through those

6        hoops.  So, I'm now sitting there.  I can't hear a blessed

7        word.  Why?  Because the witness is facing the TV.  His

8        back is to me.

9                THE COURT:  I would suggest there's more of a

10       reason why you can't hear, but okay.

11               MR. CANTOR:  My client cannot hear, he tells me.

12       My client cannot hear and, thus, Mr. Rosenfeld, after

13       having the witness turn without any judicial permission,

14       without any application, he says I want to approach, and I

15       want to approach, too, but I want it memorialized, your

16       Honor.  It's not an affront to your authority.  There is no

17       doubt that you run this court.

18               MR. ROSENFELD:  The jury is hearing this.

19               MR. CANTOR:  He's making these statements just to

20       smudge the record and cloud the record.  No one can hear.

21       I'm whispering to you.

22               Mr. Rosenfeld asked to approach.  I think his

23       conduct has been outrageous in terms of his handling the

24       witness.

25               THE COURT:  Be careful here.

cm/f

1        MR. CANTOR:  Without your permission, without your

2    permission.  He wants to approach, fine.  I want to make a

3    record of it.  Don't you think I'm entitled to have a

4    reporter?

5        THE COURT:  Surely.  And I can't blame you for

6    grasping on anything you can, but that's exactly what

7    you're doing.  There is no affronting to the Court when

8    this witness turned around to point, turned to point out in

9    response to the question, and then over and above and aside

10   from that, Mr. Rosenfeld was just allowing him to explain

11   it from a different angle, and you got up.

12       MR. CANTOR:  But his back was to everyone and he

13   was talking toward the wall.

14       THE COURT:  Maybe you didn't hear it, but the man

15   was responding appropriately.

16       MR. CANTOR:  Excuse me.  There is no denying his

17   back was to me and my client.

18       THE COURT:  No, there isn't.

19       MR. CANTOR:  And I don't think that's proper.  I

20   think that calls for judicial permission.

21       THE COURT:  That's for me to decide.

22       MR. CANTOR:  Yeah.  I am going to ask you for a

23   motion in limine.  Before any witness stands, it requires

24   judicial sanction.  Before any witness turns so as his back

25   is to the participants or parties in this case, that

A. Vasquez - for People - Direct

cm/f

1    requires judicial permission, and yet Mr. Rosenfeld didn't

2    seek that.  He had this witness testify while he was facing

3    the television, his back to my client, his back to me.

4    That's why I'm making a complaint.  I have to follow

5    intelligently the proceedings.

6              THE COURT:  Anything else you wish to say?

7              MR. CANTOR:  No.  I just wish to -- intelligently

8    wish to follow.  So, I now need the assistance of the court

9    reporter to read back what he said when his back was to my

10   client and to me.

11             THE COURT:  We've already done that any number of

12   times.

13             MR. CANTOR:  We haven't read back what he said as

14   he was facing the television.  You agree his back was to me

15   and my client?

16             THE COURT:  I do agree it was.

17             MR. CANTOR:  So, I'd like to hear it.  I guess the

18   court reporter took it down.  I or my client didn't hear

19   it.  And I think that it should be a standing rule --

20             THE COURT:  You don't have to repeat anything.  We

21   just went over it a moment ago.

22             MR. CANTOR:  You're right.

23             THE COURT:  Anything else you want to say?

24             MR. ROSENFELD:  While the witness was talking, he

25   was demonstrating and pointing to the TV screen.  I was

A. Vasquez - for People - Direct

cm/f

1    standing much farther away than Mr. Cantor, and while he

2    turned to point to the screen and indicate where the couch

3    was, it was loud and clear.  I was standing about 15 feet

4    or more away.  The witness in no way reduced his voice

5    level.  It was very clear.

6            Mr. Cantor constantly is asking for witnesses to

7    stop, asking for things to be read back, and he's sitting

8    about ten feet away from the witness stand.  This is just

9    to be obstructive, your Honor.  He's been raising his voice

10   while he was making this record.  I want it on the record

11   that his voice was loud enough -- I had my assistant walk

12   over where the jury was sitting -- for them to hear what he

13   was just putting on the record.  At various times, he's

14   raising his voice.

15           MR. CANTOR:  I find that scurrilous.

16           MR. ROSENFELD:  I want to make a complete record.

17           MR. CANTOR:  I find it scurrilous that a

18   prosecutor without judicial intervention has a witness

19   stand, turn his back to the defense counsel and to the

20   defendant in a Murder in the Second Degree case without

21   even seeking the slightest permission from the Court to

22   have this witness move about, turn his head, and then he's

23   uttering things that my client can't hear.

24           You see what Mr. Rosenfeld is doing?  He's trying

25   to manipulate you against me.

A. Vasquez - for People - Direct

cm/f

1          MR. ROSENFELD:  Objection, your Honor.  He's
2     raising his voice.
3          MR. CANTOR:  I see that.  My voice is not raised.
4     He's trying to manipulate.  He never gained your
5     permission.  He's trying to manipulate this.
6          MR. ROSENFELD:  That is outrageous.
7          MR. CANTOR:  You make it seem as if I am the
8     villain.  I am not the villain.
9          THE COURT:  I am only smiling here because, I
10    mean, it's laughable, half the things you are putting on
11    this record.
12         MR. CANTOR:  And how about Mr. Rosenfeld?
13         THE COURT:  Some are very serious.
14         MR. CANTOR:  He's turning witnesses around.
15         THE COURT:  He's not turning them around.
16         MR. CANTOR:  Who is?
17         THE COURT:  And the Court is not in any way
18    stopping him, which means the Court doesn't find it as such
19    to be anything along the lines of disrespect to the Court.
20         MR. CANTOR:  It's not disrespect?
21         THE COURT:  We're all professional here.  He's
22    just as much a professional as you, and hopefully everyone
23    who appears before this Court.  Let's not talk in
24    trivialities.  When you have a real objection, by all means
25    make it.

A. Vasquez - for People - Direct

cm/f

1      MR. CANTOR:  Can I have the court reporter read

2  back?

3      THE COURT:  The last question.

4      MR. CANTOR:  And what this witness was saying when

5  he had his back to me and my client.

6      THE COURT:  We'll have the last question and

7  answer.

8      (Whereupon, the following takes place in open, on

9  the record, in the presence of the Court, counsel,

10  defendant and jury:)

11      THE COURT:  We are continuing.  Let us begin with

12  the last question and last --

13      MR. CANTOR:  Last two, if I might.

14      THE COURT:  Last two questions and answers, so we

15  can all reorient ourselves to where we left off.

16      (Whereupon, the requested portion was read by the

17  reporter.)

18      MR. ROSENFELD:  Your Honor, is there any problem

19  if the witness continues to get up and demonstrate by the

20  TV?

21      THE COURT:  No.

22      MR. ROSENFELD:  Thank you.

23      MR. CANTOR:  Is there any problem with his

24  projecting his voice to both my client and myself?

25      THE COURT:  In other words, you wish him to speak

A. Vasquez - for People - Direct

cm/f

1      a little louder?

2                    MR. CANTOR:  For my client.

3                    THE COURT:  Yes, of course.

4                    Would you speak as loudly as possible?

5                    THE WITNESS:  Sure.  Sure.

6                    MR. ROSENFELD:  Thank you, Judge.

7    DIRECT EXAMINATION

8    BY MR. ROSENFELD: (Continued)

9        Q    Mr. Vasquez, you can stand up.  If you can, stand at

10   the side of the TV screen.  Move back.  Stand up.  You can stand

11   up.  The Court said it's okay.  Move back a little.  And when

12   you talk, try talking out this way as you're pointing.

13       A    The sofa was more out towards this way, towards this

14   way.  Like three or four feet.

15                   MR. CANTOR:  So, the record should reflect the

16                   witness is taking his hand and moved it away from the TV

17                   screen.

18                   THE COURT:  What would be correct, Mr. Cantor, is

19                   for the inquiring attorney to make that so indicating, so

20                   there is no need for you to have to repeat what Mr.

21                   Rosenfeld has to do in any case.

22                   MR. CANTOR:  Well, I just want a complete record.

23                   THE COURT:  There is no need to.  It only consumes

24                   time.

25                   MR. CANTOR:  Then let it be placed on the record

A. Vasquez - for People - Direct

cm/f

1   by the People, your Honor.

2           THE COURT:  The People have and will do it.

3           MR. CANTOR:  They haven't done it yet.

4           THE COURT:  Mr. Cantor, you know that's not true.

5   He's doing it throughout.  Okay.  Let's move along.

6           MR. CANTOR:  He hasn't described it, Judge, but

7   that's okay.

8           THE COURT:  Please continue.

9           MR. ROSENFELD:  I won't go over it since it was

10  just put on the record.

11      Q    Where did you notice Sosa and the defendant?

12      A    Right in this area right here.

13      Q    You have your hand in front of the chair right now; is

14  that correct?

15      A    Yes.

16      Q    That chair wasn't there at that time, was it?

17      A    No.

18      Q    You're pointing to the area of the floor,

19  approximately?

20      A    Yes.

21      Q    How close to the couch were they?

22      A    About two feet.

23      Q    They were two feet what?

24      A    Like this is the couch right here.

25      Q    Yes.

A. Vasquez - for People - Direct

cm/f

1      A     Like they was like in front of the couch right here,

2   but the couch is a little more distance.  The couch is right

3   here, and this is where when I looked out the kitchen --

4              MR. CANTOR:  Can he raise his voice?

5      A     (Continuing) When I looked out the kitchen, I saw David

6   assaulting Sosa.

7              MR. ROSENFELD:  The witness, just for the record,

8         put his hand in front of the chair with his palm facing one

9         way then kind of bent his wrist with his fingers pointing

10        up also while holding it in front of the chair.

11             THE COURT:  So indicating.

12     Q     And what, if anything, did you observe?

13     A     I observed David punching Sosa.  It was like three or

14  four punches I seen.  On the last punch --

15     Q     You can sit down.

16     A     On the last punch, I saw a blade between his fingers in

17  a fist.

18     Q     Please continue.

19     A     So, I seen a blade on the last punch.  When he came

20  out, there was a blade between his fingers.  Sosa's neck didn't

21  bleed immediately.  I saw like an open skin, white, and then the

22  blood came out like a hose, like you see in movies.  Like it

23  just came out.

24             MR. ROSENFELD:  Indicating the witness while

25        describing that tilted his head to the left and put his

A. Vasquez - for People - Direct

cm/f

1    right hand to the right side of his neck as he was

2    describing it.

3              THE COURT:  So indicating.

4        Q    And could you show us or demonstrate for us the

5    movement that the defendant was making towards Sosa when you say

6    you saw him punching?

7        A    Sure.

8        Q    Use your hands.  Sit towards us.  Use your own hands.

9        A    He was swinging over him like this.

10       Q    Please use names.

11       A    David was swinging over Sosa like this.  He had him

12   like in a hold and he was swinging with his hand and it looked

13   like he was just punching him.

14             MR. ROSENFELD:  Indicating the witness has leaned

15       forward in the box with his left arm, bringing his right

16       hand from behind him over his shoulder toward his left

17       hand.

18       Q    Is that correct, sir?

19       A    That's correct.

20             THE COURT:  So indicating.

21       Q    And did you notice if Sosa at that point said anything

22   or reacted in any way?

23       A    No.  At that moment when he punched him --

24       Q    When who punched?  Sir, use names.

25       A    When David punched Sosa at the last time, it was like

A. Vasquez - for People - Direct

cm/f

1    three or four punches, on the last punch, he stepped away from

2    him and he stand right in front of the doorway of the apartment.

3        Q    You have to use names, sir.  Please go back.

4        A    David stand right in front of the doorway to the

5    apartment.  At that moment I looked at Sosa and I looked at

6    David.  I told David, I told him, I said, "Yo, why you did that?

7    Why you did that?  You know, why you did that?"  And then I told

8    my friend Rob, "He's going to die," because I seen.  I know he

9    was going to die.

10            MR. CANTOR:  I object to that, Judge.  It's

11        speculative.  I ask it be stricken.

12            THE COURT:  Your objection is overruled.  He's

13        characterizing what he believed he saw.

14        A    (Continuing) And then I grabbed -- I took my shirt off

15    to try to put on his neck to stop the bleeding, and at that

16    moment I seen Margie and David start heading out the apartment

17    and I let Sosa go and ran behind him.  When I went down the

18    stairs, I ran down the stairs.  When I got out in front of my

19    building, they were already -- David and Margie was already

20    halfway down the block.

21        Q    Now, at the time you saw David stabbing Sosa with what

22    you say was a knife in his hand?

23        A    It was something in his fist and it had a blade

24    protruding out through the fist.

25            MR. ROSENFELD:  Indicating the witness has his

A. Vasquez - for People - Direct

cm/f

1    right hand in a fist and indicating with his left hand

2    something moving away.

3         THE WITNESS:  Like that.

4         MR. ROSENFELD:  He has his left hand going through

5    the fingers of his right hand, which are closed, pointing

6    up in the air.  The jury so noting.

7         THE COURT:  So indicating.

8    Q    Did you do anything to David after he stabbed Sosa?

9    A    No.  I chased after him maybe a good 20 seconds after

10   he stabbed Sosa, David stabbed Sosa.  I think it was about 20

11   second went by.  It wasn't that far apart.

12   Q    Let me ask you again.  While you were in the apartment,

13   while David was stabbing Sosa and as soon as he finished, did

14   you do anything towards David at that point?

15   A    No.

16   Q    Where were you standing?

17   A    I was trying to help Sosa.

18   Q    How far away from David and Sosa were you as David was

19   doing this to Sosa?

20   A    About five feet.

21   Q    Did David say anything?  Did the defendant say anything

22   as he was stabbing Sosa right afterwards?

23   A    No.

24   Q    What were other people doing?

25        MR. CANTOR:  I object to the open-endedness of

A. Vasquez - for People - Direct

cm/f

1          this question.

2                              THE COURT:  Overruled.

3                              MR. CANTOR:  Why, Judge?

4                              THE COURT:  Overruled.  He can give a general

5          explanation.

6          Q     What did you observe other people doing?

7          A     My kids were screaming.  Everyone was screaming.  There

8     was blood all over the place.  Blood all over everybody.  Over

9     my kids.  Over everybody.

10         Q     And you said after David --

11                            MR. CANTOR:  I don't know if he's finished his

12         answer.

13         Q     I'm sorry.  Did you finish?

14                            MR. ROSENFELD:  He looked down, your Honor.  I

15         thought he was finished.

16         A     I'm finished.

17         Q     Now, after you saw David go to the hallway, you

18    indicated Margie did something?

19         A     They was together.

20         Q     Did you see where your wife Melissa was at that point?

21         A     She was in the apartment in front of the hallway and

22    the door.

23         Q     How about Mercedes Rodriguez, did you see where she

24    was?

25         A     She was standing next to my wife.

A. Vasquez - for People - Direct

cm/f

1    Q    Let's use -- this was after Sosa was stabbed, correct?

2    A    Yes.

3    Q    So, were they outside the door of the apartment?

4    A    Yes.

5    Q    Okay.  I'm showing you what has been marked People's 2.

6         As you went out of the apartment, did you notice where

7    your wife, Melissa, and Mercedes were as you left the apartment?

8    A    Yes.

9    Q    Could you indicate there, if you recall, where they

10   were?

11   A    You want me to stand up?

12   Q    Sure.

13        MR. ROSENFELD:  If he may, your Honor.

14        MR. CANTOR:  Can he keep his voice up?

15        THE COURT:  Keep your voice up.

16   A    Right here.  Right in this area right here.

17   Q    Where did you go?

18   A    I came out the apartment this way.  I ran this way

19   because there is a staircase after this door right here, and I

20   went down the staircase.

21        MR. ROSENFELD:  Indicating the witness is pointing

22        to the TV with his right hand, moving his fingers away from

23        the TV and indicating the door on the left in the photo.

24   Q    Correct?

25   A    Correct.

A. Vasquez - for People - Direct

cm/f

1      Q      And as you went down the stairs, could you see the

2   defendant or Margie?

3      A      No.

4      Q      And where did you get down to, what level?

5      A      I got down to -- I was on the third floor.  I got down

6   to the main level, the main floor.  Came out the building.  When

7   I came out of my building, that's when I seen Margie and David

8   escaping.

9      Q      And what did you do?

10     A      I just right there I called the cops.

11     Q      From that spot?

12     A      Yes.

13     Q      Okay.  And do you recall what you told the cops?

14     A      I called 911.  I told 911 --

15            MR. CANTOR:  Judge, I object to what he told 911.

16            THE COURT:  Overruled.

17     Q      Do you recall what, if anything, you said?

18     A      I called 911 and I asked the police to come over

19   because someone had just stabbed my friend.

20     Q      Did you stay outside?

21     A      Yes.

22     Q      Okay.  And what happened as you stayed outside?

23     A      I stayed outside until the police came.

24     Q      When the police came, did you talk to them?

25     A      Yes.

A. Vasquez - for People - Direct

cm/f

1    Q    Did you tell them what happened?

2    A    Yes.

3    Q    Did you give them a description of David, of the

4    defendant?

5    A    No. I just said it was an Hispanic male and I didn't

6    give a description because I knew it was Margie's boyfriend, so

7    I said it's my friend's boyfriend did it.

8    Q    What did you tell the police?  What characteristics of

9    David or the defendant did you tell the police?

10   A    I don't really remember.

11                   (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People - ALBERTO VAZQUEZ - direct

1     A     I don't really remember.

2     Q     So once the police arrived what did you do?

3     A     When the police arrived they took me upstairs, we went

4     upstairs and, um --

5     Q     What did you see when you --

6           MR. CANTOR:   He is not finish answering the

7     question.

8     Q     I am sorry, were you not finished?

9     A     Yeah, I wasn't.  We went upstairs and, um, proceeded

10    to go into the apartment.

11          MR. CANTOR:   To?

12          THE WITNESS:   Carmen's apartment.   Carmen's

13    apartment.

14    Q     When you got to Carmen's apartment with the police

15    what did you see?

16    A     I saw my friend dead on the floor.

17    Q     Did you do anything?

18    A     No.

19    Q     Did you see your friend Addie (phonetic) do anything?

20    A     Who?

21    Q     Addie?  Someone named A-D-D --

22    A     Ari, she was giving Sosa mouth to mouth, but he was

23    gone.

24    Q     Did you go over to him at all?

25    A     Yes.

G-ljb

People - ALBERTO VAZQUEZ - direct

1032

1    Q    What did you do?

2    A    I checked his pulse.

3    Q    Did you feel anything?

4    A    (No verbal response).

5    Q    Did you remain at the apartment?

6    A    Yes.

7    Q    You talk to the police officers, the detectives who

8    came into the apartment?

9    A    Yes.

10   Q    What did you do after that?

11   A    Well, after that what happened was the police said we

12   couldn't go nowhere.  They said we couldn't leave.  No one could

13   leave and, um, they just told us to sit down.

14   Q    How were you feeling at that point?

15   A    Well, we had to sit down and -- and for hours and my

16   friend is dead in front of us.  He is not covered, nothing and

17   we just couldn't leave, you know.

18   Q    Did other people remain in the apartment with you at

19   that point?

20   A    Yes.

21   Q    Who else was still there that you recall?

22   A    Everyone that was there, that was there.

23   Q    What about the kids?

24   A    The kids, everyone.

25   Q    Did there come a time that you took the kids out of

G-1jb

1    the apartment?

2        A    Yes.

3        Q    Where did they go, if you know?

4        A    The kids went over to Ms. Saddie's house, she lived in

5    the building next door to us.

6        Q    Did you then return or stay in the apartment after the

7    kids left?

8        A    Yes, I stayed their.

9        Q    Did you stay there the entire time the police were

10   there?

11       A    Yes.

12       Q    Did there come a time you finally did leave the

13   apartment?

14       A    Yes.

15       Q    Did you talk to the detectives, police officers later

16   in the morning of December 25, 2009?

17       A    Yes.

18       Q    When you saw the defendant inside the apartment do you

19   remember what he was wearing, any of his clothing?

20       A    Not really.

21       Q    What parts?

22       A    Not really.

23       Q    What do you remember?

24       A    He never took off his coat, I remember that.

25       Q    What else do you remember?

People - ALBERTO VAZQUEZ - direct

1034

1      MR. CANTOR: He said not really, it's been asked

2  and answered.

3      A      I just remember, I just remember him having a coat. I

4  really don't remember. I really don't remember. I know he had

5  a white T-shirt because he never took off his coat and his coat

6  was open.

7      Q      Do you remember what type of pants he was wearing?

8      A      It was like jeans.

9      Q      Anything else about him or what he was wearing?

10      A      No.

11      Q      Did there come a time the following day, December 26,

12  2009, that you went to a police precinct?

13      A      Yes.

14      Q      And had you met a Detective Banker before that?

15      A      I think I met him that morning.

16      Q      Okay.

17      A      Yeah.

18      Q      Had you spoken to Detective Banker about what

19  happened?

20      A      Yes.

21      Q      And on December 26, 2009, did you go to a police

22  precinct to view a line up?

23      A      Yes.

24      Q      And who did you go with?

25      A      I went with -- well, they came in a van and picked us

G-1jb

People - ALBERTO VAZQUEZ - direct

1  all up.

2      Q    And when you got to the precinct did there come a time

3  a little bit after, approximately, 7:20 in the evening of

4  December 26, 2009, that you went into a room to view a line up?

5      A    Yes.

6      Q    Who were you with when you went into that room?

7      A    I was in a room with a couple of detectives.

8      Q    Okay.  And did there come a time that you viewed a

9  line up?

10     A    Yes.

11     Q    And when you looked at that line up did you recognize

12  anybody?

13     A    Yes.

14     Q    And who did you recognize?

15     A    I recognized David.

16     Q    And do you remember what position he was in?

17     A    Yes.

18     Q    What position was that?

19     A    He was facing -- standing, facing forward.

20     Q    What number?

21     A    Three.

22     Q    And did you say anything to the detectives at that

23  time?

24     A    Yes.

25     Q    What, if anything, did you say?

G-ljb

People - ALBERTO VAZQUEZ - direct

1036

1    A    I said it was number -- its number three and then he

2  asked me who's number three and I said David and he -- I told

3  him number three was the one who killed my friend.

4    Q    Was there any doubt in your mind that the man in

5  position number three, David, was the one who killed your

6  friend?

7    A    No doubt in my mind.

8    Q    Mr. Vasquez, prior to coming to court today did you

9  have an opportunity to come to my office and review this case?

10   A    Yes.

11   Q    And did you have an opportunity to look at the

12 photographs and talk about the case?

13   A    Yes.

14   Q    About how many times have you done that since the

15 beginning?

16   A    Um, this the first time I looked at photographs was

17 today.

18   Q    How many times have you come to my office?

19   A    Twice.

20        MR. ROSENFELD:   May I just have a moment, your

21   Honor?

22        THE COURT:   You may.

23        (Whereupon there is a pause in the proceedings.)

24        MR. ROSENFELD:   Okay.   The People have no further

25   questions.

G-1jb

People - ALBERTO VAZQUEZ - direct

1037

1    Q    Thank you, Mr. Vasquez.

2              THE COURT:   Thank you.

3              MR. CANTOR:   May we approach, your Honor?

4              THE COURT:   Defense counsel?

5              MR. CANTOR:   May we approach?

6              THE COURT:   Approach?

7              MR. CANTOR:   Yes.

8              THE COURT:   Surely.

9              (Whereupon, there is an off-the-record discussion

10   at this time.)

11             THE COURT:   Would you be good enough, sir, to

12   take a seat down?

13             THE WITNESS:   Sure.

14             (Whereupon the witness exits the witness stand.)

15             THE COURT:   Sir.

16             THE WITNESS:   Yes.

17             (Whereupon the witness resumes the stand.)

18   CROSS EXAMINATION

19   BY MR. CANTOR:

20   Q    Mr. Vasquez, on the evening of the Christmas party

21   were you wearing your prescription sunglasses?

22   A    Yes.

23   Q    Now, if I understand you correctly, how long had David

24   and Margie been in the apartment before Sosa made the threat to

25   David that you described on direct examination?

G-1jb

People - ALBERTO VAZQUEZ - cross

1038

1    A    Couple of hours.

2    Q    Can you approximate, I am not asking for an exact

3    time?

4    A    (No response.)

5    Q    Here is the question.  There is no question pending,

6    but I am about to put one to you.

7    A    Okay.

8    Q    When -- withdrawn.

9         You testified about three days later before the Grand Jury

10   under oath, correct?

11   A    That's correct.

12   Q    And, obviously, your memory was much more vivid and

13   much more exact about three days after this incident than it is

14   now, approximately, 30 months after the incident?

15   A    Correct.

16   Q    Correct?

17   A    Correct.

18   Q    I wonder if I could please ask you to keep your voice

19   up.

20   A    Sure.

21   Q    The last member of the jury has to hear you.

22   A    Sure.

23   Q    Okay.  So Margie and the defendant had been in the

24   apartment a couple of hours before Sosa threatened David?

25   A    That's correct.

G-1jb

People - ALBERTO VAZQUEZ - cross

1039

1    Q    Now, when Sosa threatened David both men were standing

2  chest to chest, face to face, correct?

3    A    Correct.

4    Q    And that was within a foot or two of the couch,

5  correct?

6    A    Correct.

7    Q    A couple of feet from the couch?

8    A    Couple of feet, yeah.

9    Q    Sosa was a very good friend of yours, correct?

10    A    Yes.

11    Q    When you didn't have money for marijuana he would

12  sometimes give it to you on lone so-to-speak?

13    A    Of course, yes.

14    Q    Since you was such a close friend?

15    A    Yes.

16    Q    And aside from buying marijuana from Sosa did he ever

17  sell or give you if you didn't have the money at that point any

18  other drugs?

19    A    No.

20    Q    Now, you told us very candidly that since the age of

21  14 on a daily basis you have been using marijuana, correct?

22    A    Like my life depends on it, yes.

23    Q    Okay.  Now, is the marijuana, having smoked three or

24  four blunts a day since you were 14, makes you high; does it

25  not?

G-1jb

People - ALBERTO VAZQUEZ - cross

1040

1    A    High.

2    Q    Can you repeat?

3    A    Yes, it gets you high.

4    Q    Of course?

5    A    Of course.

6    Q    That's the purpose of smoking it, correct?

7    A    Correct.

8    Q    Thank you.

9        Now, this day at about -- this day being December 24, 2009,

10   at about five o'clock in the afternoon, you had smoked a blunt

11   in front of the building?

12   A    Yes.

13   Q    Now, a blunt, for those who don't know what a blunt

14   is, is more in the shape of a stubby cigar rather than a

15   cigarette, correct?

16   A    Correct.

17   Q    Now, I want to be able to quote you accurately so

18   please bear with me, okay?

19   A    Okay.

20   Q    After Margie and David had been in the apartment a

21   couple of hours from a distance of about five or six or maybe

22   even seven feet you heard Sosa quote, tell David and I am going

23   to read your exact words, Margie was a good friend of mine.  You

24   better do right by her or I and my brothers are going to fuck

25   you, beat you up; is that correct?

G-ljb

People - ALBERTO VAZQUEZ - cross

1041

1    A    Yes.

2    Q    Did you see or did you hear anything said by David

3    prior to Sosa making that rather graphic threat to David, did

4    you hear David say anything immediately before "yes" or "no",

5    sir?

6    A    Say that again.

7    Q    Immediately prior to Sosa threatening to either

8    himself or himself and his brothers fucking up David, beating

9    him up, did you hear David say anything?

10   A    Yes.

11   Q    To Sosa?

12   A    Yes.

13   Q    Immediately prior?

14   A    Yes.

15   Q    Did David say anything to Sosa immediately prior to

16   that threat that was negative or disparaging of Margie?

17   A    I don't understand the question.

18   Q    Okay.  Did he, David, say anything to Sosa immediately

19   before the threat that was bad about Margie?

20   A    No.

21   Q    He didn't put down Margie?

22   A    No.

23   Q    But as you say Sosa was very drunk?

24   A    Yes.

25   Q    And so David, not having said anything bad about

G-ljb

1042

1   Margie was there, as you said, face to face, chest to chest with

2   Sosa and they were standing as you said, correct?

3       A    Correct.

4       Q    And Sosa, out of the blue, says Margie is a good

5   friend of mine.  You better do right by her or me and my

6   brothers are going to fuck you up, beat you up, correct?

7       A    Yes.

8       Q    You hadn't heard a word said by David that was bad or

9   negative about Margie, had you?

10      A    No.

11      Q    Okay.  Now, it would be a fair statement to say that

12  on the night of the party you had taken Sosa to your apartment

13  to try to calm him down?

14      A    Yes.

15      Q    Is it not true and you are under oath, sir, that Sosa

16  was behaving brazenly; do you understand what I mean by that?

17  Brazenly, boldly, gesticulating with his hands, was behaving

18  loudly with respect to the participants at the party; would that

19  be a fair statement?

20      A    Yes.

21      Q    You know what the word obnoxious means?

22      A    Yes.

23      Q    Was he in plain English being obnoxious to people in

24  general at the party; would that be a fair statement here under

25  oath?

G-ljb

People - ALBERTO VAZQUEZ - cross

1043

1    A    Yes.

2    Q    Thank you.

3    And so he was excited and you took him to your apartment to

4    calm him down, correct?

5    A    Yes.

6    Q    Now, several times when you were asked questions by

7    the prosecutor you described that there were portions of the

8    party when Sosa was dancing as were other people, correct?

9    A    Yes.

10   Q    So it would be a fair statement to say that Sosa on

11   the 24th carrying over to the 25th of December 2009, was able to

12   dance?

13   A    Yes.

14   Q    Prior to Sosa threatening my client and my client

15   according to whatever you heard, if you heard anything, did he

16   threaten Sosa?

17   A    No.

18   Q    He was in the kitchen, as you say, with other men as

19   you say such as yourself smoking cigarettes, correct?

20   A    Correct.

21   Q    Because you didn't want to smoke cigarettes in the

22   living room where the kids were so they wouldn't suffer

23   secondhand smoke, correct?

24   A    Correct.

25   Q    And each and every time and you saw, I don't know, you

G-1jb

People - ALBERTO VAZQUEZ - cross

1044

1   saw Margie and David together before the party I don't know

2   four, five, six times maybe in the neighborhood, correct?

3        A    Correct.

4        Q    At any time did David behave in an ungentlemanly

5   fashion to either you or Margie on those occasions?

6        A    No, I never spoke to him, no.

7        Q    That's not what I am asking.

8        A    How can you tell that, you are just seeing somebody in

9   the street?

10        Q    Did he ever threaten you?

11        A    I just told you we never spoke.

12        Q    So he never threatened you ever?

13        A    No, never.

14        Q    Did he ever try to take physical action against you?

15        A    No.

16        Q    He just stood there as a plain, ordinary person would

17   stand there?

18        A    Correct.

19        Q    Correct?

20        A    Yes.

21        Q    You didn't view him as violent or hostile or harassing

22   on those five and six occasions that you saw him in the

23   neighborhood, did you?

24        A    No.

25        Q    When the cops came they had made you sit there and

G-ljb

People - ALBERTO VAZQUEZ - cross

1   your children sit in that apartment.  Margie -- not Margie --

2   they had made you sit in apartment 3D for a long time, correct?

3       A    Yes.

4       Q    And eventually you left that apartment, correct?

5       A    Yes.

6       Q    And all of this was occurring really after midnight so

7   it was now Christmas day, correct?

8       A    Correct.

9       Q    And there were a lot of cops circulating around the

10  hallway of the apartment where the party had been going on,

11  correct?

12      A    I couldn't really tell, sir.

13      Q    Well, there were policeman there?

14      A    Yes.

15      Q    And did you ever see any policeman looking for a

16  weapon?

17      A    No.

18      Q    And how long were you in the police presence at McGraw

19  Avenue before you were taken over to the precinct, I am talking

20  about after the punching incident?

21      A    Oh, um, four, five hours.

22      Q    So you certainly did see policeman?

23      A    Yes.

24      Q    And you said that at the party music was emanating,

25  coming from the radio, but not that loud that it would impair

G-1jb

**People - ALBERTO VAZQUEZ - cross**

1  your being able to hear people talk, I think that's what you

2  said, correct?

3       A    Yes.

4       Q    And you had that night drunk from a cup that's larger

5  than the Dixie cup in front of you and you had two drinks, half

6  with Hennessy half with soda?

7       A    Yes.

8       Q    You don't drink much, do you?

9       A    I -- I'm not a drinker.

10      Q    So when you drink something like that it could have an

11 affect on you?

12      A    No, I say I am not a drinker because --

13      Q    No, you said your not a drinker --

14           MR. ROSENFELD:  Your Honor, may he --

15      Q    I am not asking that question.

16           THE COURT:  Let him finish the question.

17           MR. CANTOR:  Thank you.

18      A    You asked me if two cups --

19      Q    I asked you whether or not --

20           MR. ROSENFELD:  Your Honor, objection.

21      Q    -- you are not a drinker.

22           THE COURT:  Let him finish the question.

23      Q    Taking half a cup larger than the Dixie cup filled

24 with Hennessy and soda, correct, was it soda?

25      A    Yes.

People - ALBERTO VAZQUEZ - cross

1047

1    Q    Okay.  Whether those two drinks from a larger cup and
2    the Dixie cup in front of you had any effect on your ability to
3    perceive things, did it?
4    A    I got a buzz, yeah.
5    Q    So you were not drunk?
6    A    No.
7    Q    All you did was get a buzz, a high, correct?
8    A    Correct.
9    Q    Especially since you don't usually drink?
10   A    Yeah.
11   Q    Pot is your thing, right?
12   A    What?
13   Q    Marijuana is your thing?
14   A    Yeah.
15   Q    Now, you testified on direct examination that Sosa was
16   depressed because he was having problems with his common-law
17   wife, if I could use that expression, okay?
18   A    Yes.
19   Q    Okay.  Is that true?
20   A    Yes.
21   Q    And did he tell you the nature of the problems?
22        MR. ROSENFELD:  Objection.
23        MR. CANTOR:  It was brought out on direct.
24        THE COURT:  Yeah, the objection is sustained.
25   Q    Do you remember Mr. Rosenfeld -- withdrawn.

G-ljb

1     You remember testifying on direct examination that Sosa was
2   depressed and he was having trouble with his daughter's mother?
3     A    Yes.
4     Q    Now, I want to ask you the nature of the trouble that
5   Sosa was experiencing with his common-law wife.
6              MR. ROSENFELD:  Objection.
7     Q    That's all.
8              THE COURT:  Sustained.
9     Q    Did he tell you the nature of the trouble?
10    A    Yes.
11    Q    Can you tell us, the members of the jury, what the --
12  what Sosa told you by way of trouble with his common-law wife?
13             MR. ROSENFELD:  Objection.
14             THE COURT:  Sustained.
15             MR. CANTOR:  Judge, may we have the benefit of a
16        side bar with the reporter?
17             THE COURT:  I will reserve for you.
18    Q    But he certainly was depressed?
19    A    Yes.
20    Q    And he certainly attributed that to problems he was
21  having with his common-law wife?
22    A    Yes.
23    Q    And he told you that at the party?
24    A    Yes.
25             MR. CANTOR:  Judge, I beg your leave for a

                                                          G-ljb

People - ALBERTO VAZQUEZ - cross

1       sidebar presently.

2                   THE COURT:  I will reserve for you.  The

3       objection has been sustained.  Your exception is noted.

4       Q     You knew that he was having a problem with his

5   common-law wife even before he told you that?

6       A     No.

7                   MR. ROSENFELD:  Objection.

8       Q     It was only when he told you?

9                   THE COURT:  The objection is sustained.

10      Q     When he arrived at the party he was already drunk; was

11  he not, Mr. Sosa?

12      A     That's correct.

13      Q     And at the party he had two vodkas and soda, correct?

14      A     That's correct.

15      Q     And he was depressed, upset.  I think you used the

16  word, having troubles, problems with his baby's mother, correct?

17      A     Correct.

18      Q     Now, this is something that you told Mr. Rosenfeld

19  when he was questioning you on direct examination, correct?

20      A     Yes.

21      Q     Now, I would like you to tell the members of the jury

22  what it was that Sosa told you on the evening of the 24th

23  carrying over into the 25th, 2009, as to the cause of his

24  depression.

25                  MR. ROSENFELD:  Objection.

                                                        G-ljb

1050

1           THE COURT: Sustained.

2           MR. CANTOR: Judge, it would behoove me --

3           THE COURT: First of all, we haven't --

4           MR. CANTOR: I'm sorry?

5           THE COURT: First of all, we haven't gone into

6    this -- district attorney.

7           MR. CANTOR: Mr. Rosenfeld brought it up.

8           THE COURT: He only ascertained what you

9    ascertained?

10           MR. CANTOR: What?

11           THE COURT: He only ascertained what you

12   obtained, namely, that he was depressed because of some

13   difficulty with his wife.

14           MR. CANTOR: Right. So now?

15           THE COURT: Now, we don't go any further because

16   it's not probative of anything here.

17           MR. CANTOR: Well, it may be probative of the

18   basis for the threat that he uttered to my client, that's

19   the reason why I wanted to introduce --

20           MR. ROSENFELD: Objection to the colloquy.

21           THE COURT: Objection has been sustained. The

22   exception is noted.

23           MR. CANTOR: The respectful exception, Judge.

24   BY MR. CANTOR:

25    Q    So it would be a fair statement to say, as I think you

G-ljb

1 mentioned it once, you took him to your apartment keeping Sosa

2 to calm him down?

3     A    Correct.

4     Q    Did you talk to him at the apartment about the

5 problems he was having with his wife?

6     A    No.

7     Q    That was a conversation you had with him at the party?

8     A    Yes.

9     Q    And you were a very good friend of his for 12 years?

10     A    Correct.

11     Q    And he confided in you that he was depressed of a

12 problem that he was experiencing with his common-law wife,

13 correct?

14     A    Correct.

15     Q    And did he elaborate "yes" or "no" on the problems?

16     A    Yes.

17     Q    Can you tell us what he said?

18            MR. ROSENFELD:  Objection, your Honor.

19            THE COURT:  Sustained.

20     Q    You also said aside from being depressed Sosa appeared

21 to you at the party to be angry, correct?

22     A    Yes.

23     Q    Was that anger, according to what he told you, related

24 to the problems he was experiencing with his common-law wife?

25            MR. ROSENFELD:  Objection.

People - ALBERTO VAZQUEZ - cross

1052A

1          THE COURT:  I will allow that.

2     Q    You can answer.

3     A    Yes.

4     Q    And what was that?

5               (Continues next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G-ljb

h MC                     A. Vasquez - People - Cross

1    Q.   And what was that, sir?

2              MR. ROSENFELD:   Objection.

3              THE COURT:   Sustained.

4    Q.   Do you know Mr. Sosa's wife?

5    A.   Do I know her?

6    Q.   Yeah?

7    A.   Yes.

8    Q.   Her name?

9    A.   I don't know her name.

10   Q.   Hold it.   Mr. Sosa was a very good friend of yours?

11   A.   That's right.

12   Q.   He was your marijuana supplier?

13   A.   That's right.

14   Q.   And he would even give you marijuana when you didn't

15   have the money?

16   A.   That's right.

17   Q.   And you socialized with him?

18   A.   That's right.

19   Q.   And you've met his wife --

20   A.   Yes, I have.

21   Q.   -- on numerous occasions over the course of twelve

22   years?

23   A.   Yes, I have.

24   Q.   And you don't know her name?

25   A.   No, I don't.

1053

h MC

A. Vasquez - People - Cross

1   Q.   Okay, was she at the party?

2   A.   No.

3   Q.   Well, when you were in the kitchen and David was

4   fidgeting with his belt buckle, he told you he always carries

5   something, correct?

6   A.   Correct.

7   Q.   And you told him there's no need, this is a party of

8   love?

9   A.   Correct.

10  Q.   These are good people and we're here to show our love

11  for each other, correct?

12  A.   Correct.

13  Q.   And up until that time, aside from Sosa being angry and

14  depressed and dancing and behaving obnoxiously, it had been a

15  loving party, people were interacting well with one another,

16  correct?

17  A.   Yes.

18  Q.   In the kitchen, before the punching with the knife that

19  was extended, protruding, to use your words, between the fingers,

20  how many inches of that knife was protruding approximately, if

21  you can tell me; an inch, two inches?

22  A.   About two, three inches.

23  THE COURT:   We're going to take a two minute

24  break.

25  You may stand down, sir.   Come right back.

Proceedings

1    MR. CANTOR:  Well, would you tell him not to

2    discuss his testimony with anyone?

3    THE COURT:  Yes.  Do not discuss your testimony

4    with anybody.

5    THE WITNESS:  I just need to use the bathroom real

6    quick.

7    THE COURT:  If anybody wishes to take advantage of

8    this opportunity, you may go.  Not everybody.

9    MR. CANTOR:  Judge, may this be a propitious time

10   for us to approach with the reporter at the side bar?

11   THE COURT:  Yes.

12   MR. CANTOR:  Thank you, I appreciate that.

13   (Whereupon, the following takes place on the

14   record, at side bar, in the presence of the Court, Counsel,

15   and the defendant:)

16   MR. CANTOR: I asked you to revisit the issue in

17   your own mind of the nature of the problems that Sosa was

18   experiencing with his wife which this witness said was

19   connected to Sosa expressing the depression and anger at the

20   party and this witness taking him to his apartment to calm

21   Sosa down.

22   The reason I offered this is to show you the state

23   of mind of Mr. Sosa -- of Sosa and how my client reacted

24   when Sosa made that very blatant and blunt threat to my

25   client.  Because I'm going to suggest to this jury at the

h MC

Proceedings

1    appropriate time in summation that my client was not

2    possessed of a state of mind to make out, beyond a

3    reasonable doubt, intent to cause the death or intent to

4    cause serious physical injury.  Indeed, I am going to, after

5    my client testifies, I anticipate that they'll be a basis

6    here for your Honor to charge reckless manslaughter in the

7    first degree as well as criminally negligent homicide.

8         We intend to lay an evidentiary predicate for that

9    sort of a charge.  So I think it's quite pertinent to my

10   client's state of mind that the jury hear what Sosa was

11   going through in his own mind that prompted this, sua

12   sponte, if you will, threat that was not provoked by David

13   because the witness has testified that my client had not

14   said anything bad or derogatory about Margie and out of the

15   blue comes this rather blatant and bizarre threat.

16        And I intend to lay before this jury that my

17   client has a very sensitive, fragile mind.  That he suffers

18   by bi-polarity, that he's been diagnosed as such, he's been

19   diagnosed as depressed that he's attempted suicide on three

20   occasions, that he's been mentally institutionalized on two

21   occasions, that he's been physically and sexually abused by

22   his stepfather.

23        He has a very feeble mind and therefore what

24   motivates Sosa to make this threat to my client might indeed

25   be pertinent for this jury's evaluation because that

h MC

Proceedings

1    reflects upon my client's --

2              MR. ROSENFELD:  Keep your voice down.

3              MR. CANTOR:  -- my client's actions.  That's what

4    it does.

5              And this is not a topic that was not touched

6    upon.  This was a topic that the District Attorney opened up

7    the door on, your Honor, on his direct examination.  I

8    should be allowed, first of all, to make out my defense and

9    that is Sosa's -- genesis of his problems, certainly

10   relevant to my defense.

11             And if the district attorney, the district

12   attorney opened the door because it was quite obvious

13   because he asked him questions about Sosa's state of mind,

14   that I be able to complete the narrative and this jury know

15   what the nature of the problem was that caused Mr. Sosa to

16   be angry, depressed -- to be angry, depressed, obnoxious,

17   interfering with the other party-goers.

18             Why can't I bring that out?  I think it's indeed

19   quite pertinent.  If you want to give a limiting

20   instruction, I have no problem, no problem whatsoever.  It's

21   only being introduced to show my client's state of mind

22   because if it was an extreme problem that would be

23   motivating Sosa to make such an extreme, bizarre, blatant

24   threat -- you see I have no problem with you telling this

25   jury it's not offered for the truth, but offered simply as

h MC                              Proceedings

1    evidence of my client's state of mind when he had the

2    interaction with Sosa.

          THE COURT:  Okay.  Mr. Rosenfeld.

4          MR. ROSENFELD:  Switch places, I don't want to

5    yell.

6          Your Honor, this is probative of nothing.  First

7    of all, I can't even follow all of Mr. Cantor's reasonings

8    because I don't think it's logical.  The defendant's state

9    of mind has nothing to do with what transpired between the

10   deceased and his wife way before this party.  They didn't

11   even know each other, so it's not an issue of what the

12   defendant knew about the deceased or the deceased -- what's

13   in the deceased's mind about his problems with his wife.

14   Those are all well before the party, before this incident.

15   There's no relevance except to be admitted for its truth,

16   which is basically what would happen if that would come in.

17         It has no basis for the defendant's arguments

18   about criminally reckless homicide, whatever his argument

19   was about having lesser charges admitted, going to his

20   defendant's state of mind.  It's not probative of anything.

21         I asked one question, I think.  Mr. Vasquez's

22   response was that he had problems with his baby's mother.

23   "Problems with his baby's mother," that was it.  I didn't

24   ask any other questions before that, I didn't ask any other

25   questions after.  I never mentioned it again.  It only came

1058

Proceedings

1   out over and over again by defense trying to bring this

2   improper --

3               THE COURT:  I have heard enough.

4               MR. CANTOR:  We don't know --

5               THE COURT:  I heard enough.

6               MR. CANTOR:  This is what we don't know.

7               THE COURT:  You don't seem to understand, I have

8   heard enough.

9               MR. CANTOR:  When the problem --

10              THE COURT:  I adhere to my earlier determination.

11              MR. CANTOR:  So I want to make a full record.

12              We don't know.  Since the People are arguing that

13  these problems may have existed prior to the date of the

14  party, we don't know because you have not allowed me to

15  explore the issue when these problems between Sosa and his

16  common-law wife arose.  What happens if they arose that very

17  day?  Might that not account for Mr. Sosa's intoxicated

18  condition?  And if it did, Judge, does that not affect my

19  client's state of mind?  Because one of the elements of

20  both -- Murder in the Second Degree is intent, my client's

21  intent to kill someone.  And then Manslaughter in the Second

22  Degree is also charged in the indictment.  Manslaughter in

23  the First Degree is charged in the indictment and the People

24  have to prove, beyond a reasonable doubt, that my client

25  harbored the intent to cause serious physical injury.  So

h MC

Proceedings

1    indeed, my client's state of mind is key to this case.

2         You heard my opening.  I was telling this jury

3    that my client had a very feeble, troubled --

4         MR. ROSENFELD:  Keep your voice down, please.

5         MR. CANTOR: -- state of mind.  That's what I was

6    telling this jury.  And so, if those problems arose earlier

7    that evening, they would be very relevant for the actions

8    that Sosa took and the threats that he made.  But we don't

9    know when these problems first arose.  So I would at least

10   like to go into that issue.

11        MR. ROSENFELD: It's irrelevant.

12        MR. CANTOR:  I don't want to be interrupted by Mr.

13   Rosenfeld, who's behaving childishly by make gestures and

14   faces.  I just want to find out if I can go into the time

15   when these problems first arose according to Sosa's

16   statement to this witness.

17        THE COURT:  Thank you for making the record.

18        MR. CANTOR:  Can I do that?

19        THE COURT:  No.

20        MR. CANTOR: You have my respectful exception,

21   Judge.

22        THE COURT:  Yes.

23         (Whereupon, the following takes place on the

24   record, in open court, in the presence of the Court, the

25   defendant, Mr. Cantor, Assistant District Attorneys

1060

h MC

A. Vasquez - People - Cross

1    Rosenfeld and Mason and the sworn jurors:)

2              THE COURT: Let us continue.

3    CROSS-EXAMINATION (CONTINUED)

4    BY MR. CANTOR:

5         Q.   Sosa, once you had calmed him down and he reentered the

6    party, Sosa was telling everyone at the party that he was sorry

7    for the way he was acting, correct?

8         A.   Yes.

9         Q.   It was almost immediately, a matter of a mere second or

10   two after Sosa had threatened my client, that my client, in the

11   fashion that you've demonstrated, had began punching Sosa's face

12   and head, correct?

13        A.   You have to tell me that question again.

14        Q.   Sure, I'll do it again.  It was a matter of mere

15   seconds after Sosa had made the threat to my client, that you've

16   earlier described, that my client, in the fashion that you

17   earlier demonstrated, began punching at Sosa's head and face?

18        A.   Yes.

19        Q.   Okay, let me ask you, you have had quite an extensive

20   history of conflicts with the criminal justice system, have you

21   not?

22        A.   That's correct.

23        Q.   What year were you born in, sir?

24        A.   '69.

25        Q.   Well, you heard Mr. Rosenfeld ask you about arrests and

h MC

A. Vasquez - People - Cross

1   your pleading guilty to various crimes in dealing in court with

2   those arrests, you remember that whole line of questioning?

3       A.   Yes.

4       Q.   So you first -- you're presently how old now, sir, to

5   be exact?

6       A.   Forty-three.

7       Q.   So you first ran afoul of the law here in the Bronx in

8   1986, when you were, according to Mr. Rosenfeld, arrested for

9   Grand Larceny in the First Degree, correct?

10      A.   Yes.

11      Q.   And what had you stolen, sir?

12           (No verbal response.)

13      Q.   You were seventeen at that point, right?

14      A.   Yeah, I stole a T.V. set.

15      Q.   Was that from someone's apartment?

16      A.   Yes.

17      Q.   How did you gain entry into their apartment?

18      A.   He let me in the apartment.

19      Q.   I'm sorry?

20      A.   I was with him in the apartment and then I robbed him

21   and took his T.V. set.

22      Q.   Did you use any weapon?

23      A.   Yes.

24      Q.   What did you use?

25      A.   I used a knife.

A. Vasquez - People - Cross

1   Q.   Was that a man or a woman?

2   A.   It was a man.

3   Q.   And that was in his apartment?

4   A.   That's correct.

5   Q.   Well, later that same year, not even six months later,

6   according to Mr. Rosenfeld, you were arrested for Robbery in the

7   First Degree, correct?

8   A.   That's correct.

9   Q.   And what did you do on this occasion?  I'm talking

10  about November 2, 1986, were you then seventeen or eighteen?

11  A.   I'm not sure.

12  Q.   I'm sorry?

13  A.   I'm not sure.

14  Q.   All right, what did you do November, 1986, that was

15  when you were arrested, according to Mr. Rosenfeld's questioning,

16  for Robbery in the First Degree, here in the 44 Precinct in the

17  Bronx?

18  A.   What did I do?

19  Q.   Yeah?

20  A.   I robbed somebody.  That's what it says there, right?

21  Q.   Did you rob someone in the street or in the home or in

22  the store?

23  A.   In the street, I think, I don't remember.

24  Q.   Was it a man or a woman?

25  A.   It was a man, there's no women on my record.

h MC                        A. Vasquez - People - Cross

1      Q.   So you robbed a man using a weapon?

2      A.   Yes.

3      Q.   What was the weapon?

4      A.   I don't recall.

5      Q.   Well, it was a knife or a gun?

6      A.   I don't recall, I don't think it was a weapon involved,

7   it was with my hands.

8      Q.   I'm sorry?

9      A.   It was a strong-arm robbery, there was no weapons

10   involved in that one.

11      Q.   But you were nonetheless arrested, according to Mr.

12   Rosenfeld, for Robbery in the First Degree, which requires a

13   dangerous instrument or weapon.  Now I'm asking you, what was the

14   weapon that you employed?

15      A.   What year was that?

16      Q.   I'll give you the exact date of your arrest according

17   to Mr. Rosenfeld's questioning.  November 2nd, 1986, in the 44th

18   Precinct here in the Bronx, you were arrested for Robbery in the

19   First Degree, that means robbery utilizing a dangerous

20   instrument?

21      A.   It's a knife.

22      Q.   A knife?

23      A.   A knife, yes.

24      Q.   And what did you rob from this man in the street?

25      A.   I think it was a credit card or something.

h MC                         A. Vasquez - People - Cross

1       Q.    Did you get to use the credit card?

2       A.    No.

3       Q.    And in connection -- okay, so you were still a young

4   man at that time?

5       A.    Yes.

6       Q.    And the judge, taking that into account, gave you three

7   years of probation, did he not?

8       A.    Yes.

9       Q.    No jail?

10      A.    Yes.

11      Q.    Well, you didn't learn very well from that experience

12  because you were arrested, according to Mr. Rosenfeld, soon

13  thereafter, on September 3, 1987, in the 44th Precinct, for

14  Criminal Mischief in the Third Degree, what was that about?

15      A.    What's this got to do with me?  What's this got to do

16  with me?

17            MR. CANTOR:  Judge, will you direct the witness to

18        answer the question.

19            THE COURT:  Yes.

20      A.    I got arrested a whole bunch of times.

21      Q.    Sure you did.

22      A.    In my life I have.

23      Q.    So now I'm asking you about the third time, and that

24  would be September 3, 1987, according to Mr. Rosenfeld's

25  questioning, in the 44th Precinct, and you were arrested for

h MC                        A. Vasquez - People - Cross

1    Criminal Mischief in the Third Degree?

2         A.   Yes, that's true.

3         Q.   And I want to know what you did that caused the police

4    to arrest you?

5         A.   I broke a car window with a brick.

6         Q.   And what did you take from the car?

7         A.   A radio.

8         Q.   This was after -- you were still on probation, correct?

9         A.   Yes, I was.

10        Q.   Did they violate you on probation?

11        A.   Yes, they did.

12        Q.   And they put you in jail?

13        A.   Yes, they did.

14        Q.   So you really didn't learn too much from the

15   probationary status that the prior judge had imposed upon you?

16        A.   I guess not.

17                  MR. ROSENFELD:   Objection to form.

18                  THE COURT:   I'll allow it.

19        Q.   Please answer the question?

20        A.   I guess not.

21        Q.   I appreciate your answer.

22             Well soon thereafter, August 24th, according to Mr.

23   Rosenfeld's questioning of you, you were arrested in the 40th

24   Precinct here in the Bronx for Burglary in the Third Degree and

25   you got four months, correct?

h MC                    A. Vasquez - People - Cross

1    A.   Yes.

2    Q.   What did you burgle, what kind of store or apartment?

3    A.   It was a store.

4    Q.   What kind of store?

5    A.   I don't remember.

6    Q.   What did you take from the store?

7    A.   I don't remember.

8    Q.   You've had so many arrests and so many convictions that

9    in your mind they all tend to merge one into another and you

10   really can't distinctly recall what each one was about, is that

11   correct?

12                   MR. ROSENFELD:  Objection.

13                   THE COURT:  Overruled.

14   Q.   Is that correct, sir?

15   A.   No.

16   Q.   Well then tell me about the burglary back on August 24,

17   1988, you burglarized what, sir?

18   A.   You know we in 2012 now, right?

19   Q.   What did you burglarize?

20   A.   I don't remember.

21   Q.   Well you got four months for whatever you burgled, did

22   you not?

23   A.   Yes, I guess so.

24   Q.   And after serving your four months or three months,

25   later in November 14, 1988, according to Mr. Rosenfeld's

h MC                          A. Vasquez - People - Cross

1   questioning of you, in the 42nd Precinct, you were arrested for

2   Burglary in the Third Degree, correct?

3        A.   Yes.

4        Q.   And what did you burgle this time?

5        A.   I think that was a factory.

6        Q.   And what did you take from the factory?

7        A.   I didn't get to take anything.

8        Q.   You mean you just got into the factory --

9        A.   I got caught on the roof.

10       Q.   You got caught on the roof with a club?

11       A.   No, I got caught on the roof.

12       Q.   Of the factory?

13       A.   Yes.

14       Q.   What were you planning to take?

15       A.   Whatever was in it.

16       Q.   I'm sorry?

17       A.   Whatever was in the factory, I didn't know what was in

18  it.

19       Q.   Whatever was of value?

20       A.   Yes.

21       Q.   And the reason you did that, you wanted to sell it and

22  get money, correct?

23       A.   Correct.

24       Q.   And you wanted to get money to use to purchase drugs,

25  correct?

h MC
A. Vasquez - People - Cross

1      A.    Could have, could have been.

2      Q.    Those drugs could include heroin and cocaine?

3      A.    I never done heroin and cocaine.

4      Q.    But you wanted money to buy drugs, correct?

5            MR. ROSENFELD:   Objection, that was not the

6      response.

7            THE COURT: I'll allow him to clarify.

8      Q.    Is that correct?

9      A.    I don't remember if that was money for drugs or not, I

10     didn't have a drug habit.

11     Q.    Excuse me?

12     A.    I did it to have money, I didn't have a job, I did it

13     to have money.

14     Q.    Excuse me, you were on the roof of a factory and your

15     intent was to burgle that factory?

16     A.    Exactly.

17     Q.    And your purpose was to get whatever you could of

18     value, sell it and get money, correct?

19     A.    Correct.

20     Q.    And obviously with that money you were looking to

21     support a habit?

22     A.    Why is that obvious?

23     Q.    Well, you tell me?

24     A.    No, you tell me why.  You're asking me the question,

25     why is that obvious?  You're twisting my words.

1069

h MC

A. Vasquez - People - Cross

1    THE COURT:  Sir.

2    A.   Fuck out of there with that shit.

3    THE COURT:  Come on.

4    THE WITNESS: I'm sorry.

5    THE COURT:  Listen, you have to answer the

6    questions.

7    A.   I'm serious, don't twist my words.

8    THE COURT: I direct you to answer and you can

9    clarify where you think Mr. Cantor may have misunderstood or

10   twisted, as you said.  Don't hesitate.

11   Q.   Okay, so I'm not here to fuck around with you.

12   A.   You're fucking around with me.  You are.

13   MR. ROSENFELD:  Objection, your Honor.

14   A.   Yes, you is.

15   THE COURT: It's not a question.

16   MR. ROSENFELD:  It's not a question.

17   THE COURT:  Only answer questions.

18   Q.   You were looking to get into that factory through the

19   roof to get whatever you could to sell it for money so that you

20   could buy, according to you, marijuana, correct?

21   A.   Whatever I wanted.

22   MR. ROSENFELD:  Objection, your Honor.

23   Q.   Whatever you wanted?

24   A.   Whatever I wanted.

25   THE COURT:  I'll allow it.

h MC                         A. Vasquez - People - Cross

1    A.   Just money.

2    Q.   I see, whatever you wanted?

3    A.   I had no job.

4    Q.   You had no job so you resorted to burglary, correct?

5    A.   Exactly.

6    Q.   How many years now have you been on unemployment?

7    A.   I have been on unemployment now a year.

8    Q.   Only a year?

9    A.   A year and a half on unemployment.

10   Q.   So the tax payers are presently supporting you,

11   correct?

12                MR. ROSENFELD:  Objection.

13                THE COURT:  Sustained.

14   Q.   Well, we go from 1988 to 1989, and you were arrested,

15   according to Mr. Rosenfeld's question, for Criminal Possession of

16   Stolen Property in the Third Degree and the judge gave you a

17   year, correct?

18   A.   Correct.

19   Q.   What was it that you had in your possession that you

20   knew was stolen property?

21   A.   A copy machine.

22   Q.   That caused the judge to give you --

23   A.   A copy machine.

24   Q.   And where did you steal that from?

25   A.   Me and a friend of mine stole it from a school.

h MC                          A. Vasquez - People - Cross

1    Q.   From a school?

2    A.   Yes.

3    Q.   Here in the Bronx?

4    A.   Yes.

5    Q.   The school was closed at the time?

6    A.   Yes.

7    Q.   And you were caught by the cops?

8    A.   Yes.

9    Q.   And this time you got a year?

10   A.   Yes.

11   Q.   Well, the very next year you were arrested, according

12   to Mr. Rosenfeld's questions, for Criminal Possession of a

13   Controlled Substance in the Seventh Degree, correct?

14   A.   Correct.

15   Q.   And what was the criminal possession, what was the

16   controlled substance?

17   A.   Powder cocaine.

18   Q.   I'm sorry?

19   A.   Powder cocaine.

20   Q.   Powder cocaine.  Okay, but of course you never used

21   cocaine?

22   A.   No.

23   Q.   Sorry?

24   A.   No.

25   Q.   So why did you have it on your possession?

1072

h MC                    A. Vasquez - People - Cross

1     A.    It was in my coat.

2     Q.    I'm sorry?

3     A.    It was in a coat.

4     Q.    It was in your coat?

5     A.    It was in my coat, I had somebody else's coat.  There

6     was a little bit of cocaine in the zipper pocket in the arm.  If

7     you look at the charge, you see I didn't get no time for that, so

8     you know it's no cocaine, come on.

9     Q.    Here's the question, sir.  You have told this jury

10    repeatedly that you never used cocaine, right, correct?

11    A.    That's what I said.

12    Q.    And now here you are telling us that you're arrested

13    November 26, 1990, for criminal possession of some cocaine, is

14    that correct?

15    A.    Correct.

16    Q.    But of course it was not your intent to use that

17    cocaine personally?

18    A.    It could have been my intent to sell it.

19                    CONTINUED NEXT PAGE.........

20

21

22

23

24

25

1      Q.    Your intent was to sell it?

2      A.    It could have been my intent to sell it, I just told

3    you.

4      Q.    I'm asking you which one was it, to use it or sell it,

5    sir?

6      A.    Either.  Both.  It wasn't mines.  I didn't know it was

7    in the coat.

8      Q.    If you had an intent to use it, and if you couldn't use

9    it -- can I get to complete the question -- you intended to sell

10   it, correct?

11     A.    No.

12     Q.    Well, didn't you just tell this jury that you possessed

13   that cocaine for the purpose of either using it or selling it to

14   make money?

15     A.    No.  I'm telling you -- I'm telling you that because

16   you're putting words in my mouth.  You're telling me what I got

17   cocaine for.  You don't know what I got cocaine for.  You tell me

18   I got cocaine for the use, to use it.  You're asking me a

19   question without asking me the whole question, to get a part of

20   the question.  It's not making sense.  I put my brother-in-law's

21   coat on to go to the store.  They stopped me in the street.  I

22   had cocaine on me, it wasn't my cocaine.  It wasn't my cocaine.

23     Q.    But, nonetheless, you told the judge it was, didn't

24   you?  You plead guilty to that charge?

25     A.    Of course I did.

1        Q.    So you lied to the judge?

2        A.    I didn't lie to the judge.  I plead guilty to the

3    cocaine.  It's in my possession.

4        Q.    But it wasn't your's?

5        A.    They didn't ask me if I was selling it or using it.

6    They asked me if it was in my possession, I said yes.  That's not

7    a lie to the judge.

8        Q.    Did you know it was in your possession?

9        A.    No.

10       Q.    But yet you told the judge that you possessed it

11   knowingly in order to get the guilty plea?

12                   MR. ROSENFELD:  Objection, your Honor.

13                   THE COURT:  I'll allow it.

14       A.    It makes no sense.

15       Q.    Did you tell the judge that you knowingly possessed

16   cocaine in order to get the judge to give you a sentence?  Yes?

17       A.    Yes.

18       Q.    So you lied to the judge, did you not?

19       A.    No.

20       Q.    You told the judge --

21       A.    The judge.

22       Q.    Sir, I get to ask a question.

23       A.    Ask me a different question.  Ask me a different

24   question.  Ask me a different fucking question.  I'm leaving.

25   Get the fuck out of here.  I'm leaving.  Get the fuck out of

1    here.

2                    (Whereupon, the witness stepped down from the

3        witness stand.)

4                    THE COURT:  Let me give you a chance to get back.

5                    THE WITNESS:  Fuck that.  I'm leaving.  Lock me

6        up.  Get the fuck out of here.  This nigga's an idiot.

7                    COURT OFFICER:  The judge said to wait.

8                    THE COURT:  Mr. Vasquez.

9                    THE WITNESS:  I'm not the one on trial here, for

10       real, you ask me those questions.

11                   THE COURT:  Mr. Vasquez, come here.  Just a few

12       more questions.

13                   MR. CANTOR:  Hardly that, I have many more

14       questions.

15                   THE COURT:  Well, many more questions but you're

16       coming to the end of this record.

17                   MR. CANTOR:  No, it's a lengthy one, and I'm

18       not --

19                   THE COURT:  I'm sure you're going to explore it

20       and you're entitled to.

21                   And Mr. Vasquez, please don't do that again.

22                   THE WITNESS:  Judge, I'm not on trial.  This --

23                   THE COURT:  I understand.

24                   THE WITNESS:  Come on.  I'm serious.  Come on,

25       man, everything in my past, I ain't been in jail for 15

1        years.  Get the fuck out of here with that.

2                        (Whereupon, the witness resumed the witness

3        stand.)

4                        THE COURT:  Your attorney, when I say your

5        attorney, the District Attorney, will have his chance later

6        and will clarify --

7                        THE WITNESS:  I apologize.

8                        THE COURT:  -- many of these things.

9                        THE WITNESS:  I apologize.

10                       THE COURT:  This is cross-examination.  You have

11       to expect that.

12       Q.    You had possession -- we are talking about the arrest

13       of November 26, 1990, you had unknowingly cocaine in your

14       brother-in-law's jacket, which you had taken, correct, a jacket?

15                       MR. ROSENFELD:  Objection, your Honor.  It is

16       asked and answered.  We've gone through this already.  This

17       is the third time.

18       Q.    Is that correct?

19                       THE COURT:  I'll allow it.

20       A.    That's correct.

21       Q.    But yet you told the judge when you plead guilty that

22       you knowingly possessed the cocaine, yet that was a lie, was it

23       not?

24       A.    I guess, yes.

25       Q.    Are you in the habit of lying to judges?

1          A.    No.

2                         MR. ROSENFELD:  Objection, your Honor.

3                         THE COURT:  Yes.  No editorial necessary, Mr.

4          Cantor.

5          Q.    Well, let us go on.  Soon after that, the next year,

6     according to Mr. Rosenfeld's questioning to you, you were

7     arrested on February 7, 1991, for criminal possession of stolen

8     property.  What was the property?

9          A.    Don't remember.

10         Q.    You've stolen so much property that you can't recall

11    what the property was on that date, can you?

12         A.    I guess so.

13         Q.    There were many times that you committed crimes and

14    were not caught --

15                        MR. ROSENFELD:  Objection, your Honor.

16         Q.    -- is that correct?

17                        THE COURT:  Sustained.

18                        MR. ROSENFELD:  Totally improper.

19         Q.    Okay.  Well, I'd like to know, I'd like you to use your

20    powers of recollection to tell us what the property was when you

21    were arrested on February 7, 1991, and the judge gave you 30, 30

22    days jail.  What was it that you possessed?  You had no problem

23    telling Mr. Rosenfeld on direct examination.  I await your

24    response, sir.  You're on cross-examination.

25         A.    I don't remember.

1    Q.   But yet you remembered when Mr. Rosenfeld was asking

2  you.

3    A.   Well, I just forgot.

4    Q.   I see.  Do you usually forget things in the span of an

5  hour or two?

6              MR. ROSENFELD:  Objection.  Improper.

7              THE COURT:  Yes, it is, unless there's a

8        legitimate question.

9              MR. CANTOR:  It is a legitimate question.

10   Q.   About an hour and a half ago you told Mr. Rosenfeld

11  what the nature of the property was and now here I am cross

12  examining you and you're saying you just forgot, correct?

13   A.   Right.

14             MR. ROSENFELD:  Objection to the form of the

15        question.

16   A.   Correct.

17             MR. ROSENFELD:  Objection to the form of the

18        question.

19             THE COURT:  I'll allow it.

20   Q.   Okay. We will go on.  We will go on to the very next

21  year.  According to Mr. Rosenfeld's question, February 7, 1991,

22  you were arrested for criminal possession of stolen property.  On

23  that date, what did you possess knowing that it was stolen?

24             MR. ROSENFELD:  Objection.  Asked and answered.

25        He indicated --

1          THE COURT:  It's a new date.

2          MR. ROSENFELD:  It's the same date, February 7,

3      '91.

4          MR. CANTOR:  Yes, sir.  It's a new date.

5          MR. ROSENFELD:  It's the same date, your Honor.

6      Q.    Okay.  What was it, that on February 7 when were you

7  arrested for criminal possession of stolen property, what was it

8  you possessed knowing it was stolen?

9          MR. ROSENFELD:  He just asked several times.  He

10      indicated he doesn't know.  Asked and answered.

11          THE COURT:  This is the one where he said I

12      forgot.

13          MR. CANTOR:  No, it's not.  It's a different

14      date.

15          THE COURT:  Let's just let him answer and we can

16      move on.

17      Q.    What was it that you possessed when you were arrested

18  on February 7, 1991, for criminal possession of stolen property?

19          MR. ROSENFELD:  Objection.  It's the same date.

20      A.    A gold chain.

21          THE COURT:  I'm allowing it.

22      Q.    A gold chain.

23      A.    I think it was a gold chain.  Yeah.

24      Q.    Okay.  And where did you get it from?  Who do you

25  remember taking it from?

1      A.    I took it off a police officer's neck.

2      Q.    Were you high at the time?

3      A.    No.

4      Q.    Was the cop in uniform?

5      A.    Nope.

6      Q.    Was the cop in civilian dress?

7      A.    Yes.

8      Q.    You didn't know it was a cop at the time, right?

9      A.    Nope.

10     Q.    And the judge sentenced you to jail for that, correct?

11     A.    Yes.

12     Q.    Well, the very next month, according to Mr. Rosenfeld's

13     questioning of you on direct, on March 27, 1991, you were

14     arrested in the 49 Precinct, here in the Bronx, for robbery in

15     the first degree.  Correct?

16     A.    That's correct.

17     Q.    What did you rob?  Who did you rob, I should ask.

18     A.    I robbed a business with a shotgun.

19     Q.    You robbed who?

20     A.    A business.  It's a business.

21     Q.    What kind of business was that?

22     A.    I think it was a restaurant.

23     Q.    Here in the Bronx?

24     A.    Yes.

25     Q.    Were there patrons in the restaurant?

1      A.    Nope.

2      Q.    Was there an owner in the restaurant?

3      A.    Yes.

4      Q.    And you were looking for the cash that he had on hand?

5      A.    I took the cash.

6      Q.    You took it?

7      A.    Yeah.

8      Q.    How much money?

9      A.    900.

10     Q.    Not a bad score that time, right?

11           MR. ROSENFELD:  Objection.

12           THE COURT:  No need to editorialize.  Please, Mr.

13     Cantor.

14     Q.    And you used the shotgun?

15     A.    Yes.

16     Q.    As a result of that, you got 3 and a half to 7 years

17     Upstate, didn't you?

18     A.    Yup.

19     Q.    Well, that was in '91?

20     A.    Yup.

21     Q.    You got out of jail.  Did you stay out of trouble with

22     the law when you got out of jail?  You were Upstate in prison?

23     A.    Yes.

24     Q.    Well, what about the arrest on May 31, 1998, for

25     assault in Kings County?  That's Brooklyn.

1        A.    Then, an argument with my wife.

2        Q.    I see.  You slapped her around a little bit?

3        A.    Yeah.

4        Q.    I see.  And you got four months?

5        A.    Yeah.

6        Q.    You and your wife were having an argument?

7        A.    Yeah.

8        Q.    And during the course of that argument, you slapped her

9   around and got arrested?

10       A.    We assaulted each other but I got arrested.

11       Q.    You got arrested?

12       A.    Yeah.

13       Q.    Are you proud of the fact that you slapped your wife,

14  hit her?

15       A.    No.

16              MR. ROSENFELD:  Objection.

17              THE COURT:  Sustained.  Mr. Vasquez, wait until

18       the Court rules.  Sustained.

19       Q.    So that was a domestic violence situation?

20              THE COURT:  Sustained.  There is no need to

21       involve yourself in that questioning.

22              MR. CANTOR:  Well, I'm asking a new question.

23       Q.    That was a domestic violence case?

24       A.    Yes.

25       Q.    Yes?

1     A.    Yes.

2     Q.    And the victim was your wife, correct?

3     A.    Yes.

4     Q.    The same wife who accompanied you to the Christmas

5     party, correct?

6     A.    Yes.

7     Q.    The same wife who is the mother of your three children,

8     right?

9     A.    Yes.

10    Q.    Well, you've accumulated an awful lot of convictions

11    and conflicts with the criminal justice system, would that be a

12    fair statement?

13    A.    Yes.

14          MR. ROSENFELD:  Objection.

15    A.    Yes.

16          THE COURT:  I'll allow that.

17    Q.    Do you want to answer that, please.

18    A.    Yes.  In the past.

19    Q.    Well, everything is in the past.  Right now you're on

20    the witness stand under oath, correct?

21    A.    That is right.

22    Q.    When you walked off the witness stand and had to be

23    restrained by court officers, were you angry at me?

24    A.    Yes.

25          MR. ROSENFELD:  Objection, your Honor.

1        THE COURT:  Sustained.  Wait for the Court to

2    rule, please, sir.

3        Q.   Did I threaten you at all during the course of my

4    questioning?

5                MR. ROSENFELD:  Objection.

6                THE COURT:  Sustained.

7        Q.   Would it be a fair statement to say that your criminal

8    record is representative of a rather violent past?

9                MR. ROSENFELD:  Objection.  That's a

10    characterization.

11                THE COURT:  Sustained.

12        Q.   Are you, by nature, a rather violent man?

13                MR. ROSENFELD:  Objection.

14                THE COURT:  Sustained.

15        Q.   You have, in your past, committed numerous acts of

16    violence that has resulted in your arrest and convictions,

17    correct?

18        A.   Yes.

19        Q.   Right here in this courtroom, you were of a mind to

20    walk out, correct?

21        A.   Yes.

22                MR. ROSENFELD:  Objection.

23                THE COURT:  Sustained.

24                MR. CANTOR:  I have no further cross-examination

25    of this good witness, your Honor.

1        THE COURT:  Thank you, Mr. Cantor.

2        Mr. Rosenfeld?

3        MR. ROSENFELD:  Yes.

4    REDIRECT EXAMINATION

5    BY MR. ROSENFELD:

6        Q.    Regarding the statement that Sosa made to David, the

7    defendant, that's when he came back to the apartment after having

8    left to go to your apartment, correct?

9        A.    Correct.

10       Q.    And did David, the defendant, say anything to Sosa?

11       MR. CANTOR:  When?

12       Q.    In response to that statement that Mr. Cantor asked you

13   about, that ended with the words, "fuck him up if he treated her

14   bad," or words to that effect.

15       A.    He said something in a sense, I get down too.  I heard

16   something like that.

17       Q.    At that moment, when defendant responded to Sosa, did

18   something happen at that moment?

19       A.    No.

20       Q.    Okay.  Mr. Cantor asked you if it was mere seconds

21   after Sosa made the statement that the incident occurred; is that

22   correct?

23       A.    When you say mere seconds it's like what, like two or

24   three seconds, no.

25       Q.    Well, let's get -- please be clear.  After you came

1    back to the apartment, Sosa made that statement to David that Mr.

2    Cantor asked you about, right, that ended with the word, "fuck

3    him up"?

4         A.   That's correct.

5         Q.   And David said the words to the effect of, "I get down

6    too"?

7         A.   That's correct.

8         Q.   Did the incident, the stabbing, happen right at that

9    moment?

10        A.   No.

11        Q.   What happened after Sosa made the statement and that

12   David responded?

13        A.   Margie grabbed David and took him away and Sosa went

14   the other way.

15        Q.   Okay.  So, after that happened, up until the time of

16   the actual stabbing, how much time passed, if you can estimate?

17        A.   I'd say about 30 seconds, 40 seconds.

18        Q.   So, just to clarify, when you answered Mr. Cantor with

19   "mere seconds" you're saying it was more than -- it was around

20   what you just said?

21        A.   Yeah.

22             MR. CANTOR:  Objection.  I object to his

23        characterization.

24             THE COURT:  We will allow the witness to clarify.

25        A.   Yes.

1              MR. CANTOR:  It's not clarification, your Honor,

2          it's contradiction.

3              THE COURT:  The jury can take anything into

4          consideration.

5              MR. CANTOR:  Yeah.

6              MR. ROSENFELD:  No other questions.

7    RECROSS EXAMINATION

8    BY MR. CANTOR:

9        Q.    Well, you know the difference, do you not, sir, between

10   two, three, four seconds and a half a minute, correct?

11       A.    Of course.

12       Q.    And you recognize that when I was cross-examining you,

13   you had taken an oath to tell the truth, the whole truth and

14   nothing but the truth, right?

15       A.    Sure did.

16       Q.    Sure did.  And you told me, unequivocally, you know

17   what -- meaning, you told me plainly, straight out, that it was a

18   matter of mere seconds after the threat was made to my client

19   that my client began punching Sosa.  Do you remember telling me

20   that?  Yes or no, sir.

21       A.    Yes.

22       Q.    And you were under oath when you made that statement to

23   me, correct?

24       A.    Yes.

25              MR. CANTOR:  No further questions.

1                    THE COURT:  Mr. Rosenfeld.

2    REDIRECT EXAMINATION

3    BY MR. ROSENFELD:

4         Q.    Mere seconds is now your testimony as to how much time

5    mere seconds is --

6                    MR. CANTOR:  Objection he's gone over this on

7           redirect.

8                    MR. ROSENFELD:  I'm clarifying this as to the

9           recross.

10                    MR. CANTOR:  This is not recross.  I get to

11          cross.  This is redirect.

12                    MR. ROSENFELD:  Redirect.

13                    MR. CANTOR:  He said it's recross.

14                    MR. ROSENFELD:  I misspoke.  I made a mistake.

15                    THE COURT:  Okay.  Very good.

16                    MR. CANTOR:  So, I'm saying it's outside of the

17          boundaries of redirect examination.

18                    THE COURT:  No.  I will allow it.

19                    MR. CANTOR:  What is the question?

20         Q.    You were talking to Mr. Cantor about mere seconds.

21    Okay.  You didn't say how many seconds, did you?

22         A.    No.

23         Q.    So we can be clear now, as we leave this courtroom, how

24    many seconds are we talking about between the time Sosa made the

25    statement and David responded, until the stabbing?

1     A.    Yes.

2     Q.    How much?

3     A.    About 30 seconds.

4              MR. ROSENFELD:   Thank you.

5     RECROSS EXAMINATION

6     BY MR. CANTOR:

7     Q.    As a grown, mature man, you certainly know the

8     difference between 3 or 4 seconds and 30 seconds, do you not?

9     Yes or no.

10    A.    Yes.  Yes.

11             MR. ROSENFELD:   Objection.   Nobody said three or

12       four seconds.

13             THE COURT:   Overruled.

14    Q.    Do you know the difference between three and four

15    seconds and a half minute?

16    A.    Of course.  Yes.

17    Q.    And at all times that you've been testifying here, both

18    on direct and cross and redirect and recross, you've been telling

19    the truth?

20    A.    Yes.

21    Q.    Because you're under oath?

22    A.    Yes.

23    Q.    And you take an oath seriously, right?

24    A.    Yes.

25    Q.    That's why you tried to walk out of this courtroom?

```
 1                    MR. ROSENFELD:  Objection.  Now we are outside of

 2           the scope of redirect.

 3           A.   I tried to walk out of this courtroom --

 4                    THE COURT:  Sir, the objection is sustained.

 5           Q.   Have a bit of a temper, do we, sir?

 6                    MR. ROSENFELD:  Objection, your Honor.

 7           A.   I don't have any temper.  I have no temper.

 8                    MR. CANTOR:  We will let the jury determine that.

 9                    MR. ROSENFELD:  I'm going to object and ask that

10           it be stricken.  It was unnecessary to be demoralized by

11           the defense counsel.

12                    THE COURT:  Did you have any further questions?

13                    MR. ROSENFELD:  No.

14                    MR. CANTOR:  I have no further questions of this

15           good witness, your Honor.

16                    THE WITNESS:  Thank you.

17                    THE COURT:  Thank you.  You are excused.

18                    THE WITNESS:  Thank you.

19                    THE COURT:  Counsel, please approach.

20                    (Whereupon, an off the record discussion was

21             held at the bench.)

22                    THE COURT:  Madam Forelady, ladies and gentlemen

23           of the jury, that concludes our witnesses for today.  We

24           will have a full day tomorrow, Friday.  Please be here 9:30

25           right outside the door.  Remember all the precautions.
```

1    have a pleasant evening.  You are excused.

2                  (Whereupon, the jury exited the courtroom.)

3              THE COURT:  The jury having been excused,

4    gentlemen, ma'am, tomorrow, giving the sergeant time to

5    bring up Mr. Delgado, so we will gather, I told them at

6    9:30, for our purpose, 9:45 tomorrow morning.

7              MR. ROSENFELD:  Thank you.

8              THE COURT:  Thank you.

9                  (Whereupon, the trial was adjourned to Friday,

10   June 29, 2012.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1091

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF BRONX:  CRIMINAL TERM:  PART T14
     - - - - - - - - - - - - - - - - - -
3    THE PEOPLE OF THE STATE OF NEW YORK,

4                                        Indictment No.

5              -against -                27/2010

6    DAVID DELGADO,                      **PROCEEDINGS**

7                        Defendant.
     - - - - - - - - - - - - - - - - - -
8                                265 East 161st Street
                                 Bronx, New York 10451
9                                June 29, 2012

10   B E F O R E:

11            THE HONORABLE  DOMINIC R. MASSARO,

12                            J U S T I C E and jury

13            (Appearances as previously noted.)

14                  *    *    *    *    *

15            COURT CLERK:  Case on trial, your Honor, *People*

16   *of the State of New York against David Delgado.*  Let the

17   record reflect the presence of the District Attorneys, the

18   defense attorney and the defendant.  The sworn jurors are

19   not present at this time.

20            MR. CANTOR:  Hello, your Honor.

21            THE COURT:  Hello, Mr. Cantor.

22            MR. CANTOR:  Judge, I have two applications.

23            THE COURT:  Please make them, sir.

24            MR. CANTOR:  With respect to the second witness

25   who testified --

A-1jb

1           THE COURT: Mr. Vasquez?

2           MR. CANTOR: Ms. Melissa Dempsey.

3           THE COURT: Okay.

4           MR. CANTOR: She denied on cross examination that

5 she had earlier testified on direct examination that Sosa

6 and my client were arguing.

7           THE COURT: She denied they were arguing?

8           MR. CANTOR: Yes and she went further and she

9 denied that she ever said on cross examination the word

10 arguing. She went that far. I, of course, receive daily

11 minutes, but I receive them the next day. I didn't have

12 the minutes of her direct examination in my hand,

13 understandably. Court reporters do a great job, but they

14 are not superhuman. In any event, I intend to ask your

15 Honor to have her recalled for continued cross examination

16 on one subject matter and that was the subject matter that

17 I just made reference to now that I've had an opportunity

18 to read her direct examination. My examination of her

19 should last anywhere from one to two minutes, it's simple

20 as that. That's my first application and I am indifferent

21 as to when she is recalled, but it is imperative for the

22 defense that I confront her with a prior inconsistent

23 statement, which I am, by law, allowed to do.

24           THE COURT: Counsel, Mr. Rosenfeld.

25           MR. ROSENFELD: I wish you had told me beforehand

1093

1  I would have addressed the specific sections of the cross.

2  However, your Honor, I do recall defense attorney

3  questioning Ms. Dempsey about using the word arguing,

4  whether she had said it on direct or not and she did

5  respond to his cross examining question and he can use that

6  as part of the record now on his summation in other way.  I

7  don't see the necessity to call her for the same question

8  he already indicated that he asked her if she said it and

9  then she denied and he asked her about the arguing and

10  pursued that cite I --

11            THE COURT:  You have the citation?

12            MR. CANTOR:  Yes, I have it.

13            THE COURT:  Did you ask her?

14            MR. CANTOR:  Well I asked her and she denied.

15  She denied that she heard arguing between my client and

16  Sosa.  She went so far to say that she never used the word

17  arguing on direct examination and that was her position

18  and, of course, not having the record at hand I couldn't

19  use the record.  Now I have the record where she clearly

20  says that Sosa and my client were arguing on direct.  So I

21  want to call her back for continued cross merely on that

22  subject, which should take 16 to 120 seconds.

23            THE COURT:  Okay.

24            MR. ROSENFELD:  There is no reason to if he

25  already has on the direct exam, which he says he has it in

A-1jb

1094

1    front of him and now, he is seeing on cross she says

2    something different and he has the inconsistency, whatever

3    he wishes to call it.

4         THE COURT:  So you are saying the inconsistency

5    is already a matter of record?

6         MR. ROSENFELD:  Yes.

7         MR. CANTOR:  But I want to confront the witness.

8         MR. ROSENFELD:  You did.

9         MR. CANTOR:  I have the right of confrontation

10   and the only reason I couldn't do it is because I didn't

11   have the record in hands when I was cross examining.  So in

12   the interest of justice I want to finish my cross

13   examination on that very limited, very, very narrow subject

14   matter.  Take a minute, two minutes perhaps.

15        MR. ROSENFELD:  People's position is the defense

16   attorney had more than adequate time to cross examine on

17   this issue.  He did ask her about the word and the use of

18   it and there is no reason that she --

19        THE COURT:  But he maintains he didn't ask.  Now,

20   what is revealed in the transcripts, which he just

21   received --

22        MR. ROSENFELD:  Can we hold this until after the

23   next witness continue this discussion.  It is not going to

24   affect it -- us right now.  We have a witness outside ready

25   to testify.

A-ljb

1095

1    MR. CANTOR: Judge, I am obligated to bring this
2    to your attention.
3    THE COURT: It is good that you did.
4    MR. CANTOR: As soon as possible.
5    THE COURT: I will reserve.
6    MR. CANTOR: Because you are the master of how
7    these proceedings will flow. I just direct your Honor's
8    attention --
9    THE COURT: But because the necessity --
10    MR. CANTOR: 878 of the record.
11    THE COURT: I said I am reserving on the
12    application until we finish -- until we finish with this
13    witness that we have.
14    MR. CANTOR: We haven't even started that
15    witness.
16    THE COURT: But we will finish with him as
17    quickly as we can.
18    MR. CANTOR: It is a her, your Honor, it's a she.
19    THE COURT: Her.
20    MR. CANTOR: Secondly.
21    MR. ROSENFELD: No --
22    MR. CANTOR: I have another application, please.
23    THE COURT: Another application?
24    MR. CANTOR: Yes, you've reserved on my first
25    application.

A-1jb

1    THE COURT:  Go ahead.

2    MR. CANTOR:  And that is the next witness to be

3    called would be Maria Mercedes Rodriguez.

4    THE COURT:  Is that correct, Mr. D.A.?

5    MR. ROSENFELD:  Yes.

6    MR. CANTOR:  Boy, I must have so little

7    credibility with this Court.

8    THE COURT:  I just want to see maybe he changed

9    the order that he is going.

10   MR. CANTOR:  This is what he tells me and I take

11   him at his word, but apparently you don't take me at my

12   word.

13   Okay.  That being said, Judge, earlier in the

14   proceedings you urged the prosecutors with respect to

15   Alberto Vasquez, who had a criminal record, to turn over

16   the NYSID sheet.

17   MR. ROSENFELD:  I did.

18   MR. CANTOR:  People complied.  Now, this next

19   witness, Maria Mercedes Rodriguez likewise following a

20   NYSID sheet and Mr. Rosenfeld, as he had done with respect

21   to the earlier witness, Mr. Vasquez, rather than writing

22   out his criminal record as he had done with Mr. Vasquez and

23   then at your urging turning over the NYSID sheet this time

24   he emailed the subject of Mercedes -- Maria Mercedes

25   Rodriguez's criminal record and I am asking once again for

1     the NYSID sheet, just as you gave me the NYSID sheet with

2     respect to Mr. Alberto Vasquez.

3               THE COURT:  All right.

4               MR. CANTOR:  So I would like the NYSID sheet.

5               THE COURT:  I understand.

6               MR. ROSENFELD:  Your Honor, the People have under

7     Section 240 regarding Maria Mercedes Rodriguez turned over

8     to defense counsel the date of arrest, the precinct of

9     arrest, the arrest charged, the day she pled guilty, what

10    the plea was to and her sentence.  That was the first

11    thing.  Again, for the second incident same thing:  Arrest,

12    what she was arrested for, the precinct, what she pled

13    guilty to and the sentence.  We have acceded what is

14    required for us under 240.  I didn't argue when your Honor

15    asked me to turn over with Mr. Vasquez, it was an extensive

16    NYSID sheet, an extensive list of crimes.  I wanted to make

17    sure because there were so many that I was complying with

18    the Court's request, at his request and I just did it for

19    expediency.  For this purpose now he has all the necessary

20    information that is required under the CPL to cross examine

21    Ms. Rodriguez.

22               THE COURT:  That may be true and it is true.

23               MR. ROSENFELD:  Plus on my NYSID.

24               THE COURT:  But the Court would again appreciate

25    if you would turn it over so we move things along.

1098

1    MR. ROSENFELD:  I have my own notes written on

2    there.

3    MR. CANTOR:  He can Xerox it and cross out his

4    notes.

5    MR. ROSENFELD:  Your Honor, again, this is not

6    necessary.

7    MR. CANTOR:  You have already ruled.

8    THE COURT:  I am asking you to do that, all

9    right.  Take a moment, make a copy and then on the copy

10   delete what it is you wish to delete.

11   MR. CANTOR:  And by the way, Judge, if those

12   notes are the products of the Assistant District Attorney's

13   conversations with Ms. Rodriguez I am entitled to them.  So

14   what I am going to ask your Honor to do is to take a look

15   at the original NYSID sheets, which contains notes by

16   Mr. Rosenfeld and determine whether that constitutes

17   *Rosario* material that ought be turned over to me and/or

18   *Brady* material.

19   THE COURT:  Does any of it fall in that category,

20   sir?

21   MR. ROSENFELD:  No and I will show it to the

22   Court so you can see for yourself.  I turn over three

23   pages, I am just showing the Court on the second page my

24   notes.

25   THE COURT:  All right.  The Court is satisfied.

A-ljb

1099

1       MR. CANTOR:  May I have a moment, Judge.

2       THE COURT:  There is no need for any further --

3       MR. CANTOR:  Yes, your Honor.

4       THE COURT:  -- revelation.  All right.  Now, we

5   have a little situation that may interfere with us.

6   Alternate --

7       COURT CLERK:  I believe it is Alternate Juror

8   number one.

9       THE COURT:  Alternate Juror number one has

10  informed the Court that he has airline tickets for today to

11  Boston, will be back on the weekend, however, today must

12  leave the court at three o'clock to make his air flight to

13  Boston.

14      MR. CANTOR:  Let him go is my position.  We have

15  two other alternates, let him go.  Discharge him and make

16  the substitution.

17      MR. ROSENFELD:  I have no problem with that, your

18  Honor.

19      THE COURT:  Very good.

20      THE COURT:  All right.  I will treat it

21  accordingly.

22      All right.  Let us now continue.  Please bring in

23  the jury.

24      COURT OFFICER:  Yes, Judge.

25      MR. ROSENFELD:  Your Honor, can we approach for a

People - MARIA MERCEDES RODRIGUEZ - direct

1100

1    second?

2              THE COURT:  You may.

3              (Whereupon there is an off-the-record

4    discussion.)

5              COURT OFFICER:  Jury entering.

6              THE COURT:  All right.  Good morning, ladies and

7    gentlemen of the jury.

8              THE JURY:  Good morning.

9              THE COURT:  We continue on the People's case.  I

10   trust everybody can assure the Court they followed the

11   instructions; is that correct?

12             THE JURY:  Yes.

13             THE COURT:  All right.  And you have nothing to

14   report everybody, correct?

15             THE JURY:  Yes.

16             THE COURT:  Very good.

17             THE COURT:  Mr. Rosenfeld, the name of your

18   person?

19             MR. ROSENFELD:  People call to the stand

20   Ms. Maria Mercedes Rodriguez.

21             THE COURT:  Maria Mercedes Rodriguez to the

22   witness stand.

23             (Whereupon the witness enters at this time.)

24        M A R I A    M E R C E D E S    R O D R I G U E Z,

25   having been called as a witness on behalf of the People, having

A-ljb

People - MARIA MERCEDES RODRIGUEZ - direct

1101

1  first been duly sworn, testified as follows:

2          COURT OFFICER:  Witness gives her name as Maria

3      Mercedes Rodriguez, R-O-D-R-I-G-U-E-Z, resident of Bronx

4      County.

5          THE COURT:  Ms. Mercedes Rodriguez, good morning

6      to you, ma'am.

7          THE WITNESS:  Good morning.

8          THE COURT:  Just sit back, be comfortable, listen

9      carefully to the questions that will be asked of you.

10     Please, answer only what they ask.

11         THE WITNESS:  All right.

12         THE COURT:  Please, voice keep it up.

13         THE WITNESS:  Okay.

14         THE COURT:  You may inquire.

15         MR. ROSENFELD:  Thank you.

16 DIRECT EXAMINATION

17 BY MR. ROSENFELD:

18     Q.  Good morning, Ms. Rodriguez.

19     A.  Good morning.

20     Q.  Ms. Rodriguez, how old are you?

21     A.  Fifty.

22     Q.  Can you tell us where you were born and where you grew

23 up?

24     A.  Puerto Rico.

25     Q.  And where did you grow up?

1102

1    A.    Half and half, half in Puerto Rico and half in New

2    York.  I came in 1977 to New York.

3    Q.    Okay.  And when you came in 1997 -- 1977 to New York.

4    What did you do?

5    A.    I came to my mom, lived with my mom, came to school.

6    Q.    Went to school.  What year of school did you complete?

7    A.    Ninth grade.

8    Q.    What did you do after you completed ninth grade?

9    A.    Got married.

10   Q.    And what happened after you got married?

11   A.    Move to Texas, was there for five years, came back to

12   New York in '82.

13   Q.    And when you came back to New York you come back by

14   yourself or with a family?

15   A.    I had a daughter.

16   Q.    And what did you do in 1992?

17   A.    Ninety-two?

18   Q.    Is that what you said you came back?

19   A.    Eighty-two.

20   Q.    Eighty-two, my mistake, go ahead.

21   A.    I came back and I was with my daughter.

22        MR. CANTOR:  I am sorry?

23        THE WITNESS:  I lived with my mom for awhile.

24        THE WITNESS:  Excuse me?

25        MR. CANTOR:  She said something about her

A-ljb

1103

1    daughter.

2              THE WITNESS:  Yes, I have a daughter.

3    Q.    Repeat your answer.  Repeat your answer, please.

4              MR. CANTOR:  I raised my daughter?  Let's --

5    Q.    Let's start again.  You came back in 1982, tell us

6    what you did.

7    A.    I move in with my mom because I came from Texas.  I

8    had a daughter one year old then I got my own place and started

9    working.

10   Q.    What type of work did you do?

11   A.    I used to work in a clothes store.

12   Q.    And how long did you work in a clothes store?

13   A.    Five years, something like that.

14   Q.    What years are we talking about?

15   A.    Eighty-two to '85.

16   Q.    And what did you do after that?

17   A.    I was on public assistance.

18             MR. CANTOR:  I'm sorry?

19             THE WITNESS:  Public assistance.

20   Q.    Did you work after that?

21   A.    No.

22   Q.    You raised your daughter?

23   A.    Yes.

24   Q.    You have any other family at this time?

25   A.    Yes.

A-ljb

1104

1    Q.   Who do you live with?

2    A.   I live with my two grand kids.

3    Q.   Are you employed as of today?

4    A.   No, not right now.

5    Q.   Did you have any other jobs besides that clothing

6    store job?

7    A.   Yep, I use to work at Kennedy Fried Chicken, used to

8    be a restaurant.

9    Q.   What did you do there?

10   A.   I used to be the cash register, I also work at the

11   Denise store.

12   Q.   Is that a store, D-E-N-I-S-E?

13   A.   Si, Denise.

14   Q.   What did you do there?

15   A.   I used to be a cash register.

16   Q.   Any other jobs?

17   A.   No.

18   Q.   And how long have you lived at your current location?

19   A.   Where I living right now?

20   Q.   Yes.

21   A.   Six years.

22   Q.   Now, Ms. Rodriguez, back in on or about April first of

23   1999, were you arrested for criminal possession of controlled

24   substance in the third degree?

25   A.   Yes, I was.

A-ljb

1105

1     Q.    And did you plead guilty to that?

2     A.    Yes, I did.

3     Q.    On May 18th of 1999, you plead guilty of criminal

4  possession of controlled substance seventh degree and were you

5  sentenced to a conditional discharge and community service of

6  two days?

7     A.    Yes.

8     Q.    What was that incident about?

9     A.    It was in a store.

10    Q.    What did you do?

11    A.    Supposedly, I had stolen a Downy bottle.

12          MR. CANTOR:  Downy?

13          THE WITNESS:  Uh-hum, some Downy, fabric

14    softener.

15    Q.    And what happened?

16    A.    I was arrested for that, I did community service.

17    Q.    Did you have anything on you when you were arrested

18  besides the Downy bottle?

19    A.    Yes, I did.  I think I had a bag of weed and some

20  cocaine.

21    Q.    Were you using any of those items back at that time?

22    A.    At that time I did.

23    Q.    What?

24    A.    I used to smoke weed and I used to do some cocaine.

25    Q.    And you had a second incident on April fourth of 1999,

A-ljb

1106

1    you were arrested for criminal possession of a controlled

2    substance, seventh degree, in the 42nd Precinct and were you

3    sentenced on May 18th of 1999, the same day as the first

4    incident, to disorderly conduct and received a conditional

5    discharge?

6         A.   Yes, sir.

7         Q.   What was that incident about?

8         A.   Well, I think I made a mistake just now.  I think the

9    first incident was in the apartment that I was and the second

10   incident you speaking on, on the 42nd Precinct was in the store.

11        Q.   So lets go back so you can correct that.  The first

12   incident when you were arrested, April first of '99, what was

13   that?

14        A.   Tremont and Southern Boulevard, it was in an

15   apartment.

16        Q.   And what happened?

17        A.   I was arrested there.  They had cocaine, supposedly

18   had a gun.  I was arrested for being in the apartment.

19        Q.   Were you there alone?

20        A.   No.

21        Q.   With other people?

22        A.   Yes.

23        Q.   Okay.  The second incident is that the store incident?

24        A.   Yes.

25        Q.   That's with the Downy bottle?

1107

1    A.    Yes.

2    Q.    That's where you received the conditional discharge

3    and violation of disorderly conduct?

4    A.    Yes.

5    Q.    Thank you.

6    And Ms. Rodriguez, I direct your attention to December 24,

7    2009, were you living at your current location at that point?

8    A.    Yes, sir.

9    Q.    And were you familiar with somebody by the name of

10   Carmen Diaz?

11   A.    Yes.

12   Q.    And how did you know Carmen Diaz?

13   A.    I know her.  I met her in Parkchester when I moved in

14   there, we grew friends.

15   Q.    And did you have any plans with Carmen Diaz for

16   December 24, 2009?

17   A.    Yes, I went to her house after 12 o'clock midnight for

18   Christmas Eve.

19   Q.    When had you made --

20          MR. CANTOR:  May I have that read after 12

21   o'clock midnight?

22   A.    Yes, sir?

23   Q.    For Christmas eve?

24          MR. CANTOR:  Can I have that read, Judge, please?

25          THE COURT:  Read it back.

A-ljb

1108

1      (Whereupon the answer was read back by the

2      reporter as follows:

3           "ANSWER: Yes, I went to her house after

4      12 o'clock midnight for Christmas Eve."

5      Q.   When had you made plans with Ms. Diaz about Christmas

6      Eve?

7                MR. CANTOR:  Objection, irrelevant.

8                THE COURT:  Overruled.

9      A.   That same night, I called to wish her happy -- Merry

10     Christmas.  She told me to come on over that she had a little

11     get together in the house.  That when I finish at my mother's

12     house to come on over to her house.

13     Q.   So you went to Ms. Diaz's house with anybody or by

14     yourself?

15     A.   I went to Ms. Diaz with my grandson and my daughter.

16     Q.   And how old were they at the time?

17     A.   My grandson was 15 and my daughter is 30.

18                MR. CANTOR:  Thirty?

19                THE WITNESS:  Yes, sir.

20     Q.   And when you got to Carmen Diaz's apartment, I'm

21     sorry, had you been to Carmen Diaz's apartment before?

22     A.   Yes.

23     Q.   Approximately, how many times?

24     A.   Whole bunch of times, we friends.

25     Q.   And how far away from your apartment is Carmen Diaz's

A-ljb

1  apartment, approximately?

2      A.   Like 20 feet away from buildings, because we live

3  right next to each other, different buildings.

4      Q.   And when you arrived at Carmen Diaz's apartment the

5  night of December 24, 2009 into December 25, 2009, who else was

6  there that you recall?

7      A.   Carmen was there, Melissa was there, Tango was there.

8                MR. CANTOR:   Who?

9                THE WITNESS:   Tango.

10               MR. CANTOR:   Sangle?

11               THE WITNESS:   Tango.

12               MR. CANTOR:   Tango.

13     A.   Was there, Robert was there, Sosa was there and me

14  just got there it was me, Sosa, Biango.

15     Q.   Did you bring anything with you when you came to

16  Ms. Dempsey's apartment?

17     A.   Yes, I did.

18     Q.   What did you bring?

19     A.   I brung a bottle of Hennessy.

20     Q.   Anything else?

21     A.   No, sir.

22     Q.   Now, you mentioned some other people.  This person

23  Melissa did you know her?

24     A.   Yes.

25     Q.   How long had you known Melissa?

1110

1     A.    Since I been living in Parkchester.

2     Q.    And what is the nature of your relationship with

3 Melissa?

4     A.    We close friends.

5     Q.    Do you know her husband, Tango, Alberto Vasquez?

6     A.    Yes.

7     Q.    How long have you known him?

8     A.    As long as I know Melissa.

9     Q.    And then you mentioned someone named Sosa?

10    A.    Yes.

11    Q.    How long had you known Sosa?

12    A.    Around five years.

13    Q.    And where did your know Sosa from?

14    A.    I met him with Carmen downstairs, Parkchester and also

15 we used to be in the apartment at Carmen's house.

16    Q.    When you say "we" who are you referring to?

17    A.    Sosa used to come and be with us in the house couple

18 of times.

19    Q.    How often over the years did you see Sosa?

20    A.    Almost every day.

21    Q.    Okay.  When you came into the party what was going on,

22 what was --

23    A.    He was already in the party when I got there.

24    Q.    What was happening in the apartment?

25    A.    They was eating, there was drinking, they were

1   dancing, having a good time, celebrating Christmas.

2       Q.   Was there music?

3       A.   Yes.

4       Q.   Could you indicate for us the level of the music, how

5   loud or soft was it?

6       A.   Like medium.

7       Q.   And you mentioned drinking, what were people drinking,

8   if you observed?

9       A.   Well, I seen a lot of liquor.  They had Bacardi.  They

10  had Vodka.  They had the bottle of Hennessy that I took there.

11  They had Coors Lite; that I could remember.

12      Q.   What did you do when you got to the apartment?

13      A.   I ate then I started drinking Hennessy and dancing and

14  partying like everybody else.

15      Q.   Okay.  Did there come a time anybody else came to the

16  apartment?

17      A.   Yes.

18      Q.   Who else?

19      A.   Margie and David.

20      Q.   This person Margie how do you know her?

21      A.   I know her -- I met her in Parkchester.

22      Q.   And how long from this party had you known this person

23  Margie?

24      A.   Well, we started like hanging out with each other like

25  three years before everything happens.

A-ljb

1112

```
 1      Q.   I'm sorry, how many years?

 2      A.   Three years.

 3      Q.   Three years, okay.  Were you friends with this person

 4   Margie?

 5      A.   Yeah, I was associated with her.

 6      Q.   And did you know her by Margie or did you know her by

 7   another name?

 8      A.   Margie.

 9      Q.   Did you know her real name?

10      A.   No.

11      Q.   And had you socialized with Margie before this party?

12      A.   Yes.

13      Q.   And how was your relationship with her?

14      A.   Fine.

15      Q.   You said she brought someone with her to the party?

16      A.   Yes.

17      Q.   Who did she bring to the party?

18      A.   David (indicating)

19               MR. ROSENFELD:  Again, the witness has pointed to

20      her left.

21      Q.   Indicating where you point and who you pointing at?

22      A.   Him, David.

23      Q.   What is he wearing?

24      A.   Blue and gray with a tie.

25               THE COURT:  Indicating the defendant herein.
```

A-ljb

1113

1      Q.    The defendant, had you ever seen him before that

2   night?

3      A.    No, sir.

4      Q.    And you called him David.  Did you know his name when

5   he was at the party?

6      A.    When she came in the party with him she said his name

7   was David, but I really didn't pay too much mine on his name.

8      Q.    So my question did you know his name after that or

9   not?

10      A.    I didn't remember it, no.

11      Q.    Okay.  And do you know, approximately, what time it

12   was that Margie and the defendant came to the party?

13      A.    Around one, 1:30, something like that.

14      Q.    Were you checking your watch or timing it?

15      A.    No.

16      Q.    And when you got to the party you saw Sosa?

17      A.    Yes.

18      Q.    And what was Sosa doing when you arrived at the party?

19      A.    He was sitting down at the table eating.

20      Q.    And did you notice anything else about his demeanor or

21   how he was acting?

22      A.    No, like always, being himself, being happy, loud,

23   celebrating.

24      Q.    All right.  Please continue.  What happened after you

25   got to the apartment and as you indicated you ate and you drank,

1114

1  go ahead.

2      A.   We was in the living room.  We was with Sosa.  We was

3  dancing:  Me, Ari, Melissa, Tango, Sosa, Gabriella, that's

4  Carmen's daughter, we were always dancing in the living room.

5      Q.   And where --

6               MR. CANTOR:  Can I have that list of people read

7      back, Judge?

8               MR. ROSENFELD:  Your Honor --

9               MR. CANTOR:  May I?

10              THE COURT:  Yes.

11              MR. CANTOR:  Thank you.

12              (Whereupon the last answere was read back by the

13      reporter.)

14              (Continues next page.)

15

16

17

18

19

20

21

22

23

24

25

A-1jb

1115

B mc                          Rodriguez - People - Direct

1              MR. ROSENFELD:  Can I approach a second?

2              MR. CANTOR:  Judge, I'm waiting for the court

3        reporter patiently.

4              THE COURT:  You may approach, if you wish.  You

5        wish Mr. Cantor?

6              MR. ROSENFELD:  I'd like to, sure.

7              THE COURT: Mr. Cantor.

8              (Whereupon, there was a discussion held off the

9        record, at the bench, among Court and Counsel.)

10             (Whereupon, the following takes place on the

11       record, in open court:)

12             (Whereupon, the court reporter read back the

13       requested testimony.)

14             THE COURT:  Mr. Rosenfeld.

15             MR. ROSENFELD:  Thank you.

16       Q.   Miss Rodriguez, after Margie came in with the

17  defendant, did you have any conversation with them?

18       A.   Yes, I did, at the door.

19             MR. CANTOR: At the door?

20             THE WITNESS:  Yes, when they first got there.

21       Q.   What was your conversation with them?

22       A.   I asked her, I asked Margie --

23             MR. CANTOR:  I can't understand.

24       A.   -- how she met David, who he was, how she met him,

25  where he came from, and she said she had met him in the

B mc                          Rodriguez - People - Direct

1   laundromat and that she was going out with him, she was seeing

2   him almost two months.

3        Q.   Did you have any conversation with the defendant at

4   that point?

5        A.   I told him welcome to the family, and let him in.

6        Q.   Okay, you remember what Margie and the defendant did

7   after that?

8        A.   They was in the kitchen most of the time.

9        Q.   Were you in the kitchen also?

10        A.   I was in the kitchen in and out.

11        Q.   What was going on in the kitchen area?

12        A.   I really couldn't tell what they was doing in the

13   kitchen because I was in the living room most of the time.

14        Q.   Who was hanging out in the kitchen area, if you

15   recall?

16        A.   Well, I saw David, I saw Margie, Carmen used to be in

17   the kitchen, in and out of the kitchen, Pachingo too, in and out

18   of the kitchen, everybody was in and out of the kitchen.

19        Q.   What were they doing in the kitchen, did you notice?

20        A.   Well some of us smoked cigarettes so we used to go in

21   the kitchen, smoke cigarettes out the window because we had the

22   kids in the living room.

23        Q.   And when you were in the kitchen, was the defendant

24   David in the kitchen?

25        A.   Yeah.

B mc                        Rodriguez - People - Direct

1      Q.    You have anymore conversations with him when he was in

2   the kitchen?

3      A.    I really didn't speak to him much that night.

4      Q.    Did you -- after Margie and the defendant came into the

5   apartment, did you notice if Sosa had any interaction with Margie

6   or the defendant?

7      A.    Well, when he first got there with her --

8      Q.    When who got there?

9      A.    David and Margie.

10     Q.    Yes?

11     A.    Sosa was in the kitchen and I was in the kitchen and

12  Sosa just told him --

13     Q.    Told who?

14     A.    "I know Margie for a long time, do the right thing by

15  her because I know her son for many years and if you don't do the

16  right thing by her, then you got to answer to me."

17            MR. CANTOR:  Can I have that read back because I

18        want to take it down verbatim?

19            MR. ROSENFELD:  Your Honor, this is unnecessary

20        delays.

21            MR. CANTOR:  I want to take it down verbatim.

22            THE COURT: Yes, you may.

23            MR. CANTOR:  Thank you.

24            (Whereupon, the court reporter read back the

25        requested testimony.)

B mc                          Rodriguez - People - Direct

1            MR. CANTOR:  Thank you, your Honor.

2            MR. CANTOR:  May I continue?

3       Q.   While you were talking, you had your left hand pointed

4    in that direction, who were you pointing at?

5       A.   David.

6            MR. ROSENFELD: The defendant.

7       Q.   And Sosa was saying those words to the defendant?

8       A.   Yes.

9       Q.   Was Sosa doing anything with his hand or in any other

10   way interacting with the defendant as he was saying those words?

11      A.   Just talking, you know with his hands, pointing with

12   the finger, but he didn't mean no harm by it.

13           MR. CANTOR:  I object to that and ask that it be

14      stricken.

15           THE COURT:  Yes, the jury will disregard.

16           MR. ROSENFELD:  I assume you mean just the last

17      part?

18           MR. CANTOR:  No, the entire --

19           THE COURT:  No, just the part that was objected

20      to.

21      Q.   You just raised your hand up in the air and you had

22   your hand up with your fingers out, are you showing us what Sosa

23   was doing while he was talking to David?

24      A.   Yeah, he was being -- like talking, he was just meeting

25   him.

B mc                    Rodriguez - People - Direct

1    Q.   You're holding your hand in a certain way, is that how
2    Sosa was holding his hand?
3    A.   Yes.
4              MR. ROSENFELD:   Indicating, your Honor, the
5         witness had her right hand raised with more of her second
6         finger kind of pointed out.
7    A.   Yeah, telling him to do the right thing by Margie,
8    she's a good person, he knew her --
9              MR. CANTOR:   I can't hear.
10             THE COURT: So indicating.
11             MR. CANTOR:   So she began to say something?
12   A.   (Continuing)   She was a good person and he knew her for
13   many, many, many years.
14             MR. CANTOR:   All right, the record should indicate
15        she was pointing her index finger --
16             THE COURT:   That's what she just said.
17             MR. CANTOR:   -- as she was jabbing her hand back
18        and forth.
19             THE COURT: Mr. Rosenfeld just said that.
20             MR. ROSENFELD:   Thank you.
21             THE COURT: Mr. Rosenfeld.
22             MR. ROSENFELD:   Thank you.
23   Q.   And after Sosa said that to the defendant, did he react
24   in any way?
25             MR. CANTOR:   Who is he, your Honor?

B mc                     Rodriguez - People - Direct

1      A.    No.

2      Q.    I'm sorry, the defendant react?

3      A.    No.  He said okay.  He was just -- with his head down,

4   said, "All right, all right, I will."

5            MR. ROSENFELD:  Again, the witness is nodding her

6      head up and down.

7      Q.    That was the defendant's response to Sosa?

8      A.    Yes.

9            THE COURT:  So indicating, sir.

10     Q.    And when Sosa was talking to the defendant, how would

11   you describe his voice, the level of his voice?

12     A.    Like he usually talk, he wasn't loud or nothing like

13   that.

14           MR. CANTOR:  What?

15           THE WITNESS:  He was not loud, he was talking like

16     he usually talks.

17     Q.    Was either Sosa or the defendant angry during that

18   conversation?

19     A.    No.

20     Q.    After that conversation took place, what happened?

21     A.    After everybody started leaving?

22     Q.    I mean -- exactly.  I'm sorry, let me back up.

23           MR. CANTOR:  No, Judge, she was in the midst of an

24     answer when everyone was leaving and then she was cut off.

25           THE COURT:  He withdrew his question.

B mc                        Rodriguez - People - Direct

 1                        MR. ROSENFELD:  I withdraw it.

 2                        MR. CANTOR:  He can't withdraw once the witness

 3          begins to answer.

 4                        THE COURT:  Of course he can withdraw it at any

 5          moment.

 6                        MR. CANTOR:  What do you do with the partial

 7          answer?

 8                        MR. ROSENFELD:  Objection, colloquy.

 9                        MR. CANTOR:  What do you do with the partial

10          answer?

11                        THE COURT:  You disregard so much of it that was

12          not connected.

13          Q.   The conversation you just told us about between Sosa

14     and David happened when they first got to the apartment?

15          A.   Yes.

16          Q.   After that conversation did you go back to the party?

17          A.   Yes, everybody kept on with the party.  Sosa was back

18     in the living room with us.

19          Q.   And you mentioned before that you were drinking?

20          A.   Yes, I was.

21          Q.   And what were you drinking?

22          A.   Hennessy.

23          Q.   And approximately how many Hennessys did you have to

24     drink that evening from the time you got there until the end of

25     the party?

B mc                          Rodriguez - People - Direct

1      A.    Like six shots.

2      Q.    By a shot, can you show us an example?

3      A.    This is the cup.   This.

4                  MR. CANTOR:   She's indicating.

5                  MR. ROSENFELD:   Your Honor, may I do the

6      indication?

7                  THE COURT:   Mr. Rosenfeld has to.

8                  MR. CANTOR:   As long as it meets with your own

9      approbation.

10                 THE COURT:   Sir.

11                 MR. ROSENFELD:   Thank you.

12                 Indicating the witness has picked up the Dixie cup

13     in front of her.

14     Q.    Please hold it up again so I can point -- so you can

15     point to the area?

16                 (Witness complied.)

17                 MR. ROSENFELD:   Indicating the witness is pointing

18     to an area on the Dixie cup I'd say a little below the half,

19     half cup line.

20                 The jury can see where she's pointing.

21                 MR. CANTOR:   I would say about a third of the cup,

22     but, your Honor, the jury will make that determination.

23                 THE COURT:   That's correct.

24                 MR. ROSENFELD:   That's what I just said.

25                 MR. CANTOR:   Okay.

B mc                     Rodriguez - People - Direct

1           THE COURT:  So indicating, Mr. Rosenfeld.

2      Q.    And you indicated you had about six of those?

3      A.    Yes.

4      Q.    Had you drunk Hennessy before that night?

5      A.    Yes.

6      Q.    How often?

7      A.    On holidays, special occasions.

8      Q.    Did you have all those six drinks at once or was that

9   over the course of the party?

10      A.    Over the course of the party.

11      Q.    And after having those six drinks of Hennessy how did

12   you feel?

13      A.    I feel nice, had a nice head.

14      Q.    Were you drunk?

15      A.    No.

16      Q.    Do you know what it feels like to be drunk?

17      A.    Yes.

18      Q.    Did that at all impair your ability to see and hear?

19      A.    No.

20      Q.    Did you notice, after Margie and David came into the

21   party, if David, the defendant, if he was drinking any alcohol?

22      A.    No.

23      Q.    So no, you didn't notice or no, he wasn't?

24      A.    I didn't notice him drinking no alcohol.

25      Q.    How about Margie?

B mc                       Rodriguez - People - Direct

1      A.   No.

2      Q.   While Sosa was at the party did you notice if he was

3   drunk?

4      A.   Yes.

5      Q.   Did you notice what he was drinking?

6      A.   A little bit of everything, I guess.

7      Q.   How would you characterize how Sosa was acting after he

8   was drinking all those things?

9      A.   Like I said, he was being very friendly, we was

10   dancing, having fun, being Sosa.

11      Q.   Can you tell whether or not he was drunk?

12      A.   I could say yes.

13      Q.   Please continue.  After all this, the party continued?

14      A.   Yes.

15      Q.   Go ahead?

16      A.   Then I'm sitting on the table, the dining room table by

17   the door.  Pachingo is sitting also on the table, eating.  David

18   and Sosa was talking behind the sofa right in front of me and

19   Margie was standing by David too.

20              MR. CANTOR:  Who?

21              THE WITNESS: Margie.

22      Q.   If you don't mind, Miss Rodriguez, I ask you to look at

23   what's been marked People's Exhibit 4 in evidence on the T.V.

24   screen behind you.

25              MR. ROSENFELD:  And with the Court's permission,

B mc                    Rodriguez - People - Direct

1      may the witness rise and approach the T.V., your Honor?

2                      THE COURT:  You may.

3      Q.   Go ahead, Miss Rodriguez, you may stand up to the side

4      of the T.V., please.

5                      MR. CANTOR:  Would you ask the witness not to turn

6      her back to my client and myself and to keep up a loud

7      voice?

8                      THE COURT: Yes.  Be guided, ma'am.

9      A.   I was sitting --

10                     MR. CANTOR:  I can't hear, Judge, because she's

11     turning towards the screen.

12                     MR. ROSENFELD:  Your Honor, I can hear perfectly

13     and I'm approximately twenty-five feet away.

14                     MR. CANTOR:  He's not on trial, my client is.

15                     THE COURT: Gentlemen, please.

16                     Keep your voice up, ma'am.

17                     You may continue.

18                     MR. ROSENFELD:  Thank you.

19     Q.   Go ahead?

20     A.   I was sitting on this chair right here.  This chair was

21     here.  At the moment Pachingo was sitting over here.

22     Q.   Can you wait one second.

23                     MR. CANTOR:  Can he not interrupt the answer.

24                     MR. ROSENFELD:  I have to indicate on the record.

25                     THE COURT:  One second, Mr. Cantor, he is asking

B mc                    Rodriguez - People - Direct

1    her to indicate so the Court can take cognizance of where

2    she's indicating, which is perfectly correct.

3                    MR. ROSENFELD:  Thank you.

4    Q.   If you don't mind slowing down, I have to put on the

5    record where you were pointing, where you were sitting?

6    A.   I was sitting on this chair.

7                    MR. ROSENFELD:  Indicating the witness is pointing

8    to a chair on the right side of the photograph.

9                    THE COURT:  So indicated.

10   Q.   Go ahead.

11   A.   Pachingo was sitting here, and this chair was over

12   here.

13   Q.   Wait a second.

14                   MR. ROSENFELD: Indicating the witness is pointing

15   to the third chair from the right.

16   Q.   Is that correct?

17   A.   Yes.

18                   THE COURT:  So indicating.

19   Q.   And then you indicated something about this chair in

20   the middle?

21   A.   It was over here in the middle.

22   Q.   Indicating the chair in the bottom middle of the

23   photograph closer to the table, is that correct?

24   A.   Yes.

25                   THE COURT:  So indicating.

B mc                    Rodriguez - People - Direct

1              MR. ROSENFELD:  Thank you, Judge.

2        A.    Nobody was sitting there at the moment.

3        Q.    And the couch, do you recall where the couch was?

4        A.    The couch was over here where the chair is right here.

5        Q.    So the back of the couch was where the chair is?

6              MR. CANTOR:  Objection, she didn't say the back,

7        she said the couch.

8              THE COURT:  He's indicating where she is pointing.

9              MR. CANTOR:  No.

10             THE COURT:  Please.

11             MR. CANTOR:  He used the words, "Back of the

12       couch."

13             THE COURT:  He's starting to say what was

14       indicated; are you not, Mr. Rosenfeld?

15             MR. ROSENFELD:  I'm trying, yes, your Honor.

16       Q.    All right, Miss Rodriguez, you're pointing to this

17  chair here, and on the left is the couch, correct?

18       A.    Yes.

19       Q.    If you don't mind stepping over a little more to the

20  couch then, and using your finger, draw over to where the back of

21  the couch was?

22       A.    The back of the couch was over here.

23             MR. ROSENFELD:  Indicating --

24       A.    Right here.

25             MR. ROSENFELD:  Indicating the witness is pointing

B mc                    Rodriguez - People - Direct

1      to an area to the left of the chair in the middle.

2      Q.    Into the floor area, where my pen is?

3      A.    Yes.

4             THE COURT:  So indicating.

5             MR. ROSENFELD:  Thank you.

6             MR. CANTOR:  What People's exhibit is that?

7             MR. ROSENFELD:  People's Exhibit 4, your Honor, as

8      I said at the beginning.

9             THE COURT: Yes, you did.

10     Q.    Was the door to the apartment open at that time?

11     A.    No.

12     Q.    All right, and you indicated that on there you said

13     Pachingo, yourself, the couch, who else was standing where?

14     A.    Sosa was standing right here.

15            MR. ROSENFELD:  Indicating to the left of --

16     A.    David was standing in front of Sosa.

17            MR. ROSENFELD:  Again, indicating way to the left

18     of the chair, on the left, lower quadrant of the photo.

19            THE COURT:  So indicated.

20     A.    Margie was standing next to David.

21            MR. CANTOR:  Who?

22            THE WITNESS:  Margie.

23     A.    And they was conversating.

24            MR. ROSENFELD:  When -- I'm indicating.

25     Q.    When you point to something, I have to indicate it for

B mc                        Rodriguez - People - Direct

1   the record.

2                  MR. ROSENFELD:  So when she said Margie, she was

3         pointing towards the chair in the middle.

4        Q.   Is that approximately where Margie was standing?

5                  THE COURT: So indicating.

6        A.   Well, I can't really tell with the chair, but it's like

7   David was -- Sosa was standing here, David was standing in front

8   of him and Margie was standing next to David.

9                  MR. ROSENFELD: And the witness has just pointed to

10        areas around the chair, as noted by the jury.

11                 THE COURT:  So indicating.

12       Q.   And you said the couch was back towards approximately

13   where they were standing?

14       A.   Yes.

15       Q.   You indicated on the floor here?

16       A.   Yes, Sosa was with his back on the couch, on the back

17   of the couch.

18       Q.   Please continue.

19       A.   They were conversating, standing there.  All of a

20   sudden David swung at Sosa, to the front, Sosa holds his face,

21   fell back on the top of the sofa.

22                 MR. CANTOR:  Can she resume sitting, Judge?

23                 MR. ROSENFELD: You may sit down.  It's okay.

24       A.   So what --

25                 MR. CANTOR:  Can she sit down?

B mc                          Rodriguez - People - Direct

1                MR. ROSENFELD:  I ask defense counsel not to

2        direct the witness.

3                MR. CANTOR:  I'm asking, your Honor.

4                MR. ROSENFELD:  I object.

5                THE COURT: I will allow her to sit when Mr.

6        Rosenfeld is finished with her standing.

7                May she sit, Mr. Rosenfeld?

8                MR. ROSENFELD:  Yes.

9                THE COURT: Thank you.

10       Q.    All right, Miss Rodriguez, after the people are in the

11   position you just described --

12       A.    Yes.

13       Q.    -- please go ahead and tell us what you observed?

14       A.    David swung at Sosa to the front of his face, Sosa held

15   his face and fell back in the sofa.  When he fell back in the

16   sofa, David got on top of him and hold him to his neck and swing

17   at him couple of times.  I thought he was punching him, really he

18   was stabbing him.

19                MR. CANTOR:  I'm going to object to the last

20        thing, she's making an assumption really, he was stabbing

21        him, I move that that be stricken.

22                THE COURT:  That's what she saw.

23                MR. CANTOR:  She didn't see that.

24                THE COURT:  That's what she observed.

25                MR. CANTOR:  I'm sorry?

B mc                          Rodriguez - People - Direct

1              THE COURT:  She observed what appeared to her to

2       be a stab.  I will allow it to stand.

3              MR. ROSENFELD:  So I can indicate on the record,

4       so, since we've taken a break, that Miss Rodriguez put her

5       right hand to her nose and moved her body backwards as she

6       described what Sosa's reaction was.

7       A.     He fell back.

8              MR. ROSENFELD:  And then she took her left arm in

9       front of her with her left elbow crooked and moved her right

10      arm.

11      Q.     Is that correct?

12      A.     He hold him like this, on top of the sofa, like that.

13             MR. CANTOR:  He was doing what?

14             MR. ROSENFELD: Indicating --

15      A.     He hold him through his neck, through his head and

16   stabbed him couple of times.

17             MR. ROSENFELD:  Indicating the witness grabbed her

18      left arm crooked in front of her and moving her right hand

19      from behind her shoulder approximately three times forward

20      in a sideways motion.

21      A.     Yes.

22             THE COURT:  So indicating.

23      Q.     Who was holding whom?

24      A.     David.

25      Q.     Was what?

B mc                        Rodriguez - People - Direct

1    A.   He was the one holding him and stabbing him.

2    Q.   Holding who?

3    A.   Sosa.

4    Q.   Please continue.

5    A.   After that he went out the door.

6    Q.   Who?

7    A.   David.

8         MR. ROSENFELD:   Indicating the witness is pointing

9    to the defendant.

10   A.   I tried to stop him in the hallway and he pushed me and

11   I fell on the floor.   From there I seen him going down the stairs

12   and I didn't see him no more after that.

13        THE WITNESS:   Indicating when the witness used the

14   word, "Pushed," she had her right arm thrown to the side.

15   A.   Yeah.

16        THE COURT:   So indicating.

17   Q.   Let me go back to the --

18   A.   When I'm going back in the apartment, Margie was coming

19   out of the apartment and I told Margie you need to go back and

20   find your man and bring him back into the apartment because he

21   just finished killing Sosa in Carmen's house.

22        MR. CANTOR:   Can I have that reread because she

23   spoke so quickly?

24        THE COURT:   Yes.

25        MR. ROSENFELD:   Judge, I object to this

1133

B mc

Rodriguez - People - Direct

1    interruption and this constant asking for read back.

2                    THE COURT:  Well --

3                    MR. CANTOR:  I'd just like to hear to

4    intelligently follow the proceedings while I'm representing

5    a man charged with murder.

6                    THE COURT:  We don't have to editorialize, Mr.

7    Cantor.  You can't seem to grasp that.

8                    MR. CANTOR:  It's an unwarranted objection.

9                    THE COURT:  Just don't editorialize.  Don't say

10   anything, that's the best thing, unless you have an

11   objection.

12                   MR. CANTOR:  Thank you.

13                   (Whereupon, the court reporter read back the

14   requested testimony.)

15                   MR. CANTOR:  Judge, what she told, I object and

16   ask that it be stricken, what she told Margie.

17                   THE COURT:  That's enough.  I know what your

18   objection is.

19                   MR. CANTOR:  You know the basis.

20                   THE COURT:  -- to be stricken.

21                   The application is denied.

22                   MR. CANTOR:  And my exception, respectful

23   exception is noted.

24                   THE COURT:  You may continue, Mr. Rosenfeld.

25                   MR. ROSENFELD:  Thank you.

B mc                    Rodriguez - People - Direct

1      Q.    Miss Rodriguez, before that interaction between David

2   the defendant and Sosa, did you hear any conversation between

3   Sosa and the defendant?

4      A.    No, I didn't.

5      Q.    Could you tell what was going on, if anything, between

6   them as they were standing there, where you indicated, before it

7   happened?

8      A.    They were conversating.

9      Q.    How could you tell, what did you notice?

10     A.    David was talking to him and Sosa was talking.  David

11  and him was talking and Sosa like gave a smile.  All of a sudden

12  I just saw him swinging at Sosa.

13     Q.    From where you were sitting could you hear any of the

14  words?

15     A.    No.

16     Q.    How was the music at that point?

17     A.    Medium, like it was all right.

18     Q.    And did you ever see any type of weapon in Sosa's

19  hands?

20     A.    No.

21     Q.    When David started swinging at Sosa, do you recall if

22  you could see anything in his -- the defendant's hands?

23     A.    No, but when I went --

24           MR. CANTOR:  Judge, she's answered the question by

25       saying no.

B mc                    Rodriguez - People - Direct

1         THE COURT:  She's further elaborating.

2         MR. CANTOR:  Why?  "Did you see anything in my

3    client's hands?"  She said, "No."

4         THE COURT:  It's part of the, "No," I should

5    imagine.

6         MR. CANTOR:  "No," answers it completely.

7         THE COURT:  Do you have more to say in your

8    answer?

9         THE WITNESS:  Yes.  When I went out in the

10   hallway --

11        MR. CANTOR:  Well, Judge, I'm going to object,

12   that is outside the scope of the question.

13        THE COURT:  Please.  You have anything more to say

14   about that moment?  The hallway is separate.

15        THE WITNESS:  No, I didn't notice him.

16        THE COURT:  Very good.

17        Mr. Rosenfeld.

18        MR. ROSENFELD:  Thank you.

19   Q.    After the defendant made those motions towards Sosa,

20   grabbing him as you indicated, and the thrust with the arm, did

21   you notice anything about Sosa right after that?

22   A.    He got up, he was bleeding all over, he was bleeding

23   through his neck, holding onto his neck, trying to breathe for

24   air.

25   Q.    Where -- what was happening with the blood?

B mc                          Rodriguez - People - Direct

1      A.    It was all over the apartment.

2      Q.    Where was it coming from?

3      A.    From Sosa's neck, his head, everywhere.

4            MR. ROSENFELD:  Indicating the witness had her

5      right arm to the side of her neck as she said that.

6            THE WITNESS:  It was on his left side.

7            THE COURT:  So indicating.

8            MR. ROSENFELD:  The left arm to the left side of

9      her neck.

10     Q.    That's the side you recall?

11     A.    Yes, holding on.

12     Q.    And using People's Exhibit 3, did you notice where Sosa

13     went as he moved and held his neck?

14     A.    Yes, he walked towards the door.

15           MR. CANTOR:  Towards the door?

16           THE WITNESS:  Towards the door.

17     A.    (Continuing)  But he stand by the wall and that's when

18     he said he couldn't breathe no more and he just dropped on the

19     floor.

20           MR. ROSENFELD:  I'm asking the witness to look at

21     People's Exhibit 3.

22     Q.    You need a moment?

23     A.    Go ahead.

24     Q.    Are you okay?

25     A.    I'm all right.

B mc                        Rodriguez - People - Direct

1    Q.   Using People's Exhibit 3, if you don't mind again, I'm

2  sorry to ask you this, stand up please, with the Court's

3  permission, by the T.V.

4              THE COURT:  Please do so.

5    Q.   Please stand to the side.  Indicate where Sosa was when

6  the defendant attacked him and where he moved to?

7              MR. CANTOR:  Objection to the form of that

8     question, Judge.

9              THE COURT:  If she understands it.

10             MR. CANTOR:  It's two questions embraced in one.

11             THE COURT:  If she understands it, I will allow

12    her to respond.

13             MR. CANTOR:  Can you ask her to keep her voice up,

14    please?

15   A.   He was standing here with David talking behind the

16  sofa.  Sosa fell over the sofa.  He got on top of Sosa to the

17  side, stabbed him.  Sosa got up and from this side he walks all

18  the way around like this, holding on all the way to the side of

19  the wall, that's when he got close to the wall and we tried to

20  help him at the same time, and he was saying that he couldn't

21  breathe.  Right there, that's when he dropped, sit down and just

22  laid on the floor.  He was dead.

23   Q.   Thank you.  You may be seated.

24             MR. ROSENFELD:  May the record indicate, your

25    Honor, as she was talking, she was pointing to the middle of

B mc                          Rodriguez - People - Direct

1      People's Exhibit 3, to the chair in the middle, and then she

2      pointed to the sofa on the left, around the area in the

3      lower middle part where the red is, and then she indicated

4      the wall on the right side of the midline of People's

5      Exhibit 3.

6                    THE COURT:   So indicating.

7      Q.   After the defendant attacked Sosa, did he say anything?

8                    MR. CANTOR:   Who's he?

9      A.   He walked out of the house.

10     Q.   Who --

11                   MR. CANTOR:   Who is he?

12     Q.   I said after the defendant attacked Sosa, did he say

13     anything?

14     A.   He walked out of the house.

15     Q.   So the defendant didn't say anything?

16     A.   No.

17     Q.   And you indicated you were in the chair by the door,

18     correct?

19     A.   Yes.

20     Q.   Was the door open or closed?

21     A.   It was closed.

22     Q.   Who opened the door?

23     A.   He did.

24                   MR. ROSENFELD:   Pointing towards the defendant,

25     your Honor.

B mc                     Rodriguez - People - Direct

1    A.    David.

2              THE COURT:  So indicating.

3    Q.    And did you say anything to him at that moment when he

4    went out the door?

5    A.    I tried to stop him.

6              MR. CANTOR:  I ask that that be stricken as not

7         responsive.  The question was, "Did you say anything to

8         him," and she did not respond appropriately.  It called

9         for --

10              THE COURT:  You may reask the question.

11              MR. CANTOR:  I'm sorry, your Honor?

12              THE COURT:  I accept your objection, he may reask

13         the question.

14              MR. CANTOR:  So it's stricken?

15              THE COURT:  At this moment, yes.

16    Q.    Did you say anything to the defendant as he went out

17    the door?

18    A.    Not to leave, that he killed my friend, you stabbed

19    Sosa.

20              THE COURT:  So you did say something to him?

21              THE WITNESS:  Yes, I was trying to stop him to go

22         walking out the door.

23              THE COURT:  Wait for the next question.

24    Q.    Please tell us what words you said to the defendant as

25    he went out the door?

B mc                          Rodriguez - People - Direct

1    A.    Not to leave, that he just finished stabbing Sosa.

2    Q.    Did he respond to that?

3    A.    No.

4    Q.    What did he do, the defendant?

5    A.    He just walked out the door.

6    Q.    Using People's Exhibit 2 in evidence behind you, please

7    indicate what you did?  You may approach again.

8                   MR. CANTOR:  Judge, you'll ask the witness to keep

9         a loud voice since she's going to the T.V.

10                  MR. ROSENFELD:  This is unnecessary.

11                  THE COURT:  Yes, I must agree with Mr. Rosenfeld.

12                  MR. CANTOR:  Okay.

13                  THE COURT:  You don't have to say it each time.

14                  MR. CANTOR:  Well, I have a client who's about

15        thirty foot distance.

16                  THE COURT:  Your client hasn't asked you to do

17        anything.

18                  MR. CANTOR:  He has told me, Judge -- I'm not

19        going to reveal conversations between myself and my client,

20        but he's telling me he's experiencing difficulty --

21                  MR. ROSENFELD:  Objection to the colloquy.

22                  THE COURT:  Sit down, sir.

23                  MR. CANTOR:  -- in hearing the witness.

24                  THE COURT:  We don't have to tell the witness the

25        same thing a hundred times.

B mc                        Rodriguez - People - Direct

1        MR. CANTOR:  Very well, your Honor.  Then --

2        THE COURT:  And she is keeping her voice to a

3    level that I'm sure everyone in the courtroom can hear.

4        Is there anyone in the courtroom who cannot hear

5    her in the jury box?  No?

6        Okay, let us move -- you heard her, Mr. Delgado?

7        THE DEFENDANT;  I have.

8        THE COURT:  You have, good.  Let's move forward.

9    A.   He came out from this door, out the hallway and I came

10   behind, I tried grab him through his right hand, that's when he

11   pushed me because I had my heels on and I fell on the floor.

12   Melissa then came out.  That's when I saw him going down the

13   stairs and I saw the knife in his hand.

14       MR. ROSENFELD:  Indicating the witness is pointing

15   to the doorway of the apartment on the right, then indicated

16   an area on the floor to the left of the middle of the

17   photo.

18   A.   The door over here to go down the stairs in the

19   hallway, it was that door.

20       MR. ROSENFELD:  And moving her finger down from

21   the middle of the photo to the bottom of the photo.

22       THE COURT:  So indicating, Mr. Rosenfeld.

23       MR. ROSENFELD:  Thank you.

24   Q.   At what point did you notice something in the

25   defendant's hands?

B mc                    Rodriguez - People - Direct

1      A.    When I was on the floor, that he was going down the

2  stairs, when he opened the door, I seen the knife in his hand.

3               MR. ROSENFELD:   Indicating the witness has her

4         right fist clenched.

5      A.    Yes, he had his hands like closed, with the knife in

6  his hand.

7               MR. ROSENFELD:   The witness holding her hand down

8         to her right side, as noted by the jury.

9               THE COURT:   So indicating.

10     Q.    Were you injured at all?

11     A.    No.

12              MR. ROSENFELD: You may sit down.

13     Q.    And when you say you observed something in the

14 defendant's hand at that moment, could you describe exactly what

15 you saw, what part of anything you saw?

16     A.    I saw a knife.

17     Q.    Tell us what part?

18     A.    A handle, a beige handle, and it was curved, it was

19 curved, like this big.

20              MR. ROSENFELD:   Indicating the witness is holding

21        her fingers apart, I'm guessing, approximately three

22        inches.

23     A.    A little bigger than that.  Like that.

24              MR. ROSENFELD:   Three and a half inches,

25        approximately.  Jury can note.

B mc                    Rodriguez - People - Direct

1    A.   And like this wide.

2              MR. ROSENFELD:  Again, holding her fingers apart

3    an inch.

4              THE COURT:  An inch.

5              MR. ROSENFELD:  Approximately, I'm just

6    estimating.

7              THE COURT:  More or less so indicating.

8    Q.   And how far was the defendant from you if you're in the

9    position you were when you fell, and tell us where I should

10   stand?

11   A.   You could say like ten feet.

12   Q.   Tell me where to stand.  You stay there.  Look at me

13   and tell me where to move, so I'll be where the defendant was.

14   A.   A little further back.  More.  Right there.

15             MR. ROSENFELD:  Indicating -- may I, please?

16             THE COURT:  You may.

17             MR. ROSENFELD:  Indicating, your Honor, I'm

18   standing the equivalent with the prosecutor's table away

19   from the witness stand, I guess we could estimate that's

20   about five, ten -- approximately between fifteen and

21   eighteen feet.

22             THE COURT:  It's thirteen feet.

23             MR. ROSENFELD:  Thirteen feet.  Approximately

24   thirteen feet away.

25   Q.   And you said his hand was clenched?

B mc                         Rodriguez - People - Direct

1      A.    Yes.

2      Q.    Where was the handle that you were able to see?

3      A.    He had it in his hand.

4      Q.    You could see through the fist?

5      A.    No, I could see it in the bottom of the knife.

6      Q.    Indicating the blade part?

7      A.    Yes.

8      Q.    Pointing to the bottom?

9            THE COURT:  So indicated.

10     Q.    Did you -- what happened to you?  You said you were on

11  the ground, go ahead?

12     A.    Melissa came out, she asked me if I was hurt.  I said,

13  "No, I'm not hurt."

14            MR. CANTOR:  Who asked her?

15            MR. ROSENFELD:  She just stated Melissa asked her.

16     We don't need this constant interruption.

17            THE COURT:  No, we don't.  Please.

18     A.    I told her I was not hurt.  Tango started -- came out

19  of the apartment and Margie, supposedly to go get him, but Margie

20  never returned back.

21     Q.    When you were on the ground, did anything -- did you

22  have anything on your body, anything happen to your body?

23     A.    No.

24     Q.    Did you have anything on your clothing or your hands at

25  that point?

B mc                    Rodriguez - People - Direct

1      A.    I had some blood on my hands and a little bit on my

2    shirt.   When I tried to grab him through the jacket that he

3    had --

4                    MR. ROSENFELD:   Indicating the witness has grabbed

5          her right arm with her left arm with a grabbing motion.

6      Q.    And you got some blood?

7      A.    And that's when he said, "Get away from me," and pushed

8    me.

9      Q.    Who?

10     A.    David.

11                   MR. ROSENFELD:   Indicating moving her right arm out

12         to the side.

13     Q.    Is that how you got the blood onto you?

14     A.    Yes.

15                   THE COURT:   So indicating.

16     Q.    Where did the blood come from, from who?

17     A.    Sosa.

18     Q.    Okay, but when you were out in the hallway --

19     A.    It was on him.

20                   MR. ROSENFELD:   Indicating the defendant, your

21         Honor.

22                   THE COURT:   What did you say, if I understood you,

23         he answered you when you tried to hold him?

24                   THE WITNESS:   Yes, he said, "Get away from me,"

25         and pushed me.

B mc                        Rodriguez - People - Direct

1    Q.    Now you indicated something about Margie?

2    A.    Yes.

3    Q.    Please tell us what happened, while you were out in the

4    hallway, regarding Margie?

5    A.    Margie was not in the hallway, it was Melissa that come

6    out to the hallway.  When we went back in the apartment, Margie

7    was coming out of the apartment and that's when I told her, "You

8    need to go get your man."

9                 MR. CANTOR:  Objection, your Honor, to what she

10        told Margie.

11                THE COURT:  Overruled.

12                MR. CANTOR:  We've had it.

13                THE COURT:  Overruled.

14   A.    (Continuing)   That she needed to go get her man because

15   he just finished killing my friend Sosa in Carmen's house.

16   Q.    I thought you finished.  Go ahead?

17   A.    She said she was going to come back, but she did not

18   come back, cops came.

19                MR. CANTOR:  Judge, that should be stricken

20        because that's outside the purview of the question what did

21        she say to Margie.

22                THE COURT:  Mr. Rosenfeld, will you clarify that.

23                MR. CANTOR:  Can you strike that last portion?

24                THE COURT:  If the clarification is not

25        satisfactory for the Court, I will strike it.

B mc                          Rodriguez - People - Direct

1    Q.   Okay, Miss Rodriguez, just indicate to us the words

2 that you said to Margie at the moment that she --

3    A.   That I went back in the apartment, I told her you need

4 to go get your man because he just finished killing Sosa in

5 Carmen's house.

6    Q.   Okay.

7    A.   She said she was going to come back and she never came

8 back.

9              MR. CANTOR:  Judge, what Margie said is hearsay.

10             THE COURT: Overruled.

11   Q.   She responded to you?

12   A.   Yes.

13   Q.   Did she stay in the apartment or did she leave the

14 apartment?

15   A.   She left the apartment supposedly to go get him, but

16 she never came back.

17             MR. CANTOR:  I ask that last part of the answer be

18        stricken.  "Did she say anything," and now she's giving you

19        the benefit of her subjective thoughts where Margie --

20             MR. ROSENFELD:  I'll agree, that last part should

21        be stricken.

22             THE COURT:  Will you withdraw it?

23             MR. ROSENFELD:  I'll withdraw the last part of the

24        answer.

25             THE COURT:  Yes.

B mc                    Rodriguez - People - Direct

1           MR. ROSENFELD:  I agree.

2           THE COURT: Only so much of it?

3           MR. ROSENFELD:  Yes.

4           MR. CANTOR:  Will you strike that?

5           THE COURT:  That much of it as objectionable is

6     stricken.

7           MR. CANTOR:  And the jury should disregard?

8           THE COURT:  For the moment, yes.

9     Q.    Did Margie leave?

10    A.    Yes.

11    Q.    What did you do when Margie left the apartment?

12    A.    I stood in the apartment with Carmen and everybody else

13    that was in the apartment, Melissa, Tango, the kids, everybody

14    that was in there, waiting for the cops to get there and for her

15    to come back with David, but she never came back.

16    Q.    When you were in the apartment, where was Sosa?

17    A.    In the floor, laying down, laid out dead.

18    Q.    Well, so you noticed what his condition was?

19    A.    Yes.

20    Q.    Was he responsive at any moment?

21    A.    Excuse me?

22    Q.    Was he responsive, did he appear alert or do anything?

23    A.    He was just saying he couldn't breathe when he got

24    stabbed.

25          MR. CANTOR:  What?

B mc                    Rodriguez - People - Direct

1           THE WITNESS:  When he got stabbed.

2      Q.   I'm talking about now, when you're back inside the

3  apartment awaiting for the police?

4      A.   No, Sosa was already dead.

5      Q.   How could you tell?

6      A.   We all could tell, he was on the floor.  He --

7           MR. CANTOR:  Judge, "We all could tell," is

8  objectionable.

9           MR. ROSENFELD:  I'll withdraw.

10          MR. CANTOR:  I'll ask it be stricken.

11     A.   I was able to tell.

12          MR. ROSENFELD:  I'll withdraw it.

13          MR. CANTOR:  It's been withdrawn, yet the witness

14  has uttered it.

15          THE COURT:  There's nothing to strike, it's been

16  withdrawn.

17          MR. CANTOR:  Judge, he's withdrawn the question.

18          THE COURT:  No colloquy.  Your objection is noted,

19  your exception is noted.  That's all the Court can do for

20  you.

21          MR. CANTOR:  What are you going to do with the

22  answer that she made, will you strike that?

23          THE COURT:  I already said it's been withdrawn,

24  there's nothing to strike.

25          MR. CANTOR:  The question is withdrawn, but not

B mc                    Rodriguez - People - Direct

1      the answer, it stands.

2                      MR. ROSENFELD:  I object to this continued

3      colloquy.

4                      MR. CANTOR:  I'm sorry, your Honor?

5                      THE COURT:  The question has been withdrawn.

6                      MR. CANTOR:  And what about the answer?

7                      THE COURT:  Therefore the question no longer

8      exists, therefore it is not objectionable.

9                      Now, please continue.

10                     MR. CANTOR:  The partial answer though?

11     Q.    Indicate, Miss Rodriguez, what you observed about Sosa

12     when you were in the apartment awaiting for the police?

13     A.    He was dead on the floor, he wasn't answering, nothing,

14     nothing, moving, nothing, he wasn't doing nothing, he just laid

15     out.

16     Q.    Did there come a time that the police arrived?

17     A.    Yes.

18     Q.    Before the police arrived, did you attempt to contact

19     anybody?

20     A.    Yes, I tried to call Margie to come back in the

21     apartment.

22     Q.    Did you ever call the police?

23     A.    Yes.

24     Q.    That's the 911 operator?

25     A.    Yes.

B mc                     Rodriguez - People - Direct

1    Q.   And prior to coming to court to testify, have you had

2    the opportunity to come to my office and review the case?

3    A.   Yes.

4    Q.   Have you had an opportunity to look at the photographs

5    that we just saw in the court?

6    A.   Yes.

7    Q.   Did you have an opportunity to listen to a copy of your

8    911 call that you made to the police back on December 25, 2009?

9    A.   Yes.

10   Q.   Did you listen to it in its entirety?

11   A.   Yes.

12   Q.   And was that a true and accurate copy of your

13   conversation with the 911 operator back on December 25, 2009?

14   A.   It was true.

15              MR. ROSENFELD: Your Honor, I ask that the disk

16         that is already in the computer be deemed People's Exhibit

17         11.

18              THE COURT:  So deemed for identification.

19              (Whereupon, the item referred to is deemed

20         People's Exhibit Number 11 for identification.)

21              MR. CANTOR:  Let it come in, Judge.

22              MR. ROSENFELD:  And for evidence.

23              MR. CANTOR:  I have no objection to it being

24         offered and received in evidence.

25              THE COURT:  But it has not been offered yet.

B mc                          Rodriguez - People - Direct

 1                    MR. CANTOR:  I'm sorry?

 2                    THE COURT:  He has not offered it yet.

 3                    MR. ROSENFELD:  I'm offering it in evidence.

 4                    THE COURT:  Now you're offering it?

 5                    MR. ROSENFELD:  Yes.

 6                    MR. CANTOR:  All right, so obviously, no

 7           objection.

 8                    THE COURT:  There being no objection, what

 9           previously was deemed People's 1 for identification --

10                    MR. ROSENFELD:  11.

11                    THE COURT:  11, did you say?

12                    MR. ROSENFELD:  11.

13                    THE COURT:  11 for identification, is now deemed

14           as having been proffered into and is received in evidence as

15           People's Number 11.

16                    (Whereupon, the item previously deemed marked for

17           identification is received and deemed marked People's

18           Exhibit Number 11 in evidence.)

19                    MR. ROSENFELD:  I'll ask that People's Exhibit 11

20           be played for the jury.

21                    MR. CANTOR:  No objection.

22                    (Audiotape played in open court.)

23                    CONTINUED NEXT PAGE.............

24

25

1          MR. ROSENFELD:  May the record indicate People's

2     11 has been played for the jury.  I do note that it's a CD,

3     and it's final number 655, specifically.  That's in

4     evidence.

5          THE COURT:  All right, sir.

6          MR. ROSENFELD:  Thank you.

7     Q.   Ms. Rodriguez, you just heard the entire conversation.

8     A.   Yes.

9     Q.   Towards the end of the conversation, the operator asked

10    you, do you know who stabbed him.  Do you recall that?

11    A.   Yes.

12    Q.   And do you recall what your answer was?

13    A.   I told them, no.

14    Q.   And why did you tell them that?

15    A.   Because I didn't remember his name.

16         MR. CANTOR:  I'm going to object, and the witness

17    should not answer until you rule.

18         THE COURT:  That's correct.

19         MR. CANTOR:  So, can you tell the witness that?

20         THE COURT:  That's sustained.

21         MR. CANTOR:  And can you strike what she said?

22         THE COURT:  Whatever she did say, the jury may

23    disregard.

24    Q.   Did you know what the defendant's name was at that

25    point?

1       MR. CANTOR:  At what point?

2    A.   I didn't remember.

3       MR. CANTOR:  Judge, I arise to make an objection,

4    and she speaks as if I'm not here.

5       THE COURT:  There is no need to go on and on.  All

6    you have to do is say objection.

7       MR. CANTOR:  Objection.

8       THE COURT:  All right.  The objection is

9    overruled.

10   Q.   You can answer.

11   A.   What was the question again?

12   Q.   Did you know the defendant's name at that point?

13   A.   I didn't remember his name at that point.

14   Q.   Just yes or no.  That was your voice on the tape,

15   right?

16   A.   Yes.

17   Q.   Okay.  Thank you.  Did there come a time the police

18   arrived?

19   A.   Yes.

20   Q.   And when the police arrived in the apartment, did you

21   speak with them?

22   A.   Yes, I did.

23   Q.   Now, when the defendant was in the apartment, do you

24   recall what he was wearing, any of his clothing?

25   A.   He had jeans on, white T-shirt and a blue dark jacket.

1    Q.   And when the police came to the apartment, do you

2    recall when you spoke to them, did you give them a description

3    of the defendant?

4    A.   Yes.  Yes, I did.

5    Q.   What, if anything, did you tell them?

6                   MR. CANTOR:  Objection.

7    A.   Same thing --

8                   THE COURT:  Do you have an objection?

9                   MR. CANTOR:  You see.  Yes.

10                  THE COURT:  That's all you have to say.

11                  MR. CANTOR:  But she keeps on saying, after I've

12       made it.

13                  MR. ROSENFELD:  Your Honor, I object to badgering

14       the witness.

15                  THE COURT:  The objection is overruled.

16                  Ma'am, please wait, whenever anyone says

17       objection, for me to make a ruling.  I've asked you before.

18                  THE WITNESS:  Okay.

19   Q.   You can answer now.

20   A.   Repeat the question.

21   Q.   Sure.  What, if anything, did you tell the police

22   regarding the description of the defendant?

23   A.   I told them he had white T-shirt, blue jeans and a blue

24   jacket.

25   Q.   Now, did you remain in the apartment at that point?

1   A.   I went with the officers to Margie's house to go get

2   her.

3   Q.   Had you been to Margie's house before?

4   A.   No, but I knew where she lived.

5   Q.   So, who left the apartment and went with you?

6   A.   The police officer.

7   Q.   How many?

8   A.   Like three of them.

9   Q.   Tell us what happened.

10  A.   We went in there, they knocked on Margie's door.  They

11  walked inside the apartment.  They searched for David.  He was

12  not in the apartment.  They told Margie that she needed to come

13  back to the apartment where the accident had happened.

14  Q.   And what happened after that?

15  A.   She came upstairs.

16  Q.   She came back to 2033 McGraw, Apartment 3D?

17  A.   Yes.

18  Q.   Thank you.  Did you notice anything particular about

19  Margie when you saw her at her apartment?

20  A.   She had changed clothes.

21  Q.   Did you see the defendant at all around Margie's

22  apartment?

23  A.   No.

24  Q.   So, what happened when you arrived back at the scene,

25  Carmen's apartment?

1      A.    I was in the apartment, in the -- they had us all in

2   the room.

3                    MR. CANTOR:   What?

4      A.    They had us all in the room.  They had us all in the

5   room.  Margie walked in the room.  The officer asked what was

6   his name.  She said she didn't remember his name or she didn't

7   know him.  That's when I had -- I got up from --

8                    MR. CANTOR:   Judge, she's answered the question.

9      Q.    Did you have further discussions with the police?

10     A.    Yes.  Not with the police, with Margie inside the room.

11     Q.    Okay.  And did there come a time later that day that

12  you spoke with detectives regarding the incident?

13     A.    Yes.

14     Q.    Did there come a time on December 26, 2009 that you

15  were contacted by the detectives again?

16     A.    Yes.

17     Q.    And on December 26th of 2009, did there come a time

18  that you went to view a line-up?

19     A.    Yes.

20     Q.    And who did you go with?

21     A.    It was all of us that was in the van.

22     Q.    Were you with a police officer or a detective?

23     A.    Yes.  Yes.

24     Q.    And where did they take you?

25     A.    Hunts Point, the courthouse.  Somewhere on Hunts Point.

1    I don't really remember.

2         Q.   You don't know what type of building it was?

3         A.   No.

4         Q.   Okay.  When you were in that building, did there come a

5    time that you went to view a line-up?

6         A.   Yes.

7         Q.   And who were you with when you went into the room to

8    view the line-up?

9         A.   A detective.

10        Q.   And did you, in fact, view a line-up on December 26th,

11   of 2009, some time after 7:00 in the evening?

12        A.   Yes.

13        Q.   And when you viewed that line-up, did you recognize

14   anybody?

15        A.   Yes.

16        Q.   Who did you recognize?

17        A.   David.

18             MR. ROSENFELD:  Indicating the witness is pointing

19        with her left hand towards the defendant.

20             THE COURT:  So indicating.

21        Q.   Did you say anything to the detective when you viewed

22   that line-up?

23             MR. CANTOR:  Objection.

24             THE COURT:  Overruled.

25        A.   Yes, I did.

1     Q.   What did you say?

2     A.   He killed my friend.

3     Q.   Did you indicate any position?

4          THE COURT:  Indicating --

5     Q.   Of the defendant?

6     A.   Position?

7     Q.   Position in the line-up?

8     A.   Number three.

9     Q.   Did you tell that to the detective?

10    A.   Yes.

11         MR. ROSENFELD:  One moment, your Honor.

12         THE COURT:  Yes, Mr. Rosenfeld.

13         MR. ROSENFELD:  I have no further questions.

14         THE COURT:  Nothing further, Mr. Rosenfeld?  Thank

15    you, Mr. Rosenfeld.

16         Mr. Cantor.

17         MR. CANTOR:  Can I have this marked as Defendant's

18    Exhibit A.

19         THE COURT:  Yes, we'll pre-mark it for you.

20         MR. CANTOR:  It's a complaint report.

21         MR. ROSENFELD:  Your Honor, I'm going to object.

22    This is not in evidence.

23         MR. CANTOR:  But it is for the record, just as he

24    does.

25         MR. ROSENFELD:  No, that's not correct, your

1   Honor.

2                    MR. CANTOR:  Judge --

3                    THE COURT:  Look, why does this have to become a

4   major confrontation.

5                    Do you want to have it marked?

6                    MR. CANTOR:  Yes, please.

7                    THE COURT:  We'll pre-mark it for you.  It's

8   Defense A.

9                    MR. CANTOR:  Thank you.

10                   THE COURT:  Nothing more has to be said.

11                   MR. CANTOR:  Okay.  Can the court reporter do

12  that, Defense A for identification.

13                   THE COURT:  That is correct.

14                   MR. ROSENFELD:  May I see what's Defense A that's

15  been marked?

16                   MR. CANTOR:  He has it.  He has the original.

17                   MR. ROSENFELD:  I don't know what he's showing.

18                   MR. CANTOR:  He gave it to me.  He crossed out

19  portions of it.

20                   MR. ROSENFELD:  Your Honor, I object to this.

21  It's not in evidence.  He's showing it to the jury.

22                   MR. CANTOR:  Why is he --

23                   MR. ROSENFELD:  May we approach, your Honor?

24                   THE COURT:  One thing at a time.  You may

25  approach, but one thing.  Number one, we will not mark it

KJ/c                          ~ *Proceedings* ~

1    now, because it has caused an outburst.  Please take your

2    seat with your client.  Remove the seat from here, so it's

3    not in the way of anyone and no accidents can occur.

4    That's number one.

5                    MR. CANTOR:  (Complies.)

6                    Now, number two, would you like to approach, you

7    said?

8                    MR. ROSENFELD:  Yes.

9                    THE COURT:  Please come forward, Mr. Cantor.

10                   Madam district attorney.

11                   MR. CANTOR:  And may we have the reporter?

12                   THE COURT:  Would you be good enough, ma'am, to

13   stand down.

14                   (Whereupon, the witness exits the witness stand.)

15                   MR. CANTOR:  May we have the reporter, your Honor.

16                   THE COURT:  Not at this point.  Come forward.

17                   (Whereupon, an off-the-record discussion was held

18   at the bench.)

19                   THE COURT:  Ma'am.

20                   MR. CANTOR:  May I continue, your Honor?

21                   THE COURT:  Please.  Let me bring the young lady

22   back.

23                   (Whereupon, the witness returns to the witness

24   stand.)

25                   MR. CANTOR:  All right.  May I have this marked

1              for identification as Defendant's A?

2                        THE COURT:  You may.

3                        MR. CANTOR:  Thank you.

4                        THE COURT:  Give it to the officer.

5                        MR. CANTOR:  I just did that.

6                        THE COURT:  Very good.

7                        (Whereupon, the item referred to is marked

8          Defendant's A for Identification.)

9                        COURT OFFICER:  Defendant's A for identification

10        so marked.

11                       MR. CANTOR:  May I have it back.  Let

12        Mr. Rosenfeld see it.

13                       MR. ROSENFELD:  I've seen it.

14   CROSS-EXAMINATION

15   BY MR. CANTOR:

16        Q.   Now, you told this jury on direct examination that,

17   during the party -- well, there came a time after the party was

18   over and David had left the premises that police arrived,

19   correct?

20        A.   Yes.

21        Q.   And you spoke to the police?

22        A.   Yes.

23        Q.   And, obviously, your memory was much better maybe a

24   half hour after this incident, when you spoke to the police or

25   an hour later than it is today, some 30 months later, correct?

1    A.   I don't think so, no.

2    Q.   You think your memory is the same?

3    A.   Yes.

4    Q.   As it was 30 minutes after the incident?

5    A.   Yes.

6    Q.   As compared to today, 30 months after the incident?

7    A.   Yes.

8    Q.   So, your memory has remained constant; is that correct?

9    A.   Yeah.

10   Q.   Okay.  Is it not a fact that when Margie -- and you are

11   a friend of Margie's, right?

12   A.   Yes.

13   Q.   When Margie came with David, Margie introduced the male

14   as David, her boyfriend, correct, who she had met at a

15   laundromat about two months ago?

16   A.   Yes.

17   Q.   And you told Detective Jeffrey Francan, F-R-A-N-C-A-N

18   -- well, I'll withdraw that question.  I want you to take a look

19   and read to yourself, there is a sentence that begins with the

20   word "the" and ends with the word "drinking," which I have put

21   in brackets.  You know what a bracket is, right?

22   A.   No.

23            MR. ROSENFELD:  Your Honor, I'm going to object to

24        this question.  There has been no question before

25        presenting the --

1     MR. CANTOR:  This is the document.

2     MR. ROSENFELD:  Again, he's showing the document

3     to the jury.  It's not in evidence.

4     THE COURT:  Please, all you have to do is say

5     objection.

6     MR. ROSENFELD:  Objection.

7     THE COURT:  All right.  The objection is

8     sustained.

9     Q.  All right.

10    THE COURT:  Let us have a foundation for the

11    question.

12    Q.  Do you know what a bracket is?

13    A.  Now I do.

14    Q.  Now you do.  Okay.  So, I want you to take a look at

15    the sentence that's in the brackets that begins with the word

16    "the" and ends with the word "drinking."

17    MR. ROSENFELD:  Objection, your Honor.

18    THE COURT:  The objection is sustained.

19    MR. CANTOR:  Well, I have to lay a foundation for

20    the --

21    THE COURT:  Yes, of course.  And the foundation is

22    separate and apart from the document you're using.

23    Q.  Did you not tell the police, and I'm referring to

24    Detective Jeffrey Francan, within hours after this incident that

25    the male who had been introduced to you was David and was

1    drinking and he had at least one plate of food?

2        A.   Yes.

3        Q.   And that was the truth?

4        A.   Yes.

5        Q.   And you told the police that at some point you saw

6    David and a person that everyone knows as Sosa arguing, correct?

7        A.   No.

8        Q.   Okay.  I'm going to put a second bracket.  And the

9    court officer is going to show you the words that begin with the

10   word "Maria" and ends with the word "arguing."

11               MR. ROSENFELD:  I'm going to object to defense

12          counsel reading from the document not in evidence.

13               MR. CANTOR:  I'm trying to refresh to herself,

14          obviously.

15               THE COURT:  All right.

16       Q.   Read that to yourself.  The court officer will show you

17   the material within the bracket.

18       A.   Okay.  (Complies.)  It stops there?  Yes.

19       Q.   Can he have it back?

20       A.   Sure.

21       Q.   You told the police officer that David, that you

22   observed David and a person everyone knows as Sosa arguing,

23   correct?

24       A.   They were talking.

25       Q.   Did you tell the police arguing, ma'am?

1    A.    No, he never said arguing.

2    Q.    You never?

3    A.    No.

4    Q.    But you see it in the paper, don't you?

5    A.    Yes.

6    Q.    So, you're saying the police made a mistake when they

7    wrote arguing, when they were interviewing you, rather than

8    writing the word talking?

9    A.    Yes.

10   Q.    This was a very serious case, correct?

11   A.    Yes.

12              MR. ROSENFELD:  Objection.

13              THE COURT:  Subject to --

14   Q.    And you are taking it very seriously?

15   A.    I still do.

16   Q.    And you were doing your human best to answer the

17   detective's questions accurately and truthfully, correct?

18   A.    Yes.

19   Q.    And although you've admitted that the detective's

20   complaint form says that Maria --

21              MR. ROSENFELD:  Objection, your Honor.  This is

22         not in evidence.  Again, he's reading from it and it's not

23         in evidence.

24              MR. CANTOR:  I'm not reading from anything.

25              MR. ROSENFELD:  Objection.

1                   THE COURT:  Overruled.

2        Q.   That you observed David and Sosa arguing, that's what

3   you told us?

4        A.   I never said that they were arguing.

5        Q.   Ma'am, I haven't finished my question.  The police

6   wrote that down, did they not?

7        A.   You showed me they did.

8        Q.   Was there any reason that you can offer this jury why

9   the police officer would lie?

10                  MR. ROSENFELD:  Objection.

11                  THE COURT:  Sustained.

12       A.   No.

13                  THE COURT:  Ma'am, ma'am, you must wait for the

14          Court to rule.

15                  THE WITNESS:  Oh, I'm sorry.

16                  THE COURT:  The objection is sustained.

17                  One second.  I'm explaining something to the

18          witness.

19                  The objection is sustained.  That means you don't

20          have to answer.  So, don't jump ahead, please.

21                  THE WITNESS:  All right.

22       Q.   You said to the police officer, did you not, at some

23   point you observed, meaning saw, David and a person that

24   everyone knows as Sosa arguing.  Did you not tell that to the

25   detective who interviewed you a half hour, an hour, hour and a

 1   half after the incident, yes or no?

 2                   MR. ROSENFELD:  Objection.  Asked and answered.

 3        A.   No.

 4                   THE COURT:  Cross-examination.  The answer is no.

 5        Q.   Did you have any reason -- when you were answering the

 6   police officer's questions, he was listening to you -- he

 7   appeared to be listening to you, correct, the police officer?

 8        A.   Yes.

 9        Q.   And he was asking you questions?

10        A.   Yes.

11        Q.   The police officer?

12        A.   Yes.

13        Q.   And you were making answers?  You were giving him

14   answers?

15        A.   Yes.

16        Q.   Truthful answers, correct?

17        A.   Yes.

18        Q.   And this was very, very, very fresh in your mind since

19   it had occurred a matter of hours before, correct?

20        A.   Yes.

21        Q.   This was a horrific, memorable event that you had

22   witnessed, correct?

23        A.   Yes.

24        Q.   And you understood each and every question that was

25   asked of you by the detective, correct?

1      A.   Yes.

2      Q.   And you did your honest best to answer him accurately

3   and truthfully, correct?

4      A.   Yes.

5      Q.   And so, although you admitted that the police report

6   says that you observed Sosa and David arguing, it is your

7   position that you never told that to the police officer?

8      A.   Never.   Never said they were arguing.

9           MR. ROSENFELD:   Objection.

10           THE COURT:   Overruled.

11      Q.   You said they were merely talking?

12      A.   Yes.

13      Q.   Can you account for any reason why the police report

14   says arguing?

15      A.   No.

16           MR. ROSENFELD:   Objection.

17           THE COURT:   One second, ma'am.   You must wait.

18           THE WITNESS:   I'm sorry.

19           THE COURT:   Try to remember, please.

20           THE WITNESS:   Okay.

21           THE COURT:   All right.   The objection is

22       sustained.

23           You don't have to answer.

24           MR. CANTOR:   Judge, this is cross-examination.

25           THE WITNESS:   Okay.

1      THE COURT:  I understand it's cross-examination.

2    Q.   Can you offer any reason or notion as to why the police

3   document, which admittedly you say arguing -- would say arguing,

4   when all you said were David and Sosa were talking not arguing?

5      MR. ROSENFELD:  Objection.

6      THE COURT:  Sustained.

7    Q.   Very well.  I want you to read the entirety of

8   Defendant's A, where it says "Summary of Investigation."  And

9   the court officer -- read it to yourself.  And the court officer

10  will show you.

11      MR. ROSENFELD:  Objection.  There is no question

12     being posed.

13      MR. CANTOR:  Of course.  She has to read the

14     prefatory for the question.

15      MR. ROSENFELD:  Objection.

16      THE COURT:  It will only be used to perhaps

17     rehabilitate her.  The objection is sustained.

18      MR. CANTOR:  How can I ask the question?

19      MR. ROSENFELD:  Objection to the colloquy.

20      THE COURT:  She may know it from her own mind.

21      MR. CANTOR:  Okay, but I'm asking her to read the

22     entire portion.

23      MR. ROSENFELD:  Objection to the colloquy.

24      THE COURT:  The objection has been sustained.

25    Q.   Okay.  To your knowledge, were the police officers

1   taking down -- were they taking this case seriously?

2                    MR. ROSENFELD:  Objection.

3                    THE COURT:  Sustained.

4        Q.   To your knowledge, were the police officers writing

5   down as you were asked questions and made answers?  They were

6   writing, were they not?

7        A.   Yes.

8        Q.   Okay.  Now, see what is written by the police under

9   "Summary of Investigation," read that to yourself.

10                    MR. CANTOR:  And it's prefatory to my next

11             question.  She has to read it.

12                    MR. ROSENFELD:  Objection, your Honor, to the

13             referral to the document.  This not in evidence.

14                    MR. CANTOR:  Of course not, that's why she is

15             reading it to herself.  That's why it's to herself.

16                    THE COURT:  The objection is sustained.

17                    MR. CANTOR:  How can I proceed with the next

18             question?

19                    THE COURT:  Ask it.  Simply ask it.

20                    MR. ROSENFELD:  Objection to the colloquy.

21        Q.   Okay.  Have you read the content of the "Summary of

22   Investigation" on Defense Exhibit A?

23                    MR. ROSENFELD:  Objection.

24        A.   No.

25                    THE COURT:  I'll allow it.

1    Q.   You haven't read it?

2    A.   No.

3              MR. CANTOR:  Holding it up.

4              MR. ROSENFELD:  Indicating a document.

5              MR. CANTOR:  Holding up to your Honor.  Impossible

6        for the jury to read it.

7              THE COURT:  The answer is no.

8    Q.   You didn't read it?

9    A.   No, I did not.

10   Q.   So, now I'm asking you, read it to yourself so no one

11       else knows what's on it, but you.  Please.

12             MR. ROSENFELD:  Objection.  Defense counsel

13       badgering witness, also.  This is improper.

14             THE COURT:  Sustained.

15             MR. CANTOR:  It is totally proper.

16             THE COURT:  Sustained.

17             MR. CANTOR:  How can I get to the basis?

18             THE COURT:  Just ask your question.  If the answer

19       is not to your liking, then you will share something with

20       her to see if she changes her answer.

21   Q.   Okay.  The police wrote that you told them that you saw

22       David and Sosa arguing.  You admitted that?

23             MR. ROSENFELD:  Objection.

24   A.   I didn't see no arguing.

25             THE COURT:  The objection is sustained.

1          MR. CANTOR:  Well, how can I get her to change --

2    to rehabilitate her?

3          MR. ROSENFELD:  Objection to the qualifying.  It's

4    improper.

5          MR. CANTOR:  He stands up and speaks --

6          THE COURT:  You're a seasoned practitioner.  You

7    know how you should do it.

8    Q.    You've admitted in this police report, it says arguing.

9          MR. ROSENFELD:  Objection to what the document

10   says.  He is referring to a document not in evidence.

11         THE COURT:  She did say it's wrong, yes.

12   Q.    And you're saying it's wrong, correct?

13   A.    Yes.

14   Q.    Okay.  Now, I want you to read the rest of it to

15   yourself, because I'm going to ask you, is the rest of it

16   correct?

17         MR. ROSENFELD:  Objection.

18         MR. CANTOR:  You see, that's a legitimate

19   question.

20         THE COURT:  The objection is sustained.

21   Q.    Can you read this to yourself, because I'd like to ask

22   you whether or not the balance of the "Summary of

23   Investigation," the interview with the potential witness is

24   correct.  I'm entitled to do that.

25         MR. ROSENFELD:  Objection.

1          THE COURT:  If you wish to pose a question to the

2     witness, please do so.

3          MR. CANTOR:  Okay.

4          THE COURT:  If the question is not to your liking

5     and you wish to have her re-examine her conscience, her

6     recollection, perhaps that document will help you.

7          MR. CANTOR:  Okay.

8          THE COURT:  But, at this point --

9          MR. CANTOR:  I'm not offering it in evidence.

10          THE COURT:  At this point, there has been no

11     question to the witness.

12     Q.   Ma'am, you said that the police made a mistake, an

13     error in putting down argument, correct?

14     A.   Yes.

15     Q.   Now, I want to see if there were any other mistakes in

16     the police report, which reflects their interview with you.

17     That I'm entitled to do.

18          MR. ROSENFELD:  Objection.

19          THE COURT:  The objection is sustained.

20          MR. CANTOR:  Okay.

21     Q.   Can you read this to yourself.

22          MR. CANTOR:  Then I'll ask her whether she notes

23     any other mistakes.

24          MR. ROSENFELD:  Objection.

25          MR. CANTOR:  Why is that not allowed?

1              THE COURT:  Because it's putting the cart before

2         the horse.

3              MR. CANTOR:  I can't hear the witness --

4         Q.   Okay.  You're saying the police made a mistake.  I want

5    to know now, after you read this document now, if they made any

6    other mistakes.  It goes to the integrity of the police

7    investigation.

8              MR. ROSENFELD:  Objection.

9              THE COURT:  Sustained.

10              MR. CANTOR:  It goes to prior inconsistent

11         statements.

12              MR. ROSENFELD:  Objection to the colloquy.

13              THE COURT:  Now, you may have something.  But

14         first you have to get her to make the statement.

15         Q.   Did you, on 12/26/09, tell Detective Jeffrey Francan

16    that you observed David and a person everyone knows as Sosa

17    arguing?  Did you tell that to the detective?

18         A.   No.

19              MR. ROSENFELD:  Objection.

20              THE COURT:  Because we have gone over this, and

21         she has admitted what she admitted, and that's it now.

22         Let's move on.

23              MR. CANTOR:  Now, I want to contradict her by

24         using a document.  She's denied it by way of her prior

25         inconsistent statement.

1      MR. ROSENFELD:  Objection to colloquy.

2      THE COURT:  Yes.

3      MR. CANTOR:  Judge, can she look at the document?

4   It's inconsistent with what she is saying, so I want to be

5   able to cross-examine her.

6      MR. ROSENFELD:  Judge, this is improper colloquy.

7      THE COURT:  Absolutely.

8      MR. CANTOR:  I want to cross-examine her on the

9   prior inconsistent statement.

10      MR. ROSENFELD:  Objection.

11      THE COURT:  What is the inconsistent statement?

12      MR. CANTOR:  The document says --

13      THE COURT:  I don't want you to read it.

14      MR. CANTOR:  I'm not reading it.  The document

15   says she saw Sosa and the defendant arguing.

16      MR. ROSENFELD:  Objection.

17      THE COURT:  She has already controverted what was

18   in the report saying there was an error, right?

19      MR. CANTOR:  Correct.

20      THE COURT:  Okay.

21      MR. CANTOR:  Now, what I want her --

22      THE COURT:  Now --

23      MR. CANTOR:  What I want her to do, you see --

24      THE COURT:  No, no, no.  Now, you may ask her

25   another question.  And if it's not to your liking, you may

1      want to use that document in some fashion.

2              MR. CANTOR:  Okay.  Okay.

3      Q.   You already told Mr. Rosenfeld on direct examination

4      that David wasn't drinking, correct?  Do you remember telling

5      him, yes or no?  The question is yes or no.  Did you tell

6      Mr. Rosenfeld on direct examination?

7      A.   Yes.

8      Q.   Okay.  Now, in the statement that you made to the

9      detective, you told the detective that David was drinking,

10     correct?

11     A.   Yes.

12     Q.   Okay.  Now, you're telling us here at trial, that you

13     never observed Sosa and David arguing, correct?

14     A.   Never argued.

15     Q.   Okay.  Now, if you read this document to yourself, and

16     I'm asking you to do that, see if there is another error by way

17     of what you're presently saying as contrasted to the document?

18              MR. ROSENFELD:  Objection.  Two things.  He's

19          showing it to the jury again.

20              MR. CANTOR:  I'm not showing it to the jury.  I'm

21          furious.

22              THE COURT:  First of all, the jury cannot see what

23          it is.

24              MR. CANTOR:  Thank you, Judge.

25              THE COURT:  Secondly, you may pose to her a

1   question.  If you don't like the answer, you may otherwise

2   see and ask her is there anything that will refresh your

3   recollection.  And she may say yes or she may say no.

4   We'll have to see as we move along.

5        MR. CANTOR:  Okay.

6        THE COURT:  So, let us, as the Court already

7   characterized it, it's putting the cart before the horse.

8   You've been practicing too long to not know the right

9   procedure.

10       MR. CANTOR:  I thought I had been employing the

11  right procedure your Honor's way, as we do everything in

12  this courtroom.

13  Q.   Here we go.  You presently now, June 29, 2012, say you

14  never told the police that you saw Sosa and the defendant

15  arguing the night of the party, correct?

16  A.   Yes.

17       MR. ROSENFELD:  Objection.  Asked and answered

18  four times.

19       THE COURT:  It has been.

20       MR. CANTOR:  But I have to lay the foundation, as

21  you've just told me.

22       THE COURT:  Go ahead.  Let me hear.

23  Q.   The answer is yes, correct?

24  A.   Yes.

25  Q.   Correct?

1      A.   Yes.

2                THE COURT:  Yes, they were or yes, they weren't

3      arguing?

4                THE WITNESS:  They were not arguing.

5      Q.   And you never told the police they were arguing,

6      correct?

7      A.   I never did.

8      Q.   I'm sorry?

9      A.   I never did.

10     Q.   Now, see if this refreshes your recollection by reading

11     it as to whether or not you told the police that you saw Sosa

12     and the defendant arguing.

13               MR. ROSENFELD:  Objection.  She never indicated

14     she needed her memory refreshed.

15               THE COURT:  Ask her the question.

16     Q.   Is there anything here that would refresh your

17     recollection that indeed you told the police a mere hour or so

18     after the incident that David and Sosa were arguing?

19               MR. ROSENFELD:  Objection.

20     A.   I never told the police they were arguing.

21     Q.   Ma'am, is there anything that would refresh your

22     recollection on that point?

23               MR. ROSENFELD:  Objection.

24               THE COURT:  Yes, the objection is sustained.

25               MR. CANTOR:  How can I -- I've done it your way.

1                    MR. ROSENFELD:  Objection to the colloquy.

2          Q.   Ma'am, you're telling us you never told the police

3     that, right?

4                    MR. ROSENFELD:  Objection.  Asked and answered.

5          A.   Yes.

6                    THE COURT:  I will allow it.

7          Q.   The police, according to you, didn't have any knowledge

8     to falsify or write down anything you weren't telling them?

9                    MR. ROSENFELD:  Objection.

10                    THE COURT:  Just ask the question.

11          Q.   Did the police -- could you discern, see any motive on

12     behalf of the police to write something incorrectly or

13     mistakenly?  That's a perfect question.

14                    MR. ROSENFELD:  Objection as to police motive.

15          Objection.

16                    THE COURT:  Please approach.

17          Q.   Did you --

18                    THE COURT:  Please approach.

19                    Please stand down.

20                    (Whereupon, the witness exits the witness stand.)

21                    (Whereupon, an off-the-record discussion was held

22          at the bench.)

23                    (Whereupon, the witness returns to the witness

24          stand.)

25          Q.   Do you remember exactly what you told the detective

1    when he interviewed you, yes or no?

2        A.   If I remember exactly what I told the detective when

3    they interviewed me?

4        Q.   When he was interviewing you, yes or no?

5        A.   Not everything.

6        Q.   Not everything?

7        A.   No.

8        Q.   Take a look at what's been marked as Defendant's A for

9    identification.  Now, the officer will tell you what to read to

10   yourself.

11              MR. ROSENFELD:  Objection.

12              THE COURT:  Sustained.

13              MR. CANTOR:  Judge, she says she doesn't recall.

14       I'm trying to refresh her recollection.

15              THE COURT:  The question would be, is there

16       anything, ma'am, that could refresh your recollection as to

17       what you told the police?

18              THE WITNESS:  Everything I had said here.

19       Q.   You don't have a complete --

20              THE COURT:  No, one second.  There is a question.

21       A.   I don't understand that question, no.

22              THE COURT:  Is there anything, you think, that

23       might refresh your recollection as to what it is you told

24       the police about whether or not they were arguing?

25              THE WITNESS:  No, there was never argument.

1            THE COURT:  I know you've already stated that.  Is

2       there anything that would help your recollection as to

3       whether or not there was an argument that you've stated --

4            THE WITNESS:  No.

5            THE COURT:  -- to the police?

6            THE WITNESS:  No.

7            THE COURT:  No.  So, you stand by your answer?

8            THE WITNESS:  Yes.

9            THE COURT:  That you did not hear them argue?

10           THE WITNESS:  Yes.

11           THE COURT:  And that the police report is in

12      error?

13           THE WITNESS:  Yes.

14           (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

People - MARIA MERCEDES RODRIGUEZ - cross

1183

1    Q.    Can you give us a motive why the police would make a

2    mistake?

3                    MR. ROSENFELD:  Objection.

4                    THE COURT:  Sustained.

5                    MR. CANTOR:  You know, Judge --

6                    THE COURT:  That's the ruling of the Court.

7                    MR. CANTOR:  That is really unfair.

8                    MR. ROSENFELD:  Objection.

9                    THE COURT:  If you want to make a record we'll do

10    that for you.

11                    MR. CANTOR:  Thank you.  All I was going to say I

12    ask a question --

13                    MR. ROSENFELD:  Objection to the colloquy.

14                    MR. CANTOR:  -- and you turn to the prosecutor

15    and he makes an objection and you sustain it.

16                    MR. ROSENFELD:  Excuse me, nobody turned to me.

17                    MR. CANTOR:  And he objects to --

18                    THE COURT:  I sustained it.

19                    MR. CANTOR:  Excuse me?

20                    THE COURT:  I sustained it because I think it's

21    correctly --

22                    MR. CANTOR:  No, I am not addressing that.

23                    THE COURT:  All right.

24                    MR. CANTOR:  I ask a question, you face the

25    prosecutor and right away there is an objection and it gets

D-1jb

People - MARIA MERCEDES RODRIGUEZ - cross
1184

1   sustained.

2           MR. ROSENFELD:  Your Honor, so the record is

3   clear, I stood up.

4           MR. CANTOR:  He is yelling now, as he always

5   does.

6           MR. ROSENFELD:  This is wrong, Judge, and that is

7   incorrect.

8           MR. CANTOR:  Now, he is totally --

9           THE COURT:  The Jury will totally disregard all

10  of this colloquy.

11  BY MR. CANTOR:

12      Q.   Okay.  Can you look, not read, not review, can you

13  look at Defendant's-A for identification, hold it in your hands

14  and just look at it?

15          MR. ROSENFELD:  Objection.

16          THE COURT:  Sustained.

17          MR. CANTOR:  Judge, this was provided me --

18          THE COURT:  I think --

19          MR. ROSENFELD:  Objection.

20          THE COURT:  I think we are going to break for

21  lunch now.

22          MR. CANTOR:  I have one 30 --

23          THE COURT:  No.

24          MR. CANTOR:  Thirty second --

25          THE COURT:  We are going to break for lunch now.

D-ljb

People - MARIA MERCEDES RODRIGUEZ - cross

1185

1          MR. ROSENFELD:  But your Honor, no, may we

2     approach?

3          THE COURT:  No.

4          MR. ROSENFELD:  We can't, Judge, this is a very

5     good reason I have to approach?

6          THE COURT:  No.

7          MR. CANTOR:  No.

8          THE COURT:  We are going to lunch.

9          MR. ROSENFELD:  Your Honor, may it --

10         MR. CANTOR:  May it please without a reporter --

11         MR. ROSENFELD:  I will approach with the

12    reporter, it's important.

13         THE COURT:  Come forward.

14         MR. CANTOR:  No, Judge, I want a reporter.

15         THE COURT:  Let me hear what the subject matter

16    is first.

17         MR. CANTOR:  Judge, you said at the appropriate

18    time we could have a side bar.

19         THE COURT:  Please don't, don't have colloquy in

20    front of the jury.  The jury is to disregard.  I already

21    ruled.

22         (Whereupon there is an off-the-record

23    discussion.)

24         MR. CANTOR:  Now, may I continue for about 30

25    seconds?

                                                    D-ljb

1186

1        THE COURT:  No.

2        MR. CANTOR:  On your watch --

3        THE COURT:  No, we are going to break for lunch.

4        Madam Forelady and ladies and gentlemen of the

5   jury, we are going to break for lunch.  I think it's

6   important for the Court to point out that this colloquy

7   sometimes, as you just heard between the Court and

8   Mr. Cantor and to some degree Mr. Rosenfeld, certainly

9   should not in anyway, anyway whatsoever indicate to you

10  that the Court perhaps rules one way or the other way

11  because the Court has a determination as to the outcome of

12  this case.  The Court has no determination, that's why you

13  are here and there is nothing wrong with this colloquy.  It

14  might be a little upsetting from time-to-time, but it's THE

15  enthusiasm of the battle of the trial, which always takes

16  place when you have two opposing sides.  So don't make too

17  much of it and certainly don't hold it against counsel to

18  either side and certainly not holding it against

19  Mr. Delgado.  Just because his counsel is giving him the

20  type of exuberant representation that he thinks he

21  deserves, which I respect.

22        We will see each other two o'clock.  Have a

23  pleasant lunch.

24        (Whereupon the jury exits for lunch.)

25        THE COURT:  All right.  The jury having been

D-ljb

1187

1  excused, Ms. Mercedes Rodriguez, I am going to excuse you

2  for lunch.  I thought you would be done this morning, but,

3  unfortunately, that has not happened.

4          Please be back here at two o'clock sharp.  Please

5  do not in any way discuss your testimony with anyone and

6  this includes the district attorney, all right, ma'am.

7  Have a pleasant lunch.  Please be back here, we will put

8  you right back on the stand.  Hopefully, we will get you

9  out as quickly as we can.

10          THE WITNESS:  Thank you.

11          (Whereupon the witness is excused for lunch.)

12          THE COURT:  All right.  The witness now has been

13  excused.

14          MR. CANTOR:  One --

15          THE COURT:  Sergeant, please clear the courtroom.

16          (Sergeant complies.)

17          THE COURT:  All right.  The courtroom has been

18  cleared.

19          MR. CANTOR:  Judge, off the record.

20          (Whereupon there is an off-the-record

21  discussion.)

22          THE COURT:  We are on the record in the absence

23  of everyone.

24          MR. CANTOR:  The witness, Mercedes Rodriguez --

25  Maria Mercedes Rodriguez, has denied several times that she

D-1jb

PROCEEDINGS

1188

1  ever told the police officer and that would be Jeffrey

2  Franken, this is a DD520 that was supplied to me in

3  redacted fashion by the People.  She told him quote, Maria

4  observes this David and a person everyone knows as Sosa

5  arguing.  She has denied telling that to him.  She admits

6  that the word arguing is here.  I am putting the People on

7  notice that on my case I am going to need Detective Franken

8  because in order and you are right, it falls under the

9  rubric of a prior inconsistent statement.  I have to ask

10 Detective Franken when he interviewed Maria Rodriguez did

11 she tell you that she saw the defendant and Sosa arguing,

12 that's all.  That's appropriate impeachment, appropriate --

13         THE COURT:  Yeah, you're right.

14         MR. CANTOR:  So I want to give everyone notice of

15 it and this is not going to happen until the defense case,

16 but I know you are keenly concern about expeditiously, but

17 yet consistent with my client's constitutional rights of a

18 fair trial moving this case along.  That's why I take the

19 first opportunity I can to bring this to the Court and the

20 People's attention.

21         THE COURT:  Will you have that particular

22 detective?

23         MR. ROSENFELD:  I don't know this detective, your

24 Honor.  I have no idea where he is or who he is or if he's

25 still on the force or retired.  I will be happy to inquire

D-ljb

PROCEEDINGS

1189

1    and let the Court --

2             THE COURT:  Can you assist the Court in finding

3    out?

4             MR. ROSENFELD:  That's what I am saying, I will

5    give the Court and Mr. Cantor any information I can gather

6    on the lunch period.

7             THE COURT:  That's the best we can do.

8             MR. CANTOR:  Judge, do you have the witness list

9    on your podium?

10            THE COURT:  I do.

11            MR. CANTOR:  May I look at it?

12            THE COURT:  You may.  Did he not give you a copy

13   of it?

14            MR. CANTOR:  Yes, it's buried amongst lots of

15   paper.  Okay.

16            So it's very clear and very early in the

17   proceeding, admittedly my effort to impeach this witness

18   whose credibility by a prior inconsistent statement

19   requires the presence and testimony of the officer who

20   interviewed her and that officer is Detective --

21            THE COURT:  Unless we can do it by stipulation

22   since it --

23            MR. CANTOR:  Unless we can do it by stipulation.

24   I'm not too sanguine about that, but yes, we can do it by

25   stipulation.  I am willing, I don't know if the People are.

PROCEEDINGS

1190

1   THE COURT: Well, maybe they are and maybe

2   they're not.

3   MR. CANTOR: Well, let us find out. The People

4   can speak for themselves.

5   THE COURT: Yes, they can.

6   MR. ROSENFELD: I will be -- I will again give

7   the Court the information you request about Detective

8   Franken. If Defense counsel writes out a stipulation I

9   will certainly review it with the Court and defense counsel

10  and we'll see. I don't know what it would be at this

11  point, but I will always keep an open mind.

12  MR. CANTOR: I can tell you what it will be and

13  it will simply be that on December 25, 2009, Detective

14  Jeffrey Franken interviewed Maria Mercedes Rodriguez and

15  during the course of that interview Ms. Rodriguez told

16  Detective Franken that she observed quote, I am reading

17  verbatim, this David and a person everyone knows as Sosa

18  arguing. That is the stipulation.

19  MR. ROSENFELD: I will consider that, your Honor.

20  THE COURT: Consider it over the lunch hour.

21  MR. ROSENFELD: Yes, I will.

22  THE COURT: It seems simple enough.

23  MR. ROSENFELD: Yes, I agree.

24  THE COURT: And it seems to be in line of what is

25  the reality of the situation.

PROCEEDINGS

1191

1    MR. CANTOR:  Thank you, Judge.

2    THE COURT:  He will think about it and we will

3    see.

4    MR. CANTOR:  I sense your --

5    THE COURT:  Perhaps it will remove one thing at

6    least from --

7    MR. CANTOR:  I sense some encouragement in your

8    statement, Judge.  That's the way I read it and I am

9    thankful for that.

10   MR. ROSENFELD:  Just -- we're on the record, I

11   just want to remind you as the officer reminded me, we have

12   an issue with Alternate Number one who has to leave at

13   three.

14   THE COURT:  We do.

15   MR. ROSENFELD:  Hopefully, we can start on time,

16   your Honor.

17   THE COURT:  I would like to, but we have already

18   eaten into the lunch hour and even if the sergeant is there

19   in 15 minutes I really don't see this lady off the witness

20   stand by three o'clock, which --

21   MR. CANTOR:  I don't know if that can occur.  I

22   have this DD5 number 20 with this witness.

23   THE COURT:  I don't think he is going to finish.

24   I think we should probably --

25   MR. CANTOR:  Well, if there is a stipulation I

D-ljb

PROCEEDINGS

1    would certainly move onto a new area.

2              THE COURT:  Okay, but this gentleman was to be

3    excused at three o'clock.

4              MR. CANTOR:  So my statement to you --

5              THE COURT:  You think we can finish by three?

6              MR. CANTOR:  -- that you excuse him and

7    substitute, we have two others.

8              MR. ROSENFELD:  Let's wait.

9              THE COURT:  Your suggestion is becoming more

10   realistic I think of what the situation is.  Let's see what

11   happens when we're all back again.

12             MR. CANTOR:  Thank you.

13             (Whereupon there is a luncheon recess at this

14   time.)

15             A F T E R N O O N   S E S S I O N

16             THE COURT: Good afternoon.  Mr. Clerk.

17             COURT CLERK:  This is case on trial *People of the*

18   *State of New York against David Delgado*.  Let the record

19   reflect the presence of the District Attorneys, defense

20   attorney and defendant.  Sworn jurors are not present at

21   this time.

22             THE COURT:  Yes, Mr. Cantor.

23             MR. CANTOR:  In the spirit of your good words

24   late this morning or early this afternoon you will be happy

25   to know that Mr. Rosenfeld and I have worked out a

D-ljb

PROCEEDINGS

1193

1   stipulation and I think obviated the necessity of calling

2   Detective Franken and I would ask this stipulation be

3   marked -- well, it's a stipulation between both of us.

4            THE COURT:  Joint Exhibit.

5            MR. CANTOR:  Jointly marked of People's Exhibit

6   number --

7            MR. ROSENFELD:  I believe it's Court Exhibit.

8            MR. CANTOR:  I think defense -- I think it's a

9   prosecution's and defense exhibit.

10           THE COURT:  That's why I said a joint exhibit.

11           MR. CANTOR:  It's his exhibit too.  I want --

12           THE COURT:  Joint.

13           MR. CANTOR:  Yeah, joint.  So what is his next

14   number?

15           MR. ROSENFELD:  Twelve.

16           MR. CANTOR:  And mine is B; am I correct?

17           THE COURT:  Yes.

18           MR. ROSENFELD:  However, the Court wishes.  I

19   would suggest it be Court Exhibit one, but if you like it

20   that way, Judge, I have no problem.

21           MR. CANTOR:  I would like it that way.

22           THE COURT:  Call it Joint Exhibit one.

23           MR. CANTOR:  Okay.

24           THE COURT:  Which is what I first attempted to

25   do.

D-ljb

PROCEEDINGS

1           MR. CANTOR:  All right.  Joint Exhibit one in

2   evidence, we have agreed to it.  I have shown it to

3   Mr. Rosenfeld, he has read it.  He made some suggestions,

4   I've adopted his suggestions because they're correct.

5           THE COURT:  I am very pleased that we have that

6   stipulation.

7           (A handwritten Stipulation was received and

8   marked in evidence as Joint Exhibit one.)

9           COURT OFFICER:  Joint Exhibit one in evidence so

10  marked.

11          MR. CANTOR:  Joint exhibit.

12          COURT OFFICER:  That's what I said.

13          MR. ROSENFELD:  Could we do one more thing?

14          THE COURT:  Yes, Mr. Rosenfeld.

15          MR. ROSENFELD:  Apparently, Alternate Number one

16  has reminded us that he has to leave at three o'clock.

17          THE COURT:  And I think at this moment your

18  earlier suggestion --

19          MR. CANTOR:  My earlier suggestion.

20          THE COURT:  Your -- I was going to say his

21  earlier suggestion no longer has the weight that we once

22  tried to --

23          MR. ROSENFELD:  I still am reluctant to loose any

24  juror if this case goes longer, however, if we be finished

25  can we inquire if he can leave at 3:30, 3:15 --

PROCEEDINGS

1195

1    THE COURT: If we immediately get underway and

2    finish this witness in half an hour.

3    MR. CANTOR: I doubt it.

4    THE COURT: I doubt it too.

5    MR. CANTOR: Judge, let him go. Let him have

6    some peace of mind. He is a human being, let him go.

7    Replace him, we've got two others.

8    MR. ROSENFELD: Your Honor, I appreciate that and

9    I agree, but he did -- he was fully aware that he would

10   have to be here everyday until approximately 4:30 or five.

11   THE COURT: That's true, you're right. Let me

12   just find out. Let's let him go. I will let him go.

13   MR. ROSENFELD: Your Honor, Ms. Weisswasser, as

14   the Court is aware, is before Judge Webber, and we were

15   trying to work out a time for her to testify about the

16   crime scene video.

17   MR. CANTOR: And about the statement.

18   Ms. Weissocker --

19   THE COURT: He hasn't finished.

20   MR. CANTOR: -- can come at any time.

21   THE COURT: He hasn't finished.

22   MR. ROSENFELD: Thank you.

23   MR. CANTOR: Can come at any time.

24   THE COURT: He hasn't finished.

25   MR. CANTOR: I was going to say something that

D-ljb

PROCEEDINGS

1196

1    would moot the issue perhaps.

2              THE COURT:  You wish to hear these words of

3    mootness or do you want to finish?

4              MR. ROSENFELD:  I would like to finish.

5              MR. CANTOR:  Finish.

6              THE COURT:  Let him finish.

7              MR. CANTOR:  And maybe I will change my mind.

8              MR. ROSENFELD:  And perhaps the Court has already

9    been in contact with Judge Webber and they are on trial and

10   Judge Webber may have contacted you about her testifying

11   today at 3:30, then I am conveying the message.  That Judge

12   Webber is awaiting to hear from us whether we could

13   accommodate and take Ms. Weisswasser not Weisberg,

14   Ms. Weisswasser at 3:30.

15             THE COURT:  They are about to make those

16   arrangements.

17             MR. ROSENFELD:  I think we can --

18             MR. CANTOR:  I have a better idea if I can speak

19   to my colleague.

20             (whereupon there is an off-the-record

21   discussion.)

22             MR. ROSENFELD:  So, Judge, we contact Judge

23   Webber's part and say we don't --

24             MR. CANTOR:  I have agreed that without

25   foundational evidence I've conceded and assistant district

D-ljb

PROCEEDINGS

1197

1   attorney would testify that it's a true and accurate

2   depiction of the crime scene as she observed it on

3   12/25/09, and, therefore, when the People move it into

4   receipt I will say absolutely no objection.

5           THE COURT:  All right.

6           MR. CANTOR:  And your Honor will then, although

7   we cannot force your Honor to accept it, you will say

8   whatever you say.

9           THE COURT:  All right.

10          MR. ROSENFELD:  Can we contact Judge Webber and

11  let her know that we will not need them to break from their

12  jury trial this afternoon?

13          THE COURT:  Yes, I will have the clerk call over.

14          MR. CANTOR:  But I am ever so anxious to deal

15  with the juror and get on with my cross examination then

16  read my stipulation.

17          THE COURT:  We will take care of the jury.

18          MR. CANTOR:  Read my stipulation, get it and go

19  onto a new subject matter --

20          THE COURT:  All right.

21          MR. CANTOR:  -- with the witness.

22          THE COURT:  All right.  Let's bring out number

23  one, the jury; number two, let's find the witness, is she

24  in the courtroom?

25          MR. CANTOR:  No, shouldn't we, number one, deal

D-ljb

PROCEEDINGS

1198

1    with the juror?

2              THE COURT:  we will take care of that

3    administratively.  We are just going to excuse him.

4              MR. CANTOR:  Sure.

5              THE COURT:  And tell him, no, we don't require of

6    him to come back.

7              All right.  So leave him back there and bring out

8    the remainder of the jury panel.

9              MR. CANTOR:  And then you will have to take

10   alternate --

11             THE COURT:  We will do that.

12             MR. CANTOR:  -- two and make him number one.

13             THE COURT:  We know how to do that.

14             MR. CANTOR:  No, it will be a change of seats.

15             THE COURT:  We always rearrange the bench.

16             MR. CANTOR:  Judge, you could let a treatise on.

17   The movements of the machination.

18             THE COURT:  We always rearrange the box.

19             All right.  where is Ms. Vasquez -- no

20   Ms. Mercedes Rodriguez?

21             MR. ROSENFELD:  Outside the door.

22             THE COURT:  All right.  Let's bring her back in.

23             MR. CANTOR:  And, Judge, I am going to ask you

24   have already told this jury that a stipulation is a form of

25   evidence along with testimony and exhibits and I am going

                                                      D-ljb

PROCEEDINGS

1199

1   to ask you to remind them of that.

2              THE SERGEANT: Witness entering.

3              (Whereupon the witness enters at this.)

4              M A R I A   M E R C E D E S   R O D R I G U E

5   z, having been called as a witness on behalf of the People,

6   having been previously sworn, testified as follows:

7              THE COURT: Good afternoon, ma'am.

8              THE WITNESS: Good afternoon.

9              THE COURT: I invite you back.

10             THE WITNESS: Thank you.

11             THE COURT: I remind you, you are under oath.

12             THE WITNESS: Yes.

13             THE COURT: I inquire of you if you followed the

14  Court's instruction: No discussions with anyone including

15  the district attorney during the lunch break; can you

16  assure the Court of that?

17             THE WITNESS: Yeah.

18             THE COURT: Very good. We will do the

19  stipulation first, right?

20             MR. CANTOR: Yes, yes.

21             THE COURT: Who will read it into the record?

22             MR. CANTOR: I will.

23             THE COURT: Okay.

24             MR. CANTOR: I will read it as a joint exhibit.

25             THE COURT: Yes.

PROCEEDINGS

1200

1      MR. CANTOR: And I have put it on top Stipulation

2   Between A.D.A. Paul Rosenfeld and Defense Attorney Robert

3   Cantor.

4      THE COURT: Very good.

5      COURT OFFICER: Jury entering.

6      (Whereupon the jury enters at this time.)

7      THE COURT: Good afternoon, ladies and gentlemen,

8   Madam Forelady.

9      THE JURY: Good afternoon.

10      THE COURT: I trust everyone could assure the

11   Court they followed the instructions and have nothing to

12   report; is that correct?

13      THE JURY: Yes.

14      THE COURT: All right. As you can see one of

15   your number had an emergency situation, which it involved

16   family. We have let that juror go and we are going to

17   replace that juror with our next alternate, which we will

18   do momentarily, all right.

19      Please replace the juror.

20      COURT CLERK: Okay. Alternate number one is

21   excused. So Mr. Charles Gonzalez, please take the seat up

22   there, you are now alternate juror number one and

23   Ms. Castro, you can take the seat right directly behind

24   him.

25      A JUROR: Okay.

D-ljb

## PROCEEDINGS

1201

1    COURT CLERK: You are now alternate juror number

2    two.

3    THE COURT: Thank you, Mr. Clerk.

4    We continue on the People's case. Before we call

5    the -- well, we have the next witness, which is the

6    continuing witness. We would likewise have a stipulation

7    between and among counsel as, you know, that is evidentiary

8    and you may consider it and I will ask Counsel Cantor to

9    read it into the record.

10    MR. CANTOR: All right. I am now reading from a

11    stipulation, which as His Honor says is evidence for you to

12    consider. It's between Assistant District Attorney Paul

13    Rosenfeld and Defense Attorney Robert Cantor and it reads

14    as follows: On December 25th, 2009, Detective Jeffrey

15    Franken of the Bronx Night Watch Detectives Bureau

16    interviewed Maria Mercedes Rodriguez at 2033 McGraw Avenue.

17    Ms. Rodriguez told Detective Franken that it quote, at some

18    point Maria, referring to the witness, observed this David,

19    referring to my client.

20    MR. ROSENFELD: Your Honor, I would ask that he

21    read the stipulation as it was written and not

22    editorialize.

23    MR. CANTOR: And as a person that everyone knows

24    as Sosa arguing and Detective Jeffrey Franken so recorded

25    this on a Police Follow-up Informational Report Form number

D-ljb

PROCEEDINGS

1202

1   20 dated 12/25.  And I will now -- how do I --

2           MR. ROSENFELD:  Your Honor, I am going to object

3   at this point since it was a rough drafted handwriting

4   where things crossed out we can't display.

5           THE COURT:  You don't have to --

6           MR. CANTOR:  It's in evidence.

7           MR. ROSENFELD:  Just what --

8           MR. CANTOR:  It's in evidence.

9           MR. ROSENFELD:  But not what's crossed out?

10          MR. CANTOR:  Yeah, what is crossed out, I will do

11  a better job of crossing out, Judge.  I will cross -- I

12  will obliterate.  I will not cross out, I will obliterate.

13          MR. ROSENFELD:  Your Honor, the stipulation

14  itself --

15          MR. CANTOR:  Judge, why do we have to have

16  talking after?

17          THE COURT:  All right.  Do what you have to do.

18          MR. CANTOR:  I will obliterate.

19          THE COURT:  Mr. Rosenfeld, this is joint exhibit

20  number one.

21          MR. CANTOR:  One in evidence.

22          THE COURT:  Is that correct?

23          MR. ROSENFELD:  Yes, your Honor.

24          THE COURT:  Is that correct, Mr. Cantor?

25          MR. CANTOR:  Yes.

D-ljb

PROCEEDINGS

1203

1    THE COURT: All right.

2    MR. CANTOR: Hold it, I have to obliterate and

3    then I have to show it to Mr. Rosenfeld so that he can be

4    satisfied that I have completely obfuscated, if you will,

5    your Honor, that which I had earlier crossed out.

6    MR. ROSENFELD: Your Honor, I would merely

7    suggest we rewrite this afterwards.

8    MR. CANTOR: No, your Honor, I am going to

9    obliterate everything.

10    MR. ROSENFELD: Have him take up the Court's

11    time?

12    THE COURT: Yes, it is taking up a great amount

13    of time.

14    MR. CANTOR: Well, it's a murder case, Judge,

15    give me a few minutes.

16    THE COURT: A minute you need to obliterate this?

17    MR. CANTOR: All right. I have obliterated it.

18    I want to show it to Mr. Rosenfeld. May I?

19    THE COURT: You may.

20    MR. ROSENFELD: Your Honor, may we approach? Can

21    we do this properly?

22    MR. CANTOR: Judge --

23    THE COURT: Come forward. It's a joint exhibit,

24    come forward.

25    (Whereupon there is an off-the-record

D-ljb

**PROCEEDINGS**

1    discussion.)

2            THE COURT: We are putting it into readable

3    fashion should you ever wish to examine it which, of

4    course, you are invited to do at the appropriate time.

5            (Whereupon there a pause in the proceedings.)

6            MR. ROSENFELD: Your Honor, I would still ask

7    that it be rewritten neatly and shown to the jury.

8            MR. CANTOR: It is neatly, Judge.

9            THE COURT: Display it.

10            MR. CANTOR: Good, thank you.

11            Now, how do I zoom? I don't want to touch the

12    People's equipment, I need some assistance in utilizing the

13    zoom so that we can make --

14            THE COURT: The district attorney will show you

15    how.

16            MR. CANTOR: Can you zoom it to its max?

17            (Whereupon the D.A. Complies.)

18            MR. CANTOR: And I would ask -- okay. I will

19    move it down. This is perfect.

20            THE COURT: All right.

21            MR. CANTOR: I think it's readable.

22            THE COURT: Everyone had a chance to look at it?

23            THE JURY: Uh-huh.

24            THE COURT: You have already heard it read into

25    the record and it's available for you along with all the

PROCEEDINGS

1205

1  other evidence at the appropriate moment in the trial,

2  which, of course, is at the end.

3       All right.

4       MR. CANTOR:  Now, I have to move it down because

5  it's only showing half of it because when you zoom it --

6       THE COURT:  By all means you will move it down.

7       MR. CANTOR:  I will wait for the jury to finish

8  reading.

9       THE COURT:  The jury has already read it, I take

10  it; is that correct?

11       THE JURY:  Yes.

12       MR. CANTOR:  Judge, I will move it down to the

13  bottom half.

14       THE COURT:  Can you all see it?

15       THE JURY:  Yes.

16       THE COURT:  Have you all read it?

17       THE JURY:  Yes.

18       MR. CANTOR:  The bottom half.

19       THE COURT:  Does that finish it, Mr. Cantor?

20       MR. CANTOR:  No, not quite.  One more time, I

21  want to make sure that the jury reads the bottom half.

22       THE COURT:  The jury has just informed me that

23  they have read up to here.  Move it down to the last line.

24       MR. CANTOR:  Very well.

25       THE COURT:  All right.  Did everyone see it?

D-1jb

PROCEEDINGS

1206

1    THE JURY:  Yes.

2    THE COURT:  Did anyone want to continue looking

3    at it?

4    THE JURY:  No.

5    THE COURT:  Thank you.

6    MR. CANTOR:  Thank you, your Honor.

7    THE COURT:  You're welcome, Mr. Cantor.  Now let

8    us --

9    MR. CANTOR:  I will proceed.

10    THE COURT:  -- continue with this lady, please.

11    MR. CANTOR:  Yes, your Honor.

12 CROSS EXAMINATION

13 BY MR. CANTOR:

14    Q.   I would like to ask you some questions and I would ask

15 you to please keep your voice up.  Answer slowly and clearly and

16 as His Honor instructed you.  Only answer the question that's

17 posed.

18    MR. ROSENFELD:  Your Honor, I will object.  Isn't

19    this for the Court to instruct the witness not for defense

20    counsel?  He can ask questions, I have no objection.

21    THE COURT:  Yes.

22    MR. ROSENFELD:  Not the instructions.

23    MR. CANTOR:  Here we have speechifying.

24    THE COURT:  All right.  Let us go forward.

25    Q.   You understand what I just said?

D-ljb

1    A.   Yes.

2    Q.   Now, Carmen Diaz was a friend of yours.  For how long

3  as of December 24, 2009, how long had you been friends?

4    A.   Since I move in Parkchester, 2001.

5    Q.   I cannot hear you.

6    A.   Since I move in Parkchester in 2001.

7    Q.   Okay.  So you knew her, approximately, as of the time

8  of the party, eight years, right?

9    A.   Yes.

10   Q.   And you were a friend of hers?

11   A.   Yes.

12   Q.   And she had been to your apartment?

13   A.   Yes.

14   Q.   On many occasions?

15   A.   Yes.

16   Q.   And you had been to her apartment on many occasions?

17   A.   Yes.

18   Q.   And did you hear this morning Mr. Rosenfeld played

19  your telephone call to 9-1-1, correct?

20   A.   Yes.

21   Q.   And on that telephone recording of your 9-1-1 call you

22  were asked the apartment number where the deceased was laid, you

23  remember the 9-1-1 operator asking you that?

24   A.   Yes.

25   Q.   And you said you didn't know and you had to ask other

D-ljb

People - MARIA MERCEDES RODRIGUEZ - continued cross
1208

1  people?

2        A.    Yes.

3        Q.    Now, how many times prior to December 24, '09, had you

4  been in Carmen Diaz's apartment since she was a good friend of

5  yours?

6        A.    More than ten.

7        Q.    Maybe even more than 20?

8        A.    Yes.

9        Q.    Well, how is it that you are unable to provide the

10  apartment number to the 9-1-1 operator when she asked you where

11  the body was?

12        A.    I was nervous.

13        Q.    As a matter of fact you had had six Hennessy?

14        A.    Excuse me?

15        Q.    Is that correct, six drinks of Hennessy?

16        A.    Yes, I did.

17        Q.    And as a result of that you were feeling a little, I

18  am not saying drunk, but a little --

19        A.    Feel nice.

20        Q.    Tipsy, high, correct?

21        A.    Yes.

22              (Continues next page.)

23

24

25

                                                        D-ljb

E mc

Rodriguez - People - Cross

1    Q.    So it was a combination of the excitement plus the

2    liquor that didn't allow you to give the appropriate and proper

3    apartment number, correct?  Yes or no, ma'am?

4                MR. ROSENFELD:  Your Honor, may the witness please

5         answer?

6                MR. CANTOR:  I'm asking a question.

7                THE COURT:  Yes.

8    Q.    Yes or no, is that correct?

9    A.    Repeat the question again.

10               MR. CANTOR:  I'm sure the court reporter will be

11        ever so happy to do so, ma'am.

12               (Whereupon, the court reporter read back the last

13        question.)

14   A.    You could say that, yes.

15   Q.    Thank you.

16        As a matter of fact, you had to ask -- according to the

17   911 call you had to ask both Melissa and Tango, her husband, for

18   the appropriate apartment number, correct?

19   A.    Yes.

20   Q.    Even though you had been there many, many times?

21   A.    Yes.

22   Q.    Now you were -- while you were at the party when Margie

23   and David arrived, and you said that was approximately 1:30 a.m.

24   on December 25, 2009, correct?

25   A.    Yes.

E mc

Rodriguez - People - Cross

1   Q.   Margie introduced you to David as David, correct?

2   A.   As her boyfriend, yeah.

3   Q.   Right.  And she said she had been going out with him

4   for about two months and they had met at a laundromat?

5   A.   Yes.

6   Q.   And at that time, when Margie introduced David to you

7   as David, were you tipsy at that time?

8   A.   No.

9   Q.   You clearly understood your friend Margie?

10   A.   Yes.

11   Q.   But yet two times, two times during the course of your

12   911 call when asked who had harmed the deceased, you said, "I

13   don't know?"

14   A.   I didn't remember his name.

15   Q.   But when Margie introduced you to him, you were not

16   tipsy, as you just told us, correct?

17   A.   Yes.

18   Q.   There had been no horrendous incident yet, correct?

19   A.   Yes.

20   Q.   It was just a normal, everyday, ordinary introduction?

21   A.   Yeah.

22   Q.   And you certainly understood Margie's words?

23   A.   Yes.

24   Q.   And you said hello to David and he said hello to you?

25   A.   I just told him welcome to the family.

E mc

Rodriguez - People - Cross

1    Q.   I can't hear you?

2    A.   I told him welcome to the family, that was it.

3    Q.   You said welcome to the family and he said words to

4  that effect?

5    A.   He didn't say nothing to me.

6    Q.   Did he say that to you?

7    A.   No.

8    Q.   You just said welcome to the family, correct?

9    A.   Yes.

10   Q.   And you had been introduced to him as David, correct?

11   A.   Yes.

12   Q.   And then a few hours later you had already drunk the

13 six glasses of -- or cups of Hennessy and you had witnessed a

14 horrific event and so, therefore, when the 911 operator asked you

15 who was responsible for causing this death, twice you said you

16 don't know, correct?

17   A.   That I didn't know, yes.

18   Q.   Now I want to ask you something.  Sosa by nature was a

19 loud person in voice, spoke very loudly, correct, by nature?

20        MR. ROSENFELD:  Objection.

21        THE COURT:  If she can answer.

22   A.   I cannot say that he was loud all the time like that,

23 no.

24   Q.   But frequently he was loud?

25        MR. ROSENFELD:  Objection.

E mc

Rodriguez - People - Cross

1    A.   No.

2    Q.   Do you know a woman by the name of Melissa Dempsey?

3    A.   Yes, I do.

4    Q.   Are you a friend of her's?

5    A.   Yes.

6    Q.   And how long have you been a friend of her's?

7    A.   Since I have been in Parkchester, 2001.

8    Q.   So as of the date of the party you knew her about eight

9    years?

10   A.   Yeah.

11   Q.   And would you characterize her as a truthful person?

12   A.   Yes.

13              MR. ROSENFELD:  Objection.

14              THE COURT:  I'll allow it.

15   Q.   Now would it cause you to change your answer that Sosa

16   was not constantly a loud person if you were informed that

17   Melissa described him as always loud and gesticulating, moving

18   his hands about, would that cause you to change your answer?

19   A.   No.

20              MR. ROSENFELD:  Objection.

21              THE COURT:  Overruled.

22   Q.   It wouldn't?  It would not, ma'am?

23   A.   No.

24   Q.   Now he could be loud, Mr. Sosa, at times?

25   A.   Yeah.

1213

E mc

Rodriguez - People - Cross

1      MR. ROSENFELD:  Objection.

2      THE COURT:  I'll allow it.

3   Q.   And he could at times be gesticulating, moving his

4   hands about as he was loud, correct?

5      MR. ROSENFELD:  Objection.

6      THE COURT:  I will allow it, overruled.

7   Q.   Correct?

8   A.   Yes.

9   Q.   Now at the party you were asked by Mr. Mr. Rosenfeld

10  about his demeanor.  Would you say that he was happy?

11  A.   Yes.

12  Q.   Would you say that he was outgoing?

13  A.   Yeah.

14  Q.   He wasn't depressed or angry, was he?

15  A.   Not that I noticed.

16  Q.   Now you know Alberto Vasquez, the husband of Melissa

17  Dempsey, do you not?

18  A.   Yes.

19  Q.   And you knew him for about eight years?

20  A.   Yes.

21  Q.   And he's a friend of yours?

22  A.   Yes.

23  Q.   And you know him as a truthful, honest person?

24     MR. ROSENFELD:  Objection.

25     THE COURT:  Yes, sustained.

E mc                    Rodriguez - People - Cross

1     A.    Yes.

2     Q.    Well, you know him?

3            THE COURT:   Sustained.

4     Q.    You know him as the type of person who wouldn't lie

5     under oath, correct?

6     A.    Excuse me?

7     Q.    You know him as a person who would not lie under oath,

8     correct?

9     A.    I can't say that.

10    Q.    So he might lie under oath?

11    A.    I can't say that either.

12    Q.    Well --

13    A.    I don't know if he would or not.

14    Q.    Okay, but you, in terms of your experience with him,

15    always found him to be honest and trustworthy?

16    A.    Yes.

17    Q.    Now if you were informed that Alberto Vasquez testified

18    that Sosa at the party was angry and depressed and that he, Mr.

19    Vasquez, had to bring Sosa to Vasquez's apartment to calm him

20    down, would that cause you to change your answer that Sosa at the

21    party was happy and outgoing?

22            MR. ROSENFELD:   Objection.

23            THE COURT:   Overruled.

24    Q.    Would it?

25    A.    No.

E mc

Rodriguez - People - Cross

1    Q.    Let me ask you, in all candor, six -- six cups of

2  Hennessy, were you used to consuming so much alcohol during a

3  given period of time, say three or four hours, were you used to

4  that?

5    A.    No.

6    Q.    So wouldn't it be a very fair and very honest and

7  forthright answer to say that you were drunk, ma'am, after

8  consuming six --

9    A.    No.

10   Q.    -- cups of Hennessy?

11   A.    I was not drunk.

12   Q.    Yes or no?

13   A.    No.

14   Q.    Now you testified on direct examination that Sosa told

15  David, "I know Margie for a long time, do the right thing by her

16  because I know her son for many years and if you don't do the

17  right thing by her, you got to answer to me?"

18   A.    Yes.

19   Q.    And when Sosa said that, he was speaking at a level, a

20  tone above a conversational tone, such as I'm using now, is that

21  correct?

22   A.    Yes.

23   Q.    And you're a mature, grown woman, so when Sosa said

24  that in a loud voice to David, do you interpret those remarks to

25  David to be a threat?

1    MR. ROSENFELD:  Objection, she just said it was

2    conversational tone --

3    A.    He just --

4    MR. ROSENFELD:  Objection.

5    A.    He was just --

6    MR. ROSENFELD:  Objection.

7    THE COURT:  Wait.  She did say conversational

8    tone, but you may answer.

9    MR. CANTOR:  But she said it was above a

10   conversational tone.

11   THE COURT:  She may clarify her answer.

12   MR. CANTOR:  Well, I'll question her.

13   Q.    When Sosa said that to David, it was above a

14   conversational tone, such as I'm using with you now, correct?

15   A.    It was a conversation, like everything.

16   Q.    That is not what I'm asking.  I'm asking about the

17   tone.  You see if I raise my voice to you like this?

18   A.    It was not loud.

19   Q.    It was not loud?

20   A.    No.

21   Q.    It was at a more conversational tone, and you didn't

22   perceive that to be a threat, correct?

23   A.    No.

24   Q.    Did you perceive that to be a greeting?

25   A.    Just to scare --

E mc                          Rodriguez - People - Cross

1      Q.    Did you perceive that to be a greeting, yes or no?

2      A.    I don't understand the word greeting.

3      Q.    You know what the word greeting means, "Hello, how are

4  you?"

5      A.    No.

6      Q.    "I'd like you to meet my boyfriend?"

7      A.    No.

8      Q.    You didn't perceive that as a greeting?

9      A.    No.

10     Q.    You perceived that as Sosa warning David, did you not?

11     A.    Yes, you could say that.

12     Q.    And when he warned David, he was speaking above a

13  conversational tone that I am presently using with you now?

14     A.    Yes.

15     Q.    And when he said that, gave David that warning above a

16  conversational tone, he was pointing his finger, his index

17  finger --

18     A.    Yes.

19     Q.    -- at David?

20     A.    Yeah.

21     Q.    And did he ever touch the body of David with that index

22  finger?

23     A.    No.

24     Q.    Okay, so before the incident with Sosa falling to the

25  ground, at any time that you were observing Sosa -- because from

E mc

Rodriguez - People - Cross

1   time to time you've admitted that he could talk loudly, from time

2   to time?

3       A.   Yeah.

4       Q.   Did you hear him talking loudly?

5       A.   Yeah, he was happy.

6       Q.   So he was talking loudly, correct?

7       A.   Yes.

8       Q.   And he was also drunk?

9       A.   Yeah.

10      Q.   And he was also dancing with people?

11      A.   Yeah.

12      Q.   And he was also behaving obnoxiously with people?

13      A.   I cannot say that because I never seen that.

14      Q.   Well, you answered the question, you cannot say that?

15      A.   No.

16      Q.   But he was asked to leave the party and it was Alberto

17   Vasquez who took him out of the party to calm him down, correct?

18      A.   No, I never seen that.

19      Q.   Did you ever see Sosa removed from the party by Alberto

20   Vasquez and his wife, Melissa Dempsey?

21      A.   No.

22      Q.   And you had been drinking at that party?

23      A.   Yes.

24      Q.   Correct?

25      A.   Yes.

1219

E mc

Rodriguez - People - Cross

1    Q.    Drinking from the very bottle that you had brought, the

2    Hennessy, correct?

3    A.    Yes.

4    Q.    And you say that after -- after this warning above a

5    conversational tone by Sosa to David, David responded, "All

6    right, all right, I will," and David was nodding his head up and

7    down in an affirmative fashion, correct?

8    A.    Yes.

9    Q.    David didn't strike out at Sosa at that point, did he?

10    A.    No.

11    Q.    David didn't make a counter threat or warning to Sosa,

12    did he?

13    A.    No.

14    Q.    He acknowledged the warning and he agreed with the

15    warning by saying, "All right, all right, I will," correct?

16    A.    Yes.

17    Q.    And he even nodded his head up and down, correct?

18    A.    Yes.

19    Q.    And you said that you're drinking the six cups of

20    Hennessy gave you, I think your description, I'm going to quote

21    it exactly, gave you a nice head, correct?

22    A.    Yes.

23    Q.    And you said that there came a time that David was

24    standing in front of Sosa, correct, and that Margie was standing

25    next to David?

E mc                           Rodriguez - People - Cross

1    A.    Yes.

2    Q.    And Sosa had his back to the couch?

3    A.    Yes.

4    Q.    And they were conversating, having a conversation?

5    A.    Yes.

6    Q.    That would be David and Sosa?

7    A.    Yeah.

8    Q.    Now how far were you from David and Sosa when they were

9    having this conversation?

10   A.    A couple of feet.

11   Q.    Okay, that would be about two, three feet, four feet?

12   A.    Yeah, like this distance that you got right now, right

13   there.

14   Q.    Right now?

15   A.    Yeah.

16   Q.    So, okay, so that's approximately, six, six and a half

17   feet, agreed?

18            MR. ROSENFELD:   Your Honor, I would say it's

19        approximately ten feet.

20   Q.    Agreed, ma'am?

21   A.    Excuse me?

22   Q.    Is this about six to seven feet that I'm from you now,

23   approximately?

24   A.    Approximately.

25   Q.    And at that time who was doing the talking, both of

E mc                          Rodriguez - People - Cross

 1 | them?

 2 |     A.   Yeah, they were both talking.

 3 |     Q.   Hold it, ma'am.  You've answered the question.

 4 |          And at that time Sosa issued to David another warning

 5 | to do the right thing by Margie?

 6 |     A.   I couldn't tell you that because I couldn't hear what

 7 | they was saying.

 8 |     Q.   But both were talking?

 9 |     A.   Yes.

10 |     Q.   One to the other?

11 |     A.   Yes.

12 |     Q.   And at that time was Sosa talking above a

13 | conversational level?

14 |     A.   I cannot tell you that, I said because I didn't hear

15 | what they was talking.

16 |     Q.   You were six to seven feet away?

17 |     A.   I could not hear.

18 |     Q.   Ma'am, I had yet to complete a question.

19 |               MR. ROSENFELD:  Your Honor, I would object.

20 |               MR. CANTOR:  I get to complete a question.

21 |               MR. ROSENFELD:  Counsel is instructing the

22 |          witness.

23 |               MR. CANTOR:  That's the rule.

24 |               THE COURT:  All right.

25 |               MR. CANTOR:  Thank you, Judge.  Would you instruct

E mc                           Rodriguez - People - Cross

1       the witness to wait until the question is completed?

2                    THE COURT:  Yes.

3                    THE WITNESS:  I'm sorry.

4       Q.  You were six to seven feet away, the radio music was

5  medium, correct?

6       A.  Yes.

7       Q.  Were they whispering, Sosa and David, one to the other?

8       A.  I don't know.

9                    MR. ROSENFELD:  Objection.

10      A.  They was talking.

11      Q.  Ma'am --

12                   THE COURT:  I'll allow it.

13      Q.  They were just talking, is that correct?

14      A.  Yes.

15      Q.  And from a distance of six to seven feet away, with

16  radio music at a medium level, you couldn't hear what they were

17  saying to one another?

18      A.  I could not hear what they were saying to each other.

19      Q.  Did you see Sosa put his hand or hands on David?

20      A.  No.

21      Q.  Did you see David, as they were talking, as they were

22  talking, conversating, did you see David put his hands on Sosa?

23      A.  No.

24      Q.  How long would you say -- how long would you say that

25  they were talking before something happened?

E mc

Rodriguez - People - Cross

1    A.    Five minutes.

2    Q.    So after about five minutes these men were face to

3  face, chest to chest, correct?

4    A.    Talking, yes.

5    Q.    Okay, so after about five minutes you say that you saw

6  David punching Sosa in the head or face, correct?

7    A.    In the face, yes.

8    Q.    In the face, and he was using a fist?

9    A.    I thought it was his fist.

10   Q.    Did you see any knife in that fist at that time?

11   A.    No.

12   Q.    And what hand was David using to punch?

13   A.    Right hand.

14   Q.    And how many strikes did David use in terms of hitting

15  Sosa's face?

16   A.    One.

17   Q.    He hit him once in the face?

18   A.    Yes.

19   Q.    Sosa remained standing?

20   A.    Sosa fell back in the sofa.

21   Q.    He fell back in, so now the sofa was in back of Sosa,

22  correct?

23   A.    Yes.

24   Q.    So when he falls back, does that mean that his feet are

25  up in the air and that his back is on the cushions of the sofa?

E mc                          Rodriguez - People - Cross

1       A.    Yes.

2       Q.    And then you say David continued to punch him?

3       A.    Yes, he got on top of him.

4       Q.    You've answered the question.

5             How many more times would you say David punched him as

6    Sosa was now with his back on the cushions and his legs up in the

7    air?

8       A.    Like five times.

9       Q.    So altogether there were six punches then?

10      A.    Yes.

11      Q.    At any time during -- and were they all being done by

12   David with his right fist?

13      A.    Yes.

14      Q.    At any time did you see any weapon in the fist?

15      A.    In that moment?

16      Q.    Yes?

17      A.    No.

18      Q.    And you said that when Sosa fell backwards onto the

19   couch with his feet up in the air and his back on the cushions,

20   did David lean over the couch and continue the striking?

21      A.    Yes.

22      Q.    To the face of Sosa?

23      A.    He had --

24      Q.    Ma'am, I'm just asking you to the face of Sosa?  Do you

25   understand the question?

E mc                          Rodriguez - People - Cross

1      A.    Yes, and I cannot say to the face.

2      Q.    The answer is yes or no?

3      A.    No.

4      Q.    Okay, so you never saw anymore strikes by my client

5    David with his fist, his right fist to the head or face of Sosa,

6    is that correct?

7      A.    No.

8      Q.    You did see more strikes?

9      A.    Yes.

10     Q.    And was that to the face or head of Sosa?

11     A.    To the head.

12     Q.    Ma'am, I'm just asking was that to the face or --

13           MR. ROSENFELD:  Objection, the witness tried to

14     answer?

15     A.    To the head.

16           THE COURT:  One second.

17           MR. ROSENFELD:  He's cutting her off.

18           THE COURT:  One second.

19     Q.    It's a simple question, was it to the head?

20     A.    Yes.

21           MR. ROSENFELD:  Your Honor.

22           THE COURT:  One second.

23           MR. ROSENFELD:  Objection.

24           THE COURT: One second.

25           It's not whether the question is simple or not,

E mc                        Rodriguez - People - Cross

1    she was attempting to answer it.

2              MR. CANTOR: Well, it can be answered --

3              THE COURT:  You have more for that answer, that

4    was the question, about your observations?

5              MR. CANTOR:  She's already answered it, Judge.

6              MR. ROSENFELD:  Objection.

7              MR. CANTOR:  She's already answered.

8              THE COURT:  You have anything else to say, say it

9    now?

10             MR. CANTOR:  Ma'am, you have already answered the

11   question.

12             MR. ROSENFELD:  Your Honor, objection, he's still

13   instructing the witness.

14             MR. CANTOR:  This is speech-afying.

15             THE COURT: Wait a second.

16             Do you have anymore to say?

17             MR. CANTOR:  About whether or not he punched him

18   in the face?

19             THE COURT:  I'm asking the lady, not you.

20             MR. CANTOR:  It's my question.

21   Q.   Only one punch to the face, the rest of the punches

22   were to the neck?

23   A.   I cannot say to the neck or the head.

24   Q.   Ma'am, I'm just asking you about the neck.  You

25   understand where the neck is on a human body?

E mc

Rodriguez - People - Cross

1  A.  I cannot say that.

2  Q.  Yes or no?

3  A.  No.

4  Q.  You don't understand where the neck is?

5  A.  Yes.

6  Q.  Okay.  Okay, and I'm asking you whether the five

7  additional punches, since you've told us there were six punches,

8  were the five additional punches to the neck of Sosa, yes or no?

9  A.  I didn't know where it was at the moment.

10  Q.  Okay, so you saw the five additional punches somewhere

11  in the general area of Sosa's --

12  A.  In the head.

13  Q.  Head, correct?

14  A.  Yes.

15  Q.  Now where were you standing, how far distant were you

16  standing when the five additional punches to the area of Sosa's

17  head were ended?

18  A.  I was behind him.

19  Q.  How --

20  A.  I was behind David when he got on top of Sosa.

21  Q.  You're also behind the well.  I'm asking distance, how

22  far, how far were you from David and Sosa during this

23  altercation?

24  A.  Like five feet.

25  Q.  And then there came a time that David stopped punching

E mc                        Rodriguez - People - Cross

1    in the area of Sosa's head, correct?

2        A.    Yes.

3        Q.    And he went out the front door?

4        A.    Yeah.

5        Q.    And Margie was the next person to leave the apartment,

6    correct?

7        A.    Yes.

8        Q.    And you were the third person to leave?

9        A.    No.

10       Q.    Who was the third?

11       A.    I was behind him.

12       Q.    Who was the third person to leave the apartment, that

13   is the question?

14       A.    I don't know, sir.

15       Q.    Okay, we know that David went out, correct?

16       A.    Yes.

17       Q.    We know that Margie was the second person?

18       A.    I was the second person behind him.

19       Q.    I see.  And then Margie was behind you, if you know?

20       A.    No.

21       Q.    She was not?

22       A.    No.

23       Q.    Who was behind you, if you know?

24       A.    Melissa came out of the apartment.

25       Q.    So Melissa was the third.  And who -- was there anyone

E mc

Rodriguez - People - Cross

1   behind Melissa, if you know?

2       A.   No.

3       Q.   Okay, so then you latched onto his arm, was that it?

4       A.   Yes.

5       Q.   And he pushed you off?

6       A.   Yes.

7       Q.   Pushed you off, okay.  And you say you saw him going

8   down the stairs, correct?

9       A.   Yes, opening the door to go down the stairs.

10      Q.   Okay, now you claim that you saw him holding what

11  appeared to be a blade?

12      A.   It's a knife.

13      Q.   Well, did you see the handle?

14      A.   Yes.

15      Q.   What color was it?

16      A.   It was beige.

17      Q.   Did you see the blade?

18      A.   Yes.

19      Q.   And I think you showed us before, can you do that

20  again, how much of the blade?

21      A.   Like this long.

22      Q.   I'm sorry?

23      A.   And this wide.

24      Q.   I'm not asking about the width.  Would this be about

25  the length?

E mc                          Rodriguez - People - Cross

1    A.    No, this long.

2               MR. CANTOR:   About four inches.

3    Q.    And where was he holding that?

4    A.    In the right hand.

5    Q.    But he had used his right hand to push you off?

6    A.    To push me off like this.

7    Q.    With his elbow?

8    A.    Yes.

9    Q.    With his elbow.  And in his hand he had a knife.  Was
10   he gripping it by the handle?

11   A.    Yeah, he had it in his hand.

12   Q.    How were you able to see the color of the handle if he
13   was gripping --

14   A.    When --

15   Q.    Ma'am, I get to finish a question.

16         How were you able to see the color of the handle if he
17   was gripping it?

18   A.    When I fell on the floor.

19   Q.    Yes?

20   A.    I looked at his hand, I saw it.

21   Q.    Wasn't he gripping it at that time?

22   A.    He had it on his hand.

23   Q.    It was in his hand?

24   A.    Yes.

25   Q.    So how could you see the color of the handle?

E mc

Rodriguez - People - Cross

1     A.   I was able to see it, sir.

2     Q.   Through his hand?

3     A.   No, on top, you see the color.

4     Q.   You mean the blade portion?

5     A.   No.

6     Q.   What portion?

7     A.   The handle.

8     Q.   So he wasn't covering the whole handle, is that what

9 you're saying?

10     A.   No, he wasn't.

11     Q.   And you saw how much of the handle?

12     A.   The top, the top of the handle.

13     Q.   Show me with your fingers how much?

14     A.   Like this much.

15           MR. CANTOR:   That shows about a half inch.

16     Q.   And that color was beige?

17     A.   Yes.

18     Q.   And then you saw a blade of about four inches in

19 length, correct?

20     A.   Yes.   He couldn't close --

21     Q.   Ma'am, you've answered the question.

22           You said on direct testimony that David, I'm using your

23 words now when you answered Mr. Rosenfeld, that David walked out

24 of the apartment, is that correct?

25     A.   Yes.

E mc

Rodriguez - People - Cross

1    Q.    And then as he was walking down the hallway, you caught

2    up to him and he gave you the elbow and you were no longer

3    attached to his body, is that correct?

4    A.    Yes.

5    Q.    Now this happened, as you testified on direct

6    examination, about thirteen feet away from the entrance to the

7    apartment, correct?

8    A.    Yes.

9    Q.    What apartment was that now?

10   A.    Apartment 3D.

11   Q.    How many times have you spoken to Mr. Rosenfeld, the

12   D.A., in his office or over the phone altogether?

13   A.    Like five times.

14   Q.    Five times?

15   A.    Yes.

16   Q.    And he went over the case with you, asked you questions

17   and you made answers?

18   A.    Yes.

19   Q.    And he told you during the course of your

20   conversations, either in person or over the telephone, that the

21   apartment was 5D, did he not -- 3D, did he not tell you that?

22   A.    The apartment was 3D.

23   Q.    Yes.  Did he tell you that?

24   A.    Yes, maybe in the conversations we had.

25   Q.    Ma'am, I'm just asking if he told you that was your

E mc

1232a

Rodriguez - People - Cross

1   answer?

2      A.   Yes.

3                  CONTINUED NEXT PAGE............

1        Q.   Now, the cops arrive, right?  Ma'am?

2        A.   Yes.

3        Q.   And when the police arrive, eventually there are a lot

4    of police on the scene, eventually, correct?

5        A.   Yes.

6        Q.   And they had you take them to Margie's apartment, which

7    was in another building near by, correct?

8        A.   Yes.

9        Q.   And they were searching, correct?

10       A.   Yeah.

11       Q.   Did you ever see the cops, when they were searching,

12   come up with a knife?

13       A.   No.

14       Q.   When you saw Margie and the defendant outside, they

15   were heading in the direction of Margie's building?

16                MR. ROSENFELD:  Objection.

17       A.   I never said I seen them going outside.

18       Q.   You didn't see them outside?

19       A.   No.

20       Q.   You lost sight when David started to go downstairs?

21       A.   Yes.

22       Q.   Okay.  In that 911 call, the police operator asked you

23   for your name, correct?

24       A.   Yeah.

25       Q.   Did you say Carmen Diaz?

1    A.   Yes.

2    Q.   Are you Carmen Diaz?

3    A.   No.

4    Q.   When you spoke to the 911 operator, this was after you

5    had had six Hennessys, correct?

6    A.   Yes.

7    Q.   Had you taken any marijuana that day?

8    A.   No.

9    Q.   At the time you spoke to the police dispatcher on the

10   911 call, you knew your name, did you not?

11   A.   Yes.

12   Q.   Now, what I want to know is, on the next day, that

13   would be the 26th, you were taken in a police van?

14   A.   Yes.

15   Q.   And you viewed a line-up, right?

16   A.   Yes.

17   Q.   I want to know the names of all the other people that

18   were taken to the courthouse, I think that's the word you used,

19   to view a line-up?

20   A.   It was me, Melissa --

21   Q.   Go slowly, please.  What's the next one after you?

22   A.   Melissa.

23   Q.   Melissa.  Go ahead.

24   A.   Tango.

25   Q.   Tango?

1       A.   Carmen.

2       Q.   Carmen Diaz?

3       A.   Yes.

4       Q.   Go ahead.

5       A.   Bachingo (sic).

6       Q.   Bachingo (sic)?

7       A.   Ari.

8       Q.   And Alo?

9       A.   Ari.

10      Q.   Is Ari a male or female?

11      A.   It's a female.

12      Q.   Is there anyone else or is that it?

13      A.   Not that I can recall.

14      Q.   Okay.  Now, are you presently working?

15      A.   No.

16      Q.   How long have you been unemployed?

17      A.   A couple of years.

18      Q.   What does that mean, two?  Three?  Four?  Five?  Six?

19  Seven?  Eight?  Nine?  Ten?  Eleven?  Twelve?

20      A.   Yeah, like eight or ten.

21      Q.   How do you support yourself?

22      A.   Public Assistance.  Section 8.

23      Q.   You were a bit confused on direct examination

24  concerning the incidents of your arrest.  So, let's go to the

25  first arrest as asked ultimately by the assistant district

1    attorney.  Okay.  The first arrest was on April 1st, 1999, here

2    in the 48th Precinct, in the Bronx.  When you were arrested,

3    according to Mr. Rosenfeld, for criminal possession of a

4    controlled substance in the third degree.  Correct?

5         A.   Yes.

6         Q.   And you pled guilty to criminal possession of a

7    controlled substance in the seventh degree, did you not?

8         A.   Yes.

9         Q.   A misdemeanor?

10        A.   Yes.

11        Q.   A high grade misdemeanor, correct?

12        A.   Yes.

13        Q.   And but three days later, we're talking about

14   April 4th, 1999, you were, according to Mr. Rosenfeld's

15   questions, arrested in the 42nd Precinct for criminal possession

16   of a controlled substance in the seventh degree, correct?

17        A.   Yes.

18        Q.   And you pled guilty?

19        A.   Yes.

20        Q.   Well, what was the nature -- what I want to know, what

21   was the nature of the April 1st, 1999 arrest for criminal

22   possession of a controlled substance in the third degree?  What

23   was the drug?

24        A.   Cocaine.

25        Q.   And from time to time, you used cocaine?

1    A.   Yes, at that time.

2    Q.   That's all I'm asking.  When did you stop using

3    cocaine, if you have stopped?  What year?

4    A.   1999.

5    Q.   You mean after you were arrested?

6    A.   Yes.

7    Q.   But three days later, you were again arrested for

8    criminal possession of a controlled substance in the seventh

9    degree?

10    A.   Yes.

11    Q.   Was that cocaine again?

12    A.   No.

13    Q.   What was it?

14    A.   Marijuana.

15    Q.   And --

16    A.   And coke.

17    Q.   And how long did you continue to use marijuana after

18    April 4, 1999?

19    A.   I stopped completely everything in 1999.

20    Q.   Really?

21    A.   Yes, sir.

22    Q.   You haven't used any marijuana?

23    A.   No.

24    Q.   From 1999 to the present?

25    A.   Yes.

1          Q.   And the marijuana was purchased, I assume, from the

2     money you got from Public Assistance, correct?

3          A.   Well, at that time, I was scrambling in the streets.

4          Q.   I see, you were hustling in the streets?

5          A.   Yes, sir.

6          Q.   And when you say hustling, can you be a little bit more

7     detailed.  What were you doing in the streets?  Were you

8     committing acts of prostitution?

9          A.   No, I was selling drugs.

10         Q.   You were selling drugs.  And those drugs included

11    cocaine?

12         A.   Yes.

13         Q.   Heroin?

14         A.   No.

15         Q.   Marijuana?

16         A.   Yes.

17         Q.   And for how long were you selling drugs in the street,

18    both heroin and pot?  For how many years did you do that?

19         A.   Like four or five years.

20         Q.   And during that four- or five-year period, you were

21    only arrested --

22         A.   Once.

23         Q.   Twice?

24         A.   Twice.

25         Q.   Where did you get the drugs from that you were selling,

1    the heroin and pot?

2         A.   I used to buy it from some other people.

3         Q.   Then, you would sell it to other people?

4         A.   Yes.

5         Q.   Now, where you live, Parkchester, there are schools in

6    that area?

7         A.   I was not living at the moment in Parkchester.

8         Q.   Where were you living?

9         A.   Crotona.

10         Q.   Well, there are certainly schools in the area of

11    Crotona, are there not?

12         A.   Yes.

13         Q.   And there are playground attached to those schools,

14    correct?

15         A.   Yes.

16         Q.   Were you selling the pot and the heroin to the

17    adolescents who were attending that school?

18              MR. ROSENFELD:  Objection.

19         A.   No.

20              THE COURT:  Overruled.

21         Q.   You made it your policy to sell only to adults; is that

22    correct?

23              MR. ROSENFELD:  Objection.

24              THE COURT:  Overruled.

25         Q.   Is that correct, ma'am?

1     A.   Yes.

2     Q.   Commendable.

3              MR. ROSENFELD:  Objection as to counsel's remarks.

4              THE COURT:  As to editorializing, sustained.

5     Q.   Sosa was a good friend of yours?

6     A.   You could say that, yes.

7     Q.   David Delgado, who is over there on trial, you were

8  under the belief that he killed Sosa, correct?

9     A.   I know he killed Sosa.

10             MR. ROSENFELD:  Objection.

11    Q.   Okay.  And you want to see David Delgado punished, do

12  you not?

13    A.   Yes, I do.

14    Q.   You wouldn't mind David Delgado being sent to prison

15  for the rest of his life, would you?

16             MR. ROSENFELD:  Objection.

17             THE COURT:  Overruled.

18    A.   I wouldn't mind.

19    Q.   And, in fact, you wouldn't mind that?

20    A.   Yes, I wouldn't.

21    Q.   If they had a death penalty in New York State, you

22  would like him to be put to death, would you not?

23             MR. ROSENFELD:  Objection.  Totally improper.

24             THE COURT:  Sustained.

25    Q.   During those four to five years that you were selling

1    drugs, were you using drugs yourself?

2        A.   Yes.

3        Q.   And were you using drugs in your own home?

4        A.   Yes.

5        Q.   And who else lived in your home during that period of

6    time that you were using drugs?

7        A.   Me.

8        Q.   Anyone else?

9        A.   Alone.  No.

10       Q.   Just you?

11       A.   Yes, me.

12       Q.   What about your children?

13       A.   My mother had my daughter at that time.

14       Q.   And do you have any other children?

15       A.   No, that's it.

16       Q.   And did your mother have your daughter, was that

17   something you voluntarily did or did a court place her there?

18       A.   No, something voluntary I did.

19       Q.   Because you didn't want her to be around drugs that you

20   were using?

21       A.   Exactly.

22       Q.   And selling, correct?

23       A.   I wasn't selling from my house.

24       Q.   You were selling from your house?

25       A.   No, I wasn't.

1    Q.   You were selling from the street?

2    A.   Yes.

3    Q.   You were hustling?

4    A.   Yes.

5    Q.   You were using money to buy drugs?

6    A.   I was using money to pay my bills.

7    Q.   And to buy drugs, correct?

8    A.   Yes.

9         MR. CANTOR:   I have no further direct examination

10   -- cross-examination of this witness, your Honor.

11        THE COURT:   Thank you, Mr. Cantor.

12        Mr. Rosenfeld.

13   REDIRECT EXAMINATION

14   BY MR. ROSENFELD:

15   Q.   Why did you stop in April -- in 1999, drugs?

16   A.   I had a new grandson in my life, and I got tired of

17   using.  I wanted a change in my life, so I went into a

18   residential for two years.

19   Q.   Now, Mr. Cantor asked you in his cross-examination how

20   long Sosa and David were talking or appeared to be talking up

21   until the moment David struck Sosa.  Do you recall that?

22   A.   Yes.

23   Q.   You said five minutes?

24   A.   Five minutes.

25   Q.   Were you timing that on a watch?

1     A.   No.

2     Q.   So, where did you get five minutes from?

3          MR. CANTOR:  Objection.  That's her estimate.

4          MR. ROSENFELD:  Redirect.

5     A.   It was like five minutes.  It wasn't long before he did

6     what he did.

7     Q.   You don't know exactly?

8     A.   No.

9     Q.   And on the 911 call, let's go over that.  You were

10    asked questions by Mr. Cantor.  Let's start with, when the

11    operator asked you do you know who did it, do you know what your

12    response was?

13    A.   Yes.

14    Q.   What did you say?

15    A.   No.

16    Q.   Why did you say that?

17         MR. CANTOR:  Objection.

18    A.   I didn't remember his name.

19         THE COURT:  Overruled.

20         MR. CANTOR:  Can you at least instruct her when I

21    object, as you indicated, she would not answer until you

22    rule.

23         THE COURT:  That's true.

24         MR. ROSENFELD:  Objection to colloquy.

25         THE COURT:  You're reminded again.

1    MR. CANTOR:  Your ruling on my objection, please.

2    COURT OFFICER:  Judge, I'm sorry.  The juror has

3    to go to the bathroom.

4    THE COURT:  Yes, all right.

5    (Whereupon, the sworn juror exited the courtroom.)

6    (Whereupon, a brief pause in the proceedings was

7    held.)

8    (Whereupon, the sworn juror entered the

9    courtroom.)

10    THE COURT:  Mr. Rosenfeld.

11    MR. ROSENFELD:  Thank you.  I believe there had

12    been a question.  The objection has been overruled.  Did

13    she answer?

14    THE COURT:  That's correct, she may.

15    MR. CANTOR:  She did.  She said she wasn't timing.

16    THE COURT:  Is there an answer?

17    (Whereupon, the requested portion of the record

18    was read back by the Court Reporter.)

19    THE COURT:  I overruled the objection.  She may

20    answer.

21    Q.  You may answer that.

22    A.  It was the first time I seen him.  I met him that

23    night, so I didn't remember his name in the moment.  So, I said

24    I don't know him.

25    Q.  Do you know who stabbed and killed Sosa?

1   A.   David.

2   Q.   No, at that point on the phone?

3   A.   I couldn't remember his name.

4   Q.   Okay, but you had seen what had happened, right?

5   A.   Yes.

6   Q.   So, your answer to the question was because you didn't

7   remember his name, not because you didn't know who did the

8   stabbing?

9             MR. CANTOR:  Judge, that's --

10  A.   Yes.

11            THE COURT:  That's a fair question.

12            MR. CANTOR:  But it's leading and it's his own

13  witness.  That's leading.

14            THE COURT:  That's fair.  Please continue.

15  Q.   Can you explain?

16  A.   Can you repeat the question, please.

17  Q.   So we're clear, your answer to the 911 operator had to

18  do would your not knowing the defendant's name, but you knew who

19  did the stabbing?

20  A.   Yes.

21  Q.   Okay.

22            MR. CANTOR:  Is that a question or a declarative

23  statement?

24            THE COURT:  That's a question.

25            MR. CANTOR:  Really.  Note my respectful

1    exception.

2                    THE COURT:  Noted.

3         Q.   And at one point on the tape, towards the end, they

4    asked your name?

5         A.   Yes.

6         Q.   And your answer was what?  What did you hear you say?

7         A.   I gave Carmen Diaz's name.

8         Q.   Why were you saying Carmen Diaz's name?

9         A.   It was her apartment.

10        Q.   Did the fact that you had six -- I'll say six shots of

11   Hennessy at all interfere with your ability to see and recall

12   what the defendant did to Sosa?

13        A.   No.

14                   MR. ROSENFELD:  One moment, your Honor.

15                   THE COURT:  Yes.

16                   (Whereupon, a brief pause in the proceedings was

17        held.)

18                   MR. ROSENFELD:  I have no further questions.

19                   THE COURT:  Mr. Cantor.

20   RECROSS-EXAMINATION

21   BY MR. CANTOR:

22        Q.   When you said that Sosa and the defendant were

23   interacting prior to the striking for five minutes, that was

24   your best approximation; is that correct?

25        A.   Yes.

1      Q.   You certainly -- well, you're a grown and mature woman,

2   and you can approximate lengths of time, can you not?

3      A.   Well, I cannot tell you exactly the time, but it was

4   like five minutes.

5      Q.   I'm not asking you exactly.  I'm asking, do you have an

6   ability to approximate, estimate times?

7      A.   Yes.

8          MR. CANTOR:  Thank you.  I have no further

9   questions.

10          MR. ROSENFELD:  Nothing further.

11          Thank you, Ms. Hernandez.

12          THE COURT:  Thank you, ma'am.  You can step down.

13          THE WITNESS:  Thank you so much.  Can I go home?

14          THE COURT:  Yes, you may.

15          THE WITNESS:  Thank you.

16          (Whereupon, the witness' testimony was concluded,

17   and the witness was escorted out of the courtroom.)

18          THE COURT:  Please approach.

19          (Whereupon, an off-the-record discussion was held

20   at the bench.)

21          MR. ROSENFELD:  Your Honor, at this time, we have

22   People's Exhibit 7A that has been marked for

23   identification, a CD.

24          MR. CANTOR:  And that is a CD of a video scene.

25          MR. ROSENFELD:  I'll explain in one second.

1          MR. CANTOR:  I don't want to use --

2          MR. ROSENFELD:  I just want to make a record of

3    the number.  We're talking about 7A.

4          THE COURT:  7A is correct.

5          MR. CANTOR:  Give me a moment, Judge, because I

6    want to look at my list.

7          THE COURT:  7A.

8          MR. CANTOR:  Can I have a moment?

9          THE COURT:  You can have a moment, but it is 7A.

10          (Whereupon, a brief pause in the proceedings was

11    held.)

12          MR. CANTOR:  Judge, may we step up?

13          MR. ROSENFELD:  Yes.

14          (Whereupon, an off-the-record discussion was held

15    at the bench.)

16          THE COURT:  Mr. Rosenfeld.

17          MR. ROSENFELD:  Yes, your Honor.  At this time,

18    the People move People's Exhibit 7A, a CD, into evidence.

19          MR. CANTOR:  I have --

20          MR. ROSENFELD:  That is a video of Apartment 3D at

21    2033 McGraw Avenue, taken at approximately 4:15 in the

22    morning on December 25, 2009.

23          MR. CANTOR:  I have absolutely no objection.  Let

24    it be admitted and let it be viewed by the jury and your

25    Honor.

1    THE COURT:  Very good.  There being no objection,

2    what was previously deemed 7A for identification is now

3    deemed as having been proffered, without objection, into

4    evidence as such.

5         (Whereupon, the item referred to, previously

6    marked People's 7A for Identification, was received and

7    marked People's 7A in Evidence.)

8    THE COURT:  We will now play it for you.

9         (Whereupon, the video is played in open court.)

10   MR. ROSENFELD:  May the record indicate People's

11   Exhibit 7A has been played in its entirety for the jury.

12   THE COURT:  So indicated.  Do you have another

13   witness?

14   MR. ROSENFELD:  No, your Honor.  That concludes

15   the testimony for today.

16   THE COURT:  That concludes for today?

17   MR. ROSENFELD:  Yes.

18   THE COURT:  All right.  Please approach.

19        (Whereupon, an off-the-record discussion was held

20   at the bench.)

21   THE COURT:  As you heard, that completes our

22   witnesses for the day.  It has been a very long day.  We

23   are now recessing for the weekend.

24        The Court repeats all the precautions.  No

25   discussions with anyone, not amongst yourselves.  In the

1   unlikely event anyone approaches you, report it back to the

2   Court.  You're not detectives, you're not researchers,

3   you're not investigators, so do nothing on any of those

4   scores.

5          Another caution the Court now gives you, which it

6   has given you before, but emphasizes it more now, because

7   you've heard a lot of testimony, and you've seen a number

8   of exhibits, rush to no judgment.  Make no judgment call at

9   all.  Why?  Because we still have more witnesses.  We must

10  hear the People's final witnesses.  We must turn and see if

11  the defense wishes to go forward with any witnesses.  We

12  must hear the closing summation of counsel, where they

13  attempt to summarize for you the evidence as they see it or

14  the lack or insufficiency thereof.  Then, you must hear the

15  law from the Court.  Rush to no judgment.

16         Have a pleasant weekend.  We'll see you on Monday

17  morning.  Be here at 9:30, as per usual.  And we will get

18  underway as soon as we are all gathered.  We'll see you

19  then.  Good evening.

20         COURT OFFICER:  Okay.  Jurors, this way, please.

21         (Whereupon, the sworn jurors exit the courtroom.)

22         THE COURT:  All right.  The jury having been

23  excused, we know the routine.  On Monday, to give the

24  sergeant a little extra time to bring up Mr. Delgado.  For

25  our purposes, be here 9:45.

*KJ/f*                         *~ Proceedings ~*

1              MR. ROSENFELD:  Thank you.

2              THE COURT:  We'll see you then.  Have a pleasant

3     weekend.  Good night.

4              MR. CANTOR:  Have a pleasant weekend as well.

5              THE COURT:  Thank you.

6              (Whereupon, the court stands in recess, and the

7     case is adjourned to Monday, July 2, 2012, at 9:45 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

tr/a    Proceedings

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF BRONX :   CRIMINAL TERM - PART:   T-14

------------------------------------------- X

THE PEOPLE OF THE STATE OF NEW YORK,

                                                    Indictment #27/2010

          - against -                        Cont'd Jury Trial


DAVID DELGADO,

                              Defendant.

------------------------------------------- X

                         July 2, 2012

                         265 East 161st Street
                         Bronx, New York 10451


B E F O R E:

            HONORABLE DOMINIC R. MASSARO,

                         J U S T I C E

(Appearances same as previously noted.)

                         TRICIA L. ROBINSON, CSR, RPR
                         Senior Court Reporter

            (Whereupon, the following takes place, on the

      record, in open court, in the presence of the Court, the

      assistant district attorneys, defense counsel, the

      defendant and outside the presence of the jury.)

            THE COURT:  All right.  Mr. Clerk, please

      proceed.

1     THE CLERK:  Okay.  This is case on trial

2  continued, People of the State of New York against David

3  Delgado.

4     Counsel wishes to approach, your Honor.

5     THE COURT:  Yes, approach.  Please come forward.

6     (Whereupon, there was a discussion held, off the

7  record, at the bench, among the Court, the assistant

8  district attorneys, defense counsel, and outside the

9  hearing of the defendant and the jury.)

10    (Whereupon, the following takes place, on the

11  record, in open court, in the presence of the Court, the

12  assistant district attorneys, defense counsel, the

13  defendant and outside the presence of the jury.)

14    THE COURT:  Madam Reporter and Counsel.

15    (Whereupon, the following takes place, on the

16  record, at the sidebar, among the Court, the assistant

17  district attorneys, defense counsel, and outside the

18  hearing of the defendant and the jury.)

19    MR. ROSENFELD:  Are you waiving the defendant?

20    MR. CANTOR:  Yes.

21    MR. ROSENFELD:  I just wanted that on the record.

22    MR. CANTOR:  So we have found out firstly that

23  Juror Number 5 called and we have been informed by the

24  court clerk that Juror Number 5 called and said that his

25  wife had a medical issue and he would not be coming in

1    today.  I asked --

2            THE COURT:  He said, to be more accurate and not

3    to interrupt your record making, he said his wife had an

4    emergency which required him to take her and him to the

5    hospital.  That's more specific.

6            MR. CANTOR:  Okay.  I asked your Honor to have

7    the clerk call up to see to inquire as to his availability

8    tomorrow as to the nature of his wife's illness or

9    disposition.  The clerk informs me that he called back on

10   the cell phone and he, the juror, did not respond.  That's

11   all I have to say.  I don't know the nature of the malady,

12   perhaps the clerk can shed some further light on that.  All

13   I know is what you just said, Judge.

14           THE CLERK:  All he said was that she was in the

15   emergency room.  He didn't give me any specifics.

16           MR. CANTOR:  I think before you can take action

17   with respect to Juror Number 5 that we need some

18   particulars as to what causes the wife's presence in the

19   hospital.  Is it serious?  Is it minor?  Is it incidental?

20   Is it major?

21           I don't think you can knowingly and intelligently

22   replace this juror unless we have a foundation and that

23   would require further communication with the juror so

24   that's my position.  We are now getting towards the end of

25   the People's case, we are not there yet, at least I'm led

1      to believe there are three other witnesses, then we will

2      turn to the defense.  This case is not over by any means.

3      We are not near the end by any means, Judge.  So I think we

4      should harness --

5                   THE CLERK:  He says "no," Judge.  Hold on.  I'm

6      going to hand you over to the Judge.

7                   (Whereupon, the Clerk handed the phone to the

8      Court.)

9                   THE COURT:  Hello, Mr. Campbell.  Sorry for your

10     troubles, Sir.  We are further concerned with the

11     continuity of the trial.  I am inquiring or substantiating

12     what I think you just told the clerk.  Your wife's

13     emergency will not see you today and tomorrow and possibly

14     longer, is that correct?

15                  May I inquire is she still in the emergency room

16     or have they done a procedure?

17                  Is there someone who will be watching over her

18     that might allow you to resume your function here as a

19     juror?  Okay.  We will keep in touch with you.  All right,

20     sir.  I trust everything will work out well for you.

21     You're welcome, sir.

22                  He said we could call him tomorrow and he might

23     have a further situation, but his wife has had a procedure

24     of some sort which I didn't inquire as to an operative

25     procedure, and he's trying to arrange for people to assist

tr/a    Proceedings

1   and care for her.  I get the impression that we're not

2   going to see him.

3          MR. CANTOR:  Well, you left it off, I didn't hear

4   the other end obviously, but you left it off we'll speak to

5   you tomorrow.

6          THE COURT:  No.  I pushed him as you heard and

7   said can you get anyone or whatever the situation is, he

8   says well, I can try, we'll speak tomorrow.

9          MR. CANTOR:  Who said that?

10          THE COURT:  He did.

11          MR. CANTOR:  He will try to get a caretaker.

12          THE COURT:  That's what I think he was

13   suggesting, but he sounded not enthusiastic at all.

14          MR. CANTOR:  Enthusiastic is not a prerequisite

15   to service.

16          THE COURT:  I think given the situation I'm going

17   to replace him.

18          MR. ROSENFELD:  As indicated earlier to the

19   Court, Detective Florio who is here now is not available

20   tomorrow.  We have a second witness who's here also.

21          THE COURT:  Thank you for that information.  But

22   I think independent of that information and separate and

23   apart that the gentleman is not going to be available, he's

24   certainly not available today and the likelihood is he will

25   not be available tomorrow.  That's my impression.

1        MR. CANTOR:  Well, all I know is you left it with

2    him we'll speak tomorrow.

3        THE COURT:  No.  I did not say that.  I said

4    we'll keep in touch.

5        MR. CANTOR:  Tomorrow.

6        THE COURT:  No.  I didn't even use the word

7    tomorrow purposely because I wish to keep in touch with him

8    today seeming something might resolve.

9        MR. CANTOR:  Well, fine.  Let's adjourn.

10        THE COURT:  I'm not going to do that either.

11        MR. CANTOR:  What is the purpose of keeping in

12    contact with him later today if you're --

13        THE COURT:  You're probably right.

14        MR. CANTOR:  But I clearly heard at the end of

15    your conversation you tell him we'll keep in further touch.

16        THE COURT:  I did say that.  I said we'll be in

17    further touch because I expect Willie will call him and

18    tell him he's excused.

19        MR. CANTOR:  Well, you have my objection.

20        THE COURT:  Your objection is noted.

21        MR. CANTOR:  You also have seated in the

22    courtroom according to one of the court officers the sister

23    of Juror Number 1, and I'm afraid that any body or facial

24    language exhibited by this member of the audience being the

25    sister of Juror Number 1 would taint Juror Number 1.

1    How the sister of Juror Number 1 comes to be here

2    has to be contradiction of the instructions because you

3    only told the jurors that they were simply jurors, nothing

4    more, nothing less.  But apparently this young lady, the

5    sister of Juror Number 1, knows the courtroom or your name,

6    and or the name of my client which may be posted on the

7    calendar outside, and I'm saying that it's too close to the

8    line.  I don't want Juror Number 1 to be at all influenced

9    by someone that's as close as her sister and I'm suggesting

10   in the interest of sanitizing this trial and this jury as

11   much as humanly possible she be politely asked to leave the

12   courtroom, that being the sister.

13       MR. ROSENFELD:  As I indicated to the Court, I

14   was the one who observed the juror and this woman sitting

15   outside on the bench awaiting a court officer.  When the

16   court officer arrived at the usual post by the glass doors,

17   the juror went over to him leaving this woman or girl

18   sitting on the bench, and then the juror said something to

19   her about either the officer, she'll let her know, these

20   are my own words, I don't know what the words were.  The

21   woman remained sitting there or something.  I then saw her

22   in the courtroom and informed Mr. Cantor, so it appears she

23   came with Juror Number 1.  I don't know what conversations

24   or anything else further than that.

25       MR. CANTOR:  So you have the application.

1    THE COURT:  Yes.  I don't believe we're at a
2    threshold that suggests I either have to make further
3    inquiry or ask her to excuse herself.  It's pure
4    speculation how she's here.  This is a public courtroom.
5    We'll watch and see if there are any signals, faces and
6    correct them as we go along should they occur, which the
7    Court considers highly unlikely.
8    MR. CANTOR:  You have my exception.
9    THE COURT:  Noted.
10    (Whereupon, the following takes place, on the
11    record, in open court, in the presence of the Court, the
12    assistant district attorneys, defense counsel, the
13    defendant and the jury.)
14    COURT OFFICER:  Jury entering.
15    (Whereupon, the jury entered the courtroom.)
16    THE COURT:  Madam Forelady, ladies and gentlemen
17    of the jury, good morning to you.
18    JURORS:  Good morning.
19    THE COURT:  I trust everyone had a pleasant
20    weekend.  We continue on the People's case and the first
21    inquiry I make of all of you is can you all assure the
22    Court that you followed its instructions in their entirety?
23    JURORS:  Yes.
24    THE COURT:  Did you all do that?
25    JURORS:  Yes.

1          THE COURT:  All right.  Now, as you notice, one

2     juror number five is not with us.  We've had another

3     unfortunate emergency situation and so at this moment I'm

4     going to replace him with alternate -- Mr. Clerk?

5          THE CLERK:  Mr. Charles Gonzalez, you're now

6     juror number five.  Please take the seat.

7          THE COURT:  This gives us a chance and I'll

8     stress how important alternates are, many times people as

9     alternates think they have no role to play.  Actually, they

10    play a very important role, more like an understudy in a

11    play because they are constantly there.  They know exactly

12    what's going on because they've heard and seen evidence up

13    until the point they've moved up into the deliberating

14    jurors' box, as has just been done.  And so that's a very

15    real role, a very real function and certainly equates with

16    the civic obligation of jurors who are first chosen as such

17    and those that join them as alternates as the trial moves

18    on.

19         All right.  We continue on the People's case and

20    I invite the district attorney now to bring forward his

21    next witness.

22         MR. ROSENFELD:  People call Detective Christopher

23    Florio.

24         THE COURT:  Detective Florio to the witness

25    stand.

```
 1              COURT OFFICER:  Witness entering.
 2              (Whereupon, the witness entered the courtroom and
 3         takes the stand.)
 4              COURT OFFICER:  Remain standing, place your left
 5         hand on the Bible, raise your right hand, face the clerk.
 6              THE CLERK:  Do you solemnly swear the testimony
 7         you give to this Court shall be the truth, the whole truth
 8         and nothing but the truth, so help you God?
 9              THE WITNESS:  I do.
10              COURT OFFICER:  Have a seat.
11              Witness gives his name as Detective Christopher
12         Florio, shield number 329, Crime Scene Unit, New York City
13         Police Department.
14              THE COURT:  Good morning, Detective Florio.
15              THE WITNESS:  Good morning, your Honor.
16              THE COURT:  Just sit back, be comfortable, sir,
17         listen carefully to the questions that will be posed to
18         you.  Answer only the question.  Keep your voice up.
19              THE WITNESS:  Thank you.  I will.
20              THE COURT:  You may inquire.
21              MR. ROSENFELD:  Thank you.
22    DIRECT EXAMINATION
23    BY MR. ROSENFELD:
24         Q    Good morning, Detective Florio.
25         A    Good morning.
```

1          Q      Detective, how long have you been with the New York

2     City Police Department?

3          A      A little more than fifteen years.

4          Q      Can you tell us a little about your background prior

5     to joining the New York City Police Department?

6          A      Prior to the NYPD I did accounting work for an ad

7     agency and received an associate's from Nassau County Community

8     College, a bachelor's degree from John Jay College in criminal

9     justice and police science.

10

11                    (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People - CHRIS FLORIO - direct

1261

1    Q.    And when you first joined the police department,
2    approximately, 15 years ago what was your first assignment?

3    A.    Out of the academy I was assigned to the 17th Precinct
4    in Manhattan and was assigned to Field Training Unit, after that
5    I was assigned to Manhattan South Task Force for a little over
6    three years.  After that I went to the Evidence Collection Team
7    for about five months and December of '01, I was assigned to the
8    Crime Scene Unit, where I'm currently assigned to the Detective
9    Bureau.

10   Q.    And your first few months after the police academy
11   Field Training Unit what did that involve?

12   A.    The Field Training Unit basically teaches you to apply
13   what you learned in the academy out on the street.

14            MR. CANTOR:  Judge, can you ask the witness just
15       to speak forward?

16            THE COURT:  We already did, I will ask him again.

17            MR. ROSENFELD:  No, your Honor --

18            THE WITNESS:  I will speak up.

19            MR. ROSENFELD:  -- for the record the witness --

20            MR. CANTOR:  Judge, are we doing this will

21       colloquy?

22            MR. ROSENFELD:  And I hear him find.

23            MR. CANTOR:  Do we need --

24            THE WITNESS:  I can speak up.

25            THE COURT:  Please, gentlemen, please.

B-ljb

1    THE WITNESS:  I will speak up.

2    THE COURT:  Thank you.

3    A.   The Field Training Unit in the police department

4    essentially teaches you to apply what you learned in the academy

5    out on the street working with senior officers and supervisors.

6    Q.   It did not involve patrolling?

7    A.   Yes and patrol, foot post, riding in a sector car, all

8    aspects of patrol work.

9    Q.   And following your Field Training Unit those six

10   months you went to what, the task force?

11   A.   Yes.

12   Q.   And what was your assignment in the task force?

13   A.   The task force is a borough-wide response unit that

14   responds to potential riots or volatile situations.  We also

15   would respond to perpetrators searches, evidence searches,

16   anyway, any time you in need of a lot of cops right away for

17   something or some major incident that's what the task force did.

18   Q.   And you did that for how long?

19   A.   A little over three years.

20   Q.   Okay.  Were you involved or were you responding to

21   crime scenes during that time?

22   A.   Yes.

23   Q.   Did you participate in making arrests during that

24   time?

25   A.   Arrests, yes.

B-1jb

People - CHRIS FLORIO - direct

1263

1      Q.    Then you said you went to the Evidence Collection

2   Team?

3      A.    Yes.

4      Q.    Please explain what the Evidence Collection Team is

5   and when you started there.

6      A.    The Evidence Collection Team is -- forms a similar

7   function to the Crime Scene Unit.  We respond to lesser crimes

8   such as burglaries and robberies.  You still a uniform police

9   officer and you would dust for fingerprints, package evidence

10  and you were assigned to a borough.  I worked in Manhattan

11  South.  I worked in the Evidence Collection Team from August of

12  '01 to December of '01.  So I primarily spent actually most of

13  that time working at Ground Zero.

14     Q.    And when you were apart of the Evidence Collection

15  Team did you receive training?

16     A.    I had just started my training and 9/11 happened so

17  I -- that kind of through everything out the window.

18     Q.    What did you do at 9/11?

19     A.    During 9/11, I worked at Ground Zero primarily almost

20  daily helping recover pieces of human anatomy and pieces of the

21  aircraft and other things of potential evidentiary value.  Since

22  it was the largest crime scene in history we worked side by

23  side.

24          MR. CANTOR:  Judge, can we strike the largest

25      crime scene in history?

B-ljb

People - CHRIS FLORIO - direct

1264

1      THE COURT:  Well, he is explaining what he does.

2      MR. CANTOR:  Well --

3      THE COURT:  He did.

4      MR. CANTOR:  Judge --

5      THE COURT:  What his qualifications are.

6      MR. CANTOR:  I'm sorry?

7      THE COURT:  And what his qualifications are?

8      MR. CANTOR:  Well, he --

9      MR. ROSENFELD:  Your Honor, I am going to object

10     to colloquy.

11     MR. CANTOR:  He is stating that it is the largest

12     crime scene in history.  Really I wonder what --

13     MR. ROSENFELD:  Your Honor, I object.

14     MR. CANTOR:  I wonder what the Holocaust was.

15     MR. ROSENFELD:  That's unnecessary and I would

16     ask that counsel be rendered because of that.  It's

17     unnecessary and totally unappropriate for this courtroom.

18     THE COURT:  Well, yes, it was inappropriate, it

19     is correct.

20     MR. CANTOR:  What's correct?

21     THE COURT:  Over and above that, your comparison,

22     but over and above that it's totally out of order to be

23     editorializing.

24     MR. CANTOR:  Well, I moved to strike and your

25     Honor wouldn't rule.

B-ljb

People - CHRIS FLORIO - direct

1265

1    THE COURT:  You don't go berserk over it.

2    MR. CANTOR:  He goes berserk, he wouldn't let me

3    make an objection.  He overrides me.

4    THE COURT:  Please, let us let us proceed in an

5    orderly fashion.

6    Detective, can you continue, please?

7    THE WITNESS:  Sure, your Honor.

8    A.    And at the end of my evidence collection experience,

9    December of '01, I was transferred to the Detective Bureau

10   within the Forensic Investigation Division Detective Bureau in

11   the Crime Scene Unit where I'm still currently assigned ten-and

12   a-half years later.

13   Q.    Okay.  Please explain what the Crime Scene Unit is.

14   A.    The Crime Scene Unit responds citywide to all five

15   boroughs conducting forensic investigation of major crimes such

16   as homicides, sexual assaults, police involved shootings, things

17   of that nature.  Upon entering the crime scene unit I did an

18   apprenticeship-type program where you work with a senior

19   investigator for a period of 18 months to two years assisting

20   him in his investigations and simultaneously I would attend

21   different training courses and continuously over the last decade

22   I've taken multiple courses in crime scene investigation,

23   forensic investigation.

24   Q.    When did you become a detective?

25   A.    I was promoted to detective June of 2003.

People - CHRIS FLORIO - direct

1266

1    Q.    And, approximately, how many crime scenes have you

2    attended either as the main assigned detective or as an

3    assistant detective?

4    A.    I've processed, approximately, a thousand crime scenes

5    in the last decade and a half.

6    Q.    All right.  Detective, I now direct your attention to

7    December 25, 2009, were you working that day?

8    A.    Yes.

9    Q.    And do you recall what your proximate tour of duty was

10   either beginning that day or the day before?

11   A.    Yes, we were doing a double shift.  I started at two

12   p.m. on the 24th and I was working until eight a.m. on the 25th.

13   Q.    Did there come a time sometime after two o'clock in

14   the morning of December 25, 2009, that you were notified about a

15   crime scene in the Bronx?

16   A.    Yes.

17   Q.    And did there come a time that you responded to that

18   notification?

19   A.    Yes.

20   Q.    Do you recall, approximately, what time it was that

21   your office was notified?

22   A.    We were notified like around 3:30 a.m. and we left the

23   office about quarter to four in the morning and we arrived on

24   the scene about 4:15.

25   Q.    When you say "we" who are you referring to?

B-ljb

People - CHRIS FLORIO - direct

1    A.    My former partner, Detective Karen Newman and I.

2              MR. CANTOR:  Can I have that please, Detective?

3              THE WITNESS:  Detective Karen Newman and I.

4    Q.    Detective, could you please explain what a run number

5    is?

6    A.    A run number is our case number.  We call it a run so

7    it's not confused with the detectives squad case number.  This

8    way when you are asking for a run number or case number you know

9    if it's the crime scene's case number or detective squad case

10   number.

11   Q.    And was a case number assigned to this incident that

12   you responded to?

13   A.    It's '09 for the year 2009, 7295.

14   Q.    And where was the location that you responded to the

15   morning of December 25, 2009?

16   A.    In the Borough of the Bronx.  It was 2033 McGraw

17   Avenue, third floor apartment.

18             MR. CANTOR:  Judge, the record should reflect the

19   witness is glancing down at something.  I can't see what it

20   is, I assume it to be a paper of some sort.

21             THE COURT:  That's perfectly all right.

22             THE WITNESS:  My case folder (indicating).

23             THE COURT:  What is it you are looking at?

24             THE WITNESS:  Sure, this is my case folder that

25   contains all of the paperwork from the case that.

B-1jb

People - CHRIS FLORIO - direct

1268

1      THE COURT:  Feel free to refresh your

2   recollection at any time, just let us know.

3      THE WITNESS:  Sure.

4   Q.   Detective, I am sorry.  Approximately, what time was

5   it that you arrived at that location?

6   A.   About 4:15 a.m.

7   Q.   Okay.  And when you first arrived at 2033 McGraw

8   Avenue here in the Bronx were there other police personnel

9   present?

10   A.   Yes.

11   Q.   And did you speak with those police personnel?

12   A.   Yes.

13   Q.   And did you then approach the crime scene at 2033

14   McGraw Avenue, apartment 3D?

15   A.   Yes.

16   Q.   What was the first thing that you recall that you did

17   when you got to that crime scene?

18   A.   When we first arrived we do a walk through of the

19   crime scene and that's what we did in this case.

20      MR. CANTOR:  I'm going to object to "we" it

21   should be what he did, Judge.

22      THE COURT:  All right.  Be guided.  Please

23   continue.

24   A.   I did a walk through of the crime scene.  My partner

25   Detective Newman was with me.  A walk through essentially is

B-ljb

People - CHRIS FLORIO - direct

1269

1    done to make visual observations.

2                    MR. CANTOR:  No, the question was what did he do.

3         Not the purpose for what he did.

4                    THE COURT:  All right.  Wait for the next

5         question.

6         Q.    Please explain what the walk through is and what you

7    did that morning.

8         A.    The walk through, the purpose of is to make visual

9    observations prior to us performing any act of recovering any

10   evidence or doing any processing of the scene.

11        Q.    And did you, in fact, have an opportunity to observe

12   the inside of apartment 3D at 2033 McGraw Avenue that morning

13   when you did your walk through?

14        A.    Yes, I did.

15        Q.    And was the victim of the incident still there?

16        A.    Yes, he was.

17        Q.    After you did this walk through with your partner do

18   you recall what the second thing was that you did?

19        A.    Yes.

20        Q.    And what was that?

21        A.    We took photographs.

22        Q.    Detective, I show you what has been marked in evidence

23   People's Exhibits six, five, four, three and two.

24                    (Photographs being shown to the witness.)

25        Q.    Please take a look at those exhibits.

                                                              B-ljb

People - CHRIS FLORIO - direct

1       A.    Okay.

2       Q.    And do you recognize those exhibits?

3       A.    Yes.

4       Q.    And what did you recognize them to be?

5       A.    These are copies of the photographs taken that night?

6       Q.    Okay.    Are those fair and accurate photographs of the

7    way the crime scene looked back on December 25, 2009, when you

8    were taking those photographs?

9       A.    Yes, they are.

10      Q.    Okay.    Thank you.    In addition to preparing

11   photographs did you do a handwritten sketch of the area?

12      A.    Yes, a hand-drawn sketch was performed of this crime

13   scene.

14      Q.    Please explain what that means and what's included.

15      A.    A hand sketch is done to essentially show a layout of

16   the crime scene, like a floor plan to show locations of objects

17   or items in relation to one another.   Where doorways are.   Where

18   a victim might have been lying or a piece of evidence

19   potentially could have been recovered from.

20      Q.    And did you do that of that apartment?

21      A.    Yes, it was done.

22      Q.    Now, if we just skip ahead a little bit, Detective,

23   what do you do with that handwritten sketch that you prepare

24   inside a crime scene?

25      A.    The hand-drawn sketch of is then used to prepare a

B-1jb

People - CHRIS FLORIO - direct

1271

1   computer generated diagram at a later date.

2       Q.   And where is that done?

3       A.   That's done back in our office from the police lab in

4   Jamaica Queens.

5       Q.   And did there come a time that you took your

6   handwritten sketch Of the crime scene at 2033 McGraw Avenue,

7   apartment 3D, back to the Crime Scene Unit and use that process?

8       A.   My partner, Detective Karen Newman actually did the

9   sketch.

10      Q.   And did you have an opportunity to review the sketch?

11      A.   Yes.

12              MR. ROSENFELD:  Your Honor, I ask that this be

13          marked People's Exhibit 12 for identification.

14              THE COURT:  So deemed, sir.

15              MR. CANTOR:  May I look at it, your Honor?

16              THE COURT:  Okay.

17              MR. ROSENFELD:  I'm sorry, your Honor, may I

18          change the marking on the record; I asked that it be marked

19          People's Exhibit 1A not 12 my mistake.

20              MR. CANTOR:  Judge --

21              THE COURT:  1A it is so deemed.

22              MR. CANTOR:  -- may we have to approach?

23              THE COURT:  Not at this point.

24              MR. CANTOR:  Well, it's consistent with what --

25              MR. ROSENFELD:  I agree.  I understand, your

B-ljb

People - CHRIS FLORIO - direct

1272

1    Honor.

2                THE COURT:  All right.

3                MR. ROSENFELD:  I agree to approach.

4                THE COURT:  Detective, please be good enough to

5    stand down and take a seat?

6                (Whereupon, the witness exits the witness stand

7    and there is an off-the-record discussion at this time.)

8                MR. ROSENFELD:  Your Honor, I ask that People's

9    Exhibit 1A marked for identification be shown to Detective

10   Florio.

11               THE COURT:  Please display it.

12   Q.    Detective Florio, please look at People's Exhibit 1A

13   marked for identification only; do you recognize what that is?

14   A.    Yes.

15   Q.    Please indicate what it is that you are holding in

16   your hands?

17   A.    This is a copy of the computer generated diagram

18   prepared for this crime scene.

19   Q.    That's a piece of paper that you are holding?

20   A.    Yes.

21   Q.    You are holding the paper?

22   A.    Yes.

23   Q.    And the paper contains the diagram you just indicated?

24   A.    Yes.

25   Q.    Okay.  And have you had an opportunity to review this

1   diagram?

2        A.   Yes.

3        Q.   Is that a fair and accurate diagram or sketch of the

4   crime scene as it appeared back on December 25, 2009, in

5   apartment 3D?

6        A.   Yes.

7             MR. ROSENFELD:   Your Honor, at this time I would

8        move People's Exhibit 1A into evidence.

9             MR. CANTOR:   And I have a voir dire.

10            THE COURT:   Show it to defense counsel.

11  VOIR DIRE EXAMINATION

12  BY MR. CANTOR:

13       Q.   Detective, what I am holding in my hand 1A, which

14  you -- for identification, which you just had up on the witness

15  stand this is computer generated, right?

16       A.   Yes.

17       Q.   And it has Detective Newman's name and shield number,

18  correct?

19       A.   It does.

20       Q.   And she was the one that did this?

21       A.   That's correct.

22       Q.   Did there come a time after she did it that you looked

23  at it?

24       A.   Yes.

25       Q.   Was that today for the first time?

People - DETECTIVE CHRIS FLORIO - voir dire

1274

1    A.    No.

2    Q.    Much closer to 12/25/09?

3    A.    And again after I prepped for this trial.

4    Q.    When was that, sir, approximately?

5    A.    Couple of weeks ago.

6    Q.    Okay.

7              MR. CANTOR:  No objection, Judge.

8              THE COURT:  There being no objection, what

9    previously was deemed People's 1A for identification is now

10   deemed as having been proffered into and is received in

11   evidence as such and it will be marked at the close of the

12   session.

13             Please move on, Mr. Rosenfeld .

14             MR. ROSENFELD:  I'm sorry, Sergeant, may I please

15   have People's Exhibit 1A in evidence.

16             (Sergeant complies.)

17             (The handwritten having been previously marked

18   for identification is hereby marked in evidence as People's

19   Exhibit 1A.)

20   BY MR. ROSENFELD:

21   Q.    Detective, I am publishing People's Exhibit 1A in

22   evidence and I would ask you to look at People's Exhibit one

23   that the sergeant is holding there.

24             MR. ROSENFELD:  Please show it to the witness.

25             (The sergeant complies.)

People - DETECTIVE CHRIS FLORIO - direct

1          MR. CANTOR:  It's for identification.

2          MR. ROSENFELD:  It's not in evidence yet.

3     Q.    Detective, have you had an opportunity to look at

4    People's Exhibit one for identification?

5     A.    Yes.

6     Q.    And compared to People's Exhibit 1A can you please

7    explain what that is?

8     A.    They appear to be copies of the same diagram.

9     Q.    Okay.

10          MR. ROSENFELD:  Your Honor, at this time we would

11    move People's Exhibit one into evidence.

12          MR. CANTOR:  May I?

13          THE COURT:  Share it with Mr. Cantor.

14          MR. CANTOR:  And may I have the smaller one?

15          THE SERGEANT:  (Complies.)

16          THE COURT:  Any objection, sir?

17          MR. CANTOR:  Yeah, give me a moment, Judge.  May

18    we step up, your Honor?

19          THE COURT:  Yes.  Detective, please .

20          (Whereupon the witness exits the witness stand

21    and there is an off-the-record discussion.)

22          MR. CANTOR:  Has it B offered, Judge?

23          THE COURT:  Do you have an objection?

24          MR. CANTOR:  Yes, I have an objection to the

25    marking 3D on the configuration.

People - DETECTIVE CHRIS FLORIO - direct

1276

1      MR. ROSENFELD:  Objection to the colloquy.

2      THE COURT:  Yes, but it's descriptive so I will

3  allow it.

4      All right.  Thank you, Mr. Cantor.  Over and

5  above and aside from the objection what previously was

6  deemed as People's 1A -- I'm sorry, as People's one?

7      MR. ROSENFELD:  One, yes, your Honor.

8      THE COURT:  Is now deemed as having been

9  proffered and it is received in evidence as such.  You will

10  mark it at the close of session.

11      (The sketch having been previously marked for

12  identification is hereby deemed in evidence as People's

13  Exhibit one.)

14  BY MR. ROSENFELD:

15  Q.   Okay.  Detective, looking at People's Exhibit 1A

16  that's in evidence and we can also see 1, which is a chart to

17  the side of it.  You've indicated that those are the same

18  drawings, right?

19  A.   Yes.

20      MR. ROSENFELD:  Okay.  If you don't mind,

21  Detective, if you could stand up and with the Court's

22  permission go next to the television so everyone can see

23  because I am going to ask you to point things out.

24      THE COURT:  Yes, please.

25  Q.   If you just back up a little bit to make sure everyone

People - DETECTIVE CHRIS FLORIO - direct

1277

1    can see and you can use your pen.  I appreciate that.  Could you

2    please indicate, first of all, what are we looking at in the

3    diagram?

4        A.   Sure.  Okay.  This here (indicating) towards the

5    bottom level of the diagram is a general hallway on the third

6    floor of the building, okay.  You have a stairwell here

7    (indicating).  This is -- these symbols are doorways

8    (indicating).  This is the apartment (indicating) in question

9    which is apartment 3D.

10       Q.   Just one second.

11            MR. ROSENFELD:  So I can indicate, your Honor,

12       what the detective was pointing.  He pointed to the

13       stairwell and that to the left is the word stairwell.  He

14       then pointed to the next area, which has a 3B on it and

15       then he points to the next area, which has a 3C on it.

16       Then he pointed to the area and said doorway.

17       Q.   Is that correct, Detective, right in the middle of the

18   photo?

19       A.   Yes.

20       Q.   Next?

21            THE COURT:  All right.  So indicating.

22            MR. ROSENFELD:  Thank you.

23       Q.   And that is the doorway to where?

24       A.   This is the entrance of apartment 3D?

25       Q.   Please continue.

People - DETECTIVE CHRIS FLORIO - direct

1278

1    A.    All right.   When you first walk into the apartment
2  directly in front of you there is a table and chairs
3  (indicating), beyond the table is a kitchen (indicating).   When
4  you come into the apartment if you go to the left the victim was
5  laying on the floor.   This is the living area (indicating),
6  these are couches, table, furniture (indicating) and then there
7  is small hallway here (indicating) leading to bedroom and a
8  bathroom.

9    Q.    And Detective, when you examined this area and your
10  partner made the sketch were measurements taken?

11    A.    Yes.

12    Q.    Did you assist in taking those measurements?

13    A.    Yes.

14    Q.    And, approximately, can you give us a measurement of
15  the apartment as you walk in through that door and I am pointing
16  to the middle of the photograph from one end of the apartment,
17  which would be down to the left (indicating) all the way down to
18  the right beyond the door (indicating), which we will call for
19  now, the length of the apartment.   The length of the entire
20  apartment from the living area is 22 feet (indicating).   The
21  width of the apartment would be 17 feet and six inches, but the
22  area up to the kitchen, these are walls here (indicating) that
23  enclose the kitchen from the kitchen wall to the wall where the
24  door is seven feet, eight inches (indicating).

25               MR. CANTOR:   How much?

People - DETECTIVE CHRIS FLORIO - direct

1          THE WITNESS:  Seventeen, eight inches.

2          MR. ROSENFELD:  Indicating, your Honor, as

3     detective was describing it on the right side of the sketch

4     is the word kitchen and to the left is an opening and above

5     and below the opening is two lines, which the detective

6     indicated are walls to the kitchen.

7     Q.    Is that correct, sir?

8          THE WITNESS:  Yes.

9          THE COURT:  So indicated.

10         MR. ROSENFELD:  Thank you.

11    Q.    Now, out in the hallway you noted a couple of items.

12    Could you please indicate what those two things are?

13    A.    Yes, these were footprints.

14    Q.    And what did you do about the footprints?

15    A.    The footprints we photographed them and took

16    measurements as to their location where they were in case they

17    became pertinent later on in the investigation.

18    Q.    As far as you were concerned at that time you were

19    present on December 25, 2009, in the morning; did they have any

20    significance at that moment?

21    A.    No.

22    Q.    Okay.  And could you indicate, approximately, how far

23    was to the stairwell from the apartment, whatever measurements

24    you have that would assist you?

25    A.    The hallway, as you can see here (indicating) was 4

People - DETECTIVE CHRIS FLORIO - direct

1280

1    feet, 11 inches wide, almost five feet wide and to the wall that

2    is just beyond the entrance of the entrance to the apartment to

3    the stairwell is 20 feet.

4        Q.   Thank you, detective, you may be seated.

5        So, Detective, in addition to taking photographs and

6    participating in the measurements and the sketch of the crime

7    scene did you perform any other duties at that crime scene?

8        A.   Yes.

9        Q.   What, if anything, else did you do?

10       A.   We also dusted for fingerprints.

11       Q.   Okay.  Detective, could you please explain to the,

12   ladies and gentlemen, what that means and what that involves?

13       A.   Dusting for fingerprints essentially is the process we

14   used in an attempt to locate and recover fingerprints.  This was

15   done on that evening in question multiple locations including

16   the stairwell, in the hallway, the entrance to the stairwell in

17   the hallway, outside the apartment.

18       Q.   And were you able to obtain any fingerprints?

19       A.   No.

20                  (Continues next page.)

21

22

23

24

25

**Det. Florio - People - Direct**

```
1    CONTINUED DIRECT EXAMINATION BY

2    MR. ROSENFELD:

3         Q.   You indicated that you have been to many crime scenes,

4    correct?

5         A.   Yes.

6         Q.   Have you been to crime scenes that are inside of

7    buildings and apartments?

8                   MR. CANTOR:  Objection, relevancy.

9                   THE COURT:  Sustained.

10        Q.   And when you say there were no fingerprints, does that

11   indicate there was nothing indicating that someone had touched

12   objects or does that indicate you were not able to recover

13   anything?

14                  MR. CANTOR:  Objection.

15                  THE COURT:  I will allow that.

16                  MR. CANTOR:  He hasn't established it on

17        competency grounds.

18                  THE COURT:  He can ask him right now.

19                  MR. CANTOR:  Sorry.  I'm objecting to competency

20        grounds.

21                  THE COURT:  I understand.  Thank you.  Noted.

22                  MR. CANTOR:  Excepted.

23        A.   Could you repeat the question?

24        Q.   You indicated there were no prints recovered.  Does

25   that mean that you were unable to observe any type of prints or
```

**Det. Florio - People - Direct**

1   that you were unable to discern whether prints were useful or

2   not useful or anything?

3                    MR. CANTOR:  Objection to the form of question.

4                    THE COURT:  If he understands it, I will allow him

5        to answer.

6        A.    We dusted for fingerprints in an attempt to locate and

7   recover fingerprints.  The process of dusting for fingerprints

8   was done and we did not recover any usable fingerprints.  This

9   is not uncommon.

10                   MR. CANTOR:  Objection.  I would ask that the last

11       statement be struck.

12                   THE COURT:  Struck.

13                   MR. CANTOR:  And the jury be informed to disregard

14       it.

15                   THE COURT:  They may.

16                   MR. CANTOR:  They should, not that they may.

17                   THE COURT:  They are instructed.

18                   MR. CANTOR:  Thank you.

19       Q.    What does usable mean?

20       A.    A usable fingerprint would be a print that has ridged

21   definition in it.  That's a fancy way of saying if -- you've all

22   looked at your hands.  You see lines on the skin of your

23   fingers.  Those are what we refer to as ridge, friction ridges.

24   If there are no friction ridges visible, then we don't have a

25   usable fingerprint or if it's smudged or it's not enough there

**Det. Florio - People - Direct**

1    because fingerprints are made of moisture.  It's about

2    98 percent water, the rest is amino acids and oils.  Just

3    because you touch an item does not mean you are going to leave a

4    fingerprint on it.

5        Q.   Thank you, detective.

6             Did there come a time that you completed your

7    assignment inside of the apartment at 2033 McGraw Avenue that

8    morning?

9        A.   Yes.

10       Q.   Approximately when was it that you finished your

11   assignment?

12       A.   About 6:30 in the morning.

13       Q.   Detective, prior to coming to court to testify, have

14   you had an opportunity to meet with me in my office and review

15   this case?

16       A.   Yes.

17       Q.   Have you had an opportunity to review the sketches,

18   photographs and reports that were initiated as a result of this

19   incident?

20       A.   Yes.

21             MR. ROSENFELD:  I have no further questions.

22       Thank you.

23             THE COURT:  Thank you.  Mr. Rosenfeld.

24             Mr. Cantor?

25   CROSS EXAMINATION BY

**Det. Florio - People - Cross**

```
 1    MR. CANTOR:
 2        Q.   You said one of the duties of the Crime Scene Unit
 3    would be to search for a weapon; is that correct?
 4        A.   I did not say that, no.
 5        Q.   Well, is it one of the duties?
 6        A.   Yes, to search.
 7        Q.   You've answered the question --
 8        A.   Yes.
 9        Q.   -- by saying yes.  And did you do that in this
10    particular case to search for a weapon?
11        A.   Yes.
12        Q.   And did you recover a weapon?
13        A.   No.
14        Q.   Did the victim appear to have suffered some stab
15    wounds?
16        A.   Yes.
17        Q.   And thus you would look for a weapon?
18        A.   Yes.
19        Q.   And you did and you found one, correct?
20        A.   Correct.
21             MR. CANTOR:  No further questions.
22             MR. ROSENFELD:  Nothing further.  Thank you,
23        detective.
24             THE COURT:  Detective, thank you.
25             (Witness leaves the courtroom.)
```

**Proceedings**

1          MR. ROSENFELD:  Can we approach, your Honor?

2     Please.

3          THE COURT:  You may.

4          (Whereupon, there is a discussion held off the

5     record, at the bench, among the Court, and the Assistant

6     District Attorney.)

7          All right.  We will now take a five minute break.

8     Anybody wishes to go back and use the facility, please do

9     so and be back in your seats in five minutes.

10          COURT OFFICER:  Okay.  Jury exiting.

11          (Jurors leave the courtroom.)

12          THE COURT:  Who will be the next witness?

13          MR. ROSENFELD:  Carmen Matos.

14          THE COURT:  Very good.

15          (A recess is taken.)

16          COURT OFFICER:  Jury entering.

17          (Jurors enter the courtroom.)

18          MR. ROSENFELD:  I call Carmen Matos.

19     C A R M E N    M A T O S, a witness called on behalf of the

20     People, after having been first duly sworn and having stated her

21     county of residences as Bronx County, took the witness stand and

22     testified as follows:

23          THE COURT:  Good morning, Ms. Matos.  Just sit

24     back and be comfortable.  Listen carefully to what will be

25     asked of you.  Please answer only the questions and keep

1      your voice up.

2                THE WITNESS: Okay.

3                THE COURT: You may inquire.

4                MR. ROSENFELD: Thank you, your Honor.

5      DIRECT EXAMINATION BY

6      MR. ROSENFELD:

7          Q.   Good afternoon, Ms. Matos.

8          A.   Good afternoon.

9          Q.   How old are you?

10         A.   I'm 52.

11         Q.   And where were you born? Where did you grow up?

12         A.   I was born in Puerto Rico and I was raised here.

13         Q.   When did you come here to New York?

14         A.   When I was going to second grade.

15         Q.   Okay. Did you go to school here in New York?

16         A.   Yes, I did.

17         Q.   Was that New York City or the Bronx?

18         A.   The Bronx.

19         Q.   And when you completed school or when you finished

20     school, what grade was that?

21         A.   I went to the 11th grade.

22         Q.   What did you after that?

23         A.   I got married.

24         Q.   Approximately what year was that?

25         A.   '78.

**Matos - People - Direct**

```
 1        Q.   Okay.  What did you after you got married in 1978?

 2        A.   I was with my husband.  I had my kids.

 3        Q.   Okay.  Did you have any work at that point after 1978?

 4        A.   Yes, I worked.

 5        Q.   What type of work did you do?

 6        A.   I was a sales person.

 7        Q.   For?

 8        A.   Some company and I worked in an art company.

 9        Q.   Okay.  You were a sales person.  You worked for an art

10   company?

11        A.   Yes.

12        Q.   How long did you do those jobs for?

13        A.   For about five to six years.

14        Q.   Okay.  That's into the early '80's.  Did you have other

15   jobs in the '80's?

16        A.   I did the bus.

17             MR. CANTOR:  I can't hear.

18             THE WITNESS:  I was a bus monitor, an escort.

19        Q.   Is that a New York City Public School bus?

20        A.   Yes.

21        Q.   How long were you doing the bus monitoring job?

22        A.   I did that for a good ten years.

23        Q.   Okay.  Into the '90's or into the 2000's?

24        A.   It was in the '90's.

25        Q.   Were you still living here in the Bronx at that time?
```

Matos - People - Direct

1    A.   Yes.

2    Q.   After you were a bus monitor, did you have any other

3  jobs?

4    A.   No.  I stood home with my children.

5    Q.   That has been since what year?

6    A.   I don't remember.

7    Q.   Okay.  All right.  Well, were you working back in and

8  around December of 2009?

9    A.   2009?  I don't remember.

10   Q.   You don't remember the last time that you worked as a

11  matron of the bus company?

12   A.   It wasn't in 2009 because my mother passed away in

13  2006, so --

14   Q.   So can you give us an approximation?

15   A.   I don't remember.

16   Q.   So going back to around 2009, did you know someone by

17  the name of Carmen Diaz?

18   A.   Yes.

19   Q.   How did you know Carmen Diaz?

20   A.   I met her outside from where, the neighborhood where I

21  live.

22   Q.   Okay.  And approximately what year was it or how many

23  years before December of 2009 did you meet her?

24   A.   We met outside.  I don't remember.  I don't remember.

25   Q.   Well, did you live in the same area as Carmen Diaz in

**Matos - People - Direct**

```
 1    December of 2009?

 2         A.   Yes.

 3         Q.   Where were you living then?

 4         A.   I was living in 1959 McGraw.

 5         Q.   And how long had you been living at 1959 McGraw Avenue?

 6         A.   About eight years.

 7         Q.   So are you telling us you met Carmen when you first

 8    moved there eight years before that?

 9         A.   No.

10         Q.   Sometime after that?

11         A.   Yes.

12         Q.   When you say eight years, eight years before 2009 or

13    eight years from today?

14         A.   No, eight years from today.

15         Q.   Okay.  It would be approximately 2004 you moved to that

16    address?

17         A.   I think it was 2005 that I moved there.

18         Q.   You met Carmen sometime after that?

19         A.   Way after that.

20         Q.   How far after that?

21         A.   I met her -- I only know them for like two years now,

22    you could say.

23         Q.   Well, two years.  Again, when you say now, is that from

24    2010, 2009 or from today?

25         A.   2000 -- I think it was -- I met them in 2009, I think
```

**Matos - People - Direct**

```
 1    it was.  It was in the summer and then from there --

 2         Q.   What was the nature of your relationship with Carmen

 3    Diaz?

 4         A.   Just a friend.

 5         Q.   Okay.  And did you know someone by Melissa Dempsey?

 6         A.   Yes, I met her outside too.

 7         Q.   When you say outside, you're talking about the area

 8    between your buildings?

 9         A.   Yes, and where we used to sit and the kids play in the

10    park.

11         Q.   Okay.  Approximately when did you meet Melissa Dempsey

12    before 2009?

13         A.   It was about, I think, a year, about the same amount of

14    time, the same, year.

15         Q.   2009 you met her?

16         A.   Yes.

17         Q.   Did you also meet her husband Tango also known as

18    Alberto Vazquez?

19         A.   Yes.

20         Q.   How long have you known him?

21         A.   The same amount.

22         Q.   Okay.  Do you know someone by the name of Mercedes

23    Rodriguez?

24         A.   Yes.

25         Q.   How long had you known Mercedes Rodriguez as of
```

```
 1   December of 2009?
 2        A.   The same amount.
 3        Q.   Had you also met Mercedes along with everyone else
 4   outside of the building?
 5        A.   Yes, that's where I met them outside.
 6        Q.   Were you friends with them?
 7        A.   Yeah.  We used to--friends, yeah.
 8        Q.   Hung out socialized?
 9        A.   Outside.  We -- outside we socialized, outside when the
10   kids were outside playing.
11        Q.   Okay.  Did you know someone named George Talarvera also
12   known as Sosa?
13        A.   I knew -- I saw Sosa, but I did not know him
14   personally, no.
15        Q.   So when you say you saw Sosa, was that before
16   December 24th or 25th of 2009?
17        A.   Yes.
18        Q.   How long before that day had you seen Sosa?
19        A.   It was the year before.
20        Q.   Okay.  So would it be fair to say that you've known
21   Sosa for about a year?
22        A.   Yes.
23        Q.   Have you ever talked with him or socialized with him?
24        A.   Not really.
25        Q.   Where would you see him?
```

**Matos - People - Direct**

1      A.   When he would be walking outside and just say hi and

2   that's it.

3      Q.   No further socialization?

4      A.   No.

5      Q.   Okay.  Now Ms. Matos, back in September -- sorry.  Back

6   on September 11th of 1995, you pled guilty?

7           MR. CANTOR:  Objection, your Honor.  This is his

8      witness.

9           May we have a side bar?  You can't do this with

10      his witness.

11           THE COURT:  Yes.  Sure.

12           MR. CANTOR:  Thank you.

13           THE COURT:  Would you be good enough to stand down

14      and take that seat there?

15           THE WITNESS:  No problem.

16           (Whereupon, the following takes place on the

17      record, at side bar, in the presence but out of the hearing

18      of the jury.)

19           MR. CANTOR:  One can only impeach one's own

20      witness by way of prior inconsistent sworn or subscribed

21      statements.

22           This is a People's witness and one cannot by

23      virtue of the rules of evidence impeach one's own witness

24      by way of prior immoral acts of criminality or conviction

25      of crime.  There is only two ways and they are both in the

```
 1    CPL.
 2               This is the direct examination and the People's
 3    own witness.  If they had a subscribed or sworn statement,
 4    then they could use it to impeach her.  Other than that,
 5    they cannot.
 6               MR. ROSENFELD:  First of all, we have had two
 7    other witnesses that have testified for the People who have
 8    gone through -- we have gone through the records, the same
 9    way and there was no such objection, just for the record.
10               MR. CANTOR:  That's correct.
11               MR. ROSENFELD:  Okay.  So now I'm asking.
12               THE COURT:  What distinguishes this from them?
13               MR. CANTOR:  Well, I just chose not to object.
14    This witness has a de minimus criminal record and she's
15    called by the People and the People cannot impeach her by
16    way of prior acts of immorality or criminality.  They can
17    impeach only if have they a signed sworn prior inconsistent
18    statement.
19               I'm not asking for your sustaining the objection,
20    but directing this jury to disregard any portion and there
21    was a portion of the question framed by the prosecutor --
22               THE COURT:  Anything else?
23               MR. CANTOR:  No.
24               THE COURT:  Okay.  I'm going to overrule the
25    objection.
```

**Matos - People - Direct**

```
 1                    MR. CANTOR:  Contrary to law, but I will take an

 2        exception.

 3                    (Whereupon, the following takes place on the

 4        record in open court.)

 5                    THE COURT:  Mr. District Attorney, you may

 6        continue.

 7                    Ma'am, you can resume.

 8                    MR. ROSENFELD:  I will withdraw the question and

 9        restate it.

10   CONTINUED DIRECT EXAMINATION BY

11   MR. ROSENFELD:

12        Q.   Ms. Matos, have you ever been convicted of a crime?

13        A.   Yes, I was.

14        Q.   And was that on or about September 11th of 1995 in

15   Kings County Brooklyn?

16        A.   Yes.

17        Q.   Do you recall what you were convicted of?

18        A.   Solicitation.

19        Q.   Criminal solicitation in the second degree?

20        A.   Yes.

21        Q.   Do you recall -- did you receive a sentence for that?

22        A.   Yes, I did.

23        Q.   Do you remember what it was?

24        A.   Five years probation.

25        Q.   Are you also known by another name, a nickname?
```

**Matos - People - Direct**

```
 1        A.   Margie.

 2        Q.   Okay.  Is that what your friends call you?

 3        A.   Yes.

 4        Q.   Now, did there come a time that you met a person by the

 5   name of David Delgado?

 6        A.   Yes.

 7        Q.   When did you meet David Delgado?

 8        A.   Around September.

 9        Q.   Of what year?

10        A.   Of -- I don't remember the year, but I know it was in

11   September.

12        Q.   Okay.  Do you remember being Carmen Diaz's apartment

13   for a Christmas party on December 24, 2009?

14        A.   Yes.

15        Q.   How many -- how long before that Christmas party on

16   December 24th into December 25th of 2009 had you met David

17   Delgado?

18        A.   In September.

19        Q.   So that would be September 2009?

20        A.   Yes.

21        Q.   And where did you meet David Delgado?

22        A.   At a laundry mat.

23        Q.   Okay.  And after you met David Delgado, did you develop

24   a relationship with him?

25        A.   Yes.  We started talking.  I gave him -- he asked me
```

1    for my number and we would speak over the phone and --

2        Q.   Did there come a time that you would see each other

3    after that?

4        A.   Yeah.  We saw each other a couple of times.

5        Q.   Would it be fair to use the word dating?

6        A.   Yeah.  We started dating after.

7        Q.   After you met him in September of 2009?

8        A.   Yeah, we started dating and stuff.

9        Q.   Okay.  Approximately how many times, if you could

10   estimate, between the time that you met him in December of 2009

11   up until December 25th of 2009 did you date David Delgado?

12       A.   How many times I dated?

13       Q.   Approximately or how often, if that would be easier.

14       A.   He would come over to my house like every other

15   weekend, you know, or every other day.

16                MR. CANTOR:  Or every other --

17                THE WITNESS: Every other weekend.

18       Q.   I ask you to look around the courtroom.  Do you see

19   David Delgado in the courtroom?

20       A.   Yes, I do.

21       Q.   Indicate where he's sitting, what he's wearing.

22       A.   He's sitting on my left side and he's wearing a peach

23   shirt.

24                THE COURT:  So indicating the defendant herein.

25       A.   And a pair of black pants.

**Matos - People - Direct**

1           MR. ROSENFELD:  So indicating.

2      Q.   Now, you indicated that the Defendant David Delgado had

3   been to your apartment in the Bronx a number of times between

4   September and December of 2009, correct?

5      A.   Yes.

6      Q.   Had you ever been to his apartment?

7      A.   I went like once.

8      Q.   Okay.  Where did the defendant live?

9      A.   I don't remember where he lived.  I know it was on

10  Fourth Avenue.

11     Q.   In what county?

12     A.   In Brooklyn.

13     Q.   And when the defendant used to come to the Bronx to

14  visit you, did you ever go with him into the areas between your

15  buildings around 1954 or whatever your number is McGraw Avenue

16  and 2033 McGraw Avenue?

17     A.   Well, actually we never went outside, no.  He never

18  went outside with me.  Outside?  No.

19     Q.   The whole four months?

20     A.   Oh, we went out, I mean, but not out in front of the

21  building.

22     Q.   Where would you go?

23     A.   To a movie, to eat.

24     Q.   You would walk around the area?

25     A.   Yeah.  We walked around the area and we went to eat and

1    to the movies.

2        Q.   Okay.  Were you still married at that time?

3        A.   Married?  No.

4        Q.   You were divorced because you indicated you were

5    married before?

6        A.   Divorced.

7        Q.   Who was living with you around December of 2009?

8        A.   My son.

9        Q.   Okay.  And how old is your son?

10       A.   Ten years old.

11       Q.   And were there times between before December 24th of

12   2009 that you were with the Defendant David Delgado and you saw

13   some of the friends that I mentioned before, Carmen, Melissa,

14   Tango, Mercedes or Sosa?

15       A.   Yes.  Melissa met David, I introduced him to Melissa.

16   She came over to my house.  I introduced David to Melissa, then

17   Carmen met him too.

18       Q.   Where?

19       A.   I think it was in my house.

20       Q.   Carmen came to your house one time.  You were there

21   with David Delgado?

22       A.   Yes.

23       Q.   Melissa Dempsey came to your house?

24       A.   Yes.

25       Q.   You were there with David Delgado?

1      A.   Yes.

2                MR. CANTOR:  Did she say yes or--

3                THE WITNESS: Yes.

4      Q.   When they came to your house, I assume there were

5  different times?

6      A.   Different times.

7      Q.   Did you socialize with them in your house?  Did they

8  hang out?

9      A.   No.  They just came over.  Melissa came over to ask me

10  something and that was it.

11     Q.   Okay, but you introduced the defendant to her?

12     A.   Yes, I did.

13     Q.   How about Melissa's husband Tango, Alberto Vazquez?  Do

14  you recall ever introducing the defendant to him?

15     A.   No.

16     Q.   How about Mercedes Rodriguez?

17     A.   No.

18     Q.   How about Sosa, George Talarvera?

19     A.   No.

20     Q.   When you were with the defendant around your area going

21  out on dates, did you ever see these people outside?

22     A.   Because it was cold.

23                MR. CANTOR:  Sorry?

24                THE WITNESS: It was cold.

25     Q.   By the way, Ms. Matos, are you married now?

1      A.   No.

2      Q.   Are you in a common-law relationship with anybody?

3      A.   Yes.

4      Q.   Who?

5      A.   David Delgado.

6      Q.   And when did you--withdrawn.

7           Over the last couple of years since December 25th of

8      2009, have you seen David Delgado on a regular basis?

9      A.   Yes.

10     Q.   You've talked to him over that time period?

11     A.   Yes.

12     Q.   Now, going back to December of 2009, had you made any

13     plans for Christmas Eve?

14     A.   No.

15     Q.   What were your plans for December 24, 2009?

16     A.   I didn't have any plans.

17     Q.   Okay.  Do you recall where you were on that day

18     December 24, 2009?

19     A.   I was in Manhattan and I came home and then Carmen had

20     invited us to a party.

21     Q.   So you did have some plans to go to a party?

22     A.   Well, she had told me a week before or two weeks before

23     that if we could go, we was invited to her house to go to the

24     party and to go.

25     Q.   You said we.  Who are you referring to?

```
 1          A.    Me and David.

 2          Q.    So two weeks before December 24, 2009, Carmen invited

 3    you to her apartment for Christmas Eve party?

 4          A.    Yes.

 5          Q.    Okay and when she made that invitation to you, did they

 6    do that in person?

 7          A.    Yeah.

 8          Q.    Were you with David at the time?

 9          A.    She asked me first and then she, when she met David she

10    told David to come.

11          Q.    Okay.  All right.  Did you agree to go?

12          A.    I told her I might go, I'll see.

13          Q.    Had you made any other plans for that evening?

14          A.    No.

15          Q.    Okay.  So let's talk about December 24, 2009.  You say

16    you were in Manhattan during the day?

17          A.    Yes.

18          Q.    With whom?

19          A.    With David.

20          Q.    What were you doing in Manhattan during that day?

21          A.    Walking around and shopping.

22                MR. CANTOR:  Objection.  Irrelevant.

23                THE COURT:  Overruled.

24          A.    Shopping.

25          Q.    Shopping.  Okay.  What part of the day were you
```

Matos - People - Direct

```
 1    shopping for?
 2                        MR. CANTOR:  What day?
 3         A.   It was Christmas.
 4         Q.   What part of the day were you shopping?
 5                        MR. CANTOR:  Objection.  Irrelevant, totally.
 6                        THE COURT:  Overruled.  You may answer.
 7         A.   It was Christmas Eve.
 8         Q.   Were you shopping in the morning?  I'm trying to get
 9    the time of day, morning, afternoon, evening?
10         A.   We went out about one, two o'clock.  We were out there
11    all afternoon.
12         Q.   Okay.  Where were you before you say you went out,
13    where were you in the morning then?
14         A.   In my house.
15         Q.   Who were you in your house with?
16         A.   With David.
17         Q.   And who else?  Anybody else?
18         A.   And my son.
19         Q.   Okay.  So you left your house you're saying
20    approximately one o'clock in the afternoon with the defendant?
21         A.   Yes.
22         Q.   Was your son with you?
23         A.   No.
24         Q.   And you and the defendant went to Manhattan to shop,
25    correct?
```

**Matos - People - Direct**

```
 1      A.   Yes.

 2      Q.   Okay.  How long did you shop for?

 3      A.   For hours.

 4      Q.   Approximately?

 5      A.   What six, seven, hours.

 6      Q.   Okay.  What did you do after that?

 7      A.   Then we went home.

 8      Q.   Home to?

 9      A.   My house.

10      Q.   Your apartment?

11      A.   Yes.

12      Q.   Okay.  About what time did you get back to your

13 apartment here in the Bronx on December 24th of 2009?

14      A.   About 9:30, 10:00.

15      Q.   Okay.  All right.  And what happened when you got back

16 to your apartment at about 9:30 or 10:00 on December 24th of

17 2009?

18      A.   We stood in the house for a while.  David was depressed

19 because it was the holidays.

20           MR. CANTOR:  Sorry?

21           THE WITNESS:  We stood in the house and David was

22      depressed.

23      Q.   You said it was--

24      A.   He was depressed.

25      Q.   Yes?
```

1    A.    Because it was the holidays.

2    Q.    Okay.

3    A.    And his children and his mother, he wasn't around his

4    main family members.

5    Q.    Where were his family members?

6    A.    In Puerto Rico.

7    Q.    Now, were there times that David Delgado would stay

8    over at your apartment?

9    A.    Yeah, he would stay.

10    Q.    Okay.  And when you went to his apartment in Brooklyn

11    or his place in Brooklyn, did you stay over there?

12    A.    No.

13    Q.    Did you have any alcoholic drink up until that moment

14    at 9:00 or 9:30 Christmas Eve?

15    A.    If I --

16    Q.    Had you had any alcoholic drink up until that moment?

17    A.    No.

18    Q.    Had you observed the defendant have any alcoholic drink

19    up until the time that you got home which was around 9, 9:30 of

20    Christmas Eve?

21    A.    No, because I don't have liquor in my house.

22    Q.    Do you smoke marijuana?

23    A.    I don't even know how to smoke a cigarette.

24    Q.    You don't smoke cigarettes either?

25         MR. CANTOR:  Can we have a verbal answer?  No?

Matos - People - Direct

1    Yes?

2    A.   No.  I don't smoke cigarettes.

3    Q.   How about the defendant?  Did he smoke cigarettes that

4  day?

5    A.   Yes, David smokes cigarettes.

6    Q.   Okay.  And did you see him take any medications that

7  day?

8    A.   Yes, he took his medication.

9    Q.   What was that?

10   A.   Some medication he takes that he had to take.

11   Q.   You don't know what it is?

12   A.   No.

13   Q.   Okay.  And when did he take that?

14   A.   I don't remember.

15   Q.   Okay.  Now at 9 or 9:30, you were back in your

16  apartment.  What happened after that?

17   A.   Well, I asked David are we going to go to the party.

18  He stated to me that he didn't want to go, but Carmen was

19  insisting for us to go, so I came out.  I told him let's just go

20  for a little while.

21   Q.   You said Carmen was insisting.  Were you talking to

22  Carmen at that time?

23   A.   No, but we had spoken to me the day before and she said

24  come, come, come, so that's why I asked David if, you know, for

25  us to go.

**Matos - People - Direct**

1      Q.   Okay.  So what did you do?

2      A.   So then David said he didn't feel like going and I said

3  let's just go for a little while and we took a shower and we got

4  dressed and we went there for a little while.

5      Q.   Okay.  Do you recall what you were wearing when you

6  left the apartment to go to the party that night?

7      A.   I had a pair of jeans on.  A black shirt and a brown

8  little jacket on.

9      Q.   Okay.  Do you recall how the defendant was dressed that

10  night?

11      A.   He had a pair of jeans, a white t-shirt, and his jacket

12  on.

13      Q.   Okay.  And approximately what time was it when he left

14  your apartment?

15      A.   I think we went to the party around 12:00.

16      Q.   12:00 midnight?

17      A.   Around 11, 11 to 12 o'clock.

18      Q.   Was it just the two of you alone?

19      A.   Yes.

20      Q.   Did you bring anything with you from your apartment to

21  go to Carmen's that night?

22      A.   No.

23      Q.   Did you see whether or not the defendant took anything

24  with him when he left your apartment?

25      A.   No.

**Matos - People - Direct**

1     Q.  Did you carry anything with you, any type of

2  pocketbook, a wallet or anything?

3     A.  I had my keys and my cell phone.

4     Q.  How about David Delgado?  Did you see what he took with

5  him that night?

6     A.  No.

7     Q.  So when you left your apartment, where did you go?

8     A.  We went to Carmen's house.

9     Q.  Approximately how long does it take to get from your

10  apartment to Carmen's house?

11     A.  About two or three minutes.

12     Q.  Please continue.  What happened when you got to her

13  apartment?

14     A.  We went in.  I introduced David to Mercedes.

15              MR. CANTOR:  Sorry?

16     A.  We got to the apartment, to the party.  I introduced

17  David.

18              MR. CANTOR:  Can I have a moment, Judge?

19              (Pause in the proceedings.)

20              THE COURT:  Very good.  Continue.

21     Q.  When you got to Carmen Diaz's apartment and walked in,

22  could you tell us what you saw, what was happening?

23     A.  Well, there was a whole bunch of people.  There were

24  some of her family members, her friends which was Mercedes,

25  Melissa and other friends that used to be outside with them.

Matos - People - Direct

```
 1                    MR. CANTOR:  Sorry?

 2        A.   There was a party.

 3        Q.   It was a party?

 4        A.   They had music on.  They had music, they had liquor.

 5        Q.   Okay.  But music was playing when you got there?

 6        A.   Yes.

 7        Q.   How would you describe the level, the loudness of the

 8   music?

 9        A.   It was very loud.

10        Q.   Okay.  When you first walked in, did someone greet you?

11        A.   Yes.  Carmen, she said hello, everyone said hello and I

12   introduced --

13        Q.   Well, let's take it one at a time.  You said everyone,

14   Carmen said hello?

15        A.   Carmen said hello.  Melissa said hello.  Everybody said

16   hello to me.

17        Q.   Did David say anything or did they say anything to

18   David Delgado, the defendant?

19        A.   Well, they didn't -- Mercedes didn't know him, but

20   Carmen did say hello to him and Melissa.

21        Q.   And did the defendant say anything?

22        A.   He said hello.

23        Q.   Okay.  Did you go into the apartment at this point?

24        A.   Yes, we went in.

25        Q.   Okay.  Other than introducing him to Carmen and
```

**Matos - People - Direct**

1    Mercedes, did you say Melissa too?

2          A.    Yes.

3          Q.    Anybody else that you introduced him at that moment?

4          A.    I introduced him to Tango, to a man that was there

5    named Robert.  To a guy named Pachingo, to Sosa, and that was

6    it.  There was nobody else.

7          Q.    When you say you introduced David to these people, you

8    were inside of the apartment at this point?

9          A.    Yes.  We was inside of the apartment.

10         Q.    Okay.  Had you had anything to eat or drink yet at that

11   moment or was this the first thing that you did?

12         A.    No.  We was just walking in.

13         Q.    Okay.  And did Tango say anything to the defendant when

14   you introduced him?

15         A.    I guess they said hello to each other and they gave

16   their hand and they kept having a conversation.

17         Q.    Did you hear the conversation?

18         A.    No.

19         Q.    What were you doing?

20         A.    I was talking to Carmen, Melissa, Mercedes.

21         Q.    Okay, and you said at some point you also introduced

22   Sosa to the defendant?

23         A.    Yes.

24         Q.    Tell us what you said and what he said.

25         A.    I introduced Sosa.  I said Sosa, this is David.  David

**Matos - People - Direct**

```
 1    this is Sosa.

 2        Q.   And do you recall where you were standing at that time?

 3        A.   We was inside of the kitchen.

 4        Q.   Okay.  Just look up to your right.  There is a sketch.

 5    If you look at that sketch, it's a sketch of an apartment?

 6        A.   Yes.

 7        Q.   Here is the doorway to the apartment.  You see there is

 8    an object here to the right, it says kitchen.

 9        A.   We went into the kitchen.

10        Q.   Okay.  I'm showing you what has been marked People's

11    Exhibit 5 in evidence.  Do you recognize that?

12             (Whereupon, the exhibit is shown to witness.)

13        A.   Yes.

14        Q.   When you say you went into the kitchen, do see what

15    area you went into?  Do you recall?

16        A.   Into the kitchen, into where the kitchen is.

17        Q.   You see a table right here, correct?

18        A.   Not where the table is.  We were in the kitchen.

19        Q.   Okay.  Is that area past the table right here?

20        A.   Yes.

21        Q.   Is that where you said or indicating that Sosa and

22    David were introduced?

23        A.   Yes.

24        Q.   Okay.  So while you are inside the kitchen, what did

25    you say?
```

**Matos - People - Direct**

1    A.   That's where everybody was, at the kitchen.

2    Q.   Who else was in the kitchen?

3    A.   Tango was in the kitchen, Carmen was in the kitchen,

4  and then Sosa came to the kitchen and they were giving, telling

5  David that if he wanted a drink.

6    Q.   Okay.  When they were hanging out in the kitchen, what

7  were they doing?

8    A.   Having a conversation.

9    Q.   Was anyone smoking cigarettes?

10    A.   Not that I recall.

11    Q.   Okay.  So did you hear any conversation between Sosa

12  and David at that point when you introduced him?

13    A.   No.  He just started like telling him that --

14    Q.   Just use names please.

15    A.   Sosa said hi, whatever.  They said hi to each other and

16  then that was it.  Then afterwards we was, we was still in the

17  kitchen, then Sosa came back.

18    Q.   So some time passed?

19    A.   Yes.

20    Q.   Sosa left the kitchen?

21    A.   Yes.

22    Q.   You remained in the kitchen with David?

23    A.   We was in the kitchen.

24    Q.   What were you doing in the kitchen at this point?

25    A.   He was having a conversation with Tango and Melissa was

1    there and Carmen.

2         Q.   The defendant was having a conversation with Tango?

3         A.   With Tango.

4         Q.   And so you say Melissa, Carmen, yourself, you were all

5    in the kitchen area?

6         A.   Yeah.

7         Q.   But Sosa left the kitchen?

8         A.   Yes.

9         Q.   There came a time that Sosa came back into the kitchen?

10        A.   He came back to David, yes.

11        Q.   About how much time had passed?

12        A.   It was about, about two or three minutes.

13        Q.   Please continue.

14        A.   He came back into the kitchen and --

15             MR. CANTOR:  Can you speak up, please?

16        A.   He came back into the kitchen.

17        Q.   Please face out this way.  It might help project.

18        A.   Okay.  He came back into the kitchen.

19        Q.   That's Sosa?

20        A.   Yes.

21        Q.   Continue, please.

22        A.   And David was still having a conversation with Tango.

23        Q.   Had you -- did you overhear any of David's conversation

24   with Tango?

25        A.   No.

1   Q.   Who were you talking with?

2   A.   I was talking with Carmen.

3   Q.   How was the music at this point?

4   A.   It was loud.

5   Q.   What happened when Sosa returned to the kitchen?

6   A.   He approached David and he told -- he hit David and he

7   told David that if he was to do a disrespect to me or do

8   anything to me, that he would fuck him up.

9            MR. CANTOR:  Can I have that reread, please?

10           MR. ROSENFELD:  Indicating -- your Honor, the

11       witness is taking her left hand and touched herself on the

12       left side of her chest.

13   Q.   Is that correct, Ms. Matos?

14   A.   Yes my left side.

15   Q.   Just show us again where you are touching so I can put

16   it on the record.

17   A.   Between the chest and shoulder on the left side.

18           THE COURT:  So indicating.

19           MR. CANTOR:  Can I have the answer read back?

20           THE COURT:  Yes, you may.

21           (Whereupon, the court reporter read back the

22       above-requested testimony.)

23   Q.   You indicated a motion with your hand.  Is that how

24   Sosa put his hand on David?

25   A.   Yes.

1    Q.    Show us what he did?

2    A.    Yes. (Indicating)

3    Q.    Put his hand there?

4    A.    Yes.

5              MR. CANTOR:   Put his hand where?

6              MR. ROSENFELD:   Same spot that was noted on the

7         record before.

8    Q.    Other than putting his hand there, did he do anything

9    else?

10    A.    No.   He -- what I said, what he told him.

11    Q.    But you used the word hit.   Is that the same thing as

12    you are doing with your hand?

13    A.    He went like, you know. (Indicating)

14    Q.    Well --

15    A.    He was just going like this to him.   (Indicating)

16              MR. ROSENFELD:   Indicating, the witness has used

17         her hand on her chest pushing against the area between her

18         shoulder and her breast.

19    Q.    How many times did he do that?

20    A.    I guess once or twice.

21    Q.    Okay.   So --

22              MR. ROSENFELD: Indicating, again, as the witness

23         is speaking.

24              THE COURT:   So indicating.

25    Q.    And did David have any reaction after Sosa said that

**Matos - People - Direct**

1  and did that?

2       A.   No.

3       Q.   Did David say anything at that moment?

4       A.   No.

5       Q.   Okay.  All right.  Did he move out of the kitchen,

6  David?

7       A.   No.

8       Q.   What happened?

9       A.   I don't remember.

10      Q.   You don't remember if David, if the defendant said

11 anything?

12      A.   No.

13      Q.   Did you say anything?

14      A.   I didn't say anything.

15      Q.   Okay.  All right.  You heard this whole conversation as

16 you just indicated to us as you were standing next to David and

17 Sosa?

18      A.   Yes, that's what he told him.  That's what he said to

19 him.

20      Q.   Okay.  All right.  Then what happened?

21      A.   Then David just stepped away from him and kept having

22 the conversation with Tango.

23      Q.   And what did Sosa do after that?

24      A.   He went to the living room.

25      Q.   So nothing happened?

1    A.    No.

2    Q.    Okay.  Please continue.  What happened after that

3    moment?  What happened next?

4    A.    So they kept having, David kept having a conversation

5    with Tango and Sosa was in the living room dancing and stuff.

6    Q.    How about you?

7    A.    I was talking to the girls.

8    Q.    Did you stay in the kitchen the whole time?

9    A.    Yes.  We was in the kitchen.

10    Q.    Did you ever go into the other rooms?  If you look at

11    the sketch over there, did you go into the living room where the

12    couches were or the area or to the side?

13    A.    I went to where the kids were.

14    Q.    Where were the kids?

15    A.    At the couch.

16    Q.    If you look at the sketch all the way over here,

17    People's Exhibit 1, do you see the area that I'm referring to?

18    A.    Yes.

19    Q.    Is that the area that you're referring to?

20    A.    Yes.

21    Q.    Did you go over to talk to the kids?

22    A.    Yes.

23    Q.    Music still playing?

24    A.    Yes.

25    Q.    What else did you do?

**Matos - People - Direct**

1   A.   That was it.  We was talking and laughing and --

2   Q.   Did you dance at all?

3   A.   No.

4   Q.   No?

5   A.   No.

6   Q.   How about the table?  If you look at the table over

7   here on People's Exhibit 1 and the table on here on the

8   photograph, did you ever sit at the table or eat at the table?

9   A.   No.  I didn't sit at the table or eat in the table.

10   Q.   Okay.  Did you have any food to eat that evening while

11   were you at the party?

12   A.   No.

13   Q.   Did you have anything to drink either non-alcoholic or

14   alcoholic?

15   A.   I drank soda.

16   Q.   Other than soda anything else?

17   A.   No.

18   Q.   Okay.  And after you went over to see the kids on the

19   couch over here on the People's Exhibit 1 and talked to people,

20   where did you go?  Where did you go after that?

21   A.   I went back to where David was.

22   Q.   Which was where?

23   A.   In the kitchen.

24   Q.   You walked back from the couches over here back into

25   the kitchen over here?

1       A.   Yes.

2       Q.   Had David remained in the kitchen the whole time when

3  you had gone over to the kids on the couch until the time you

4  came back?

5       A.   David was having a conversation with Tango.  That's

6  where he stayed most of the time.

7       Q.   They continued for a while then?

8       A.   Yes.

9       Q.   What happened when you went back in the kitchen now?

10      A.   He kept talking to Sosa.  I mean, to Tango.

11      Q.   Okay.  All right.  What did you do?

12      A.   I stood there for a little while and then I went back

13 and I started talking to the girls.  They was sitting on the

14 table which was Mercedes, her daughter.

15      Q.   By sitting around the table, you are talking about in

16 People's Exhibit 4, sitting around the table over here?

17      A.   Yeah.  They was sitting there, so we was all having a

18 conversation, laughing, joking.

19      Q.   Okay.  David was in the kitchen with Tango over here to

20 the left?

21      A.   Yes.

22      Q.   Who else was in the kitchen at that point, if you

23 remember?

24      A.   I don't recall.

25      Q.   Okay.  Please continue.  What happened after that?

**Matos - People - Direct**

1    A.   Nothing else happened after that.

2    Q.   Okay.  All right.  Did you ever observe any of the

3    people in the kitchen smoking cigarettes?

4    A.   David and Tango was smoking cigarettes.

5    Q.   Okay.

6    A.   They smoked cigarettes.

7    Q.   More than one, if you noticed?

8    A.   No.

9    Q.   Okay.  You saw them when they were smoking?

10   A.   Yes.

11   Q.   Okay.  So you're sitting at the table.  David is in the

12   kitchen with Tango and other people.  What happened next?

13   A.   Yes.

14   Q.   What happened after that?

15   A.   Nothing else happened after that.

16   Q.   Okay.  Did you remain seated at the table talking to

17   your friends?

18   A.   We were just sitting there having a conversation

19   talking.

20   Q.   Okay.  For about how long?

21   A.   I don't remember.

22   Q.   Okay.  All right.  Did there come a time that you got

23   up from the table and moved your position?

24   A.   Yeah, I got up.

25   Q.   Okay.  And what --

1    A.    They were looking for something to change the music so

2  that we could all go and dance and then that was it.

3              (Continued on the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q    So did you move from the table on People's Exhibit 1

2  over here into the dancing area on the left over here?

3    A    I stood maybe, I'd say maybe right where the table is

4  I stood.

5    Q    You stood around where the table is?

6    A    Yes.  Yeah, it was just standing.

7    Q    Was the music still playing?

8    A    Yes.

9    Q    What was the level of the music?

10   A    It was loud.

11   Q    What happened after that?

12   A    Nothing.

13   Q    Did you ever leave Carmen Diaz's apartment for any

14  reason?

15   A    Yes, we went to my house.

16   Q    So after you're standing up there, you just left, you

17  said you were standing up by the table?

18   A    Umm-hmm.

19   Q    I asked you what happened next.  Does there come a

20  time you left the apartment at some point?

21   A    Yes, because they needed some juice.

22   Q    Tell us what happened, please.

23   A    Um, Melissa came and said that they needed some juice

24  for, um, Absolute.

25                  MR. CANTOR:  They needed what?

1       A      Some juice.  So I stated to her that I had cranberry

2  juice, so I walked to my house and I went and I got the

3  cranberry juice.

4       Q      Did you go by yourself or with anybody?

5       A      I went with David.

6       Q      So before you left, had you gone into the kitchen to

7  say something to David?

8       A      Yes.  I told him let's go get the juice.

9       Q      Okay.  Did he say anything to you?

10      A      No.

11      Q      Did you walk out the apartment?

12      A      Yes.

13      Q      And the defendant walked out with you?

14      A      Yes.

15      Q      You walked back to your apartment?

16      A      Yes.

17      Q      And what happened when you got to your apartment?

18      A      I went in, I got the cranberry juice.

19      Q      Did David go into the apartment at that point with

20  you?

21      A      Yes.

22      Q      Where did you go to get the cranberry juice?

23      A      Out of the refrigerator.

24      Q      Where did David go?

25      A      To the bathroom.

1    Q    I assume your refrigerator is in the kitchen, right?

2    A    Exactly.

3    Q    Did David come into the kitchen with you to get the

4    cranberry juice?

5    A    No.

6    Q    You say he went to the bathroom when he returned to

7    your apartment?

8    A    Yes.

9    Q    Then what?

10   A    I went into the kitchen.  I waited for him to finish

11   and then to leave.

12   Q    Did you then leave after you got the cranberry juice?

13   A    Yes.

14   Q    Did you take anything else from your apartment besides

15   the cranberry juice?

16   A    No.

17   Q    Did you see whether or not David took anything from

18   the apartment?

19   A    No.

20   Q    You went in the kitchen by yourself?

21   A    Yes.

22   Q    Did you ever see David go into the kitchen?

23   A    No.

24   Q    So you left the apartment and went where?

25   A    Back to Carmen's house.

1       Q     How long did all that take from the time you left

2    Carmen's apartment to go get the cranberry juice to the time

3    you returned to her apartment?

4       A     About what, ten minutes, ten to fifteen minutes.

5                  MR. CANTOR:   I'm sorry?

6       A     Ten to fifteen minutes.

7       Q     Do you know approximately what time it was when you

8    returned to Carmen's apartment?

9       A     I don't remember.

10      Q     What happened when you returned to Carmen's apartment?

11      A     We went back and I took the juice.

12                 MR. CANTOR:   "And I" what?

13      A     We went back to the party and I gave the juice, gave

14   them the juice.   They put the juice on top of the table.

15      Q     Then what happened?

16      A     Then the party kept going and stuff.

17      Q     Was this a full bottle of cranberry juice that you

18   brought back?

19      A     No.   It was a half a bottle.

20      Q     So please continue.   What did you do when you got back

21   to the party?

22      A     We started talking like we were before.

23      Q     Where were you hanging out at that point?

24      A     More or less in the same area.

25      Q     By the table right here?

1    A    More or less, around the same area.

2    Q    What did David do when you came back into the

3  apartment with the cranberry juice?

4    A    He was more or less around the same area.

5    Q    Again, this table here on the picture?

6    A    Right around there, yeah, he was there.  As a matter

7  of fact we were sitting down.

8             MR. CANTOR:  I'm sorry?

9    A    We sat down.

10    Q    Who sat down?

11    A    David sat down and I sat on his lap.

12    Q    Where did you sit?

13    A    On his lap.

14    Q    I'm sorry.  Where around the table did you sit?  You

15  could use these chairs to indicate an area.

16    A    In one of those chairs.

17    Q    Was it the chair by the door over here, the middle

18  chair, the chair on the left or the chair in the foreground?

19    A    That one.

20    Q    This one?

21    A    Yes.

22    Q    Where was this chair at that point?

23    A    By the table.

24    Q    So would that be fair to say I'm pointing to an area

25  at the table on People's Exhibit 4 right by this white

1      tablecloth?

2          A    Yes.

3          Q    Who else was sitting at the table with you?

4          A    There was other people sitting at the table.

5          Q    Do you remember who?

6          A    I know there was Robert sitting on the table, um,

7      Mercedes' friend, and someone else was sitting, I don't

8      remember.

9          Q    So all three chairs were occupied by people?

10         A    Um, um, everybody was sitting, talking.

11         Q    Was the music still playing?

12         A    Yes.

13         Q    Was the same people who had been at the party earlier

14     still at the party when you got back?

15         A    Yes.

16         Q    What was the level of the music at this point?

17         A    Loud.

18         Q    And you said David sat down, you sat on his lap and

19     what were you doing?

20         A    Talking.

21         Q    Please continue.  What happened after that?

22         A    We kept talking to the people that were on the table

23     and sitting around the table and having a conversation.

24         Q    Was anybody drinking alcohol at that point?

25         A    Everybody was drinking in that party.

1    Q    How about you?

2    A    I don't drink.

3    Q    Did you observe David the defendant drinking any

4  alcohol?

5    A    Yes, he did.  He drank.

6    Q    What did you see him drinking?

7    A    They gave him all types of drinks.

8    Q    Tell us.

9    A    They had Hennesy there, they had Absolute, and they

10 had some other stuff that I don't remember.

11   Q    When did you see David drinking these things?

12   A    Tango, Melissa, they all gave him drinks.

13   Q    Was it at this point when you were sitting down at the

14 table here, or you talking about earlier?

15   A    They gave him earlier and when we went back.

16   Q    So more drinks.  So about how many drinks did you

17 observe David having that evening?

18   A    It was quite of them.

19              MR. CANTOR:  "Quite of them"?

20              THE WITNESS:  Yes.

21   Q    Can you give me an approximation in terms of one, two,

22 three, a number?

23   A    About five, six.

24   Q    When you say cups, how big of cups were they compared

25 to the cups in front of you?

1    A    They were a little bigger than that.

2    Q    Do you know if the cups were full, half full, quarter

3    full?

4    A    I don't know.

5    Q    You have no idea how much liquor was in them?

6    A    I don't know.

7    Q    If you look at People's Exhibit 4 here to your right

8    on this table where you were sitting, there's some items, do

9    you recognize any of those items?

10   A    The cranberry juice.

11        MR. CANTOR:  And what?

12   A    The cranberry juice.

13   Q    That's the cranberry bottle you brought back from your

14   apartment?

15   A    Yes.

16   Q    How about the other items on the table?

17   A    No.

18   Q    Do you know what they are?

19   A    No.

20   Q    Did you see anybody drinking beer from beer cans?

21   A    Yes.

22   Q    You don't recognize those?

23   A    They look like beer cans.

24        MR. CANTOR:  They what?

25   A    Beer cans.

 1       Q      Were you drinking any of those beer cans?

 2       A      No.

 3       Q      How about David?

 4       A      No.

 5       Q      All right.  Please continue.  You're sitting down on

 6    David's lap, you're talking about your friends.  What's the

 7    next thing you remember that happened?

 8       A      Then, um, Carmen's daughter comes and says that she

 9    was upset because --

10       Q      Please don't indicate what she said.  Just indicate

11    she came over to you?

12       A      She said --

13       Q      Don't indicate what she said.  Did she come over to

14    you?

15       A      No.

16       Q      You heard her say something?

17       A      I heard her say that --

18       Q      You heard her say something?

19       A      Yes.

20       Q      After she said something, what happened?

21       A      She went and she spoke to her mother.

22       Q      What happened after that?

23       A      Then her mother went and got Sosa's coat.

24              MR. CANTOR:  Got?

25       A      Sosa's coat.

1    Q    Go ahead.

2    A    And told him he had to leave.

3    Q    What happened after that?

4    A    He was upset.

5    Q    Go ahead.

6    A    And they kept arguing.

7    Q    Who?

8    A    Carmen and Sosa, and then they walked out of the

9    apartment.

10   Q    So Carmen and Sosa walked out the door, he had his

11   coat on?

12   A    I don't remember.

13   Q    Oh, okay.  Do you know where -- did you see where they

14   went?

15   A    They went out the hall.

16   Q    Did you see if anybody else went out the hall with

17   them?

18   A    Melissa and Tango.

19   Q    So after they left, what happened inside?

20   A    We stood inside in the party.

21   Q    Were you still sitting on David's lap by the table?

22   A    No.

23   Q    What were you doing?

24   A    I was standing talking to Mercedes and to her

25   daughter.

1       Q     What about the defendant?

2             MR. CANTOR:   I can't hear the answer.

3       A     To Mercedes and her daughter.

4       Q     What about the defendant?

5       A     And the defendant.   He was drinking.

6       Q     Where?

7       A     I think around the table.

8       Q     What happened after that?

9       A     I don't remember.

10      Q     Well, did there come a time that Carmen returned to

11   the apartment?

12      A     Yes, there did.   They came back to the apartment.

13      Q     Who came back to the apartment?

14      A     Carmen came back to the apartment, Melissa came back

15   to the apartment, Tango and Sosa.

16      Q     Do you know approximately what time it was when they

17   came back?

18      A     No.

19      Q     What happened when they came back to the apartment?

20      A     They were talking and me and David was leaving.

21      Q     Why were you leaving at that point?

22      A     Because Sosa had harassed, um, David.

23      Q     When did that happen?

24      A     Couple of times.

25            MR. CANTOR:   Can I hear that?

 1        A     Couple of times.

 2        Q     Let's go back.  You told us about the time Sosa was in

 3   the kitchen with David and tapped him, hit him, whatever word

 4   you used, around the shoulder and said something?

 5              MR. CANTOR:   Is there an answer to that?

 6        A     Yes.

 7        Q     Now you're saying there was another time something

 8   happened between them?

 9              MR. CANTOR:   She said a couple of times.

10        Q     We'll start with one time.

11        A     There was a couple of times he came, he approached

12   him.

13        Q     Who approached whom?

14        A     Sosa approached David couple of times.

15        Q     Where was this?

16        A     While he was in the kitchen.

17        Q     You told us about the first time, correct?

18        A     Umm-hmm.

19        Q     Now you're saying there's some other time that Sosa

20   approached David in the kitchen?

21        A     Umm-hmm.

22        Q     This is before he left with Carmen or after he came

23   back?

24        A     Before he left with Carmen.

25        Q     Go ahead.  Tell us what happened.  There was another

1    time that Sosa approached David?

2         A    Yes.

3         Q    Go ahead.

4         A    He told him the same thing.  He told him if he wants

5    to disrespect me or do anything to him that he would fuck him

6    up.

7                   MR. CANTOR:  Can I have that read back?

8                   MR. ROSENFELD:  It's unnecessary.

9                   THE COURT:  I will decide.  You may.

10                   (Whereupon, the requested portion was read by the

11         court reporter.)

12                   MR. CANTOR:  Thank you, your Honor.

13         Q    How long from the first time Sosa said that to David

14    was the second time?

15         A    It was couple of times.

16         Q    Okay.  It was the first time you told us about before

17    he touched your shoulder and now there's a second time.  How

18    much time between them?

19         A    About two or three minutes.

20                   MR. CANTOR:  I'm sorry?

21         A    Two to three minutes.

22         Q    So after the second time or during the second time

23    when Sosa said that to David, did he say anything back to Sosa?

24         A    No, he didn't say anything back to Sosa.

25         Q    Did Sosa the second time use his hands in any way the

1    same way he did the first time, or a different way?

2    A    Same way.

3    Q    Show us.

4    A    He approached him the same way.

5    Q    What, if anything, did Sosa do the second time?

6    A    The exact same way.

7    Q    Show us what he did with his hands.

8    A    He went like, you know, (indicating).

9         MR. ROSENFELD:   Indicating the witness with her

10   left hand is touching above her left chest, pushing down.

11        MR. CANTOR:   Hitting three times is what I saw.

12        MR. ROSENFELD:   The jury can observe whatever.

13   Q    Is that how Sosa touched David?

14   A    Yes.

15   Q    As a result of that, did David move or react in any

16   way?

17   A    No.

18   Q    Did David say anything to him?

19   A    No.   David didn't say anything to him.

20   Q    Did Sosa stay there after the second time or did he

21   leave?

22   A    He went and he was dancing.   He went back to dancing.

23   Q    So that was the end of it for the moment?

24   A    Umm-hmm.

25   Q    You mentioned before you left the apartment with David

1    to get cranberry juice?

2        A    Yeah.

3        Q    Other than these first two times that Sosa approached

4    David, was there any other time before you left the apartment?

5        A    I don't remember.

6        Q    Okay.  So you came back from getting the cranberry

7    juice?

8        A    Umm-hmm.

9             MR. CANTOR:  What's the answer?

10       A    Yes.

11       Q    You came back from getting the cranberry juice, you

12   were sitting at the table?

13       A    Yes.

14       Q    There came a time that Sosa left with Carmen and Tango

15   and Melissa?

16       A    Yes.

17       Q    Up until that moment from the time you returned until

18   the time they left, had Sosa approached David while you were

19   sitting on his lap?

20            MR. CANTOR:  This will be a third time are we

21       talking about?

22            MR. ROSENFELD:  I'm asking if there's a third

23       time is my question.

24       A    David wasn't sitting on the table when Sosa came back.

25   We had our coats on.

1    Q    No.  I'm sorry.  From the time you came back with the
2    cranberry juice until the time Sosa left with Carmen, Tango and
3    Melissa, just that period of time, you told us you were sitting
4    at the table in David's lap, correct?
5    A    Umm-hmm.
6    Q    During that time, had Sosa approached David at all?
7    A    During that time, no.
8    Q    So Sosa left with Carmen, Melissa and Tango and you
9    stayed in the apartment?
10   A    Umm-hmm.
11        MR. CANTOR:  What's that?
12   A    Yes.
13   Q    Then you say they came back?
14   A    Right.  They came back.
15   Q    And you told us you went about doing things after
16   that, right?
17   A    Yes.
18   Q    Did Sosa approach David at any point after they came
19   back?
20   A    Yes, he did.
21   Q    At what point was that?
22   A    We had our coats on.  We was leaving.
23   Q    This was approximately how long after Sosa came back
24   into the apartment were you leaving?  About how much time?
25   A    It was like seconds.

1    Q    So when Carmen, Melissa and Tango came back into the

2    apartment is when you got your coats?

3    A    Yes, we had our coats.

4    Q    You were leaving why at that moment?

5    A    Because we wanted to go home.

6    Q    So tell us what did you say happened as you got your

7    coats?

8    A    So we had our coats.  We were standing to leave.

9    Q    Were the coats in a different place when you say we

10   got our coats?

11   A    Well, my coat, um, Carmen's daughter got my coat and

12   David his jacket, his gray jacket on.

13   Q    Where were you at that point?

14   A    We were standing.

15   Q    I'm using People's Exhibit 6 if that assists you.

16   Does that assist you?

17   A    No.

18   Q    Or is it better to use People's Exhibit 4?  Is this

19   one better?

20   A    Yes.

21   Q    Go ahead.

22   A    We were standing by where the chair -- a little

23   further in to the table.

24   Q    By the chair, which chair are you referring to?

25   A    This chair.

1       Q    I'll point with my pen.  Is this the chair you're

2    referring to?

3       A    Yes.

4       Q    You and David were standing approximately where?  Tell

5    me to move my pen to the right or left.

6       A    We were standing about more to -- a little closer to

7    the door.

8       Q    Tell me.  You tell me where to move the pen, left or

9    right, away from you or towards you.

10      A    A little further to the front.

11      Q    That way or?

12      A    No.  We were standing around right there.

13                MR. ROSENFELD:  Indicating, your Honor, pointing

14           to the right side of the photograph by the right table leg

15           or a little to the left of the right table leg below where

16           the cloth is.

17      Q    That's the general area you were?

18      A    We were standing there.

19      Q    You and David?

20      A    Yes.  We was getting ready to leave.

21                THE COURT:  All right.

22      Q    Where was Carmen at that point, if you remember?

23      A    I don't remember.

24      Q    Do you remember where Mercedes was at that point?

25      A    Mercedes was by the door.

1   Q   Here's the door here.  What was she doing?

2   A   She was sitting on the chair.

3   Q   This chair right here that's now by the door?

4   A   She was right there by the door.

5   Q   Was the door open at that point?

6   A   Yes.

7   Q   Was it being held open like it is in the photograph?

8   A   Yes.

9   Q   Do you remember where Melissa was at that point?

10  A   No.

11  Q   How about Tango?

12  A   No.

13  Q   How about Sosa?

14  A   Sosa, when we was getting ready to leave, Sosa

15  approached David.

16  Q   Where was he before he approached David, if you

17  recall?

18  A   I don't recall.

19  Q   Now, the other people, were they still at the party?

20  A   Yeah, everybody was at the party.

21  Q   Same people who had been there earlier?

22  A   Yes.

23  Q   Was the music still playing?

24  A   Yes.

25  Q   What was the level of the music at this point?

1       A     Loud.

2       Q     Please continue.  So you're standing approximately

3    here as you indicated on the photograph with your coats on,

4    Sosa came over.  Go ahead.  Please continue.

5       A     Sosa approached David and punched him on his shoulder

6    and told him he was gonna fuck him up, and Mercedes was sitting

7    down.  I tried pulling David so they wouldn't argue.

8       Q     Tried what?

9       A     I said I pulled David so they wouldn't argue, but he

10   said, "let go of me," so I did.  So Mercedes was pulling me

11   'cause she wanted to talk to me, so Mercedes pulled me.  I gave

12   Mercedes my full attention.

13              MR. CANTOR:  I can't hear you.

14      A     Mercedes pulled me.  I gave Mercedes my full attention

15   and was talking to Mercedes and I don't know what else

16   happened.

17      Q     Okay.  Just go back, please.  I didn't have a chance

18   to put on the record when Sosa approached David this time, this

19   is the third time now, you had your coats on by the table,

20   right?

21      A     Umm-hmm.

22      Q     Sosa came over to David?

23      A     Yes.

24      Q     Was Sosa holding anything in his hand?

25      A     I don't know.

1    Q    Was he holding a drink?

2    A    No.

3    Q    You don't see anything in his hands?

4    A    No.  I don't know.

5    Q    Sosa said something to David?

6    A    Umm-hmm.

7         MR. CANTOR:  Can I hear that answer?  Yes?

8    A    Yes.

9    Q    Then you made a gesture with your hand, so it's on the

10   record, began with you hit your left shoulder, the same area

11   you hit before, correct?

12   A    He hit David on the shoulder.

13   Q    This third time when you say he hit him on the

14   shoulder, show us how Sosa is using his hands.  Demonstrate.

15   A    He came and he punched (indicating) David on the

16   shoulder.  They got into a argument.

17   Q    For the record, this time you had a fist closed and

18   you hit yourself in the same area and you moved back, correct?

19   Is that what happened?

20   A    Yes.

21        MR. CANTOR:  I can't hear the answer.

22   A    Yes.

23        MR. ROSENFELD:  She said "yes."

24   Q    Did David move back when Sosa hit him where you showed

25   us?

tr/d    C. Matos - People - Direct

1     A     Yes.

2     Q     What did David do?

3     A     I can't say because Mercedes pulled me.

4     Q     But I'm saying you just demonstrated for us.

5     A     Sosa came up to him and went like this (indicating) to

6     him.

7     Q     How did David --

8               MR. CANTOR:  Can you finish your answer, Judge,

9          without a question --

10              THE COURT:  Please.

11              MR. CANTOR:  She's in the middle of an answer.

12    A     And they got into the argument and I tried pulling

13    David to go and then Mercedes pulled me.  When Mercedes pulled

14    me, I don't know what else happened.

15    Q     Please listen.  Before you pulled David, you've shown

16    us that Sosa hit him in this area, the same area you showed us,

17    correct?

18              MR. CANTOR:  Punched is the word she used, Judge.

19              THE COURT:  The jury will recall.

20    Q     When Sosa did that, did David react or move at all?

21    A     David stood there and then they got on the argument.

22    Q     You're not answering my question.  Did David's body --

23    did it move at all when Sosa hit him or punched him or

24    whatever?

25    A     Yeah, he moved back.

1    Q    He moved back?

2    A    Umm-hmm.

3    Q    Towards where?

4    A    You know when somebody comes and (indicating).

5    Q    At that moment before you grabbed David, did David

6    react to Sosa?

7    A    No.

8         THE COURT:  Counselors, please approach.

9         Ma'am, please stand down.

10        (Whereupon, the witness left the stand and there

11   was a discussion held, off the record, at the bench, among

12   the Court, the assistant district attorneys, defense

13   counsel, and outside the hearing of the defendant and the

14   jury.)

15        THE COURT:  We're going to break now, ladies and

16   gentlemen, and ma'am, you may step down.  At lunch, please

17   do not discuss your testimony with anyone including the

18   district attorney.

19        THE WITNESS:  Okay.

20        THE COURT:  Please be back here exactly quarter

21   after 2.

22        THE WITNESS:  Okay.

23        (Whereupon, the witness left the courtroom.)

24        THE COURT:  Madam Forelady, ladies and gentlemen

25   of the jury, likewise remember the cautions.  Please have a

1    pleasant lunch.  Be back here outside of the courtroom

2    door.  Doors will be open for you at a quarter after 2.

3    We'll see you then.  Follow the officer.

4                   (Whereupon, the jury left the courtroom.)

5                   THE COURT:  Mr. Rosenfeld, who else do you have

6    today after this lady?

7                   MR. ROSENFELD:  Detective Banker is also here.

8                   THE COURT:  Detective, yes, as indicated.  Please

9    be back here in order to give the sergeant time to bring

10   him up.  Be here sharp 2:30.  We'll see each other then.

11

12                  (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1343

1    A F T E R N O O N   S E S S I O N

2    COURT OFFICER:  Jury entering.

3    (Jury enters at this time.)

4    THE COURT:  Good afternoon, Everyone.

5    MR. ROSENFELD:  Good afternoon.

6    MR. CANTOR:  Good afternoon, your Honor.

7    THE JURY:  Good afternoon.

8    THE COURT:  Please invite back the witness to the

9    witness stand.

10   Madam Forelady, ladies and gentlemen of the jury,

11   can you all assure the Court that you followed its

12   instructions during the luncheon hour and you have nothing

13   to report; is that correct?

14   THE JURY:  Correct.

15   THE COURT:  Very good.

16   We are continuing on the People's case.  We will

17   bring back Ms. Matos to the witness stand now.

18   (The witness enters at this time.)

19   THE COURT:  Good afternoon, ma'am.

20   THE WITNESS:  Good afternoon.

21   THE COURT:  I inquire of you if you followed the

22   Court's instruction and can assure the Court that you did

23   not discuss your testimony with anyone including the

24   district attorney?

25   THE WITNESS:  No, I didn't.

E-1jb

People - CARMEN MATOS - direct

1344

1          THE COURT:  Very good.

2          All right.  We can continue and we continue on

3     direct examination.

4          Mr. Rosenfeld.

5          C A R M E N   M A T O S, having been called as a

6     witness on behalf of the People, having been previously

7     sworn, testified as follows:

8          MR. ROSENFELD:  Thank you.

9   CONTINUED DIRECT EXAMINATION

10  BY MR. ROSENFELD:

11      Q.   Ms. Matos, right before the lunch recess you indicated

12  you were standing here (indicating) on People's Exhibit four

13  next to the table and you and the defendant both had your coats

14  on?

15      A.   Yes.

16      Q.   And you said you were leaving?

17      A.   Yes.

18      Q.   At that point were you going to buy anything, did

19  anyone ask you to buy anything?

20      A.   No.

21      Q.   Was there any question about enough beer at the party;

22  did anybody request any beer?

23      A.   I don't remember.

24      Q.   Do you remember if anybody gave you any money to go

25  buy any beer?

E-ljb

People - CARMEN MATOS - direct

1345

1     A.     I don't remember.

2     Q.     You said as you and David, the defendant, were

3     standing that Sosa came over to him, correct?

4     A.     Yes.

5     Q.     And you told us right before lunch what Sosa said to

6     him?

7     A.     Yes.

8     Q.     And then hit him on the area of the shoulder, whatever

9     you showed us before, right?

10    A.     Yes.

11    Q.     Then you said you grabbed David, right?

12    A.     No.

13    Q.     You didn't tell us before lunch that at that point you

14    grabbed David?

15    A.     I grabbed -- yes, I grabbed David (indicating).

16    Q.     That's what I am asking.  Then let's stop then.  Did

17    you grab David at that moment?

18    A.     Yes.

19    Q.     You started to go to your left hand to show us

20    something.  Could you please show us how you grabbed the

21    defendant at that moment?

22    A.     I went like this to him (indicating).

23           MR. ROSENFELD:  Indicating the witness has with

24    her right hand grabbed her left wrist and pulled her left

25    wrist across and turned her body to the right.

E-1jb

People - CARMEN MATOS - direct

1346

1    Q.   Is that correct?

2              THE COURT:  So indicating.

3    Q.   Is that what you did?

4    A.   I just grabbed his wrist and pulled him (indicating).

5    Q.   Okay.  Again showing us the same thing.  You remember

6    which wrist you grabbed?

7    A.   No.

8    Q.   Because you are grabbing your left wrist now.  You

9    remember which wrist of the defendant's you grabbed?

10   A.   No, I don't remember.

11   Q.   Okay.  Well, did he have anything in that wrist -- in

12   that hand that you grabbed?

13   A.   No.

14   Q.   Did he have anything in his other hand?

15   A.   I don't know.

16   Q.   Okay.

17             MR. CANTOR:  Can the witness speak up?

18             THE WITNESS:  I don't know.

19             THE COURT:  Yes, keep your voice up.

20   Q.   So you pulled.  Did the defendant react as you pulled

21   his wrist as you just showed us?

22   A.   He just pulled away.

23             MR. ROSENFELD:  Indicating the witness with her

24        left hand has moved her left elbow back.

25             THE COURT:  So indicated.

E-ljb

People - CARMEN MATOS - direct

1347

1       Q.    Is that what happened, David pulled his left elbow
2    back?
3       A.    Yes.
4             MR. CANTOR:  I can't hear.
5             THE WITNESS:  Yes.
6       Q.    And where was Sosa at that moment?
7       A.    Right in front of David.
8       Q.    Okay.  So how were they standing in terms of if I ask
9    you to stand up, ma'am, please --
10            MR. ROSENFELD:  Is that okay, Judge?
11            THE COURT:  Yes, it is.
12      Q.    Tell me if you were David where would Sosa be
13   standing.  I will be Sosa, just tell me where to move.
14      A.    David was standing here (indicating).
15      Q.    You being David and tell me where to move so I am
16   Sosa.
17      A.    Right in front of me.
18      Q.    Should I move closer?
19      A.    You can come right here (indicating).
20      Q.    Tell me.
21      A.    They were like this (indicating).
22      Q.    Okay.  Right now the witness is off the witness stand
23   standing facing the jury.  I am standing facing the Court.
24   We're face to face, correct?
25      A.    Uh-huh.

E-ljb

People - CARMEN MATOS - direct

1348

1    Q.    Would you put it that way face to face?

2    A.    Yes.

3    Q.    So you grabbed David.  After David turned away from

4    you what happened?

5    A.    Mercedes pulled me.  When she pulled me --

6              MR. CANTOR:  In a loud voice.

7              THE WITNESS:  Mercedes pulled me.

8    Q.    Right.

9    A.    When she pulled me I gave her my full attention.

10   Q.    Okay.

11   A.    And I was talking to her.

12   Q.    So the last time you saw Sosa was he standing like I

13   am to David?

14   A.    Yes.

15   Q.    Did he have anything in his hand that you could see?

16             MR. CANTOR:  Who David or Sosa?

17             THE COURT:  Please.

18   Q.    Sosa.

19   A.    I don't know.

20   Q.    Thank you.  And you indicated you turned to talk to

21   Mercedes Rodriguez?

22   A.    Yes.

23   Q.    And that you said she was sitting here (indicating) by

24   the door?

25   A.    Yes.

E-ljb

People - CARMEN MATOS - direct

1349

1    Q.    And the door was open?

2    A.    Yes.

3    Q.    If you had wanted to at that point could you have

4  walked out the door?

5    A.    Yes.

6    Q.    Okay.  And David was how close to you as you are

7  sitting there; how far was David away from you?

8            MR. CANTOR:  Which moment, your Honor?

9    Q.    As she turned towards Mercedes.

10   A.    Oh, I don't know.

11   Q.    How close was he before you turned to Mercedes after

12  you had grabbed his wrist?

13   A.    He was standing right next to me.

14   Q.    So please continue.  You turn towards Mercedes what --

15  go ahead.  What happened?

16   A.    Me and Mercedes was talking and somebody yelled.

17   Q.    Yelled what?

18   A.    Oh, I don't know.  I don't.

19   Q.    How was the music at that point?

20   A.    It was loud.

21   Q.    Go ahead.  Somebody yelled, you couldn't hear?

22            MR. CANTOR:  Judge, I object.

23            MR. ROSENFELD:  I will withdraw that.  I did make

24  a remark.  I withdraw it.

25   Q.    Somebody yelled, correct?

E-1jb

People - CARMEN MATOS - direct

1350

1    A.   Someone yelled.

2    Q.   Did you hear them, what they said?

3    A.   I just heard a scream.

4    Q.   Go ahead.

5    A.   And then I turned around.

6    Q.   Go ahead.  And what did you see when you turned

7  around?

8    A.   When I turned around I just saw Sosa with blood all

9  over his face.

10   Q.   Okay.  And where was Sosa when you turned around and

11 saw him with blood all over his face?

12   A.   He was like where the chair (indicating), more or less

13 where the chair was.

14   Q.   This chair (indicating) in the middle?

15   A.   A little further down.

16   Q.   Which way?

17   A.   Right there (indicating), right there where the chair

18 is.

19           MR. ROSENFELD:  Indicating I am pointing to the

20       chair with the blue gloves on it in the middle of People's

21       Exhibit four.

22           THE COURT:  So indicating.

23   Q.   Okay.  And when you turned around were you facing

24 Sosa?

25   A.   I was standing by where Mercedes was.

                                                        E-ljb

People - CARMEN MATOS - direct

1    Q.   That's over here by the chair (indicating)?

2    A.   Uh-hum.

3         MR. CANTOR:   What is she saying "uh-hum"; "yes"

4    or "no"?

5    A.   Yes.

6    Q.   And where was David Delgado?

7    A.   He was standing there.

8    Q.   Where?

9    A.   In the same place he was standing.

10   Q.   Where he was standing before by this table

11   (indicating)?

12   A.   I don't remember where exactly he was standing.

13   Q.   Well, let me ask you this, when you turned after,

14   after hearing someone yell and saw Sosa with blood on his face

15   did you see the defendant?

16   A.   It was so much commotion and stuff that I don't --

17        THE COURT:   The question was did you speak with

18        the defendant.

19        MR. CANTOR:   She is answering, Judge, she should

20        have an opportunity to complete it.

21        THE COURT:   One second.  The answer was "yes" or

22        "no"?

23        THE WITNESS:  No.

24   Q.   Thank you.  You said commotion.  Tell me what you saw

25   other than Sosa with his face bleeding.

E-ljb

People - CARMEN MATOS - direct

1352

1   A.   He was bleeding.

2   Q.   And what else was going on?

3   A.   Everybody was like all scared and -- and, you know,

4   stunned and stuff.  Everybody was scared.

5   Q.   Was anybody saying anything?

6   A.   No, everybody was like shocked.

7   Q.   So did you hear the defendant say anything?

8   A.   I didn't hear nothing.

9   Q.   Please continue.  What happened then after you turned

10  around and saw the commotion?  Go ahead.

11  A.   And then I -- I -- I was standing there.  We was

12  standing there.  I was standing next to Mercedes.  We was

13  standing there.

14  Q.   Go ahead.

15       MR. CANTOR:  Can she complete --

16  A.   And in shock.  I was shocked.

17  Q.   Go ahead.  What happened next, please?

18  A.   And then I can't recall what happened next.

19  Q.   Did you stay in the apartment?

20  A.   Yes, I stood there.

21  Q.   Okay.  How about David?

22  A.   He ran out.

23  Q.   He ran out the door?

24  A.   Yes.

25  Q.   Okay.  And how soon after you saw Sosa with blood on

E-ljb

People - CARMEN MATOS - direct

1353

1    his face did the defendant run out the door?

2        A.    I don't recall.

3        Q.    Well, can you give us an approximation?

4        A.    I don't remember.

5        Q.    Was it right after you looked at Sosa and saw --

6        A.    I don't remember.

7        Q.    Was it more than five minutes?

8        A.    I don't remember.

9        Q.    Between the time you saw Sosa with blood on his face

10   and the defendant running out the door did you say anything to

11   the defendant?

12       A.    No.

13       Q.    Did he say anything to you?

14       A.    No.

15       Q.    Did you see anything in the defendant's hand as he ran

16   out the door?

17       A.    No.

18       Q.    Did you see anything in Sosa's hands when you looked

19   at him and he had blood on his face?

20       A.    No.

21       Q.    And did you know what, if anything, Mercedes did?

22       A.    No.

23       Q.    Was she still in the apartment after David ran out?

24       A.    Yes.

25       Q.    And how about Melissa?

E-1jb

People - CARMEN MATOS - direct

1354

1    A.    Everybody was in the apartment.

2    Q.    Okay.  Continue, what was the next thing that

3    happened?

4    A.    So I still standing there, when I came down to my

5    sense I ran out and asked David to give me my keys and my cell

6    phone because he was holding it.

7    Q.    When you went out of the apartment, if you look at

8    People's Exhibits over here (indicating), the sketch.  You see

9    the sketch over here (indicating)?

10   A.    Uh-hum.

11   Q.    Okay.  Here is the apartment door (indicating),

12   correct?

13   A.    Uh-hum.

14   Q.    You said you were --

15            MR. CANTOR:  What's the answer?

16            THE WITNESS:  Yes.

17   Q.    Please, again, instead of "uh-huh" you have to say

18   "yes".  This is the table over here (indicating) where I am

19   pointing, correct?

20   A.    Yes.

21   Q.    You went out this door?

22   A.    Yes.

23   Q.    And where did you go?

24   A.    Down the stairs.

25   Q.    Okay.

People - CARMEN MATOS - direct

1355

1    A.    And outside the building.

2    Q.    Okay.  If you look over here on People's Exhibit one

3    you see the stairwell over here (indicating).  You went out that

4    stairwell?

5    A.    The stair that was by the hallway, I don't know where

6    the steps, the stairs.  I know there was, was a staircase there.

7    Q.    Oh, okay.  When you went out in the hallway

8    (indicating), again I am pointing at People Exhibit one, you

9    went -- did you see Mercedes or Melissa out in the hallway?

10   A.    I don't remember.

11   Q.    When you went out in the hallway did you see David?

12   A.    No.

13   Q.    He was gone already?

14   A.    Uh-hum, yes.

15   Q.    When you left the apartment did anybody say anything

16   to you before you left the apartment?

17   A.    No.

18   Q.    Did Mercedes say anything to you?

19   A.    No.

20   Q.    Melissa?

21   A.    No.

22   Q.    What was happening in the apartment when you ran out?

23   A.    Everybody was like shocked.  Everybody was scared.

24   Everybody was like stunned.

25   Q.    Where was Sosa when you ran out of the apartment?

E-ljb

People - CARMEN MATOS - direct

1356

1    A.    He was on the floor.

2    Q.    Okay.  So you said before you turned around and saw

3    Sosa with blood on his face was he standing at that point?

4    A.    He was like walking, like tumbling (indicating).

5    Q.    And then what happened to him?

6    A.    And he fell.

7    Q.    Okay.  If you look at People's Exhibit four down here

8    on the right-hand side is that where you observed him to be?

9    A.    Yes.

10   Q.    So you saw him there before you left the apartment?

11   A.    Yeah, he was on the floor.

12   Q.    How long after David ran out of the apartment did you

13   run out of the apartment?

14   A.    I don't recall how long.

15   Q.    Was it seconds?

16   A.    I can't recall.

17   Q.    Minutes?

18   A.    I don't recall.

19   Q.    Okay.  So you went -- did you go down the stairwell?

20   A.    Yes.

21   Q.    Did you see David in the stairwell?

22   A.    No.

23   Q.    Did you go in the bottom of the building?

24   A.    I went outside the building.

25   Q.    What happened when you got outside the building?

E-ljb

People - CARMEN MATOS - direct

1357

1    A.   I -- I -- I saw David by the middle of the -- of where
2  the park was.

3    Q.   So this was outside 2033 McGraw Avenue?

4    A.   A little further down, it was in front.

5         MR. CANTOR:   Where?

6         THE WITNESS:   It was a little bit -- a little
7    further down from 2033.

8    Q.   And how far was that from your building?

9    A.   It was far from my building.

10   Q.   Okay.  So, what happened when you went outside?

11   A.   I ran up to David, I told David to give me my keys and
12 my cell phone.

13   Q.   When you ran up to him was he moving or was he
14 standing there?

15   A.   He just like (indicating) and gave me my -- he was
16 shaking and he just gave me my keys and my cell phone and left.

17   Q.   Well, when you got outside and you saw him was he
18 moving or was he in one place waiting for you?

19        MR. CANTOR:   Asked and answered.

20   A.   No, he was running.  He was running and I caught up to
21 him.  I ran up to him and I asked him to give me my keys.

22   Q.   You said David was running?

23   A.   Yes.

24   Q.   Fast or slow?

25   A.   I can't recall how fast he was running.

E-1jb

People - CARMEN MATOS - direct

1358

1    Q.   How about you, how fast or slow were you running?

2    A.   I tried to run fast to catch up to him.

3    Q.   So you ran. He ran, you caught up to him?

4    A.   Yes.

5    Q.   Did you stop him?

6    A.   I tell him give me my cell phone and my keys. I

7    yelled at him, I said give me my cell phone and my keys.

8    Q.   Well, you told us earlier that you left your apartment

9    with your cell phone and keys, you went back to your apartment

10   and went back to the party. So when did he get your cell phone

11   and keys?

12   A.   I gave it to him when we got to the party. He was

13   holding my cell phone at all times because I gave it to him when

14   we got to the party and I gave him my keys. When we went to the

15   house he gave me my keys, we went to the door and we went back.

16   Q.   That's because you didn't have pockets?

17   A.   No, I didn't have a pocketbook.

18   Q.   When you saw David outside at this moment --

19   A.   Yes.

20   Q.   -- did you say anything to him?

21   A.   No.

22   Q.   Did he say anything to you?

23   A.   No.

24   Q.   You said you asked -- did you ask him for something?

25   A.   I asked him for my keys and my cell phone.

E-ljb

People - CARMEN MATOS - direct

1    Q.   So that's what you said to him?

2    A.   Yes.

3    Q.   Then what did he say?

4    A.   He gave me my keys and my cell phone and he left.

5    Q.   Did he say anything?

6    A.   No.

7    Q.   When you saw him outside you said -- tell us what

8  his -- how did he appear?

9    A.   He was like (indicating) I don't -- scared, nervous.

10            MR. ROSENFELD:   Indicating, your Honor, the

11   witness just kind of held her hand a little bit and shook

12   her head back and forth.

13            MR. CANTOR:   She had a nervous look on her face,

14   your Honor.

15            THE COURT:   So indicating.

16   Q.   Did you notice anything in his hands at that point?

17   A.   No, I didn't notice anything, he just gave me my keys

18  and my cell phone.

19   Q.   Did you notice anything on his body?

20   A.   I didn't notice anything.

21   Q.   Notice any blood anywhere on him?

22   A.   No, I didn't notice anything.

23   Q.   All right.   What did you do after that?

24   A.   I went back -- I stood outside and then I went back

25  upstairs to where -- the detectives came they took me upstairs.

E-1jb

People - CARMEN MATOS - direct

1360

1    Q.    When you saw David outside did he have a knife in his
2  hands?

3    A.    I -- I didn't see, no.

4    Q.    And after you got your keys and cell phone back you
5  went to which apartment?

6    A.    I went to the party, to where the party was?

7    Q.    You went back up, rush right back up to the party?

8    A.    I was standing with Mercedes' daughter outside and
9  that's when the detectives came.

10    Q.    Did you ever go back to your apartment?

11    A.    Yes, I went back to my apartment because Mercedes
12  wanted to hit me.  She wanted to --

13    Q.    Well, let's just back up a little, please.

14    A.    Okay.

15    Q.    After David gave you your cell phone and keys you were
16  outside, correct?

17    A.    Yes.

18    Q.    Where did you go next?  What is the next step?

19    A.    I was outside.  I stood outside, standing outside with
20  Mercedes' daughter, she was outside.

21    Q.    And then what happened after Mercedes' daughter came
22  outside with you?

23    A.    Mercedes' daughter was standing outside and I was
24  standing right next to her.

25    Q.    Then what?

E-ljb

People - CARMEN MATOS - direct

1361

1      A.   And everybody was like stunned, like shocked and stuff
2   and scared.

3      Q.   Whose everybody?

4      A.   Mercedes' daughter and her grandson.

5      Q.   They were outside with you?

6      A.   Yeah, they were standing outside.  I went up to them
7   after David gave me my keys and cell phone.

8      Q.   Okay.  I am sorry, did you go back to your apartment
9   before you went back to apartment 3D?

10      A.   I don't remember.

11      Q.   You saying at some point you went back to the party
12   scene?

13      A.   Yes.

14      Q.   To apartment 3D?

15      A.   Yes.

16      Q.   Is that when you talking about Mercedes -- seeing
17   Mercedes' daughter?

18      A.   I saw Mercedes' daughter after David gave me my cell
19   phone and my keys.

20      Q.   Outside?

21      A.   Outside.

22      Q.   Downstairs?

23      A.   Yes, downstairs.

24      Q.   Okay.  Did you go back with her into the apartment at
25   that point or did you go to your apartment at that point?

E-ljb

People - CARMEN MATOS - direct

1362

1     A.   Didn't go to the apartment, I went up the stairs and
2     Mercedes wanted to hit me.  So then --
3          Q.   Back in this apartment?
4          A.   Yes.
5          Q.   Apartment 3D?
6          A.   So Mercedes wanted to hit me so I left, I went home.
7          Q.   So you went back to apartment 3D after you got your
8     cell phone and keys, correct?
9          A.   Uh-hum.
10         Q.   Went up to the apartment, saw Mercedes?
11         A.   Yes.
12         Q.   And you said she wanted to hit you?
13         A.   Yes, she wanted to hit me.
14         Q.   So you left?
15         A.   I went home.
16         Q.   Did anybody say anything to you when you went back to
17    the party?
18         A.   No, everybody was scared.  Everybody was in the room.
19    Everybody was in one room.
20         Q.   Were the police there yet?
21         A.   Yes, the police were there.
22         Q.   But you left?
23         A.   Then after that I left, yes, I went --
24         Q.   Where did you go?
25         A.   I went home.

E-ljb

People - CARMEN MATOS - direct

1363

1    Q.    Okay.  After you went home did there come a time that

2    the police came to your apartment?

3        A.    Mercedes brung the police to my house.

4        Q.    Once they came to your house where did you go?

5        A.    With the police back to 3D.

6        Q.    Okay.  Did you do anything once you went back to your

7    apartment?

8        A.    No.

9        Q.    Were you wearing the same clothes when you went back

10    to the party in apartment 3D?

11        A.    Yes, I was.

12        Q.    Did you change your clothes at all?

13        A.    No.

14        Q.    And when you went back to the apartment did there come

15    a time you spoke to police officers?

16        A.    Yes, I spoke to police officers and to a detective.

17        Q.    Okay.  When you spoke to the police officers did you

18    give them a description of David?

19        A.    No, they didn't ask me.

20        Q.    What did they ask you?

21        A.    That if I knew -- they came into my house and they

22    looked and see if he was in my house.

23        Q.    So they searched your apartment?

24        A.    Yes, they went into my house.

25        Q.    Looking for the defendant?

E-1jb

People – CARMEN MATOS – direct

1364

1  A.  Yes.

2  Q.  He wasn't there, was he?

3  A.  No.

4  Q.  Okay.  Then did they ask you anything about him at

5  that point?

6  A.  No.

7  Q.  Did they?

8  A.  They just took my cell phone away and my camera.

9  Q.  Okay.  And did they ask you any information about his

10  name?

11          MR. CANTOR:  Where?

12  Q.  In the apartment, still in her apartment.

13  A.  They asked me what was his name, I said David.

14  Q.  Did you give the police his last name?

15  A.  No.

16  Q.  Did you tell the police where he lived?

17  A.  No because I didn't remember where he lived.  I didn't

18  know where he lived.

19  Q.  So you went back to apartment 3D with the police?

20  A.  Uh-hum, yes.

21  Q.  Did you stay there for awhile?

22  A.  I stood there with the detective.  She said not to

23  move and not to go anywhere and then she took me to the

24  precinct.

25  Q.  Okay.  And when you got to the precinct did you speak

E-1jb

People - CARMEN MATOS - direct

1  to the detective at the precinct?

2      A.   Yes, I spoke to a detective.

3      Q.   And did he ask you questions about David?

4      A.   He asked me what was it that happened and I explained
5  what was it that happened.

6      Q.   Did he ask you for information about David such as his
7  name?

8      A.   She asked his name and I said David.

9      Q.   Okay.  Did she ask you where he lived, the detective
10  now?

11      A.   They asked me where he lived, I said I don't remember
12  where he lives.  I know its somewhere on Fourth Avenue.

13      Q.   Okay.  And did you show the detectives any
14  photographs?

15      A.   No, they took -- they had my camera.

16      Q.   What was in your camera?

17      A.   David's picture.

18      Q.   Okay.  At some point did they have or did you have the
19  picture of David that was in your camera to look at?

20      A.   They went through the camera.

21      Q.   Okay.  And at some point did you have the picture of
22  David on your camera or from your camera?

23      A.   Yes, it was in my camera.

24      Q.   Okay.  Right after speaking to the detective at the
25  precinct did you stay at the precinct or did you go someplace?

People - CARMEN MATOS - direct

1   A.   They kept me in the precinct from 2:30 in the morning

2   all the way to eight o'clock at night.

3        Q.   And then what happened?

4        A.   They had me in there questioning me back and forth.

5        Q.   What happened after they questioned you?

6        A.   I told them what --

7        Q.   After that?

8        A.   -- happened.

9        Q.   And then what -- where did you go?

10       A.   They took me home.

11       Q.   Okay.  When did you get home?

12       A.   Around 8:30, 9 o'clock.

13       Q.   In the morning?

14       A.   In the evening.

15       Q.   Okay.  Had you spoken to David Delgado, the defendant,

16   at all from the time of the incident until the time the police

17   brought you back to your home that night?

18       A.   No.

19       Q.   Once you got back to your apartment that night you

20   said, I'm sorry, 8:30 or nine?

21       A.   I guess it was around 8:30.

22       Q.   Okay.

23       A.   Eight or 8:30.

24            MR. CANTOR:   I can't hear.

25       A.   Eight or 8:30.

E-ljb

People - CARMEN MATOS - direct

1367

1    Q.    Once you got back to your apartment did you speak to
2    David after that?

3    A.    No.

4    Q.    When you got back to your apartment did you notice if
5    anything was missing from your apartment?

6    A.    No.

7    Q.    Did there come a time you went to sleep that night on
8    December 25th of 2009?

9    A.    I took a shower and I went to get my son.

10   Q.    Okay.  Had you spoken to David Delgado up until that
11   point?

12   A.    No, I didn't speak to David.

13   Q.    Okay.  You got your son, did you go back to your
14   apartment to go to sleep?

15   A.    No.

16   Q.    Where did you sleep that night?

17   A.    I stayed at my son's father's house.

18   Q.    Okay.  And you slept overnight there?

19   A.    Yes.

20   Q.    Did you have your cell phone with you?

21   A.    Yes.

22   Q.    Did you speak to David at all up until the time you
23   woke up the next morning?

24   A.    No.

25   Q.    Where did you go on December 26, 2009?

E-ljb

People - CARMEN MATOS - direct

1368

1    A.    I was in my son's father's house.

2    Q.    Did you stay there all day?

3    A.    Yes.

4    Q.    At any point during the day did you speak with David

5    Delgado?

6    A.    No.

7    Q.    Did there come a time the night of December 26, 2009,

8    that you again spoke with detectives?

9    A.    Yes.

10   Q.    Up until that moment had you spoken with David Delgado

11   at all?

12   A.    No.

13   Q.    After you were at the precinct that night, December

14   26, 2009, did there come a time you went home again, go home

15   that next day or that evening?

16   A.    That evening when the cops took me home.

17   Q.    Okay.  So you went home?

18   A.    I went home and I showered and I went to my son's

19   father's house.

20   Q.    This is the next night?

21   A.    No, not the next night.

22   Q.    This is not the night of the incident, the next night.

23   A.    Yeah, the 25th.

24   Q.    I am talking about the 25th you stayed overnight?

25   A.    I stood in my son's father's house.

E-ljb

People - CARMEN MATOS - direct

1    Q.   Overnight?

2    A.   I didn't come back home.

3              MR. CANTOR:  And what?

4              THE WITNESS:  I didn't come back home.

5    Q.   Perhaps you misunderstood.  After the incident, the

6    night of December 25th into the morning of December 26th you

7    stayed at your son's father's house; is that correct?

8    A.   Say it again.

9    Q.   The night of December 25th, Christmas day?

10   A.   Yes.

11   Q.   After the incident into the next morning, December 26,

12   you stayed at your son's father's house?

13   A.   Yes.

14   Q.   So now we have the day of December 26, the day after

15   the incident, that day?

16   A.   Yes, uh-hum.

17   Q.   Did you stay at your son's father's house or did you

18   go back to your apartment?

19   A.   I stayed at my son's father's house.

20   Q.   And that evening, later that night, did you go to the

21   precinct on the night of December 26, 2009?

22   A.   The detective called me.

23   Q.   Just "yes" or "no"?

24   A.   Yes.

25   Q.   Okay.  And after you went to the precinct the night of

E-1jb

People - CARMEN MATOS - direct

1    December 26, 2009, did you go back to your house that night?

2        A.    Yes.

3        Q.    Okay.  So, when you got back to your house the night

4    of December 26, 2009, after being at the precinct did you speak

5    with the defendant?

6        A.    No.

7        Q.    So you didn't speak with the defendant the first

8    night, December 25th?

9                    MR. CANTOR:  Judge, repetition, I object.

10                   MR. ROSENFELD:  Your Honor --

11                   THE COURT:  Overruled.

12       Q.    You didn't speak with the defendant the night of

13   December 25th, you didn't speak with him the night of

14   December 26th, correct?

15       A.    Yes.

16       Q.    Did you go to sleep that night?

17       A.    Yes, I went to sleep.

18                   MR. CANTOR:  What night?

19       Q.    The night of December 26, 2009.

20                   MR. ROSENFELD:  I asked not to be interrupted.

21                   MR. CANTOR:  Well, the question is ambiguous.

22                   THE COURT:  Well, that's for you to then later

23   correct if you wish or expound on cross.

24                   MR. CANTOR:  I do have a role here to object.

25                   MR. ROSENFELD:  I object to the colloquy.

E-ljb

People - CARMEN MATOS - direct

1371

1            THE COURT:  If you have an objection by all

2        means --

3            MR. CANTOR:  So I do raise that objection.

4            THE COURT:  The objection is overruled.

5    Q.  The night of December 26, 2009, you went to sleep?

6    A.  Yes.

7    Q.  Had you spoken to David up until that moment?

8    A.  No.

9    Q.  How about the next day, December 27, 2009, did you

10   speak with David Delgado?

11   A.  No.

12   Q.  And, Ms. Matos, before coming to court today have

13   you -- did you come to my office to talk to me?

14   A.  No.

15   Q.  Did I ask you to come talk to me?

16           MR. CANTOR:  Objection.

17           THE COURT:  Overruled.

18           MR. CANTOR:  He is becoming a witness advocate.

19           THE COURT:  Please, Mr. Cantor, it's overruled.

20   No need to editorialize.

21   A.  Say it again.

22           THE COURT:  The jury will disregard.

23   Q.  Were you asked to come to my office to talk to me?

24   A.  Yes.  You asked me.

25   Q.  To come to my office?

E-1jb

People - CARMEN MATOS - direct

1372

1     A.    Yes.

2     Q.    Did you come to my office?

3     A.    No.

4     Q.    When was the first time you and I met?

5     A.    The day that the detective told me that I had to go in

6     to your office.

7     Q.    And that was at the beginning of the case, right,

8     December 29th, approximately, 2009?

9     A.    Yes.

10    Q.    Since then have you come to my office to talk to me?

11    A.    No.

12    Q.    And when was the next time you met with me?

13    A.    Today.

14    Q.    Mr. Cantor, sitting here, do you know Mr. Cantor?

15    A.    Yes.

16    Q.    Have you met with him before today?

17    A.    No.

18    Q.    You ever spoke with him before today?

19    A.    No.

20    Q.    The defendant you said over the last two-and a-half

21    years you've seen him, right?

22    A.    Yes.

23    Q.    How often would you see him?

24    A.    In the beginning was like every visit.

25    Q.    Okay.  And recently have you seen him up until now?

E-1jb

People - CARMEN MATOS - direct

1373

1    A.    Yes.

2    Q.    Is it weekly, daily, how often?

3    A.    Weekly.

4          MR. ROSENFELD:  May I just have a moment, your

5    Honor, I will be finished?

6          THE COURT:  Yes.

7          (Whereupon there is a pause in the proceedings.)

8    Q.    All right.  Thank you very much, Ms. Matos.

9          THE COURT:  Your witness, Mr. Cantor.

10   CROSS EXAMINATION

11   BY MR. CANTOR:

12   Q.    When you and David got to the party was Sosa already

13   there?

14   A.    Yes.

15   Q.    And what time would you estimate, I don't want an

16   exact time, but approximately what time did you and David get to

17   the party?

18   A.    I think it was about 11 or 12, I don't remember.

19   Q.    Somewhere in that area?

20   A.    Yes.

21   Q.    And when you got there you saw Sosa, correct?

22   A.    Yes.

23   Q.    Was he drunk?

24   A.    Yes.

25   Q.    Was he interfering with the other guests at the party?

People - CARMEN MATOS - cross

1374

1        MR. ROSENFELD:  Objection as to form.

2        MR. CANTOR:  It's cross.

3        MR. ROSENFELD:  Objection.

4        THE COURT:  I will, if she understands it --

5   Q.   Was he interfering --

6        THE COURT:  Wait until I complete my sentence.  I

7   said, if she understands the question I will allow it to be

8   answered.

9   Q.   Was he, Sosa, interfering with other guests at the

10  party?

11  A.   Yes.

12  Q.   Was he loud, Sosa?

13  A.   Yes.

14  Q.   Was he moving his hands about such as I am moving

15  (indicating), it's called gesticulating, was he moving his hands

16  about him?

17       MR. ROSENFELD:  Objection, at what point?

18  Q.   During his stay at the party at any time did you see

19  Sosa flailing (indicating) that means moving his arms about?

20  A.   He was dancing and --

21  Q.   Okay.

22  A.   And moving around.

23  Q.   Okay.  So when he is dancing he was flailing his arms?

24  A.   Yes.

25  Q.   Okay.  Now, when Sosa made these three threats to

E-ljb

People - CARMEN MATOS - cross

1    David you could hear that over the music on the radio; could you

2    not?

3         A.    Yes.

4                    MR. ROSENFELD:  Objection to cross --

5                    MR. CANTOR:  It's cross.

6                    THE COURT:  No need to editorialize, Mr. Cantor.

7                    MR. CANTOR:  I apologize.

8                    THE COURT:  The objection is overruled.

9         Q.    You could hear that over the radio?

10        A.    Yeah because it was loud.

11        Q.    And you were right by them?

12        A.    Yes.

13        Q.    Up until that evening had Sosa ever met David in your

14   presence?

15        A.    No.

16        Q.    Did you have on December 24, 2009, a particularly

17   close relationship with Sosa?

18        A.    No.

19        Q.    He was just a neighbor in the neighborhood, wasn't he?

20        A.    Yes.

21        Q.    Hi and by?

22        A.    Yes.

23        Q.    Now, you had met David in September.  So we're talking

24   about October, November, December, you knew David more than

25   three months?

People - CARMEN MATOS - cross

1    A.    Yes.

2         Q.    And during that three-month period of time you were

3    romantically intimate with David, correct?

4    A.    Yes.

5         Q.    And did David, during those three months, would it be

6    a fair statement to say that you and David were lovers?

7    A.    Yes.

8         Q.    And did David during the course of those three months

9    tell you that he had tried to commit suicide three times?

10                    MR. ROSENFELD:   Objection, your Honor.

11                    THE COURT:   During the course of the three

12        months?

13                    MR. CANTOR:   Yes, your Honor.

14                    THE COURT:   Sustained.

15        Q.    At any time prior to the party did he tell you that he

16   had been institutionalized -- mentally institutionalized on two

17   occasions?

18                    MR. ROSENFELD:   Objection.

19                    THE COURT:   Sustained.

20                    MR. CANTOR:   Judge, could we go with the reporter

21        to sidebar, I will tell you the legal basis for my asking?

22                    THE COURT:   Sure.

23                    MR. CANTOR:   Thank you.

24                    (Whereupon the following takes place at sidebar.)

25                    THE COURT:   Mr. Cantor.

E-1jb

People - CARMEN MATOS - cross

1377

1        MR. ROSENFELD:  Are we waiving the defendant's

2   presence?

3        MR. CANTOR:  Yes.  The state of my client's mind

4   during those three months --

5        THE COURT:  Prior?

6        MR. CANTOR:  Prior and including December 25,

7   2009, is key because we are going to interpose a defense

8   that he had a fragile, feeble and delicate mind.  That he

9   suffered from bipolarity.  That he tried to take his life

10  on three occasions.  So, therefore, when your Honor,

11  hopefully, charges justification these jurors must place

12  themselves in his shoes of the defendant and that the

13  defendant had tried suicide three times.  Has twice been

14  mentally institutionalized.  Had been diagnosed with

15  suffering from bipolarity.  Had been diagnosed as suffering

16  from depression and even had testimony on direct of this

17  witness --

18        MR. ROSENFELD:  May I interrupt, could he please

19  keep his voice down.

20        MR. CANTOR:  My voice is down.

21        MR. ROSENFELD:  It might be heard in the jury

22  box.

23        MR. CANTOR:  I am sick and tired of this

24  prosecution's --

25        THE COURT:  Just keep it down.

E-ljb

1378

1          MR. CANTOR:  I am speaking low.

2          MR. ROSENFELD:  Judge, I just asked somebody by

3     the jury, they can hear.

4          MR. CANTOR:  How by any stretch of the

5     imagination you are not going to allow me to establish a

6     defense in this case by showing this jury that based upon

7     his feeble, delicate, trouble bipolar mind where he was

8     also suffering from depression and had been so diagnosed

9     both as being bipolar and suffering from depression.  That

10    when he was hit by this man, Sosa, he thought that it was

11    the prelude to an onslaught, and I can't for the life of me

12    understand why you won't allow my client to interpose a

13    defense during the three months that they were lovers he

14    confided in her.  He is going to take the stand, he is

15    going to tell you that he confided in his lover.  He twice

16    was mentally institutionalized.  Three times tried to take

17    his life and had all sorts of mental disorders.

18         So the jury if you charge justification, if you

19    don't charge --

20         MR. ROSENFELD:  Please keep your voice down.

21         MR. CANTOR:  If you don't charge justification

22    and there is a conviction it will be a reversal.  This

23    conviction should never occur, it will be overturned by a

24    unanimous --

25         MR. ROSENFELD:  Keep your voice down.

E-ljb

1    MR. CANTOR:  You will not allow me to develop a

2    state of mind that existed for the three months up to and

3    including the 24th of December 2009, part of a defense of

4    self defense is the subjective portion.  This defendant had

5    a weak, feeble, troubled, unbalanced mind.  Then this jury

6    must place themselves in the shoes of my client with his

7    weak, troubled, fragile, bipolar, depressed mind and

8    determine, given those attributes, whether or not what

9    occurred in the apartment at the party was reasonable.

10   That is a subjective/objective test under *People vs. Goetz*.

11   Now, when you sustain these objections you cut my

12   legs out from under me.  You are not allowing my client to

13   interpose a defense, this is the People's witness.  This

14   was the lover of my client and still remains close to my

15   client.  I for the life of me can't understand how that

16   ruling can be consistent with a fair administration, even

17   administration of the rules of evidence and the interests

18   of justice.  It just boggles my mind.  Boggles my minds you

19   are not allowing my client to interpose a very viable

20   defense.  Very viable defense, it's a subjective/objective

21   test.  They have to take the defendant as I told them.  The

22   defendant as I told them in voir dire as they come.  This

23   was a troubled, weak, feeble, depressed individual and has

24   been threaten three times and even the People's witnesses

25   has admitted to the threats that were rendered by the

E-ljb

People - CARMEN MATOS - cross

1380

1    deceased to my client.

2              What are you doing to me here, Judge?  I am

3    trying to establish that by virtue of my client's

4    subjectivity mind on December 24, '09, that his actions,

5    given his mind and his history, were reasonable and if the

6    jury concludes that then the district attorney will not

7    have be able to disprove the defense of justification

8    beyond a reasonable doubt.  I don't understand for the life

9    of me --

10             MR. ROSENFELD:  May I?

11             THE COURT:  Anything else?

12             MR. CANTOR:  No, it's clear enough.

13             THE COURT:  Okay.

14             MR. ROSENFELD:  I need me to make a record.

15             THE COURT:  Change position, please.

16             (Continues next page.)

17

18

19

20

21

22

23

24

25

1           THE COURT:  Mr. Rosenfeld.

2           Can you lean back, first of all, so the reporter

3    can hear?

4           MR. ROSENFELD:  First of all, I put on the record

5    during Mr. Cantor's soliloquy just now to the Court, I asked

6    my assistant to stand by, because he can be heard by the

7    jury.

8           MR. CANTOR:  If I had been, I would have been

9    interrupted.

10          MR. ROSENFELD:  Twice or three times tried to ask

11   him to lower his voice as he was talking, but his voice

12   remained up, and can be heard by the jury.  He lowered it

13   once or twice and raised it.

14          MR. CANTOR:  You would have stopped me.  You would

15   have stopped me, Judge, if my voice was so loud so the jury

16   can hear.  I spoke, "volta solochi," and a whisper

17   virtually, I was about a foot to two feet, Your Honor, to be

18   honest with you.  I was almost tongue-tied.  I am astounded

19   that we're up here raising a Hornbook issue.

20          MR. ROSENFELD:  I thought you finished.

21          THE COURT: Okay.

22          MR. ROSENFELD:  I don't want to interrupt.  Do you

23   have more?  I thought I was talking.

24          THE COURT:  It's your show.

25          MR. ROSENFELD:  Yes, Your Honor.

f-ljb            Proceedings                 1382

1          This is improper.  The defendant is trying to bring

2     out through a witness, things that the defendant told her

3     prior to the incident three months ahead.  This is his

4     trying to put out his defense through the witness, which

5     would be improper, if he wants to call her as his witness

6     after the defendant's taken the stand and spoken about any

7     of these things that's a separate issue.

8          But to try to bring out through this witness what

9     he may or may not have told her, now, prior suicide, which

10    she was not privy to or things in the psychiatric or

11    physical or mental background is totally inappropriate.

12         I'm not going to make it longer on that.  I rest on

13    that.

14              MR. CANTOR:  My God ---

15              THE COURT:  The Court adheres.

16              MR. CANTOR:  Of course, it does --- You've ---

17              MR. ROSENFELD:  He's raising his voice, Judge.

18              MR. CANTOR:  You've been here thoroughly throughout

19    this trial.

20              THE COURT: All right.

21              MR. CANTOR:  How am I to argue ---

22              THE COURT:  I don't want to go through this again.

23    You already made your record.

24              MR. CANTOR:  How am I to argue to this jury that on

25    the 24th of December, 2009, that my client was of a troubled

f-ljb                    Proceedings                1383

1    fragile, feeble mind, and thus when he had engaged in Sosa

2    or Sosa had engaged with him, it was that mind that reacted

3    in the stabbing of Sosa five times?

4              The jury must consider under People versus Goetz

5    the subjective elements.  If you want me to include, did she

6    know it as of, I'll give the date, December 24th, '09,

7    perhaps, it's the form that disturbs the Court.

8              MR. ROSENFELD:  This ---

9              THE COURT:  No.  I'm not going to allow this line,

10   at least, this way.

11             The Court adheres to its earlier disposition of

12   your objection.

13             MR. CANTOR:  This way ---

14             THE COURT:  There's nothing more to be said, except

15   noting your exception.

16             MR. CANTOR:  It's noting my exception.  Very

17   quietly you have violated my client's constitutional rights.

18             MR. ROSENFELD:  Judge, can we go in the back --

19             THE COURT:  No.

20             MR. CANTOR:  -- to interpose a defense and Mr.

21   Rosenfeld is trying to interrupt me?  It goes to Chambers v.

22   Mississippi, the United States Supreme Court.

23             MR. ROSENFELD:  The sergeant to tell him he has to

24   keep his voice down.  She's telling him.

25             MR. CANTOR:  Because the Chambers versus

1    Mississippi, my client has an absolute right to interpose a

2    defense.

3              THE COURT:  All right.  Very good.

4              MR. CANTOR:  And I'll note my most vigorous and

5    astounded, astounded exception.

6              THE COURT:  So noted.

7              MR. ROSENFELD:  May the record indicate the

8    Sergeant of the Court has been trying to tell defense

9    attorney to lower his voice as she's standing away from us

10   in front of the jury.  He has ignored that.

11             MR. CANTOR:  Judge, have I raised my voice ---

12             THE COURT:  I think that's acceptable when it's

13   low.

14             MR. CANTOR:  Yes, and it was low, Judge.

15             THE COURT:  Not always, no.

16             (Whereupon, the following takes place on the record

17   in open court in the presence of the jury among the

18   defendant, Mr. Rosenfeld, Mr. Cantor, Ms. Mason and the

19   Court:)

20             THE COURT:  Mr. Cantor.

21   CROSS EXAMINATION

22   BY MR. CANTOR:  (CONTINUING)

23   Q    During your relationship with David Delgado, did he

24   confide in you about intimate facts and history that touched upon

25   his life?

fljb                    C. Matos - People - Cross        1385

1      A    Yes, he did.

2                 MR. ROSENFELD:  Objection to form.

3                 THE COURT:  Sustained.

4      Q    You were lovers, were you not?

5      A    Yes.

6      Q    He took a pill on the evening or late afternoon of

7   December 24, 2009; correct?

8      A    Yes.

9      Q    What was that pill for, if you know?

10     A    For his depression and bipolar.

11     Q    I see.  And you already told Mr. Rosenfeld that he was

12  depressed that evening?

13     A    Yes.

14     Q    And during the period of time that you were with David

15  prior to the party for the three plus months, did he take pills

16  on a daily basis when you were with him?

17                MR. ROSENFELD:  Objection.

18     A    Yes.

19                THE COURT:  Sustained.

20                Ma'am, when I have to rule ---

21     A    Oh, I'm sorry.

22                THE COURT:  Wait until the Court rules.

23     A    Okay.

24     Q    Okay.  Oh, on prior occasions did he take pills that you

25  were with --- when you were with him?

fljb                  C. Matos - People - Cross        1386

1                         MR. ROSENFELD:  Objection.

2        A    Yes.

3                         THE COURT:  When?

4                         Ma'am, you have to listen ---

5                         And the objection is sustained.

6        Q    On occasions that you were with him over the period of

7    three months, did he seem to you to be depressed --

8                         MR. ROSENFELD:  Objection.

9        Q    -- at times?

10                        MR. ROSENFELD:  Objection.

11                        THE COURT:  Sustained.

12       Q    She can't testify as to this ---

13                        MR. ROSENFELD:  Objection to colloquy.

14                        THE COURT:  Sustained.

15       Q    Whether there --- Well, let's go to the 24th.  On the

16   24th, you told Mr. Rosenfeld he was depressed; correct?

17       A    Yes.

18       Q    Had you ever seen him in like conditions prior to the

19   24th?

20                        MR. ROSENFELD:  Objection.

21                        THE COURT:  At any time, prior to the 24th?

22                        MR. CANTOR:  Yeah.  Because Mr. Rosenfeld --

23                        THE COURT:  I understand.  You don't have to

24       editorialize.

25                        You may answer that question.

fljb            C. Matos - People - Cross       1387

1    Q    Had you ever seen him likewise depressed prior to the

2    24th of December?

3    A    Yes.

4    Q    And you said on your cross-examination --- on your

5    direct examination, Mr. Rosenfeld was questioning you, that you

6    saw him take a pill on the 24th; correct?

7    A    Yes.

8    Q    Had you ever seen, such like occurrence, prior to that?

9    A    Yes.

10   Q    And do you know what that was for?

11            MR. ROSENFELD:  Objection.

12            THE COURT:  The pill on the 24th?

13            MR. CANTOR:  She said the pill on the 24th ---

14            THE COURT:  No.  We only ---

15            MR. CANTOR:  -- was for depression.

16            Now, the ---

17            THE COURT:  The pill on the 24th you're speaking

18       about.

19            MR. CANTOR:  Yes.  Now, I'm asking --- She told us

20       on prior ---

21            THE COURT:  We don't have to repeat it.  The jury

22       heard it.  It's a matter of question.

23            You may answer that question.

24   Q    You may.  What was the reason that he took those pills

25   prior to the 24th --

fljb                    C. Matos - People - Cross        1388

1                      MR. ROSENFELD:  Objection.

2          A    -- because he was depressed.

3          Q    Now, on the 24th at the party, he had six drinks of

4    either Vodka or Absolut; correct?

5          A    Yes.

6          Q    Did you see him --- You took a look in that --- at that

7    picture.  There appear to be --- Take a look at it.  That's

8    People's ---

9                    I'll show you People's 5.

10                       (Whereupon, Mr. Cantor displays People's Exhibit

11                   Number 5 in evidence to the witness.)

12         Q    See People's 5 on the screen?

13         A    Yes.

14         Q    You see cans of Coors beer?

15         A    Yes.

16         Q    Isn't it a fact that David, aside from the hard liquor,

17   was also drinking beer that night?

18         A    Yes.

19         Q    So, you said David had about six drinks of hard liquor

20   from cups that were larger than Dixie cup, please, in front of

21   you; correct?

22         A    Yes.

23         Q    And the Dixie cup in front of the witness is

24   approximately two and a half to three inches in height?

25         A    (No verbal response.)

C. Matos - People - Cross          1389

1     Q     Now, you told Mr. Rosenfeld on direct examination that

2     when you got to the party, you introduced David to everyone as

3     your boyfriend; correct?

4     A     Yes.

5     Q     Do you remember if, earlier that day you and David went

6     to a local supermarket to purchase some either paper plates or

7     plastic spoons or any provisions for the party later that night?

8     A     No.

9     Q     Okay.  David first didn't want to go to the party

10    because he was depressed; correct?

11    A     Yes.

12    Q     But you urged him on and you told him it would be good

13    for him to meet other people and get out; correct?

14    A     Yes.

15    Q     And David ultimately agreed with you and went with you

16    to the party; right?

17    A     Yes.

18    Q     And David, when you were introducing to Carmen and

19    Melissa and Mercedes and Tango and Robert and Paccino and Sosa,

20    he would say, Hello, to each of these individuals; correct?

21    A     Yes.

22    Q     And shake their hand?

23    A     Yes.

24    Q     And you said that David, in the kitchen, was engaging in

25    conversation with Tango, with Carmen and with Sosa; correct?

1    A    Yes.

2    Q    How long had you and David been in the apartment before

3    Sosa, either the first of three threats to David approximately?

4    A    I can't remember.

5    Q    Well, was it in terms of minutes or half hour that you

6    were in the apartment before the first threat when Sosa told

7    David that he was going, and if David was going to disrespect you

8    or do anything to you, that he Sosa would, "Fuck him up?"

9    Approximately, how long were you at the party before Sosa told

10   that to David?

11   A    I don't remember.

12   Q    Okay.  But were you right alongside David when Sosa

13   uttered that first threat?

14   A    Yeah.

15   Q    And did Sosa touch, was he patting, if you will, David's

16   left shoulder when he weighed that threat?

17   A    Yes.

18   Q    Okay.  And you said that all that David did was he

19   stepped away and continued to talk to other people; correct?

20   A    Yes.

21   Q    And you went back into the living room, and in the

22   kitchen there remained some people, and there were children in

23   the living room sitting on a sofa; correct?

24   A    Yes.

25   Q    And the first threat that Sosa uttered to David was that

fljb          C. Matos - People - Cross          1391

 1   in the condition?

 2        A    In the kitchen, yes.

 3        Q    And then, ultimately, you found yourself sitting around

 4   the table that's depicted in People's Number 5; correct?

 5        A    Yes.

 6        Q    And you were there and Mercedes was there; correct?

 7        A    Yes.

 8        Q    And you were conversating and laughing and joking --

 9        A    Yes.

10        Q    -- with the other women?

11        A    Yes.

12        Q    And David and Tango were in the kitchen smoking

13   cigarettes?

14        A    Yes.

15        Q    And then the music was changed, was it not, I think you

16   said that someone changed the station on the radio?  Do you

17   recall saying that?

18        A    I don't remember.

19        Q    Well, did someone change the music on the radio?

20        A    I don't recall.

21        Q    Okay.  Eventually, you said that Carmen ran out of

22   cranberry juice, which was being used for the hard liquor as a

23   mixer; correct?

24        A    Yes.

25        Q    So, you went to the kitchen and you told David, "Come.

fljb            C. Matos - People - Cross        1392

1    We'll go get some juice.  They ran out of cranberry juice;"

2    correct?

3        A    Yes.

4        Q    And you and David, and David was holding your keys and

5    your cell phone since you had no pocketbook; right?

6        A    Yes.

7        Q    So, you went to your apartment to the refrigerator and

8    got that plastic jug that you see in the middle of the table of

9    cranberry juice; right?

10       A    Yes.

11       Q    And you were in your apartment for about fifteen ---

12   ten, fifteen minutes; right?

13       A    Yes.

14       Q    And then you went back with David, and you sat down on

15   one of the chairs by the table on David's lap because he was also

16   sitting in that chair; right?

17       A    Yes.

18       Q    And around that table was Robert and a friend of

19   Mercedes.  Do you recall his or her name?

20       A    It was Mercedes and ---

21       Q    You said Mercedes' friend was at the table, so I'm

22   asking you, if you recall the name?

23       A    No, I don't --- I don't recall the name.

24       Q    Okay.  And there was someone else who was also at the

25   table, but you don't recall who; correct?

fljb                 C. Matos - People - Cross      1393

1     A    Correct.

2     Q    And you were talking and laughing and joking with the

3     people at the table; right?

4     A    Yes.

5     Q    And everyone was drinking alcohol?

6     A    Yes.

7     Q    And they had Hennessy, and they had Vodka there for the

8     partygoers; correct?

9     A    Yes.

10    Q    And David was drinking both Hennessy and Absolut;

11    correct?

12    A    Yes.

13    Q    And it was Melissa, who was giving the defendant the

14    hard liquor drinks?

15    A    Yes.

16    Q    Now, there came a time while you were still in the area

17    of the table that you heard --- does Carmen ---

18              MR. ROSENFELD:  Withdrawn.

19    Q    Does Carmen have a daughter?

20    A    Yes.

21    Q    What's her name?

22    A    Gabriella.

23    Q    And Gabriella at that time was at the party?

24    A    Yes.

25    Q    She was about fifteen years old?

fljb              C. Matos - People - Cross        1394

1     A     Yes.

2     Q     And you heard Mr. Rosenfeld ask you about there was a

3  yell or a scream from some --- one of the children sitting on a

4  couch or a sofa in the living room; correct?

5     A     Yes.

6     Q     Was that Gabriella?

7     A     Yes.

8     Q     And what did she yell out?

9              MR. ROSENFELD:   Objection.

10             THE COURT:   Overruled.

11    Q     Loud, loud voice?

12    A     She told her mother that Sosa had to leave because he

13  was disrespecting the house.

14    Q     Okay.   And did Carmen and Sosa then begin arguing?

15    A     He was upset because she told him that he had to leave.

16    Q     Right.   So, Carmen --

17    A     Yes.

18    Q     -- who told Sosa that he would have to leave because he

19  was disrespecting the house, Sosa and Carmen began arguing?

20    A     Yes.

21    Q     And, eventually, Sosa was taken from the party by

22  Melissa and by Tango and by anyone else?

23    A     Carmen.

24    Q     And Carmen.

25             And can you approximate how long ---

fljb                    C. Matos - People - Cross        1395

1                  MR. ROSENFELD: Withdrawn.

2        Q    There came a time that Tango --- that Sosa was brought

3    back to the party?

4        A    I don't recall the time.

5        Q    No.  I'm not asking you that.  There came a time that

6    Sosa returned to the party?

7        A    Yes, he did.  He returned back to the party.

8        Q    Okay.  And he returned back to the party and David was

9    at the table, Carmen, Melissa, Tango, Sosa, and David was still

10   drinking; right?

11       A    Yes.

12       Q    And then there came a time, again, no longer at the

13   table, but back in the kitchen, where Sosa uttered his second

14   threat to David; correct?

15       A    Yes.

16       Q    He says if you want to disrespect me or do anything to

17   him, meaning Sosa, he would, "Fuck David up?"

18       A    Yes.

19       Q    And when he did that, he was face-to-face and chest to

20   chest with David?

21       A    Yes, they were face-to-face.

22       Q    And you heard it?

23       A    Yes.

24       Q    Okay.  And when Sosa uttered the second threat to David,

25   he hit David on the left shoulder about three times; correct?

fljb                 C. Matos - People - Cross        1396

 1      A     Yes.

 2      Q     And then afterwards, Sosa went back to dancing; correct?

 3      A     Yes.

 4      Q     Now, when Sosa was brought back from wherever he was

 5    taken and returned to the party, you and David had your coats on;

 6    right?

 7      A     Yes.

 8      Q     And you and David were standing by the front door.  You

 9    see that door in that picture?

10            You see it, the blue door?

11      A     Yes.

12      Q     Can you stand up?

13            MR. CANTOR:  With your permission.

14            THE COURT:  She may.

15            MR. CANTOR:  Stand up.

16            (Witness complies.)

17      Q     Put your index finger on that blue door.

18      A     Right here.

19      Q     Thank you.

20            MR. CANTOR:  Indicating the blue door that appears

21    to the right in People's Number five.

22            THE COURT:  So indicating.

23      Q     And you and David were getting ready to leave; right?

24      A     Yes.

25      Q     And Mercedes was by the front door?

fljb            C. Matos - People - Cross        1397

1       A    Yes.

2       Q    And, once again, for the third time, Sosa approached

3    David face-to-face, chest to chest; right?

4       A    Yes.

5       Q    And, this time, he punched him with a fist, two times,

6    on his left shoulder; correct?

7       A    Yes.

8       Q    And said "I'm going to fuck you up?"

9       A    Yes.

10      Q    And you tried to pull David away; correct?

11      A    Yes.

12      Q    But you were unable to; correct?

13      A    Yes.

14      Q    And Mercedes was calling you over rather urgently;

15   right?

16      A    Yes.

17      Q    And, so, you went to the doorway.  Did you see that open

18   doorway there in that picture?

19           Do you?

20      A    Yes, I went to the ---

21      Q    Ma'am, do you see the open doorway?

22      A    Yes.

23      Q    In the picture --- And when you went to that open

24   doorway, did you have your back to the people who were at the

25   party?

fljb            C. Matos - People - Cross        1398

1    A    Yes.

2    Q    So -- And was Mercedes and the --- Where was she, in the

3    door --- in the hallway or by the doorway?

4    A    By the chair.

5    Q    By the chair.  So, you weren't facing her.  You had your

6    back to her and the other people; correct?

7    A    Yes.

8    Q    And you heard some sort of a commotion inside the

9    apartment, but didn't see it; correct?

10   A    Yes.

11   Q    And, eventually, Mercedes pulled you into the hallway;

12   correct?

13   A    Yes.

14   Q    And in the hallway, before you went into the hallway,

15   you saw Sosa trying to walk feebly and collapse by the wall next

16   to the door; is that correct?

17   A    Yes.

18   Q    Blood on his face?

19   A    Yes.

20   Q    Blood on the wall?

21   A    Yes.

22   Q    Did you see the stabbing?

23   A    No.

24   Q    And David was going down the hallway; correct?

25   A    Yes.

1    Q    And you grabbed him by the wrist.  He pulled away;

2    correct?  Did you grab him by the wrist?

3              MR. ROSENFELD:  Objection, your Honor.  At what

4     point?

5    Q    He's in the hallway and he's going down the hallway; is

6    that correct?

7              David, David, David Delgado?

8    A    I went down the steps.

9    Q    Okay.  You went down the steps.  So, did you see David

10   in the hallway?

11   A    No.

12   Q    You didn't see David until you got out on the street?

13   A    Yes.

14   Q    And how many feet was David from the main entrance to

15   that apartment building when you caught up with him?

16   A    About thirty ---

17   Q    Say it, feet, inches, meters, what?

18   A    About thirty feet.

19   Q    And you caught up with him; right?

20   A    Yes.

21   Q    And in the hallway, did Mercedes pull on David as David

22   was leaving down the hallway?

23   A    (No verbal response.)

24   Q    David had left; right?  Yes, no, or you don't know?

25   A    I don't know.

fljb                C. Matos - People - Cross        1400

1      Q    The last time you saw David before you went outside, he

2    had left the apartment; correct?

3      A    Yes.

4      Q    And you didn't see him in the hallway; correct?

5      A    No.

6      Q    Okay.  So, did you see Mercedes --- you couldn't have

7    seen Mercedes try and stop him; correct?

8           Correct?

9      A    Correct.

10     Q    And you said everyone, when you saw Sosa with blood and

11   blood on the walls, everyone was scared and shocked and

12   horrified; correct?

13     A    Yes.

14     Q    And when David ran out, you didn't see anything in his

15   hand, did you?

16     A    No.

17     Q    Now, Sosa is on the floor.  Did you eventually ---

18          MR. CANTOR:  Well --

19     Q    You eventually out on the street, caught up to David and

20   asked him for your keys and the phone ---

21     A    Yes.

22     Q    --- Correct?

23          And he gave it to you; correct?

24     A    Yes.

25     Q    And he was shaking and scared and nervous; correct?

fljb          C. Matos - People - Cross        1401

1    A    Yes.

2    Q    And then there you were and he went away David; correct?

3    A    Yes.

4    Q    And then Mercedes and her daughter and her grandson came

5    outside?

6    A    Yes.

7    Q    And you went back into Apartment 3-D; is that correct?

8    A    Yes.

9    Q    And you saw or you felt or you suspected that Mercedes

10   was about to hit you; is that correct?

11   A    Yes.

12   Q    So, you left and you went home to your apartment;

13   correct?

14   A    Yes.

15   Q    Police came to your apartment; correct?

16   A    Yes.

17   Q    And they brought you back to 3-D?

18   A    Yes.

19   Q    Cops searched your apartment?

20   A    They went all the way in ---

21   Q    Did they search your apartment?

22   A    Yes.

23   Q    Did they find any knife or any sharp implement?

24   A    No.

25   Q    Okay.  The cops brought you back to apartment, 3-D;

1   right?

2       A    Yes.

3       Q    They asked you for the name of the man that you were

4   with him; right?

5       A    Yes.

6       Q    You told him, David?

7       A    Yes.

8       Q    They asked you where he lived.  You told him Brooklyn,

9   Fourth Avenue; correct?

10      A    Yes.

11      Q    The cops then took your camera and went through it;

12  correct?

13      A    Yes.

14      Q    And there was a picture of David in the camera?

15      A    Yes.

16      Q    And you were taken to the police precinct; right?

17      A    Yes.

18      Q    And you told the cops what happened; correct?

19      A    Yes.

20      Q    And then about 8:00, 8:30 you got back to your

21  apartment, and you got your son and you were so upset that you

22  went and slept at your son's father's apartment?

23      A    Yes.

24      Q    And the next day you went to the street --- precinct and

25  again spoke to detectives and told him what happened?

```
fljb              C. Matos - People - Cross      1403
```

1   A   Yes.

2   Q   And it was in the evening on the 26th, '09 of December;

3   correct, that you went to the precinct?

4   A   Yes.

5   Q   Now, when you were on probation in Brooklyn, some

6   thirteen years ago, you did five years of probation?

7   A   Yes.

8   Q   Did you ever violate probation?

9   A   No.

10  Q   Did you ever commit any crime or do anything immoral or

11  wrong?

12  A   No.

13  Q   And you successfully completed your five year

14  probationary term and were discharged; correct?

15  A   Yes.

16  Q   Will you describe David's state of mind at the party on

17  December 24th into the 25th of 2009, his state of mind as being

18  fragile and delicate?

19            MR. ROSENFELD:  Objection.

20            THE COURT:  I'll allow her to testify to what she

21      saw on that evening.

22            MR. CANTOR:  On that evening, yes.

23            MR. ROSENFELD:  Objection, your Honor.

24  A   He was depressed.

25            MR. CANTOR:  You already ruled.

fljb                    C. Matos - People - Cross        1404

1                    THE COURT:  I said I will allow her to testify to

2      what she saw.

3      A    He was depressed.

4                    THE COURT:  One second.

5                    That evening.

6      Q    Elaborate.  Was he fragile?

7      A    Yes.

8                    MR. ROSENFELD:  Objection.

9      Q    Was he depressed?

10     A    Yes.

11                   MR. ROSENFELD:  Objection.

12     Q    Would it be a fair statement to say that on the evening

13     of the 24th carrying over to the 25th, he was not mentally,

14     physically in the condition that you were used to seeing him

15     earlier?

16                   MR. ROSENFELD:  Objection.

17                   THE COURT:  She can characterize what she viewed.

18     Q    Is that yes or no?

19     A    Yes.  He was.

20     Q    He was what?

21     A    Depressed and down.  He was very depressed.

22     Q    Was he easily frightened?

23                   MR. ROSENFELD:  Objection.

24     A    No.

25                   THE COURT:  Yes.

fljb                    C. Matos - People - Cross        1405

1              MR. ROSENFELD:  Objection.

2              THE COURT:  Sustained.

3      Q    Well, he had been threatened three times, hadn't he?

4              MR. ROSENFELD:  Objection.

5              THE COURT:  Only as to form.  You can break it up.

6      Q    Was he threatened by Sosa?

7      A    Yes.

8      Q    How many times?

9      A    Three times.

10     Q    Did you see David as being scared as a result of those

11     threats?

12     A    David was shaking.  David was afraid.

13             MR. CANTOR:  No further questions.

14             THE COURT:  Mr. District Attorney.

15     REDIRECT EXAMINATION

16     BY MR. ROSENFELD:

17     Q    Which threat --- after which threat did you say ---

18     would you say David was shaking?

19     A    David was scared.

20     Q    After which threat?

21     A    The --- I guess the second or the third one.

22     Q    Well, let's go back to the first threat you told us

23     earlier today how Sosa came up to David and put his hand on his

24     --- on his left side area?

25     A    Ah-ha.

C. Matos - People - Redirect      1406

1    Q     You pointed to, and said the words that he said and

2    repeated the same words later; right?

3    A     Yes.

4    Q     So, is David afraid at that point?

5          MR. CANTOR:  Which point, the first one?

6          MR. ROSENFELD:  I just said the first one, yes.

7    A     I don't --- I don't know.

8    Q     Okay.  But you just told Mr. Cantor that after the

9    threats, David was afraid and shaken.  So, after the first threat

10   was he afraid and shaken?

11   A     I don't recall.

12   Q     Okay.  And that was in the kitchen?

13   A     Yes.

14   Q     And you were with everybody else?

15   A     Yes.

16   Q     And you told us that after Sosa touched David again with

17   however you demonstrated on the left side, David stepped back a

18   little bit and that was it.  Isn't that what you told us this

19   morning?

20   A     Yes.

21   Q     And you went back to talking to Tango?

22   A     Yes.

23   Q     Okay.  After the second time, again, it was in the

24   kitchen, and you told us Sosa approached the defendant; right?

25   A     Yes.

C. Matos - People - Redirect      1407

1    Q    And you demonstrated, again, it was earlier this

2    afternoon, how Sosa again said words to him and put his hand on

3    his shoulder chest area; right?

4    A    Yes.

5    Q    He went back -- And after that one, again, David didn't

6    react to that; right?

7    A    No.

8    Q    Okay.  No, he didn't or yes, he did?  I'm sorry.  He did

9    react?

10   A    He reacted on the third ---

11   Q    I'm talking about the second now.  He didn't react;

12   right?

13   A    No.

14   Q    He went back to talking to Tango you said?

15   A    Right.

16   Q    Okay.  So, now, let's talk about the third one, the

17   third time, and I'm following Mr. Cantor's cross-examination.

18   You said Sosa came over to David, punched him on the side as you

19   demonstrated, and said the words ending with, "Fuck you up;"

20   right?

21   A    Yes.

22   Q    Okay.  Then you said, at that point you told us earlier,

23   you grabbed David's arm; right?  Right?

24   A    Yes.

25   Q    And David said what?

C. Matos - People - Redirect    1408

1    A    He just pushed away.

2    Q    Pushed away.  Okay.  So, at what point was he shaking?

3    A    At that point, he was scared.

4    Q    Well, did he say something to you at that point?

5    A    To who?

6    Q    Did he say --- David say something to you at that point

7    when you grabbed his arm and he pushed you away?

8    A    No, he didn't say anything to me.

9    Q    And you then said you turned to talk to Mercedes; right?

10   A    Yes.

11   Q    So, you weren't looking at David and Sosa at that point;

12   right?

13   A    No.

14   Q    And did you hear any further words between David and

15   Sosa after you turned towards Mercedes?

16   A    No.

17   Q    And you turned to talk to Mercedes; right?

18   A    Yeah, because she pulled me.

19   Q    Okay.  I'm sorry.  And what?

20   A    She pulled me.

21   Q    To talk to you?

22   A    Yes.

23   Q    Did you talk to her?

24   A    Yes, I was talking to her.

25   Q    Could you hear anything else transpire between Sosa and

C. Matos - People - Redirect     1409

1   David?

2   A    They were --- They were arguing.

3   Q    They were arguing.  Okay.

4   A    Ah-ha.

5   Q    Well, you weren't looking at them; right?

6   A    No.

7   Q    So, you could hear them?

8   A    They were arguing.  All you heard was a voice.  That's

9   it.

10  Q    What did you hear?  Tell us.

11  A    All I heard was, "I'll fuck you up." That's all I heard.

12  Q    Miss Matos, you said you heard, "I'll fuck you up," then

13  you turned to Mercedes?

14  A    That's what I heard.

15  Q    Okay.  After you turned to Mercedes, you didn't hear

16  them say anything else, yes or no?

17  A    They were arguing, what they were saying yes or no.

18  Q    So, you heard them yes or no?

19          MR. CANTOR:  She heard it.  She said she was

20     arguing.

21          THE COURT:  Overruled.

22  Q    You heard them argue ---

23       I'll go back.  Let's start over.  You turned away from

24  David and Sosa to speak with Mercedes; correct?

25  A    Yes.

C. Matos - People - Redirect     1410

1    Q    Once you turned away to talk to Mercedes, you weren't

2  looking at David and Sosa; correct?

3    A    Yes.

4    Q    How far away was David and Sosa were you when you turned

5  to talk to Mercedes?

6    A    I wasn't too much too far.

7    Q    Well, using yourself, now, reporters, jurors, myself,

8  how far away?

9         Use objects.  Whatever will help you.

10   A    I don't recall.  I can't --- I don't remember.

11   Q    Well, how about using our photographs, your photograph

12 Number 4.  You said Mercedes was on the chair here on the right

13 side of the photograph; correct?

14   A    Yeah.  We was right there, and David wasn't too far from

15 me.

16   Q    Okay.  Well, let's say --- You're saying Mercedes was in

17 this chair by the door, correct, by the right side?

18   A    Ah-ha.

19   Q    You were talking to her and you were by the edge of the

20 table here.  David was behind you you said around the chair?

21   A    No.  I told you ---

22   Q    Okay.  Tell me again.  Stand up and show us, please?

23   A    It was around here, here.

24   Q    She's now pointing to the table.  That's where who was?

25   A    Me and David was standing here.

C. Matos - People - Redirect      1411

MR. CANTOR: Indicating.

One second, please.  Under the white tablecloth on the right side of the photograph, she's pointing to the area, kind of between the legs as she's indicating the area not between the legs, but close to the right leg of the table.

Q    So, however she's indicating.  I'm approximating.

A    He was right here.

THE COURT:  Okay.  Indicating.

Q    Okay.  And Sosa was where?

A    Right in front of David.

Q    Okay.  So, when you turned to talk to Mercedes, could you hear anything between --- any words between David and Sosa?

A    They were arguing.

Q    Okay.  Tell us what words you heard.

A    "I'll fuck you down, I'm going to fuck you up and bring you down."  That's what I was hearing.  That's all I heard.

Q    Before you turned around or after you turned around?

A    I heard them before and then after.  That's what you hear.  That's what you heard.

Q    Let's just get this --- I want to follow you.  Before you turned around, David touched Sosa, punched Sosa and said, "I'll fuck you up;" right?  That's what we were calling the third time?

MR. CANTOR:  No.  She said, "I'll fuck you up. I'll put you down."

C. Matos - People - Redirect      1412

1       THE COURT:  Please, you will have a chance.

2    A    State it again.

3    Q    Okay.  While you were standing next to David before you

4    grabbed his arm, Sosa came over to him; right?

5    A    Yes.

6    Q    And he made that statement to him?

7    A    Yes.

8    Q    The words --- Whatever the words were; correct?

9    A    Yes.

10   Q    Including the word, "Fuck you up, I'll put you down,"

11   whatever; right?

12   A    Yes.

13   Q    That's when you grabbed David's arm?

14   A    Yes.

15   Q    And David shook you off?

16   A    Yes.

17   Q    That's when you turned to talk to Mercedes?

18   A    Yes.

19   Q    And you weren't facing David and Sosa?

20   A    No.

21   Q    Now, you're saying you heard additional words after

22   that?

23   A    They were arguing.

24   Q    Okay.  But I'm asking, my question is, Miss Matos, did

25   you hear more words after you turned to talk to Mercedes or not?

C. Matos - People - Redirect       1413

1  Words?

2      A     They were saying to each other -- He was telling him,

3  "I'm going to fuck you up and bring you down."  That's what they

4  were saying.

5      Q     So, he said it again after you were facing Mercedes?

6      A     Yes.

7      Q     Okay.  So, you were talking to Mercedes and you heard

8  who say that?

9      A     Yes.

10     Q     Who said that?

11     A     Sosa did.

12     Q     And what did David say in response to him?

13     A     He said, "Well, we'll fight."

14     Q     David said that?  Go ahead.  Tell us.

15     A     I guess, yes.

16                    (Continued on next page.)

17

18

19

20

21

22

23

24

25

1          MR. CANTOR:  I move to strike "yeses."

2          THE COURT:  Overruled.

3          MR. CANTOR:  Did she hear it or is she guessing?

4          THE COURT:  Overruled.

5          MR. ROSENFELD:  Mr. Cantor, please.

6          MR. CANTOR:  I'm trying to look at the witness

7     and the court reporter is blocking her.

8          MR. ROSENFELD:  There's no necessity for this.  I

9     object.

10          THE COURT:  You're the one who chose that chair.

11          MR. CANTOR:  No, Judge.  The court officer --

12          THE COURT:  You could move it a little bit.

13          MR. CANTOR:  Thank you.

14     Q     So after you grabbed the defendant's elbow and he

15   pulled you away, you heard Sosa repeat some of the words to

16   David, is that correct?

17     A     Yes.

18     Q     And then the defendant responded let's fight, is that

19   correct?

20     A     No.  That's not what he said.

21     Q     What did he say?

22     A     He said well, come fuck me up.  That's what he told

23   him.

24     Q     Okay.  A second ago before Mr. Cantor moved his chair,

25   you said the word fight?

1     A     No.  It wasn't fight.  It wasn't fight.

2     Q     Did you make a mistake?

3     A     Yes, I made a mistake.

4     Q     Okay.  I just want to be totally clear.  Now, after

5     you grabbed the defendant's arm, you turned towards Mercedes

6     Rodriguez, you heard Sosa say what additional words?

7     A     I'm gonna fuck you up and bring you down.

8     Q     So now he said it again, you're still facing Mercedes

9     and the defendant responded?

10    A     We'll bring it down.

11    Q     Well bring it down or we'll?

12    A     We'll, we'll bring it down.

13    Q     Did you hear Sosa respond to that?

14    A     They kept arguing.  They kept saying things to each

15    other.

16    Q     Tell us please what was said.

17    A     The same thing over, and I'ma fuck you up and bring

18    you down.

19    Q     Sosa kept saying those words, and David you're saying

20    was arguing with him saying what?

21    A     Saying the same thing.  Well, fuck me up, come down,

22    we'll fight or we'll get it down.

23    Q     That was the defendant responding, okay.  And during

24    this time, are you talking to Mercedes or just standing there?

25    A     Just standing there, me and Mercedes.

```
 1        Q    So you weren't talking?

 2        A    We were just -- she was just, you know, telling me

 3   they all acting crazy.

 4                 MR. CANTOR:   She was what?

 5        A    Acting crazy.

 6        Q    But did you turn around to face Sosa and David when

 7   you heard them continuing?

 8        A    No.

 9        Q    You kept your back to them?

10        A    Right.

11        Q    How long did this go on for that Sosa repeats the

12   words and David repeats the words?

13        A    Oh, I don't know.

14        Q    One time, two times, three times, four times?

15        A    I didn't say.   About two times.

16        Q    Then what happened?

17        A    Then when I -- when I turned around, then I seen Sosa

18   with blood.

19        Q    By the way, Sosa -- Mr. Cantor asked you if you had a

20   close relationship with Sosa.   You had known him for several

21   years, right?

22        A    Who?

23        Q    Sosa.

24        A    No.

25        Q    Well, how about your son, do you know if your son knew
```

 1   him?

 2                   MR. CANTOR:   Objection.   Outside of the scope of

 3        redirect.

 4                   THE COURT:   I'll allow it.

 5        A     If my son knew him?

 6        Q     Yes.

 7        A     I guess.

 8        Q     And your relationship with Sosa was more than just hi

 9   and goodbye, occasionally, it was a friend of yours, right?

10        A     No.   We just say hi and bye whenever I saw him.

11        Q     Over how many years?

12                   MR. CANTOR:   Judge, this is beyond the scope of

13        redirect.

14                   THE COURT:   Overruled.   Your objection is

15        overruled.

16                   MR. CANTOR:   I can't hear you sometimes when the

17        DA interrupts.

18        Q     Go ahead.   You may answer.

19        A     What was the question?

20        Q     Was it over a couple of years?

21        A     I don't know Sosa for a couple of years, no.   No.   I

22   don't know him for a couple of years.

23        Q     Your son may have known him?

24                   MR. CANTOR:   Objection.   "May have" is

25        speculative.

1      Q    Did your son --

2                 MR. CANTOR:  Hold it.  I can't hear your ruling.

3                 THE COURT:  Objection is sustained, however only

4      as to son may have.

5      Q    Did your son know Sosa?

6      A    I think so.

7      Q    For how long, do you know?

8      A    I don't know.

9      Q    When you and David the defendant left the apartment to

10     go get the cranberry juice, you had to walk from the apartment

11     over to your apartment, right?

12     A    Yes.

13     Q    Did you have to take the stairs or the elevator, do

14     you remember?

15                MR. CANTOR:  Judge, didn't we have this on

16     direct?  I object.

17                MR. ROSENFELD:  Your Honor, subject to

18     connection.

19                MR. CANTOR:  Everything is subject to connection.

20     I object.  May I have a ruling?

21                THE COURT:  Objection is overruled.

22                MR. CANTOR:  Exception.

23     Q    How did you get from Carmen Diaz's apartment over to

24     your apartment?

25                MR. CANTOR:  We had this on redirect.

```
 1                    MR. ROSENFELD:  He's interrupting.

 2                    THE COURT:  Yes.  Please, Mr. Cantor, control

 3          yourself.

 4          Q     Go ahead.

 5          A     We walked.

 6          Q     Down the stairs?

 7          A     We took the elevator, then we walked.

 8          Q     When you walked over to the apartment, did you take

 9      the elevator up to your apartment?

10          A     No.

11                    MR. CANTOR:  Objection.  Repetitive.

12                    THE COURT:  I'm sorry.  Read it back.

13                    (Whereupon, the requested portion was read by the

14          court reporter.)

15                    THE COURT:  Objection is overruled.

16          Q     You walked upstairs to your apartment?

17                    MR. ROSENFELD:  Mr. Cantor is shaking his head.

18      May we have an objection or something on the record?

19                    MR. CANTOR:  How about the fact that I'm inhaling

20      and exhaling?  How about that?  I'm shaking my head.

21      Imagine that, Judge.

22                    THE COURT:  He's only breathing.

23                    MR. ROSENFELD:  Yeah, barely.

24                    MR. CANTOR:  Barely?  How desperate are you for a

25          conviction here?
```

```
 1              THE COURT:  Please, Mr. Cantor.

 2              MR. ROSENFELD:  This is totally improper.

 3              MR. CANTOR:  Let me tell you something.  I have

 4      an assistant district attorney who is uttering out

 5      comments.

 6              MR. ROSENFELD:  This is totally done for the

 7      jury.  He knows it's unprofessional.

 8              THE COURT:  The jury will totally disregard.

 9              MR. CANTOR:  And when Mr. Rosenfeld says "barely"

10      and I say "breathing" and he --

11              THE COURT:  Let's go forward.

12      Q    How did you get up to your apartment?

13      A    Walked to my apartment.

14      Q    Did David Delgado walk also?

15      A    Yes.

16      Q    When you got to your apartment, you told us what you

17    did at the apartment.  How did you get back to Carmen Diaz's

18    apartment?

19              MR. CANTOR:  Repetitive.  Objection.

20              THE COURT:  Overruled.

21              MR. CANTOR:  Of course.  Exception.

22              THE COURT:  Noted.

23      A    We walked back to the apartment.

24      Q    During any of that time period from the time you left

25    Carmen Diaz to go to your apartment to the time you got back to
```

1    Carmen Diaz's apartment, did David Delgado have any difficulty

2    walking?

3        A    No.

4        Q    At any time --

5            MR. ROSENFELD:  Withdrawn.

6        Q    When you told Mr. Cantor that David Delgado was being

7    given drinks in the apartment, did he ever refuse the drinks?

8        A    No.

9            MR. ROSENFELD:  Can I have one more moment, your

10       Honor?

11           THE COURT:  Yes, Mr. Rosenfeld.

12           (Whereupon, a brief pause was taken.)

13       Q    You mentioned earlier that the defendant was depressed

14   because he wasn't with his family.  Is that what he was

15   depressed about?

16       A    Yes.  He was depressed because he was away from his --

17   his kids and his mother, his closer family.

18       Q    He was living in Brooklyn, right?  The defendant?

19       A    Yes.

20       Q    He was living alone in Brooklyn?

21       A    Yes.

22       Q    Did you know how long he had been living alone in

23   Brooklyn?

24       A    No.

25       Q    Was he living with his family or children in Brooklyn?

1    A    I don't know.

2              MR. ROSENFELD:  I have nothing further.

3              THE COURT:  Mr. Cantor.

4    RECROSS EXAMINATION

5    BY MR. CANTOR:

6    Q    You said on direct examination that he was depressed

7    because his family, his siblings were in Puerto Rico?

8    A    Right.

9    Q    Did you ever see any members of his family the one

10   time that you went to his room in Brooklyn?

11   A    No.

12   Q    Let's straighten this out.  The second time that Sosa

13   threatened the fuck up and put down David, did you look at

14   David?

15   A    I looked at David.

16   Q    Did he appear nervous or frightened?

17   A    He was nervous.  He was frightened.

18   Q    Did he appear frightened?

19   A    Yes, he did.

20   Q    And the third time that Sosa said I'm gonna fuck you

21   up, I'm gonna put you down, did David appear even for a second,

22   even for an instant frightened and scared?

23             MR. ROSENFELD:  Objection to form.

24   A    He was frightened.

25             THE COURT:  I'll allow it to characterize.

1    Q    When you went outside and got your keys and your cell

2    phone, you said he was shaking and scared and frightened, is

3    that correct?

4       A    Yes.

5       Q    Had you ever in the over four months that you were

6    going out with the man, had you ever seen him commit any act of

7    violence?

8       A    No.

9       Q    Would it be a fair statement to say that by the end of

10   the evening after David had had six drinks, been three times

11   threatened by Sosa, that this had a bad effect on David?

12                   MR. ROSENFELD:   Objection.

13                   THE COURT:   Too broad.   But you may restate it.

14      Q    He had six drinks, David, right?

15      A    Yes.

16      Q    David's about 5'-6", isn't he?

17      A    Yes.

18      Q    Sosa is about six feet, right?

19      A    Yes.

20      Q    So David has six drinks, he's threatened three times,

21   do you think that affected David's state of mind?

22                   MR. ROSENFELD:   Objection.

23                   THE COURT:   Sustained.

24      Q    Well, you could noticeably see that David was different

25   after the third threat and after drinking six hard liquors and

1    beer that his demeanor was not the same when he first entered

2    the party, is that correct?

3        A    Yes.

4        Q    Scared, frightened, correct?

5                MR. ROSENFELD:  Objection.

6        A    Yes.

7                THE COURT:  Yes, only as to form.

8        Q    You used the words -- at the end of the six drinks, at

9    the end of the three threats, how would you describe his

10   demeanor?

11               MR. ROSENFELD:  Objection.

12               THE COURT:  Well, his demeanor I would allow.

13       Q    Tell everyone in a loud voice.

14       A    He wasn't in his state of mind.

15       Q    He was what?

16       A    He was scared.

17       Q    Do you know what another word for scared is?

18               MR. ROSENFELD:  Objection.  Improper.

19               THE COURT:  Yes.

20       Q    Was he frightened?

21       A    Yes, he was, he was frightened.

22               MR. ROSENFELD:  Objection.

23               THE COURT:  Sir.

24               MR. ROSENFELD:  No further questions.  Thank you.

25               MR. CANTOR:  Thank you.

 1              THE COURT:  You may stand down, ma'am.  You're

 2       excused.

 3              MR. CANTOR:  Ms. Matos, thank you.

 4              THE WITNESS:  You're welcome.

 5              THE COURT:  People may call their next witness.

 6              MR. ROSENFELD:  People call Detective Kenneth

 7       Banker.

 8              THE COURT:  Detective Banker to the witness

 9       stand.

10              MR. ROSENFELD:  May I approach just for

11       scheduling?

12              THE COURT:  You may.

13              (Whereupon, there was a discussion held, off the

14       record, at the bench, among the Court, the assistant

15       district attorneys, defense counsel, and outside the

16       hearing of the defendant and the jury.)

17              (Whereupon, the following takes place, on the

18       record, in open court, in the presence of the Court, the

19       assistant district attorneys, defense counsel, the

20       defendant and the jury.)

21              COURT OFFICER:  Witness entering.

22              (Whereupon, the witness entered the courtroom and

23       takes the stand.)

24              COURT OFFICER:  Remain standing, raise your right

25       hand, place your left hand on the Bible, face the clerk.

1    THE CLERK:  Do you solemnly swear that the
2    testimony you give this Court shall be the truth, the whole
3    truth and nothing but the truth, so help you God?
4    THE WITNESS:  I do.
5    COURT OFFICER:  Have a seat.
6    Witness gives his name as Detective Kenneth
7    Banker, shield 282, retired from the 43 Squad, New York
8    City Police Department.
9    THE COURT:  Detective, good afternoon.
10    THE WITNESS:  Good afternoon.
11    THE COURT:  Just sit back, be comfortable, sir.
12    Listen carefully to the question.  Answer only the
13    question.
14    You may inquire.
15    THE WITNESS:  Yes, sir.
16    MR. ROSENFELD:  Thank you.
17    DIRECT EXAMINATION
18    BY MR. ROSENFELD:
19    Q    Good afternoon, Detective.
20    A    Good afternoon.
21    Q    Detective, how many years were you with the New York
22    City Police Department?
23    A    Thirteen years.
24    Q    When did you retire?
25    A    December 31, 2011.

1     Q     Why did you retire on or about that time?

2     A     I broke my back while working.  I had to get spinal

3     fusion.

4     Q     Detective, before you joined the New York City Police

5     Department, please tell us what you did.

6     A     I worked -- I graduated Iona College.  From there I

7     went to the Office of Revenue Investigations for the City of

8     New York investigating welfare fraud until I was called for the

9     Police Department.

10     Q     When were you called for the Police Department

11     approximately?

12     A     I started July 7 of 1999.

13     Q     When you first began your assignment in the Police

14     Department, after the academy, where did you go?

15     A     PSA 8.

16     Q     And what is PSA 8?

17     A     Housing police.

18           MR. CANTOR:  I'm sorry?

19     A     Housing police.

20     Q     How long were you assigned to the Housing police?

21     A     Four and a half years.

22     Q     Please tell us what were your duties and assignment in

23     PSA 8?

24     A     I started off as a regular community police officer.

25     I was a foot post in the Castle Hill houses in the Soundview

1    area of the Bronx, I did that.  From there I went to gang unit.

2    I did that for about a year.  Then I went to the anti-crime

3    division, did that for like a year and a half, and then I went

4    to the detective squad as a robbery investigator.

5        Q    Going back to your time with PSA 8, during that time,

6    did you participate in making arrests?

7        A    Yes.

8        Q    Participate in interviewing witnesses?

9        A    Yes.

10       Q    As a result of making arrests, did you also

11   participate in interviewing suspects and defendants of crimes?

12       A    Yes.

13       Q    You also participated in what are referred to the

14   lineup procedures while you were still at PSA 8?

15       A    Yes.

16       Q    Can you approximate how many arrests you participated

17   in while you were in PSA 8 either as the main arresting officer

18   or assisting officer?

19       A    Personally, over five hundred.  I assisted in

20   thousands.

21       Q    After PSA 8, where were you assigned?

22       A    To the 43 Precinct robbery unit.

23       Q    And what did you do in the 43 Precinct robbery unit?

24       A    I investigated robberies that occurred in the past,

25   interviewed people, conducted canvasses, conducted lineups.

1    Q    When did you become a detective?

2    A    2004.

3    Q    Was that while you were with the robbery apprehension

4    unit?

5    A    Yes, it was.

6    Q    Approximately how many arrests did you participate in

7    while you were in the robbery unit?

8    A    Robbery arrests, I made over a hundred and fifty,

9    participated in --

10             MR. CANTOR:  I'm sorry?

11   A    Participated in probably at least five hundred.

12   Q    You were with the robbery unit until when?

13   A    2007.

14   Q    What happened after that?

15   A    I went to the regular precinct detective squad.

16   Q    What do you mean by the regular precinct detective

17   squad?

18   A    They handle everything except robberies basically,

19   from petit, you know, threatening phone calls to homicides.

20   Q    And while you were with the robbery unit, did you

21   participate in conducting lineups?

22   A    Yes.

23   Q    Again, approximately how many lineups did you

24   participate in conducting while you were in the robbery unit?

25   A    Over fifty.

1    Q    Did you also participate in taking statements from the

2    defendants and suspects while you were in the robbery unit?

3    A    Yes.

4    Q    Did you participate in taking written statements from

5    the suspects?

6    A    Yes.

7    Q    Did you participate in taking video statements from

8    the suspects?

9    A    Yes.

10   Q    How many of those were you involved in approximately

11   either taking written statements or video statements from the

12   suspects?

13   A    Well over fifty.

14   Q    When you started in the detective squad of the 43,

15   what was your assignment?

16   A    I was in what they call a catching unit which is a

17   group of detectives that you work different charts and whatever

18   crimes occur during those time periods you're responsible for.

19   Q    And the type of cases you investigated?

20   A    Everything from threatening phone calls, domestic

21   violence to homicides.

22   Q    During the time you were with the 43 squad, was that

23   up to your retirement?

24   A    I was in that catching unit up until the last two

25   years of my career, at which point I led a special division

1        that investigated gang cases.

2             Q     So during that time before you did the gang cases,

3        approximately how many arrests did you participate in either as

4        the main detective assigned a case or assisting?

5             A     Over a thousand.

6             Q     You also participated in lineup procedures during that

7        period?

8             A     Yes, I did.

9             Q     Again, approximately how many?

10            A     Over a hundred.

11            Q     And you participated in taking statements from the

12       defendants while you were in the 43 squad, either written

13       statements or video statements?

14            A     Yes.

15            Q     Again, approximately how many of those did you

16       participate in?

17            A     Over fifty lineups.

18                  MR. CANTOR:   Over 51?

19            A     Over fifty lineups.

20                  MR. CANTOR:   Question dealt with statements,

21            Judge.

22            Q     I think I was referring to statements, Detective,

23       that's correct.

24            A     Oh, yeah.   Statements probably at least a hundred.

25            Q     After you completed your assignment at the 43 Squad,

1    you said you spent your last two years where?

2    A    I led a unit that targeted violent areas that were

3    gang areas that was high in violence, and basically created set

4    books on the players associated with those areas, and then

5    targeted those areas and did long-term investigations where we

6    took out the whole group at once at the end, federally and

7    state both.

8    Q    That led you right up to retirement?

9    A    Yes.

10   Q    Now, Detective, at this point, I'd like to direct your

11   attention to December 25, 2009, where were you assigned at that

12   time?

13   A    43 Squad.

14   Q    Were you working on that day December 25, 2009?

15   A    Yes, I was.

16   Q    What was your tour of duty that day?

17   A    8 a.m. to 4 p.m.

18   Q    In laymen's terms?

19            MR. CANTOR:   It is laymen's terms.

20            MR. ROSENFELD:   I'm sorry.  My mistake.  I'm so

21   used to changing it.

22   Q    When you came in for your assignment 8 o'clock in the

23   morning, did you receive any particular assignment?

24   A    Yes, I did.

25   Q    What was your assignment?

1      A      I was assigned to the homicide that had occurred that

2  evening.

3      Q      How did it come that you were assigned the homicide?

4      A      I was up next on a catching order, which is a chart

5  that's worked where it rotates, whoever caught the last

6  homicide goes to the bottom of the list and everyone moves up

7  one.

8      Q      Was anyone anybody else working with you that morning?

9      A      No.   I actually volunteered to work Christmas so they

10  could have off.   It should have been their case.

11      Q      So when you came in, how did you hear about the case?

12      A      Night Watch.

13      Q      What is Night Watch?

14      A      Detective unit that works basically from midnight to 8

15  a.m. while the regular detective's squad is off, they catch any

16  major cases that occur, run with it up until 8 a.m. when the

17  detectives start, and then the case is given to whoever is the

18  primary lead on it, which was me, for that case.

19      Q      Does Night Watch cover just the 43 Precinct or all

20  precincts?

21      A      It's borough wide.

22      Q      The same thing applies, they're the only detectives

23  working at night, midnight to 8 in the morning?

24      A      That would help us.   There's other units like

25  narcotics and gang and people like that, but they don't have

1    anything to do with what I do.

2        Q    So you came in, you were assigned this incident.  Did

3    they give any information to you at the beginning as to what

4    this incident was?

5        A    Yes.

6        Q    In sum and substance, what information did you receive

7    at the beginning about the incident?

8                MR. CANTOR:  Objection.  Hearsay.

9                THE COURT:  Overruled.

10               MR. CANTOR:  Exception.

11       Q    In sum and substance, what had happened, what

12   information?

13               MR. CANTOR:  From who?

14               MR. ROSENFELD:  Okay.  That's fair.

15       Q    Who did you receive information from?

16       A    Night Watch, Detective Evans and Manga, M-A-N-G-A, had

17   told me that the victim George Talarvera was stabbed in the

18   neck at 2033 McGraw Avenue and that they had witnesses that

19   they interviewed already.

20               MR. CANTOR:  Judge, isn't it a bit too far in

21       terms of hearsay?

22               THE COURT:  No.

23       Q    So your additional conversations were with detectives

24   from Night Watch that morning?

25       A    Yes.

1    Q    That was done in person or by phone?

2    A    No.   Person.

3    Q    So you left the 43 Precinct.  Did you respond?

4    A    I did, yes.

5    Q    Where did you respond to?

6    A    To the location.

7    Q    And when you got to 2033 McGraw Avenue, is that when

8    you encountered detectives from Night Watch?

9    A    They were present at the location still, correct.

10   Q    After you had conversations with these detectives,

11   what, if anything, did you specifically do?

12   A    I spoke to a few individuals that were at the scene

13   inside the apartment, and then I went back to the 43 Precinct,

14   started doing some computer checks.

15   Q    When you got to that apartment at 2033 McGraw Avenue,

16   was the victim still there?

17   A    No.   The victim was already removed.

18   Q    And when you first got to that location, did you go

19   into the apartment?

20   A    I did.

21   Q    And do you recall what your observations were when you

22   first entered apartment 3-D?

23   A    Yes.

24   Q    Please tell us.

25   A    I walked into the apartment and there was blood

1    everywhere.  The floor was covered in blood.  The couch was

2    pushed, you could tell it was like a weird angle, it was moved.

3    The table, there was empty beer cans and bottles and drinks all

4    over the place.  It was in disarray and covered in blood.

5    There was splatter on the walls, the floor, everywhere.

6        Q    And you mentioned you spoke to some civilian witnesses

7    at that point?

8        A    Yes.

9        Q    Do you remember approximately how many you spoke to?

10       A    Really briefly like five people, not in-depth

11   interviews.  Just pedigree stuff.

12       Q    Do you remember the names, if any, of the people you

13   spoke with?

14       A    Miss Dempsey, Mr. Vasquez, Miss Matos, Miss Diaz.

15   They were all there.

16                   MR. CANTOR:  Can I have that re-read, Judge?

17                   THE COURT:  Yes.

18                   (Whereupon, the requested portion was read by the

19            court reporter.)

20       Q    Conducting these conversations with these individuals,

21   did you remain at the location?

22       A    After that I left and went back to the 43 Precinct.

23       Q    When you were at the 43 Precinct, did you have any

24   further conversations with any witnesses from the incident at

25   2033 McGraw Avenue?

1              MR. CANTOR:  I object to the term "witnesses" to
2      the incident.  Civilians, people, persons?
3              THE COURT:  I'll allow it.
4              MR. CANTOR:  Of course you will.
5      A    Yes, I did.  I spoke to Miss Carmen Matos who was a
6      witness.
7              MR. CANTOR:  Judge, I'm going to object who was a
8      witness.  The question is did you speak to anyone?  The
9      answer should be yes.
10             THE COURT:  That is true.
11             MR. CANTOR:  So will you strike that was a
12     witness?
13             THE COURT:  For the time being, yes.  Please move
14     on.
15     Q    So you spoke with a Miss Matos, correct?
16     A    Correct.
17     Q    As a result of your conversation with Miss Matos, did
18     you develop a suspect in the case?
19     A    I did.
20     Q    How did that come about?  Without indicating what she
21     said, what did you do?
22     A    She had a camera on her in her pocketbook.  I asked if
23     she had any pictures of David because she said she didn't know
24     --
25             MR. CANTOR:  I'm going to object to conversations

1    between he and Miss Matos.

2    THE COURT:  Overruled.

3    A    Miss Matos stated that she had the photo in a camera

4    in her bag.  She took the camera out and we were viewing,

5    myself was viewing the photos in this, and when we got to the

6    picture of a male, she said, "That's David."  So we knew what

7    he looked like, knew his name was David.  We continued to look

8    and came about a picture of another female, she said, "That's

9    David's daughter."  On the bottom of that picture was her name,

10   which was Dakalis Delgado.  We took her name because it was a

11   Facebook picture, we signed on that Facebook, put that name in

12   and her name and picture came up.  We looked who her friends

13   were, and listed on her friends was a David Delgado Corsavair

14   who was the same David that was in the picture that she just

15   told us was David who was a suspect in the crime.

16   Q    After that, did you make any efforts -- this is now,

17   Detective, December 25, 2009, right?

18   A    Yes.

19   Q    After that, did you make any efforts to locate David

20   Delgado?

21   A    I did.

22   Q    Did this continue during the day of December 25, 2009?

23   A    Phone calls were made the 25th.  We actually didn't

24   pursue until the following day.

25   Q    So there came a time you ended your tour on December

1    25, 2009?

2       A    Yes, sir.

3       Q    About when was that?

4       A    I don't recall.

5       Q    Had you spoken to any additional witnesses or

6    civilians or people who were at the crime scene of 2033 McGraw

7    Avenue that day?

8       A    No.

9       Q    When was the next time you came back to work?

10      A    The following morning.

11      Q    That would be December 26, 2009?

12      A    Yes.

13      Q    Approximately what tour of duty did you do on December

14   26, 2009?

15      A    08:00, 8 a.m. to 4 p.m.

16      Q    That's laymen's terms?

17      A    Yes.

18      Q    Were you working alone at that time or was anybody

19   else working with you on this case?

20      A    No.   I had several other investigators on and a

21   sergeant working with me.

22      Q    Let me just back up a little bit.   Going back to the

23   day before December 25, 2009, did there come a time you went

24   and spoke with other civilians and witnesses who were at the

25   crime scene during the day?

```
 1              MR. CANTOR:  I'm going to object that he's
 2    testifying other civilians who were at the scene.  Not only
 3    is he testifying, he's leading the witness.
 4              THE COURT:  Overruled.
 5              MR. ROSENFELD:  You finished?  Thank you.
 6    Q    Yes or no?
 7    A    Yes.
 8
 9              (Continued on next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

People - DETECTIVE KENNETH BANKER - direct

1440

1    Q    And did you go to anybody's house to have those

2    conversations?

3    A    Several locations.

4    Q    And were these people's who had been at 2033 McGraw

5    Avenue on the evening of December 24th?

6         MR. CANTOR:  That -- I object, that implicates

7    hearsay, that's all it does.

8         THE COURT:  Would you please reread that?

9         MR. ROSENFELD:  Sure.

10   Q    Were these individuals who had been at the scene of

11   2033 McGraw Avenue the evening of December 24th into the morning

12   of December 25, 2009?

13        MR. CANTOR:  Doesn't that implicate hearsay?

14        THE COURT:  That objection is overruled.

15   A    Yes.

16   Q    You remember how many people were interviewed on

17   December 25, 2009?

18   A    Like, approximately, seven or eight people, I am not

19   sure exactly.

20   Q    Let's get back to December 26, 2009, you came on tour

21   of duty eight o'clock in the morning; what did you do that day?

22   A    We organized ourselves.

23        MR. CANTOR:  The question is what did he do not

24   the collective or royal we?

25        THE COURT:  Please stay in the context of the

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1441

1   question.

2   A    I met with my other detectives and we went out to

3   several different locations.

4   Q    Why did you go to several different locations?

5   A    I spoke to parole, found out --

6           MR. CANTOR:  Well, Judge, Judge, can I go on the

7   sidebar with the reporter, please?

8           THE COURT:  No.

9           MR. CANTOR:  No.

10          THE COURT:  No, but I will reserve.

11          MR. CANTOR:  Oh, you will reserve, that's grounds

12  for a mistrial.

13          MR. ROSENFELD:  Objection, we don't need --

14          MR. CANTOR:  And I move for a mistrial.

15          MR. ROSENFELD:  Objection, your Honor.  Judge,

16  that's totally improper.

17          THE COURT:  I will take that under advisement.

18          MR. CANTOR:  But I would like a ruling.

19          THE COURT:  I am not prepared to make a ruling.

20          MR. CANTOR:  Well, then, Judge, I am not prepared

21  to participate until you rule on my motion for a mistrial

22  because what this witness said --

23          MR. ROSENFELD:  Objection, he said parole --

24          THE COURT:  He is not your witness number one.

25          MR. CANTOR:  Correct.

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1442

1    THE COURT:  The jury will disregard.

2    MR. ROSENFELD:  I object to the colloquy.

3    THE COURT:  There are no other charges except the
4    one stated in the indictment.

5    Move on.

6    MR. CANTOR:  So, you haven't ruled on my
7    application.

8    THE COURT:  On the mistrial?

9    MR. CANTOR:  Yes.

10    THE COURT:  Denied.

11    MR. CANTOR:  Excepted.

12    THE COURT:  Noted.

13    MR. CANTOR:  Will you tell the jury to disregard
14    what they heard from this witness?

15    THE COURT:  You will disregard.  I just did, I
16    told them this.

17    MR. CANTOR:  That's a coached witness.

18    MR. ROSENFELD:  Objection, your Honor, this is
19    outrageous.  He just looked at the jury and said to --
20    indicated that I coached the witness.

21    MR. CANTOR:  Well, how does the word parole come
22    out again?

23    MR. ROSENFELD:  He is saying it again.

24    THE COURT:  One second.

25    MR. ROSENFELD:  This is improper.

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1443

1    Unprofessional.

2            THE COURT:  Please be seated.

3            MR. CANTOR:  He is yelling.  He is screaming.  He

4    is approaching the bench.

5            THE COURT:  This is the height of

6    juxta-positioning.  Mr. Cantor, you are the one yelling and

7    screaming.

8            MR. CANTOR:  Well, we will let the jury determine

9    that.

10           THE COURT:  Yes, the jury will and the detective

11   was simply recording his investigative procedures.

12           MR. CANTOR:  But the implications --

13           THE COURT:  But I have to -- the jury will

14   disregard the reference to the parole authorities because

15   that's not a matter for this case.

16           MR. CANTOR:  Of course, it's not, but yet --

17           THE COURT:  Move on.

18           MR. ROSENFELD:  Thank you.

19   BY MR. ROSENFELD:

20       Q    Detective Banker, did there come a time that you went

21   to any specific locations looking for a suspect?

22       A    Yes.

23       Q    And where did you go, what areas of the city did you

24   go to?

25       A    They were all in Brooklyn.

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1444

1    Q    Okay.  And did there come a time that you went to a

2  specific location and located the suspect?

3    A    Yes.

4    Q    And where was that?

5    A    That was on 47th of -- I'm sorry.  It was on 50th

6  Street, 325-50th Street in Brooklyn.

7    Q    And how did you get to that location?

8    A    Right before that I was at 237-45th Street, which was

9  the aunt and uncle of the defendant.

10            MR. CANTOR:  Judge, I object to that, that

11        implicates hearsay.

12            THE COURT:  I will allow it.

13            MR. CANTOR:  Note my exception.

14    Q    So you eventually ended up at this last location and

15  what happened when you got to that location?

16    A    We were walking around and going house to house to

17  different people and showing the photo of the defendant and

18  myself, as I was walking by, someone made eye contact with me, I

19  kept walking.  Another detective was behind me about 50 feet, I

20  turned around and I see the guy was looking at him.  So that

21  detective walked over to this gentleman, showed him a picture,

22  at that point I started walking back to them and the guy stated

23  that --

24            MR. CANTOR:  Objection to what a guy stated.

25            THE COURT:  All right.  All right.  Be cautious,

People - DETECTIVE KENNETH BANKER - direct

1445

1    lead --

2            MR. CANTOR:  Can you -- is that sustained, Judge?

3            THE COURT:  No, I said be cautious.

4            All right.  What happened as a result of going

5    over to this guy?

6            THE WITNESS:  The guy told me --

7            MR. CANTOR:  Objection.

8            THE WITNESS:  -- he was upstairs.

9            MR. CANTOR:  To what the guy told him.

10           THE COURT:  What happened as a result of what the

11   guy said?

12           THE WITNESS:  We found the defendant.

13           THE COURT:  Okay.

14           MR. CANTOR:  Will you strike whatever he said,

15   which was not responsive to your question?

16           THE COURT:  He said nothing, I stopped him.

17           MR. CANTOR:  Of course, he said something, it's

18   on the record.

19           THE COURT:  He went over to the guy, we clarified

20   that the question --

21           MR. CANTOR:  No, the guy told him something, it

22   is so improper.

23           THE COURT:  That's exactly the way you do it,

24   Mr. Cantor.  After he visited with the guy what occurred.

25           MR. CANTOR:  He testified as to what --

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1446

1     THE COURT:  Did you change your answer?

2     THE WITNESS:  No, sir.

3     THE COURT:  All right.  Please, Mr. Rosenfeld.

4  BY MR. ROSENFELD:

5     Q     And who was this person that you were talking about,

6  this civilian?

7     A     His name was Umberto Biaz.

8     Q     Did you determine who was Umberto Biaz?

9     MR. CANTOR:  Objection, that's hearsay.

10     THE COURT:  All right.  I will allow that to

11  determine who he was.

12     A     He told me he was --

13     MR. CANTOR:  Objection to what he told him.  How

14  can you let that in?

15     THE COURT:  Look, Mr. Cantor --

16     MR. CANTOR:  It's hearsay.

17     THE COURT:  -- wait for the Court to rule on your

18  objection.

19     MR. CANTOR:  Objection.

20     THE COURT:  All right.  You cannot make an

21  objection and then continue on a whole line --

22     MR. CANTOR:  I object.

23     THE COURT:  All right.  The objection is

24  overruled.

25     Not what anyone told you, Detective.

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1447

1    THE WITNESS:  Okay.

2    THE COURT:  All right.  You already answered.

3    THE COURT REPORTER:  Excuse me, your Honor, I did

4    not get the answer.

5    MR. ROSENFELD:  You want me to restate the

6    question?

7    THE COURT:  You would.

8    Q    Did you learn who this person was?

9    A    Yes.

10   Q    Who or what was he?

11   A    The landlord of that location.

12   MR. CANTOR:  I object, move to strike.  That's

13   hearsay.

14   THE COURT:  Overruled.

15   Q    Did you have a conversation with that individual?

16   A    Yes.

17   Q    Pursuant to that conversation what did you do?

18   A    We went upstairs.

19   Q    Okay.  And this is in which building?

20   A    Thirty -- 325-50th -- 40 -- 50th Street.  I'm sorry, I

21   don't know Brooklyn well.

22   Q    Well, if you need to refresh --

23   A    No, 325-50th Street in Brooklyn.

24   Q    And you indicated you went upstairs, go ahead.  What

25   happened?

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1448

1      A     As we were walking upstairs I was behind Mr. Biaz.

2  Mr. Biaz said the name David.

3           MR. CANTOR:  Objection to what Mr. Biaz said.

4           THE WITNESS:  I heard him say it.

5           THE COURT:  Yes.

6           MR. CANTOR:  I object to it, its hearsay.

7           THE COURT:  Not what he said.

8           MR. CANTOR:  I'm sorry?

9           THE COURT:  I said I agree, not what he said.

10           MR. CANTOR:  Did you rule?

11           THE COURT:  Mr. Rosenfeld.

12           MR. CANTOR:  Did you overrule or sustain?

13           THE COURT:  Yes, I overruled or did I sustain?

14           MR. CANTOR:  I don't know.

15           THE COURT:  You tell me.

16           MR. CANTOR:  I am sorry?

17           THE COURT:  Weren't you listening?

18           MR. CANTOR:  Of course, but you say be guided, be

19  guided as to what?  I don't know what this means, Judge, be

20  guided as to what?

21           THE COURT:  Be guided means to be cautious in the

22  name of the typed question that you are using.

23           MR. CANTOR:  Okay.  I objected on grounds of

24  hearsay, the traditional ruling is overruled or sustained.

25           THE COURT:  Right, but you weren't -- you didn't

People - DETECTIVE KENNETH BANKER - direct

1449

1    listen, you were so anxious.

2           MR. CANTOR:  No, no, Judge, I am used --

3           MR. ROSENFELD:  Judge, can we have this colloquy

4    stopped?  Objection.

5           MR. CANTOR:  Can I have a ruling?  Can I pray a

6    ruling?

7           THE COURT:  The objection is overruled.

8           MR. CANTOR:  Exception.

9           THE COURT:  Noted.

10           MR. CANTOR:  Jesus fucking --

11           MR. ROSENFELD:  Detective Banker, as you went up

12    the stairs did this person say something?

13    A    He did.

14    Q    Pursuant to that what happened; what did you observe?

15    A    The defendant came out of the bedroom.  Through the

16    door of the bedroom, right in front of it is like a little

17    hallway where the stairs are and at that point I had stepped to

18    him, I had my shield out.  I had, you no, I said I was Detective

19    Banker from the 43rd Precinct and handcuffed him.

20    Q    What type of building was this?

21    A    I think it was a three-story walk up, regular house.

22    It was a connected row house.

23    Q    What type of rooms were there in this house?

24    A    Like S.R.Os.

25    Q    What does that stand for?

H-ljb

People - DETECTIVE KENNETH BANKER - direct

1450

1    A    Single room occupancies, it looks like they were

2 renting out little rooms throughout.

3    Q    And you say you apprehended the individual at that

4 point?

5    A    Yes, he was handcuffed at that point in the hallway

6 right there.

7         MR. ROSENFELD:  Your Honor, I think this would be

8 a good time to stop.

9         THE COURT:  All right.  Detective, we are going

10 to break now, I suspect you will be on the stand a little

11 longer.  I direct you to put aside any command or any other

12 obligations you may have.  We will begin tomorrow morning

13 at 9:30.  We will put you on to continue.

14         THE WITNESS:  Yes, sir, thank you.

15         THE COURT:  All right.  Please do not discuss

16 your testimony with anyone, that includes the District

17 Attorneys.  Tomorrow morning, Detective.

18         THE WITNESS:  Good, thank you.

19         (Whereupon the witness is excused.)

20         THE COURT:  Madam forelady, ladies and gentlemen

21 of the jury, that completes our work for today.  Please be

22 here first thing tomorrow morning 9:30.  Just give me one

23 moment to confer with counsel.

24         Counsel approach.

25         (Whereupon there is an off-the-record

H-ljb

PROCEEDINGS

1    discussion.)

2         THE COURT:  Madam forelady, ladies and gentlemen

3    of the jury, have a pleasant evening.  Remember all of the

4    cautions, no discussions with anyone, not amongst

5    yourselves.  In the unlikely event anyone approaches you,

6    you know, you have to report that.

7         Again, I remind you, you are not investigators,

8    researchers, detectives.  Do nothing to retain what it is

9    that you've heard and seen and we will move along tomorrow.

10   Hopefully, we will close the People's case tomorrow

11   morning, we will see as we move along, okay.

12        Have a pleasant evening, 9:30 tomorrow.

13        THE JURY:  Goodnight.

14        (The jury exits at this time.)

15        THE COURT:  For our purposes, in order to allow

16   the sergeant time to bring up Mr. Delgado 9:45.  That

17   completes the record for this evening.

18        (Whereupon the trial is adjourned to Tuesday,

19   July 3, 2012, at 9:45 a.m.)

20

21

22

23

24

25

H-ljb