tr/a   Proceedings                                    1452

FILED

APR 3 0 2013

SUP COURT, APP. DIV
FIRST DEPT.

1   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF BRONX :  CRIMINAL TERM - PART:  T-14
2
    ------------------------------------------ X
3
    THE PEOPLE OF THE STATE OF NEW YORK,
4
                                         Indictment #27/2010
5
            - against -                  Cont'd Jury Trial
6

7

    DAVID DELGADO,
8
                        Defendant.
9
    ------------------------------------------ X
10
                        July 3, 2012
11
                        265 East 161st Street
12                      Bronx, New York 10451

13  B E F O R E :

14          HONORABLE DOMINIC R. MASSARO,

15                    J U S T I C E

16  (Appearances same as previously noted.)

17                    TRICIA L. ROBINSON, CSR, RPR
                      Senior Court Reporter
18

19          (Whereupon, the following takes place, on the

20     record, in open court, in the presence of the Court, the

21     assistant district attorneys, defense counsel, the

22     defendant and the jury.)

23          COURT OFFICER:  Jury entering.

24          (Whereupon, the jury entered the courtroom.)

25          COURT OFFICER:  All rise.



SCANNED
DATE:  MAY 1 3 2013
BY:  S.C. Owens

tr/a    Proceedings

1    (Whereupon, the Court entered the courtroom.)

2    THE COURT:  Good morning.

3    JURORS:  Good morning.

4    THE COURT:  Mr. Clerk.

5    THE CLERK:  This is case on trial People of the

6    State of New York against David Delgado.  Let the record

7    reflect the presence of the district attorney's office,

8    defense attorney, defendant and all sworn jurors.

9    THE COURT:  Madam Forelady, ladies and gentlemen

10   of the jury, I trust everyone followed the Court's

11   instructions and no one has anything to report, is that

12   correct?

13   JURORS:  Yes.

14   THE COURT:  Very good.  We continue on the direct

15   case of the People and I recall to the witness stand

16   Detective Banker, please.

17   COURT OFFICER:  Witness entering.

18   (Whereupon, the witness entered the courtroom and

19   takes the stand.)

20   THE WITNESS:  Good morning.

21   JURORS:  Good morning.

22   THE COURT:  Good morning, Detective.

23   THE WITNESS:  Good morning, your Honor.

24   THE COURT:  I remind you you're under oath.

25   Please be seated, make yourself comfortable.

1       Can you assure the Court that you did not discuss
2   your testimony with anyone including the district attorney
3   during the break?
4               THE WITNESS:  Yes, sir.
5               THE COURT:  Very good, sir.  All right.  We
6   continue on direct examination.  Mr. Rosenfeld.
7               MR. ROSENFELD:  Thank you.  Good morning,
8   Detective.
9               THE WITNESS:  Good morning.
10  CONTINUED DIRECT EXAMINATION
11  BY MR. ROSENFELD:
12      Q    Detective, if I can just go back to yesterday.  We
13  were at the moment when you were at the location of Brooklyn
14  and you apprehended a suspect, correct?
15      A    Correct.
16      Q    What was the name of the person that you apprehended?
17      A    Excuse me.  Drawing a blank.
18               THE COURT:  Check whatever you wish.  Tell us
19  what it is you're looking at.
20      A    Yes, it's David Delgado.
21               MR. CANTOR:  He looked at his case file.
22               THE COURT:  Review, refresh.
23      A    Yes, David Delgado.
24      Q    Do you see the person you apprehended back on December
25  26, 2009, in the courtroom?

tr/a    Det. Banker - People - Direct

1     A     Yes, I do.

2     Q     Could you please indicate where he's sitting and what

3     he's wearing?

4     A     He's sitting to my left, wearing a pink checkered

5     shirt.

6          MR. ROSENFELD:   Indicating the defendant, your

7     Honor.

8          THE COURT:   Yes, indicating the defendant herein.

9     Q     I believe we left off, you said you placed him in

10    handcuffs?

11    A     Yes, I did.

12    Q     Please continue.   What, if anything, happened next?

13    A     After I -- after that, I brought him into his room

14    where I put a jacket over him covering him over his shoulders,

15    while he was rear cuffed, shoes were put on him, I helped him

16    put them on, and then at that point we left the location.

17    Q     Where did you go to?

18    A     We got into our vehicle and we were gonna go back to

19    the Bronx at that point.

20    Q     Who was in the vehicle with you?

21    A     Detective Rentas and Swanston.

22    Q     Was the defendant David Delgado in cuffs while he was

23    in the vehicle?

24    A     He was.

25    Q     Where were you sitting in the vehicle?   Where was he

1    sitting, if you recall?

2        A    He was sitting in the rear seat behind the passenger.

3    I was seated in the rear seat behind the driver.

4        Q    And what happened once you were seated in the vehicle?

5        A    At about 12:40 hours, we were just pulling off of the

6    corner there on 50th and Third in Brooklyn and he made a

7    statement to me.

8        Q    And had you said anything to the defendant before he

9    made that statement?

10       A    No, I did not.

11       Q    What, if anything, did he say?

12       A    Can I -- I wrote it down.

13               THE COURT:  Just tell us what it is you're

14           looking at and the date thereof.

15               THE WITNESS:  Yes, sir.

16       A    It's from December 26, 12:40 hours, which is 12:40

17   p.m. in the afternoon.  This is my steno book where I kept my

18   notes throughout the case.

19       Q    So Detective, when the defendant made that statement

20   to you, did you have that steno book out at that point?

21       A    No.  It was my -- it was in a pocket in my jacket.

22               THE COURT:  What was the statement did you say?

23               MR. CANTOR:  He didn't make it.

24               THE COURT:  Did you get up to that?

25               MR. ROSENFELD:  Yes, your Honor, one second.

1                    THE COURT:  All right.  Yes.

2         Q    So you had the memo book with you and the defendant

3    started to talk to you?

4         A    Yes.

5         Q    What did you do?

6         A    I listened to what he said, and then I wrote it down

7    preserving it on paper.

8         Q    And you indicated you have an item with you, that's

9    what's called a steno book?

10        A    Correct.

11        Q    Is there a page in the steno book that has writing

12   that you made back on December 26, 2009?

13        A    Yes, there is.

14        Q    Is it possible just to remove that page with the

15   writing that you made when the defendant spoke to you?

16        A    Yes, I can (handing).

17                  COURT OFFICER:  (Handing.)

18                  MR. ROSENFELD:  Your Honor, may we please have

19        this item marked People's Exhibit 12 for identification?

20                  THE COURT:  So deemed People's 12 for

21        identification.

22                  MR. CANTOR:  (Handing.)

23                  COURT OFFICER:  (Handing.)

24        Q    Detective, looking at People's Exhibit 9 marked for

25   identification -- People's Exhibit 12 marked for

1    identification, does that document -- what is that document?

2        A    This is the oral statement that the defendant made to

3    me and then I preserved it onto paper.

4                MR. CANTOR:  Let it be offered, Judge.  I have no

5        objection.

6                MR. ROSENFELD:  Thank you.  At this time, the

7        People offer People's Exhibit 12 into evidence.

8                THE COURT:  All right.  There being no objection,

9        what previously was deemed People's 12 for identification,

10       is now deemed as having been proffered into and is received

11       in evidence.  You'll mark it at the close of the session.

12       Q    Detective, looking at People's Exhibit 12 in evidence,

13   could you please tell the jury what it is that the defendant

14   did -- that Delgado said to you in the vehicle back on December

15   26, 2009?

16       A    "Yo, that guy kept fucking with me all night.  He was

17   drunk.  They took him outside.  When he came back, he grabbed

18   my arm.  I saw a knife on the table and grab it and swung it at

19   him.  The people in the party grabbed me, then I ran."

20       Q    Was the vehicle moving as he was saying this?

21       A    Yeah, it was, when we were pulling off of the corner

22   on 50th and Third.

23       Q    What language did he say this to you in?

24       A    Every statement was in English.

25       Q    And you indicated you wrote it down in your memo book.

1    Then what, if anything, happens?

2       A     About ten minutes later, at 12:50 hours, he made

3    another oral statement.

4       Q     What, if anything, did the defendant say to you the

5    second time?

6       A     "Yo, I really fucked up this time."

7       Q     All right.   Please continue.   What happened --

8             MR. ROSENFELD:   I'm sorry.   Withdrawn.

9       Q     Had you said anything to the defendant before he made

10   that second statement?

11      A     No, I did not.

12      Q     Did you write down the second statement?

13      A     No, I did not.

14            MR. ROSENFELD:   Your Honor, may I please have

15   People's Exhibit 12?

16            THE WITNESS:   (Handing.)

17            COURT OFFICER:   (Handing.)

18            MR. ROSENFELD:   Publishing it for the jury.

19            (Whereupon, the item was displayed in open

20      court.)

21            MR. ROSENFELD:   Let the record indicate that

22      People's Exhibit 12 has been published.

23            THE COURT:   So indicated.

24      Q     All right.   Detective, please continue.   Did you

25   continue to proceed in your vehicle at that point?

1    A    Yes, we drove back to the Bronx.

2    Q    Specifically, where did you go to?

3    A    To the 43 Precinct.

4    Q    What happened when you arrived -- did there come a

5    time when you arrived at the 43 Precinct?

6    A    Yes.

7    Q    What happened when you arrived at the 43 Precinct?

8    A    We got there somewhere just around 2 o'clock in the

9    afternoon.  At that point, he was brought upstairs, put into

10   the cell area where I took the jacket off of him, uncuffed him,

11   and we actually went and got food at that point for ourselves

12   and for him.

13   Q    Now, please explain the setup of where you took the

14   defendant and where you placed him.

15   A    It's inside the 43 Precinct on the second floor.  The

16   detectives work separate than the cops.  We have our own office

17   upstairs.  You go up a flight of stairs, detective squad is

18   clearly marked.  When you walk through the door, you make a

19   left, there's a cell area probably like eight by eight, and he

20   was the only one there.  I walked him into that cell, took the

21   jacket off him and then uncuffed him, and then he sat down at

22   that point.

23   Q    You indicated then something about food?

24   A    Yeah, at 14:10 hours we had gotten some pizza.  He had

25   two slices of Sicilian, a soda.

1    Q    When you say "he" who are you referring to?

2    A    I'm sorry.  The defendant.

3    Q    After you gave the defendant --

4         MR. CANTOR:  What time was that at, your Honor?

5         THE COURT:  There's no question.

6         MR. CANTOR:  I know.

7         THE COURT:  You may ask him that on cross

8    examination.

9         Please continue.

10   Q    After you gave the defendant some food, what, if

11   anything, happened?

12   A    At about 14:50, 2:50 p.m., he was then walked from the

13   cell into the interview room, and at 2:55 is when I read him

14   his Miranda warnings, asked him all the questions, he responded

15   and then we marked it on the paper and then he gave a written

16   statement.

17   Q    Please explain this room that you took the defendant

18   to where the Miranda warnings took place and the statement.

19   A    It's fifteen feet away from the cell.  When you walk

20   out of the cell, you make a right, it's right there.  It's a

21   room that's probably twelve feet by eight feet long.  There's a

22   solid wooden door that locks from the outside so you can't see

23   in from that area, and then to the left of that door is another

24   wall that's a one-way mirror, so inside all you see is a

25   mirror, but you could view it from outside in the detective's

1     office.

2         Q     And who else was present in that room?

3         A     It was me, Detective McSloy and the defendant.

4         Q     And what was the first thing you did once you had him

5     in that room?

6         A     Once I had him in that room, he sat down behind the

7     table that was there in the chair and I started reading him the

8     Miranda warnings.

9         Q     And was he cuffed at that point?

10        A     I believe he was single cuffed, one arm free, one hand

11    cuffed.

12              MR. CANTOR:  I'm sorry?

13        A     One hand cuffed, one hand free.

14        Q     You indicated you read something called Miranda

15    warnings?

16        A     I did.

17        Q     What are the Miranda Warnings and why did you read

18    them?

19        A     It's a set of questions asked to the defendant by the

20    detective notifying him of what his rights are in this

21    situation.

22              MR. CANTOR:  Judge, I move to strike.  The

23         question is what are the Miranda rights.

24              MR. ROSENFELD:  He's explaining them.

25              MR. CANTOR:  No, he isn't.  What are Miranda

tr/a    Det. Banker - People - Direct

1      rights is the question.

2                THE COURT:  I'll allow him to extrapolate.

3      A    I was reading him the Miranda warnings making him

4      aware of his rights at that time and then he responded yes to

5      every question I asked.  I marked it yes, he initialed it yes,

6      he signed it, I signed it, and then we began the written

7      statement.

8                MR. ROSENFELD:  Your Honor, I ask this piece of

9          paper be marked People's Exhibit 13 for identification.

10               THE COURT:  So deemed, sir.

11               MR. CANTOR:  Can I see it, your Honor?

12               THE COURT:  You may.

13               MR. ROSENFELD:  (Handing.)

14               COURT OFFICER:  (Handing.)

15               MR. CANTOR:  (Handing.)

16               COURT OFFICER:  (Handing.)

17     Q    Detective, I ask you --

18               MR. CANTOR:  What is that?  What number?  13?

19               THE COURT:  Yes, deemed 13.

20               MR. CANTOR:  Thank you.

21               MR. ROSENFELD:  May I continue?

22     Q    Detective, I ask you to look at what's been deemed

23     marked People's Exhibit 13 for identification.  Do you

24     recognize what that is?

25     A    Yes.

tr/a    Det. Banker - People - Direct

1    Q    What is that?

2    A    This is the original copy of the document that I used

3  to read off of to the defendant in which he and I both signed,

4  as well as Detective McSloy.

5    Q    That's how you recognize the original document?

6    A    Yes, it's written in ink in my handwriting and the

7  defendant's.

8            MR. ROSENFELD:  At this time, I move People's

9        Exhibit 13 into evidence.

10           THE COURT:  Share it.

11           MR. CANTOR:  No objection, Judge.

12           THE COURT:  There being no objection, what

13       previously was deemed as People's 13 for identification is

14       now deemed as having been proffered into and is received in

15       evidence People's 13.  We'll mark it at the close of the

16       session.

17    Q    Detective, could you please tell the ladies and

18  gentlemen of the jury exactly what transpired during the time

19  that you said you read the defendant his Miranda warnings?

20           MR. CANTOR:  Has it been marked into evidence

21       yet, Judge?

22           THE COURT:  No.  It's deemed.

23           MR. ROSENFELD:  It's deemed.

24           MR. CANTOR:  Judge, I'm addressing the Court, can

25       it be marked presently?

1        THE COURT:   It's deemed.   I said mark it at the

2     close of the session.

3        Move on.

4        MR. ROSENFELD:   Thank you.

5     Q     You may respond, Detective.

6     A     I wrote out 43 Precinct, 43 PDU interview room for

7     location.   I wrote the case number 3527, defendant's name

8     Delgado, date 12/26/09, detective assigned Banker, time 14:55,

9     which is 2:55 in the afternoon, and witness McSloy.   I then

10    read all six statements to the defendant in which he responded

11    yes, then initialed it.

12    Q     Please go through each of the statements that you read

13    to the defendant and what transpired when you read the

14    statements after each statement.

15    A     I said to the defendant, you have the right to remain

16    silent and refuse to answer any questions, do you understand?

17    The subject replied yes.   I wrote yes, he initialed it.

18    Q     How did he initial it?

19    A     D.D.

20    Q     Please continue.

21    A     I then stated anything you say could be used against

22    you in a court of law, do you understand?   Subject replied yes,

23    I wrote yes, he then initialed it.

24        You have the right to consult an attorney before

25    speaking to the police and to have an attorney present during

tr/a    Det. Banker - People - Direct

1    any questioning now or in the future, do you understand?

2    Subject replied yes, I wrote yes, he initialed it.

3            If you cannot afford an attorney, one will be provided

4    for you without cost, do you understand?  Subject replied yes,

5    I wrote yes, he then initialed it.

6            If you don't have an attorney available, you have the

7    right to remain silent until you've had the opportunity to

8    consult with one, do you understand?  Subject replied yes, I

9    wrote yes, he initialed it.

10           Now that I've advised you of your rights, are you

11   willing to answer questions?  Subject replied yes, I wrote yes,

12   he then initialed it.

13           I then as he had the paper, I asked him to sign his

14   name and then print his name underneath that, which he did.  I

15   then took the document back, signed my name, wrote my shield

16   number 282, handed it to Detective McSloy who was present, he

17   then signed it with his name and then wrote his shield number

18   1448.

19                   MR. ROSENFELD:  Thank you.  May I please have

20       People's Exhibit 13.

21                   THE WITNESS:  (Handing.)

22                   COURT OFFICER:  (Handing.)

23                   MR. ROSENFELD:  May the record indicate that I am

24       publishing People's Exhibit 13 to the jury.

25                   (Whereupon, the item was displayed in open

tr/a    Det. Banker - People - Direct

1    court.)

2                    MR. ROSENFELD:  May the record indicate that

3        what's been deemed People's Exhibit 13 into evidence has

4        been published to the jury.

5                    THE COURT:  So indicated.

6        Q    Detective, up until that moment, had the defendant

7    ever asked for an attorney?

8        A    No, never.

9        Q    Up until that moment, had you ever observed the

10   defendant to be in need of any medical attention?

11       A    No, never.

12       Q    Did the defendant ever ask you for any medical

13   attention?

14       A    No, never.

15       Q    What language did you communicate with the defendant

16   in?

17       A    English always.

18       Q    Did he ever indicate to you at any time that he did

19   not understand any of your questions?

20       A    No, never.

21       Q    Did you understand the defendant when he responded to

22   you?

23       A    Always.

24       Q    At any time, did the defendant appear to be from the

25   time you first apprehended him to the time you took the

1    statement to be intoxicated?

2       A    No.

3       Q    Did he appear to be high on drugs based on your

4    experience?

5                 MR. CANTOR:  Objection.

6                 THE COURT:  Overruled.

7       A    No.

8       Q    Did the defendant ever have any difficulty walking

9    whether it was to the car or into the precinct or up to the

10   cell?

11      A    No.

12      Q    All right.  Once you read the defendant the Miranda

13   warnings contained in People's Exhibit 13, what, if anything,

14   transpired?

15      A    I then handed him two blank pages of paper.  That's

16   the forms that we use for written statements from the Police

17   Department.  It's a basic form.  Handed it to him, gave him a

18   pen and at that point he started writing.  Myself and Detective

19   McSloy left the room.  I walked out the door, made the right

20   and another quick right and went to the window where the

21   one-way mirror is and I observed him writing the statement.  At

22   that point, I told him if you need anything or when you're

23   done, just yell out detective and I will be right there.

24      Q    Now, the paper you gave him, did that paper have any

25   handwriting on it when you gave it to him?

tr/a    Det. Banker - People - Direct

1      A    When I handed it to him, I just filled out the top

2   caption, which is like the pedigree information stuff.

3      Q    Okay.  How about the actual body of the pages, did

4   that have any handwriting on it?

5      A    No.

6      Q    If I can back up a moment.  The Miranda warnings we

7   saw, People's Exhibit 13, were in English and Spanish, correct?

8      A    Yes.

9      Q    And did the defendant ever request to you to read it

10   in Spanish?

11      A    No.

12      Q    When you gave the defendant these instructions about

13   the paper, did he ask you any questions about it?

14      A    No.

15              MR. CANTOR:  Papers.

16              MR. ROSENFELD:  There were two pages, yes, your

17      Honor.  Thank you.

18              Your Honor, at this time, I would ask these two

19      pages be marked People's Exhibit 14 collectively.

20              MR. CANTOR:  Let them be marked in evidence.  I

21      have no objection.

22              THE COURT:  So deemed People's 14 for

23      identification.

24              MR. CANTOR:  I have no objection if they come

25      into evidence.

 1              THE COURT:  Thank you, Mr. Cantor.

 2              MR. ROSENFELD:  People would move People's

 3     Exhibit 14 into evidence on consent.

 4              MR. CANTOR:  Yes, on consent.

 5              THE COURT:  There being no objection, what

 6     previously was deemed People's 14 for identification is now

 7     proffered into and received in evidence.  You will mark it

 8     at the close of the session.

 9              MR. ROSENFELD:  Thank you (handing).

10              COURT OFFICER:  (Handing.)

11              MR. ROSENFELD:  Indicate the documents have been

12     given to Detective Banker.

13      Q     Detective Banker, I ask you to look at People's

14     Exhibit 14 now in evidence.  What are those pages that you are

15     holding in front of you?

16      A     This is the statement that was written by the

17     defendant.

18      Q     Those are the same two pages that you had given him

19     but were blank back on December 26, 2009, except for the

20     heading?

21      A     Yes.

22      Q     What did you put on that paper before you handed it to

23     the defendant?

24      A     43 Precinct, case number 3527, date 12/26/09, time

25     15:05 hours.

1     Q      Then you gave the defendant some instructions?

2     A      I did.

3     Q      What, if anything, did you say to him at that point

4     once you filled out the header?

5     A      I handed him a piece of papers and a pen and told him

6     to write out the statement, at which point when you're finished

7     just yell out detective, I will be outside.  I'll come in and

8     get it from him.

9     Q      What did the defendant do at that point?

10    A      He started writing.

11    Q      And the pages that you have in front of you, do they

12    embody the entire statement that the defendant wrote out back

13    on December 26, 2009?

14    A      Yes, they do.

15    Q      Detective, I would ask at this point to please read

16    the statement that the defendant wrote back on December 26,

17    2009.  Take your time.

18    A      "I David Delgad state that Christmas Eve I met my

19    girlfriend Margie to go to a party.  It was 2033 McGraw Avenue,

20    apartment 3-D.  I walked to the apartment and I was introduced

21    to people and that -- and that when Sosa started saying that if

22    I disrespect Margie --"

23              MR. CANTOR:  "Disrespected."

24    A      Correct.  "Disrespected Margie that I was going to

25    have problems with him and everybody and I said okay, I get it.

tr/a    Det. Banker - People - Direct

1    And I started to drink, associated with people at the party and

2    he came at me again saying the thing tell me that I -- that I

3    was going to have problems with her and I got nervous and --"

4                    MR. CANTOR:  "With him."

5                    THE COURT:  Continue, Detective.

6                    MR. CANTOR:  "With him."

7                    THE COURT:  Please, Mr. Cantor.

8                    MR. CANTOR:  That's what it says, Judge.

9                    THE COURT:  You'll have an opportunity.

10        A     "Going to have problems with him, and I -- I got

11   nervous and he was disrespected everybody at the party and --

12   and he came back at me again and I got feared at him 'cause

13   he's bigger than me.  I was scared at the point that he was

14   going to attack me so I took a knife from the kitchen because I

15   was already scared at him.  So when I was about to leave the

16   party, he came at me again and told me to remember that if I

17   fuck around with Margie that I was going to get hurt by him.

18   So when I went to walk away Sosa grab me and that's when I took

19   the knife out of my pocket" --

20                    MR. CANTOR:  No out of.  "Out my pocket."

21        A     "Out my pocket and hit him -- was -- I -- I was

22   already scared and nervous for my safety.  I not the person to

23   do thing like this.  It wasn't planned.  I'm sorry for what

24   went down that night.  I was scared for my life.  And after I

25   leave the party, I ran out of the apartment and took a cab and

tr/a    Det. Banker - People - Direct

1    I -- and I don't remember where is the knife."  Signed David

2    Delgado.

3        Q    Do you recall approximately how much time it took him

4    to write out that statement?

5        A    Between ten and fifteen minutes.

6        Q    Approximately --

7            MR. ROSENFELD:  Withdrawn.

8        Q    You indicated you were watching him during this time

9    or at some point?

10       A    I was.

11       Q    And at any point while he was writing the statement,

12   did he ask you to come into the room?

13       A    No.

14       Q    Please continue.  What happened after you were

15   watching him write the statement?

16       A    He yelled out detective, I came in the room.  I asked

17   him to make a swirled mark line on the remaining space of the

18   paper so nothing could be added in that area in which he made a

19   swirl mark and then signed it David Delgado.  I then took the

20   document, signed it, wrote 282, my shield number on it, gave it

21   to Detective McSloy who signed it, wrote his shield number 1448

22   on it.  I then took page one and wrote one of two on the top,

23   and on page two I wrote two of two on the top.

24           MR. ROSENFELD:  Your Honor, may I please have

25       People's Exhibit 14 in evidence?

tr/a    Det. Banker - People - Direct

```
 1                THE COURT:  Yes.
 2      A    (Handing.)
 3                COURT OFFICER:  (Handing.)
 4                MR. ROSENFELD:  At this time, I'm going to
 5      publish People's Exhibit 14 into evidence, two pages, first
 6      page one.
 7                (Whereupon, the item was displayed in open
 8      court.)
 9                I just published page one.  Now I'm publishing
10      page two People's Exhibit 14.
11                (Whereupon, the item was displayed in open
12      court.)
13                (Continued on next page.)
14
15
16
17
18
19
20
21
22
23
24
25
```

People - DETECTIVE KENNETH BANKER - continued direct

1474

1    Q.    After the defendant called out detective did you go

2    into the room?

3                    MR. CANTOR:  Objection.

4                    THE COURT:  After, I'm sorry, I didn't hear the

5           question.  Can you repeat it, please?

6                    MR. ROSENFELD:  Sure.

7    Q.    After the defendant called out detective did you go

8    into the room?

9                    THE COURT:  After defendant?

10                   MR. CANTOR:  Called out detective did you go --

11                   THE COURT:  Pulled out?

12                   MR. CANTOR:  Called out.

13                   MR. ROSENFELD:  Called out.

14                   THE COURT:  He called out detective?

15                   MR. CANTOR:  Yes and there is an objection.

16   There is no testimony to that affect.

17                   THE COURT:  Rephrase.

18   Q.    Detective, you indicated -- I will back up the

19   question I asked before.  You were watching the defendant while

20   he was writing the statement?

21   A.    I was.

22   Q.    And did there come a time that something happened when

23   you finished writing the statement?

24   A.    Yes.

25   Q.    What happened?

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1475

1    A.   He said detective, at which point I walked out of the

2  corner and through that wooden door to him and sat back down at

3  the interview table.

4    Q.   And that's when you say you signed the rest of it?

5    A.   Yes.

6    Q.   Now, you notice on People's Exhibit 14 and I am

7  looking first at page one, there is some cross outs.  So I am

8  directing your attention to the lines he came back at me

9  between -- before the word again there is a cross out?

10    A.   Yes.

11    Q.   And then on the two lines below that he is bigger than

12  me there is another cross out?

13    A.   Yes.

14    Q.   Who crossed those out?

15    A.   He did while he was writing it originally.

16    Q.   Okay.  You had nothing to do with those cross outs,

17  did you?

18    A.   No.

19    Q.   And on page two in the middle again there is a cross

20  out after the word safety?

21    A.   Yes.

22    Q.   And then there is another cross out below that after

23  the word the person to do there is a cross out, correct?

24    A.   Correct.

25    Q.   Did you have anything to do with that crossing out?

People - DETECTIVE KENNETH BANKER - continued direct
1476

1    A.    No, the defendant did that of his own.

2    Q.    Thank you.  After you went back in the room did you

3    review the statement?

4    A.    I did.

5    Q.    Did the defendant say anything or indicate to you

6    anything further about the statement?

7    A.    No, he did not.

8    Q.    What, if anything, did you do at that point?

9    A.    At that point I safe guarded it and he actually asked

10   to use the bathroom and to get some water in which he did, we

11   took him.

12   Q.    At some point either at that moment or before had the

13   Bronx District Attorney's office been contacted?

14             MR. CANTOR:   Judge, I object to the leading.

15   Can't the witness testify rather than the prosecutor lead?

16   Can't the witness testify?

17             MR. ROSENFELD:   Objection to the colloquy, your

18   Honor.

19             MR. CANTOR:   Your Honor.

20             MR. ROSENFELD:   Objection.

21             THE COURT:   The objection is overruled.

22             MR. CANTOR:   The exception is noted.  You don't

23   think...

24   Q.    You may answer.

25   A.    Can you please ask the question, again?

B-ljb

People - DETECTIVE KENNETH BANKER - continued direct

1477

1    Q.    Sure.  At some point was the Bronx District Attorney's
2  office contacted?

3    A.    Yes.

4    Q.    And at some point did there come a time that some
5  representatives from the Bronx District Attorney's office
6  responded to the four three precinct?

7    A.    Yes.

8    Q.    What was the purpose in contacting the Bronx District
9  Attorney's office?

10              MR. CANTOR:  He was the one who did it.

11              THE COURT:  If he knows.

12              MR. CANTOR:  No, that would be hearsay if he was
13      the one who did it.

14              THE COURT:  If he knows, I said.

15    A.    The D.A.'s office was contacted and responded to the
16  43rd Precinct to conduct a video statement of the defendant.

17    Q.    Had you been involved prior to December 26, 2009, in
18  taking videotaped statements from defendants at precincts
19  working with the Bronx District Attorney's office?

20    A.    Yes, multiple times.

21    Q.    What was -- what happened to the defendant once you
22  took -- once he gave you the written statement where was he
23  placed?

24    A.    He went to the bathroom, he was given water and then
25  he was brought back into the cell area where he remained until

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1478

1    the D.A. responded.

2        Q.    Once the D.A.'s representatives responded what was

3    setup; what was done?

4        A.    Once A.D.A. Weisberg responded with the video

5    technician they setup inside the interview room where he gave

6    his written statement to me.  In the corner a video camera and

7    then a wire goes onto the desk for a little microphone where he

8    sits.  They put a little clock up next to him to his left so

9    while being viewed the whole time you could see the defendant

10   and the clock and those two people so you know what time it is

11   and whose saying what.

12       Q.    Okay.  And did you have a discussion with A.D.A.

13   Weisberg prior to taking the videotaped statement?

14       A.    Yes.

15       Q.    And what proceeded after that?

16       A.    The statement was conducted inside of that office.

17       Q.    And who was present when the representatives of the

18   Bronx District Attorney's office A.D.A. Weisberg took the

19   videotaped statement?

20       A.    A.D.A. Weisberg, myself and the defendant, David

21   Delgado, and a videotaped technician.

22              MR. ROSENFELD:  Your Honor, I ask that this CD be

23       deemed marked People's Exhibit 15 for identification.

24              THE COURT:  So deemed.

25              MR. CANTOR:  Let it come in evidence, your Honor.

B-ljb

People - DETECTIVE KENNETH BANKER - continued direct

1479

1       MR. ROSENFELD:  Obviously, your Honor, at this

2   time the People would move People's Exhibit 15 into

3   evidence on consent.

4       THE COURT:  There being no objection it is so

5   moved and you will mark at the appropriate time.

6           (The videotaped statement of defendant was

7   received and deemed marked in evidence as People's Exhibit

8   15.)

9   Q.   Detective, have you had an opportunity prior to coming

10  here to view People's Exhibit 16?

11      MR. CANTOR:  Fifteen.

12  A.   Yes, I have.

13  Q.   Fifteen, I'm sorry, I misspoke, 15?

14  A.   Yes, sir, I have.

15  Q.   And does that -- withdrawn.

16      MR. CANTOR:  Let him see it.

17      MR. ROSENFELD:  I am waiting to setup.  Your

18  Honor, at this time the People would like to play People's

19  Exhibit 15 for the jury.

20      MR. CANTOR:  No objection whatsoever.

21      THE COURT:  You may.

22      (Whereupon the videotape is played at this time.)

23      MR. ROSENFELD:  May the record indicate, your

24  Honor, that People's Exhibit 15 has been played in its

25  entirety for the jury?

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1480

1        THE COURT: So will indicate.

2    Q.   Detective, once the videotape statement was taken what

3    was done with the defendant?

4    A.   At approximately 1600 hours I called the Dempsey

5    family and I stated I will need them --

6            MR. CANTOR:  I will object to what he stated.

7            THE COURT:  Overruled.

8    Q.   Go ahead.

9    A.   Actually that was right before that I called them.

10   After that was done the DA finished up what they were doing

11   there and then I took the defendant to Simpson Street, 1086

12   Simpson Street.

13   Q.   What was the purpose of going to 1086 Simpson Street

14   with the defense?

15   A.   So line up procedures could be done.

16   Q.   Could you please explain, to the ladies and gentlemen

17   of the jury, in generic terms what a line-up procedure is and

18   how you go about setting one up?

19   A.   A line-up procedure is when you have a suspect or a

20   defendant of a crime and you are going to have an identification

21   process completed by witnesses or a victim of a crime.  It's a

22   room maybe 20 feet long with a wall like (indicating), similar

23   to the one in front of you with chairs behind it, you only see

24   the upper torso area of the people.  There is numbers one

25   through six behind each chair.  What happens is you bring the

B-ljb

**People** - DETECTIVE KENNETH BANKER -- continued direct
1481

1   witness or victim into a separate room, which is another one-way

2   mirror that they can see out of, but the people on the other

3   side of the glass can only see a reflection of themselves.  At

4   that point once they're ready the detective lets the inside

5   detective know they're ready.  Once he responds that he is ready

6   blinds are opened up.  The witness or victim views the people

7   seated in the chairs one through six or one through five,

8   depending on how much you did, and then you ask them if they

9   recognize anyone in the line up.  If so, where do you recognize

10   them from and what did they do and then after those questions

11   are done you leave, the blinds are shut, you leave the room with

12   them.  They sign a little form on where they know the person or

13   don't know the person from.  Sometimes they don't know them.

14       Q.   And where is this conducted by the New York City

15   Police Department?

16       A.   The one I did was at 1086 Simpson Street, which is

17   Detective Borough Headquarters for the Bronx.

18       Q.   And is that the normal place where the police

19   department conducts its line up?

20       A.   Bronx County, yes.

21       Q.   And how is that area setup in regards to where a

22   suspect is kept, fillers for the line ups are kept and witness

23   is kept?

24            MR. CANTOR:  Three questions and one objection.

25            MR. ROSENFELD:  It's all one.

B-ljb

People - DETECTIVE KENNETH BANKER - continued direct
1482

1          MR. CANTOR:   Judge, I object.

2          THE COURT:   The objection is overruled.

3          MR. CANTOR:   Yeah, but why do we have to have his

4     argument, why?

5          THE COURT:   Right, no argument by either side,

6     just objection.

7          MR. CANTOR:   I am right, wow.

8     A.    When you walk into 1086 Simpson Street you pass a

9     desk, go to an elevator, take the elevator to the third floor.

10    Once you get to the third floor you make a left-hand turn.

11    Right after the left-hand turn, about ten feet down the hall to

12    the right there is a solid wooden door, through that door when

13    you first go through it are two cell areas where the defendants

14    are kept.  If you -- instead of going to the cell if you make a

15    sharp left there is a solid wooden door, that little room is

16    like an eight by four room where the witnesses stand to view it

17    and on the other side of the glass of that is the room probably

18    20 feet by 10 feet long where the witnesses and suspects sit to

19    be viewed.

20    Q.    Where the witnesses sit?

21    A.    I'm sorry, where the fillers and the suspects sit in

22    that room.  Now, when you get out the elevator you make the left

23    instead of going to the right to that door.  If you continue

24    down that hallway down the left to the end of the hall where it

25    ends you make a right.  You go down about five feet on the

People - DETECTIVE KENNETH BANKER - continued direct

1483

1  left-hand side is another room where witnesses sit.  In that

2  room it has blinds that are closed.  Because of all of the turns

3  and walls there is no way possible to see --

4              MR. CANTOR:  I am going to object.

5       A.    -- where a defendant is.

6              MR. CANTOR:  There is no way possible to see.

7              THE COURT:  All right.  You may stop there, you

8       have answered.  You may continue.

9              MR. CANTOR:  May that part be stricken, the last

10      part?

11             THE COURT:  For the moment.

12      A.    They're seated behind a series of turns so that there

13  is no direct viewing between --

14             MR. CANTOR:  Judge, I objected, you for the

15      moment sustained it.

16             THE COURT:  Yes, yes, you are correct.

17             MR. CANTOR:  Will you strike that?

18             THE COURT:  It's sustained.

19             MR. CANTOR:  And will you strike it?

20             THE COURT:  And re-posture your question.

21             MR. CANTOR:  Will you strike that?

22             THE COURT:  For a moment.

23      Q.    Detective, where the witnesses are kept after these

24  turns that you just described to the area where the suspects,

25  defendants or fillers are kept can that area be seen by

B-ljb

People - DETECTIVE KENNETH BANKER - continued direct

1484

1   witnesses?

2       A.   No.

3       Q.   Why is that?

4       A.   There is a series of turns and walls and solid objects

5   that are blocking that possibility.

6       Q.   You use the word filler.  Explain what the word filler

7   means.

8       A.   Once you have your suspect, just by looking at that

9   person you know what they look like so, what you want to try to

10  do is get a group of people similar in appearance to your

11  suspect so that a line-up procedure can be done.

12      Q.   So, Detective, on December 26, 2009, at some point in

13  the afternoon were attempts made to conduct a line up or setup

14  or prepare for a line up?

15      A.   Yes.

16      Q.   Okay.  What were some of the things you did to prepare

17  for the line up that afternoon?

18      A.   At 6:10 myself and Detective McSloy took the defendant

19  from the 43rd, brought him to Detective Bureau Headquarters,

20  that was the first thing we did.  At that point I asked

21  Detective Walker to pick up the fillers and then I observed him

22  come back to that location with the fillers.  That was like 6:40

23  that occurred.

24      Q.   And where were the fillers and the defendant kept?

25      A.   The defendant was brought up first before anyone when

B-ljb

People – DETECTIVE KENNETH BANKER – continued direct

1485

1   we got there.  Once he was safeguarded in the cell area,

2   Detective Walker, I observed him downstairs with the fillers and

3   let him know that it was okay to come up being that the

4   defendant was in his cell.

5       Q.   Were there any witnesses there to the crime at that

6   time?

7       A.   The witnesses were already in the viewing air -- the

8   waiting area.  They were inside that other room with the blinds

9   the witnesses.

10      Q.   The witnesses were in which room?

11      A.   The waiting area.  After they were there Detective

12  McSloy went to get the fillers.  He responded with the fillers,

13  again I saw him when he was outside, let him know it was okay.

14  He brought the fillers up to put them into the room.  Now once

15  they're inside that room that was when we gave the defendant the

16  opportunity to chose a seat, being seats one through five,

17  because we had four fillers.  So we used the first five seats

18  and at that point he chose to sit in position number three.

19      Q.   And did the defendant at any point have any problem

20  following your instructions?

21      A.   No, he was very cooperative.

22      Q.   Up until that point had the defendant ever asked for

23  an attorney?

24      A.   No, he did not.

25      Q.   Up until that point had the defendant ever requested

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1486

1   any medical attention?

2      A.   Never.

3      Q.   Up until that point had it appeared to you the

4   defendant was in need of any medical attention?

5      A.   No.

6      Q.   Now, once the defendant had sat in seat number three

7   was anything done in respect -- up to the fillers and the

8   defendant?

9      A.   Yes, I filled the fillers in their positions that were

10   one, two, four and five so that all five seats were

11   consecutively filled and the numbers were behind them.  At that

12   point then preserved that line up by taking photographs of it.

13      Q.   All right.  I show --

14            MR. ROSENFELD:  I asked that this be marked

15      People's Exhibit 16 for identification.

16            THE COURT:  So deemed People's 16 for

17      identification.

18            MR. ROSENFELD:  I ask that People's Exhibit 16 be

19      shown to the witness.

20            (Whereupon the exhibit is shown to the witness.)

21      Q.   Detective, have you had an opportunity to look at what

22   has been deemed marked People's Exhibit 16 for identification?

23      A.   Yes.

24      Q.   And you recognize what People's Exhibit 16 is?

25      A.   Yes.

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1487

1      Q.    And what is that?

2      A.    It's a photograph that I took of the line up

3   preserving what it looked like that day.

4                MR. CANTOR:  Judge, he really ought not display

5         it until it's in evidence.  He's so anxious to display it.

6                MR. ROSENFELD:  Objection, your Honor.

7                THE COURT:  No need to editorialize.

8                MR. CANTOR:  This is the first time that he has

9         banged on the table.

10               THE COURT:  Yes, please.

11               MR. CANTOR:  Third time.  People don't have the

12        record they go want --

13               MR. ROSENFELD:  Objection, your Honor, this is

14        outrageous what he just said to the jury.

15               THE COURT:  Yes.

16               MR. ROSENFELD:  It's on the record, your Honor.

17        I want the jury instructed this is unprofessional.

18               MR. CANTOR:  He is yelling.  He is screaming.  He

19        is pointing his finger at me.

20               MR. ROSENFELD:  Improper.

21               THE COURT:  The jury will disregard.

22               MR. CANTOR:  And he is yelling.

23               THE COURT:  Please continue, Mr. District

24        Attorney.

25               MR. ROSENFELD:  Your Honor, I can't continue if

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1488

1  he is going to interrupt and say things to the jury that

2  are totally outside the scope of this trial and are

3  unprofessional.

4          MR. CANTOR:  I am silent.

5          THE COURT:  He's cautioned against it.

6          MR. ROSENFELD:  Okay.

7          MR. CANTOR:  I am quiet and he is carrying on

8  like a little child who can't get his thought.

9          MR. ROSENFELD:  Your Honor, may we approach?

10          THE COURT:  You know I really can't believe this.

11  This is unbelievable, Mr. Cantor --

12          MR. CANTOR:  No, Judge, he is carrying --

13          THE COURT:  -- how you are going on.  Now listen

14  to me, please.

15          MR. CANTOR:  I am silent.

16          THE COURT:  Just sit there quietly, let us

17  continue with this gentleman.  You will have your

18  opportunity on cross examination --

19          MR. CANTOR:  Thank you.

20          THE COURT:  -- to vint anything you wish.

21          MR. CANTOR:  Thank you.

22          THE COURT:  To find out anything you wish.

23          Mr. D.A.

24          MR. CANTOR:  Will you tell the D.A. to stop

25  banging on the table, Judge, stop raising his voice?

B-1jb

People - DETECTIVE KENNETH BANKER - continued direct

1489

1        THE COURT:  I did not really perceive that.

2        MR. CANTOR:  Really?

3        THE COURT:  Go ahead, Mr. District Attorney.

4        MR. CANTOR:  Can you tell the witness not to

5    display --

6        MR. ROSENFELD:  Your Honor, he is continuing with

7    the colloquy objection.

8        MR. CANTOR:  Can you do that at least?

9        MR. ROSENFELD:  Objection.

10       THE COURT:  The witness did not display it to the

11   jury, he waved it.

12       MR. CANTOR:  Did not, did not display it?

13       THE COURT:  No.

14       MR. CANTOR:  Okay.  We will let the jury

15   determine that.

16       THE COURT:  You may continue.

17   BY MR. ROSENFELD:

18       Q.   Detective, is that item, People's Exhibit 16, a fair

19   and accurate photograph of the way the line up appeared back on

20   December 26, 2009?

21       A.   Yes, it is.

22       MR. ROSENFELD:  Your Honor, at this time we would

23   move People's Exhibit 16 into evidence.

24       THE COURT:  Please share it.

25       MR. CANTOR:  Can I have that voir dire?

B-1jb

People - DETECTIVE KENNETH BANKER - voir dire

1490

1          THE COURT:   You may.

2    VOIR DIRE EXAMINATION

3    BY MR. CANTOR:

4        Q.   Did all of the fillers who came to be seated in that

5    room did they all come to the precinct with black caps?

6        A.   No, they did not.

7        Q.   My client, was he brought to borough headquarters with

8    a black caps on?

9        A.   No, he was not.

10       Q.   But the line up that you conducted had five males in

11   it, correct?

12       A.   Correct.

13       Q.   And each one was wearing a black cap?

14       A.   Correct.

15       Q.   Did you put them on?

16       A.   I handed them to them, correct.

17       Q.   And they put it on?

18       A.   Correct.

19       Q.   Of the five people in the line up how many people were

20   wearing a white shirt?

21       A.   One.

22            MR. ROSENFELD:   Your Honor, objection.  Out of

23       the scope of voir dire.

24            THE COURT:   The objection is sustained.

25            MR. CANTOR:   Let it come in, Judge, I have no

People - DETECTIVE KENNETH BANKER - direct

1491

1    objection.

2              THE COURT:  There being no objection to what

3    previously was marked People's number 16 for purposes of

4    identification is now deemed as having been proffered into

5    and received as People's 16 in evidence.  You will mark it

6    at the close of the session, sir.

7              (The lineup photograph having been previously

8    marked for identification is hereby deemed marked in

9    evidence as People's Exhibit 16.)

10             MR. ROSENFELD:  Your Honor, may the record

11   indicate that I am publishing People's Exhibit 16?

12             THE COURT:  So indicated.

13             (Whereupon People's Exhibit 16 is published to

14   the jury at this time.)

15   BY MR. ROSENFELD:

16   Q.   Detective, looking at People's Exhibit 16 when the

17   individuals was seated in their seats, the fillers plus the

18   defendant, did you do anything regarding their appearance?

19   A.   Yes.

20   Q.   What, if anything, was done and why?

21   A.   I handed them all baseball caps and asked them to

22   cover all their hair.  This way if someone has a pony tail or

23   long hair or shaved head it won't be an issue.  It will be, you

24   know, its a fairer way of conducting a line up.

25             MR. CANTOR:  Object to that --

People - DETECTIVE KENNETH BANKER - direct

1492

1      A.    Because the hair is not issued --

2            MR. CANTOR:  -- fairer way.  I ask that that be

3      stricken.

4            THE COURT:  Yes, the jury will determine the

5      fairness, it's stricken.

6      Q.    Your purpose of -- in asking them to put caps on was

7      what?

8      A.    To hide hair color and haircuts style.

9      Q.    Was the haircut style and color among the fillers and

10     the defendant?

11     A.    Yes.

12     Q.    Other than that did you do anything else to change

13     their appearance?

14     A.    No.

15     Q.    All right.  Detective, did there come a time before

16     this had you during the day of December 26, 2009, contacted

17     potential witnesses or people who had been at the incident that

18     occurred on December 26th of 2009?

19     A.    Yes.

20           MR. CANTOR:  Judge, can we --

21     Q.    And the witnesses --

22           MR. CANTOR:  Judge, can we approach with the

23     reporter because we are coming perilously close --

24           MR. ROSENFELD:  Objection to the colloquy, your

25     Honor.

B-1jb

People - DETECTIVE KENNETH BANKER - direct

1493

1    THE COURT:  You may approach the bench first.

2 Detective, be good enough to stand down.

3    THE WITNESS:  Yes.

4    (The witness exits the witness stand and there is

5 an off-the-record discussion.)

6    THE COURT:  Ms. Reporter.

7    (Whereupon the following discussion is conducted

8 at sidebar.)

9    THE SERGEANT:  Counsel, you are waiving your

10 client's appearance?

11    MR. CANTOR:  Yes.  We've already had testimony

12 that a line up has been set up.  A picture of the line up,

13 including my client in white shirt, and the only one in a

14 white shirt has been introduced into evidence and published

15 to the jury.  The DA has now elicited that police officers

16 went out, left Borough Headquarters for purposes of

17 bringing witnesses to view the line up.  We already have

18 circumstantially reached the point of violation of *People*

19 *v. Trowbridge*.  It doesn't take too much for the jury to

20 put two and two together that witnesses came to the

21 precinct.  They've seen what the line up looked like.  They

22 know that my client was under arrest and it's indelectable

23 inference that can be drawn and would be drawn by the

24 jurors if the witnesses are brought and made

25 identifications of my client.  Now, of course, the People

B-1jb

People - DETECTIVE KENNETH BANKER - direct

1494

1       can't introduce the witnesses themselves and they have

2       those witnesses testified that they made a line up

3       identification of number three, but what the People can't

4       do are either circumstantially or by direct evidence is

5       induce via a third party, such as this detective, that

6       these witnesses made identification of my client.  That is

7       the steadfast rule of People v. Trowbridge,

8       T-R-O-W-B-R-I-D-G-E.  He's already crossed, the prosecutor

9       has already circumstantially crossed that line by setting

10      in motion the line up the way it looks showing the picture

11      to the jury and now, he has witnesses that are on their way

12      to view a line up at Bronx Borough Headquarters.  I am

13      moving for a mistrial.  Firstly, this is considered a most

14      egregious error, it violates the Court --

15              MR. ROSENFELD:  Please keep your voice down, sir.

16              MR. CANTOR:  My voice is not loud.

17              MR. ROSENFELD:  Judge, may we go in chambers?

18              MR. CANTOR:  I am objecting.

19              THE COURT:  That's why I made --

20              MR. CANTOR:  I --

21              THE COURT:  Just continue your record.  Face the

22      reporter.

23              (Whereupon at this time the defense counsel leans

24      over the court reporter's machine and begins speaking in

25      close proximity to her face.)

B-ljb

People - DETECTIVE KENNETH BANKER - direct

1495

1        THE COURT REPORTER:  Counsel, get out of my face.

2        MR. CANTOR:  Fine.  I am being frustrated.  You

3    tell me to face the reporter.  You --

4        THE COURT:  You did --

5        MR. CANTOR:  And she says get out of my face.

6        THE COURT:  Only because you sort of leaned on

7    top.

8        MR. CANTOR:  I leaned because I wanted her to

9    hear.  I have a right to have a record.  This reporter is

10   frustrated.  That right --

11       THE COURT:  This reporter is not doing that, she

12   is asking you to give her some space.

13       MR. CANTOR:  You tell me where to look, where to

14   stand.

15       THE COURT:  Right where you're standing.

16       MR. CANTOR:  Okay.

17       THE COURT:  Please continue your line of

18   reasoning.

19       MR. CANTOR:  Okay.  I want my last comments read

20   by the reporter.  You interrupted me by saying get out of

21   my face.

22       MR. ROSENFELD:  Your Honor, may I suggest we go

23   into chambers, this is not good.

24       THE COURT:  You may read back that last sentence.

25       MR. CANTOR:  Thank you.

B-ljb

People - DETECTIVE KENNETH BANKER - direct

1496

1        (Whereupon the last sentence was read back by the

2   reporter as follows: I am moving for a mistrial.  Firstly,

3   this is considered a most egregious error, it violates the

4   Court --)

5        MR. CANTOR:  It violates the Court of Appeals

6   decision in *People v. Trowbridge*, T-R-O-W-B-R-I-D-G-E, it

7   is reversal error per se.  I am moving for a mistrial.

8   Mr. District Attorney has circumstantially set the stage

9   for these jurors to draw an indelectable inference that

10  witnesses on who were produced at Borough headquarters made

11  identifications of my client.  Now, that would be all right

12  if it came from the witness themselves, but it cannot come

13  from the third party such as Detective Banker and so thus I

14  move for a mistrial.

15        THE COURT:  Mr. D.A.

16        MR. CANTOR:  And, Judge, repeatedly I have kept

17  my voice at a level that no one outside perhaps only two

18  feet from where we are and we are as you are face on the

19  podium on the right steps, there are three steps that lead

20  out to the ground.  This district attorney in order to

21  discombobulate, confuse me, has continuously interrupted me

22  be claiming my voice is too loud.  My voice is not too

23  loud.  My voice has always been low enough so that the only

24  people can hear beyond two or three feet beyond this circle

25  can hear and these constant interruptions and scurrilous

B-1jb

People - DETECTIVE KENNETH BANKER · direct

1497

1    statements that have no foundation are only meant to
2    obstruct and obfuscate my viability to defend my client
3    vigorously and zealously.  I am sure the Court wants that,
4    vigorously representation of a man accused of murder in the
5    second degree.

6                    THE COURT:  Very definitely.

7                    Mr. D.A. would you like to say anything?

8                    MR. ROSENFELD:  First of all, your Honor,
9    regarding the last part of Mr. Cantor's statements he has
10   at times raised his voice louder than normal voice and
11   that's what I tried to point out so that he would reduce
12   his tone of voice so the jury cannot hear what he is
13   saying.  He is facing the direction of the jury as he is
14   talking and sometimes he does raise his voice as he is
15   pointing out.

16                    Second of all, that the argument that Mr. Cantor
17   last presented the Court are totally irrelevant.  The
18   People have not in any manner asked this witness to state
19   what some other witness told him about an identification
20   process.  We have only been talking about the setting up of
21   the line up.  The arrangements were made and the following
22   statements were being where the witnesses were already
23   testified, present, the time they viewed the line up not
24   whether they made an identification or not.  That was
25   *Trowbridge* and I will not be asking merely the

                                                              B-ljb

People - DETECTIVE KENNETH BANKER - direct

1498

1    circumstances surrounding it as has been testified to.

2             MR. CANTOR:  He is --

3             THE COURT:  And he is not finished and the motion

4    to -- for mistrial?

5             MR. ROSENFELD:  There is no circumstantial

6    evidence at this point that would support any type of

7    motion for a mistrial, it's not even close.

8             MR. CANTOR:  This is a fair evidentiary --

9             MR. ROSENFELD:  I --

10            THE COURT:  You made your record.

11            MR. CANTOR:  Okay.  I am just going to say in one

12   sentence there is a sufficient evidentiary predicate

13   established through this witness for the jury to conclude

14   by way of an inference drawn that this witness is

15   circumstantially testifying in a manner that would allow

16   the jurors to draw the inference through the Detective

17   Banker's testimony that I think identifications by

18   witnesses of my client in the line up had been made, this

19   violates *Trowbridge*.

20            THE COURT:  All right.  The motion for a mistrial

21   the Court does not believe we have even come near the

22   threshold of such a drastic action and denies that.  Your

23   exception is noted.

24            The People are cautioned with regard to

25   *Trowbridge* rule, which they've expressed themselves on and

B-ljb

People - DETECTIVE KENNETH BANKER - direct

1499

1   once again, the Court pleads both counsel no outbursts.  No

2   editorializing and so forth.

3           Let us continue.

4           MR. ROSENFELD:  Just for saying, your Honor, I am

5   just going to reiterate, when we make an objection do you

6   want us to say one or two words or just --

7           THE COURT:  One or two words, but no argument.

8           MR. ROSENFELD:  I will abide by that.

9           THE COURT:  Thank you.

10          MR. CANTOR:  It will be a first time if he did.

11          (Continues next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B-ljb

1          (Whereupon, the following takes place on the

2      record, in open court, in the hearing and presence of the

3      jury.)

4          THE COURT:  Detective, back on the stand, all

5      right.

6          THE WITNESS:  Yes, sir.

7          THE COURT:  Mr. District Attorney, let us continue

8      and complete with the gentleman.

9  CONT'D DIRECT EXAMINATION BY

10  MR. ROSENFELD:

11      Q.    Now, did there come a time later that evening that

12  witnesses viewed the lineup?

13      A.    Yes.

14      Q.    And did there come a time at approximately 7:21 p.m.

15  that a witness, Alberto Vasquez, viewed the lineup?

16          MR. CANTOR:  Objection.

17      A.    No.

18          MR. CANTOR:  He is leading.  Why can't he say what

19      happened at 7:21.  It's leading.

20          THE COURT:  I think it's fine.  It is okay.

21          MR. CANTOR:  It is okay?  It is okay?

22          THE COURT:  Let it go.  Yes.

23          MR. CANTOR:  Can you note my exception, please.

24          THE COURT:  Yeah, sure.

25      A.    Yes.

1    Q.    And who is present when Alberto Vasquez viewed the

2  lineup?

3    A.    I was.

4    Q.    And you described before how a lineup was conducted.

5  What room was Alberto Vasquez in?

6    A.    The viewer's room.

7    Q.    And did there come a time -- I'm sorry.  Where was

8  Alberto Vasquez prior to viewing the lineup?

9            MR. CANTOR:  Objection.  How does he know?  He was

10   in the lineup room.

11   Q.    Prior to viewing the lineup --

12           MR. CANTOR:  Yes.

13   Q.    -- where was Alberto Vasquez?

14           THE COURT:  If he knows.

15           MR. CANTOR:  Objection.

16           THE COURT:  If he knows.

17           MR. CANTOR:  Of course it's if he knows.

18   A.    He was in the waiting room, viewer's waiting room.

19           MR. CANTOR:  I am going to move to strike, Judge,

20   because he is in the lineup area.  How does he know that?

21           THE COURT:  Denied.

22           MR. CANTOR:  Denied?  Thank you.  Exception noted.

23   Q.    How does the process work -- withdrawn.

24           When Alberto Vasquez was brought into this viewing room

25  was that window that you were describing before covered, opened

JO-C      **DET. BANKER-PEOPLE-DIRECT**

1    in any way or how does it appear?

2        A.    The closed blind.

3        Q.    What happened once you brought him into the room

4    regarding the blinds?

5                    MR. CANTOR:  Objection.

6                    THE COURT:  Overruled.

7                    MR. CANTOR:  Trowbridge.

8                    THE COURT:  All right.  Be cautious.

9                    MR. ROSENFELD:  Okay.

10                   THE COURT:  But overruled.

11       Q.    What happened regarding the lineup?

12       A.    Once we were in that room and ready the blinds were

13   opened.

14       Q.    And after Alberto Vasquez -- withdrawn.

15             Did you have a conversation with Alberto Vasquez at any

16   time?

17       A.    Yes.

18       Q.    And after Alberto Vasquez viewed the lineup what if

19   anything did you do with them?

20       A.    I brought him out and down the hall to the DNA room.

21       Q.    What does that mean?

22       A.    It's just labelled the DNA room.  It's a separate area

23   away from where the future viewers are anyway.

24                   MR. CANTOR:  Objection to this witness --

25                   THE COURT:  Okay.  All right.  He put him in a

1    separate area; is that correct?

2                   THE WITNESS:  Correct, yes, sir.

3                   THE COURT:  Let's move on.

4                   MR. CANTOR:  And can anyway be stricken?

5                   THE COURT:  There is nothing to really be

6    stricken.  All right, let's move on.

7    Q.    Now, after Alberto Vasquez was put in that DNA room

8    area did there come a time at around 7:23 --

9                   MR. CANTOR:  Judge, I am going to object to the

10    leading.  I am going to object to the leading.

11                   THE COURT:  Because of the multiplicity of viewers

12    I find this an efficient way to move on, and I find it not

13    prejudicial in the least.  Therefore, I am permitting it.

14    Your exception is noted.

15                   Please continue, Mr. District Attorney.

16    Q.    You may answer.

17    A.    Yes.

18    Q.    And did there -- did you bring Ms. Melissa Dempsey into

19    the same lineup room where you previously brought Alberto

20    Vasquez?

21    A.    I did.

22    Q.    And who was present in the interviewing room that day?

23    A.    I was.

24                   MR. CANTOR:  Would you note my continuing

25    objection to the entire line, and would you instruct the

JO-C     **DET. BANKER-PEOPLE-DIRECT**

```
 1        witness --

 2                    THE COURT:  You don't know --

 3                    MR. CANTOR:  He answered notwithstanding my

 4        objection --

 5                    MR. ROSENFELD:  Objection to the colloquy.

 6                    MR. CANTOR:  -- before you ruled.

 7                    THE COURT:  You are correct.  You are correct.

 8                    MR. CANTOR:  Until you rule.

 9                    THE COURT:  You know the rules, Detective.  When

10        the objection is made, wait.  Just wait a moment.

11                    THE WITNESS:  Yes.

12                    THE COURT:  Continue, Mr. District Attorney.

13                    MR. ROSENFELD:  I am not sure.

14        Q.     Was Melissa Dempsey brought to the same viewing area

15        where Alberto Vasquez had viewed the lineup?

16        A.     Yes.

17        Q.     And was the process the same in terms of viewing the

18        lineup as you did with Alberto Vasquez as to Ms. Dempsey?

19        A.     Yes.

20        Q.     And once Ms. Dempsey had finished viewing the lineup

21        what if anything did you do with her?

22        A.     I brought her to the DNA room.

23        Q.     That's where Mr. Vasquez was?

24        A.     Yes, correct.

25        Q.     And then did there come a time that you brought -- one
```

1   second -- a woman by the name of Maria Rodriguez to view a

2   lineup at about 7:33 p.m.?

3       A.   Yes.

4       Q.   And, again, was this the same procedure that you

5   conducted with Melissa Dempsey and Alberto Vasquez?

6       A.   Yes.

7       Q.   The same room?

8       A.   Yes.

9       Q.   And Maria Rodriguez, what did you do with her after she

10  viewed the lineup?  What you did with her?

11      A.   Brought her to the DNA room.

12      Q.   Thank you.  Now, during the viewing of the lineup by

13  all three of these witnesses was the -- were the fillers and

14  defendant seated as they are in People's exhibit 16?

15      A.   Yes.

16      Q.   Did you at any time communicate to any of the witnesses

17  anything about the lineup as to where anyone was seated?

18      A.   No.

19      Q.   All right.  Once the lineups were concluded did there

20  come a time that you took defendant David Delgado for processing

21  your arrest?

22      A.   Yes.

23      Q.   And did there come a time that you got what's known as

24  pedigree or received pedigree information from David Delgado?

25      A.   Yes.

JO-C      **DET. BANKER-PEOPLE-DIRECT**

1      Q.    And did you receive from David Delgado his date of

2    birth?

3      A.    I did.

4      Q.    What is his date of birth?

5      A.    7/18/75.

6      Q.    And you received from David Delgado any information

7    about his height and his weight?

8      A.    Yes.

9      Q.    And what was that?

10      A.    Five foot six, approximately 200 pounds.

11            MR. ROSENFELD:   Your Honor, may I have a couple of

12      minutes.   One minute even just to let me review, and I will

13      be finished.

14            THE COURT:   Take your time.

15            (Whereupon, there was a brief pause in the

16      record.)

17      Q.    Detective, prior to coming into court have you had an

18    opportunity to meet with me and my office and discuss this case?

19      A.    Yes.

20      Q.    Have you had an opportunity prior to coming to court to

21    review the photographs that or that are on this case and your

22    reports and anything else in regards to this case?

23      A.    Yes.

24      Q.    Approximately how many times in the course of two and a

25    half years did you have an opportunity to review this case with

1    me?

2        A.    About 10 or 11 times.

3               MR. ROSENFELD:  Thank you.  I have no further

4    questions.  Thank you, Detective.

5               THE WITNESS:  You are welcome.

6               THE COURT:  Thank you, sir.

7               Mr. Defense counsel.

8    CROSS-EXAMINATION BY

9    MR. CANTOR:

10              (Whereupon, the exhibit is displayed on the ELMO.)

11       Q.    After Maria Rodriguez viewed the lineup at 7:35 did you

12   bring any other civilian into the viewing room?

13              MR. ROSENFELD:  Objection, your Honor.

14              THE COURT:  Overruled.

15       A.    Yes.

16       Q.    Who?

17       A.    I would have to refer to my DD-5.

18       Q.    Yeah, why don't you do that.

19              (Whereupon, the witness perused documents.)

20              THE COURT:  Just tell us what it is that you are

21   looking at and the date thereof.

22              THE WITNESS:  Yes, sir.  I am referring to DD-5

23   No. 45.

24       Q.    Just the name of the person --

25              THE COURT:  Dated?  One second.

1              THE WITNESS:  Sorry.  I am sorry.  December 26th

2      is when this occurred.

3              THE COURT:  All right.

4      Q.    No.  The Judge asked you the date of the document, sir.

5      A.    The date of the document?

6      Q.    Yes.

7      A.    Was on the 27th.

8      Q.    Okay.  So who was the civilian that came in after Maria

9      Rodriguez, just the name?

10     A.    Maria Rodriguez?  Daniel Solis, S-o-l-i-s.

11     Q.    Now, after Mr. Solis was there, another civilian who

12     was brought in to view the lineup?

13     A.    Yes, sir.

14     Q.    Who, by name?

15     A.    Wilfredo Cruz, C-r-u-z.

16     Q.    I got it.  I got it.  After Mr. Cruz was there, another

17     civilian brought in?

18     A.    Yes.

19     Q.    Who?

20     A.    Arileida Jimenez.

21     Q.    Spell the first name.

22     A.    A-r-i-l-e-i-d-a.

23     Q.    And after Ms. Jimenez was there, another civilian

24     brought in?

25     A.    Not for the lineup, no.

1    Q.    Was a picture of this lineup, which has been marked

2    People's 16 in evidence -- did you ever -- after conducting the

3    actual lineup with these six people, did you ever show a picture

4    of that lineup to any prospective witnesses?

5    A.    Never.

6    Q.    Now, you said in order to cover the different

7    hairstyles of defendant and the four fillers you put baseball

8    caps on all of them?

9    A.    Wool caps.

10   Q.    Now, did you say on direct examination when questioned

11   by Mr. Rosenfeld that you put baseball caps on all of them, yes

12   or no?

13   A.    Oh, I may of.  I don't know.

14   Q.    Sir, the question is, do you recall?

15   A.    I do not.

16   Q.    You don't recall -- I want to complete my question.

17   You don't recall your testimony of about 10, 12 minutes ago that

18   in order to conceal the different hairstyles you put baseball

19   caps on all four fillers and my client, you remember making that

20   statement?

21   A.    I don't remember if it's baseball caps.  If I --

22   Q.    Sir, my question is, do you remember making that

23   testimony, yes or no?

24              MR. ROSENFELD:  Objection:  Asked and answered.

25              THE COURT:  I will allow him to answer the

1   question.

2   Q.   Yes or no?

3   A.   The --

4   Q.   The answer is simple --

5         MR. ROSENFELD:   Your Honor --

6   Q.   -- make --

7         MR. ROSENFELD:   Judge, an objection.

8   Q.   -- the same --

9         THE COURT:   No, I allow it.

10  Q.   It's very simple, do you remember telling Mr. Rosenfeld

11  that you put baseball caps on them, yes or no?

12  A.   No.

13  Q.   Thank you.   Who is the only one wearing a white

14  t-shirt?

15  A.   The defendant.

16  Q.   Let's go back to Brooklyn.   When you went up the stairs

17  you had your shield around your neck displayed, correct?

18  A.   Correct.

19  Q.   And did you not identify yourself to Mr. Delgado?

20  A.   I did.

21  Q.   And was that at the doorway of Mr. Delgado's room or

22  apartment?

23  A.   Yes.

24  Q.   And then you took him into the apartment and helped him

25  put on footwear, correct?

JO-C        **DET. BANKER-PEOPLE-CROSS**

1       A.      Yes.

2       Q.      Helped him put on a jacket?

3       A.      Yes.

4       Q.      Or actually draped the jacket over his back, correct?

5       A.      Yes, that's correct.

6       Q.      Which you had handcuffed him behind the back, correct?

7       A.      Yes.

8       Q.      And so you did that so that the handcuff couldn't be

9       seen by other people?

10      A.      Correct.

11      Q.      Okay.  And you are in the car now with Mr. Delgado and

12      you are alongside of him in the backseat, and without your

13      asking or any other police member asking any question

14      Mr. Delgado within a minute of getting into the car made the

15      statement which you later wrote down in your memo book, correct?

16      A.      Yes.

17      Q.      And then as the car was traveling, about 5, 10 minutes

18      later, again without you asking or any other police officers

19      asking questions he said that was the time that he really fucked

20      up?

21      A.      Not exact words, no.

22      Q.      This was the time that he really fucked up, words to

23      that effect?

24      A.      To that effect, yes.

25      Q.      Okay.  But you didn't write that down?

1    A.    No, I did not.

2    Q.    But you wrote the first statement down?

3    A.    Correct.

4    Q.    And you still had your memo book in your possession,

5    correct?

6    A.    Yes.

7    Q.    You still had your writing implement in your

8    possession, correct?

9    A.    Correct.

10   Q.    Now, you retired from the New York City police force on

11   December 31, 2011, right?

12   A.    Yes.

13   Q.    Since that time until the present are you working?

14   A.    No.

15   Q.    You have been supporting yourself on disability

16   payments provided to you by the City of New York; is that

17   correct?

18   A.    Yes.

19   Q.    And is that full disability or three quarters or one

20   half?

21              MR. ROSENFELD:   Your Honor, is this relevant?

22   Q.    Don't mumble and look at Mr. Rosenfeld.

23   A.    What does that have to do with anything?

24              MR. ROSENFELD:   Objection, your Honor.

25              THE COURT:   One second.  One second, please.  You

1        may answer the question.

2        A.    It's -- can you --

3        Q.    Please look at me, sir, and the jury --

4                    MR. ROSENFELD:  Objection to this colloquy from

5        defense counsel.

6        Q.    -- and answer the question.

7                    THE COURT:  Please, please.

8                    MR. ROSENFELD:  Objection to the --

9                    MR. CANTOR:  You already overruled.

10                   THE COURT:  One second, Mr. Cantor.  No need to

11       badger the witness.

12                   MR. CANTOR:  He looks to you and mumbles

13       something.

14                   THE COURT:  He is thinking perhaps.

15                   MR. CANTOR:  He shouldn't be mumbling to the

16       Court.

17                   MR. ROSENFELD:  Objection to this colloquy.

18                   THE COURT:  Yes.

19       Q.    All right.  Answer the question.  It's been overruled.

20       A.    All right.  Can you repeat it.

21       Q.    The court reporter will be ever so happy to do so.

22                   (Whereupon, the court reporter read back the

23       above-requested testimony.)

24       A.    Okay.  It's three quarters disability.

25       Q.    And in what county do you reside?

JO-C          **DET. BANKER-PEOPLE-CROSS**

1              MR. ROSENFELD:  Objection.

2              THE COURT:  Sustained.

3              MR. CANTOR:  Every prosecution witness gets to say

4        that.

5              THE COURT:  Sustained.

6        Q.   Do you reside outside of New York City?

7              MR. ROSENFELD:  Objection to relevance.

8              THE COURT:  Sustained.

9        Q.   Wherever you reside you support yourself by three

10       quarters disability that you receive from New York City as a

11       result of the injury you sustained while working as a New York

12       City detective, correct?

13       A.   Partially.  My wife work.

14       Q.   I see.  But you get how much money per month?

15             MR. ROSENFELD:  Objection, your Honor.

16             THE COURT:  Sustained.

17       Q.   You get a substantial amount of money from New York

18       City, don't you?

19             MR. ROSENFELD:  Objection.

20             THE COURT:  Sustained.

21             MR. CANTOR:  Judge, it goes to bias or interest.

22             THE COURT:  I understand, sir.  It's sustained.

23       Q.   You work partially?  You have a part-time job?

24       A.   No.

25       Q.   You don't?

JO-C      **DET. BANKER-PEOPLE-CROSS**

1      A.    No.

2      Q.    Your wife has a part-time job?

3            MR. ROSENFELD:  Objection, your Honor.  This is --

4            THE COURT:  Sustained.

5      Q.    Does your wife work?

6            MR. ROSENFELD:  Objection:  Asked and answered.

7            THE COURT:  Sustained.

8      Q.    Well, you did go over to a apartment 3D on McGraw

9   Avenue, 2023, on either the late hours of the 27th of December

10  of '09 or the early morning hours of December 25th of '09,

11  correct?

12     A.    Incorrect.

13     Q.    Did you ever go to apartment 3D?

14     A.    Yes.

15     Q.    What date?

16     A.    On the 25th.

17     Q.    Yes, that's what I asked you.  Either on the 25th --

18  24th or 25th.

19     A.    You said late night on the 24th early morning.  I

20  didn't get there until nine o'clock on the morning on the 25th.

21     Q.    Nine o'clock of the morning of the 25th?

22     A.    Yes.

23     Q.    And there were lots of police officers there both

24  uniformed and un-uniformed?

25     A.    At that point there wasn't a lot.  There were probably

1    about five or six.

2         Q.    Okay.  Was crime scene there when you were there?

3         A.    Yes, crime scene was there.

4         Q.    And crime scene sketches and looks for evidence and

5    takes measurement, things of that nature?

6         A.    Yes.

7         Q.    Did any police officer in your presence ever recover a

8    weapon?

9         A.    No.

10        Q.    Did any police officer out of your presence, but

11   subsequently bring to your attention that a weapon had been

12   found in connection with this homicide?

13        A.    Never.

14        Q.    When you brought my client into his apartment in

15   Brooklyn to dress him and handcuff him, did you search the

16   apartment?

17              MR. ROSENFELD:  Objection to the form.

18              THE COURT:  I will allow it.

19        Q.    Did you, yes or no, sir.  Simple.

20        A.    Search?  No.

21        Q.    Did you look around?

22        A.    Yes.

23        Q.    So what is the difference, if you can explain it to the

24   jury, between looking around and searching?

25        A.    Plain view and moving objects in order to find

1    something.

2         Q.    I see.  So you never moved any objects?

3         A.    Correct.

4         Q.    By that time you were aware of the fact that the

5    deceased had died by way of stab wounds?

6         A.    Correct.

7         Q.    And you are telling this jury that you had sufficient

8    grounds to arrest my client for the murder of the sir, correct?

9         A.    Yes.

10        Q.    And you didn't move any objects within his room or his

11   apartment to see whether or not there was a sharp object or a

12   weapon in that apartment; is that correct?

13        A.    Correct.

14        Q.    And how long had you been a detective as of the date of

15   arrest?

16        A.    Five years approximately.

17        Q.    And you had gone out and participated in many arrests

18   and taken many video statements and interrogated many prisoners,

19   correct?

20        A.    Correct.

21        Q.    Hundreds I think you began saying?

22        A.    Correct.

23        Q.    And here you are -- how many other detectives were with

24   you when you went to Brooklyn and arrested Mr. Delgado?

25        A.    Approximately five or six detectives and one sergeant.

1       Q.     Did any officer search the room or apartment of

2     Mr. Delgado in Brooklyn when you arrested him?

3       A.     Not that I was aware of.

4       Q.     I see.  Now -- now, you told Mr. Rosenfeld on direct

5     examination that on December 25, '09 you interviewed seven or

6     eight people at the scene of the party?

7       A.     Yes.

8       Q.     Of those seven or eight people that you interviewed at

9     the scene of the party was Daniel Solis one of them?

10      A.     I would have to refer back to my memo steno book.

11      Q.     Please do so.

12             (Whereupon, the witness perused the document.)

13             THE COURT:  Once again, what you are looking at

14     and date.

15             MR. CANTOR:  Memo steno book.

16             THE COURT:  Let the gentleman tell me.

17             THE WITNESS:  I am looking at my memo steno book

18     of the 25th.

19             THE COURT:  Review, refresh and answer as you best

20     see fit.

21             THE WITNESS:  Okay.

22      Q.     Okay.

23             (Whereupon, the witness perused documents.)

24      A.     Ready.

25      Q.     Of the six and seven people that you interviewed was

1      one Daniel Solis?

2         A.     Yes, sir.

3         Q.     Was one Wilfredo Cruz?

4         A.     Yes.

5         Q.     Was one Arileida Jimenez?

6         A.     Yes.

7         Q.     Now, we go to December 25th when you were in the

8      interview room, you and Detective McSloy and David Delgado.  You

9      recall testifying about that?

10        A.     Yes.

11        Q.     And you had read him his Miranda rights, he

12     acknowledged such and initialled such?

13        A.     Correct.

14        Q.     Then you didn't ask any questions but you handed him

15     two blank pieces of paper issued by the police department,

16     correct?

17        A.     Correct.

18        Q.     And you filled in the top that requires information by

19     a police officer or a detective, correct?

20        A.     Correct.

21        Q.     Why did you hand him two rather than three or four or

22     one?  Did you think that two would be sufficient to cover

23     whatever narrative he was going write?

24        A.     I just, out of habit, gave two.  If they needed more I

25     hand them more.

JO-C          **DET. BANKER-PEOPLE-CROSS**

1    Q.    No, that's not my question.  My question is why not

2    three?  Why not four?  Why not one?

3    A.    You are right.  I could have done that.

4    Q.    But you didn't?

5    A.    Correct.

6    Q.    You drew the assumption that two pieces of blank paper

7    would be sufficient for Mr. Delgado to write out his

8    narrative --

9              MR. ROSENFELD:  Objection.

10             THE COURT:  Overruled.

11   Q.    -- is that correct?

12   A.    No.  He could have took one and not mentioned it.

13   Q.    So why did you hand him two?

14             MR. ROSENFELD:  Objection.

15   A.    Just out of habit.

16   Q.    I see.  Your technic, your habit?

17   A.    There may have only --

18             MR. ROSENFELD:  Sorry, your Honor.  May the

19   witness please answer.

20             MR. CANTOR:  I am asking about technic and habit.

21             THE COURT:  He is trying to answer.

22             MR. CANTOR:  No.  He is going --

23             MR. ROSENFELD:  Objection.

24             MR. CANTOR:  Let me withdraw the question.

25             THE COURT:  All right.

1        Q.    Is it your technique and habit when interviewing a

2   suspect or a defendant who is willing to answer questions to

3   always hand them two blank pieces of papers?

4        A.    No.

5        Q.    On some occasions you hand them more than two?

6        A.    Whatever --

7        Q.    No --

8              MR. ROSENFELD:   Your Honor, objection.  He's

9        interrupting him again.

10       Q.    I am asking you, are there occasions when you hand the

11  suspect more than two pieces of paper, yes or no.  Simple

12  question.  Yes or no.

13       A.    I may have in the past.

14       Q.    You may have in the past.  How about after this

15  interview, did you ever interview with -- was your technic or

16  policy to hand out --

17             MR. CANTOR:   And may he be seated while I am

18       examining this officer?

19             THE COURT:   I am sure he is ready to pose --

20             MR. CANTOR:   He is ready to pounce you mean, not

21       pose.

22             MR. ROSENFELD:   Objection, your Honor, improper.

23             THE COURT:   Yes, unnecessary.

24       Q.    Are there occasions when you handed people such as

25  suspects or defendants more than two pieces of blank paper, the

JO-C         DET. BANKER-PEOPLE-CROSS

 1  ┃ answer is yes or no?

 2  ┃     A.   Yes.

 3  ┃     Q.   Yes.  And are there occasions that you hand suspects or

 4  ┃ defendants, but one piece of paper, yes or no?

 5  ┃     A.   Yes.

 6  ┃     Q.   On this occasion you handed my client two pieces of

 7  ┃ paper, correct?

 8  ┃     A.   Correct.

 9  ┃     Q.   Was there any particular reason why you thought that

10  ┃ two pieces of paper would be sufficient to cover the narrative

11  ┃ that my client was told by you to write?

12  ┃               MR. ROSENFELD:  Objection to form.

13  ┃               THE COURT:  Sustained.

14  ┃     Q.   You gave him two pieces of paper, right?

15  ┃     A.   Yes.

16  ┃     Q.   You told him to write down his statement, correct?

17  ┃     A.   Yes.

18  ┃     Q.   And he proceeded to do so?

19  ┃     A.   Yes.

20  ┃     Q.   And were you of a mind -- as you were given him the two

21  ┃ pieces of paper, were you of a mind to believe that the two

22  ┃ pieces of paper would be sufficient to encompass my client's

23  ┃ written statement?

24  ┃     A.   Yes.

25  ┃     Q.   But you've had occasions where people have asked for

 1   more paper?

 2        A.    Yeah.   If he needed, I would have given it to him.

 3        Q.    That doesn't answer my question.   What prior

 4   occasion --

 5                    MR. ROSENFELD:   Objection.

 6        Q.    -- where people needed more than two pieces of paper,

 7   yes or no?

 8                    THE COURT:   The objection is sustained.

 9        Q.    Did you ever in the past, prior to interviewing my

10   client, give a prisoner or defendant more than two pieces of

11   paper?

12        A.    Yes.

13        Q.    And after interviewing my client you've interviewed

14   other suspects or defendants?

15        A.    Correct.

16        Q.    And did you hand them at times more than two pieces of

17   paper for them to write their statements?

18        A.    I don't remember.

19        Q.    You don't remember?

20        A.    No.

21        Q.    You have a very good memory about this incident some 30

22   months ago, correct?

23                    MR. ROSENFELD:   Objection.

24                    THE COURT:   No, I will allow it.

25        Q.    Is that correct?

1       A.     Yes, cause I reviewed it.

2       Q.     Do you have an ordinary, average, bad or excellent

3   memory?

4              MR. ROSENFELD:  Objection to form.

5              THE COURT:  Sustained.

6       Q.     Do you have a very good memory, sir?

7       A.     No.

8              MR. ROSENFELD:  Objection.

9       Q.     You have an ordinary memory?

10             THE COURT:  One second, Detective.  You must wait

11  until the Court rules when there is an objection.

12             The objection is sustained.

13      Q.     Do you have an ordinary memory, an average memory?

14             MR. ROSENFELD:  Objection.

15             THE COURT:  Sustained.

16             MR. CANTOR:  This is cross-examination, Judge.

17             THE COURT:  The jury will make a determination

18  about the memory and the credibility.

19      Q.     So you gave him the two pieces of paper and you told

20  him to write out the statement and to just call you, Detective,

21  if he needed more, correct?

22      A.     Yes.

23      Q.     And you safeguarded the statement once you got it from

24  him, correct?

25      A.     Correct.

1     Q.   You safeguarded it by putting it in your desk, correct?

2     A.   Correct.

3     Q.   Were there other detectives in or about the area --

4     A.   Yes.

5     Q.   -- of your desk?

6     A.   Yes.

7     Q.   Were there other civilians being interviewed or talked

8   to by these other police officers?

9     A.   No.

10    Q.   It was all police officers?

11    A.   Yes.

12    Q.   Of that you are sure?

13    A.   Yes.

14    Q.   Of that you are certain?

15    A.   Yes.

16    Q.   And that was 30 months ago, correct?

17    A.   Correct.

18    Q.   And you have an average memory?

19         MR. ROSENFELD:  Objection, your Honor.

20         THE COURT:  Sustained.

21    Q.   Did you contact the DA's office or was it some other

22   police officer?

23    A.   Detective McSloy did.

24    Q.   So when you answered Mr. Rosenfeld's questions you

25   heard me object to the Judge that it was hearsay that you hadn't

1    done it?

2                    MR. ROSENFELD:   Objection to form.

3        Q.    You remember me making that objection?

4                    THE COURT:   Sustained.

5        Q.    In any event, you testified about the DA's office being

6    contacted, correct, to take the video statement?

7        A.    Correct.

8        Q.    But it wasn't you who personally did that contacting,

9    was it?

10       A.    Correct.

11       Q.    It was, Detective, you learned on later McSloy,

12   correct?

13       A.    I learned that day.

14       Q.    You learned from McSloy later?

15       A.    Yes.  He said --

16       Q.    No.  I am just asking you such a simple question.

17                   MR. ROSENFELD:   Your Honor --

18       Q.    Did you learn that from McSloy later on in the day, yes

19   or no?

20                   MR. ROSENFELD:   I am objecting to the way the

21   defense counsel is badgering the witness.

22                   MR. CANTOR:   I'm not badgering.  Trying to get at

23   the truth.

24                   THE COURT:   Just allow him to answer the question.

25       Q.    Did you learn that from McSloy later on that day, yes

1    or no?

2         A.    Yes.

3         Q.    See how easy it is.

4               MR. ROSENFELD:  Objection to the colloquy.

5               THE COURT:  No need for all of these comments and

6         little words that are inserted in and there, and

7         editorializing.  Please, Mr. Cantor, I implore you that we

8         may move along with efficiency and disparity.  Stop

9         incumbering the record.

10        Q.    I think you testified on direct examination that the

11   defendant was very cooperative?

12        A.    Correct.

13        Q.    And that was from the time you first encountered him at

14   the doorway of his apartment in Brooklyn until you lost sight of

15   him in the borough headquarters in the Bronx; is that correct?

16        A.    Correct.

17        Q.    Whatever instruction, command or direction you gave him

18   he followed?

19        A.    Correct.

20        Q.    And he answered all questions put to him by the

21   Assistant District Attorney in your presence while it was being

22   videotaped?

23        A.    Correct.

24        Q.    And even when the clock tilted over, repositioned it so

25   it could be seen, correct?

1    A.    Correct.

2    Q.    When was the case marked closed out?  Was that after

3    the -- was that after the lineups were conducted on the 25th?

4    A.    No.

5    Q.    When?  What date?

6    A.    After I finished typing --

7    Q.    No, no.  Date.  Date.  Date.

8    A.    Oh, I don't know.

9    Q.    Well, was it six months later?

10   A.    No.

11   Q.    Was it five months later?

12   A.    No.

13   Q.    Was it four months later?

14   A.    No.

15   Q.    Three months later?

16   A.    Within days of the incident.

17   Q.    I see.  It was closed out?

18   A.    Correct.

19   Q.    Now, you had a deceased who had died by way of stab

20   wounds, correct?

21   A.    Correct.

22   Q.    So it would be an important evidentiary matter for

23   police to recover the weapon that caused these inflictions, that

24   lead to these physical inflictions that lead to the deceased's

25   death, correct?

1           MR. ROSENFELD:  Objection.

2           THE COURT:  No, I will allow that.

3    A.    No, absolutely not.

4    Q.    It wouldn't be important?

5    A.    No, no.

6    Q.    Okay.  You've answer the question.

7           MR. CANTOR:  And I have no further questions.

8           THE COURT:  Thank you, Mr. Cantor.

9           MR. CANTOR:  On cross-examination.

10          (Continued onto the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      Q     Were you aware that police officers searched for a

2    weapon in this case?

3      A     Correct, yes.

4      Q     Where was that search done?

5      A     Inside apartment 3-D of 2033 McGraw, outside the

6    hallway, the stairwell, the premises outside the building.  I

7    personally completed a daylight search when I responded.  I did

8    a DD-5 on that.

9                  MR. CANTOR:  Objection.  Object to that.  Ask to

10              be stricken.  He did a DD-5 on that.  What does that have

11              to do --

12                  MR. ROSENFELD:  Objection to the colloquy.

13                  THE COURT:  All right.

14                  MR. CANTOR:  Will you strike that, sir?

15                  THE COURT:  Stricken.  Disregard.

16                  THE WITNESS:  Yes, sir.

17      Q     On the 26th, you took the statement from the

18    defendant, correct?

19      A     Yes.

20      Q     And he indicated on the statement that he didn't

21    remember where the knife went after he left the apartment,

22    right?

23      A     Correct.

24      Q     And you searched all around the apartment area and

25    outside?

1        A     Yes.

2        Q     Looking at People's Exhibit 16 in evidence, the head

3    coverings of the fillers and the defendant, can you please tell

4    us what you used as head covering for them?

5        A     Black wool caps.

6              MR. ROSENFELD:  Thank you.  I have no further

7        questions.

8    RECROSS EXAMINATION

9    BY MR. CANTOR:

10       Q     If as you say it was not important to recover the

11   weapon, why were you searching, you yourself, apartment 3-D the

12   hallway, the stairway and outside of 2033 McGraw Avenue?  You

13   wanted to recover the weapon, did you not?

14       A     Yes.

15       Q     But it was not important according to your testimony

16   two or three minutes ago, do you remember making that

17   testimony?  Yes or no?

18             MR. ROSENFELD:  Your Honor, I object to the tone.

19       Q     Do you remember making that testimony?  Yes or no,

20   sir?

21       A     I can't answer yes or no.  Can I give an explanation?

22             THE COURT:  No.  At this point, it's only yes or

23       no.

24       A     Repeat the question.

25             MR. CANTOR:  I'm sure the court reporter will be

1        ever so happy to do that.

2                    THE COURT:  I don't believe we need it.  The

3        answer is yes or no.

4                    THE WITNESS:  To which question, sir?

5                    THE COURT:  The last question.  If you don't

6        recall it, I'll have the reporter read it.

7                    THE WITNESS:  Yes, please read it.

8                    THE COURT:  Please.

9                    (Whereupon, the requested portion was read by the

10       court reporter.)

11       A    Yes.

12                   MR. CANTOR:  That's it.  No further questions of

13       this good retired detective.

14       RE-REDIRECT EXAMINATION

15       BY MR. ROSENFELD:

16       Q    Detective, regarding this question about looking for

17       the weapon, did you want to explain something?

18                   MR. CANTOR:  Objection to the form of that

19       question on redirect.

20                   THE COURT:  I'll allow it.

21                   MR. CANTOR:  You just want to explain something?

22                   MR. ROSENFELD:  Objection.

23                   THE COURT:  He was cut off in his answer.

24                   MR. CANTOR:  I'm sorry, your Honor?

25                   THE COURT:  His answer was continuing.  It was

1   cut off.

2                    MR. CANTOR:  By me?

3                    THE COURT:  Yes.

4                    MR. CANTOR:  Then let him continue with an

5        answer.

6                    MR. ROSENFELD:  Your Honor, I'm objecting to

7        this.

8                    MR. CANTOR:  I'll step back.

9                    THE COURT:  The objection for the record is

10       sustained.

11                   MR. CANTOR:  How about the form of the question?

12                   THE COURT:  People can reposit the question they

13       just asked.

14                   MR. CANTOR:  In a proper form.

15                   THE COURT:  Let us see.

16       Q    In regard to the last question asked you by Mr.

17       Cantor, did you have a full opportunity to explain your answer?

18       A    No.

19       Q    Could you please explain your answer?

20       A    Although the knife is important to the case, it is not

21       necessary.  You don't need to recover the weapon to prove that

22       weapon was used for the crime.  Is it nice to have it?  Yes.

23       If not available, there's other ways of proving that it was

24       that item.  That's what I meant by saying that.

25                   MR. ROSENFELD:  Nothing further.

1    Let the record indicate the defense counsel is

2    getting up laughing.   Objection.

3    RE-RECROSS EXAMINATION

4    BY MR. CANTOR:

5    Q    If you don't recover --

6    MR. ROSENFELD:   Objection.

7    Q    -- recover the weapon --

8    THE COURT:   I'm happy that he's in a jovial mood.

9    MR. ROSENFELD:   He's the only one.

10   THE COURT:   You have a question, please.

11   MR. CANTOR:   Yeah, sure.

12   Q    If you don't recover the weapon, how can you prove

13   that who was responsible for the wounds of the deceased that

14   led to his death?

15   MR. ROSENFELD:   Objection.

16   Q    That's what you've told us.

17   THE COURT:   The objection is sustained.   The

18   Court will give the appropriate standard at the time.

19   Q    You did tell this jury it was not important to recover

20   the knife, you clearly told that to the jury, correct?

21   MR. ROSENFELD:   Objection.   Asked and answered.

22   THE COURT:   It's been explained.

23   MR. CANTOR:   Oh, it has?

24   Q    So you told Mr. Rosenfeld less than a minute ago it

25   wasn't important, but one of the purposes of recovering a knife

1    would be to see whether or not it was consistent with the

2    wounds inflicted, correct?

3        A    Correct.

4        Q    And you told this jury that it wasn't important, but

5    you searched the apartment, the hallway, the stairwell,

6    outside, that's what you did, right?

7        A    Correct.

8        Q    And your purpose was to recover a knife, correct?

9        A    Yes.

10       Q    And there's a police laboratory that can determine

11   whether or not and there's a chief medical office, Office of

12   the Chief Medical Examiner that can determine whether or not

13   the stab wounds that the deceased sustained were consistent

14   with any weapon recovered, correct?

15               MR. ROSENFELD:  Objection.

16               THE COURT:  The objection is sustained.  Mr.

17       Cantor, please.  The jury has already been informed that if

18       they believe a knife was employed here, they're entitled to

19       that belief despite the fact that the People have no

20       obligation to produce that knife.

21               MR. CANTOR:  No.  But it may affect the jury's --

22               MR. ROSENFELD:  Objection.

23               THE COURT:  Could do many things, but we don't

24       invite speculation.  Please, now, do you have any other

25       questions?

1          MR. CANTOR:  Yes.

2      Q    You told Mr. Rosenblatt that it would be very relevant

3  to determine how you have recovered the knife, whether or not

4  that knife was consistent with the nature of the stab wounds

5  sustained by the deceased, you told him that, did you not?

6          MR. ROSENFELD:  Objection.  After two weeks at

7      least get my name right.

8          THE COURT:  Sustained.

9          MR. CANTOR:  Sustained?

10          THE COURT:  Yes.

11          MR. CANTOR:  He says it's not important and then

12      he says it is important.

13          THE COURT:  He's explained himself.  It's up to

14      the jury to determine whether they wish to accept or reject

15      that allegation, Mr. Cantor.

16          MR. CANTOR:  It's up to the jury.

17          MR. ROSENFELD:  Objection to any colloquy.

18          THE COURT:  There's no need for further comment.

19      Your exception is noted.

20          MR. ROSENFELD:  People have no further questions,

21      your Honor.  Thank you, Detective.

22          THE COURT:  Detective, you're excused.

23          THE WITNESS:  Thank you, sir.

24          (Whereupon, the witness left the stand and the

25      courtroom.)

1            THE COURT:  Counselors, please approach.

2                 (Whereupon, there was a discussion held, off the

3       record, at the bench, among the Court, the assistant

4       district attorneys, defense counsel and outside the hearing

5       of the defendant and the jury.)

6                 (Whereupon, the following takes place, on the

7       record, in open court, in the presence of the Court, the

8       assistant district attorneys, defense counsel, the

9       defendant and the jury.)

10            THE COURT:  Madam Forelady, ladies and gentlemen

11      of the jury, we're now recessing for lunch.  Have a

12      pleasant lunch.  Remember the cautions.  Be back at 2

13      o'clock and we'll continue towards completion of the

14      People's case.  We'll see you then.  Have a pleasant lunch.

15                 (Whereupon, the jury left the courtroom.)

16            THE COURT:  Jury having been excused, Mr.

17      Rosenfeld.

18            MR. ROSENFELD:  Your Honor, this is regarding

19      evidence markings.  We have several items that were marked.

20            THE COURT:  Please mark everything.

21            MR. ROSENFELD:  But there was a mistake made by

22      me.  People's Exhibit 10 had been previously marked was the

23      video statement redacted that we used for identification

24      and to show in court to defense counsel and your Honor

25      earlier.  I introduced it today as People's Exhibit 15.  We

1    put that into evidence.

2              THE COURT:  People's 10 was the tape, yes, the

3    video.

4              MR. ROSENFELD:  Right.  Now I've introduced that

5    same item People's Exhibit 10 as People's Exhibit 15, which

6    we put into evidence.

7              MR. CANTOR:  10 is for ID so it makes no

8    difference.  It will never be seen by the jury.  It makes

9    no difference.  15 is in evidence so there's really no

10   problem.

11             MR. ROSENFELD:  That's all I'm pointing out to

12   your Honor for purposes of all our record-keeping items,

13   that's the same item.  People's Exhibit 10 was only marked

14   for ID.  People's Exhibit 10 is now People's Exhibit 15 in

15   evidence.

16             MR. CANTOR:  I consent.

17             THE COURT:  Very good.

18             (Whereupon, a lunch recess was taken.)

19             A F T E R N O O N    S E S S I O N

20             COURT OFFICER:  Jury entering.

21             (Whereupon, the jury entered the courtroom.)

22             (Whereupon, the following takes place, on the

23   record, in the robing room, in the presence of the Court,

24   the assistant district attorneys, defense counsel, and

25   outside the presence of the defendant and the jury.)

tr/d   Proceedings

1    THE COURT:  Is your gentleman coming in?  You

2    waive his presence?

3    MR. CANTOR:  I'll waive his presence.

4    THE COURT:  Mr. Rosenfeld.

5    MR. ROSENFELD:  All right, Judge.  For the

6    record, People have the medical examiner ready to testify.

7    THE COURT:  Excellent.

8    MR. ROSENFELD:  And we have a disk that contains

9    photos we wish to introduce through the medical examiner.

10    I printed out eight of the nine photographs.

11    THE COURT:  May I see them?

12    MR. ROSENFELD:  Yes (handing.)  The ninth one is

13    on here.  I just didn't get the printout from the person

14    downstairs.  It's the same photo here.  And all of the

15    photos are on disk.  We're going to use our disk in the

16    computer to display them.

17    MR. CANTOR:  To make it easier, Judge, whatever

18    you're reviewing now, no objection.

19    THE COURT:  That's fine.

20    MR. ROSENFELD:  So all these photos are contained

21    on the disk.  I will move the disk into evidence and only

22    as to the photos that were numbered.

23    THE COURT:  That's fine.

24    MR. ROSENFELD:  So when we get to number 73 which

25    is a photograph of the neck, the jugular vein, the

1   hemorrhaging that was inside that was the result of the

2   stab wound to the jugular vein, which is one of the main

3   causes of death, cause of death itself was stab wound of

4   the left side of neck with injury of carotid artery,

5   jugular vein and larynx, which are portrayed in this

6   photograph.

7           In order to really show the nature of the injury

8   is to show this photograph because People's photograph

9   number 47 merely shows the stab wound on the outside, but

10  it doesn't show the nature and the depth of it.  People

11  feel this photograph is necessary for the doctor to explain

12  and explain to the jury how serious this injury was.  This

13  is really one of the main injuries of causing the death.

14          THE COURT:  You said left side of --

15          MR. ROSENFELD:  Left side of the neck.  I will

16  argue the same things I argued when we looked at the

17  photographs from the crime scene, People versus Wood and

18  the subsequent cases allowing the use of photographs if

19  they're probative of something necessary in evidence.

20          THE COURT:  Let's not use it.

21          Mr. Cantor.

22          MR. CANTOR:  I'm not objecting to the others.

23  They can all come in.

24          THE COURT:  You don't just leave.  We're not

25  done.

1    MR. CANTOR:  I was told the purpose.

2    THE COURT:  That's correct.  I may want to say

3    something for the record.  He may want to say something for

4    the record.

5    MR. CANTOR:  I thought his purpose was

6    photographs.

7    MR. ROSENFELD:  Note People's exception.

8    THE COURT:  Okay.  Very good.

9    MR. CANTOR:  May I?

10   MR. ROSENFELD:  We'll mark for identification

11   just in terms of procedure the CD.

12   THE COURT:  Yes.

13   MR. ROSENFELD:  I will indicate the photos on the

14   CD if you want me to.

15   THE COURT:  Well, whatever the number is, make

16   them A, B, C, D or 1, 2, 3, 4.  How many pictures?

17   MR. ROSENFELD:  Eight.

18   THE COURT:  Okay.

19   MR. CANTOR:  So what's the next number we're up

20   to?

21   MR. ROSENFELD:  I think it's 16.

22   MR. CANTOR:  So it's 16.

23   MS. MASON:  It's 17.

24   MR. ROSENFELD:  If we premark them.

25   THE COURT:  If you'd like, yes, that's fine,

 1          MR. ROSENFELD:  Plus there will be a body head

 2     diagram.

 3          MR. CANTOR:  This is something else that they are

 4     offering?

 5          MR. ROSENFELD:  Yes, that's why I'm showing it to

 6     you.

 7          MR. CANTOR:  That's why I will be seeing it.

 8          THE COURT:  What do you wish to show?  Just this

 9     one?

10          MR. ROSENFELD:  Yes.

11          MR. CANTOR:  Can I look at it, Judge?

12          THE COURT:  Sure.

13          (Handing.)

14          MR. ROSENFELD:  This is an overview.  It's the

15     anatomical sketch of the head in different positions to

16     show where the wounds were located.

17          MR. CANTOR:  The pictures certainly speak much

18     more eloquently, all of the pictures, none of which I've

19     objected to except the one you're excluding, if you look at

20     the pictures, the pictures are much more probative than the

21     sketch.  The sketch is an external sketch.

22          THE COURT:  But this serves with the

23     measurements.

24          MR. CANTOR:  Here's the ruler, Judge.

25          THE COURT:  I know.  I don't find this

1    graphically objectionable.

2              MR. CANTOR:  No.  It's redundant.  That's the

3    reason.  If you look at the pictures, you'll note the ruler

4    on the picture.

5              THE COURT:  Yes, I see it.

6              MR. CANTOR:  So the measurements are much more

7    clearly defined and discernible from the photographs and

8    this is just -- it's confusing.  It's confusing.  It has no

9    place.

10             THE COURT:  At the risk of being confusing, I

11   will permit it.

12             MR. CANTOR:  That one?

13             THE COURT:  Just that one.

14             MR. CANTOR:  Can I see it?

15             (Handing.)

16             MR. CANTOR:  Now, was this prepared by the

17   doctor?

18             MR. ROSENFELD:  Yes.

19             MR. CANTOR:  Yes, it was.

20             THE COURT:  All right.

21             MR. CANTOR:  I intend to read it, Judge, so maybe

22   I can bring something to your attention.

23             THE COURT:  Well, if it can save time later, by

24   all means.

25             MR. CANTOR:  It has all sorts of medical ease on

tr/d  Proceedings

1   it.  I note my exception.

2              THE COURT:  That's why we have an expert.

3              MR. CANTOR:  She is a witness until your Honor

4   says she's an expert.

5              (Whereupon, the following takes place, on the

6   record, in open court, in the presence of the Court, the

7   assistant district attorneys, defense counsel, the

8   defendant and the jury.)

9              THE COURT:  Good afternoon.

10             JURORS:  Good afternoon.

11             THE COURT:  Mr. Clerk.

12             THE CLERK:  Case on trial continued, People of

13  the State of New York against David Delgado, district

14  attorney's office, defense counsel, defendant and the sworn

15  jurors are all present.

16             MR. ROSENFELD:  At this time, may I have these

17  items premarked 17-A, B following.

18             THE COURT:  A through?

19             MR. ROSENFELD:  17 and then A through H.

20             THE COURT:  Very well.

21             MR. ROSENFELD:  17 and then 17-A through H.

22             THE COURT:  All right.  You may call your next

23  witness.  Continuing, ladies and gentlemen, does anyone

24  have anything to report?  Can you all assure the Court you

25  have followed its instructions?

```
 1                      JURORS:  Yes.

 2                      THE COURT:  Very good.

 3                      MR. ROSENFELD:  Judge, may we go ahead and

 4          premark?

 5                      THE COURT:  Yes.

 6                      (Whereupon, the items referred to were marked

 7          People's Exhibit Numbers 17-A through 17-H for

 8          identification.)

 9                      COURT OFFICER:  Witness entering.

10                      (Whereupon, the witness entered the courtroom and

11          takes the stand.)

12                      THE CLERK:  Do you solemnly swear the testimony

13          you give to this Court shall be the truth, the whole truth

14          and nothing but the truth, so help you God?

15                      THE WITNESS:  I do.

16                      COURT OFFICER:  Witness gives her name as Dr.

17          Carolyn Kappen, K-A-P-P-E-N, Office of Chief Medical

18          Examiner of the City of New York.

19                      THE COURT:  Good afternoon, Doctor.

20                      THE WITNESS:  Good afternoon.

21                      THE COURT:  Just sit back, be comfortable, ma'am,

22          you know the routine.  Answer only what is asked.  Keep

23          your voice up.

24                      THE WITNESS:  Okay.

25                      THE COURT:  You may inquire.
```

1  DIRECT EXAMINATION

2  BY MR. ROSENFELD:

3      Q    Good afternoon, Dr. Kappen.

4      A    Good afternoon.

5      Q    Dr. Kappen, how long have you been with the Medical

6  Examiner's office?

7      A    July 1st it was 15 years.

8      Q    Could you please explain the function of the medical

9  examiner's office and your specialty?

10     A    Sure.  The Office of the Chief Medical Examiner is run

11 by the City of New York in this jurisdiction.  It's not

12 affiliated with any other hospital.  My paycheck comes from the

13 City of New York or unbiased in determining what we do.

14             MR. CANTOR:  Judge, she's facing the jury.  It

15         tends to drop.

16             THE COURT:  Keep your voice up.

17             MR. CANTOR:  So if she could keep addressing it

18         forward.

19             MR. ROSENFELD:  Objection to defense counsel

20         giving instructions.

21             MR. CANTOR:  It's an application, Judge.

22             THE COURT:  She'll speak a little louder.

23             MR. CANTOR:  That's all.  Why do I have to --

24             THE COURT:  Why do you have to keep speaking?

25             MR. CANTOR:  Why does he?

1    MR. ROSENFELD:  Objection.

2    MR. CANTOR:  I'd like to hear it.  I'd like my

3    client to hear it.

4    THE COURT:  Do you hear it, Mr. Delgado?

5    THE DEFENDANT:  I can't barely hear it.

6    THE COURT:  All right.  She'll keep her voice up.

7    If she shouldn't reach that far, just raise your hand.

8    THE DEFENDANT:  Okay.

9    A    At the Office of Chief Medical Examiner, as a medical

10   examiner we're employed to determine the cause of death when

11   someone dies and the manner of death when someone dies, whether

12   it's a natural death, a complication of therapy, an accident, a

13   suicide or a homicide.

14   Q    Could you please explain what forensic and anatomical

15   pathology is?

16   A    Sure.  First I'll start with anatomical pathology.

17   Pathology is a subspecialty of medicine, sort of like surgery

18   is a subspecialty of medicine.  Surgeons perform operations.

19   Pathologists study disease.  Pathologists often work in

20   hospitals.  They run the laboratory.  They oversee the

21   laboratory if they draw your blood or urine and the testing on

22   it.  If you have a tumor, it's removed by a surgeon, but it's

23   brought to the pathologist to look at it specially fixed under

24   a microscope to determine whether it's cancer or not.  That's

25   general pathology.  And specifically, anatomical pathology

1   where they're looking at tumors under the microscope.

2           Then there's a subspecialty in pathology called

3   forensic pathology and that's when you get specialized training

4   to look at injuries, to look at gunshot wound type of injuries,

5   blunt impact injuries such as lacerations, contusions and

6   abrasions, sharp force injuries.

7           MR. CANTOR:  Sharp force?

8   A    Injuries.

9           MR. CANTOR:  Sharp force?

10  A    Injuries.

11          MR. CANTOR:  Sharp force injuries?  I couldn't

12  hear.

13          THE COURT:  I believe that's what she said.

14          MR. CANTOR:  Okay.  Sharp force injuries.

15  A    And that is all part of forensic pathology, and that

16  is most importantly taught to you as a pathologist to determine

17  the cause of death when someone dies and the manner of death

18  when someone dies.

19  Q    Thank you, Doctor.  Could you please tell the ladies

20  and gentlemen of the jury your background and your training.

21  A    Sure.  I did an undergraduate degree in medical

22  technology.  I then went on to medical school.  I did my

23  pathology residency training program for three and a half years

24  at St. Luke's Roosevelt Hospital in Manhattan.  After I did

25  that, I spent a year in a specialized training program in

1   pathology called forensic neuropathology, that's the study of

2   trauma to the brain, I did that for one year at the Office of

3   Chief Medical Examiner in Manhattan.

4          After that year, I did a specialized fellowship

5   training program in pathology called forensic pathology, that

6   was for one year, that was also done at the medical examiner's

7   office in Manhattan.  After I finished those two years, I then

8   worked five years at the Office of the Chief Medical Examiner,

9   but in our Brooklyn office, five years I spent there.  And then

10  I've been in the Bronx for the last seven.

11      Q    Thank you, Doctor.  Are you licensed to practice

12  medicine in New York?

13      A    Yes, I am.

14      Q    Can you please explain what an autopsy is?

15      A    Sure.  An autopsy is the external examination and the

16  internal examination of the body.  It starts first by just

17  looking at the body with your eyes and noting physical

18  attributes such as height, weight, hair color, eye color, any

19  therapy on the outside of the body, any natural disease, any

20  injuries.

21         Then after the external examination is done, a Y

22  incision is made on the body and that's what you've probably

23  seen in movies or television where the Y starts at one shoulder

24  and the other shoulder, comes down to the chest and goes down

25  the abdomen that allows you to look at all the internal organs

1   of the abdomen for any natural disease or injury.  And then we

2   do a different type of incision on the head to be able to look

3   at the brain importantly for injury or disease.  And that's the

4   internal aspect of the autopsy.

5

6               (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

People - DR. CAROLYN KAPPEN - voir dire

1549

1    Q.   Doctor, approximately, how many autopsies have you

2  performed in your career?

3    A.   Last that I counted I performed, approximately, 2000

4  autopsies in my career.

5    Q.   And you have -- have you performed autopsies involving

6  stab wounds?

7    A.   Yes, I have.

8    Q.   Can you give a number or percentage approximately?

9    A.   You know I really can't, I didn't take the time to

10  count them knowing this question.

11    Q.   Okay.  Doctor, have you testified as an expert before

12  in the courts?

13    A.   Yes, I have.

14    Q.   Have you testified here in Supreme Court?

15    A.   Yes, I have.

16    Q.   And have you testified in other courts either here in

17  Bronx County or other places?

18    A.   Yes, I have.

19    Q.   And what courts have you testified in?

20    A.   I've testified in Supreme Court and Family Court in

21  Brooklyn, the Bronx, Queens and Manhattan.  I've also testified

22  in courts in Westchester County, White Plains.

23    Q.   And when you've testified in these courts have you

24  been declared a expert in anatomic and forensic pathology?

25    A.   In forensic pathology, okay.

E-1jb

People - DR. CAROLYN KAPPEN - voir dire

1550

1   Q.   And, Doctor, do you continue your training as you work

2   in the medical examiners office?

3   A.   Yes, with ongoing continuing education.

4   Q.   Okay.  Do you perform that education or teach or you

5   go to courses; how does that's work?

6   A.   It's a combination of the three.  We get guest

7   lectures coming in seminars that we have weekly.  You can also

8   attend conferences if you chose to, reading things like that.

9   Q.   Did you attend conferences?

10  A.   Rarely, just because I'm too busy working, but you

11  know I have in the past.

12  Q.   Thank you.

13          MR. ROSENFELD:  Your Honor, at this time I move

14      that Dr. Kappen's testimony be accepted as expert testimony

15      in forensic pathology such that she state her opinion --

16          MR. CANTOR:  Certainly so, your Honor.

17          THE COURT:  All right.  Based on education,

18      training and experience without objection she is so

19      declared an expert in the field of pathology.

20          MR. CANTOR:  Forensic pathology.

21          THE COURT:  Forensic pathology.

22          MR. ROSENFELD:  Thank you.

23          MR. CANTOR:  Will you explain to the jury what

24      that allows her to do?

25          THE COURT:  She's given ample.

E-ljb

**People - DR. CAROLYN KAPPEN - direct**

1551

1      MR. CANTOR:  I'm sorry.

2      THE COURT:  She's given ample.

3      MR. CANTOR:  She can offer opinion ···

4      THE COURT:  Yes, she can, of course.

5      MR. CANTOR:  -- as an expert witness.

6      MR. ROSENFELD:  May I continue?

7      THE COURT:  Yeah, sure.

8      MR. ROSENFELD:  Thank you.

9  DIRECT EXAMINATION

10  BY MR. ROSENFELD:

11      Q.   Dr. Kappen, pursuant to your duties as medical

12  examiner did there come a time that you conducted an autopsy on

13  an individual by the name of George Talavera on or about

14  December 25, 2009?

15      A.   Yes, I did.

16      Q.   And where was that performed?

17      A.   That was performed at the Office of the Chief Medical

18  Examiner in the Bronx office where I work.

19      Q.   And was that autopsy case given a medical examiner's

20  case number?

21      A.   Yes, it was.

22      Q.   And what was the case number assigned?

23      A.   It was BX for the Bronx 09 for 2009, 5090.

24      Q.   Doctor, prior to coming to court today have you had an

25  opportunity to review your autopsy report and photos that were

E-1jb

**People - DR. CAROLYN KAPPEN - direct**

1552

1    taken during the autopsy of George Talarvera?

2       A.   Yes, I did.

3       Q.   What is an MLI?

4       A.   An MLI is the acronym for medical legal investigator.

5       Q.   And what does an MLI do, he or she?

6       A.   They are employed by our office to go to scenes and to

7    receive information from doctors when there is a detective that

8    by law needs to be reported to our office.

9       Q.   And based upon your review of this case did a medical

10   legal examiner respond to 2033 McGraw Avenue, apartment 3D on or

11   about December 25, 2009?

12              MR. CANTOR:   I mean if she personally knows and

13         was there I have no objection, but if it's based on hearsay

14         I certainly do object.

15              THE COURT:   The objection is overruled.

16              MR. CANTOR:   Won't you allow the prefatory

17         question to be asked was she there?

18              THE COURT:   You may.

19              MR. CANTOR:   Thank you.

20      Q.   You didn't go to those crime scenes, did you?

21      A.   No, I'm sleeping because I have to perform the autopsy

22   in the morning.  They go in the middle of the night.

23              MR. CANTOR:   So any questions dealing with the

24         medical or legal investigator would be based upon hearsay.

25         She was not present and thus, I would raise an objection

E-ljb

People - DR. CAROLYN KAPPEN - direct

1553

1      and maybe --

2                  MR. ROSENFELD:  Objection to this colloquy.

3                  MR. CANTOR:  It may be one word.

4                  MR. ROSENFELD:  One word.

5                  MR. CANTOR:  It may be premature, but I am

6      objecting.

7                  MR. ROSENFELD:  Objection to this colloquy.

8                  THE COURT:  Yes, yes.  Your objection is

9      overruled firstly.

10                 MR. CANTOR:  She wasn't there, Judge.

11                 THE COURT:  I said your objection is overruled.

12     No need to editorializing.

13                 MR. CANTOR:  Exception.

14                 THE COURT:  Noted.

15     BY MR. ROSENFELD:

16         Q.    Were you able to give an answer did the medical legal

17     investigator respond to that scene?

18         A.    Yes, they did.

19         Q.    And did you review notes from the medical legal

20     investigator report?

21         A.    Yes, I did.

22         Q.    And prior to coming to court today have you and I had

23     an opportunity to discuss this case in preparation for trial?

24         A.    Yes.

25         Q.    And did you have an opportunity to review your autopsy

E-ljb

People - DR. CAROLYN KAPPEN - direct

1554

1    report and notes?

2        A.   Yes, I did.

3        Q.   You have an opportunity to review any photographs from

4    the crime scene?

5        A.   Not from the crime scene, but from the -- what our

6    medical legal investigator took pictures of at the scene for our

7    triage in the morning of the case and it's disposition.

8                MR. CANTOR:  I can't hear when she turned to you

9        and it's --

10               THE WITNESS:  Disposition.

11       Q.   When, I'm sorry?  Before you began your autopsy did

12   you take pictures of George Talarvera's body?

13       A.   I didn't, but we have a photographer that's employed

14   to do so.

15       Q.   And was that done in your presence?

16       A.   Yes.

17       Q.   Now, when you began your autopsy what was the first

18   thing that you did?

19       A.   I verify the identification of the medical examiner's

20   case number.

21       Q.   Please continue, then what?

22       A.   Then the physical attributes are noted:  Height,

23   weight, hair color, eye color, external examination of the body.

24   Then I note, I write down any postmortem changes, scars,

25   tattoos, clothing and after that therapeutic procedures and then

People - DR. CAROLYN KAPPEN - direct

1555

1    most importantly in this case injuries.

2        Q.   Okay.  Let's start with the external examination.  Can
3    you please tell us what the results of your external examination
4    was?

5        A.   Well, the decedent was well nourished, well developed.
6    He was six foot and 167 pounds.  He had lightly pigmented skin
7    and straight black hair shaved close to the scalp, quarter inch
8    mustache and beard.

9        Q.   And you mentioned about postmortem changes; what is
10   that?

11       A.   Postmortem changes are the changes that occur after
12   death; one of them is called rigor mortis, that's the stiffening
13   of the body after that I evaluated.  Rigor mortis is the
14   settling of the remaining blood in the body after that I also
15   noticed and then the basically touching the body and noting,
16   getting a generalized temperature of the body.

17       Q.   Doctor, you mentioned there was clothing submitted
18   with the body?

19       A.   He was received in clothing.

20       Q.   Could you tell us what clothing you received him in?

21       A.   Sure, he was received in sweatpants with boxer
22   underwear.

23            MR. CANTOR:  Judge, the witness is reading from
24       something.

25            THE COURT:  That's permissible.  Just tell us

E-ljb

People - DR. CAROLYN KAPPEN - direct

1556

1    what it is.

2              MR. CANTOR:  No, Judge, I was going to say --

3              THE WITNESS:  It's the --

4              MR. CANTOR:  I was going to say I have no

5    objection given the multitude of her duties.

6              THE COURT:  Yes.

7              MR. CANTOR:  If she reads.

8              THE WITNESS:  It's the autopsy report that I

9    dictated and prepared.

10             THE COURT:  Dated?

11             THE WITNESS:  The 25th of December, the date that

12   I did it and I can tell you the date I signed it if you

13   needed that.

14             MR. CANTOR:  What year was that, Judge?

15             THE WITNESS:  2009.

16             THE COURT:  Mr. Rosenfeld.

17   Q.   Yes, you may continue, Doctor.

18   A.   Apart from the sweatpants he had socks on and boots.

19   Accompanying his body was a bloody white T-shirt, a green

20   bloodstained outerwear jacket, a tan sweatshirt and a red

21   T-shirt.

22   Q.   All right.  Once you've completed your external

23   examination of the body did you then begin an internal

24   examination -- I'm sorry, let me withdraw that, I'm sorry.  In

25   continuing your external examination of the body did you note

E-1jb

People - DR. CAROLYN KAPPEN - direct

1557

1    injuries to the body?

2        A.    Yes, the decedent was undressed, cleaned off,

3    photographed and I noted immediately there were five stab wounds

4    to his body from his neck up.

5                MR. ROSENFELD:  At this time I am going to ask

6        the witness be shown People's Exhibit 17.

7                (Whereupon the requested exhibit was shown to the

8        witness.)

9        Q.    Doctor, looking at People's 17 can you please identify

10   what it is that you are holding?

11       A.    Sure, this is a diagram that I used to illustrate the

12   stab wounds on the decedent during the autopsy.

13       Q.    That's the diagram that you created?

14       A.    Yes.

15       Q.    And is that a fair and accurate and proper diagram of

16   the injuries as you noticed them back on December 25th of 2009?

17       A.    Well, this diagram shows the stab wounds on the sides

18   and the front of the decedent.  It doesn't show the stab wound

19   to the back of the head or the contusions on the back of the

20   head.

21       Q.    Okay.  So for purposes of the -- everything except the

22   back of the head injuries that you just described is that a fair

23   and accurate description?

24       A.    Yes.

25                MR. ROSENFELD:  Your Honor, at this time I move

E-ljb

People - DR. CAROLYN KAPPEN - direct

1558

1    People's Exhibit 17 into evidence.

2            THE COURT:  Share it with Mr. Cantor.

3            MR. CANTOR:  No objection.

4            THE COURT:  There being no objection it is so

5    moved and proffered into evidence and received as such.

6            (A diagram of the decedent was received and

7    marked for in evidence as People's Exhibit 17.)

8            COURT OFFICER:  People 17 in evidence so marked.

9            MR. ROSENFELD:  Your Honor, at this point I am

10   going to publish People's Exhibit 17.

11           THE COURT:  You may.

12           (Whereupon the diagram is published to the jury

13   at this time.)

14   Q.   Okay.  Doctor, just to start out, can you give us

15   using People's Exhibit 17 a point out of the different injuries

16   that you observed as you did your external examination?

17   A.   Sure, may I stand up?

18           MR. ROSENFELD:  Your Honor, may the witness

19   please rise and stand up next to the TV?

20           THE COURT:  Yes.

21           THE WITNESS:  May I use my notes?

22           THE COURT:  You may consult your notes.

23           THE WITNESS:  Thank you.

24           MR. CANTOR:  Can she keep her voice up, your

25   Honor?

E-ljb

People - DR. CAROLYN KAPPEN - direct

1559

1        THE COURT:  And please keep your voice up.

2        THE WITNESS:  I sure will.

3    A.   So the first stab wound to the decedent is on the

4    right side of his face, that's this diagram here (indicating).

5        MR. ROSENFELD:  Indicating the diagram on the

6        left.

7        THE COURT:  So indicating.

8    A.   And there is an R above it so, you know, its the right

9    side.  Here is the ear (indicating) and the right side of the

10   face.  Here is the diagram (indicating0 and I wrote in right

11   here that there is a stab wound, right.  Actually I put it not

12   in the best spot, I am not a good artist.  It's actually in

13   front of the ear a little bit (indicating) and that is that stab

14   wound (indicating), I described as being on the right side of

15   the jaw.  That stab wound was five -- it's an inch in length and

16   then we always take measurements from the top of the head to

17   where the injury is and right or left of the midline.  This

18   injury (indicating) was seven-and three-quarters inches below

19   the top of the head.  Three inches right at the midline I wrote

20   in my notes there (indicating) that it approximated a depth of

21   about two inches and that the edges (indicating) of the injury

22   were pointed.

23   Q.   What does that mean?

24   A.   Just that there wasn't a blunted edge on the knife.

25       MR. ROSENFELD:  Indicating the witness has

E-ljb

People - DR. CAROLYN KAPPEN -- direct

1560

1    pointed, again, to the right side and again pointed to the

2    various areas on the diagram of the face as she has been

3    speaking so I won't note them separately.

4              THE COURT:  So indicated.

5    Q.    Please continue, that's the one you observed.  After

6    that?

7    A.    On this diagram I marked it L, that's for left because

8    he is showing the left side of the face and here you see I made

9    like a dark mark (indicating) in through the ear lobe.  There

10   was a three-quarter inch vertical stab wound in the lower aspect

11   of the left ear lobe.  It transected the ear lobe completely.

12   This stab wound I measured five-and a-half inches below the top

13   of the head and it was, approximately, three-and a-half inches

14   left of the midline behind the ear.  You see this little X here

15   (indicating) this was a-half inch X that was behind the left ear

16   lobe because the knife when it went through the ear lobe --

17             MR. CANTOR:  Judge, I keep -- I am going to

18        object to the word knife, can we use the word instrument?

19             THE COURT:  I will allow her to testify the best

20        way.

21             MR. CANTOR:  She does not know if it was a knife.

22             THE COURT:  Your objection is overruled.

23   A.    Went through the ear lobe and made an X in the skin

24   (indicating) as an incised wound behind it so that was in the

25   left ear.  Then on the left side of the neck, that's this

People - DR. CAROLYN KAPPEN - direct

1561

1  (indicating) that I tried to draw in here which was eight inches
2  below the top of the head and three inches on the left side of
3  the neck, this (indicating) was the lethal stab wound, it was
4  five eighths of an inch.  This stab wound went into the
5  musculature of the left side of the neck.  It also injured the
6  two major vessels in the left side of the neck, the carotid
7  artery and the jugular vein.  It also went in deep enough that
8  it perforated the larynx, that's the tube you breathe with.
9  There were stab wounds in the larynx near the vocal cords that
10  was hemorrhaged, a lot of hemorrhage in the neck musculature and
11  surrounding the left side of the larynx.  I also saw that there
12  was approximately 200 cc's of blood and blood clot in the
13  stomach, which he swallowed into his stomach.  There was a
14  geographical distribution like a checkered sort of red and blue
15  pattern of the lung because he was breathing the blood into his
16  lungs and it is descriptively seen on the autopsy.  This stab
17  wound on the left side of (indicating) the neck went in
18  approximately three inches and the direction of this stab wound
19  was left to right and downward.  So, that's one, two, three,
20  four (indicating) is on the right side of the nose.  It was a
21  one-and a-quarter inch by one-and a-quarter inch irregular
22  jagged T-shaped stab wounds of the right side of the nose and
23  upper lip.  This stab wound (indicating) was six inches below
24  the decedent top of his head and it was approximately in the
25  midline of his nose (indicating) and it extended to one inch

E-ljb

People - DR. CAROLYN KAPPEN - direct

1562

1   right of the midline.  This stab wound (indicating) went in

2   approximately three inches and it had a front to back and left

3   to right direction.  So those are the four stab wounds on the

4   right, left and front of his face and then the only one is the

5   one on the back of the head that I didn't describe.

6        Q.    Okay.  We will get to that in a moment, thank you.

7        Doctor, you used the word hemorrhage.  Can you please

8   explain what hemorrhage is?

9        A.    Sure.  When an injury -- a traumatic injury occurs

10  blood vessels are injured and blood leaves the vasculature, it

11  leaves the blood vessels, the arteries and veins, it goes into

12  the soft tissue that's hemorrhage.

13       Q.    Okay.  What is the exsanguination?

14       A.    Exsanguination is when the body bleeds externally

15  and/or internally due to usually a traumatic injury.

16       Q.    And was there evidence of internal exsanguination in

17  this case?

18       A.    Sure, the internal exsanguination you can see or I saw

19  at the autopsy there was hemorrhaged in the left side of the

20  neck corresponding to this (indicating) lethal stab wound and

21  there was also blood in the stomach.  So he was bleeding

22  internally into his stomach.  There was blood in the lungs, he

23  bled into his lungs and there was also evidence of external

24  exsanguination because there is blood on the clothing from the

25  scene photos that the medical legal investigator took.  I could

E-ljb

People – DR. CAROLYN KAPPEN – direct

1563

1    see blood was sprayed and dripping down the walls, the table, a

2    chair, a couch and all over the floor.

3        Q.    What would cause the blood to be shot out from the

4    body, my word so-to-speak, causing this exsanguination?

5        A.    I mean the blood especially when a major vessels are

6    hit, in this case the jugular vein was hit, that would allow a

7    lot of blood to come out externally and, you know, internally

8    and also then when a major artery in the carotid arteries.  On

9    both sides (indicating) of the neck are major arteries, when

10   they're injured blood will actually spray out.

11       Q.    Okay.  And these were injured in this case?

12       A.    Yes.

13            MR. ROSENFELD:  Indicating, your Honor, as the

14       witness has been speaking I have not stopped to show where

15       she is pointing.  She has been pointing to the area, she is

16       describing on her neck as she described those arteries and

17       the jugular vein.

18            THE COURT:  So indicated.

19       Q.    All right.  Doctor, let's -- first of all, you've

20   indicated there has been four injuries you described here and

21   the fifth was the back of the head, correct?

22       A.    Correct.

23       Q.    You used the word knife before, are these injuries

24   consistent with a knife or similar instrument?

25       A.    Well, with a knife, yes.

E-ljb

People - DR. CAROLYN KAPPEN - direct

1564

1    Q.   Okay.  Why are these injuries consistent with a knife?

2    A.   Well, first of all, they're stab wounds by definition.

3    They go in deeper into the skin and into the body than they are

4    on the surface of the skin, that's a forensic definition and

5    then they're ragged in a sense, but for the most part they're

6    straight, they've got pointed edges, that's very consistent with

7    a knife not a jagged bottle, that would look very different.

8    Not an ice pick that would look very different.

9    Q.   And, again, in talking about these five injuries is

10   there anyway for you to determine the order of these injuries as

11   they occurred to the deceased?

12   A.   No.

13   Q.   And why is that?

14   A.   I wasn't there, I didn't see it and, you know, some of

15   them -- well, the lethal one, you know, caused his death, that's

16   all I can say, but I can't say which in the five that he

17   received, where that was in that order.

18   Q.   All right.  I am going to show you what has been

19   marked People's Exhibit 17B.  Looking at People's Exhibit 17B

20   can you please indicate what we're looking at?

21   A.   Sure, that's the stab wounds that I described on the

22   right side of the nose.

23   Q.   Okay.  And the nature and extent of the stab wounds if

24   you could stand up and get chores and point out?

25   A.   Sure.

E-ljb

People - DR. CAROLYN KAPPEN - direct

1565

1    Q.    Where it goes from?

2    A.    This stab wounds goes across here (indicating).   There

3    is a little tail, which is just on the surface of the nose.   It

4    goes through the nose and it goes through this upper lip and you

5    can see the mustache here (indicating).

6    Q.    And People's Exhibit 17A please indicate what we are

7    looking at?

8              MR. CANTOR:   That is not 17A, Judge.

9              MR. ROSENFELD:   Seventeen-A.

10             MR. CANTOR:   Is the M.E. sketch.

11             THE COURT:   Seventeen was the sketch.

12             MR. CANTOR:   Seventeen-A is the doctor's sketch.

13             THE COURT:   All right.   Let's clarify.

14             MR. ROSENFELD:   Seventeen is the sketch.

15             THE COURT:   That's what I thought.

16             MR. ROSENFELD:   Seventeen-A is being published

17    now.

18             THE COURT:   Very good.

19             MR. ROSENFELD:   And before that I published 17-B.

20             THE COURT:   You may continue with that.

21    A.    So this (indicating) is the same stab wound that we

22    saw to the right side of the nose in the previous photo, but I,

23    of course, have to pull it apart to examine it to get a

24    measurement of it, to get a depth of it and that's what I was

25    looking at.   It's really just in the soft tissue, it didn't hit

E-ljb

People - DR. CAROLYN KAPPEN - direct

1566

1    any major vessels.  It wasn't included for the cause of death.

2        Q.    And would that type of injury cause pain to an

3    individual?

4                    MR. CANTOR:  Objection.

5                    THE COURT:  Overruled.

6        A.    It would cause some pain and it would cause some

7    bleeding, but not major bleeding.

8        Q.    Thank you.  All right.  Doctor, thank you.  You may

9    stand, it may be easier.  I am going to show People's Exhibit

10   17C.

11                   MR. ROSENFELD:  May we approach a moment, your

12       Honor, before I continue?

13                   THE COURT:  Surely.

14                   (Whereupon there is an off-the-record

15       discussion.)

16                   THE COURT:  Doctor, would you step off the stand?

17                   THE WITNESS:  Sure.

18                   (Whereupon the witness exits the witness stand

19       and there is an off-the-record discussion.)

20                   THE COURT:  Doctor, please.

21                   (Whereupon the witness resumes the witness

22       stand.)

23       Q.    Again, so the two previous items were referred to as

24   17A and 17B in evidence.  I am now going to show People's

25   Exhibit 17C in evidence.  Please indicate, Doctor, what we're

E-ljb

People - DR. CAROLYN KAPPEN - direct

1567

1  looking at in this photograph?

2      A.   We're looking at the decedent's, this is the left side

3  of his head (indicating) as you can orient yourself.  Here is

4  his left ear (indicating), here is the stab wounds (indicating)

5  I described going through his left ear lobe and here is the

6  (indicating) lethal stab wound with a tail, a one inch tail on

7  it, that's on the left side of the neck.  This is the stab wound

8  (indicating) that hit the jugular vein, the carotid artery and

9  caused the internal hemorrhage and is the cause of death.

10     Q.   The injury to the ear, Doctor, specifically what

11 happened to the ear in this injury?

12     A.   It perforated the ear completely and you can't see in

13 this picture, but behind the ear there is an incised wound on

14 the scalp like behind the ear where the knife actually hit.

15          MR. CANTOR:   Judge, I keep on objecting to the

16     word knife.  She was not there, it could have been any

17     sharp instrument.

18          THE COURT:   The Court will note your continuing

19     objection.

20     Q.   Well, let's look specifically at People's Exhibit 17E

21 in evidence.  Go ahead, Doctor.

22     A.   So here is the close up (indicating) of the ear and

23 how it was cleanly --

24          MR. CANTOR:   Is this D or E?

25          MR. ROSENFELD:   I just stated what it was, I said

E-ljb

People - DR. CAROLYN KAPPEN - direct

1568

1       E.

2       Q.   Go ahead.

3       A.   Cleanly transected and then you can see a little bit

4    of the wound behind the ear, but not clearly that it made when

5    it went through the ear onto the scalp.

6              MR. ROSENFELD:  And, again, the witness has

7         pointed to the right side of the ear in the right side of

8         the photograph?

9              THE COURT:  So indicated.

10      Q.   Now, publishing People's Exhibit 17D in evidence.

11   Please indicate what we are looking at here.

12      A.   And that's sort of sideways, this label (indicating)

13   should be straight.

14      Q.   I'm sorry --

15             MR. CANTOR:  I can't hear that, I am sorry.

16             MR. ROSENFELD:  She asked me to turn the

17        photograph around.

18             MR. CANTOR:  I would like the witness to keep her

19        voice up, I would like my client to hear.  Would you have

20        the reporter to read it back or the witness repeat it?

21             THE COURT:  Read back the last question and

22        answer.

23             (Whereupon the last question and answer were read

24        back by the reporter.)

25             MR. ROSENFELD:  May I continue?

E-ljb

People - DR. CAROLYN KAPPEN - direct

1569

1    THE COURT:  Yes, sir.

2    Q.    Again, looking at People's 17D, I have straighten it

3    out, go ahead, Doctor.

4    A.    This is a close up of the stab wounds on the left side

5    of the neck.  This was the stab wound that perforated or injured

6    the carotid artery, jugular vein and caused a lot of hemorrhage

7    in the left side of the neck and the bleeding.

8    Q.    This is 17F in evidence.  Please indicate what we are

9    looking at.

10   A.    This is the right side of the face and you can see the

11   right ear.  This is the jaw line and this is the stab wound that

12   was on the right side of the face) (indicating) in the jaw line,

13   just a little bit in front of the ear, but in a jawline.  This

14   stab wound caused some perforation of vessels, but I didn't

15   include it in the cause of death.

16   Q.    Going back to the injuries to the ear would that type

17   of an injury to an individual cause pain?

18   A.    Yes.

19   Q.    Would it cause bleeding?

20   A.    Yes.

21   Q.    How about the injury to the neck would that cause

22   pain?

23   A.    Yes.

24   Q.    And this injury that we're looking at here in People's

25   Exhibit 17F would that cause pain to an individual?

E-ljb

1      A.    Sure, nerves are sensitive and they were injured.

2      Q.    Okay.  Doctor, you indicated there was injury to the

3   back of the head?

4      A.    Correct.

5      Q.    I ask you to look at People's Exhibit 17G in evidence.

6   If you would 17G demonstrate what you were referring to?

7      A.    Sure, this is the back of his head.  Of course, here

8   is the nape of his neck.  Here is the stab wound on the back of

9   his neck.  This stab wound went in approximately two inches and

10  you can see there is a little less hair here, I shaved that away

11  so that we could see the injury clearly.  This stab wound has a

12  little defect on the edge of it.  Also, there are contusions,

13  you can see the red areas of the contusions in the scalp and

14  there were three of them.

15     Q.    Please ex --

16           MR. CANTOR:  And this was what?

17           THE WITNESS:  There were three of them.

18     Q.    Please explain what you mean by contusions?

19     A.    A contusion is a red area, it's a bruise, its from

20  blunt impact, it's not from a sharp injury.

21     Q.    Would that type of injury be consistent with an

22  individual hitting his head against a hard surface?

23     A.    Yes, very much so.

24     Q.    Could that injury also be consistent with somebody

25  hitting that area with a closed fist?

People - DR. CAROLYN KAPPEN - direct
1571

1    A.   Yes, very much so.

2    Q.   And you say there were how many of those areas on his

3 head?

4              THE WITNESS:  Can I consult my notes?

5              THE COURT:  By all means.

6    A.   Just to make sure I don't miscount.  I wrote that

7 there were three, approximately, one-half inch contusions on the

8 back of the head.

9    Q.   Finally, Doctor, directing your attention to People's

10 Exhibit 17H in evidence please explain what we are looking at in

11 detail.

12   A.   This is just the close up encloser of the stab wound

13 to the back of the head (indicating) and you just see it closer

14 and you can see I shaved the hair away just to get a good

15 example of what it looked like to take measurements.

16   Q.   You mentioned about a defect or tail, I believe, you

17 referred to; what do you mean by that?

18   A.   That's this here (indicating) because the stab wound,

19 you know, can look a little -- it can look like just a simple

20 stab on the skin surface and many of these wounds there is a

21 little tail (indicating), that's when the tip of the blade just

22 scrapes the surface of the skin because there is always motion,

23 the person doing the action of the stabbing and the person

24 that's getting stabbed can easily be in motion and that causes

25 this little tear (indicating) to occur with the sharp

E-1jb

People - DR. CAROLYN KAPPEN - direct

1572

1    instrument.

2        Q.   Thank you very much, Doctor, you can be seated.

3        A.   Thank you.

4        Q.   Doctor, from looking at the injuries to the deceased

5    is it possible to tell what position he was in when those

6    injuries were inflicted on him?

7        A.   Well, at the time that he received the stab wound to

8    his nose, you know, the direction of it helps somewhat

9    approximate it since it's at the front of his body, that was the

10   exposed area so there is somewhat you can state about the

11   position of the body, but exactly what position, no.

12       Q.   And why is it that you can't determine it from the

13   injuries?

14       A.   Because they're not specific enough and they never

15   would be or people are moving continuously.  Well, you would,

16   you know, expect him to be, that he is standing and on his feet

17   and he ends up on the ground.

18       Q.   Doctor, could you please explain what toxicology is?

19       A.   Sure, the toxicology is the chemical testing that we

20   do on specimen that we obtain at the autopsy.

21       Q.   And were specimen for the autopsy sent for forensic

22   toxicology evaluations?

23       A.   Yes, they were.

24       Q.   And did you receive the results of that toxicology

25   report?

E-ljb

People - DR. CAROLYN KAPPEN - direct

1573

1      A.    Yes, I did.

2      Q.    And would you please explain what ethanol is?

3      A.    Ethanol is alcohol.

4      Q.    And in terms of forensic toxicology reports how is

5   that characterized in terms of whether it is in the blood, the

6   human urine and the vitreous humor?

7      A.    We test various specimen at the autopsy.  In this case

8   the blood was tested and we have a pretty good idea from

9   laboratory data what values should be of ethanol in the blood or

10  shouldn't be.  Urine was also tested just to confirm because

11  this case might be in court it has to be confirmed in other

12  specimen and by different methodologies.  So it's tested in

13  urine and it's tested in vitreous, which is the blood in the

14  eye.  The only value we really look at with ethanol or alcohol

15  is the blood ethanol or alcohol level.

16     Q.    Why is that?

17     A.    Because urine you don't always excrete out all of the

18  urine at a single void so that's not really accurate for

19  quantifying any value of any drug.

20                  (Continues next page.)

21

22

23

24

25

E-1jb

jo-f          **DR. KAPPEN-PEOPLE-DIRECT**

1    Q.    And what's the vitreous humor, and why wouldn't you do

2    that?

3    A.    The vitreous, you can use that in a sense, the value.

4    And vitreous is usually higher because alcohol distributes more

5    in water, and there is more water in the vitreous fluid than

6    there is in the blood.

7    Q.    So in terms of the toxicology report for George

8    Talarvera what is the ethanol level that was reported?

9    A.    The ethanol level reported in his blood was .27 grams

10   percent.

11   Q.    Could you please explain what that means in lay

12   person's term?

13   A.    Sure.  I don't know if you mean a generalization.  The

14   legal limit to drive in New York State is .08.  His is .27.  So

15   it's more than three times the legal limit or legal limit to

16   drive just to give you an idea.  He was drinking.

17   Q.    Is it possible to tell from that number how much he was

18   drinking before his death?

19   A.    Not exactly, no.

20   Q.    And what are cannabinoids?

21   A.    The cannabinoids is marijuana or pot.

22   Q.    And according to the forensic toxicology report was

23   there any results of that in the examination?

24   A.    Yes.  The cannabinoids were detected in his blood.

25   They detected it and confirmed it in the urine as well.

jo-f          **DR. KAPPEN-PEOPLE-DIRECT**

1    Q.    What does that mean detected as oppose to having a

2    specific number or so?

3    A.    Well, we never quantify cannabinoids for many reasons.

4    One is because it's usually insignificant in a cause of death.

5    You can't overdose on marijuana.  We just want to have this

6    there for completeness to show everything that we found.  So

7    it's deemed detected in the blood and detected -- it was

8    confirmed in the urine.

9    Q.    Again, by saying detected that's not indicating any

10   type of amount is it?

11   A.    None whatsoever nor can anyone state when it was used.

12   Q.    Okay.  So, again, following that can you state or

13   anybody state whether it was ingested or taken immediately

14   before his death, hours, days, weeks, month?  What can you

15   determine, if anything?

16   A.    Well, the half-life for marijuana or cannabinoids

17   varies very, very much with a frequent user and a person who

18   doesn't use it frequently.  So you have to know which category

19   the person falls into.  And the half-life is very long, up to

20   two weeks in the body.  So I can't say if he used it, you know,

21   minutes before he was stabbed, hours before.  It could even be

22   probably up to days before.

23   Q.    Now, regarding the ethanol .27, a number, is it

24   possible to determine from having that result the effects it

25   would have had on George Talarvera immediately before his death?

jo-f          **DR. KAPPEN-PEOPLE-DIRECT**

1      A.    I mean, generally, you know, we know that ethanol or

2   alcohol is a depressant.  It's sedating.  It can be calming.  I

3   can't say exactly what it was doing to him at that point in

4   time.

5      Q.    Would it in any way -- could you determine just by

6   having that number or know whether or not it affected his

7   judgment?

8              MR. CANTOR:  Objection.

9              THE COURT:  You can pose that as a hypothetical.

10     Q.    Yes, would it be possible to determine whether or not

11  having that much ethanol in his blood would have affected George

12  Talarvera's ability to -- let me withdrawn.  Let me rephrase the

13  question.

14             Can you determine by looking at that number the effect

15  that this alcohol level would have on his coordination ability?

16     A.    Generally speaking we know --

17             MR. CANTOR:  Well, Judge, I am going to object to

18  generalization.  We are dealing with this case.  I object.

19             THE COURT:  I would allow it as a hypothetical.

20     A.    Generally speaking, and that's why there is a legal

21  limit for it.  If your blood is above .08 your reaction time are

22  slowed, and that's when you are not suppose to drive, operate

23  machinery and things like that.  So it affects it adversely.

24     Q.    Doctor, can you state within a reasonable degree of

25  medical certainty what caused the death of George Talarvera?

jo-f          DR. **KAPPEN-PEOPLE-CROSS**

1     A.     Yes, I definitely can.  The stab wound of the neck with

2     the injury to the jugular vein and the carotid artery and the

3     larynx is what caused his death.

4               MR. ROSENFELD:  Thank you.  I have no further

5          questions.

6               THE COURT:  Thank you.  Mr. Cantor.

7     CROSS-EXAMINATION BY

8     MR. CANTOR:

9     Q.     Doctor, in connection with the death of this gentleman

10    were you ever in apartment 3D up on McGraw Avenue where the

11    police found the body here in the Bronx?

12    A.     Of course not.

13    Q.     But yet you testified there will be blood on the floor

14    and wall, you recall making that testimony?

15    A.     Yes, I did.

16    Q.     You never saw the floor or the walls of apartment 3D,

17    did you?

18    A.     I saw many pictures of the floor, of the walls and the

19    couch.

20    Q.     Were you there?  Consider what was the question.

21    A.     I already told you, I wasn't there.

22    Q.     Well, answer -- okay.  Therefore, you personally never

23    viewed with your eyes the walls or the floor personally?

24    A.     I viewed photos personally.

25    Q.     Ma'am, did you hear the word photo in the question?

jc-f　　　　　　**DR. KAPPEN-PEOPLE-CROSS**

1　　　A.　　On the wall and floor.

2　　　Q.　　Were you ever there?  You were not there?  You have

3　　already told us twice, correct?

4　　　　　　MR. ROSENFELD:  Objection, your Honor, asked and

5　　answered.

6　　　Q.　　Why turn to the Judge, Madam?

7　　　　　　THE WITNESS:  He is harassing.

8　　　　　　MR. ROSENFELD:  Objection.

9　　　　　　MR. CANTOR:  Why is she turning to your Honor for

10　　guidance?

11　　　　　　THE COURT:  No.

12　　　　　　MR. ROSENFELD:  Objection, your Honor.  This is

13　　improper.

14　　　　　　THE COURT:  She wants to know if she can be

15　　responsive.  I will allow it to be responsive.

16　　　Q.　　Thank you.  Can you turn back to me now?

17　　　　　　MR. ROSENFELD:  Is the objection sustained or

18　　overruled?

19　　　　　　THE COURT:  Your objection?

20　　　　　　MR. ROSENFELD:  Yes.

21　　　　　　THE COURT:  It's sustained.

22　　　　　　MR. ROSENFELD:  Oh, thank you.

23　　　Q.　　So what you say as blood that was by virtue of you not

24　　viewing the scene, but by you viewing the photographs, correct?

25　　　A.　　That is true.

jo-f                  DR. KAPPEN-PEOPLE-CROSS

1    Q.    How many photographs did you view?

2    A.    More than 20.

3    Q.    And when did you view them?

4    A.    Lastly today.

5    Q.    I am sorry?

6    A.    Lastly today.

7    Q.    Lastly today.  And when for the first time?

8    A.    On December 25, 2009.

9    Q.    And in the interim did you view them?

10   A.    Yes.

11   Q.    When?

12   A.    The date that I finalized the autopsy report and

13   probably the date that I was working on --

14   Q.    I am not interested in probability.

15         MR. ROSENFELD:  Objection.

16   Q.    I am interested in the date that you finalized the ME's

17   report.  What date would that be?

18   A.    It was January 12, 2010.

19   Q.    Do you know any members of the jury, Doctor?

20         MR. ROSENFELD:  Objection, your Honor.  This is

21   improper.

22         THE COURT:  Sustained.

23         MR. ROSENFELD:  Irrelevant.

24         MR. CANTOR:  She keeps on peering over to the

25   jury.

 1            MR. ROSENFELD:  This is improper.

 2            MR. CANTOR:  And my client is having difficulties

 3     in hearing.

 4            THE COURT:  Please, please.  Perfectly all right

 5     for her to address the jury.  They are the final determinist.

 6            MR. CANTOR:  Sure.  Let us pander to the jury.

 7            MR. ROSENFELD:  Objection.  Your Honor.  He is

 8     commenting --

 9            THE COURT:  Totally, totally outrageous I should

10     say.

11            MR. CANTOR:  Can my client hear?  Can my client

12     hear?

13            THE COURT:  I told him a long time ago if he had

14     any difficulties any time to raise his hand.  I have not seen

15     him raise his hand once.

16            MR. CANTOR:  There he goes.

17            THE COURT:  All right, now.

18            MR. CANTOR:  Now, he raised it.  Would you direct

19     the witness to at least speak to everyone in the courtroom.

20            MR. ROSENFELD:  Objection to this colloquy again.

21            THE COURT:  Your objection is sustained.

22            Please continue, Mr. Cantor.

23     Q.    Now, the wounds, five in number, would they be

24     consistent with the utilization of any sharp implement?

25     A.    No.

jo-f            **DR. KAPPEN-PEOPLE-CROSS**

1     Q.    No.  Would a carpet cutter -- you would acknowledge

2   that a carpet cutter is a sharp implement, is it not?

3     A.    It is a sharp instrument.

4     Q.    And is it or are the wounds that you detected on the

5   body of the deceased consistent with utilizing a carpet cutter?

6     A.    Well, I am not definitely sure what carpet cutter you

7   are looking like.  How long is the blade?

8     Q.    A carpet cutter.  Let's talk about any sharp

9   instrument, for instance, approximately four to five inches in

10  length by it's blade, okay.

11    A.    That's fine.

12    Q.    Now, there are such instruments that are four or five

13  inches in length that are used exclusively to cut carpets, are

14  you aware of that?

15    A.    Some of them.

16    Q.    Okay.  The wounds you saw are they consistent with the

17  infliction of a carpet cutter on the areas that you've

18  described, a sharp carpet cutter?

19    A.    And this carpet cutter you are saying --

20    Q.    I already said it once.

21          MR. ROSENFELD:  Your Honor, the witness is trying

22  to be sure of the answer.

23          MR. CANTOR:  Why does she constantly turn to you?

24          MR. ROSENFELD:  Because I am objecting.

25          MR. CANTOR:  Is that for comfort?  For support?

jo-f                    DR. **KAPPEN-PEOPLE-CROSS**

1             THE COURT:  Firstly, you may sit down.

2             MR. ROSENFELD:  Thank you.

3             THE COURT:  Secondly, your objection is sustained.

4             MR. ROSENFELD:  Thank you.

5             THE COURT:  Thirdly, Mr. Cantor, please treat the

6        witness with the respect that every person deserves.

7             MR. CANTOR:  Certainly, Judge.  Somehow my client

8        who is on trial for murder --

9             THE COURT:  There is no doubt about that.

10       Q.    Is there a reason, reason why you turned to the Judge

11       three or four times, Doctor?

12       A.    Yes.

13            MR. ROSENFELD:  Objection, your Honor.  Again --

14            THE COURT:  The objection is sustained.  You don't

15       have to answer it.

16       Q.    Okay.  So we have a sharp carpet cutter used

17       exclusively for cutting carpets.  For the third time I will tell

18       you a blade of approximately four to five inches, is that an

19       instrument that's consistent with the inflictions of wounds that

20       you've described, yes or no?

21       A.    I would need to see what you were describing.

22       Q.    Oh, you never seen a carpet cutter in your life?

23            MR. ROSENFELD:  Objection.

24            THE COURT:  Sustained.

25       Q.    Have you ever seen a carpet cutter in your life?

1   A.   Not recently.

2   Q.   I am not asking you recently.  Have you ever?

3   A.   I have seen one instrument that I knew the person used

4   to cut carpet, and it's not anything like what you are

5   describing.

6   Q.   Well, can we say barbecue screw, a thin barbecue screw

7   which certainly is more than four or five inches at length, is

8   that consistent with inflicting the wounds that you've

9   described?

10   A.   No.

11   Q.   No.  Can you think of any other implement other than a

12   knife that would be consistent with the wounds that you've

13   described the infliction thereof?

14   A.   No.

15   Q.   So you are not there at the time that wounds were

16   inflicted, correct?

17   A.   Of course not.

18   Q.   And do you know what type of knife it was?

19   A.   Nope.

20   Q.   Do you know if it was a bowie knife, a penknife, a

21   gravity knife, a switchblade knife?

22   A.   No, no one could ever say.

23   Q.   Do you know the thickness of the blade that was on that

24   knife that you claimed is consistent with the infliction of the

25   wounds you've described?

1       A.      have an idea.

2       Q.      You do have an idea as to the thickness of the blade?

3       A.      I did just say that.

4       Q.      Okay.  And is that idea within a reasonable degree of

5    medical certainty?

6       A.      Yes, it is.

7       Q.      Okay.  And how about the length.  Can you tell us, just

8    yes or no, with a reasonable degree of medical certainty the

9    length of the knife that you claim?

10      A.      No, no one could.

11      Q.      I am asking you.  You are the only one on the witness

12   stand, and you aren't --

13              MR. ROSENFELD:  Objection, your Honor.

14      Q.      Don't turn to the Judge, again.

15      A.      I'll wait for him to give his answer.

16              MR. ROSENFELD:  Your Honor, I am objecting.

17   Turning to see if the Court will sustain or overrule.

18              THE COURT:  Of course.  She's waiting as the Court

19   directed.  She's doing exactly what she should be doing.

20              MR. ROSENFELD:  Thank you.

21              THE COURT:  For the Court to rule, Mr. Cantor.

22              MR. CANTOR:  Well, everyone can hear when you're

23   ruling, your Honor.

24              THE COURT:  On the contrary, she is showing

25   courtesy to the Court.  Now, please continue.

1        Q.    Now, can you tell us the length?

2        A.    No.

3        Q.    You have a reasonable degree of medical certainty as to

4    the length of it?

5        A.    Exactly no.

6        Q.    So you don't know whether it was a penknife, a bowie

7    knife, a gravity knife, a switchblade knife, a cub scout knife,

8    a boy's scout knife, any one of the panoply of hundreds of

9    knives that exist; is that a correct statement?

10       A.    It could be many of those knifes that you just

11   mentioned.

12       Q.    And you don't know?

13       A.    No one would know.

14       Q.    I am asking you.  Do you see anyone else on the witness

15   stand?

16             MR. ROSENFELD:  Objection to form.

17             THE COURT:  Yes, sustained.

18       Q.    Okay.  You understand you are the only witness being

19   questioned presently, do you not?

20             MR. ROSENFELD:  Objection.  That's a totally

21       ridiculous question, Judge.

22             THE COURT:  That's an unnecessary question.

23       Please move on.

24       Q.    Well, there are instruments other than knifes that have

25   sharp ends or blades, would you admit that, Doctor?

1      A.    That have sharp ends, yes.

2      Q.    And you cannot tell us within a reasonable degree of

3   medical certainty that it was a knife that inflicted these

4   wounds that you described rather than any other instrument that

5   had sharp and lengthy configurations?

6      A.    I can state that.

7      Q.    Oh, it was definitely a knife?

8      A.    These are due to a knife.  I said before --

9      Q.    Ma'am, if you said it once, you said it again.

10          MR. ROSENFELD:  Your Honor, he is interrupting.

11     Q.    Ma'am, you already said it.

12          THE COURT:  Allow her to complete her answer.

13          MR. CANTOR:  Sure.

14     Q.    And you are not there --

15          MR. ROSENFELD:  Wait, wait.  She didn't complete

16   her answer.

17          THE COURT:  One second.  You asked a previous

18   question.  Are you going --

19          MR. CANTOR:  I will withdraw it, sure.

20          THE COURT:  All right.  Withdrawn.  Very good.

21     Q.    Sure.  But you don't know the type of knife?

22     A.    I did say that.

23     Q.    And there is no other instrument, based upon your 15

24   years, 15 years of experience as a medical examiner, no other

25   implement or instrument other than a knife that could be

jo-=        **DR. KAPPEN-PEOPLE-CROSS**

1     responsible for the wounds that you described; is that correct?

2     A.    That is true.

3     Q.    How about a sword, would that be consistent with the

4     infliction of the wounds that you described?

5     A.    What kind of a sword?

6     Q.    Any kind of a sword, the whole panoply?

7     A.    You can get --

8     Q.    The whole panoply of swords that exist in this world,

9     would those wounds be consistent with infliction by way of a

10    sword?

11            MR. ROSENFELD:  Objection.

12            THE COURT:  Overruled.

13    A.    The injuries are not consistent with a sword.

14    Q.    Of that you are certain?

15    A.    Yes.

16    Q.    Of that you are sure?

17    A.    Yes, that's my opinion.

18    Q.    That's your opinion.  And of course you weren't there

19    at the time of the infliction of the wounds?

20            MR. ROSENFELD:  Objection, your Honor.  This is

21       just --

22            THE COURT:  Yes.

23            MR. ROSENFELD:  -- adding on by the defense.

24    Unnecessary.

25            THE COURT:  The objection 's sustained.

1    Q.    How about a dagger.  Do you know the difference between

2    a dagger and a knife, ma'am?

3    A.    Yes.

4    Q.    Would a dagger be consistent with the inflictions of

5    the wounds that you described?

6    A.    A dagger that I have seen --

7    Q.    I am not interested in what you have seen.  I am

8    interested in the whole panoply of daggers that exist in this

9    world.  Would any one of these daggers be consistent with the

10   inflictions of wounds that you described?

11             MR. ROSENFELD:  Objection.

12             THE COURT:  Overruled.

13   A.    Well --

14   Q.    Yes or no, ma'am?

15             MR. ROSENFELD:  Your Honor, the witness started

16        answering and he interrupted.

17   Q.    Yes or no?

18   A.    Could you repeat the question.

19   Q.    Yeah.  Would a dagger be consistent with the wounds

20   that you described, and I am referring to every dagger that you

21   have ever seen in a picture, in a magazine, in a movie, that

22   you've read about.  Any dagger.  Are they consistent with the

23   infliction of the wounds that you described?

24             MR. ROSENFELD:  Objection.

25             MR. CANTOR:  You've already ruled on it.  It's

DR. KAPPEN-PEOPLE-CROSS

1    overruled.

2    Q.    You may answer.  You may answer, ma'am.

3    A.    There is a possibility.

4    Q.    So aside from a knife it could have be inflicted by a

5    dagger?  Could have been inflicted by a dagger, yes or no?

6    A.    It's a very slightly possibility.

7    Q.    There is a possibility?

8    A.    Very slight one.

9    Q.    And there is a slight possibility that they were

10   inflicted by a knife, correct?

11   A.    More of a probability.

12   Q.    More of a probability?

13   A.    That it was a knife.

14   Q.    But of course you are giving us your opinion since you

15   weren't there, correct?

16             MR. ROSENFELD:  Objection, your Honor.  Asked and

17         answered again.

18             MR. CANTOR:  This is cross.  I get to do that.

19             THE COURT:  No need to editorialize.  What you

20         need to do is wait for a determination.  Objection is

21         overruled.

22   Q.    Okay.  Answer the question.

23   A.    No, I wasn't there.

24   Q.    You were sleeping preparing to perform the autopsy the

25   next day, correct?

jc-f                    **DR. KAPPEN-PEOPLE-CROSS**

1      A.    That is correct.

2      Q.    Sorry?

3      A.    That is correct.

4      Q.    How many tattoos, professional tattoos did you notice

5    on the body of the deceased?

6      A.    Three.

7      Q.    Did you notice an unprofessional tattoos?

8      A.    Yes, I did.

9      Q.    Now, have you ever performed autopsies of inmates at

10   correctional -- not that the autopsy was done at the

11   correctional facilities -- but of inmates who expired at

12   correctional facilities under questionable circumstances?  Have

13   you ever autopsied such?

14                    MR. ROSENFELD:  Objection.

15                    THE COURT:  Sustained.

16     Q.    Have you ever autopsied people who have had

17   unprofessional tattoos on their bodies?

18     A.    Yes, I have.

19     Q.    Have you ever autopsied an inmate, someone who hasn't

20   -- was incarcerated at the time of his or her death?

21                    MR. ROSENFELD:  Objection.

22                    THE COURT:  Sustained.

23     Q.    Do you know what a prison tattoos is?

24                    MR. ROSENFELD:  Objection.

25                    THE COURT:  Sustained.

jo-f          **DR. KAPPEN-PEOPLE-CROSS**

1      Q.    Have you ever run across in your professional career

2      either in person or pictures of tattoos on the bodies of

3      inmates?

4                    MR. ROSENFELD:   Objection.

5                    THE COURT:   Sustained.

6      Q.    But the fourth tattoo was a nonprofessional one?

7      A.    That's true.

8      Q.    And have you ever heard the expression jailhouse

9      tattoo?

10                   MR. ROSENFELD:   Objection.

11                   THE COURT:   Sustained.

12     Q.    Well, let's go to the urine.  There was a urine

13     analysis of the ethanol or alcohol, was there not?

14     A.    There was.

15     Q.    And the urine analysis yielded a finding of 0.39 of one

16     percent of alcohol or ethanol as you called it in the urine,

17     correct?

18     A.    No, that's not stated properly.

19     Q.    Well, what is 0.39 next to ethanol?

20     A.    Grams percent.  Not one percent as you said.

21     Q.    I am not asking about one percent.  I said oh point, oh

22     decimal 39 percent?

23     A.    Grams percent is what you are leaving out.

24     Q.    All right.  About the oh -- no.  0.39 grams percent of

25     alcohol by way of urine testing?

1       A.    In the urine, correct.

2       Q.    Okay.  And if that is accurate -- and do you have any

3   reason to doubt the accuracy of the forensic toxicology

4   laboratory report?

5       A.    Nope.

6       Q.    That would be almost five times the legal limit for

7   driving while intoxicated, correct?

8       A.    No.

9       Q.    Wouldn't be?

10      A.    It would not be.  That's urine.  When we talk about

11  driving while intoxicated you can only compare it to the blood

12  alcohol not urine alcohol.

13      Q.    But I am asking you, the 0.39, which you said you have

14  no reason to doubt as being accurate, that is almost eight times

15  greater than 0.08; is that correct just mathematically?

16      A.    Mathematically --

17      Q.    Yes or no, madam.

18      A.    Mathematically it is correct.

19      Q.    Then you've answer my question.

20      A.    You are comparing apples to oranges.

21      Q.    You have answered my question.

22            MR. CANTOR:  Your Honor --

23            MR. ROSENFELD:  Objection.  Badgering the witness.

24            MR. CANTOR:  The only question -

25            MR. ROSENFELD:  She's trying to answer

fo-f                    DR. KAPPEN-PEOPLE-CROSS

1     professionally.

2                    MR. CANTOR:  No, that's the only question.

3                    THE COURT:  All right.  That is the only question.

4     Q.    Okay.  Now, the medical examiner's office, there is a

5     chief medical examiner, correct?

6     A.    That is true.

7     Q.    And who serve -- what is the tittle of the man or woman

8     who serves directly under the chief medical examiner?

9     A.    There are many of them.  They are called deputy chief

10    medical examiner.

11    Q.    Are you a deputy or were you at the time you performed

12    this autopsy a deputy chief medical examiner?

13    A.    No.

14    Q.    What is the rank below deputy chief medical examiner?

15    A.    City medical examiner.

16    Q.    City?

17    A.    Correct.

18    Q.    And were you a city medical examiner at that time?

19    A.    That's correct, and I still am.

20    Q.    Ma'am, you have answered the question by saying

21    correct.  And as of the time that you had performed this autopsy

22    how long had you worked as a pathologist for the Office of the

23    Chief Medical Examiner?

24    A.    Twelve years and a half.

25    Q.    And when you entered the medical examiner's office, 12

DR. KAPPEN-PEOPLE-CROSS

1    and a half years prior to that, did you enter it at the rank of
2    city medical examiner?
3         A.    Yes, I did.
4         Q.    And when you conducted this autopsy, 12 and a half
5    years later, you remained at the same rank; is that correct?
6         A.    That is true.
7         Q.    A medical legal investigator positions?
8         A.    I don't understand what you are asking.
9         Q.    What word in the question don't you understand?
10        A.    There is no verb.
11        Q.    You testified about medical legal investigation
12   investigator, correct, employed by your office?
13        A.    That is true.
14        Q.    Are they licensed physicians?
15        A.    No.
16        Q.    The one unprofessional tattoo that you noted on the
17   body of the deceased, would it be your expert opinion that that
18   was applied by a non-tattooed artist?
19        A.    Very possible.
20        Q.    It's your opinion, correct?
21        A.    That is correct.
22        Q.    If you know, since you are a forensic pathologist,
23   whether or not their exist, within detention facilities, people
24   who are capable of applying a nonprofessional tattoo?
25                    MR. ROSENFELD:   Objection.

jo-1                  DR. KAPPEN-PEOPLE-CROSS

1           THE COURT:  Sustained.

2       Q.    You don't know how the deceased came to receive or the

3   circumstances attending to his receiving that nonprofessional

4   tattoo, correct?

5       A.    That's true.

6       Q.    Now, you said that the Office of the Chief Medical

7   Examiner is an independent agency, correct?

8       A.    From other hospitals in the City of New York, correct.

9       Q.    And independent from the New York City Police

10  Department?

11      A.    That too.

12      Q.    And you are an expert in forensic pathology, correct?

13      A.    So the Court deemed me.

14      Q.    No.  I am asking you.  I am not asking about the Court.

15  Are you an expert in forensic pathology?

16              MR. ROSENFELD:  Objection.

17              THE COURT:  Sustained.  The Court has qualified

18      her as such.

19              MR. CANTOR:  You qualified her as such.

20              THE COURT:  Based on her training and experience

21      she was so qualified without objection I might note.

22      Q.    Okay.  Since you are a qualified expert in forensic

23  pathology, how many times would you estimate in your career as

24  an expert in forensic pathology you've testified for the

25  prosecution?  I want an approximation.

jo-f        DR. **KAPPEN-PEOPLE-CROSS**

1      A.     Approximately I've testified 133 times.

2      Q.     In your career as an expert in forensic pathology have

3 you ever testified for the defense?

4      A.     Yes.

5      Q.     How many times?

6      A.     Probably five or less.

7      Q.     So the overwhelming majority of the times that you've

8 testified in family and supreme courts, in the various county of

9 New York City, has been for the prosecution? Yes or no, ma'am?

10      A.     It seems the defense doesn't ask me, so yes.

11      Q.     Ma'am, I am asking you would that be a fact? Would

12 that be an imperial fact?

13      A.     Yes, it is. Yes, it is.

14      Q.     And you've had occasion, have you not, to consult at

15 your office or telephonically with prosecutor's concerning

16 cases?

17      A.     Yes, I have.

18      Q.     On many occasions; is that correct?

19      A.     Yes, it is.

20      Q.     And in this case, either by the way of telephone or in

21 person, how many times did you speak to Assistant District

22 Attorney Rosenfeld concerning the subject matter of your

23 testimony?

24      A.     Probably a couple of times.

25      Q.     When you say a couple, is that two, three, four; is

1  that what we are talking about?

2  　　A.　　A couple, two.

3  　　Q.　　About two.  And did you see pictures on either one or

4  both of those occasions?

5  　　A.　　Yes.

6  　　Q.　　The combination of the recent ingestation of cannabis,

7  which is marijuana, and large amounts of alcohol would cause

8  what in a person?

9  　　　　　　MR. ROSENFELD:  Going to object to the form.

10 　　　　　　THE COURT:  If she understands it she may respond

11 　　to it.

12 　　A.　　I don't understand it.  It's too many factors to take

13 into considerations.

14 　　　　　　MR. CANTOR:  I can't --

15 　　　　　　THE COURT:  You may want --

16 　　　　　　MR. CANTOR:  I can't hear one word when she turns

17 to your Honor.

18 　　　　　　MR. ROSENFELD:  Your Honor, just for the record --

19 　　　　　　MR. CANTOR:  This is a public trial.

20 　　　　　　MR. ROSANFELD:  I heard her perfectly.

21 　　　　　　MR. CANTOR:  This is a public trial.  I would like

22 to have her speak publicly so my client and I can --

23 　　　　　　MR. ROSENFELD:  Your Honor, I am about 15 to 20

24 feet away.  heard every word perfectly.

25 　　Q.　　What were you saying to the Judge?

1    THE COURT: Did all the jurors hear the answer?

2    THE JURORS: Yes.

3    THE COURT: Would you like it repeated?

4    MR. CANTOR: No. I would like to know from the

5    witness who is like turning to you again.

6    THE COURT: So you're withdrawing the previous --

7    MR. CANTOR: No.

8    Q.    What did you say to the Judge?

9    THE COURT: You must answer definitely. Do you

10   wish to let that question stand or you wish --

11   MR. CANTOR: I wish to let it stand.

12   THE COURT: Fine.

13   Q.    What did you say to the Judge?

14   MR. CANTOR: Again, she turns to you, Judge.

15   MR. ROSENFELD: Your Honor, every time she is

16   waiting for the Court to say something --

17   MR. CANTOR: Again --

18   MR. ROSENFELD: -- he makes a comment on it.

19   She's showing you respect and waiting for the Court to speak,

20   that's all.

21   MR. CANTOR: This is a professional witness. She

22   ought to know.

23   THE COURT: There are no conversations between the

24   Court and this witness.

25   MR. CANTOR: The witness clearly said something to

1    your Honor about 30 seconds ago.

2           THE COURT:  Only before when she asked if she had

3    to answer certain questions.

4    Q.    What did you say to the Judge?

5           THE COURT:  You mean now or before?

6           MR. CANTOR:  About 15, 20 seconds ago.

7    Q.    Please tell us.  We are awaiting your answer?

8    A.    I don't even remember at this point in time.

9    Q.    Ah.

10   A.    You would have to have it read back.

11   Q.    You've answered the question.  You don't remember.

12   A.    You would have to ask to read back.

13          MR. ROSENFELD:  Objection.

14   Q.    I'll go on to my next question.

15          MR. ROSENFELD:  Objection.

16          THE COURT:  The objection is sustained.

17   Q.    I'll go on to my next question.  When you -- would you

18   say you have a bad memory, ordinary memory or excellent memory?

19          MR. ROSENFELD:  Objection.

20          THE COURT:  Sustained.

21   Q.    Well, once again, Madam, I pose the question to you,

22   the recent ingestation, the taking, the smoking of marijuana

23   combined with large amounts of consumption of alcohol at around

24   the same time would cause what reaction in an ordinary human

25   being?

1          MR. ROSENFELD:  Objection.

2          THE COURT:  Overruled.

3     Q.    You can answer that.

4     A.    As a hypothetical question?

5     Q.    Yeah.

6     A.    The two drugs together could have various effects, but

7  generally it would relax the person, sedate them.  The alcohol

8  once again is an anti -- it's a depressant.  It would depress

9  the person.

10    Q.    Would you -- would you change your answer -- would it

11 cause you to change your answer that multiple lay witnesses

12 testified that the deceased at or about the time of his death

13 was very animated, very loud, gesticulating with his arms and

14 moving about?  Would that cause you to change your answer that

15 the combination of pot and large amounts of alcohol would sedate

16 and depress an individual?  Would that cause you to change that

17 response?

18    A.    No, that could be.

19    Q.    Ma'am, you said no and you've answer the question.

20          MR. ROSENFELD:  Your Honor, he cut her off.

21          MR. CANTOR:  No, it's a yes or no question.

22          THE COURT:  It was a yes or no.

23          MR. CANTOR:  Thank you, Judge.

24    Q.    Have there been other occasions that you've testified

25 for the prosecution when you've had occasion to turn to a Judge

jo-f          **DR. KAPPEN-PEOPLE-CROSS**

1    a half a dozen time or so?

2              MR. ROSENFELD:  Objection, your Honor.  Again, he

3    makes light of the fact that she's waiting for the Court.

4              MR. CANTOR:  I thought there was no colloquy.

5              THE COURT:  There is no colloquy.  The objection

6    is sustained.

7              MR. CANTOR:  The exception is respectfully noted.

8              THE COURT:  For what is noted it will be accepted

9    an jury can determine.

10             MR. CANTOR:  Absolutely it's for the jury to

11   determine bias and --

12             MR. ROSENFELD:  Objection, your Honor.  Colloquy,

13   again.  It's not a question to the witness.

14             MR. CANTOR:  He is engaging -

15             THE COURT:  Please, Mr. Cantor.  Please.  Just

16   continue your question.

17             MR. CANTOR:  Okay.  Well, I withdraw it to close

18   on cross-examination subject to your permission.

19             THE COURT:  Thank you, Mr. Cantor.

20             Mr. Rosenfeld, do you have any re-direct for the

21   lady?

22             MR. ROSENFELD:  Sure.

23             THE COURT:  Please.

24   REDIRECT EXAMINATION BY

25   MR. ROSENFELD:

jo-f          **DR. KAPPEN-PEOPLE-REDIRECT**

1        Q.    Doctor, Mr. Cantor asked you about testifying for the

2   prosecution.  How many times have you been asked to testify for

3   the defense?

4                  MR. CANTOR:  Asked and answered.  She said five or

5       less.

6                  THE COURT:  I will allow it.

7        A.    Five or less.

8        Q.    That's how many times you've actually testified or how

9   many times you were asked?

10       A.    Both.

11       Q.    Both?

12       A.    They rarely ask me to come and testify for them.

13       Q.    Why is that?

14                 MR. CANTOR:  Objection.

15       A.    They don't like what I have to say.

16                 MR. CANTOR:  Judge, objection.

17                 THE COURT:  Objection is sustained.

18                 MR. CANTOR:  And would you instruct the witness

19   not to answer until you've ruled.  Would you kindly so

20   instruct the witness.

21                 THE COURT:  That, of course, would cause her to

22   look at me again.  Is that --

23                 MR. CANTOR:  That's fine.  Let her look at the

24   lunar stars.

25                 MR. ROSENFELD:  Objection to colloquy.

1          MR. CANTOR:  As long as she knows it.  As long as

2     she knows it.

3          MR. ROSENFELD:  Objection, your Honor.

4          THE COURT:  Please go on again.

5          MR. CANTOR:  She's testified too many times.  She

6     ought know it.

7          THE COURT:  The objection is sustained.

8     Sustained.

9          MR. ROSENFELD:  Your Honor, I will ask you --

10         THE COURT:  Please proceed.

11         MR. CANTOR:  Judge, he is talk --

12         MR. ROSENFELD:  This is absurd.

13         THE COURT:  Let the jury take the one ruling.

14         MR. ROSENFELD:  This is unprofessional.

15         THE COURT:  The evidence --

16         MR. CANTOR:  Look, he is going on like Tennessee

17    Brook.

18         THE COURT:  Mr. Cantor, please all right.

19         Mr. Rosenfeld.

20    Q.    Doctor, you are asked to testify for the prosecution

21    because you are the one who conducted autopsies?

22         MR. CANTOR:  He is asking a leading question;

23    isn't it?  And it's his witness so I object.

24         MR. ROSENFELD:  Objection to colloquy.  You said

25    one or two words, your Honor.

 1                    THE COURT:  I am allowing it.

 2                    MR. CANTOR:  Sorry, your Honor?

 3                    THE COURT:  Allowing it.

 4                    MR. CANTOR:  Even though it's leading?

 5                    THE COURT:  That's your argument not the Court's.

 6                    MR. CANTOR:  Very well.  I take an exception.

 7                    MR. ROSENFELD:  Shall I keep going or stop?  I

 8         don't know with his constant interruption it's impossible.

 9                    THE COURT:  You may continue.

10                    MR. CANTOR:  You know, he is just engaging in

11        colloquy and misbehavior.

12                    THE COURT:  Please continue.

13                    MR. ROSENFELD:  Can I have the last question read

14        back.

15                    THE COURT:  Madam reporter.

16                    (Whereupon, the court reporter read back the

17        above-requested testimony.)

18                    MR. CANTOR:  And I objected on the leading

19        grounds.

20                    MR. ROSENFELD:  I will rephrase.

21                    THE COURT:  Rephrase that question.

22                    MR. ROSENFELD:  Thank you.

23        Q.    Doctor, is there any other agency in New York that

24        conducts autopsies other than the Office of the Chief Medical

25        Examiner?

1    THE COURT:   You mean government agency or?

2    Q.    Okay.   Government agency?

3         MR. CANTOR:   Judge, that you know of.

4    A.    No, no other agencies have the jurisdiction by law to

5    conduct autopsies on none natural death in the City of New York.

6              (Continued onto the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     Q    When there's a homicide in the City of New York,

2   specifically the Bronx, who is required to conduct the autopsy?

3     A    One of the medical examiners.

4     Q    So when there's a homicide trial like this one,

5   there's a death involved, who is the required person to come

6   testify at the trial?

7              MR. CANTOR:  Is that not leading, your Honor?

8              THE COURT:  No.

9              MR. CANTOR:  No.  Okay.

10    A    If you want information regarding the cause of death

11  and the findings of the autopsy, then of course you have to ask

12  the medical examiner who did the autopsy to come and testify.

13    Q    Someone such as yourself?

14    A    That's correct.

15    Q    Getting back to the questions about the urine,

16  toxicology report of ethanol and the blood ethanol, the number

17  0.39 gram percent, why is that number not the number that's

18  relied on?  Please take whatever you need to explain to the

19  jury the differences.

20    A    For two reasons.  We don't look at values that are

21  quantitative like .39 in the urine.  One of the reasons as I

22  said before is 'cause the bladder doesn't completely void every

23  time a person urinates, some gets retained, and it can be

24  retained for a long period of time.  That invalidates the

25  numbers of the quantitation.  And also there is more water in

1   urine than in blood.  Most of the research and everything that

2   you're all familiar with regards to blood alcohol levels, those

3   are the numbers that are in the law books.  There are

4   quantifications of ethanol in liver, in brain and you could

5   look at those as well, but it's the blood alcohol that's used

6   routinely and it's the most standardized because it doesn't

7   change much if someone doesn't void completely or not.

8           MR. ROSENFELD:  Thank you.  I have no further

9       questions.

10  RECROSS EXAMINATION

11  BY MR. CANTOR:

12      Q    There are many private hospitals in the City of New

13  York, are there not?

14      A    There are.

15      Q    And most, if not all of these hospitals have

16  departments of pathology, is that not correct?

17      A    I don't -- I'm not sure if every one of them does.

18      Q    I said most, if not all.  Why don't you listen to the

19  question.

20          MR. ROSENFELD:  Objection, your Honor.  She did.

21          THE COURT:  No need.  She wanted a clarification.

22      Q    You want a clarification.  Most hospitals have

23  departments of pathology?

24      A    Most of them do.

25      Q    And autopsies are conducted at these hospitals, is

1    that correct?

2        A    No.   That's definitely not correct.

3        Q    That's definitely not correct?

4        A    Exactly.

5        Q    A private hospital in your medical career, to your

6    knowledge, has never for instance at the request of a family

7    member never performed an autopsy, is that your sworn

8    testimony?

9        A    Well, you're changing --

10               MR. ROSENFELD:   Object.   This is a

11        generalization.

12               MR. CANTOR:   Why do we have the colloquy?

13               THE COURT:   Do you have an objection?

14               MR. ROSENFELD:   Objection.

15               THE COURT:   That's overruled.

16        Q    Please answer.

17        A    Not all public or private hospitals conduct autopsies.

18        Q    Some do?

19        A    Some do.   Not all of them.

20        Q    Ma'am, I've heard it the first time.   If you want to

21    go on and repeat it a few more times, go ahead.

22               MR. ROSENFELD:   Objection.

23               THE COURT:   No need for editorializing.

24        Q    Okay.   So oftentimes in cases where an accused are

25    charged with murder or manslaughter, there are medical issues,

tr/g    Dr. Kappen - People - Recross

1  is that not a truism?

2      A    Yes.

3      Q    And oftentimes medical testimony in a given case

4  depending on the facts and circumstances can inure to the

5  benefit of an accused, correct?

6              MR. ROSENFELD:  Objection.  Outside the scope of

7      redirect.

8              MR. CANTOR:  Oh, no, please.

9              THE COURT:  I'll allow it.

10     Q    Is that not correct, madam?

11     A    I didn't understand that.

12     Q    You didn't understand.  What word didn't you

13  understand?

14             MR. ROSENFELD:  Objection, your Honor.

15     A    I don't remember what the question was.

16     Q    You have a short memory span.

17             MR. CANTOR:  Can the reporter --

18             MR. ROSENFELD:  Objection.

19     A    You're making me nervous.

20             THE COURT:  No need to editorialize.

21             MR. CANTOR:  Can we have the court reporter over

22      Mr. Rosenfeld that's yelling read the question?

23             THE COURT:  Mr. Rosenfeld is standing to

24      interject an objection.

25             MR. CANTOR:  He engages in speechified --

tr/g    Dr. Kappen - People - Recross

1          MR. ROSENFELD:  Objection.  Again he's doing it.

2          THE COURT:  Objection is sustained.

3          MR. CANTOR:  You overruled it.

4          THE COURT:  That was the last question.

5          MR. CANTOR:  Can we have it re-read?

6          THE COURT:  You can.

7          MR. CANTOR:  Thank you.

8          (Whereupon, the requested portion was read by the

9     court reporter.)

10     Q     Is that correct?  Yes or no?

11     A     What's inure?

12     Q     It means it can flow to attach to the benefit of the

13     defendant depending on the facts and circumstances of a case.

14     A     I still don't really understand.

15     Q     I can't hear you, madam.

16     A     I still don't really understand what you're asking.

17     Q     Okay.  Oftentimes, and you must have learned this in

18     your 15 years of pathology, pathologists when they're employed

19     by the Office of Chief Medical Examiner such as Dr. Milton

20     Halpern or Dr. Michael Dodden or Dr. Charles Hirsch have

21     testified on behalf of defendants because of medical issues

22     that they testify about in favor of an accused, do you

23     recognize that?

24          MR. ROSENFELD:  Objection.  Outside the scope of

25     redirect.

1            THE COURT:  Sustained.

2            MR. CANTOR:  What?

3            THE COURT:  Sustained.

4     Q    There are times when medical issues within the purview

5     of a forensic pathologist can favor a defendant, is that not

6     correct?

7            MR. ROSENFELD:  Objection.

8            THE COURT:  Subject to connection.

9            MR. CANTOR:  Thank you.

10    Q    Is that not correct, there are times?

11    A    Their opinions may favor the defendant.

12    Q    Right.  Now, what I want to know is how many times

13    have you actually testified in a court of law on behalf of the

14    defense?

15            MR. ROSENFELD:  Objection.  Asked and answered.

16            MR. CANTOR:  No.

17            MR. ROSENFELD:  Outside the scope of redirect.

18            MR. CANTOR:  No.  He brought --

19            THE COURT:  One second.  No need to argue.  I

20        haven't ruled.  The objection is overruled.

21            MR. CANTOR:  Thank you.

22    Q    Please answer the question.

23    A    From what I understand, approximately five or less

24    times.

25    Q    No.  I mean actually testifying, not being asked.

1      A    Both.  Both asked and testifying.

2      Q    So here's the question, how many times?  One, two,

3  three, four?  How many times have you actually been in a

4  witness box called by a defense attorney and testified on

5  behalf of the defendant?

6      A    In a criminal trial?

7      Q    In a criminal trial.

8      A    Zero.

9      Q    Zero.

10              MR. CANTOR:  Thank you, your Honor.

11              THE COURT:  Mr. Rosenfeld.

12              MR. ROSENFELD:  People have no further questions.

13              THE COURT:  Thank you.  Doctor, thank you, you're

14  excused.

15              THE WITNESS:  Thank you.

16              (Whereupon, the witness left the stand and the

17  courtroom.)

18              THE COURT:  Counselors, come up.

19              (Whereupon, there was a discussion held, off the

20  record, at the bench, among the Court, the assistant

21  district attorneys, defense counsel, and outside the

22  hearing of the defendant and the jury.)

23              (Whereupon, the following takes place, on the

24  record, in open court, in the presence of the Court, the

25  assistant district attorneys, defense counsel, the

1    defendant and the jury.)

2              THE COURT:  Madam Forelady, ladies and gentlemen

3    of the jury, we've now completed the witnesses for today.

4    I ask the district attorney, Mr. District Attorney, will

5    there be any further witnesses on behalf of the People?

6              MR. ROSENFELD:  At this time, no, your Honor.

7              THE COURT:  People otherwise rest?

8              MR. ROSENFELD:  Yes, your Honor.

9              THE COURT:  People having rested, I reserve to

10   the defense the usual motion at the close of the People's

11   case.

12             Ladies and gentlemen, you have now heard the

13   People's case.  We have completed that.  We're now going to

14   recess until the day after the 4th, which would be

15   Thursday, Fourth of July obviously is a holiday, and on

16   that day we'll turn to the defense to see what they may or

17   may not wish to do.

18             MR. CANTOR:  Judge, can we step up?

19             THE COURT:  Yes.

20             MR. ROSENFELD:  Can we wait until I get up there,

21   your Honor, so I know what he's talking about?

22             (Whereupon, there was a discussion held, off the

23   record, at the bench, among the Court, the assistant

24   district attorneys, defense counsel, and outside the

25   hearing of the defendant and the jury.)

1       THE COURT:  So we'll see each other on Thursday

2   morning.  Please be here at 9:30 sharp right outside the

3   door.  Please remember again the cautions.  No discussions

4   with anyone, not among yourselves.  In the unlikely event

5   anyone approaches you, you will have to report that to the

6   Court.  Again, you are not to do any researches detectives,

7   investigators.

8       You may have vivid memory of what has transpired

9   until this time by way of evidentiary testimony and

10  exhibits and that stipulation thus far, which is the only

11  evidence in the case at this point.  We'll see each other

12  then.  Have a pleasant Fourth of July.  Follow the officer.

13      (Whereupon, the jury left the courtroom.)

14      THE COURT:  Jury having been excused, Mr.

15  District Attorney, you will have Ms. Dempsey for us on

16  Thursday.  Mr. Cantor, you will turn over to the district

17  attorney and to the Court any list you wish to share or you

18  have obligation to share.

19      MR. CANTOR:  I have no obligation under the law,

20  Judge.  You've asked me.

21      THE COURT:  That would be very helpful to the

22  Court for its scheduling purposes, yes, that is correct.

23  But the People are likewise entitled to certain

24  information, whatever that is.

25      MR. CANTOR:  I'll conform myself to the CPL.

tr/g     Proceedings

```
 1                  THE COURT:  That's correct.
 2                  MR. CANTOR:  However, your Honor has asked me
 3     something that I am hard pressed to refuse when you ask for
 4     the comity --
 5                  THE COURT REPORTER:  Excuse me, Mr. Cantor, can
 6     you repeat that?
 7                  MR. CANTOR:  You can tell her what I said.
 8                  THE COURT:  I missed it.
 9                  MR. CANTOR:  The comity, C-O-M-I-T-Y due a jurist
10     of your stature.
11                  THE COURT:  Yes, yes, yes.
12                  MR. CANTOR:  That is what I said.
13                  THE COURT:  All right.
14                  MR. CANTOR:  What time Thursday?
15                  THE COURT:  We told them 9:30.  For us, bring up
16     the gentleman.
17                  MR. CANTOR:  I have the idea.
18                  THE COURT:  9:45.
19                  MR. ROSENFELD:  Your Honor, the reason I
20     requested in advance, tomorrow is a holiday, information
21     concerning any potential civilian witnesses who may testify
22     so I wouldn't cause any delay in the trial when this person
23     testifies in running any background checks or finding out
24     any information that will be necessary for me to conduct
25     the cross examination of that witness.
```

```
 1              THE COURT:  I would concur with that.
 2    Information being a good one and I ask you, Mr. Cantor, to
 3    please inform accordingly.
 4              MR. CANTOR:  It's a request, Judge.
 5              THE COURT:  Yes, it is.
 6              MR. CANTOR:  I certainly take that very
 7    seriously.
 8              THE COURT:  Thank you.  All right.  We stand in
 9    recess.  Have a good holiday.
10              (Whereupon, the defendant left the well of the
11    courtroom.)
12              (Whereupon, Mr. Cantor left the courtroom and
13    returned.)
14              MR. CANTOR:  You asked that I return?
15              THE COURT:  My request was to do that today.
16              MR. CANTOR:  I don't have any information.
17              THE COURT:  Well, then telephonically please
18    arrange with the district attorney for a time certain you
19    will call him.
20              MR. CANTOR:  I will not call him.  It's his
21    request.  He will call me.
22              THE COURT:  Whatever you both agree to.
23              MR. CANTOR:  He will call me.
24              THE COURT:  All right.  Wait a second, Mr.
25    Cantor.
```

1          MR. CANTOR:  I can't do anything in the absence

2     of my client.

3          THE COURT:  Wait a second.

4          MR. CANTOR:  This is in the absence of my client.

5          THE COURT:  I want you to make a time with him

6     that he will call you.  This way you can transmit the

7     information to him.

8          MR. CANTOR:  And he knows my telephone number.

9          THE COURT:  Let's make it a time certain.

10         MR. ROSENFELD:  I'll call at 4:30.

11         MR. CANTOR:  I doubt 4:30, I doubt that I'll be

12    in my office.

13         THE COURT:  You tell us a time that's convenient.

14         MR. CANTOR:  I doubt that I will be in my office.

15    The time I will be in my office will be about, I don't

16    know, about quarter after 5 I should arrive at my office.

17         THE COURT:  That sounds fine.

18         MR. CANTOR:  I'll ferret out whatever

19    information, if any.

20         THE COURT:  That's good.

21         MR. CANTOR:  But this is a request, Judge.

22         THE COURT:  Yes, it is.

23         (Whereupon, the trial is continued and the case

24    is adjourned to Thursday, July 5, 2012, at 9:30 a.m.)

25

tr/a    Proceedings

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF BRONX :  CRIMINAL TERM - PART:  T-14
 2
      -------------------------------------------- X
 3
      THE PEOPLE OF THE STATE OF NEW YORK,
 4
                                         Indictment #27/2010
 5
             - against -               Cont'd Jury Trial
 6

 7

 8    DAVID DELGADO,

 9                        Defendant.

10    -------------------------------------------- X

11                        July 5, 2012

12                        265 East 161st Street
                          Bronx, New York 10451
13

14    B E F O R E:

15             HONORABLE DOMINIC R. MASSARO,

16                              J U S T I C E

17    (Appearances same as previously noted.)

18

19                      TRICIA L. ROBINSON, CSR, RPR
                          Senior Court Reporter
20
                      (Whereupon, the following takes place, on the
21
          record, in open court, in the presence of the Court, the
22
          assistant district attorneys, defense counsel, the
23
          defendant, and outside the presence of the jury.)
24
                      THE COURT:  Good morning.  Mr. Clerk.
25
```

1          THE CLERK:  Case on trial, People of the State of

2     New York against David Delgado.  Let the record reflect the

3     presence of the district attorney's office, defense

4     attorney and defendant.  The sworn jurors are not present

5     at this time.

6          THE COURT:  Mr. Cantor, I understand you wanted

7     to make a record.

8          MR. CANTOR:  Eight days ago, your Honor, I

9     advised the Court and the People that I required Melissa

10    Dempsey for brief --

11         THE COURT:  You did.

12         MR. CANTOR:  -- continued cross examination.

13         I'm not prepared to go forward with my case until

14    I have that opportunity.  I've given more than advance

15    notice.

16         THE COURT:  Is she present?

17         MR. CANTOR:  I do not know.  I do not control

18    that, Judge.

19         THE COURT:  Well --

20         MR. CANTOR:  We'll find out.

21         THE COURT:  You could have just asked Counsel.

22         MR. ROSENFELD:  She's right outside.

23         MR. CANTOR:  Here we go, Judge.

24         THE COURT:  Very good.

25         MR. CANTOR:  Thank you.

1                    THE COURT:  You're welcome.

2                    Let us recall her to the witness stand.

3                    Let us first bring out the jury, of course.

4                    MR. ROSENFELD:  It's my understanding we're

5        calling her for a very brief, I think it's re-recross that

6        Mr. Cantor has asked for.

7                    THE COURT:  So thirty seconds at one point, give

8        or take a little.  That's fine.

9                    MR. CANTOR:  It's continued cross, but it is

10       short in duration.

11                   THE COURT:  Very good.

12                   COURT OFFICER:  Jury entering.

13                   (Whereupon, the jury entered the courtroom.)

14                   THE COURT:  Madam Forelady, ladies and gentlemen

15       of the jury, good morning again to you.

16                   JURORS:  Good morning.

17                   THE COURT:  We trust everyone had a good Fourth

18       of July.  We're continuing with the case.  We're recalling

19       People's witness Ms. Dempsey.  You recall Ms. Dempsey,

20       she's here.

21                   (Whereupon, the witness entered the courtroom and

22       takes the stand.)

23                   THE COURT:  Ms. Dempsey, good morning to you.

24                   THE WITNESS:  Good morning.

25                   THE COURT:  I remind you that you continue for

1    all purposes under oath, all right, ma'am?

2            THE WITNESS:  Yes.

3            THE COURT:  You may be seated for some very brief

4    continued cross examination by Mr. Cantor.  So we'll start

5    with that.

6            Mr. Cantor, I invite you.

7    CONTINUED CROSS EXAMINATION

8    BY MR. CANTOR:

9        Q    Ms. Dempsey, you were here in this courtroom on June

10   28 when you were asked questions by the prosecutor and myself,

11   correct?

12       A    Yes.

13       Q    When I asked you questions, it was on what they call

14   cross examination.  Is it not a fact that you told me that on

15   cross examination that when you were being examined by Mr.

16   Rosenfeld on direct examination you never said I thought that

17   David and Sosa were arguing?

18       A    No.

19       Q    And you went so far as to say on cross examination

20   that you never used the word arguing when you were being

21   questioned by Mr. Rosenfeld, correct?

22       A    Correct.

23       Q    I'm now going to read something to you from the

24   official certified court record, which is produced by a

25   certified court reporter.  And then after I read it, I'll ask

1       you a question, do you understand me?

2           A    Yes.

3           Q    Page 878, direct examination by Mr. Rosenfeld of Ms.

4       Dempsey line 14:

5                "QUESTION:  Please continue."

6                "ANSWER:  Sosa was sitting there.  All of a sudden, I

7       see Mr. David come out of the kitchen and he's in front of

8       Sosa.  I thought he was arguing."

9                Did you make that answer under oath on that question?

10      Yes or no?

11          A    Yes.

12          Q    You realize when you testified you were under oath?

13          A    Of course.

14               MR. ROSENFELD:  Objection, your Honor.

15               THE COURT:  She's acknowledging she was under

16          oath.

17          Q    And you understand that an oath obligates you to tell

18      the truth --

19          A    Yes.

20          Q    -- under penalty of perjury and under moral authority,

21      correct?

22          A    Correct.

23               MR. ROSENFELD:  Objection.

24               THE COURT:  Yes.  All right.

25               MR. CANTOR:  Can she answer?

1          MR. ROSENFELD:  Objection.

2          THE COURT:  The objection is sustained.

3     Q    Do you understand that an oath obligates you by law to

4     tell the truth?

5          MR. ROSENFELD:  Objection.

6          THE COURT:  Sustained.  This has already been the

7     instruction.  The jury is aware.

8          MR. CANTOR:  Okay.

9          THE COURT:  Mr. Rosenfeld.

10    REDIRECT EXAMINATION

11    BY MR. ROSENFELD:

12    Q    Ms. Dempsey, were you able to hear any of the words

13    between Sosa and the defendant Mr. David when you said that?

14    A    Of course not.  The music was too loud.

15    Q    When you said, "I thought he was arguing," what did

16    you mean by that?

17         MR. CANTOR:  Objection.  It speaks for itself.

18         THE COURT:  Yes, it does.

19         MR. ROSENFELD:  Okay.  No further questions.

20         THE COURT:  You may stand down.  Thank you.

21         THE WITNESS:  Thank you.

22         (Whereupon, the witness left the stand and the

23    courtroom.)

24         THE COURT:  All right.  People have already

25    indicated that they have now rested.  We will now turn to

tr/a    Proceedings

1    the defense.  The Court having reserved to the People usual

2    motion at the close of the defense, that is the usual

3    motion at the close of the People's case, we now turn to

4    the defense to see if they wish to go forward with any

5    witnesses.  We already know there is no obligation on the

6    part of the defense to do anything whatsoever.

7            We will now ask to see if they wish to.  Mr.

8    Cantor.

9            MR. CANTOR:  I wish to preserve the record by way

10   of motions for trial order of dismissal.  I wish that the

11   jury retire for a short period of time and I will not make

12   full blown motions, but for purposes of preservation.

13           THE COURT:  I've already reserved them for you.

14           MR. CANTOR:  Well --

15           THE COURT:  As I just stated on the record a

16   moment ago.

17           MR. CANTOR:  I heard it, Judge.

18           THE COURT:  Okay.  So it's reserved.

19           MR. CANTOR:  It obliges me nonetheless.

20           THE COURT:  All right.  We'll do it, get the

21   housekeeping out of the way.

22           MR. CANTOR:  Thank you.

23           THE COURT:  All right.  Madam forelady and ladies

24   and gentlemen of the jury, please follow the officer.  We

25   have some technical legal things we must do and then we'll

1      call you right back.

2                    {Whereupon, the jury left the courtroom.}

3                    THE COURT:  All right.  The jury has been

4      excused.  On the non prima facie case, Mr. Cantor.

5                    MR. CANTOR:  If it please, your Honor, firstly,

6      we're moving for a trial order of dismissal with respect to

7      the count -- first count of murder in the second degree.

8      Specifically, we do not think that the People have at least

9      a prima facial level looking at the evidence and viewing

10     the evidence in the light most favorable to the People made

11     out the element of intent to cause death, the mens rea

12     element of murder in the second degree, and it's our

13     position that that ought be dismissed by way of a trial

14     order of dismissal.

15                    Secondly, if it please, your Honor, there is a

16     count of manslaughter in the first degree, which is the

17     second count of the indictment, which requires as a

18     constituent element to cause serious physical injury.  We

19     suggest that the record viewed in the light most favorable

20     to the People indicates that all the defendant did with

21     respect to both murder in the second degree and

22     manslaughter in the first degree is wildly swing out, being

23     a stranger at that party and knowing no one else other than

24     Margie and having been threatened, by testimony of the

25     people's witnesses, all of the people's witnesses,

1    including this last witness who ultimately came to

2    recognize that under oath she said arguing.

3         We're going to suggest to your Honor that the

4    mens rea element, intent to cause serious physical injury

5    with respect to the second count of the indictment, has not

6    been made out to a prima facial level.  Mainly, in view in

7    the light most favorable to the prosecution, the People

8    have not established that element beyond a reasonable

9    doubt.  And we suggest to your Honor that you be compelled,

10   that you are compelled by virtue of operation of law to

11   dismiss both murder in the second degree and manslaughter

12   in the first degree.

13        Now, as to the third count, I don't know what the

14   Court's intent is and I don't know what the People's intent

15   is with respect to that A misdemeanor of criminal

16   possession of a weapon in the fourth degree, I believe, but

17   in any event, viewing the evidence in the light most

18   favorable to the People, there has really been no

19   description of that knife other than a bent -- a bend at

20   the end of the knife.  No one has testified really as to

21   the type of knife it was, testified it was a beige handle,

22   brown handle, one does not even know if it is a knife.  But

23   nonetheless, we don't think that the proof rises to the

24   level of a prima facie case.

25        Viewing the evidence in the light most favorable

1    to the People, we suggest that the People have not

2    established that my client was in possession of a knife

3    with intent to use it unlawfully against another, that the

4    proof does not rise to the level of guilt beyond a

5    reasonable doubt viewing it in the light most favorable to

6    the People.  And thus we ask for a trial order of dismissal

7    with respect to that third count of the indictment.

8            At the end of the case, just as a matter of

9    courtesy, we will be asking the Judge in conference for

10   other charges so to give your Honor, so to speak, a leg up,

11   but for the moment we're just moving for trial orders of

12   dismissal with respect to the three counts.

13           THE COURT:  Thank you.

14           MR. ROSENFELD:  People will rest on the record,

15   your Honor, that the evidence proves in the light most

16   favorable to the People that each and every one of those

17   counts have been proved, and each and every one of the

18   elements of those counts have been proved.

19           THE COURT:  Yes.  With respect to the application

20   and the three prongs therein, the Court denies.  This will

21   be a matter for the jury to determine and the application

22   motion is denied.

23           MR. CANTOR:  Exception.

24           THE COURT:  Noted.  Let us now bring back the

25   jury.

1           COURT OFFICER:  Jury entering.

2           (Whereupon, the jury entered the courtroom.)

3           THE COURT:  All right.  The Court having attended

4      to the business at hand, we're now ready to turn to the

5      defense to see if the defense wishes to go forward with any

6      witnesses.

7           Mr. Cantor, does the defense intend to go forward

8      with any witnesses?

9           MR. CANTOR:  It does.  If it please, your Honor,

10     defense calls to the stand David Delgado.

11          THE COURT:  Mr. Delgado to the witness stand.

12          (Whereupon, the witness entered the stand.)

13          THE CLERK:  Do you solemnly swear the testimony

14     you give this Court shall be the truth, the whole truth and

15     nothing but the truth, so help you God?

16          THE WITNESS:  I do.

17          COURT OFFICER:  Have a seat.

18          Witness gives his name as David Delgado, resident

19     of Brooklyn.

20          THE COURT:  Good morning, Mr. Delgado.

21          THE WITNESS:  Good morning, sir.

22          THE COURT:  Just sit back, be comfortable, listen

23     carefully what Mr. Cantor will pose and later the district

24     attorney.  Answer please as you know only the question that

25     is asked.

tr/a    D. Delgado - Defense - Direct

1                    THE WITNESS:  Okay.

2                    THE COURT:  Keep your voice loud so everyone

3         might hear.

4                    THE WITNESS:  Okay, sir.

5                    THE COURT:  Mr. Cantor, your witness.

6                    MR. CANTOR:  Indeed, your Honor, my witness.

7    DIRECT EXAMINATION

8    BY MR. CANTOR:

9         Q    David, how old are you?

10        A    I'm 36 years Old.

11        Q    You see this last lady, she has to hear you.  You got

12   to keep your voice up.

13        A    I'm 36 years Old.

14        Q    And what country were you born in?

15        A    In United States.

16        Q    Once again --

17        A    Brooklyn, New York.

18        Q    And your parents, where were they born?

19        A    In Puerto Rico.

20        Q    Now, David, did there come a time after being born in

21   Brooklyn, New York, that you moved to Puerto Rico which is a

22   territory of the United States?

23        A    Yes.

24        Q    How old were you when you moved to Puerto Rico with

25   your family?

1     A     I was 16 years old.

2     Q     Now, did there come a time, David, when you were

3  approximately 16 years old that into your life came a

4  step-father?

5     A     Yes.

6     Q     Had the step-father been with your mother when you

7  were living here in the United States before you went to Puerto

8  Rico?

9     A     Yes.

10    Q     For how long had you resided with your mother and your

11  step-father here in the United States, New York City?

12    A     For ten years.

13    Q     Do you have any siblings?

14    A     Yes.

15    Q     Brothers, sisters?

16    A     Yes, I do.

17    Q     How many?

18    A     With my moms, one, and for my father side five.

19    Q     Okay.   Now, did there come a time either here in New

20  York City or in Puerto Rico that your step-father did something

21  to you?

22    A     Here in New York.

23    Q     For how long a period was he doing whatever he did?

24    A     Like for two years, three years max.

25    Q     What was he doing --

1          MR. CANTOR:  Withdrawn.

2     Q    How old were you when he began doing this?

3     A    I was eight.  Between eight, nine and ten.

4     Q    What was he doing to you?

5          THE COURT:  And this was back here in the United

6     States?

7     Q    Was this in the United States?

8     A    Yes.

9     Q    You got to talk louder.

10    A    Yes.

11    Q    What was he doing to you for this approximate two year

12    period of time?

13    A    He -- he touched me.  He used to touch me.

14    Q    Touch you where, David?

15    A    In my private parts.

16    Q    I want you to be -- I know it's difficult, David, but

17    you have to tell this jury, more specifically where was he

18    touching?

19    A    He used to touch me in my -- my anal.

20    Q    Where?

21    A    My penis.

22         THE COURT:  Take your time.

23         MR. CANTOR:  Do we have any tissues, Judge?

24         (Whereupon, a brief pause was taken.)

25    Q    Tell me when you're ready to continue, David.  If at

1    any time you want some water, just ask a court officer behind

2    you.

3         A    I'm ready.

4         Q    Okay. I want you to specifically during this period

5    when you were eight, nine and ten here in New York, I want you

6    to describe with specificity what your step-father was doing to

7    you.

8         A    When my moms would go to work --

9         Q    I can't hear you.

10        A    When my moms would go to work or she go to church, she

11   would leave me and my brother with my step-father, and there

12   would -- there would come a time that he would force us to

13   watch porno movies with him, and when I go to sleep or when my

14   brother, he would just walk into our room and he would just

15   start touching me, and he would tell me don't move or I'm just

16   gonna hit you, stuff like that.

17        Q    Where did he touch you, David?

18        A    Touched me in my anal and my penis.

19        Q    In your anus?

20        A    Yeah.

21        Q    And in your penis?

22        A    Yes.

23        Q    Did any part of his body come into contact with your

24   anus and/or your penis?

25        A    His finger.

1      Q     This was going on for approximately two years?

2      A     Like three years.

3      Q     David, as he was touching you, was he doing anything

4   to his own body?

5      A     He would touch himself and he would make like noises

6   like yeah, that's what you like he would tell me.

7      Q     Did he ever masturbate in front of you or your brother

8   in your presence?

9                  MR. ROSENFELD:  Objection.  Leading.

10                 THE COURT:  I'll allow it.

11     A     Yes.

12     Q     Now, David, did you tell your mother about these

13  frequent occurrences?

14     A     I spoke to my mom and she didn't believe me.  She

15  didn't believe me.

16     Q     Okay.  David, now, did there come a time  - you were

17  born in what year?

18     A     1975.

19     Q     Did there come a time when you were 14 years old that

20  you attempted something?

21     A     Yes, I attempted suicide.

22     Q     I want a loud vice.

23     A     Yes.

24     Q     What did you attempt?

25     A     Suicide.

1    Q    And how did you attempt at 14 suicide?

2    A    I drank some painkillers and I jumped in the river.

3    Q    Were you rescued?

4    A    Yes.

5    Q    I want you to tell in a loud voice why it was at such

6    an age of 14 you attempted suicide.

7    A    I was just ashamed of myself and I always thought I

8    wasn't worth nothing.

9    Q    I'm sorry?

10   A    I was ashamed of myself.  I thought I wasn't worth

11   nothing.

12              MR. CANTOR:  Can I have that read back, Judge?

13              THE COURT:  Yes.

14              (Whereupon, the requested portion was read by the

15   court reporter.)

16   Q    David, can I continue?

17   A    Yes.

18   Q    Did there come a time at age 25 that you attempted

19   something?

20   A    I attempted suicide again.

21   Q    How?  By what means?

22   A    I tried to hang myself.

23   Q    You were obviously not successful, you're here today?

24   A    No.

25   Q    Correct?

tr/a    D. Delgado - Defense - Direct

1     A     Yes.

2     Q     And tell us why at age 25 you tried to hang yourself?

3     A     I was having some problems with my ex-wife and I just

4  couldn't handle it.

5     Q     I'm sorry?

6     A     I couldn't just handle it no more.  I was -- too much

7  problems with her and my other baby mother of my kids.

8     Q     David, were you happy or depressed or indifferent?

9             MR. ROSENFELD:  Objection to leading.

10            THE COURT:  I'll allow it.

11    A     I was depressed.

12    Q     Now, did there come a time about seven years later at

13  age 32 that you attempted something?

14    A     I attempted suicide again.

15    Q     By how?

16    A     Tried to hang myself again.

17    Q     What was your state of mind at that time?

18    A     Just wanted -- just kill myself that day.

19    Q     Why?

20    A     I was so depressed, you know.

21    Q     I can't hear you.

22    A     I saw my wife with another guy so I just -- just

23  wanted to kill myself that day.

24    Q     Now, there came a time, David, when you were arrested

25  on the 26th of December 2009, about 30 months ago, correct?

1    A    Correct.

2    Q    You were sent by the Department of Corrections for a

3  mental evaluation at the Cumberland Diagnostic Treatment Center

4  in Brooklyn, correct?

5    A    Correct.

6    Q    They evaluated you, questioned and examined you,

7  correct?

8    A    Correct.

9    Q    At that time, were you feeling down, depressed or

10  hopeless?

11    A    I was hopeless.  I was feeling hopeless.

12    Q    Was that once in a while, every day?

13    A    Nearly every day.

14    Q    Did you have little interest or pleasure in doing

15  things?  Was that an occurrence in your life?

16              MR. ROSENFELD:  Objection.  Leading.

17              THE COURT:  I'll allow it.

18    A    Nearly every day.

19    Q    Did you have trouble falling or staying asleep?

20              MR. ROSENFELD:  Objection.

21              THE COURT:  I'll allow it subject to connection.

22    A    Nearly every day.

23    Q    Were you feeling tired or having little energy?

24              MR. ROSENFELD:  Objection.

25              THE COURT:  Subject to connection, Mr. Cantor.

```
 1              MR. CANTOR:  Thank you.

 2     A    Nearly every day.

 3     Q    Did you have a poor appetite?

 4     A    Nearly every day.

 5     Q    Were you feeling bad about yourself or that you were a

 6   failure or had let down yourself or your family?

 7              MR. ROSENFELD:  Objection.

 8              THE COURT:  Compound question.

 9     Q    All right.  Were you feeling bad about yourself?

10              MR. ROSENFELD:  Objection.

11              THE COURT:  I'll allow it.

12     A    Nearly every day.

13     Q    Were you feeling that you were a failure?

14              MR. ROSENFELD:  Objection.

15              THE COURT:  I'm allowing the line.

16              MR. CANTOR:  Thank you.

17              THE COURT:  Your continuing objection is noted.

18     A    Nearly every day.

19     Q    Were you feeling that you had let yourself or your

20   family down?

21     A    Nearly every day.

22     Q    Did you have trouble concentrating on things such as

23   reading a newspaper or watching a television program?

24     A    Nearly every day, yes.

25     Q    Would it be a fair statement to say that from an early
```

tr/a    D. Delgado - Defense - Direct

```
 1    age until the present you suffer from depression?
 2                    MR. ROSENFELD:  Objection.
 3                    THE COURT:  Overruled.
 4        A    Yes.
 5        Q    Have you been diagnosed by a physician or physicians
 6    as suffering from depression?
 7        A    Yes.
 8        Q    Do you know what bipolarity is?
 9        A    Yes.
10        Q    Have you ever been diagnosed as suffering from being
11    bipolar?
12        A    Yes.
13                    MR. ROSENFELD:  Objection.
14                    THE COURT:  Overruled.
15        Q    This goes back from the present to when, David?
16        A    To now.
17        Q    From now back to when?
18        A    At the age of -- I was 14.  I was depressed.
19        Q    Now, as a result of these mental illnesses, were you
20    ever prescribed anything?
21                    MR. ROSENFELD:  Objection.
22                    THE COURT:  Overruled.
23                    MR. ROSENFELD:  Characterization.
24        Q    You can answer.
25        A    Yes.
```

```
 1        Q    What?

 2        A    For depression.

 3        Q    What was that?  You got to speak in a loud voice.

 4        A    I was given medication for depression and for mood

 5    establishes.

 6        Q    Mood stabilizers?

 7        A    Mood stabilizers, yes.

 8        Q    Do you know what the word psychotropic means?

 9        A    No.

10        Q    But you were given medicine to control your depression

11    and your bipolarity?

12        A    Yes.

13        Q    How long have you been --

14             MR. CANTOR:  Withdrawn.

15        Q    You're presently in the custody of the Department of

16    Corrections, correct?

17        A    Yes.

18        Q    Do you still get these medications?

19        A    Yes, I do.

20        Q    So for how many years in total have you been on these

21    medications?

22        A    Nearly twenty years.  On and off.

23        Q    Now, what was the last grade if you were in school

24    that you completed?

25        A    Eighth grade.
```

1   Q    You can read and write in English, can you not?

2   A    Barely.

3   Q    But you can?

4   A    Yes.

5        MR. CANTOR:  Judge, I'd like the People's

6   exhibits.  That one will suffice.

7   Q    You saw People's 14 on the television set, did you

8   not?

9   A    Yes.

10  Q    That's in your hand?

11  A    Yes.

12  Q    That's your handwriting?

13  A    Yes.

14  Q    That's your signature?

15  A    Yes.

16  Q    So would it be a fair statement from the time you

17  first came into contact with the police on the 26th of December

18  2009 until you were brought before a court you were fully

19  cooperative with the police?

20  A    Yes.

21  Q    And you did what they asked?

22  A    Yes, I did.

23  Q    And how tall are you, David?

24  A    I'm 5'-6".

25  Q    And on December 26, 2009, how much did you weigh?

1        A     Approximately like 190.

2        Q     Okay.  Now, when you were prescribed these medicines

3    for your bipolarity and your depression, had you been informed

4    not to drink alcohol while on these medications?

5                   MR. ROSENFELD:  Objection to leading.

6                   THE COURT:  I'll allow it.

7        A     Yes.

8        Q     Do you recall testimony here in this courtroom while

9    you were present that on the night of the party, the 24th of

10   December 2009 carrying forth into the 25th of December '09,

11   that you had six hard drinks of alcohol?

12       A     Yes.

13       Q     And some beer?

14       A     Yes.

15       Q     Is that true?

16       A     Yes, it is true.

17       Q     Well, what, if any, effect did that have on your state

18   of mind --

19                   MR. CANTOR:  Withdrawn.

20       Q     Had you taken the medications that day?

21       A     I did.

22       Q     Before you went to the party?

23       A     Yes, I did.

24       Q     So I want you to tell the jury what effect that had on

25   your mind, the six hard -- the six drinks of hard liquor and

1   the cans of Coors beer?

2       A    I was pretty drunk.

3       Q    Was your head stable?  Was it moving?

4       A    I was kind of dizzy.

5       Q    Now, way back when you had been convicted of a felony,

6   correct?

7       A    Excuse me?

8       Q    Way back when you had been convicted of a felony?

9       A    In 1991.

10      Q    Okay.  Now, when you lived in Puerto Rico, were you

11  ever convicted of a felony?

12      A    No.

13      Q    A misdemeanor?

14      A    Yes.

15      Q    A misdemeanor is contrasted to a violation?

16      A    Yes.

17      Q    Which one?  A misdemeanor or a violation?

18      A    Misdemeanor, misdemeanor.

19      Q    Were you present in court when the Judge at a hearing

20  ruled?

21          MR. ROSENFELD:  Objection, your Honor.  It's an

22      improper question.

23          THE COURT:  Well, let me hear the question.

24      Q    Were you?

25      A    Yes.

tr/a    D. Delgado - Defense - Direct

```
 1       Q      Were you -- I'll ask you again.

 2       A      I don't understand the question.

 3       Q      Oh, you don't understand.  Do you know that below a

 4    misdemeanor there's a violation?

 5       A      No, I didn't know that.

 6       Q      Okay.  What I want to know is you've once been

 7    convicted of a felony, correct?

 8       A      Correct.

 9       Q      Had you been convicted of the lowest grade offense, a

10    violation more than one time?

11       A      Yes.

12       Q      And that constitutes --

13              MR. CANTOR:  Withdrawn.  Withdrawn.

14       Q      We move on to a new area.  Now, for three years you

15    abused alcohol, would that be a correct statement?

16       A      Yes.

17              MR. ROSENFELD:  Objection.  Leading.

18              THE COURT:  One second.  The objection is

19       sustained on that question.

20       Q      When did you abuse -- just tell us when you abused

21    alcohol.  When?  Approximately how old were you?

22       A      At 14.

23              MR. ROSENFELD:  Objection, your Honor, two

24       questions.

25              THE COURT:  Yes, two questions.
```

tr/a    D. Delgado - Defense - Direct

1    Q    How old were you when you abused alcohol?

2    A    14.

3    Q    How long did it last for, the abuse?

4    A    For a year.

5    Q    Did you ever abuse marijuana?

6    A    Yes.

7    Q    How old were you?

8    A    I was young, 14.

9    Q    For how long did it last?

10   A    Like two years.

11   Q    Now, when you were at the Cumberland facility having

12   been sent there for diagnosis and analysis by the Department of

13   Correction, was your mental health evaluated that you had

14   mental health conditions that significantly affect functioning?

15             MR. ROSENFELD:   Objection.

16             THE COURT:   I'll allow it.

17

18             (Continued on next page.)

19

20

21

22

23

24

25

Defense - DAVID DELGADO - direct

1644

1      MR. ROSENFELD:  Objection.

2      THE COURT:  I will allow it.

3   Q.   Please answer.

4   A.   Yes.

5   Q.   And you also told them at the Cumberland Health

6   Facility that you suffered from depression and bipolarity?

7      MR. ROSENFELD:  Objection.

8      THE COURT:  Overruled.

9   A.   Yes.

10   Q.   When you were examined at Cumberland they had your

11   medical documentation there; did they not?

12      MR. ROSENFELD:  Objection.

13      THE COURT:  If he knows.

14   A.   I am not aware of that.

15   Q.   When you went to the Cumberland Health Facility you

16   told them you were currently in mental treatment, correct?

17      MR. ROSENFELD:  Objection, leading.

18      THE COURT:  No, I will allow it.

19   A.   Yes.

20   Q.   And you told the Cumberland personnel that you had in

21   the past received mental treatment, correct?

22   A.   Yes.

23   Q.   How many times have you been confined to a mental

24   institution as a result of your mental condition?

25   A.   Three times.

B-ljb

Defense - DAVID DELGADO - direct

1645

1    Q.    How old were you the first time you were confined to a
2    mental institution?

3    A.    I was 14.

4    Q.    And, approximately, how long did you remain there?

5    A.    Um --

6    Q.    Approximately?

7    A.    A week.

8    Q.    And the second time how old were you when you were
9    mentally institutionalized?

10   A.    I was 25.

11   Q.    How long did you remain on that occasion?

12   A.    I was there for four days.  Four days.

13   Q.    And on the third occasion you were mentally
14   institutionalized how old were you, approximately?

15   A.    Thirty two.

16   Q.    And how long were you on that -- at that time
17   institutionalized at a mental facility?

18   A.    Three to four days.

19   Q.    Now, you were diagnosed while at Cumberland for
20   environmental restrictions; were you not?

21   A.    Yes.

22         MR. ROSENFELD:  Objection as to what somebody
23   else diagnosed him.

24         THE COURT:  Sidebar.

25         MR. CANTOR:  No, Judge, please.

B-1jb

Defense – DAVID DELGADO – direct

1646

1    MR. ROSENFELD:  I'm objecting.

2    THE COURT:  Overruled.

3    Q.  And were you diagnosed as having environmental

4  restrictions concerning being in groups of people?

5    MR. ROSENFELD:  Objection, it's all leading.

6    THE COURT:  Yes, I -- I am allowing latitude.

7    A.  Yes.

8    Q.  There was a final diagnosis rendered after you were

9  examined at Cumberland, correct?

10    MR. ROSENFELD:  Objection.

11    THE COURT:  Overruled.

12    A.  Yes.

13    Q.  And was that bipolarity and depression?

14    MR. ROSENFELD:  Objection.

15    THE COURT:  Overruled.

16    Q.  Can you speak up?

17    A.  Yes.

18    Q.  And it was in 2009 that you were sents there, correct?

19    A.  Correct.

20    Q.  Well, let's get to 2009.  You heard Margie testify in

21  this courtroom; did you not?

22    A.  Yes.

23    Q.  And prior to going to the party on the evening of

24  December 24, 2009, how long had you known Margie?

25    A.  Like three, four months.

B-ljb

Defense - DAVID DELGADO - direct

1647

1    Q.    And had you been going out with her socially?

2    A.    Yes.

3    Q.    And would you consider yourself -- there came a time

4    during that three or four month period that you were her

5    boyfriend?

6    A.    Yes.

7    Q.    You saw her exclusively and she saw you exclusively?

8    A.    Yes.

9    Q.    So did you, at first, when Margie suggested you go to

10   the party on December 24, '09, were you at first willing to go?

11             MR. ROSENFELD:  Objection, leading.

12             THE COURT:  I will allow it.

13   A.    No.

14   Q.    But eventually -- withdrawn.

15   Did Margie press the issue so-to-speak?

16             MR. ROSENFELD:  Objection, leading.

17   A.    Yes.

18             THE COURT:  I am allowing it.

19   Q.    And did you eventually consent to go to the party?

20   A.    Yes.

21   Q.    And did you go to the party with Marjorie (sic.) on

22   December 24, '09?

23   A.    Yes.

24   Q.    And aside from Margie I want you to give me an

25   approximation of how many people were at the party at the time

B-1jb

Defense - DAVID DELGADO - direct

1648

1    that you arrived, approximately?

2        A.   Twelve, like 12.

3        Q.   Does that include you and Margie or is that you and

4    Margie plus 12?

5        A.   Including me and Margie.

6        Q.   I'm sorry?

7        A.   By including me and Margie.

8        Q.   Okay.  Of the other ten people were there also

9    children there?

10       A.   Yes.

11       Q.   Okay.  Did you know any of the adults or any of the

12   children that were at the party?

13       A.   I had met two people that --

14       Q.   Prior to the party?

15       A.   Yes.

16       Q.   Who?

17       A.   Carmen Diaz and Melissa Dempsey.

18       Q.   And Melissa.  Melissa was the young lady who testified

19   here this morning concerning arguing, correct?

20       A.   Correct.

21       Q.   And you knew Carmen Diaz, she was the hostess of the

22   party?

23       A.   Yes.

24       Q.   And aside from knowing them you had been introduced to

25   them by Margie?

B-1jb

Defense - DAVID DELGADO - direct

1649

1    A.   Yes.

2    Q.   Did you know anything more about them?

3    A.   No, nothing.

4    Q.   So everyone at the party was of virtual a stranger to

5    you except for Margie?

6    A.   Right.

7    Q.   And when you got to the party did Margie introduce you

8    to everyone?

9    A.   Yes, she did.

10   Q.   And did you say hi, hello or how are you to the people

11   that you were introduced to?

12              MR. ROSENFELD:  Objection, leading.

13              THE COURT:  I will allow it.

14   A.   Yes.

15   Q.   Did you shake hands with people that you were

16   introduced to?

17   A.   Yes, I did.

18   Q.   And you heard testimony that there was hard liquor at

19   the party, correct?

20   A.   Correct.

21   Q.   And there was beer cans at the party?

22   A.   Yes.

23   Q.   And you heard testimony you had had about six cups

24   larger than the Dixie cup in front of you of hard liquor?

25   A.   Yes.

Defense - DAVID DELGADO - direct

1650

1    Q.   Is that correct?

2    A.   That's correct.

3    Q.   And that you had had beer from the beer cans?

4    A.   Yes.

5    Q.   Now, there came a time that you were introduced to

6    Sosa when you arrived at the party, correct?

7    A.   Correct.

8    Q.   You had never met the man before?

9    A.   Never.

10   Q.   And Margie introduced you to him?

11   A.   Yes, she did.

12   Q.   And the very first time that you are meeting this man

13   Sosa was he taller than you?

14   A.   Yes, he is.

15   Q.   You heard the medical examiner testify that he was six

16   feet tall?

17   A.   Yes.

18   Q.   That would be approximately a half a foot taller than

19   you?

20   A.   Yes.

21   Q.   The very first time that you met Sosa what did he say

22   or do to you?

23   A.   Um, when I was introduced to him I expanded

24   (indicating) my hand.

25   Q.   Loud voice.

Defense - DAVID DELGADO - direct

1651

1    A.    When I was induced to him I expanded (indicating) my
2    hand to embrace him.
3              MR. CANTOR:   The record should reflect that the
4          witness has put out his right hand, parallel to the floor
5          in a hand- shake fashion.
6              THE COURT:   So indicated.
7    Q.    Please continue.
8    A.    And he reject to give me his hand.
9    Q.    I'm sorry.
10   A.    Rejected to give me his hand.
11   Q.    I see.  Did he say anything to you?
12   A.    Yes, he did.
13   Q.    What did he say to you?
14   A.    He asked me if Margie was my girlfriend and I told
15   him, yes, she is and he told me --
16   Q.    Loud voice and slowly.
17   A.    He told me that if the day I disrespect her that I was
18   going to have problems with him and his peoples.  That she was
19   not alone and she had back up from everybody at the party and
20   that he was going to beat me up.
21   Q.    Did that strike you as somewhat odd?
22   A.    Yes, it did.
23   Q.    Did you make any reply to that threat?
24   A.    I told him okay.  Whatever.
25   Q.    And then there came a time that you mingled with the

B-ljb

Defense - DAVID DELGADO - direct

1652

1    other people?

2         A.   Yes, I did.

3         Q.   Talked to the other people?

4         A.   Yes, I did.

5         Q.   Drank alcoholic beverages?

6         A.   Yes, yes.

7         Q.   And there came a time once again when you found

8    yourself confronted by Sosa, correct?

9         A.   Correct.

10        Q.   For the second time, correct?

11        A.   Correct.

12        Q.   And what, if anything, did he say to you on this

13   second occasion?

14        A.   He approached me again and he asked me where I was

15   from and I told him I was from Brooklyn, and he told me remember

16   where you at you, you in the Bronx you are not in Brooklyn and

17   that if I ever disrespected Margie that he was going to fuck me

18   up.  That this was her friends.  He knew her son and that she

19   was not going -- he was not going to let anybody, an outsider,

20   come in and disrespect his Peoples.

21        Q.   And did that strike you as odd?

22        A.   Yes, it did.

23        Q.   Did you say anything in return?

24        A.   Yes.

25        Q.   What did you say?

Defense - DAVID DELGADO - direct

1653

1      A.   I told him if, if I'm with her and she's accepting the

2   person that I am it's because I have no problems -- she has no

3   problems with me so it doesn't matter if, meaning like if I am

4   from Brooklyn or from wherever, that she accepts me for the

5   person that I am.

6      Q.   Did he respond that that?

7      A.   He just told me that he was keeping an eye close on

8   me.

9      Q.   He would keep a close eye on you?

10     A.   Yes.

11     Q.   Now, you heard witnesses testify that Sosa was

12   speaking in a very loud voice during this party?

13     A.   Yes.

14     Q.   When he threatened you the first time and threatened

15   you the second time describe the level of his voice.

16     A.   He was real loud.

17     Q.   And you heard people testifying in this courtroom that

18   Sosa that evening, the word is gesticulating meaning moving his

19   hands (indicating), flailing his hands in the air?

20     A.   Yes.

21     Q.   Did he do that on the two occasions that he made the

22   threats to you?

23              MR. ROSENFELD:   Objection.

24              THE COURT:   I will allow it.

25     A.   He was just pointing his finger (indicating) at my

B-1jb

Defense - DAVID DELGADO - direct

1654

1    hands while he was talking.

2            MR. CANTOR:  The record will reflect the witness

3        is taking his right hand, taking his index finger and

4        pointing it back and forth.

5            THE COURT:  So indicating.

6    Q.   Okay.  Now, did there come a time after these two

7    threats that a girl who you had been introduced to as Gabriella,

8    one of Carmen's Diaz's, daughter said something?

9    A.   To me?

10   Q.   No, to her mother?

11   A.   Yes, she did.

12   Q.   What did she say?

13           MR. ROSENFELD:  Objection.

14           THE COURT:  If he heard it, I will allow it.

15   Q.   Please.

16   A.   She stated --

17   Q.   In a loud voice?

18   A.   She stated that Sosa was acting up.  He was being

19   disrespectful, he was touching the females at the party that he

20   didn't want him no more in the house.

21   Q.   And was as a result of that Sosa brought -- taken from

22   the party?

23   A.   What?

24   Q.   Was he removed from the party?

25   A.   Yes, he was.

B-ljb

Defense - DAVID DELGADO - direct

1655

1       MR. ROSENFELD:  Objection, leading.

2   Q.   And when he was removed from the party?

3       MR. ROSENFELD:  Your Honor.

4       THE COURT:  Wait, wait, until I rule, Mr. Cantor.

5       MR. ROSENFELD:  It's a lot of leading.

6       MR. CANTOR:  Yes, your Honor.

7       THE COURT:  The objection is overruled.

8   Q.   And when he was taken from the party you remained at
9   the party, correct?

10  A.   Correct.

11  Q.   Now, did there come a time that you and Margie went to
12  Margie's apartment to get some cranberry juice because they had
13  run out of juice?

14  A.   Correct.

15  Q.   When you went to get the cranberry juice was that
16  after the second time you were threatened by Sosa?

17  A.   After I was threatened twice then I left.

18  Q.   Okay.  You go to Margie's house, correct?

19  A.   Correct.

20  Q.   She gets the cranberry juice?

21  A.   Yes.

22  Q.   At that time as a result of what Sosa had been
23  threatening you in a loud voice at a party where you knew no one
24  other than Margie how were you feeling?

25  A.   I was feeling feared.  I had fear.

B-1jb

Defense - DAVID DELGADO - direct

1656

1    Q.   Can I hear you again?

2    A.   I was scared.  I was scared.

3    Q.   You were fearful?

4    A.   Yes.

5    Q.   As a result of that what did you do?

6    A.   I put a knife in my pocket.

7    Q.   Where did you get the knife?

8    A.   At the kitchen in Margie's house.

9    Q.   I can't hear you.

10   A.   In Margie's house -- apartment.

11   Q.   You see these two fingers here (indicating) index

12   fingers I want you to show the jury how long the blade was of

13   that knife?

14   A.   Indicating.

15        MR. CANTOR:  Indicating, approximately, three and

16   a-half to four inches, your Honor.

17        THE COURT:  So indicating.

18   Q.   And did that knife have a handle?

19   A.   Yes, it did.

20   Q.   What color?

21   A.   Black.

22   Q.   And what did you do -- and what kind of knife was it,

23   a steak knife, a dessert knife, what?

24   A.   A steak knife.

25   Q.   And then where did you put it?

Defense - DAVID DELGADO - direct

1657

1    A.   In my right-hand pocket.

2    Q.   Of your jeans?

3    A.   Of my jeans.

4    Q.   So you and Margie -- withdrawn.

5         When you took that knife what was your purpose in taking

6    that knife?

7                   MR. ROSENFELD:  Objection.

8                   THE COURT:  Overruled.

9    A.   For my protection?

10   Q.   Protection from who?

11   A.   From Sosa.

12   Q.   So you and Margie returned to the party, correct?

13   A.   Correct.

14   Q.   Margie brought --

15   A.   The cranberry juice.

16   Q.   -- the cranberry juice?

17   A.   Yes.

18   Q.   You continued to talk and mingle amongst the guests?

19   A.   Yes, I did.

20   Q.   You had more to drink?

21   A.   Yes, I did.

22   Q.   And -- and there came a time that you were about to

23   leave, correct?

24   A.   Correct.

25   Q.   Now, what kind of pants were you wearing?

Defense - DAVID DELGADO - direct

1658

1    A.    He has blue fitted jeans.

2    Q.    What kind of shirt?

3    A.    I had a white tie.

4    Q.    And did you have a jacket?

5    A.    Yes, I did.

6    Q.    What kind of jacket?

7    A.    It was a hoodie windbreaker.

8    Q.    What color?

9    A.    Gray.

10   Q.    You heard Detective Banker, the gentleman who

11   testified here who was on three-quarters disability pay, you

12   heard Detective Banker say that in your room in Brooklyn he put

13   this jacket draped it over your back so that your handcuffs

14   could not be seen; is that true?

15              MR. ROSENFELD:  Objection to form of the

16        question.

17              THE COURT:  If he understands it he may answer

18        it.

19   A.    Yes, it's true.

20   Q.    And it was a hoodie jacket windbreaker?

21   A.    No, it wasn't.

22   Q.    What was it?

23   A.    It was a leather jacket.

24   Q.    A leather jacket.  Did it have a hood?

25   A.    No, it didn't.

B-ljb

Defense - DAVID DELGADO - direct

1659

1    Q.   Okay.  What color leather, black --

2    A.   Black.

3    Q.   Black.  Now, you are back at the apartment, you've

4    told us you are drinking more, chatting more, mingling more.

5    Did there come a time that you decided to go?

6    A.   Yes.

7              MR. CANTOR:  Judge, I want all of the exhibits

8         from the party from apartment 3D.

9              (Whereupon the assistant district attorney

10        complies.)

11   Q.   And as you were leaving.

12             MR. CANTOR:  Judge, I need this machine.  It's

13        the People's machine and I don't want to do anything of an

14        obstructive or destructive act to it so I'm going to ask,

15        your Honor, to direct the People to activate it.  I know

16        not of this machine.

17             THE COURT:  Madam District Attorney, can you turn

18        it on.

19             MR. ROSENFELD:  It's been turned on, Judge.

20             THE COURT:  Thank you.

21   Q.   Okay.  Now, take a look at what has been marked

22   People's three in evidence.  You had your coat on and Margie had

23   her coat on?

24   A.   Yes.

25   Q.   And you were about to leave the party, correct?

B-ljb

Defense - DAVID DELGADO - direct

1660

1    A.    Right.

2    Q.    Did there come a third time that Sosa approached and

3    confronted you?

4    A.    He did.

5    Q.    Were you standing or seated at that time?

6    A.    I was standing.

7    Q.    And is there anywhere in this picture that you can

8    point to where you were standing?

9    A.    I was in front of the table.

10           THE COURT:   People's?

11           MR. CANTOR:   I already said it for the record.

12           THE COURT:   Please repeat.

13           MR. CANTOR:   People's three in evidence.

14           THE COURT:   People's three?

15           MR. CANTOR:   Yeah, People's three.

16           THE COURT:   Okay.

17   Q.    Stand up please with his Honor's permission.

18   A.    (Complies.)

19   Q.    Now point to where you were standing with your coat.

20   A.    I was standing right there (indicating).

21   Q.    Just keep your finger there.

22           MR. CANTOR:   He indicates mid-way of that table,

23   which has a laced sort of cloth over it.

24           THE COURT:   So indicating.

25   Q.    And when you were standing there Sosa you said

B-ljb

Defense - DAVID DELGADO - direct

1661

1   confronted or approached you, correct?

2        A.   Yes, yes he did.

3        Q.   And were you face to face and chest to chest?

4        A.   Yes.

5              MR. ROSENFELD:   Your Honor, again, objection to

6        leading.

7        Q.   And was he --

8              THE COURT:   I am allowing a little leeway.

9        Q.   And was he -- was he -- withdrawn.

10       Did he say or yell anything to you?

11       A.   Yes, he did.

12       Q.   What was that?

13       A.   He asked me if I was leaving.

14       Q.   And what did you say?

15       A.   I told him yes.

16       Q.   What did he do?

17       A.   He asked me to remember what he had told me and I told

18  him like what's your problem?  Like why you keep coming towards

19  me?  Like what is it with you and he kept telling me --

20       Q.   What did he say in a loud voice?

21       A.   He told me to remember and he warned me again.

22       Q.   Well, say it, don't characterize it.  Say it.  What

23  did he say?

24       A.   He told me that to remember to not disrespect Margie.

25  That he was going to fuck me up.  That she was not alone and he

Defense - DAVID DELGADO - direct

1662

1    was going to Brooklyn with Margie son to fuck me up.

2        Q.   And what about his hand or hands, did there come a

3    time as he was making that threat to you that his hand touched

4    your body?

5            MR. ROSENFELD:   Again, your Honor, objection,

6        leading.

7            THE COURT:   Yes.

8        Q.   What did he do?

9        A.   He was tapping my shoulder and my chest.

10       Q.   Can you -- when you say tapping you mean punching?

11       A.   Like going like this (indicating).

12           MR. ROSENFELD:   Objection.

13           MR. CANTOR:   The witness has taken his hand, his

14       right hand and rather hardly -- in a hard fashion indented

15       his left shoulder.

16           THE COURT:   So indicating.   The objection is

17       overruled.

18       Q.   Okay.   Was it an open hand or was it a fist,

19   Mr. Delgado?

20       A.   It was an open hand.

21           MR. ROSENFELD:   Objection, leading.

22       Q.   Can you show us again?

23       A.   He was going like this (indicating).

24           MR. CANTOR:   Okay.   The witness has gone like

25       that with all four fingers, with the thumb tucked in

B-ljb

Defense - DAVID DELGADO - direct

1663

1    parallel to the floor and in a hard fashion has indented

2    his left shoulder.

3              THE COURT:  So indicating.

4    Q.   You may be seated.

5              THE COURT:  The objection is overruled.

6    Q.   Yeah.

7              MR. CANTOR:  May he be seated, Judge?

8              THE COURT:  Yes.

9    Q.   And was he making that motion to you or doing these

10   things to you while he was threatening you for a third time?

11             MR. ROSENFELD:  Objection, leading.

12             THE COURT:  Overruled.

13   Q.   You can tell us.

14   A.   Yes.

15   Q.   Were you scared and frightened at that moment?

16             MR. ROSENFELD:  Objection, leading.

17   A.   I --

18             MR. ROSENFELD:  Objection.

19             THE COURT:  I will allow it.

20   Q.   Please.

21   A.   I got nervous.  I got nerve.

22   Q.   More nervous?

23   A.   I was scared.

24   Q.   You got to in a loud voice describe your state of

25   minds to this jury.

B-ljb

Defense - DAVID DELGADO - direct

1664

1    A.    I got scared.

2    Q.    Scared for what?

3    A.    For my safety, my life.

4    Q.    And as a result of being scared for your life what, if

5    anything, did you do?

6    A.    I just turned my back towards him.

7    Q.    Yes.

8    A.    Because Margie was already talking to one of her

9    friends and as soon as I turned my back he just grabbed me.

10   Q.    From where?

11   A.    From my shoulder (indicating) and just pulled me

12   towards (indicating) him.

13   Q.    So he pulled you towards him, that means your back was

14   coming towards his front; is that correct?

15   A.    Yes.

16   Q.    And what did he do at that point?

17   A.    He struck at me with his left hand.

18   Q.    Struck you where?

19   A.    Hit me between my neck and my face (indicating).

20   Q.    Is that with a fist or open hands?

21   A.    Fisted.

22   Q.    How many times did he do that?

23   A.    At that point he hit me one time.

24   Q.    What happened next?

25   A.    That's when I was leaned -- I leaned towards him and

B-1jb

Defense - DAVID DELGADO - direct

1  he struck me again.

2     Q.   where?

3     A.   He hit me in my face.

4     Q.   with his fist or an open hand?

5     A.   with his fist.

6     Q.   And what did you do?

7     A.   I put my hand in my pocket and I just started swinging

8  at him.

9     Q.   Now, when you put your hand in the pocket you grasped

10  the knife, correct?

11    A.   Correct.

12    Q.   were you holding the knife by it's handle such as I am

13  doing now (indicating)?

14            MR. CANTOR:   And the record should reflect that I

15       am holding my fist up.

16    Q.   Or did you put the knife in your hand in another

17  manner?

18    A.   In another manner like this (indicating).

19    Q.   You but it between your fingers?

20    A.   No, I didn't.

21    Q.   How?

22    A.   It's like this (indicating) I put my hand in my pocket

23  and I just pulled it out.

24    Q.   Sir, sir, this is the knife (indicating), right, this

25  is the handle (indicating), the rest is the blade.  Take it,

Defense - DAVID DELGADO - direct

1666

1    please.

2        A.    (Complies.)

3        Q.    Sit down, please.  Show the jury how you held the

4    knife (indicating).

5        A.    (Indicating).

6        Q.    So, you held it by it's handle, gripping it as if you

7    were gripping a ice cream cone (indicating)?

8        A.    Yes.

9        Q.    And what did you do hold, that hold that -- what did

10   you do with that knife as you were gripping it by its handle in

11   the fashion of holding an ice cream cone?

12       A.    I just started swinging up (indicating).

13       Q.    Now, now, do you remember seeing the videotape when

14   you were being interrogated by an assistant district attorney on

15   videotape; do you remember seeing it?

16       A.    Yes.

17       Q.    And you told the assistant district attorney that you

18   had blacked out during the time that you were striking this man

19   with the knife.

20       A.    Yes, I did.

21       Q.    And is that a fact?

22       A.    Yes, it is a fact.

23       Q.    Do you even remember how many times you were swinging

24   it?

25       A.    No.

B-ljb

Defense - DAVID DELGADO - direct

1667

1    Q.    Do you recall what portion of his body, he being Sosa,

2    you were swinging it at?

3    A.    At that point, no.

4    Q.    And there came a time, if you know, where was Margie

5    during this period of time?

6    A.    I believe she was behind me.

7    Q.    But you don't know?

8    A.    I don't know.

9    Q.    You don't know how many times you struck the man.

10   A.    No, I don't.

11             THE COURT:   What was that answer?

12             MR. CANTOR:   No, I couldn't (sic.)

13   Q.    In any event there came a time after while you were

14   blacked out and striking at the man.  You don't even remember

15   what portion of his body you were striking?

16   A.    No.

17   Q.    He was standing?

18   A.    Yes, he was.

19   Q.    You were standing?

20   A.    Yes.

21   Q.    Did there come a time when you finished striking and

22   you left the apartment?

23   A.    We fell together.

24   Q.    You and Sosa fell on where together?

25   A.    On the couch.

Defense - DAVID DELGADO - direct

1    Q.  Do you see that couch in People's three?

2    A.  Yes.

3    Q.  Can you point to where you and he fell. Stand up with

4  his honors permission and point to it.

5    A.  (Indicating).

6          MR. CANTOR:  He is pointing as one faces the

7  couch, the left most cushion in the upper left-hand corner

8  of such.

9          THE COURT:  So indicating.

10    Q.  Please sit down. What happened as -- what did you do

11  at that point?

12    A.  I leaned back, I got up and I just ran out the

13  apartment.

14    Q.  And when you ran out of the apartment did you run down

15  a hallway?

16    A.  Yes, I did.

17    Q.  This was the hallway that you ran down?

18    A.  Yes.

19    Q.  And right over here on the side (indicating), the

20  right side is the apartment door to 3D?

21    A.  Yes.

22          THE COURT:  That is People's?

23          MR. CANTOR:  This is People's two in evidence,

24  Judge.

25          THE COURT:  All right. Please continue.

Defense - DAVID DELGADO - direct

1669

1    Q.   And there come a time when someone caught up to you?

2    A.   Yes.

3    Q.   Do you remember the name of that person?

4    A.   It was Margie.

5    Q.   Okay.  Well, did there come a time that someone other

6    than Margie placed her hands-on your person?

7                MR. ROSENFELD:  Objection, leading.

8                THE COURT:  I will allow it.

9    Q.   Please.

10   A.   Melissa tried to grab me.

11   Q.   And where -- was she able to grab any portion of your

12   body?

13   A.   No, she couldn't touch me.

14   Q.   She couldn't?

15   A.   She couldn't, no.

16   Q.   What did you do?

17   A.   I was just running.

18   Q.   I see.  And?

19   A.   To --

20   Q.   And when you ran down the hallway there was an

21   elevator and stairway on that floor, correct?

22   A.   Correct.

23   Q.   How did you get down?

24   A.   I took the stairway.

25   Q.   And you're now outside?

B-ljb

Defense - DAVID DELGADO - direct

1670

1    A.    Yes.

2    Q.    And did there come a time when you were outside that

3    you saw Margie out there?

4    A.    After I ran, yes.

5    Q.    And did you give her certain items?

6    A.    Yes, I did.

7    Q.    What did you give her?

8    A.    I gave her, her cell phone and her keys.

9    Q.    And where did you go -- withdrawn.

10   What means of transportation did you take?

11   A.    I took a cab.

12   Q.    And where did you go?

13   A.    To Brooklyn.

14   Q.    That's where you live?

15   A.    Yes.

16   Q.    Do you know what happened to the knife?

17   A.    No, I don't.

18   Q.    Can you describe, as you were running down the

19   hallway, down the stairs and outside your state of mind?

20   A.    I was nervous.

21   Q.    What else?

22   A.    I was feared, I was shocked.

23   Q.    Did you know that the man was dead or about to die?

24   A.    No, I didn't.

25   Q.    And you went home?

Defense - DAVID DELGADO - direct

1671

1     A.   Yes, I did.

2     Q.   And that was in the early morning of December 25th,

3  Christmas Day '09, correct?

4     A.   Correct.

5     Q.   At that time was your mother and family living in

6  Puerto Rico?

7     A.   Yes.

8     Q.   Did you go to Puerto Rico?

9     A.   No.

10    Q.   You went to your house, to your apartment?

11    A.   Yes.

12    Q.   And the next day the police officers came to your

13 apartment and arrested you?

14    A.   Yes.

15    Q.   Handcuffed you inside your apartment?

16    A.   And he walked in.

17    Q.   He walked in, were you handcuffed?

18    A.   Yeah.

19    Q.   By the police officer?

20    A.   Yes.

21    Q.   Inside your apartment?

22    A.   Yes.

23    Q.   Now, it would be obvious -- withdrawn.

24       Would it be a fair statement to say that after the stabbing

25 was concluded you were dizzy and discombobulated and afraid and

B-1jb

Defense - DAVID DELGADO - direct

1672

1    scared and that your mind was not in its right place?

2                    MR. ROSENFELD:  Objection.

3                    THE COURT:  Sustained.

4        Q.    Describe your mind as you were running down the

5    hallway, down the stairs, down the street, in the cab to

6    Brooklyn, your state of mindful will you describe it?

7        A.    I was just blank.  I couldn't even focus.  I was just

8    running, running and I just stopped for a moment when Margie

9    called me.  I gave her what I gave her and I just kept running.

10   My -- I was just nervous.  I was just --

11       Q.    Were you frighten?

12       A.    I was frightened.

13                    (Continues next page.)

14

15

16

17

18

19

20

21

22

23

24

25

B-1jb

1    CONTINUED DIRECT EXAMINATION BY

2    MR. CANTOR:

3              MR. ROSENFELD:  Objection.

4              THE COURT:  As to leading, yes.

5        Q.   I want you to fully, amply describe your state of mind

6    to this jury.

7              You are running down the hallway, down the steps

8    outside and in the cab.  Describe your state of mind.

9              MR. ROSENFELD:  Objection.  Asked and answered.

10             THE COURT:  It's already been asked, but I will

11   allow him to continue on that.

12       Q.   Please, Mr. Delgado.

13       A.   I was frightened.  I was nervous.  I was just scared

14   for my life.  I just kept running.  I just kept running.

15       Q.   You didn't go to Puerto Rico to hide in your mother's

16   house, did you?

17       A.   No.

18       Q.   The police found you at home the next day?

19       A.   Yes.

20       Q.   And you fully cooperated with them?

21       A.   Yes.

22       Q.   And when they gave you your Miranda rights, you waived

23   those, gave them up, correct?

24             In other words, when they told you had a right to an

25   attorney do you understand, you have the right to remain silent

Delgado - Defendant - Direct

1  do you understand, if you cannot afford an attorney one will be

2  provided without cost, do you understand, things of that nature,

3  you told them you that you understood?

4      A.   I understood.

5      Q.   When they asked you whether or not after having

6  received those rights would you be willing to make a statement

7  and you said yes?

8      A.   I did the statement first, then they read me my rights.

9      Q.   Are you saying that the statement which consists of two

10  blue pages that's in your handwriting, right?

11     A.   Yes.

12     Q.   That's People's Number 14?

13     A.   Yes.

14     Q.   That was given to you by Detective Banker, correct?

15     A.   Correct.

16     Q.   You're saying you wrote out the statement before Banker

17  gave you your Miranda warnings?

18     A.   Correct.

19     Q.   And then after you had written it out, you gave the

20  statement, the two pages to Banker, correct?

21     A.   Correct.

22     Q.   And it was only then that he read you your Miranda

23  rights?

24     A.   Correct.

25     Q.   And eventually the assistant district attorney came?

**Delgado - Defendant - Direct**

1      A.   Correct.

2      Q.   She warned you of your Miranda rights?

3      A.   Correct.

4      Q.   You waived them, gave them up?

5      A.   Yes.

6      Q.   You answered each and every question she put to you to

7  the best of your ability?

8      A.   Correct.

9      Q.   She never asked you, did she, the assistant district

10  attorney, for a description of the knife, did she?

11            MR. ROSENFELD:   Objection.

12            THE COURT:   I will allow it.

13      Q.   Did she?

14      A.   Yes, she did.

15      Q.   Did you tell her?

16      A.   Yes, I did.

17      Q.   What did you tell her?

18      A.   It was a black knife, a steak knife.

19      Q.   But you don't know where in your travels you had

20  discarded it given your state of mind?

21      A.   I don't remember.

22      Q.   I can't hear you.

23      A.   Ask me the question again.

24      Q.   You don't know where you discarded it given your state

25  of mind?

1    A.   Yes.  I don't.

2              MR. ROSENFELD:  Objection.

3              THE COURT:  Sustained.

4    Q.   Why is it that you don't recall where you discarded it?

5    A.   I was just --

6    Q.   I can't hear you.

7    A.   I wasn't focused.

8    Q.   You were what?

9    A.   I wasn't thinking.

10   Q.   What was your state of mind when you discarded it?

11   A.   I was nervous.

12   Q.   Were you scared?

13   A.   I was nervous.  I wasn't focusing on what I was doing.

14   Q.   You were nervous from the events of the party?

15   A.   Yes.

16   Q.   You've waited how long for your day in court,

17   Mr. Delgado?

18             MR. ROSENFELD:  Objection.

19             THE COURT:  Sustained.

20   Q.   You have in this case entered a plea of not guilty,

21   correct?

22             MR. ROSENFELD:  Objection.

23             THE COURT:  Subject to connection.

24   A.   Not guilty, yes.

25   Q.   And you're testifying now to the best of your ability

1    to the truth, the whole truth and nothing but the truth so help

2    you God?

3                    MR. ROSENFELD:  Objection.

4                    THE COURT:  I will allow it.

5    A.    Yes.

6                    MR. CANTOR:  I've concluded my direct examination.

7                    THE COURT:  Thank you, Mr. Cantor.

8                    MR. CANTOR: People's witness.

9                    THE COURT:  Madam forelady, ladies and gentlemen

10    of the jury, the jury will now take a five minute break.

11    If anybody wishes to use the facilities, now is the time to

12    do so.  Be back in your seats in five minutes.

13                    (Jurors leave the courtroom.)

14                    (A recess is taken.)

15                    COURT OFFICER:  Jury entering.

16                    (Jurors enter the courtroom.)

17                    THE COURT:  All right.  We are all in place.  Mr.

18    DA, your witness.

19                    MR. ROSENFELD:  Thank you, Judge.

20    CROSS EXAMINATION BY

21    MR. ROSENFELD:

22    Q.    Mr. Delgado, before Mr. Cantor asked you about your

23    past abuse and you told him about what happened at ages 14, 25

24    and 32, that must have been very difficult to tell people and

25    talk to the jury about that, right?

1      A.    Yes.

2      Q.    I noticed you were crying as you said that, right?

3      A.    Yes.

4      Q.    Very emotional about it?

5      A.    Yes, I did.

6      Q.    The day after you were arrested, you spoke to

7   detectives about what happened in the apartment, right?

8      A.    Yes, I did.

9      Q.    You realized you just killed a man, right?

10      A.    Yes.

11      Q.    And I didn't see you crying in the video? You weren't

12   upset then, right? The day after?

13      A.    No.

14      Q.    No. But you realized when they arrested you that they

15   were arresting you for murder, right?

16      A.    Yes.

17      Q.    You had killed someone?

18      A.    Yes.

19      Q.    And when the detective arrested you and took you down

20   to his car, you were sitting in the car and you made a statement

21   to him, right?

22      A.       did.

23      Q.    Okay. The statement was yo, that guy kept fucking with

24   me all night. He was drunk. They took him outside and when he

25   came back he grabbed my arm. I saw a knife on the table and

**Delgado - Defendant - Cross**

1    grab it and swung at him.  The people in the party grabbed me

2    then I ran.

3              That's what you said to the detective, right?

4         A.   I did, yes.

5         Q.   Were you crying when you said that to him?

6         A.   No.

7         Q.   And you said that he grabbed my arm, right?  That's

8    what you told the detective?

9         A.   Yes, I did.

10        Q.   You didn't mention anything about being struck in the

11   neck, right?

12        A.   No, I didn't.

13        Q.   Okay.  And you say you saw a knife on the table when he

14   grabbed your arm, right?  That's what you told the detective?

15             MR. CANTOR:  Objection.  He said he grabbed the

16        knife from the table.

17             MR. ROSENFELD:  No.  He said I saw a knife on the

18        table.

19             THE COURT:  Wait.  Let me rule.

20             The objection is overruled.

21        Q.   You said I saw a knife on the table and grabbed it and

22   swung at him, right?

23        A.   Yes, I did.

24        Q.   You didn't say anything about having the knife in your

25   pocket to the detective when you were first arrested, right?

Delgado - Defendant - Cross

1      A.   No.

2      Q.   You also said the people in the party grabbed me,

3  right?

4      A.   Yes.

5      Q.   Okay.  That's not what happened.  You ran out you said?

6      A.   Yes, I did.

7      Q.   Okay.  So you weren't telling the truth to the

8  detective at that point?

9      A.   I told the truth.

10     Q.   Okay.  That's what you said in the car was the truth?

11     A.   I was confused at the moment.  I was -- my state of

12  mind wasn't clear at the moment.

13     Q.   Well, what wasn't clear at the moment?  You were

14  sitting in the police car, right?

15     A.   Yes.

16     Q.   And the detective wasn't saying anything to you and you

17  just said this to the detective, right?

18     A.   An officer asked me what happened.

19     Q.   Okay.  He did?

20     A.   Not him exactly, another officer.

21     Q.   Oh, another officer asked you what happened, okay.

22  Then you told him this statement, right?  Is there anything in

23  here that you didn't say?

24     A.   I just said what came out of my mouth at that point.

25  That's what I said.

**Delgado - Defendant - Cross**

1    Q.    Okay.  You hadn't had time to think much about it,

2    right?

3    A.    No,  didn't.

4    Q.    Were you surprised they came to your apartment and

5    arrested you?

6    A.    I was surprised.

7    Q.    You hadn't called 911 or anything, right?

8    A.    No.

9    Q.    In fact, you told us in the video that you called

10   Margie afterwards, right?

11   A.    Yes.

12   Q.    Is that true?

13   A.    Yes.

14   Q.    And when you called Margie, when was that, after the

15   party?

16   A.    She was in the precinct.

17   Q.    Yeah.

18   A.    When I called her.

19   Q.    On her cell phone?

20   A.    Yes.

21   Q.    Okay, so that would have been just a few hours after

22   the party, right?

23   A.    The next day.

24   Q.    The morning?

25   A.    Hours, yes.

**Delgado - Defendant - Cross**

Q.   Yeah, in the morning, and you had that conversation
with her that you told us in the video, right?

A.   Yes.

Q.   You were concerned they were going to arrest her?

A.   Yes.

Q.   And didn't you say you didn't know the guy was dead,
right?

A.   Yes, I didn't know.

Q.   But then she told you that he was dead?

A.   Yes, she did.

Q.   Isn't it true you never had a conversation with Margie?

A.   What?

Q.   You never had that conversation with Margie?

A.   I called her.

Q.   But you never had a conversation with her?

A.   A direct conversation?

Q.   Yeah.

A.   All she was asking me questions like what happened and
I told her what happened and she told me what happened between
you and Sosa and I was like I don't know and she told me he died
so I got nervous.  I hung the phone up.

Q.   Okay.  But you heard Margie testify the other day,
right?

A.   Yes, I did.

Q.   She never had a conversation with you?

Delgado - Defendant - Cross

A.  I guess she was nervous.

2       Q.  She was nervous?

3       A.  I guess.

4       Q.  When she was on the witness stand?

5       A.  I guess.

6       Q.  So after you had this conversation with Margie you knew

7  she was in the precinct the morning of December 25, 2009 -- let

8  me finish my question -- you just stayed in your house the rest

9  of the day, right?

10      A.  Yes.  I stood in my house.

11      Q.  All -- Christmas Day was December 25, 2009, right?

12      A.  Yes.  I stood in my house.

13      Q.  Did you go out in the evening, Christmas night?

14      A.  I took a walk and I came back.

15      Q.  Okay.  And then you went to sleep that night?

16      A.  Yes, I did.

17      Q.  Okay.  You woke up the next morning?

18      A.  Yes, I did.

19      Q.  Okay.  You weren't crying the next morning, were you?

20      A.  No, I wasn't.

21      Q.  So the next morning you woke up.  What did you do

22  December 26, 2009?

23      A.  I was calling my family letting them know what

24  happened.

25      Q.  You what?

**Delgado - Defendant - Cross**

1      A.   Calling my family letting them know what just happened.

2      Q.   You called your family where?

3      A.   In Puerto Rico.

4      Q.   What did you tell them?

5      A.   I told them what happened.

6      Q.   Okay.  Then what?

7      A.   And they was just talking to me, telling me like what

8   is going to happen now.  I was like I don't know what is going

9   to happen now, if they are going to come get me or I'm going to

10  turn myself in.

11     Q.   So you told them there was a choice, either you were

12  going to turn yourself in or the police were going to come get

13  you?

14     A.   Yeah, because I was talking with them at that time.

15     Q.   You hung up with them, then what did you do?

16     A.   I was in my neighbor's room and that's when my landlord

17  came and he called out my name.  He called me, Littles --

18  because that is what they used to call me when I was younger --

19  and when I opened the door, all I saw was a gun to my face right

20  there and he just told me put your hands on your head.  I put my

21  hands on my head.  I turned around, he handcuffed me and took me

22  out of the apartment.  They placed me in the stairwell and they

23  went in my room.

24     Q.   Okay.  And so between the time you left the apartment

25  and the morning of December 26, 2009, you never tried to turn

Delgado - Defendant - Cross

1   yourself in right?

2       A.   I didn't know what had happened.  I didn't know if he

3   was dead or not.

4       Q.   I see, but didn't you tell us a minute ago that Margie

5   told you that he died?

6       A.   I was confused.  I didn't understand what you said.

7       Q.   Don't be confused.  You just told us in the morning

8   when Margie was at the precinct she told you the guy died.

9       A.   It wasn't in the morning.  It was at nighttime.

10      Q.   Okay, nighttime of December 25, 2009, you're saying

11  Margie told you the guy died, right?

12      A.   Yes.

13      Q.   You realized you were the one that stabbed him, there

14  was no question?

15      A.   Yes.

16      Q.   Did you try to turn yourself in on December 25, 2009?

17      A.   I was confused that day.

18      Q.   That's not my question?

19      A.   No, I didn't.

20      Q.   Okay.  What were you confused about?

21      A.   With what was going on.

22      Q.   Tell me.

23      A.   The situation.

24      Q.   You've used the word confused a few times.  There's no

25  doubt in your mind that you stabbed Sosa, right?

**Delgado - Defendant - Cross**

1      A.    There's no doubt.

2      Q.    You're not confused about that?

3      A.    No.

4      Q.    And there is no doubt in your mind that you ran out of

5   the apartment and got rid of the knife and went home, right,

6   after the party, right?

7      A.    No.

8      Q.    So you're not confused about that?

9      A.    I didn't get rid of the knife.  I just -- I left the

10  knife at the party.

11     Q.    You left the knife?

12     A.    I assume that the knife dropped and I just left.

13     Q.    Okay, you assume, but you don't know where the knife

14  was?

15     A.    Yeah, I don't.

16     Q.    Because the -- if the knife wasn't found inside of the

17  apartment or the hallway, it was somewhere else, right?  You

18  don't know?

19     A.    I don't know.

20     Q.    Okay.  So you're not confused about killing Sosa.

21  You're not confused that you fled from the party.  You're not

22  confused that you got in the cab and went to Brooklyn, right?

23     A.    No.

24     Q.    And you're not confused that you didn't try to call 911

25  right after the party?

Delgado - Defendant - Cross

1      A.    No.

2      Q.    Okay.  You said when you ran out of the party you were

3   scared for your life?

4      A.    Yes, I was.

5      Q.    Well, when you ran out of party was anyone chasing you?

6   Yes or no?

7      A.    I was -- no.

8      Q.    Okay.  You ran down the stairwell and went outside,

9   right?  You were free at that point, right?

10     A.    Yes.

11     Q.    No one was chasing you at that moment?

12     A.    No.

13     Q.    So you weren't scared for your life at that moment?

14     A.    Yes, I was.

15     Q.    Why were you scared for your life when you were

16  standing outside of the apartment after you stabbed Sosa?

17     A.    I was around a lot of people that I don't know.  I

18  don't associate with those people and he was threatening me so

19  much that I even spoke to his peoples about it and they just

20  told me don't worry about it so --

21              MR. CANTOR:  I would like him to finish the

22         answer.

23     A.    And they told me don't worry about it, so, of course, I

24  got nervous.  Of course I got scared for my safety.

25     Q.    Let's back up.  Now I'm confused.  You ran out of the

**Delgado - Defendant - Cross**

1  party.  You're standing outside by yourself, right?

2       A.   Yes.

3       Q.   No one was chasing you?

4       A.   Margie approached me at the time.

5       Q.   Right.  Margie came up to you and that's when you gave

6  her back cell phone and keys?

7       A.   Yes.

8       Q.   Other than Margie, there were no other people around

9  you at that point?

10      A.   No.

11      Q.   You were free?  You were not under arrest?

12      A.   No.

13      Q.   No one was chasing?

14      A.   Not that I know of, no.

15      Q.   Did you see anybody chasing you while you were outside

16  of the apartment?

17      A.   No.

18      Q.   Right after the stabbing, right?

19      A.   No.

20      Q.   Why were you afraid for your life when you stood out of

21  the apartment when no one was chasing you?

22      A.   Margie stopped me and said give me my cell phone and

23  keys and I kept running after that.

24      Q.   Did Margie threaten you?

25      A.   No.

Delgado - Defendant - Cross

1    Q.    You indicated you were scared for your life.    What made
2    you scared for your life at that moment?
3    A.    Because of people at the party.
4    Q.    Were they outside chasing you?
5    A.    They wasn't outside, but I'm thinking they were coming
6    so that's why I ran.
7    Q.    Did you see them?
8    A.    They charged me at that moment when I was in the party
9    before I left the apartment, I was charged.
10    Q.    Mr. Delgado, I'm trying to be specific in terms of the
11    time and place.    I'm talking when you were outside.
12           MR. CANTOR:    Judge, I think we can do it without
13           the instructions.
14           THE COURT:    Overruled.
15    Q.    I'm talking about when you were outside by yourself
16    when Margie came up.    Were any people from the party chasing you
17    outside?
18    A.    No.
19    Q.    And you say you then after giving Margie back her cell
20    phone and keys you went and called, hailed a cab?
21    A.    Yes, I did.
22    Q.    You got in the cab and went to Brooklyn?
23    A.    Yes, I did.
24    Q.    Okay.    How much did it cost you?
25    A.    Sixty dollars.

Delgado - Defendant - Cross

1    Q.   Okay.  You had money on you, right?

2    A.   Yes.

3    Q.   You didn't try to flag down a police officer, did you?

4    A.   No, I didn't.

5    Q.   You got back to your apartment that evening.  You

6    didn't call the police department, did you?

7    A.   No, I didn't.

8    Q.   You called Margie?

9    A.   At that point, no.

10   Q.   I'm talking about -- sorry.  When you first got back,

11   it would have been the late morning right of December 25th?

12   A.   It was like four or five in the morning.

13   Q.   How long did it take you to go by cab from where the

14   party was to Brooklyn?

15   A.   Took like 45 minutes, an hour almost an hour.

16   Q.   Well, if the incident happened a little bit after two

17   in the morning, what time would you say you got to your

18   apartment then?

19   A.   Like three, almost four.

20   Q.   Three or four.  And you did you go to sleep at that

21   point?

22   A.   No, I didn't.

23   Q.   You changed clothes?

24   A.   I took a shower.

25   Q.   You had blood on your hands, right?

Delgado - Defendant - Cross

1    A.   Yes, I did.

2    Q.   You washed the blood off your hands?

3    A.   Yes.

4    Q.   Okay, and then you went to sleep?

5    A.   I tried, but I couldn't.

6    Q.   Okay.  So what did you do for the rest of the morning

7    of December 25, 2009?

8    A.   I just sat on my bed to think.

9    Q.   To think.  You told us during direct examination that

10   you were on some sort of medication on December of 2009?

11   A.   Yes, I was.

12   Q.   And what were you taking?

13   A.   I was taking Abilify.

14   Q.   Spell it.

15   A.   I'm not too good with spelling.

16   Q.   And how long had you been taking Abilify?

17   A.   I was taking it for approximately, for like four or

18   five months.

19   Q.   Okay.  And is that over-the-counter?  You get it at a

20   pharmacy or someone prescribes it?

21   A.   From a pharmacist.

22   Q.   You get a prescription for that?

23   A.   Yes.

24   Q.   It was just four or five months, so it would have been

25   August to July?

**Delgado - Defendant - Cross**

1          A.    From July or June.    had got released and I was

2    referred to a psych and when I saw the psych he prescribed those

3    medications.

4          Q.    Do you have the name of the doctor?

5          A.    I don't remember.  I don't remember.

6          Q.    You don't remember?

7          A.    I don't remember.

8          Q.    Do you have the prescription?  I would like to see it.

9          A.    I don't have the prescription on me.

10         Q.    Oh.  You have it somewhere?

11         A.    No,   don't.

12         Q.    You don't have a prescription?  You don't know the name

13   of the psychiatrist who gave it to you?  You said that you took

14   Ability for four or five months.  Is that once a day; twice a

15   day?

16         A.    That was once and I think it was once a day and I was

17   drinking Depakote at the time.

18         Q.    You were drinking something else?

19         A.    Yes.

20         Q.    Depakote?

21         A.    Yes.

22         Q.    Was that over-the-counter?

23         A.    Yes.

24         Q.    Okay.  You just went to the pharmacy and you would

25   order that and drink it?

**Delgado - Defendant - Cross**

1   A.   I would take my pills, yes.

2   Q.   Okay.

3        MR. CANTOR:   I would take my --

4        THE WITNESS: Pills.

5   Q.   Pills.  Wait.  Is this Depakote a drink or pills?

6   A.   They are pills.

7   Q.   Pills, my mistake.  That is not a prescription?

8   A.   Yes, they are.

9   Q.   So Depakote and Ability were both prescriptions?

10  A.   Yes.

11  Q.   How long had you been taking Depakote?

12  A.   Three or four months.

13  Q.   Three or four months?

14  A.   Yes.

15  Q.   Did someone give you a prescription for that?

16  A.   Yes, the psych.

17  Q.   You don't know his name?

18  A.   I don't remember his name.

19  Q.   Do you have a prescription for the Depakote?

20  A.   No, I don't.

21  Q.   You also smoke cigarettes, right?

22  A.   Yes, I do.

23  Q.   You've been smoking cigarettes for a long time, right?

24  A.   Yes.

25  Q.   And you told us before that -- are you saying you were

**Delgado - Defendant - Cross**

1    taking medication for your nerves or for mental problems?

2          A.    For depression and my mood swings.

3          Q.    Okay.  When you first were examined after you were

4    arrested at New York City Corrections you remember being asked

5    by them whether or not you were taking any medication for nerves

6    or mental problems?

7          A.    Yes.

8          Q.    Did you tell them no?

9          A.    I don't recall.

10         Q.    Would something refresh your recollection?

11         A.    May be, I don't know.

12               MR. ROSENFELD:  Your Honor, I would ask this paper

13    be handed to the defendant and I'm going to point out --

14               MR. CANTOR:  I would ask it be marked.

15               THE COURT:  People's number -- for identification.

16               MR. ROSENFELD:  Peoples Number 18 for

17    identification.

18               THE COURT:  So deemed.

19         Q.    And pointing there on Number 22?

20               MR. CANTOR:  Can I look at it, your Honor?

21               I think we are going to need the reporter.  I

22    think this is glaring and should be brought to your

23    attention.

24               MR. ROSENFELD:  Objection, your Honor, to the

25    colloquy.  That is improper.

Delgado – Defendant - Cross

```
1                    THE COURT:  Yes.  Yes.

2                    MR. CANTOR:  Judge, something ought to be brought

3      to your attention.

4                    THE COURT:  Okay.  All right.  Bring it to my

5      attention.

6                    (Whereupon, there is a discussion held off the

7      record, at the bench, among the Court, Mr. Cantor, and the

8      Assistant District Attorney.)

9                    THE COURT:  Mr. District Attorney, please

10     continue.

11                   MR. ROSENFELD:  Just one second, your Honor.

12                   (Pause in the proceedings.)

13                   MR. ROSENFELD:  This was given to the defendant, I

14     believe, to look at.

15                   THE COURT:  Do you wish to focus his attention to

16     anything in particular?

17                   MR. ROSENFELD:  Yes, to Number 22.

18                   THE COURT:  Number 22.

19     Q.   Let us know when you had an opportunity to look at

20     Number 22.  Does that refresh your recollection as to whether

21     you were asked whether you took any medications and you

22     responded no?

23                   MR. CANTOR:  By whom?  Asked by whom, your Honor?

24     I object.

25                   THE COURT:  Overruled.
```

**Delgado - Defendant - Cross**

1    Q.   By a person.

2              MR. CANTOR:   Can we find out by whom?

3              THE COURT:   Overruled.

4    A.   My mind wasn't clear that day.

5    Q.   The day they were interviewing you?

6    A.   Yes.

7              MR. CANTOR:   Who is they?

8    Q.   Who was interviewing you?

9    A.   I guess it was in the clinic.

10   Q.   At Rikers?

11   A.   Yes.

12   Q.   Okay.  All right.  Do you recall on that day -- sorry.

13   Earlier you told us that when you were 14, I think it was 23 and

14   32, that your father sexually assaulted you, right?

15   A.   I was 8 and 9 and 10.

16   Q.   Eight and nine, sorry, that your father sexually

17   assaulted you?

18             MR. CANTOR:   Eight, nine and ten he said.

19   Q.   Do you recall being asked by someone in the clinic at

20   Rikers Island on or about December 27, 2009, whether or not you

21   had ever been assaulted sexually or physically and saying no?

22   A.   I said no because I was ashamed.

23   Q.   Okay.  All right.  But you told them you were not,

24   right?

25   A.   Yes.

**Delgado - Defendant - Cross**

Q.   On.  You also told us that -- I think Mr. Cantor had

asked if you had attempted suicide?

A.   Yes.

Q.   You were being asked on December 27, 2009 by someone in

the clinic have you tried to hurt or kill yourself and didn't

you tell them no?

A.   I told them no because I didn't want to go to M.O.

House.

MR. CANTOR:  To where?

THE WITNESS:  An M.O. House.

A.   M.O., like mental health house.  I didn't want to be

around them.  I just wanted to go to population.

Q.   And when you were talking to this person in the clinic

on that day, you had a pretty long conversation with them,

right?

A.   With whom?

Q.   The person in the clinic.  They asked you a lot of

questions?

A.   I don't recall.

Q.   Okay.  And did they tell you that your thought process

was logical?

A.   I don't recall.

Q.   And that your mood was euthymic, non-depressed?

A.   I don't recall.

Q.   You don't recall that either?  Did you have any trouble

**Delgado - Defendant - Cross**

1    communicating with the person that day when you were

2    interviewed?

3         A.    With whom?

4         Q.    The person at the clinic, that's who I'm referring to.

5         A.    I was in Intake, so I had to go through that procedure.

6         Q.    Okay.  And Mr. Cantor directed your attention to some

7    place called Cumberland?

8         A.    Yes.

9         Q.    You were there when?

10        A.    I was there in June of 2009.

11        Q.    2009?

12        A.    I was referred from parole.

13        Q.    What?

14              MR. CANTOR:  Objection, your  Honor.

15              THE COURT:  Objection is overruled.

16        Q.    Please, just speak up.  I couldn't hear you.

17              MR. CANTOR:  I don't want to hear about that word,

18        Judge, because you've ruled at a Sandoval Hearing.  That's

19        why I'm objecting.

20              THE COURT:  Overruled.  Please continue.

21              MR. ROSENFELD:  We can have it read back.  He

22        looked down and said a word, something, and I asked what.

23              THE COURT:  Well, he can either repeat it or we

24        can have it read back.

25              MR. ROSENFELD:  Let's have it read back.

1        MR. CANTOR:  No, because it's contrary to your

2   Sandoval ruling.

3        THE COURT:  Overruled.

4        MR. CANTOR:  Can we have a new question?

5        THE COURT:  No.  We are going to hear the rest of

6   the answer that he said.

7        MR. CANTOR:  I find that it violates your Sandoval

8   ruling.

9        THE COURT:  I'm going to allow it.

10       MR. CANTOR:  Can it be done at the side bar,

11  Judge?

12       THE COURT:  No, but I will reserve for you

13  anything that you wish to say later.

14       MR. CANTOR:  Judge, what he had said is contrary

15  to your Sandoval ruling.

16       THE COURT:  All right.  Thank you for that

17  information.

18       Read back what he did say.

19       (Whereupon, the court reporter read back the

20  above-requested testimony.)

21       MR. CANTOR:  You see that, Judge.  I'm moving for

22  a mistrial.

23       THE COURT:  As I indicated once before, ladies and

24  gentlemen of the jury, the only charge against this

25  gentlemen are the ones recited by Mr. Cantor.

**Delgado - Defendant - Cross**

```
 1                        You totally disregard anything about parole,

 2          anything about procedures, anything about corrections.  It

 3          has nothing at all to do with this case.  Be so instructed.

 4                        MR. CANTOR:  Yeah.

 5                        THE COURT:  Please continue.

 6                        MR. CANTOR:  You were forewarned.  I move for

 7          withdrawal of the jury and a mistrial.

 8                        MR. ROSENFELD:  Objection, your Honor.

 9                        THE COURT:  No.  No.  He's moving now for it and I

10          will --

11                        MR. CANTOR:  You were forewarned by me that this

12          would violate Sandoval ruling and the DA did it

13          nonetheless, so you have my application.

14                        THE COURT:  Your application is denied.

15                        MR. CANTOR:  And my exception is noted.

16                        THE COURT:  Done.  You may continue.

17     CONTINUED CROSS EXAMINATION BY

18     MR. ROSENFELD:

19          Q.   You said around June of 2009 you were at the place

20     Mr. Cantor mentioned Cumberland, right?

21          A.   Yes.

22          Q.   And, by the way, did they ask you your date of birth?

23          A.   Yes.

24          Q.   Did you tell them it was July 18, 1970?

25          A.   No.  That was a mistake by them.
```

**Delgado - Defendant - Cross**

1    Q.   Okay.  And at that point were you taking medication?

2    A.   No, I wasn't.

3    Q.   And do you have any type of learning disability?

4    A.   A little bit.

5    Q.   A little bit?

6    A.   Yeah.

7    Q.   Well, were you asked by them at Cumberland if you ever

8    been told that you have a learning disability?  Didn't you tell

9    them no?

10    A.   I did tell them no.

11    Q.   What?

12    A.   I did tell them no.

13    Q.   You told them no?

14    A.   Yeah.

15    Q.   Okay.  And were you employed at that time?

16    A.   No, I wasn't.

17    Q.   You told us in the video that you worked in a laundry

18    mat.  When did you work in the laundry mat?

19              MR. CANTOR:  Objection, Judge.  He said he used to

20         work in the laundry mat.  He had been fired, so, you see,

21         we have --

22              THE COURT:  Thank you for your objection.

23              MR. ROSENFELD:  Objection to colloquy.

24              THE COURT:  The jury's recollection will control.

25         You may continue.

1          MR. CANTOR:  I just hope he cites the evidence

2     correctly.

3          MR. ROSENFELD:  Objection, your Honor, to

4     colloquy.

5          THE COURT:  Yes.  Correct.

6     Q.   You may answer.

7     A.   I worked there like around August, September.

8     Q.   Of 2009?

9     A.   2009.

10    Q.   Until when?

11    A.   I only worked there for 90 days, I think it was.

12    Q.   So you're saying around August of 2009 for 90 days,

13    until September or October?

14    A.   Like around there, yes.

15    Q.   Where were you working before that?

16    A.   I was incarcerated before that.

17         MR. CANTOR:  Judge, I'm going to ask you to strike

18    that and I'm going to ask you -- once again my adversary,

19    Mr. Rosenfeld, is violating your Sandoval ruling.

20         MR. ROSENFELD:  Your Honor, that's totally --

21         MR. CANTOR:  That's what he --

22         MR. ROSENFELD:  He answered.  Objection.

23         THE COURT:  Gentlemen, gentlemen, let's not carry

24    on.  Mr. Cantor --

25         MR. CANTOR:  He's carrying on.  He's yelling.

**Delgado - Defendant - Cross**

1         THE COURT: I thank you for your objection.  Your

2    objection is overruled.

3         MR. CANTOR: You don't deem it a violation of your

4    Sandoval ruling?  It's worthy.

5         MR. ROSENFELD: Objection.

6         THE COURT: You know, everyone is speaking, but

7    she's only taking down what I say, so you're all wasting

8    your time, all right, but I will give you a chance to make

9    a record, but first --

10        MR. CANTOR: Can we do that, Judge, because it's

11   kind of important.  You ruled on Sandoval --

12        MR. ROSENFELD: Objection to Sandoval.

13        THE COURT: Sit down, Mr. Cantor.  Sit down,

14   please.

15        MR. CANTOR: He violates continually.

16        MR. ROSENFELD: Objection.

17        MR. CANTOR: Objection, objection.

18        THE COURT: I implore you, please.  The jury is to

19   disregard that reference, all right.

20        MR. ROSENFELD: We will put on the record he stuck

21   out his tongue and made a comment.

22        THE COURT: You didn't stick out your tongue out

23   at me.

24        MR. CANTOR: No.  I'm swallowing.  I move my head

25   and I'm being chastised by the DA.  He really wants this

1    conviction, Judge.

2                 MR. ROSENFELD:  Your Honor --

3                 THE COURT:  Mr. Cantor, please.  What we want here

4    is justice.

5                 MR. CANTOR:  Yes, an elusive commodity.  That's we

6    want.  I'm suggesting that he's violating the Sandoval

7    ruling.

8                 THE COURT:  There's no need to cast dispersion.

9                 MR. CANTOR:  Can we have a side bar, do you think?

10                THE COURT:  No, not now.

11                MR. CANTOR:  Are you offering an instruction to

12   the jury to disregard because --

13                THE COURT:  I did that.  Didn't you hear me?

14                MR. CANTOR:  I did.  I would like it again because

15   he violated it a second time.

16                MR. ROSENFELD:  Objection, your Honor.  This is

17   improper.  I did not violate anything.  He knows that.

18                THE COURT:  Don't argue, Mr. Rosenfeld.

19                The jury has been so instructed.  Move on.

20                MR. ROSENFELD:  I did not violate anything.

21                MR. CANTOR:  Judge, he's speechifying, that's all

22   he does.

23                THE COURT:  Patience.

24                MR. ROSENFELD:  I will do my best, Judge.  I will

25   try.

**Delgado - Defendant - Cross**

1              THE COURT:  Fortitude.

2              MR. ROSENFELD:  Fortitude.  Thank you.  I will do

3       my best under the circumstances.

4              THE COURT:  Mr. Cantor, that equally applies to

5       you.

6              Let us move forward.

7        Q.   And were you asked by the person at Cumberland--

8       withdrawn.  Sorry.

9              (Continued on the next page.)

tr/d    D. Delgado - Defense - Cross

1    Q    You told us that in your past that your father

2  sexually abused you.  Did you ever report that to the police?

3    A    No, I didn't.

4    Q    Ever receive any treatment for it?

5    A    At the time, no.

6    Q    You said you attempted -- you told Mr. Cantor you

7  attempted suicide in 1989 when you were 14?

8    A    '91 -- '89, yeah.

9    Q    When you were 14?

10   A    Yes.

11   Q    Was that reported to the police?

12   A    The EMS, my moms called 911 and the EMS had came and

13 took me to the hospital.

14   Q    What happened?

15   A    They left me there for observation.

16        MR. CANTOR:  I can't hear you.

17   A    They left me in the hospital for observation.

18   Q    Then what happened?

19   A    Then from there I was referred to a psych.

20   Q    That was back in 1989?

21   A    Yes.

22   Q    Do you have any medical records for that?

23   A    No.

24   Q    That was, I think you said you drank painkillers,

25 right?

1    A    Yes.

2    Q    And jumped in a river?

3    A    I did.

4    Q    Then eleven years later, age 25, you said you tried to

5    hang yourself?

6    A    Yes.

7    Q    Using what?

8    A    Um, a extension cord.

9    Q    You wrapped it around your neck?

10   A    I wrapped it around my neck.   I put, how do I

11   explain --

12                MR. CANTOR:   I can't hear.

13   A    Yes, I wrapped it around the neck.   I wrapped it

14   around the beam, cement beam, and I tried to hang myself.

15   Q    You jumped off something?

16   A    The chair.

17   Q    What happened?

18   A    Um, I was hanging.

19   Q    So must have left quite a mark?

20   A    It did.

21   Q    What happened after that?

22   A    Um, my mother walks in and she sees me and she just

23   starts screaming, and my neighbors from my house, my cousins

24   and they just ran into my house and they brung me down.

25   Q    Do you want to show us the mark?

1    A    I don't have a mark.

2    Q    I thought -- I asked you if it left a mark, you said

3    yes.

4    A    At that time, yes.

5    Q    But you have nothing now to show us, your neck, no

6    mark there, right?

7    A    No.

8    Q    In 2007 at age 32, you told us you attempted suicide

9    again by hanging yourself?

10   A    Yes.

11   Q    How did you try it the third time?

12   A    The same way.

13   Q    Have any marks on that?

14   A    No.

15   Q    Do you have any -- were you hospitalized?

16   A    Yes, I was.

17   Q    Do you have any medical records for that?

18   A    That's in Peurto Rico.  They have in Peurto Rico.  I

19   don't got no medical record here.

20   Q    You have nothing here to show us?

21   A    No.

22   Q    You said you had a wife?

23   A    Yes.

24   Q    In Puerto Rico?

25   A    Yes.

```
 1        Q     Just so I'm clear, what years were you living in
 2    Puerto Rico?
 3        A     I moved to Peurto Rico in '91 of December.  2005 I
 4    came back to New York.
 5        Q     To New York in 2005.  You stayed in New York since
 6    then?
 7        A     No.  I left 2007 back to Puerto Rico.
 8        Q     2007.  So you were in New York from 2005 to 2007.
 9    2007 you went back to Puerto Rico?
10        A     Yes, I did.
11        Q     When did you return to the United States?
12        A     January of 2009.
13              MR. CANTOR:  January when?
14        A     2009.
15        Q     But you left your wife back in Puerto Rico?
16        A     Yes, we were separated.
17        Q     You said you had kids?
18        A     Yes, I have kids.
19        Q     Also in Puerto Rico?
20        A     I have three in Puerto Rico and three here in New
21    York.
22              MR. CANTOR:  And three where?
23        A     Here in New York.
24        Q     So at some point you got married here in New York?
25        A     No.  They came from Puerto Rico to New York.  Since I
```

1    been incarcerated, they came to New York.

2        Q    Prior to 2009, were they in New York?

3        A    No.

4        Q    So you came back here in January 2009 and you went to

5    live where?

6        A    I stood my aunt's house.

7        Q    Let's talk about meeting Margie.  You said you met her

8    at some point in 2009, right?

9        A    Yes.

10       Q    Where was that?

11       A    At the Laundromat where I used to work.

12       Q    You started dating her after that?

13       A    No.

14       Q    Tell us.

15       A    She just come to the shop and we would just talk.

16       Q    At some point, did you start dating her?

17       A    Yes, I did.

18       Q    When was that?

19       A    Like a month and a half later.

20       Q    So approximately what month are we talking about?

21       A    Like September, November.

22       Q    September?

23       A    Like September.

24       Q    And did you used to go visit her in the Bronx?

25       A    Yes, I used to go.

1    Q    How often?

2    A    Every other day I used to go over there.

3    Q    Because you weren't working at that time?

4    A    At that time, I was working and I would go, and I just

5    travel back to my house.

6    Q    Did she ever come to Brooklyn to your place?

7    A    She came one time.

8    Q    When was that?

9    A    I don't recall.  I don't remember the date.

10   Q    So between the time you met her and September October

11   and December 25, 2009, approximately how many times had you

12   visited Margie in the Bronx?

13   A    Like fifteen, twenty times.

14        MR. CANTOR:  How many?

15   A    Like fifteen or twenty times.

16   Q    Did you ever have any problem traveling from Brooklyn

17   to the Bronx to see her?

18   A    I used to take the train.

19   Q    And when you come to the Bronx, would you stay in her

20   apartment or was it just for an afternoon visit?  What was it?

21   A    In the beginning, I just -- I -- in the beginning I

22   used to just visit, then after a while I would stay in the

23   weekends.

24   Q    She also had her son living with her, right?

25   A    Yes, she did.

1   Q     How was your relationship with her son?

2   A     It was a good relationship.

3   Q     Okay.  So out of the fifteen or twenty times, there

4   were times you would come at the beginning just for the day,

5   but other times you told us you'd stay over there?

6   A     Yes.

7   Q     Around December 2009, during the times you visited her

8   in that month, would you be staying over there?

9   A     Yes.

10  Q     How would you describe your relationship with Margie

11  at that point?

12  A     We had a good relationship.

13  Q     What type of things would you do?

14  A     We would go out.  We would go out of state.  We would

15  go out to the movies.  We would go out to eat and we just stay

16  in the apartment.

17  Q     What do you mean went out of state?

18  A     Um, we went to Massachusetts to meet one of her

19  friends and we just stood there for like two days, then we came

20  back.

21  Q     Then you said you went to the movies with her?

22  A     We went out to eat.

23  Q     You went out to eat?

24  A     Yes.

25  Q     Did you ever drink any beers during those times when

1   you guys would go out?

2       A    No, I didn't.

3       Q    Ever drink any liquor?

4       A    No.

5       Q    Why not?

6       A    'Cause at that time I wasn't in the mood to drink.

7       Q    Okay.  So now, let's go to December 25, 2009, what

8   happened that day?  How did that day start?

9       A    Um, we woked up, we went out and we came back to the

10  apartment.  We ate, we took a shower, and we just went to the

11  party.

12      Q    Okay.  So had you stayed over her apartment from the

13  night before December 24, 2009?

14      A    Yes, I did.

15      Q    Had you spent December 24, 2009, with Margie?

16      A    December 24th, yes.

17      Q    What did you do that day, do you remember?

18      A    We went out.  We went to Manhattan.

19      Q    What did you do in Manhattan?

20      A    We were shopping.

21      Q    Okay.  Buying gifts and stuff?

22      A    Clothes, gifts, stuff like that, for her family.

23      Q    And so you stayed overnight December 24 -- I'm sorry.

24  December -- that would be December 23rd into the 24th, right,

25  the day of Christmas Eve?  I think I misspoke.

1    A    Yes.

2    Q    So now, we're talking about the day of Christmas Eve,

3    December 24th, 2009, you awoke and you were in Margie's house?

4    A    Yes.

5    Q    What did you do when you got up that day?

6    A    We went out.  We went to Manhattan.  We ate, whatever.

7    We came back.  It was just -- just stood in her apartment until

8    late.

9    Q    Pretty normal day?

10   A    It was a normal day.

11   Q    Did you take any medications that day?

12   A    I took my meds at 9 o'clock that night.

13   Q    9 o'clock the night of December 24?

14   A    Yes.

15   Q    What did you take?

16   A    I took Abilify.

17   Q    Abilify?

18   A    Yes.

19   Q    You said you'd been taking that medication regularly?

20   A    I would take it regularly, yes.

21   Q    I'm sorry?

22   A    Yes.

23   Q    Okay.  And the purpose of taking the medication was to

24   control whatever problems the medication was for?

25   A    My depression, yes.

1    Q    To control it?

2    A    Yes.

3    Q    All right.  So comes Christmas Eve, December 24, 2009,

4    you're at Margie's, you said you had something to eat?

5    A    We ate something outside.

6    Q    And then what happened?

7    A    And we came back to the apartment.

8    Q    About what time was that?

9    A    Like around 8:30, around there.   7.

10   Q    What did you do after that?

11   A    We just stood in the apartment until like 10:30, 11,

12   11:30, around there.   That's when she decided to go to the

13   party.

14   Q    Up until that moment, had she mentioned anything about

15   going to the party with you?

16   A    She asked me, I told her I didn't want to go because I

17   wasn't feeling right because I had called Puerto Rico, I spoke

18   to my kids, I spoke to my mom.

19   Q    I'm not asking --

20            MR. CANTOR:  Judge, can he complete his answer?

21            MR. ROSENFELD:  Objection.

22            MR. CANTOR:  He should be afforded that courtesy.

23            THE COURT:  Well, yes.

24            MR. CANTOR:  Thank you.

25            MR. ROSENFELD:  Objection.

1          THE COURT:  The jury will disregard anything not

2   responsive to the question.

3          Let him continue.  Mr. District Attorney.

4          MR. CANTOR:  Well, he was in the middle of the

5   answer.

6          THE COURT:  Yes, he was.

7          MR. CANTOR:  So --

8          THE COURT:  Does that question still stand?

9          MR. ROSENFELD:  I'll withdraw.

10          MR. CANTOR:  How can he withdraw the question

11   when he's in the middle of answering it?

12          THE COURT:  It's withdrawn.

13          MR. CANTOR:  What with the answer that's only

14   partial?

15          THE COURT:  It's withdrawn.  The jury will

16   disregard.

17          MR. CANTOR:  He has the right to complete it.

18          THE COURT:  Thank you for your observation.

19          MR. CANTOR:  He has an absolute right to complete

20   it.

21          MR. ROSENFELD:  Objection to this colloquy.

22          THE COURT:  Yes, please continue.

23          MR. ROSENFELD:  Thank you.

24   Q     So you called Puerto Rico and you said you didn't feel

25   right?

tr/d    D. Delgado - Defense - Cross

1    A    Yes.

2    Q    What does that mean, didn't feel right?

3    A    I was feeling depressed.

4    Q    But you decided to go out to the party anyway?

5    A    At that moment, no.

6    Q    Later on you decided, 11:30?

7    A    Around 11:30, yes.

8    Q    It was just you and Margie?

9    A    Just me and Margie.

10   Q    Did you bring anything with you from her apartment?

11   A    No.

12   Q    So you told us that you got to Carmen Diaz's

13   apartment, right?

14   A    Yes.

15   Q    You came in and you were introduced to people?

16   A    Yes.

17   Q    And you told us you met Carmen Diaz one time before

18   and Melissa Dempsey one time before that?

19   A    Yes.

20   Q    When was that?  Do you remember when you met them or

21   where?

22   A    I don't recall.  I know it was -- it was like a week

23   or two weeks before the party, I think.

24   Q    When you met Carmen Dempsey, what happened?

25            MR. CANTOR:  It's Melissa Dempsey.

1                    MR. ROSENFELD:  Thank you, Mr. Cantor.  I

2          misspoke.

3                    MR. CANTOR:  Oh, he misspoke.

4                    MR. ROSENFELD:  Excuse me.

5          Q    Go ahead.

6          A    I was just introduced.  They asked me where I was

7    from, what part of Puerto Rico I was from, I told them.  We

8    just talked normal.

9          Q    Melissa Dempsey, when did you meet?

10         A    Like a week later.  I don't really remember like that.

11         Q    So you got to the party and you saw Melissa Dempsey

12   and Carmen Diaz, right?

13         A    Yes.

14         Q    And a lot of other people?

15         A    Yes.

16         Q    What did you do when you went into the party?

17         A    Um, we walked to the kitchen.  We walked to the

18   kitchen and I was introduced to Sosa, I was introduced to

19   Mercedes and to the other party people that was at the party.

20         Q    What about Alberto Vasquez, Tango?

21         A    He was at the party, I was introduced to him.

22         Q    Did he go into the kitchen to smoke?

23         A    At this point, no.

24         Q    You told us at the beginning Sosa came over to you in

25   the beginning when you were introduced to him?

1    A    Yes.

2    Q    You told us I extended my hand to embrace him.

3         MR. CANTOR:  Not to embrace him, to shake hands

4    is what he said.

5    Q    Did you use the word embrace earlier?

6         THE COURT:  The jury will be the best

7    recollection.  You may continue.

8    Q    Go ahead.

9    A    Yes.

10   Q    You said he rejected it, he rejected to give you his

11   hand?

12   A    His hand, yes.

13   Q    He asked you some questions, if Margie was your

14   girlfriend?

15   A    Yes.

16   Q    What did you tell him?

17   A    I told him yes.

18   Q    And he told you in sum and substance that if you

19   disrespected her, you would have problems with his people,

20   there's backup at the party and he would beat you?

21   A    Yes.

22   Q    That was in the kitchen?

23   A    Yes, it was.

24   Q    And your response to that was I told him okay -- I'm

25   sorry.  What was your exact response?

1    A    I said okay.  Whatever.

2              MR. CANTOR:  I'm sorry?

3    A    I told him okay.  Whatever.

4    Q    Okay.  Whatever.  So at this first time, he didn't

5    have any weapon in his hand, did he?

6    A    No.

7    Q    This first time when he said these words, did he do

8    anything to you?

9    A    He was just -- go like (indicating) just point his

10   finger at me.

11   Q    Point his finger at you?

12   A    Yes.

13   Q    And said if you disrespected him --

14   A    If I disrepsected --

15             MR. CANTOR:  I can't hear.

16   A    Yes, if I disrespected Margie.

17   Q    So after you said I told him okay, whatever, what

18   happened?

19   A    He walked away.

20   Q    Did you leave the party at that point?

21   A    No.

22   Q    What did you do?

23   A    I stood in the kitchen, I took my jacket off and they

24   offered me drinks.

25   Q    You told us before you socialized?

1    A    Yes, I did.

2    Q    You drank?

3    A    I did.

4    Q    You smoked?

5    A    Yes.

6    Q    And Sosa had left the kitchen?

7    A    Yes.

8    Q    So was anything happening at that moment other than

9    these things?

10    A    At that moment, no.  But further down the party.

11    Q    I'm just talking about that moment.

12    A    At that moment, no.

13    Q    So once he left, there was no more threat to you,

14    right?

15    A    No.

16    Q    He was in a different room?

17    A    Yes.

18    Q    And you didn't say to Margie let's go leave the party

19    now, I'm scared?

20    A    No.

21    Q    Everything was back to normal?

22    A    Everything was normal.

23    Q    Then you told us there came a second time that Sosa

24    approached you.  About how much later?

25    A    Like a half an hour, fifteen minutes later, around

1    there.

2        Q    So I believe you told us you got to the party around

3    11:30 or 12, right?

4        A    Yes.

5        Q    Approximately?

6        A    Yes.

7        Q    And he approached this first time.  Now you're saying

8    about a half hour after the first time --

9        A    Yes.

10        Q    Would that make it around 12:30 approximately?  You

11    tell me, if you know.

12        A    Like around 1.

13        Q    Around 1 o'clock?

14        A    Yeah.

15        Q    Sosa approaches you again, he asks you where you're

16    from?

17        A    Yes, he asked me where I was from.

18                MR. CANTOR:  Can we have an answer?

19                THE COURT:  The answer was given.

20                MR. CANTOR:  Okay.

21        Q    He said you're in the Bronx, not Peurto Rico?

22        A    No.  Brooklyn.

23        Q    Brooklyn?

24        A    Yes.

25        Q    You're in the Bronx now, not Brooklyn?

1    A    Yeah.

2    Q    Again, he said if you disrespect Margie, he would fuck

3    you up?

4    A    Yes, he did.

5    Q    And what else did he say?

6    A    That she's not alone, that she has peoples.

7    Q    So the second time, around 1 o'clock, did he do

8    anything with his hands?

9    A    Yeah, he went (indicating).  He went like that to me.

10    MR. ROSENFELD:  Again, with his right hand, he's

11    taking his right hand with his four fingers slightly bent

12    to the thumb and pounded himself, I'm going to use the

13    word, below the left shoulder.

14    THE COURT:  So indicating.

15    Q    Did he hurt you?

16    A    It didn't hurt at the time, but I was shocked because

17    he put his hands on me.

18    Q    I just asked if he hurt you.  Were you injured?

19    A    No.

20    Q    Did you react to that when he patted you, whatever

21    word you want to use, on the shoulder?

22    A    No.

23    Q    You said something to him at that point?

24    A    I don't remember.

25    Q    Did you tell us on direct, Mr. Cantor I told him if

tr/d    D. Delgado - Defense - Cross

1    I'm with her and she accepts the person I am, it doesn't

2    matter?

3        A    Yes.

4        Q    That's what you said to him?

5        A    Yes, that's what I said to him.

6        Q    Sosa responded or told you he would keep a close eye

7    on you?

8        A    Yes, he did.

9              THE COURT:  Gentlemen, please approach.

10             (Whereupon, there was a discussion held, off the

11       record, at the bench, among the Court, the assistant

12       district attorneys, defense counsel, and outside the

13       hearing of the defendant and the jury.)

14             (Whereupon, the following takes place, on the

15       record, in open court, in the presence of the Court, the

16       assistant district attorneys, defense counsel, the

17       defendant and the jury.)

18             THE COURT:  Mr. Delgado, we're going to break for

19       lunch, sir, you may stand down.  Have your lunch, come back

20       at 2 o'clock, okay?

21             THE WITNESS:  Okay.  Thank you.

22             THE COURT:  Do not discuss your testimony.

23             (Whereupon, the witness left the stand and

24       returned to the defense table.)

25             MR. CANTOR:  I'm sorry, Judge?

tr/d    Proceedings

1                  THE COURT:  Discuss his testimony.

2                  MR. CANTOR:  With?

3                  THE COURT:  With anyone.

4                  MR. CANTOR:  During the luncheon hour?

5                  THE COURT:  Yes.

6                  All right.  Madam Forelady, ladies and gentlemen

7   of the jury, likewise have a good lunch.  Please be back

8   sharp 2 o'clock.  We'll continue with Mr. Delgado.  You may

9   follow the officer.

10               {Whereupon, the jury left the courtroom.}

11              THE COURT:  All right.  Gentlemen, we'll see you

12  at 2:15, give the sergeant time to bring up Mr. Delgado.

13  So we stand in recess.

14              (Whereupon, a lunch recess was taken.)

15              A F T E R N O O N   S E S S I O N

16              THE COURT:  Good afternoon.

17              MR. CANTOR:  Good afternoon.

18              MR. ROSENFELD:  Good afternoon.

19              THE COURT:  Mr. Clerk.

20              THE CLERK:  This is case on trial, People of the

21  State of New York against David Delgado.  Let the record

22  reflect the district attorney's office, the defense

23  attorney and the defendant are present, jurors are not

24  present at this time.

25              MR. CANTOR:  Judge, I have an application.

tr/d   Proceedings

1          THE COURT:  Yes.

2          MR. CANTOR:  During the cross examination of my

3   client --

4          THE COURT:  During cross, yes.

5          MR. CANTOR:  -- the People elicited from my

6   client that he was on parole.  I objected, and you did give

7   a curative instruction to the jury.  Then this prosecutor

8   proceeded to question along the same line, and my client,

9   although I have advised him as a layperson, he really

10   doesn't understand the nature and quality of Sandoval

11   limitation, so in his answer, and I'm sure the assistant

12   district attorney was ever hopeful that my client would

13   repeat it, my client used the word parole.  This was after

14   you had given your curative instruction.

15          I begged the Court to go to the side bar, the

16   Court refused.  I told the Court that and you gave

17   permission pursuant to the People's application for the

18   court reporter to read it back.  That answer once again

19   embraced the word parole, which minutes before you had told

20   the jury to drive out of their mind and not consider, that

21   my client was only charged with the charges that you will

22   present to them.  I was refused a side bar.  I had heard

23   the word parole.  This prosecutor had gotten -- heard the

24   word parole.  I do not know if you had heard the word

25   parole or not.  All I know is by allowing this court

1    reporter or the court reporter who was there to read it

2    back, the word parole, with the articulate once again, it

3    was of extreme damage to my client that you refused me the

4    right of a simple side bar that would have consumed 60

5    seconds or less.

6         This prosecutor doesn't just bend the rules of

7    evidence, he breaks them.  This prosecutor repeatedly

8    during my examination, the beginning, the background, the

9    history of my client because our defense is one of my

10   client acted by way of justification, that his mind is

11   impressionable, weak, troubled, bordering on feeble

12   mindedness, and in order to establish that, of course I had

13   to bring out his entire pitiful and sorrowful background.

14   You did allow me to do such.  But each and every time I

15   sought to do that, the prosecutor who is a quasi judicial

16   officer objected.

17        You, the Court, overruled those objections and I

18   was able in all candor to flesh out that background that

19   would allow me to argue to this jury that my client's mind

20   was a troubled, fragile, delicate mind, not that he's

21   insane, but he has a very impressionable mind on account of

22   his life's history.  But yet this prosecutor sought each

23   and every time I went into these sorted events that

24   comprise my client's history, he objected.  This

25   prosecutor, and I say this in the absence of the jury, more

1    than any other prosecutor I have encountered in 45 years at

2    the bench, yearns for a conviction at any cost.

3            Why weren't we at the side bar?  Why weren't we

4    at the side bar?  Because that would have prevented my

5    client from repeating the word parole.  He's a lay person.

6    He's doing the best he can.  I didn't have that side bar.

7    And I had complete continuous interruptions of my direct

8    examination about my client's history and background that

9    would allow me to argue to this jury that he's incapable of

10   formulating the intent to cause the death of another, or to

11   inflict serious physical injury upon another.

12           Judge, I'm constrained by virtue of the behavior

13   of the assistant district attorney to repeat a legitimate

14   and recognizable defense, an inability to form the intent

15   necessary to commit the crime.  I'm forced to move for a

16   mistrial.  I don't think that my client is getting a fair

17   trial.

18           We should have been at that side bar, the

19   reporter should have been at that side bar, counsel should

20   have been at the side bar, and you would have heard the

21   very word that you had cautioned minutes before this jury

22   to strike from their mind and only consider the charges

23   that you would ultimately place before them.

24           I move for a mistrial, Judge, on the grounds that

25   my client by virtue of your inability to hear me at the

1    side bar, and by virtue of the continuous obstruction by

2    this assistant district attorney to allow me to flesh out

3    the background, albeit let us be totally forthright and

4    candid, you overruled 99 of those objections -- 99 percent

5    of those objections, nonetheless, the prosecutor has a

6    quasi judicial function which he abrogates and I move for a

7    mistrial.  Thank you.

8            MR. ROSENFELD:  Your Honor, sometimes it's hard

9    to know where to begin with Mr. Cantor's arguments.

10   They're scurrilous.  They're really without any basis or

11   foundation.  The Court has adequately observed in the

12   course of this trial his disruptive behavior, his

13   disrespectful behavior.  He jumps out of his seat when

14   there's an objection to be made, starts having colloquy and

15   making statements to the jury which are totally

16   unprofessional and improper.

17           Your Honor had asked us to make an objection with

18   one or two words.  Mr. Cantor has turned to the jury and

19   started to attack me and started to attack this Court and

20   to say things that are totally improper and should not be

21   necessary in front of a jury.  He knows that.  He does it

22   deliberately to create a record to be able to stand up now

23   and make the record that he just made.

24           It's clear the questions I asked the defendant

25   had nothing to do with Sandoval rulings, had nothing to do

1    with incarcerations or crimes.  One question I asked him

2    was where was he before -- where did he work before the

3    Laundromat and he said on his own, used the words I

4    believe, I was incarcerated.  So that was his trying to

5    throw that word out there, maybe it's to create a mistrial,

6    I don't know.

7        Then another time I asked him where was he --

8    when did he get to Cumberland, the facility Mr. Cantor

9    referred to, and his response was I got out on parole or

10   something to that nature.  When he had said it, I didn't

11   even hear the word.  He had said something.  I asked it to

12   be repeated.  It's his word.  He said it out to the jury.

13   I didn't bring it out and it had nothing to do with the

14   Sandoval ruling, yet Mr. Cantor stood up at that point,

15   turned to the jury and made a whole statement, it's part of

16   the record, indicating that I violated the Court's ruling

17   on Sandoval.

18        So one of the things I'm going to ask the Court

19   now, when the jury comes back to please indicate to the

20   jury that the prosecution in no way has violated any of the

21   Court's rulings because that would lead them with the wrong

22   impression, be very misleading.

23        Just because Mr. Cantor says it's so doesn't mean

24   it is so.  He can make things up, propose them to the Court

25   and it would be outrageous for the jury to continue to

1    serve under his statements.  And every time he makes an

2    objection, it's not one word or two words.  It turns into a

3    long colloquy and turns into statements that he tries to

4    put before the jury which are improper.  So I'd ask also

5    that he be limited in that respect or controlled somehow.

6        And of course the People oppose a mistrial.

7    There's absolutely no basis for it.

8        MR. CANTOR:  Ever so briefly, your Honor,

9    virtually each and every time the prosecution has objected

10   in this case, it is speechified.  It has gone beyond the

11   one word or two words that you have allowed.  This

12   prosecutor is guilty of overwhelmingly disregarding your

13   direction that you will hear an objection and you will hear

14   one or two, perhaps even three words after the objection so

15   that the Court may grasp the grounds of the objection.  The

16   record speaks for itself.

17       Every time I go to the side bar this prosecutor

18   interrupts me saying that from a distance of about 30 feet

19   jurors can hear me.  That is a force.  This prosecutor

20   engages in forces.  This prosecutor speechifies when he

21   makes an objection.  He conveys to the jury the prosecution

22   or the People's theory that warrants a conviction here.  I

23   have never had such a prosecutor speechify and try his case

24   in such a disreputable contrary to the rules of evidence.

25       I'm the one who should protest.  I'm protesting,

1     your Honor, the simple fact that your Sandoval ruling,

2     especially after you gave them that instruction, was

3     violated once again without benefit of a side bar and the

4     assistant district attorney insisted like Tennyson's "The

5     Brook" going on and going on and insisting that the court

6     reporter read, full well knowing that embraced within my

7     client's answer was the word parole that innovates, that

8     reduces the vigilant vitality of the charges that you give.

9     That is a deliberate tactic on behalf of an experienced

10    prosecutor.

11             You have before you, Judge, ample grounds to

12    grant a mistrial.  In short, my client on account of the

13    action of the speechifying and the maneuvering of an

14    assistant district attorney is not withstanding your best

15    efforts receiving a fair trial.  My application is one that

16    I grasp.

17

18             (Continued on next page.)

19

20

21

22

23

24

25

PROCEEDINGS

1732

1    MR. CANTOR:  And my application is one that I

2    press.

3    THE COURT:  Anything further?

4    MR. ROSENFELD:  No, it does not deserve a

5    response, your Honor, I won't.

6    THE COURT:  I regret very much that the record

7    has to be burdened with these types of personal remarks.

8    The Court is not offended as much as either of you have

9    suggested being offended.

10    With regard to the application for a mistrial the

11    Court believes we have not even come to the threshold to

12    give any vitality to serious consideration for a mistrial.

13    That is denied.

14    For the record, in regard to your earlier

15    requests, Mr. Cantor, to approach for sidebar what you

16    conveniently left out is the Court told you that it would

17    reserve on your behalf to make a record at the end of

18    whenever the Court found it convenient.

19    MR. CANTOR:  Of course, you did.

20    THE COURT:  You chose not to do that, rather you

21    chose now to make your statement, which is fine.  No need

22    to stand.

23    MR. CANTOR:  No, out of respect I stand.

24    THE COURT:  I appreciate out of respect, but no

25    need to stand at this moment but I've heard enough and I've

PROCEEDINGS

1733

1  made my ruling, you have both made your record.  At the
2  right time, of course, I invite all of you, each of you to
3  submit the charge that you think will be satisfactory to
4  sanitize this jury and the Court will see that at the
5  charging conference.
6           MR. CANTOR:  I will submit it now.
7           THE COURT:  No, I don't want it now.
8           MR. CANTOR:  Okay, Judge.
9           THE COURT:  I said at the charging conference.
10          MR. CANTOR:  But see --
11          THE COURT:  I have heard enough, Mr. Cantor.
12          MR. CANTOR:  All --
13          THE COURT:  I've heard enough.
14          MR. CANTOR:  Okay.
15          THE COURT:  Nothing more has to be said.
16          MR. CANTOR:  But what you didn't hear was the
17  word parole --
18          THE COURT:  There is nothing more to be said.
19          MR. CANTOR:  -- in the question.
20          THE COURT:  Nothing.
21          MR. CANTOR:  But the only way --
22          THE COURT:  Mr. Cantor --
23          MR. CANTOR:  Judge, the only way to be precluded
24  was by a side conference at that point.
25          THE COURT:  Yes, Mr. Cantor.

E-ljb

PROCEEDINGS

1734

1   MR. CANTOR:  I've made my record.  Now you've
2   made your rulings and when you allow me to take a
3   respectful exception.

4   THE COURT:  Of course.  All right.  Let us bring
5   back first the jury, gentlemen.  Mr. Rosenfeld?

6   MR. ROSENFELD:  Just my request to the jury that
7   the People did not violate *Sandoval*, an improper statement
8   that Mr. Cantor made in front of the jury regarding
9   prosecution's --

10   THE COURT:  I will take up that as part of any
11   charging conference charge that you would think would be
12   appropriate to answer the situation at the right time.  Not
13   now.

14   Let us bring back the jury.

15   (Whereupon the witness resumes the witness
16   stand.)

17   THE COURT:  Good afternoon, Mr. Delgado.

18   THE WITNESS:  Good afternoon.

19   THE COURT:  Once again I trust you followed the
20   Court's ruling from before, you didn't have any discussion
21   about your testimony?

22   THE WITNESS:  No.

23   THE COURT:  All right.  We continue with --

24   COURT OFFICER:  Jury entering.

25   (Whereupon the jury enters.)

E-ljb

Defense - DAVID DELGADO - cross

1735

1    THE COURT:  -- cross examination.

2    MR. CANTOR:  Can he fix his collar, Judge?  Thank

3  you.

4    THE COURT:  Continue, Mr. District attorney.

5  CROSS EXAMINATION

6  BY MR. ROSENFELD:

7    Q.    Mr. Delgado, after the first time Sosa came over to

8  you and made the statement that he made to you, you told us

9  before you told him okay.  whatever, right?

10    A.    Yes.

11    Q.    And the video statement you told the Assistant

12  District Attorney that you told Sosa I am a man, I get your

13  point.  Did you say that also or was that instead of the first

14  thing?

15    A.    I was kind of confused, but I think I said that too.

16    Q.    Okay.  And then the second time he came over to you he

17  made a statement to you, you told us about it right before

18  lunch, and Sosa said was he would keep a close eye on you,

19  right?

20    A.    Yes.

21    Q.    Correct?

22    A.    Yes.

23    Q.    And, again, you said he pointed his finger at you,

24  this is the second time?

25    A.    Yes.

E-ljb

Defense - DAVID DELGADO - cross

1736

1     Q.   Okay.  And did he have anything in his hand when he
2     pointed his finger at you?
3     A.   No.
4     Q.   Did he ever show you any weapon?
5     A.   No.
6     Q.   Did anybody at the party ever display a weapon to you?
7     A.   No.
8     Q.   And did you have a knife on you at that time when he
9     came over to you the second time?
10    A.   No.
11    Q.   Then you told us that Sosa was removed from the party?
12    A.   Yes.
13    Q.   Okay.  And is that when you and Margie left?
14    A.   Couple of minutes later, yes.
15         MR. CANTOR:  I'm sorry?
16         THE WITNESS:  Couple of minutes later, yeah.
17    Q.   You went back to Margie's apartment, went inside with
18    her, right, to get the cranberry juice?
19    A.   Yes.
20    Q.   And where did you go?
21    A.   I went to the bathroom.
22    Q.   So, you went to the bathroom and then what did you do?
23    A.   Um, I walked towards the kitchen.
24    Q.   Go ahead?
25    A.   And I saw --

E-1jb

Defense - DAVID DELGADO - cross

1737

1      MR. CANTOR:  I can't hear him.  Can he raise his
2    voice up?
3      A.   I walked towards the kitchen and I grabbed the knife
4    and put it in my pocket.
5      Q.   Okay.  And when you were in the kitchen where was
6    Margie?
7      A.   She was at the entrance of the door walking out.
8      Q.   So you heard her testify during trial, right?
9      A.   Yes.
10      Q.   And I asked her and she testified that you never went
11    into the kitchen?
12      A.   She had her back turned so she couldn't see where I
13    was going.
14      Q.   You didn't tell her you were going into the kitchen,
15    right?
16      A.   No, I didn't tell letter, no.
17      Q.   And you grabbed the knife from the kitchen, I think
18    you said like the drainboard area?
19      A.   Yes.
20      Q.   And show us where did you put it?
21      A.   Huh?
22      Q.   Where did you put it?
23      A.   In my right pocket.
24      Q.   Was the knife sharp?
25      A.   It was a sharp knife.

E-1jb

Defense - DAVID DELGADO - cross

1738

1    Q.   And was it covered with anything when you put it in

2    your pocket?

3    A.   No.

4    Q.   And then you walked out the door?

5    A.   Yes.

6    Q.   Did you ever show Margie that you had the knife?

7    A.   No.

8    Q.   And I believe you said one moment you were nervous at

9    that time is that why you got the knife?

10   A.   Yes, I was.

11   Q.   But didn't you say in the statement to the D.A. I

12   didn't worry that much?

13   A.   At the beginning.

14   Q.   Well, when you made the statement to the D.A. you had

15   just described about getting the knife from where the clean

16   dishes were.  You described that it was a four inch black knife

17   that you put in your pants pocket, in your blue jeans, then you

18   told the D.A. that you were nervous, you went back to the party

19   but you didn't worry that much?

20   A.   I might had said that.

21   Q.   Okay.  And you told Mr. Cantor on direct that you were

22   feeling fearful when you were at Margie's apartment?

23   A.   Yes, I was.

24   Q.   Scared?

25   A.   Yes.

Defense - DAVID DELGADO - cross

1739

1    Q.   And that's why you put the knife in your pocket?

2    A.   Yes.

3    Q.   Now, when you were in Margie's apartment was there

4 anyone else besides you and Margie?

5    A.   No, there was no one else.

6    Q.   Was anyone threatening you at that moment?

7    A.   No.

8    Q.   And you could have stayed at Margie's apartment,

9 right?

10             MR. CANTOR:  Objection, speculative.

11             THE COURT:  Only as to form?

12    A.   I could have.

13    Q.   But you left Margie's apartment and went back to the

14 party?

15    A.   Yes.

16    Q.   So isn't it a fact, Mr. Delgado, you weren't worried

17 at all about Sosa doing anything to you?

18    A.   That wasn't the point.

19    Q.   What was the point?

20    A.   The point is that she wanted to go back to the party

21 so I just went back with her.

22    Q.   Well, you didn't say to her at that point, did you, I

23 don't want to go back to the party because I am afraid Sosa

24 might hurt, et cetera?

25    A.   I didn't say that.

Defense - DAVID DELGADO - cross

1740

1     Q.   And you didn't say to her I would rather stay home,
2   you go back by yourself because I'm scared?
3     A.   No, I didn't say that.
4     Q.   You didn't say that.  And, in fact, you walked out of
5   the apartment, but you had a knife in your pocket?
6     A.   Yes, I did.
7     Q.   And you put the knife in your pocket because if you
8   needed to use it it would be handy, right?
9     A.   For my safety, yes.
10    Q.   For your safety?
11    A.   Yes.
12    Q.   So it was in your, I believe, you said your right
13  pocket?
14    A.   Yes.
15    Q.   And you are right handed?
16    A.   Yes.
17    Q.   So when you left Margie's apartment you knew that if
18  Sosa did anything to you, you could use the knife against him,
19  right?
20    A.   That wasn't my intention.
21    Q.   What was your intention in putting the knife?
22    A.   Because --
23           MR. CANTOR:  Loud.
24    A.   I had it just for my safety, but my intention wasn't
25  to strike at him, that wasn't my intention.  I just had it for

E-ljb

Defense - DAVID DELGADO - cross

1741

1  my safety if he would pull out something.  So I didn't know what

2  he was what his intention was.

3      Q.    Okay.  That's a fair -- you did not know what Sosa's

4  intention was?

5      A.    No.

6      Q.    Correct?

7      A.    Correct.

8      Q.    But nevertheless you put a sharp five in your pocket?

9      A.    I did.

10      Q.    Okay.  And when you left the apartment you felt safer

11  because you had the knife in your pocket, right?

12      A.    No, I didn't.  I still was nervous.

13      Q.    Still nervous and yet you continued to go out of

14  Margie's apartment, across the area, back up the building into

15  Carmen's Diaz apartment?

16      A.    Correct.

17      Q.    Did you tell Mr. Cantor the purpose of having the

18  knife on was protection?

19      A.    Yes.

20      Q.    So if somebody used a weapon against you, you would

21  have a weapon to use against them, right?

22      A.    Yes.

23      Q.    So you went back to the party and what happened when

24  you got back?

25      A.    I walked in and --

E-1jb

Defense - DAVID DELGADO - cross

1742

1       MR. CANTOR:  I can't hear you, I'm sorry.

2       A.   I walked in the apartment.  Everything was normal.

3  People was drinking and I just sat down for awhile and started

4  talking to other people.

5       Q.   Well, you told Mr. Cantor earlier that you had several

6  drinks at some point, six drinks of something and beers?

7       A.   Yes, I did.

8       Q.   Was that before you left for Margie's or after you

9  came back from Margie's?

10      A.   During the whole party.

11      Q.   Okay.  So it was over the course of about two hours or

12  two-and a-half hours.

13      A.   Yes.

14      Q.   And you mentioned that you took a medication earlier?

15      A.   I did.

16      Q.   And were you concerned at all that alcohol and the

17  medication would mix?

18      A.   I wasn't thinking at the time, I wasn't.

19      Q.   So were you concerned or not?

20      A.   Yes, I was concerned.

21      Q.   But you went ahead and drank alcohol anyway?

22      A.   I did.

23      Q.   Okay.  No one poured it down your throat?

24      A.   No.

25      Q.   And you said you were feeling a little tipsy, I

E-ljb

Defense - DAVID DELGADO - cross

1743

1   believe, is that the word?

2        A.   Yes, I was.

3        Q.   Was that when you left for Margie's apartment or when

4   you came back from Margie's apartment that you felt tipsy?

5        A.   During the party, in the beginning when I started

6   drinking I already felt an affection to it as the liquor.

7        Q.   Okay.  But you left and you walked over to Margie's,

8   right?

9        A.   Yes.

10       Q.   Feel better at that point?

11       A.   A little bit.

12       Q.   How about when you got to Margie's apartment?

13       A.   I was feeling not normal, but I was feeling like if I

14   was drinking all night and I wasn't, you know, I was kind of --

15   my head was kind of spinning.

16                 MR. CANTOR:  I can't hear, Judge.

17                 THE WITNESS:  I said my head was spinning.

18       Q.   Did you when you were in Margie's apartment say to

19   Margie I feel like lying down because I am dizzy and my head

20   was --

21       A.   I never said that, no.

22       Q.   So you were okay enough to go back to the party?

23       A.   Yes because she wanted to go, so we went back.

24       Q.   And you wanted to please her, right?

25       A.   Yes.

E-ljb

Defense - DAVID DELGADO - cross

1744

1    Q.   So you went back to the party, you didn't have any
2    trouble walking between the apartments, did you?
3    A.   No, I didn't.
4    Q.   And you got back to the party and you drank -- you say
5    you drank some more then?
6    A.   I probably did, yes.
7    Q.   You probably did or you did?
8    A.   I did drink, but I am saying I did.
9    Q.   How much more did you drink between then and the time
10   you ran out?
11   A.   I don't recall how much I drank at that point.
12   Q.   You say you came back into the party and you sat down,
13   did you go back into the kitchen where Tango was to smoke again?
14   A.   I don't recall.
15   Q.   And you said Sosa had been taken out of the party, was
16   Sosa back at the party at this point?
17   A.   Yes, he was.
18   Q.   And he was back dancing and socializing with other
19   people at that point while you were sitting down?
20   A.   I wasn't paying attention to him.
21   Q.   Okay.  No one was threatening you at that moment?
22   A.   At that moment, no.
23   Q.   And you were sitting near that table that you pointed
24   to on the photograph?
25   A.   I did.

E-1jb

Defense - DAVID DELGADO - cross

1745

1    Q.   And where was Margie?

2    A.   She was on my lap.

3    Q.   And the woman, Mercedes Rodriguez?

4    A.   She was on the other side.

5    Q.   And at this point you said Sosa came over to you

6    again?

7    A.   Not at that point.

8    Q.   Okay.  So you decided at some point to leave?

9    A.   Not at that point.

10   Q.   Okay.  Well, what point did you?

11   A.   After he started arguing with Carmen Diaz's daughter

12   and when he stepped out the apartment that's when I told Margie,

13   let's go, I am tired let's go and when I was just putting my

14   jacket on and she was putting her jacket on and she was talking

15   to Mercedes.

16              MR. CANTOR:  I can't hear.

17              THE WITNESS:

18   A.   I was putting my jacket on.  She was putting her

19   jacket on and she was talking to Mercedes and two or three

20   seconds Sosa had just walked back in stating, I don't know.  I

21   really don't exactly don't remember what he was stating, but he

22   was talking out loud and I was just standing there ready to

23   leave.

24   Q.   So you were standing ready to leave and I think you

25   told us you were standing near the table?

Defense - DAVID DELGADO - cross

1746

1    A.   Yes.

2    Q.   And we were using People's Exhibit three before.  Were

3    you standing by the table, standing by this table (indicating),

4    correct?

5    A.   Yes.

6    Q.   Was the door open?

7    A.   Yes, the door was open.

8    Q.   So you were at the table and where was Margie?

9    A.   She was in front of me.

10   Q.   Right in front of me.  You mean to the right of where

11   my pen is or to the left?

12   A.   Yes, to the right.

13   Q.   Yes, to the right.  So would be almost next to you?

14   A.   Yes, she was.

15   Q.   And Mercedes was sitting on the chair?

16   A.   Yes.

17   Q.   Okay.  And Sosa was where?

18   A.   At that point he was out the apartment.

19   Q.   Well, when he came back?

20   A.   Oh, when he came back in, oh, he just walked right

21   back in and was just standing there.

22   Q.   We use People's Exhibit four, does that show better

23   where (indicating) Sosa was when he came back in?

24   A.   Yes.

25   Q.   And I am pointing at the chair, where was he in --

E-1jb

Defense - DAVID DELGADO - cross

1747

1  with regard to where this chair is?

2      A.   Toward the right, more like around there (indicating).

3      Q.   Right where my pen is (indicating)?

4      A.   Yes.

5      Q.   So, that's below the right table clothe on the

6  photograph, on the bottom right quadrant, Sosa was here

7  (indicating)?

8      A.   Yes.

9      Q.   You were over here by the white table clothe?

10      A.   Yes.

11      Q.   Margie was next to you (indicating), I am

12  approximating?

13      A.   Yes.

14      Q.   Mercedes was in the chair (indicating)?

15      A.   Right there (indicating).

16      Q.   There (indicating) was the open door?

17      A.   Yes.

18      Q.   Had you started to walk outdoor?

19      A.   Not at that point we just got up.

20      Q.   Okay.  Your coats were on and Sosa had already come

21  in, correct?

22      A.   Yes.

23      Q.   When he came in where did he go?

24      A.   He was standing further this way (indicating).

25            MR. CANTOR:  I can't hear.

E-ljb

Defense - DAVID DELGADO - cross

1748

 1           THE WITNESS:  He was standing further this way.

 2     Q.    Further this way (indicating), so I am plopping my pen

 3  around.

 4     A.    No, upper she's.

 5     Q.    That's when he came back in?

 6     A.    Yeah.

 7     Q.    So there is nothing between you and the door at that

 8  point?

 9     A.    No.

10     Q.    And when Sosa came back in did he have any weapon in

11  his hand?

12     A.    No.

13     Q.    So, now at this point is when Sosa approached you?

14     A.    After he said what he said to the other people he

15  noticed that I was leaving and --

16     Q.    Okay.

17     A.    And that's when he approached me.

18     Q.    Go, ahead, continue.  What happened when he approached

19  you?

20     A.    And he asked me if I was leaving and I told him, yes,

21  I was and I told him why.  So he just told me I just want you to

22  remember what I told you earlier and I gave him (indicating)

23  again, I turned my back on (indicating) like forget about him.

24           MR. CANTOR:  Louder.

25     A.    I turned my back towards him and that's when he

                                                          E-ljb

Defense - DAVID DELGADO - cross

1749

1  grabbed me and when he pulled me he was already swinging a punch
2  at me.  So I kind of like lean towards him (indicating) and he
3  punched me again and that's when I pulled out a knife and
4  started swinging at him to get him off of me and we just
5  stumbled like rumbling (indicating) and we just fell on top of
6  the sofa.

7            MR. ROSENFELD:  Indicating that during his
8       statement just now the witness made several motions with
9       his hands, including the first kind of pointing his left
10       arm away the second one, crossing his arms in a fist across
11       his chest and then another motion moving forward.

12            MR. CANTOR:  With his hands pulled up in a fist.

13            THE COURT:  He said indicating.

14            MR. CANTOR:  And he touched that fist to his left
15       shoulder two times.

16            THE COURT:  You accept that?

17            MR. ROSENFELD:  Yes.

18  Q.    All right.  Margie was next to you, right?
19  A.    She was there at the point that when we was talking,
20  yes, but I wasn't really paying attention to what she was doing.
21  Q.    And at some point when Sosa approached you and started
22  talking did Margie grab you?
23  A.    I believe so, I don't recall.
24  Q.    She grabbed your arm?
25  A.    I think so, yeah.

Defense - DAVID DELGADO - cross

1750

1    Q.    You hear her testify here in court?

2    A.    I hear her say it, but I can't really remember what

3    she really was doing, I was paying attention to this guy, so I

4    don't know what she was doing right --

5    Q.    So it was Margie who grabbed your hands not the

6    defendant -- not the deceased?

7    A.    He grabbed me on my left arm (indicating) and Margie

8    grabbed me, supposedly, by my right.

9    Q.    So, Mr. Delgado, Margie grabbed your arm not Sosa,

10   correct?

11   A.    I think so.

12   Q.    You told the detective in the car Sosa when he came

13   back he grabbed my arm, meaning Sosa, right, that's what you

14   told the detective?

15   A.    Yeah, grabbing me right here (indicating).

16        MR. ROSENFELD:   Indicating the witness with his

17        right hand is grabbing his suit jacket above his left --

18        below his left shoulder.

19        THE COURT:   So indicating.

20   Q.    But it was Margie who grabbed your arm, right?

21   A.    She stated that.

22   Q.    Okay.  Was she wrong?

23   A.    I don't remember, I don't recall.

24   Q.    Okay.  And at that point you could have walked out,

25   right?

E-ljb

1      A.   It was too late.  He was already on top of us -- he

2    was already on top of me.

3      Q.   Now, show me how he was holding his hands when he was

4    on top of you?

5      A.   He just grabbed me like this.

6      Q.   Before he grabbed you?  Before he grabbed you where

7    did he have his hands, down?

8      A.   Yes (indicating).

9         MR. ROSENFELD:  Indicating he had them down, the

10        witness had his hands out in front of him with his fingers

11        open.

12     Q.   Am I correct, Mr. Delgado?

13     A.   Yes.

14     Q.   So there was nothing in his hands?

15     A.   No.

16        THE COURT:  So indicating.

17     Q.   And then what did Sosa do with his hands?

18     A.   Just started going like this (indicating) with his

19   hand, going like this (indicating), oh, remember what I told you

20   so, that's when I turned --

21        MR. CANTOR:  I can't hear you.

22     A.   That he was pointing at me (indicating), touching me

23   in my shoulder (indicating) and that's when I turned my back

24   towards him.

25     Q.   Stop.

Defense - DAVID DELGADO - cross

1752

1    MR. CANTOR:  I would like to have the complete
2    answer.  He can't stop an answer.  What happened was the
3    question.
4            THE COURT:  We have been through this before.
5            MR. CANTOR:  Let him continue.
6            THE COURT:  We have been through this before.
7            MR. CANTOR:  I am sorry, your Honor.
8            THE COURT:  We have been through this before, you
9    can't stop an answer.  However, in this case he did not
10   withdraw his answer so the answer will continue.
11           MR. CANTOR:  Well, the answer, continue please,
12   Mr. Witness.
13   A.    He was pointing at me (indicating), he was touching my
14   shoulder (indicating) and telling me to remember what he had
15   told me earlier and I just turned my back like I didn't want to
16   listen to what he was saying.  So I guess he felt offended that
17   I gave him my back.
18           MR. ROSENFELD:  All right.  Let's go back because
19   I am trying to put on the record, your Honor, the motions
20   that he is making, which is the only reason I stopped him,
21   not to stop the question.
22           MR. CANTOR:  Judge, we don't need this
23   speechifying.
24           MR. ROSENFELD:  I am trying --
25           MR. CANTOR:  I object.

E-ljb

Defense - DAVID DELGADO - cross

1753

1      MR. ROSENFELD:  Can I make the record?

2      THE COURT:  Now you can make the record --

3      MR. ROSENFELD:  Thank you.

4      THE COURT:  -- of what was indicating.

5      MR. ROSENFELD:  Thank you.  Indicating while the

6   witness was talking he used his right hand pushing forward

7   with four fingers separated from his thumb in a motion then

8   he also moved his right hand towards him, again, that left

9   upper area below his shoulder hitting himself as he did

10   that.

11      THE COURT:  So indicating.

12   Q.   Now, during the party had you disrespected Margie?

13   A.   Never.

14   Q.   When you came back in with Margie, when you went back

15   to her apartment were you still treating her nicely?

16   A.   Of course.

17   Q.   She sat on your lap?

18   A.   Yes.

19   Q.   You weren't disrespecting her, right?

20   A.   No.

21   Q.   You didn't have no argument with her, right?

22   A.   No.

23   Q.   So would it be fair to say that you treated Margie

24   respectfully during the party?

25   A.   Yes.

Defense - DAVID DELGADO - cross

1754

1     Q.   And when Sosa came over to you you said he said the
2     same thing he said before was, I will fuck you up and those
3     other words?

4     A.   Yes, he did.

5     Q.   Okay.  That would be if you disrespected Margie,
6     right?

7     A.   Yes.

8          MR. CANTOR:  I object to the word "if" that's not
9     what the witness testified.

10         THE COURT:  I will allow it.

11    Q.   Did you say that if you had disrespected Margie he was
12    going to fuck you up?

13    A.   Yes.

14    Q.   Okay.  But you hadn't disrespected Margie, right?

15    A.   No.

16    Q.   And Sosa didn't have anything in his hands?

17    A.   No.

18    Q.   And he touched you on the shoulder with whatever force
19    you indicated, right?

20    A.   Yes.

21    Q.   And that's when Margie grabbed your arm?

22         MR. CANTOR:  Objection, he has denied that.  He
23    said he doesn't recall.

24         MR. ROSENFELD:  No.

25         THE COURT:  I will allow it.  It's cross

E-ljb

Defense - DAVID DELGADO - cross

1755

1    examination.

2             MR. CANTOR:  Okay.

3    A.    I don't recall.

4             MR. CANTOR:  Can't hear you.

5             THE WITNESS:  I don't recall.

6    Q.    But you said now, you turned your back on Sosa, right?

7    A.    Yes.

8    Q.    Where were you going?

9    A.    Out the door.

10   Q.    So if you had continued, you turned your back, you

11   could have walked right out the door, right?

12   A.    Yes.

13   Q.    Okay.  But at that movement you said Sosa grabbed you

14   and you indicated with your right arm, again, grabbing the cloth

15   on your jacket on the left side, right?

16   A.    Yes.

17   Q.    You had your back to him?

18   A.    Not fully, but I was turning my back already, that's

19   when he grabbed me.

20   Q.    Okay.  Did you see him make that grabbing motion

21   before he grabbed you?

22   A.    I didn't see it coming.

23   Q.    You didn't see it coming.  So how do you know it was

24   Sosa who was going to grab you?

25   A.    He was the one behind me.

E-ljb

Defense - DAVID DELGADO - cross

1756

1    Q.   How did you know he didn't walk away?

2    A.   It was so quick, it happened in seconds.

3    Q.   But you didn't see who it was that grabbed your

4  shoulder until you turned around and swung at him?

5    A.   I turned around and he still was holding me and that's

6  when he swung at me.

7    Q.   He swung.  So he grabbed your shoulder and show us the

8  motion you made after your shoulder was grabbed?

9    A.   He (indicating).

10    Q.   What did you do that --

11         MR. CANTOR:  Loud.

12    A.   He pulled me and I turned towards him.

13    Q.   And what did you do with your right hand?

14    A.   I still had it down.

15    Q.   By your side?

16    A.   I guess it was by my side and he just swung and he hit

17  me between my neck and my face (indicating), that's when I

18  leaned towards him and he punched me again.

19    Q.   Stop, please.  At that point where was the knife?

20    A.   It was still in my pocket.

21    Q.   So you are telling us for the first time after telling

22  Mr. Cantor that now Sosa swung and hit you in the neck area,

23  correct?

24    A.   Yes.

25    Q.   Well, while you were in the car with the detective you

E-ljb

Defense - DAVID DELGADO - cross

1757

1  told him, referring to Sosa, when he came back he grabbed my

2  arm, I saw a knife on the table and grabbed it and swung at him,

3  that's not correct, right?

4        A.    I stated that.

5        Q.    You stated that, but it's not true?

6        A.    That's -- it's just the way I explained, that it was

7  just to throw it out there, what was going on throughout the

8  party, but I wasn't fully getting a full statement.

9        Q.    How about in your written statement which was, by the

10  way -- I'm sorry, withdrawn.

11        The Miranda statement was read to you and you initialed it,

12  right, these are your initials wherever it says DD?

13        A.    Correct.

14        Q.    And, of course, that's your signature at the bottom,

15  right?

16        A.    Yes.

17        Q.    And the detective signed it also?

18        A.    Yes.

19        Q.    Now, up on top the detective had filled out the top

20  and the time is 14:55, which is 2:55 hours -- 2:55, correct?

21        A.    I am assuming.

22        Q.    Okay.

23              MR. CANTOR:  I can't hear you.

24        A.    I am assuming.

25              MR. ROSENFELD:  Your Honor, for the record, I

E-1jb

Defense - DAVID DELGADO - cross

1758

1     have heard every response from the defendant and I am

2     standing about five feet.

3                 MR. CANTOR:  So what I mean, but speechifying.

4     If he wants to testify let him take the stand.

5                 THE COURT:  The important thing is jurors there

6     at the end did you hear him?

7                 THE JURY:  Yes.

8                 THE COURT:  Everyone heard.

9                 MR. CANTOR:  So everyone hears him and he

10    speechifies, he goes on like that is his brook.

11                MR. ROSENFELD:  You know what a tennis brook is?

12                MR. CANTOR:  Well, if he doesn't know who Alfred

13    Lord Tennyson is, Judge, he is the lesser for it.

14                MR. ROSENFELD:  Okay.

15    Q.   Getting back to the statement, so we have here you

16    wrote this (indicating) down, right?

17    A.   Yes.

18    Q.   Nobody told you what to write?

19    A.   With the help of Detective Banker.

20    Q.   With the help of Detective Banker?

21    A.   Yes.

22    Q.   How did he tell you?

23    A.   He spelled out a couple of words for me.

24    Q.   Which words?

25    A.   I don't remember right now, I don't remember.

E-ljb

Defense - DAVID DELGADO - cross

1759

1    Q.    You saying he helped you with spelling?

2    A.    Yes.

3    Q.    Okay.  Other than helping with spelling you wrote out

4    the statement, right?

5    A.    Yeah.

6    Q.    Thank you.  X'd out a couple of things.  There is a I

7    here (indicating) you X'd out, right, you crossed that out?

8    A.    Yes.

9    Q.    And over here (indicating) something else you crossed

10   that out?

11   A.    Yes.

12   Q.    Okay.  So let's look at the statement.  You said when

13   I had went up to walk away Sosa grabbed me and that's when I

14   took the knife out my pocket and hit him when I was already

15   scared and nervous for my safety; is that what it says?

16   A.    Yeah.

17   Q.    And you wrote that?

18   A.    Yeah.

19   Q.    Did you see anywhere there where it says Sosa grabbed

20   me in the shoulder and I turned around and he swung at me and

21   hit me in the neck?

22   A.    No, I didn't stated that.

23   Q.    What?

24   A.    No.

25   Q.    Okay.  And Sosa you now say hit you how many times?

E-1jb

Defense - DAVID DELGADO - cross

1  A.  He hit my twice.

2         THE COURT:  I'm sorry, this is in front of

3  everybody; what was the question?

4         THE WITNESS:  He hit me twice.

5         THE COURT:  Twice.

6  Q.  This is in front of everybody else, right?

7  A.  (No response).

8         MR. CANTOR:  How does know?

9  A.  I don't recall.

10  Q.  You don't know?

11         MR. CANTOR:  Can't hear you.

12  A.  I don't know.

13  Q.  Was Margie standing there?

14  A.  She was towards the door, that area (indicating) she

15  was there.

16  Q.  How about Mercedes?

17  A.  She was there too.

18  Q.  How about Melissa Dempsey?

19  A.  I don't know where she was at.

20  Q.  How about Tango?

21  A.  I don't know where they was at at that point, I don't

22  know where they were standing at that point.

23  Q.  And when he struck you, you then made a motion before

24  with your hands you fell towards him?

25  A.  Yes.

E-ljb

Defense - DAVID DELGADO - cross

1761

1    Q.    Okay.  And then what did you do?

2    A.    He hit me again and that's when I pulled out the knife

3    and I just started swinging up (indicating).

4              MR. ROSENFELD:  Indicating the witness with his

5    right arm, with his fist closed, moved his right arm with a

6    fist up two times.

7              THE COURT:  So indicated.

8              MR. CANTOR:  Three times.

9              MR. ROSENFELD:  Just now three times but before

10   two times.

11             MR. CANTOR:  But we will let the jury determine

12   that.

13             MR. ROSENFELD:  Two or three times, whichever.

14   Q.    And where did you hit him?

15   A.    I don't know where I was hitting him at.

16   Q.    But he was right in front of you?

17   A.    I wasn't really looking where I hit him at.

18   Q.    And you swung the first time did you feel hitting the

19   head, hitting the fresh?

20   A.    I know I was hitting something, but I wasn't sure

21   where I was hitting him at.

22   Q.    You didn't feel the knife penetrate into his head?

23   A.    It happened so quick that --

24             MR. CANTOR:  Can't hear you.

25   A.    It happened so quick that I don't know.

E-ljb

Defense - DAVID DELGADO - cross

1762

1    Q.   Well, did you take the knife away and slice Sosa's

2    nose?

3    A.   I was just swinging.  I was -- I wasn't -- I don't

4    know where I was aiming at all.  I know I had to get him off of

5    me, he didn't want to let me go so I was just swinging and I

6    don't know where I was hitting him at.

7              MR. CANTOR:  I am sorry, what was that?

8              THE WITNESS:  That I was swinging trying to get

9         him off of me.  I don't know where the stab wounds was

10        landing at, I wasn't sure.

11   Q.   Well, you also sliced his ear in half, right?

12             MR. CANTOR:  Objection.

13   A.   That's what I saw in the picture.

14             THE COURT:  Overruled.

15             MR. CANTOR:  I can't hear.

16             THE WITNESS:  That's what I saw on the picture.

17             MR. ROSENFELD:  You hear that?

18             MR. CANTOR:  Yeah.

19             MR. ROSENFELD:  Good.

20   Q.   And you even stabbed him in the back of the head?

21   A.   That's what I saw in the picture.

22   Q.   But that means stab in the back of the head meaning he

23   had his back turned to you?

24             MR. CANTOR:  That's not necessarily true.

25             MR. ROSENFELD:  It's cross, your Honor.

E-1jb

Defense - DAVID DELGADO - cross

1          MR. CANTOR:  I don't care what it is.

2          THE COURT:  Overruled.

3          MR. CANTOR:  Exception.

4          THE COURT:  Noted.

5     Q.   People's Exhibit 17G that's the back of his head,

6     right?

7     A.   Yes.

8     Q.   So somehow at one point you stabbed him in the back of

9     the head, correct?

10    A.   Correct.

11    Q.   You stabbed him in the back of the head, he couldn't

12    have been facing you, right?

13         MR. CANTOR:  Objection, of course, he could.

14         THE COURT:  Overruled.

15    A.   I'm -- I don't know.

16    Q.   Is there a way he could have been facing you and you

17    stabbed him in the back of the head?

18    A.   I guess when we fell on top of the sofa that's

19    where -- I don't know.

20    Q.   You still were swinging?

21    A.   No, when we fell I had stopped swinging, but I don't

22    know what happened.  I know I got up and ran.

23    Q.   Did you actually, besides hitting him with a knife,

24    punch him?

25    A.   No, I really didn't get to punch him.

E-ljb

Defense - DAVID DELGADO - cross

1764

1    Q.   So you just used the knife?

2    A.   Yes.

3    Q.   And did you see blood?

4    A.   No, I didn't.

5    Q.   You got blood on your hands, right?

6    A.   When I saw my hand I saw blood, but I didn't see blood

7  coming out of him.

8    Q.   Where did the blood come out of him?

9    A.   It eventually came from him, but I didn't see blood

10  coming out at that point.

11    Q.   Okay.  You weren't injured at all, right?

12    A.   No, I wasn't.

13    Q.   Did you say anything as you were stabbing Sosa?

14    A.   No, I didn't.

15              (Continues next page.)

16

17

18

19

20

21

22

23

24

25

E-ljb

**Delgado - Defense - Cross**

1    CONTINUED CROSS EXAMINATION BY

2    MR. ROSENFELD:

3        Q.   After you stabbed him, what did you do?

4        A.   I just ran out.

5        Q.   You ran out.  Okay.  Did anybody say anything to you

6    before you ran out?

7        A.   That I recall, no.

8        Q.   Sosa never actually hit you; isn't that true?

9        A.   He hit me.

10       Q.   Well, you saw the statement that you gave to the

11   Assistant DA, right?

12       A.   There was a lot of things that I didn't state that

13   happened.

14       Q.   No.  I asked if you saw it?

15            MR. CANTOR:  Judge, can he complete his answer?

16   Can he complete an answer?

17            THE COURT:  One second.  The answer was completed.

18   Please be seated.

19            MR. CANTOR:  Can I have the question and answer

20   re-read then, your Honor?

21            THE COURT:  Yes, if you have not heard it, of

22   course.  Please re-read it.

23            (Whereupon, the court reporter read back the

24   above-requested testimony.)

25            MR. ROSENFELD:  May  continue?

1           THE COURT:  Please, sir.

2       Q.   At the end when the DA said is there anything else you

3   want to say, you responded, correct?

4       A.   Correct.

5       Q.   Okay.  And in sum and substance your response was

6   sorry, I just responded, I was scared.  I felt by myself and

7   then it was -- I believe it was a question, your statement was

8   the victim or Sosa never showed you any weapon, he put his hand

9   in your face and then you said I thought he was going to hit me.

10  That's how you ended the video, right?

11      A.   I guess so.

12      Q.   Yeah.  So he never hit you?

13      A.   At the point when he was pointing in my face, he didn't

14  hit me at that point.  There is a lot of things that happened

15  there at that moment.  I was so nervous and confused that I

16  didn't state, but in the 30 months that I have been

17  incarcerated, a lot of things are coming back to my mind.

18      Q.   So now today you're not confused at all?

19      A.   I'm still confused.

20      Q.   Still confused?

21      A.   I'm still confused with a lot of things that happened.

22           MR. CANTOR:  I can't hear.

23      A.   I was drinking at the time.  I wasn't really focusing

24  on what everybody was saying, where everybody was standing at

25  all.  I know I was attacked and I defended myself.

**Delgado - Defense - Cross**

1    Q.   But the fact 's you told the Assistant DA that you only

2    thought Sosa was going to hit you, that he never hit you?

3              MR. CANTOR:   I'm going to object unless the Q and

4    A is played, he's paraphrasing from an exhibit.

5              THE COURT:   Your objection is overruled.

6              Mr. DA please continue.

7    Q.   Isn't it a fact that you told the DA in sum and

8    substance that you thought Sosa was going to hit you in the face

9    but he never hit you, correct?

10   A.   It's not correct.

11   Q.   So today after 30 months of thinking about it, you're

12   now saying for the first time on direct examination from

13   Mr. Cantor, your attorney, that Sosa punched you in the neck; is

14   that correct?

15   A.   Yes, it is.

16             MR. CANTOR:   Objection.

17             THE COURT:   Overruled.

18   Q.   You're not confused about that?

19   A.   There are still certain things I'm confused, that I

20   don't remember.  Certain things I do remember.  I was drinking.

21   Q.   Mr. Delgado, you were very specific telling us and

22   showing us how Sosa hit you with his four fingers and you

23   demonstrated in the shoulder.  You had no problem remembering

24   that?

25   A.   No.

## Delgado - Defense - Cross

1    Q.   Are you confused about that?

2    A.   No.

3    Q.   You have no problem remembering the words Sosa said to

4    you, that he would fuck you up, and his boys or something,

5    whatever the words were you testified to.  You remember all of

6    those, right?

7              MR. CANTOR:  Apparently the ADA does not remember.

8    Q.   You remember all of those?

9    A.   I don't remember all of them.

10    Q.   But you told us what you do remember?

11    A.   I remember what I do remember.

12    Q.   Yeah.  You remember you went and got the knife and

13    where you got the knife?

14    A.   Yes.

15    Q.   You remember that Margie didn't see you get the knife?

16              MR. CANTOR:  Judge, it is repetitive.  Haven't we

17    had it?

18              THE COURT:  It's cross-examination.

19              MR. CANTOR:  Of course, it is.  Repetitive.

20    Q.   You remember those things, right?

21    A.   Yes.

22    Q.   You were not confused about those things?

23    A.   No.

24    Q.   And you remember that you ran out of the apartment and

25    ran downstairs and gave Margie back her cell phone and keys, not

**Delgado - Defense - Cross**

1  confused about that, are you?

2      A.   No.

3      Q.   And you remember that somebody grabbed you, I think you

4  said Melissa or somebody grabbed as you ran out of the

5  apartment, yes?

6      A.   I think so, yeah.

7      Q.   You're not confused about that?

8      A.   No.

9      Q.   No?

10          MR. CANTOR:  I can't hear you.

11     A.   No.

12     Q.   And you told us earlier that you called Margie and you

13 asked had her some questions, right?

14          MR. CANTOR:  Judge, haven't we had it?  Really,

15 haven't we had it?

16          THE COURT:  Overruled.

17          MR. CANTOR:  You're overruling?

18     Q.   You remember that, right?

19     A.   Yes.

20     Q.   And she told you that Sosa was dead?

21     A.   She did.

22     Q.   You didn't go to turn yourself in at that point, right?

23          MR. CANTOR:  Judge, we have had this prior to

24 lunch.

25          THE COURT:  Overruled.

Delgado - Defense - Cross

1       A.    No.

2       Q.    Isn't it fact, Mr. Delgado, you had no intention of

3   turning yourself in once you found out that Sosa had died?

4       A.    I was nervous.  I didn't know what to do at this point.

5             MR. CANTOR:  Was what?

6       A.    I was nervous, so I didn't know what to do at that

7   moment.

8       Q.    Well, Mr. Delgado, have you ever been convicted of a

9   crime?

10            MR. CANTOR:  Objection.

11            THE COURT:  Overruled.

12            MR. CANTOR:  It's contrary to your ruling.  Don't

13   you remember your ruling?

14            THE COURT:  I remember it very specifically.

15            MR. CANTOR:  So I object if you remember it

16   specifically.

17            THE COURT:  Well, I'm glad that I wrote it down

18   because I have it right here in front of me, the very first

19   question is have you ever been convicted of a crime.

20            MR. CANTOR:  Withdraw the objection.  Fine.

21      A.    Yes.

22      Q.    On more than one occasion?

23            MR. CANTOR:  No, Judge.  If you wrote it down, you

24   have the second question there.

25            THE COURT:  have the second question, on more

1       than one occasion.

2                       MR. CANTOR:  What's his answer?

3       A.    Yes.

4                       MR. ROSENFELD:  That's what I asked.

5                       THE COURT:  You may ask.

6                       MR. ROSENFELD:  Thank you.

7       Q.    Was that a felony?

8       A.    One felony, yes.

9       Q.    And do you have other violations?

10      A.    Yes, I have violations.

11      Q.    On more than one occasion?

12      A.    Two violations.

13      Q.    So when you found out that you had stabbed a man and

14      killed him, you didn't go to the police?

15      A.    No.

16                      MR. CANTOR:  Judge, it's repetitive.  How many

17      times will you allow it?

18                      THE COURT:  It's cross-examination.  Overruled.

19                      MR. CANTOR:  It's synonymous with ad nauseam

20      repetition.

21      Q.    Correct?

22      A.    Correct.

23      Q.    Nobody stopped you from calling the police, right?

24      A.    No.

25                      MR. ROSENFELD:  May I have a moment please, your

1          Honor?

2                              THE COURT:  Yes, you may.

3                              (Pause in the proceedings.)

4          Q.   Mr. Delgado, you said you were tipsy at the party, you

5     had no problem running out of the apartment and down the stairs,

6     right?

7          A.   I was wibbly wobbly.

8          Q.   Okay.  As you went down the stairs?

9          A.   Yes.

10         Q.   Did you fall?

11         A.   No, I didn't.

12         Q.   Hurt yourself?

13         A.   No.

14         Q.   When you got to the stairs, ran outside, you were able

15    to do that, right?

16         A.   Yeah.

17                             MR. CANTOR:  I can't --

18         A.   Yes.

19         Q.   You were not so tipsy that you couldn't find a cab and

20    get back home, right?

21         A.   The cabs were all on the avenue right there.

22         Q.   So you were able to flag one down?

23         A.   They were parked.

24         Q.   What did you do?

25         A.   I asked him if he could take me to Brooklyn.  He asked

**Delgado - Defense - Redirect**

1   me what is the address and he told me get in while he punched

2   the address in the GPS and we drove off.

3         Q.   Okay.  Then you paid him $60?

4         A.   When I got to Brooklyn, yes.

5               MR. ROSENFELD:  Mr. Cantor said something.  I did

6   not hear the answer, Judge.

7               THE COURT:  He said $60.

8               MR. ROSENFELD:  But Mr. Delgado was speaking.  I

9   didn't hear what he said.  Can I have it read back?

10              THE COURT:  Would you care to have it read back?

11              MR. ROSENFELD:  Because I could not hear his

12  answer as Mr. Cantor interrupted me.

13              (Whereupon, the court reporter read back the

14  above-requested testimony.)

15        Q.   You're not confused about any of that, are you?

16        A.   No.

17        Q.   Okay.

18              MR. ROSENFELD:  All right.  Thank you.  I have no

19  other questions.

20              THE COURT:  Thank you, sir.

21  REDIRECT EXAMINATION BY

22  MR. CANTOR:

23        Q.   In a loud voice.  Did you stab -- however many times it

24  was -- Sosa in self-defense?

25        A.   Yes.

Delgado - Defense - Redirect

1      MR. ROSENFELD:  Objection.

2      THE COURT:  Overruled.

3      Q.   At the time that you stabbed Sosa, were you counting

4  the number of times that you stabbed him?

5      A.   No.

6      Q.   Were you afraid that your life was in imminent danger

7  when you stabbed him?

8      MR. ROSENFELD:  Objection, leading.

9      THE COURT:   I will allow it.

10     A.   Yes, I was.

11     Q.   And was that the reason you stabbed him?

12     A.   Yes.

13     Q.   Now, look, I want you, slowly, to show, to demonstrate

14  to this jury what Sosa on the last occasion did with his hands

15  to your body.  Do you understand the question?

16     A.   Yes.

17     Q.   Now, do it slowly.

18          (Witness indicating)

19     Q.   Okay.  That is three times you extended your fingers

20  and you rammed them into your left shoulder; is that correct?

21     A.   Correct.

22          THE COURT:  So indicated.

23     Q.   What was the next physical action that Sosa took

24  against you?

25     A.   When I turned my back, he grabbed me.

**Delgado - Defense - Redirect**

1    Q.    He grabbed you and spun you around?

2    A.    Yes, he did.

3    Q.    And what did he do with his hands?

4    A.    His left shoulder, his left hand came out and punched

5    me.

6    Q.    Where?

7    A.    In the neck and in between the face.

8    Q.    How many times?

9    A.    That was one, then he hit me again.

10   Q.    So that would be a total of two times?

11   A.    Yes.

12   Q.    And at that time were you afraid for your life?

13   A.    Yes, I was.

14   Q.    And was that the reason you used a knife?

15   A.    Yes, I did.

16   Q.    Were you concentrating on what portion of the body of

17   Sosa the knife was hitting?

18   A.    No, wasn't.

19   Q.    Were you ever concentrating on the number of times?

20   A.    No.

21   Q.    You heard the medical testimony here, did you not?

22   A.    Yes.

23   Q.    There were five stab wounds, correct?

24   A.    Yes, there was.

25   Q.    Four of them was superficial and would not cause death

Delgado – Defense – Redirect

1    and only one did, correct?

2         A.    Correct.

3         Q.    Were you looking to kill the man?

4         A.    No, I wasn't.

5         Q.    Were you looking to separate, put space between you and

6    the man?

7         A.    Yes, I was.

8         Q.    You were frightened?

9         A.    Yes, I was.

10        Q.    You were scared?

11             MR. ROSENFELD:   Objection to leading, your Honor.

12             THE COURT:   I will allow it.

13        A.    Yes, I was.

14        Q.    You were scared for your life?

15        A.    I was scared.

16        Q.    For your life?

17        A.    For my life, yes, I was.

18             Mr. CANTOR:   Now, listen, I'd like the People's

19    exhibit of the Assistant District Attorney interrogating my

20    client.

21             MR. ROSENFELD:   This is --

22             MR. CANTOR:   This is People's Exhibit 10, Judge.

23             MR. ROSENFELD:   Fifteen.

24             MR. CANTOR:   Fifteen.   Yes, it is.   I'm handing it

25    to the assistants.   I do not want to touch their machine

1       and cause any destruction.

2           Q.   I want you to look at the screen at the videotape of

3   the interrogation that you underwent by the Assistant District

4   Attorney at the police precinct.

5               MR. ROSENFELD:   Your Honor, he keeps using the

6           word interrogation.   I'm going to object.

7               MR. CANTOR:   That's what it is.

8               THE COURT:   It's a common parlance word.   Move on.

9               MR. CANTOR:   Yes. Now watch it, Mr. Delgado.

10              (Videotape is played in open court.)

11              MR. CANTOR:   Can the volume be raised?   Can it be

12          raised?   That's my request.

13              THE COURT:   It could be raised a little bit.

14              MR. ROSENFELD:   Excuse me, your Honor.   She's

15          trying.

16              MR. CANTOR:   Will it be raised?

17              THE COURT:   She raised it.

18              MR. ROSENFELD:   She raised it.

19   CONTINUED REDIRECT EXAMINATION BY

20   MR. CANTOR:

21          Q.   At the end of that interrogation, the female district

22   attorney did not ask you if you had anything else to say; is

23   that correct?

24          A.   Yes.

25          Q.   You were in a small room, correct, with what looked

**Delgado - Defense - Redirect**

1    like cinderblocks?  Were you in a small room?

2         A.    Yes.

3         Q.    You were there, a prosecutor was there?  Yes, no?

4         A.    Yes.

5         Q.    A video technician from the district attorney's office

6    was there, right?

7         A.    Yes.

8         Q.    And Detective Banker was there, correct?

9         A.    Yes.

10        Q.    What were the approximate dimensions of this room?

11        A.    It was a small room.

12        Q.    Can you approximate the dimensions?

13        A.    Like eight feet long, like five feet to the side.

14        Q.    It was a small room?

15        A.    Yeah.

16        Q.    Did you have an attorney there?

17        A.    No.

18        Q.    Was there a Judge there?

19        A.    No.

20        Q.    Was there any family member of yours there?

21        A.    No.

22        Q.    Once Margie had told you that the man died, you said

23    you sat on your bed and you couldn't fall asleep?

24        A.    Yes, correct.

25        Q.    And you were nervous?

Delgado - Defense - Redirect

1      A.    Yes.

2      Q.    You were frightened?

3      A.    Yes.

4      Q.    Well, when you were in this police station just hours

5   later and you were being interrogated by a prosecutor and there

6   was a detective and there was no one there aligned with you,

7   were you nervous?

8      A.    I was nervous.

9      Q.    You said that you've had 30 months of incarceration to

10  replay this incident in your mind, correct?

11     A.    Correct.

12     Q.    And, as you sit here now under oath, are you absolutely

13  sure, are you absolutely certain that you were struck twice in

14  either the chin or the neck by a closed fist of Sosa?

15     A.    Yes.

16     Q.    And the assistant district attorney when she wrapped up

17  and concluded her interrogation of you never asked you whether

18  or not there was something else that you wanted to say to add to

19  the answers that you had made; is that correct?

20     A.    Correct.

21     Q.    The knife that you took from the drain, you know, where

22  you put dishes to dry and the utensils to dry, you took that

23  knife for possible use as self-defense, correct?

24     A.    Correct.

25     Q.    And when you were on Abilify and Depakote you had to

**Delgado - Defense - Redirect**

1    hand in prescriptions to a pharmacist, correct?

2         A.   Correct.

3         Q.   They didn't give you back those prescriptions, did

4    they?

5         A.   No.

6         Q.   They gave you vials containing the drugs, correct?

7         A.   Correct.

8         Q.   You've been to drug stores in your life, have you not?

9         A.   Yes.

10        Q.   And if you have a prescription, you have to hand in it

11   and then you get the medicine?

12        A.   Correct.

13        Q.   Six drinks of hard liquor and cans of Coors beer.  To

14   be quite blunt about it, you were tipsy, if not intoxicated?

15        A.   Correct.

16             MR. ROSENFELD:  Objection, leading.

17             THE COURT:  I will allow it.

18        A.   Correct.

19        Q.   Loud voice?

20        A.   Yes.

21        Q.   No one you said in the video had come to intercede, to

22   stop Sosa except for a teenage girl, Carmen's daughter, who told

23   him he had to leave, he was disrespecting the house?

24        A.   Correct.

25        Q.   No other grown ups had intervened notwithstanding his

**Delgado - Defense - Redirect**

1    conduct and behavior during the party; is that correct?

2         A.   Correct.

3         Q.   And everyone except for Margie was a stranger to you

4    except having been introduced to two people briefly; is that

5    correct?

6         A.   Correct.

7         Q.   Mr. Rosenfeld asked you about the call to your mother

8    in Puerto Rico.  At the time you made that call, were you

9    depressed?

10        A.   Yes, I was.

11        Q.   What did you tell your mom?

12        A.   I told her what was going on.

13        Q.   Tell us.  Make believe that we're at the other end of

14   receiver.  Tell us what you told your mom.

15        A.   I told her ma, I think I killed somebody and she told

16   me, she just started screaming like what, what and I explained

17   to her how it happened and she told me --

18              MR. ROSENFELD:  Objection.

19              MR. CANTOR:  He brought it out.

20              MR. ROSENFELD:  I never brought out what she said.

21              THE COURT:  Yes.  Objection is sustained.

22              MR. CANTOR:  Sorry?

23              THE COURT:  The objection is sustained.

24        Q.   You spoke to your mom?

25        A.   Yes, I did.

**Delgado - Defense - Redirect**

1   Q.   You told her you think you killed a man?

2   A.   Yes.

3   Q.   And she cried and became emotional?

4              MR. ROSENFELD:  Objection.

5              MR. CANICK:  He already testified to that without

6   objection.

7              THE COURT:  Yes.  The objection is sustained,

8   however.

9              MR. CANICK:  But it's already in evidence.

10             THE COURT:  The objection to any more questions

11  along this line are sustained.

12  Q.   Is your mom a rather fragile woman or was she back then

13  when you were telling her on the phone?

14             MR. ROSENFELD:  Objection.

15             THE COURT:  Sustained.

16  Q.   Describe your mother's demeanor at the time that you

17  made that telephone call?

18             MR. ROSENFELD:  Objection.

19             THE COURT:  Sustained.

20  Q.   Were you able to determine, just yes or no, her

21  demeanor based upon that telephone call?

22             MR. ROSENFELD:  Objection.

23             THE COURT:  Sustained.

24  Q.   But you were frightened, scared and depressed enough to

25  cause you to call your mother in Puerto Rico?

Delgado - Defense - Redirect

1      A.   Yes.

2      Q.   And confess to her?

3      A.   Yes.

4      Q.   During the 30 months that you've been in jail, have you

5   gone over this incident in your mind?

6      A.   Yes, I did.

7      Q.   And as time passed, do you recall it more and more and

8   more?

9      A.   Yes.

10     Q.   You knew when you were being interrogated by the

11  assistant district attorney that you had twice been punched by

12  Sosa; is that correct?

13     A.   Yes.

14     Q.   But when -- who was asking the questions, you or the

15  assistant district attorney?

16     A.   She was.

17     Q.   And at the end of it when she asked the last question,

18  she never asked a question is there anything else that you want

19  to tell me relevant to this matter?

20          MR. ROSENFELD:   Asked and answered.

21          THE COURT:   Yes, we have, but I will allow it.

22          MR. CANTOR:   Thank you.

23     Q.   You can answer that?

24     A.   Yes.  She didn't.

25     Q.   She did not?

1    A.    She did not.

2    Q.    Have you ever in your life been interrogated by an

3    assistant district attorney where matters had been or the

4    interview or interrogation was being videotaped in a police

5    station?

6    A.    First time.

7    Q.    You were nervous?

8    A.    Yes, I was.

9    Q.    You were frightened?

10    A.    Yes.

11    Q.    You were scared?

12    A.    Yes, I was.

13    Q.    You were wondering what was going to happen to you?

14    A.    Yes.  I was confused, yes.

15    Q.    You didn't know what your fate would be?

16    A.    No, I didn't.

17          MR. CANTOR:  No further questions on redirect.

18          THE COURT:  Mr. DA?

19          Okay.  We will take a small break.

20          (Jurors leave the courtroom.)

21          (A recess is taken.)

22          COURT OFFICER:  Jury entering.

23          (Jurors enter the courtroom.)

24          THE COURT:  Mr. District Attorney?

25    RECROSS EXAMINATION BY

**Delgado - Defense - Recross**

1  MR. ROSENFELD:

2      Q.   Mr. Delgado, you've now had a second chance to view the

3  video, right?

4      A.   Yes.

5      Q.   And I noticed during the video that at one point you

6  said he was touching my belly and he was rubbing your stomach.

7  Do you remember that part of the video?

8      A.   Yes.

9      Q.   At what point during your direct examination when Mr.

10  Cantor asked you what happened you said Sosa was touching your

11  stomach?

12              MR. CANTOR:   Objection.  May be I never asked.

13              THE COURT:   Overruled.

14      A.   I didn't remember.

15      Q.   You didn't remember that he had touched your stomach?

16      A.   Yes.

17      Q.   So the day after the incident you remembered that,

18  right?

19      A.   Yes, because he was calling me fat boy.

20      Q.   What?

21      A.   Because he was calling me fat boy.

22      Q.   He was calling you fat boy and was rubbing your

23  stomach?

24      A.   Yes.

25      Q.   The first time, second time or right before you stabbed

1     him?

2          A.   The second time, I think it was.

3          Q.   The second time.  Well, just tell me at what point this

4     afternoon or this morning when Mr. Cantor asked you to describe

5     what happened did you tell him that Sosa was rubbing your

6     stomach and calling you fat boy?

7               MR. CANTOR:  Asked and answered just two questions

8          ago.

9               THE COURT:  Overruled.

10         A.   I don't remember telling that to Mr. Cantor that he was

11    rubbing my stomach.

12         Q.   Okay.  All right.  How about during my cross exam when

13    I asked what Sosa did with his hands, what position you were in?

14    At what point did you mention it?

15              MR. CANTOR:  Objection.  There was no specific

16         question about that.

17              THE COURT:  Overruled.

18         A.   I didn't mention it.

19         Q.   So the day after the incident, you remembered perfectly

20    well that Sosa touched you, right, on the stomach?

21         A.   Certain things I remembered.

22         Q.   Very well.  Were you injured at all when you were

23    punched you the face?

24         A.   No, I wasn't.

25         Q.   He didn't hit you that hard?

**Delgado - Defense - Recross**

1        A.    He hit me, but I didn't get injured.

2        Q.    Okay.  You never told the detectives, you never

3   complained of any injury to the detectives, right?

4        A.    There was, you know, a lot of things that I didn't tell

5   the detectives.

6               MR. CANTOR:    can't hear you.

7        A.    There was a lot of things that  didn't tell the

8   detectives.

9        Q.    Did you ever complain to the detective that the left

10  side of your face was injured because someone punched you?

11       A.    No, I didn't.

12       Q.    When you were giving that video statement, the DA said

13  to you in kind of a question, he didn't hit you, you said no, he

14  grabbed me, right?  You saw that?

15       A.    Yes, I did.

16       Q.    At what point did you tell the DA that Sosa punched you

17  twice in the head?

18       A.    I didn't tell her that.

19       Q.    Okay, but you are telling us now today 30 months later,

20  right?

21       A.    Because now I remember.

22       Q.    Now you remember.  Looking at the video just now, you

23  say you were nervous, scared in that video?

24       A.    I was nervous.

25       Q.    Were you scared?

**Delgado - Defense - Recross**

1     A.   Of course I was scared because I don't know what was

2   going to happen to me.

3     Q.   You knew you had killed someone, right?

4     A.   I found out that I did.

5     Q.   You found out from Margie you told us in the phone call

6   earlier?

7     A.   When the detective came to arrest me, they let me know

8   that   was being arrested for a homicide.

9     Q.   Okay.  Well, let's go back a little bit.  You said when

10  you spoke to Margie at the end of the conversation she told you

11  Sosa was dead?

12    A.   She told me he died, yes.

13    Q.   You knew you killed him?

14    A.   Yes.

15              (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1   Q     But yet you just told Mr. Cantor when you talked to

2   your mother, you said I think I killed someone.  Which was it?

3   A     There was a lot of things going on my head that I

4   couldn't focus on speaking, saying.  All I know I just --

5   something happened, something really bad happened.

6                    MR. CANTOR:  Can I have that re-read, Judge?

7                    THE COURT:  Yes.

8                    (Whereupon, the requested portion was read by the

9          court reporter.)

10                   MR. ROSENFELD:  Can I go on?

11                   THE COURT:  Yes.

12  Q     You remembered a lot about the incident in the video,

13  right?

14                   MR. CANTOR:  Objection.  This is outside of the

15         scope of recross.

16                   THE COURT:  Overruled.

17  A     Certain things.

18                   MR. CANTOR:  I can't hear you.

19  A     Certain things.

20  Q     Well, you said in the video about the knife when asked

21  about showing it to Margie, you said you showed it or the knife

22  to Margie at the party because, and those are my words, sum and

23  substance, a guy was going to attack you?

24  A     She, um, when she said in my lap she felt that I had

25  something in my pocket, so I just went like this (indicating),

1   I just showed her the black part.  I didn't really show her the

2   -- her the knife.  And she said, what's that?  She said, let me

3   get it.  I said no, no.  Leave it there, leave it there.

4   That's what happened.

5       Q     You never mentioned that this morning, did you?

6               MR. CANTOR:  Objection.

7               THE COURT:  Overruled.

8       A     I did not.

9       Q     You didn't mention it when I was asking you what

10  happened during cross exam and I asked you step by step what

11  happened?

12              MR. CANTOR:  Objection.  Step by step?  He asked

13      him specific questions to which he gets specific answers.

14              THE COURT:  Overruled.

15      A     There's a lot of things that -- things that is in my

16  mind that I don't remember, things that come up, things that I

17  forget.  There's a lot of things.

18      Q     So the day afterwards, when you were talking to the

19  detective, you remembered that and you told the detective,

20  right, you didn't forget you told him?

21      A     Because it came up in my mind at that moment.

22      Q     That was important?

23      A     Yes.

24      Q     To talk about showing the knife to Margie?

25      A     She asked me so I answered.  If you ask me a question,

1    I'll answer you.

2        Q    Oh, okay.  Great.  So when she asked you and said the

3    words he didn't hit you, and you said no, he grabbed my arm,

4    you answered?

5        A    'Cause I didn't remember exactly what was going on.  I

6    was so confused and, you know, nervous.

7                 MR. CANTOR:  I'd like to have the balance please.

8         Continue.

9                 THE COURT:  Do you have an objection?

10                MR. CANTOR:  Yes.

11                THE COURT:  Overruled.

12                MR. CANTOR:  Can he finish with his answer?

13                THE COURT:  If the district attorney hasn't

14        withdrawn the question.

15       Q    Let him continue.  There was more?

16       A    I was just nervous.  I was confused.  There was lot of

17   things going on my mind and a lot of questions confusing me, so

18   whatever came out at that moment that's what I said.

19       Q    You just told us a minute ago that someone asks me a

20   question, I give an answer, right?

21       A    Yes.

22       Q    Okay.  So she asked you about being hit and you said

23   no, correct?

24       A    Correct.

25       Q    So it never happened, right, Mr. Delgado?  Come on.

1   A    It happened.

2           MR. CANTOR:  Judge, may he stop approaching?

3   He's badgering the witness.  He's stepping up and he's

4   raising to his magnificent height and intimidating the

5   witness.  Can he step back behind the podium?

6           THE COURT:  You may continue.

7           MR. ROSENFELD:  Thank you.  May the record

8   reflect I'm about twelve feet away.

9           MR. CANTOR:  He doesn't have to step behind the

10  podium?

11          THE COURT:  If he doesn't choose to use the

12  podium, that's fine.

13  Q    Mr. Delgado, 30 months since the incident happened,

14  for the first time as you sit here today, you're telling this

15  jury that Sosa punched you twice around the face, the head,

16  whatever?

17  A    Yes, he did.

18  Q    Never said, mentioned to anybody before?

19  A    No, I didn't.

20  Q    Never mentioned to Mr. Cantor before?

21  A    No, I didn't.

22  Q    Never mentioned to the DA before?

23  A    No, I didn't.

24  Q    Never mentioned to Detective Banker the two times?

25  A    No, I didn't.

1    Q    Mr. Delgado, he never punched you, come on.

2    A    I don't gotta come up here and lie.  People at the

3    party saw what happened.  They don't want to state what really

4    happened because I was their friend.  I was the only one -- I

5    was the only one there by myself with my girlfriend.  I don't

6    gotta lie.  I'm already locked up for a murder.  I'm just

7    stating what happened.

8                MR. CANTOR:  Can I have that answer re-read?

9                MR. ROSENFELD:  Not necessary, your Honor.

10               MR. CANTOR:  Oh.  He's the Judge.

11               THE COURT:  One second.  First of all, the answer

12       hasn't been completed, but when it is, you can have it

13       re-read.

14               MR. CANTOR:  Thank you.  Can he complete the

15       answer?

16    A    I got nothing else to say.

17               MR. CANTOR:  Now can I have it re-read, your

18       Honor?

19               THE COURT:  Yes.

20               (Whereupon, the requested portion was read by the

21       court reporter.)

22    Q    Margie was there with you, right?

23    A    Yes, she was.

24    Q    You heard her testimony?

25    A    Yes, she was.

1           MR. CANTOR:  Judge, is this not repetitive?  Is

2    this not outside the bounds of recross?

3           THE COURT:  No.  I'm allowing it.

4           MR. CANTOR:  I will imagine you are.

5           MR. ROSENFELD:  Should I continue or are we going

6    to respond to that?

7           THE COURT:  Of course.  You may.

8           MR. ROSENFELD:  Thank you.  What did I ask?

9    A    You asked about Margie.

10   Q    Yes.  She was there with you, right?

11   A    Yeah.

12   Q    And you heard Melissa Dempsey testify and Mercedes

13   Rodriguez and Alberto Vasquez?

14          MR. CANTOR:  Judge, that's an improper line to

15   ask a witness to comment upon the veracity of other

16   witnesses.  I object.

17          THE COURT:  There's artful ways of asking the

18   question.  You may rephrase.

19          MR. CANTOR:  Is that a sustained, your Honor?

20          THE COURT:  At this moment, I'll sustain the

21   objection; however, I'll allow the question to be re-posed.

22          MR. CANTOR:  In its proper form.

23   Q    You heard Melissa Dempsey testify at trial, correct?

24   A    Yes.

25   Q    And you heard Alberto Vasquez testify?

1       A     Yes.

2       Q     Mercedes Rodriguez?

3       A     Yes.

4       Q     You told Margie -- I'm sorry.  You told the DA that

5   you got the knife to use against Sosa because he was bigger

6   than me, right?

7       A     Yes.

8       Q     So you have the knife on you because you intended to

9   use it, correct?

10      A     No.

11      Q     No.  What were you going to do with it?

12      A     I was just gonna pull it out, but since he attacked me

13  so I used it.

14      Q     Now, you took a knife from Margie's apartment.  You

15  didn't take a piece of soap, right, or a hair brush?

16      A     No, I didn't.

17      Q     You took a knife specifically?

18      A     Yes.

19      Q     A sharp knife?

20      A     Yes.

21               MR. ROSENFELD:  No further questions.

22               THE COURT:  Mr. Cantor.

23  REDIRECT EXAMINATION

24  BY MR. CANTOR:

25      Q     Did you take that knife for use in the event that you

tr/g    D. Delgado - Defense - Redirect

1   had to engage in self-defense?

2       A    Yes.

3       Q    When you took the knife and Sosa came back into the

4   apartment, did you immediately as he began threatening you

5   again for the third time take that knife and plunge it into his

6   body?

7       A    No, I didn't.

8       Q    It was after he had threatened you a third time, used

9   his hands on you, it was only then that you said you used the

10  knife to separate yourself from him?

11      A    Yes, I did.

12      Q    Did you ever have any intent to kill Sosa?

13      A    No, I didn't.

14      Q    Did you ever have any intent to cause serious physical

15  injury to Sosa?

16      A    No, I didn't.

17      Q    Was your sole and exclusive intent to put distance, to

18  separate yourself from Sosa who had been threatening you and

19  touching you all evening?

20      A    Yes.

21      Q    Now, Mr. Rosenfeld touched upon a very sensitive area.

22  You testified about conversations between you and me, did you

23  ever tell Mr. Cantor that Sosa punched you?  He opened that

24  door.  Now, I want you to --

25      A    No.

tr/g    D. Delgado - Defense - Redirect

1    Q    Listen to me, will you.  Can I complete a question?

2    A    Yes.

3    Q    We spoke many times about this case --

4    A    Yes.

5    Q    -- did we not?

6    A    Yes.

7    Q    Did there come a time immediately before trial, not in

8    the beginning, that you told me as your attorney that Sosa had

9    with a fist punched you twice.

10   A    No, I didn't.

11   Q    You never told me that?

12   A    No.

13   Q    Why?

14   A    'Cause at the moment I wasn't thinking what to say and

15   wasn't really thinking.  I was always nervous.  I'm confused.

16   Like I don't want to make it seem like if I'm lying, but I'm

17   not, but I was just confused.

18   Q    So you didn't even want to confide in your lawyer, you

19   were so confused?

20   A    Yes.

21   Q    But as you sit there now, and these 12 people will

22   judge you, do you understand that?

23   A    I know.

24   Q    And you spend 30 months thinking about this, correct?

25   A    Correct.

1      Q      Are you here now under oath?  That means subject to

2      the penalties of perjury and subject to even a high authority,

3      are you telling the truth, the whole truth and nothing but the

4      truth when you say Sosa punched you in the neck or chin twice?

5                   MR. ROSENFELD:  Objection.

6                   THE COURT:  Overruled.  He may answer.

7      A      Yes.

8      Q      You've made some mistakes, correct?

9      A      I have.

10     Q      One of the mistakes that you did not make, and you

11     tell me if I'm correct, is plunging the knife into Sosa with

12     the intent to kill him?

13     A      Correct.

14     Q      One of the mistakes that you didn't make, and you

15     correct me if I'm wrong, is plunging the knife into Sosa with

16     intent to cause serious physical injury to him?

17     A      I wasn't trying to hurt him.

18     Q      You were trying to separate yourself from him?

19     A      Yes, I was.

20                  MR. ROSENFELD:  Objection.

21                  THE COURT:  I'll allow it.

22     Q      You were trying to get out of that apartment without

23     Sosa taking any further and more heightened physical action

24     against you, is that correct?

25                  MR. ROSENFELD:  Objection.  Leading.

```
 1                    THE COURT:  It is leading, but I'll allow it.

 2        Q     Is that correct?

 3        A     Correct.

 4        Q     As you told the detective, you're sorry for this

 5   event, correct?

 6        A     Correct.

 7        Q     But it wasn't you who started with Sosa, it was Sosa

 8   who started with you, is that correct?

 9        A     Correct.

10        Q     How many children do you have, by the way?

11        A     I have six.  Three girls, three boys.

12        Q     Three girls?

13        A     And three boys.

14        Q     How young is the youngest?

15                    MR. ROSENFELD:  Objection, your Honor.  This

16        isn't part of recross.

17                    THE COURT:  Sustained.

18                    MR. CANTOR:  Well, I'll move to reopen my

19        redirect.  I inadvertently forgot to ask.

20        Q     So in a non-leading fashion, how many children do you

21   have?

22                    MR. ROSENFELD:  Objection.

23        A     Six.

24        Q     How young is the youngest?

25        A     She's ten.
```

1      Q     How old is the oldest?

2      A     She will be 17 in a couple of days.

3      Q     I can't hear you.

4      A     She will be 17 in a couple of days.

5      Q     Where do they live?

6      A     Three live here in Brooklyn and three in Puerto Rico.

7                  MR. CANTOR:  I have no further questions.

8                  MR. ROSENFELD:  Mr. Delgado, you don't support

9           any of those children, do you?

10     A     I can't.

11                 MR. ROSENFELD:  You've never given support for

12          those children?

13     A     Yes, I did.

14                 MR. ROSENFELD:  Weren't you asked when you were

15          arrested by a representative of the New York Criminal

16          Justice Agency whether you provide support for others and

17          didn't you say no?

18     A     The same questions that I don't understand, so I

19     really don't recall stating that.

20                 MR. ROSENFELD:  So what part of the do you

21          provide support for others don't you understand?

22     A     I don't understand.

23                 MR. ROSENFELD:  What?

24     A     I don't understand the question.

25                 MR. ROSENFELD:  Nothing further.

1    RE-REDIRECT EXAMINATION

2    BY MR. CANTOR:

3        Q    When you were interviewed by the representatives of

4    what's called the Criminal Justice Agency, you were in jail?

5        A    Yes.

6        Q    Were you in a position in jail to support anyone?

7        A    No.

8        Q    Had you in the past before you were jailed supported

9    your children?

10       A    Yes.

11       Q    You love your children?

12       A    Of course.

13       Q    You want to see them achieve the best --

14               MR. ROSENFELD:  Objection.

15       Q    -- that they can?

16               MR. ROSENFELD:  Outside the scope.

17               THE COURT:  Sustained.

18       Q    So you provided money support.  Did you provide

19    emotional support?

20               MR. ROSENFELD:  Objection.

21               THE COURT:  Sustain the objection.

22               MR. CANTOR:  I'm sorry?

23               THE COURT:  I sustained the objection.

24       Q    Did you provide emotional support?

25               MR. ROSENFELD:  Objection.

1           THE COURT:  Sustained.

2           MR. CANTOR:  Why?  He brought it up.

3           MR. ROSENFELD:  I never asked those questions.

4           MR. CANTOR:  Judge, he brings up support.

5           THE COURT:  It's sustained.

6           MR. CANTOR:  Of course it's sustained.

7    Q     You still love your children?

8    A     Always.

9           MR. ROSENFELD:  Nothing further, your Honor.

10          THE COURT:  You may resume your seat, Mr.

11   Delgado.

12          (Whereupon, the witness left the stand and

13   returned to the defense table.)

14          THE COURT:  Mr. Cantor, does the defense have any

15   further witnesses?

16          MR. CANTOR:  Defense rests.

17          THE COURT:  Defense rests.

18          The Court having previously ruled on the motion

19   for a trial order of dismissal for a non-prima facie case,

20   now that having been accomplished, then at the end of now

21   the entire trial the Court reserves to the defense the

22   usual motion regarding the elements of the crimes that will

23   be submitted to the --

24          MR. CANTOR:  Which are?

25          THE COURT:  We'll go over them at the appropriate

1    moment.

2            MR. CANTOR:  Thank you.  So my motion which I

3    will not elaborate, I reiterate it with the same force and

4    effect as I had earlier and you're reserving on that.

5            THE COURT:  No.

6            MR. CANTOR:  You're not.  You're denying it,

7    you're granting it?

8            THE COURT:  No.  I'm not doing either.  I will

9    invite you at the right time to make it.

10            MR. CANTOR:  I just made it with the same force

11    and effect.

12            MR. ROSENFELD:  Your Honor, I'm going to object

13    to this colloquy.

14            THE COURT:  There's no need to continue to

15    comment.

16            MR. CANTOR:  I'm not commenting.  You made a

17    statement.

18            THE COURT:  I reserved for you so you can

19    preserve the record.  That's what I did.

20            MR. CANTOR:  Okay.

21            THE COURT:  I didn't say anything further.

22            Now, will you both please approach.

23            (Whereupon, there was a discussion held, off the

24    record, at the bench, among the Court, the assistant

25    district attorneys, defense counsel, and outside the

1    hearing of the defendant and the jury.)

2         (Whereupon, the following takes place, on the

3    record, in open court, in the presence of the Court, the

4    assistant district attorneys, defense counsel, the

5    defendant and the jury.)

6         THE COURT:  Madam Forelady, ladies and gentlemen

7    of the jury, we have now completed the entire trial.  I

8    will excuse you for the evening.  Tomorrow I will turn to

9    counsel and I will invite them to make their closing

10   arguments where they will outline for you their impression

11   of the evidence or the lack or insufficiency thereof and

12   urge upon you the verdict they would like you to return.

13        And then of course the Court will give you the

14   law which controls and the final analysis, and you will

15   retire into your deliberations and find the facts of what

16   happened here.  You are the ones that pronounce what

17   happened here who is seeking and who is telling the truth

18   or something less than the truth and the Court will give

19   you further instructions with respect to that tomorrow.

20        So I invite you to have a pleasant evening.  I

21   invite you to remember all of the cautions.  I invite you

22   now again most importantly rush to no judgment.  You've

23   heard and seen all of the evidence, true, but you haven't

24   yet heard the summations, you haven't yet heard the law,

25   you haven't yet heard each other, all of which are to your

1    final determination as to the guilt or non-guilt of this

2    gentleman Mr. Delgado.

3            So we'll see you tomorrow.  Be here at 9:30

4    sharp.  All right.  So we can get immediately under way.

5            A JUROR:  I have a question.

6            THE COURT:  Yes.

7            A JUROR:  When does deliberation start?

8            THE COURT:  The deliberations start after you

9    hear the closing summations of both counsel and you hear

10   the law from the Court.

11           A JUROR:  Okay.

12           THE COURT:  Then you begin your deliberations.

13   Is that what you wanted to know?

14           A JUROR:  I wanted to know when I could go back

15   to work, that's why.

16           THE COURT:  Well, that's up to the jury, how long

17   do you want to stay and deliberate.  And you should stay as

18   long as you need, find it necessary.  And when you make

19   your final determinations, you announce them.  You can tell

20   your workplace that probably next week Monday.

21           A JUROR:  Okay.  Thank you.

22           THE COURT:  All right.  We'll see you then.

23   Goodnight.

24           (Whereupon, the jury left the courtroom.)

25           THE COURT:  The jury having been excused,

1    gentlemen, ma'am, we will now proceed to the charging

2    conference.  We'll start with you, Mr. Cantor, is there

3    anything that you would like the Court to charge over and

4    above the usual charges?

5        MR. CANTOR:  Oh, yes.  I think there's an ample

6    evidentiary predicate for your Honor to charge manslaughter

7    in the second degree both on the videotape, which is in

8    evidence, and based upon my client's testimony that he

9    blacked out when he inflicted the stab wounds.  It's both

10   on the videotape.  It's in his testimony.  Testimony of the

11   People's witnesses indicate that it was a wild soiree.

12   There was a lot of drinking, a lot of dancing and my client

13   testified that he didn't know how many stab wounds he

14   inflicted.  He didn't know what portion of the body they

15   were inflicted.

16       The medical examiner didn't know the order of the

17   infliction of the wounds.  But most importantly there, it's

18   ample evidence for a jury to conclude that my client acted

19   recklessly in causing the death of the deceased, and thus

20   we ask your Honor to charge manslaughter in the second

21   degree, reckless homicide.

22       We further ask your Honor --

23       THE COURT:  One second.  I want to take them one

24   at a time.

25       MR. CANTOR:  Yes.

1           THE COURT:  Mr. District Attorney.

2           MR. ROSENFELD:  Your Honor, the People would

3    oppose that motion.  It's clear the defendant brought a

4    knife back to the party.  It's clear that he swung at the

5    deceased not just one time, but five times, deliberately at

6    the head of the deceased, striking him all five of those

7    times.  This is not a reckless homicide.  In fact, the fact

8    that Mr. Cantor characterizes it as a wild soiree, it was a

9    Christmas Eve party, people dancing and drinking.  That

10   doesn't change anything or affect the charge on it.

11          The fact that the defendant didn't know how many

12   times or he says didn't remember how many times he swung at

13   the deceased does not suddenly make this a reckless case.

14   The intent can clearly be inferred by his actions in having

15   the knife on him deliberately pulling the knife out of the

16   pocket, swinging at the deceased and hitting him five times

17   in the head.  He talks about falling on the deceased.  We

18   know from the testimony he continued to attack the

19   deceased.  This is not reckless.

20          MR. CANTOR:  It didn't --

21          THE COURT:  I don't want to hear anymore on that.

22   I'll reserve and I'll give you my determination.  Next.

23          MR. CANTOR:  Judge, I'm going to tell you now,

24   you expect me to sum up tomorrow.

25          THE COURT:  Yes.

1    MR. CANTOR:  The law provides you tell me prior

2    to my preparation of summation what you're going to charge.

3         THE COURT:  Of course it does.

4    MR. CANTOR:  Okay.  So I just want to make the

5    case.  I want to correct misstatements.  And the

6    misstatements are that there were five stab wounds not all

7    to the head, to the throat as well, and of the five stab

8    wounds four were innocuous, would not have caused any

9    death, would have caused some pain.  There was only one.

10    There had been lots of drinking.  Sosa was inebriated.  My

11    client was inebriated.  My client has testified on the

12    stand that he blacked out.  The videotape provides that.

13    All People's witnesses indicated that there was drinking

14    galore and that my client had been threatened by Sosa.

15    There is indeed overwhelming evidentiary predicate for a

16    manslaughter in the second degree charge.

17         My second application is for a criminal negligent

18    homicide charge.  My client testified that he blacked out.

19    He failed to perceive the substantial and significant risk

20    what an infliction of five wounds on the head and/or the

21    throat might cause.

22         There's ample evidence from my client, from the

23    video, from the People's evidence that Sosa was totally

24    inebriated.  His actions speak of inebriation.  My client,

25    and this is uncontradicted, had six drinks of hard liquor

1   plus numerous cans of Coors beer.  That is a classic and

2   traditional case of criminally negligent homicide.  My

3   client failed to recognize the significant and substantial

4   risk of the swinging of the knife to Sosa's throat or head.

5          Medical examiner testified that there were

6   wounds, not lacerations, but bruises on the head that would

7   be consistent with falling on a hard surface.  My client

8   has not been by way of any evidence accused of inflicting

9   those.  This is a classic case of murder in the second

10  degree, manslaughter in the first degree, manslaughter in

11  the second degree, criminally negligent homicide.  Everyone

12  was intoxicated.  There was a soiree.  There were numerous

13  threats that had been made to my client, and there had been

14  numerous touchings by Sosa, some innocuous touching,

15  rubbing his stomach and some more painful and more harmful

16  and more vigorous.

17         My client has an absolute right based on the

18  evidentiary predicate developed in this case to have your

19  Honor place in the hands of the jury a charge of criminally

20  negligent homicide.

21         THE COURT:  One each time, yes, please.

22         MR. ROSENFELD:  We're back to manslaughter in the

23  second degree.  When we started, he talked about innocuous

24  cuts, deceased's ear was sliced in half and his nose was

25  sliced.  Those are not innocuous cuts.  Those are

1  deliberate cuts to the stab wounds to the neck, jugular

2  vein, carotid artery, the other side of the neck and the

3  back of the head.

4       Again, Mr. Cantor keeps referring to other people

5  that was again this wild soiree in support of criminally

6  negligent homicide where everyone was inebriated.  We heard

7  the testimony from the witnesses.  We're not talking about

8  a bunch of falling down drunks that don't remember

9  everything that happened.  You heard testimony from

10  witnesses that remember specifically what happened.  The

11  fact at that time defendant claims he didn't remember how

12  many times he hit the deceased or he blacked out at that

13  point.  He remembers everything else.  He remembers

14  bringing the knife to the party.  He remembers the grabbing

15  of the arm and the grabbing of the shoulder, the reaching

16  into the pocket, deliberately pulling out the knife and

17  swinging it.  Those are not criminally -- that's not a

18  criminally negligent homicide.  No way fits into it.

19       The fact that -- I don't understand how he can

20  say the contusions on the head are part of the criminally

21  negligent homicide charge.  The doctor said those could

22  have been caused by hitting a hard surface or being hit by

23  a fist, there's nothing criminally negligent homicide, and

24  those weren't the cause of the homicide.  The defendant

25  created this situation.  He was perfectly aware that he had

1    a sharp knife and was bringing it to the party.  He wasn't

2    unaware of failing to perceive risk of using the sharp

3    knife or stabbing someone.  So People oppose that request

4    also.

5                MR. CANTOR:  What the People do not intentionally

6    tell you that when you consider the applications for a

7    charge, that you must as a matter of law view the evidence

8    in the light most favorable to the defendant.  That is the

9    law.

10               I'm also now asking you to charge intoxication.

11   I can spend the next half hour here citing chapter and

12   verse of intoxication.  I'm asking you to charge this jury

13   that they can consider whether or not my client was so

14   intoxicated that he's incapable of formulating the intent

15   to kill, formulating the intent to inflict serious physical

16   injury, whether or not he was so drunk enough that that

17   would lend to a finding of recklessness, which would be a

18   constituent element of manslaughter in the second degree,

19   and whether intoxication was such that would cause my

20   client to act in a criminally negligent fashion.

21

22               (Continued on next page.)

23

24

25

CHARGE CONFERENCE

1812

1    MR. CANTOR: They are akin to the doctrine of

2  intoxication. I admit that if you favor me with rulings

3  and you charge intoxication that may very inure to my

4  client's detriments in connection with the charge of

5  manslaughter second degree and criminally negligent

6  homicide. I am sure you recognize that, but nonetheless if

7  you can't have a whole loaf, Judge, sometimes half a loaf

8  is better than none.

9    THE COURT: Let's do intoxication.

10    MR. ROSENFELD: Your Honor, I think the evidence

11  was quite clear from the defendant's own mouth. He said,

12  he was tipsy, felt a little dizzy.

13    I am sorry, Mr. Cantor is laughing. Should I

14  continue or do you want to do it another time, Judge? I

15  don't want to disrupt his laughter enjoyment.

16    THE COURT: Let's wait until he subsides.

17    MR. CANTOR: I have, subsided, done.

18    If you don't think there is intoxication in this

19  record, permeating this record --

20    THE COURT: All right.

21    MR. ROSENFELD: Again, this goes to just because

22  Mr. Cantor says something doesn't mean it is. So there is

23  no evidence here that the defendant was so intoxicated that

24  he was unaware of what he was doing or of being able to

25  have the mens rea to commit the acts that he did. He

1813

1    clearly remembers everything that happened except for the
2    one moment he says he blacked out while stabbing. He
3    remembers right before everything, before the grabbing, the
4    touching, the statements that were made. He testified
5    himself that he walked from one building to the other has
6    no problems. There is nothing here indicating that he was
7    so intoxicated that that should be considered in this case.
8    All he said was he had some drinks. At one point he says
9    it was beers and some alcohol, other times its alcohol and
10   some beers, but at no point did he say he was so
11   intoxicated that he had no idea of what was happening or
12   unable to control himself or knowing exactly what was
13   happening immediately before or after and during the
14   incident.
15          MR. CANTOR:  That's a jury question, you see.
16   All you have to determine is whether or not there is
17   evidentiary predicate in this record during the testimony
18   and the evidence in the light most favorable to my client
19   whether intoxication is a charge that is warned, that's
20   all.  Manslaughter in the second degree is a jury question,
21   whether or not he acted recklessly.  Criminally negligent
22   homicide is a jury question, whether he acted under
23   circumstances that events criminally negligent homicide.
24   All your duty is a very narrow one:  Is there an
25   evidentiary predicate for such charges and in coming to

CHARGE CONFERENCE

1814

1   that determination I keep on harping upon the fact that you

2   must view the evidence in the light most favorable to the

3   defendant.

4            THE COURT:   Your next request?

5            MR. CANTOR:   And when you charge intoxication I

6   am asking you not only to incorporate alcohol, but

7   medicine, psychotropic medicine.   I am not asking you to

8   use the term psychotropic, but there is testimony in this

9   case unimpeded that he took medicine prior to going to the

10  party to counter depression and bipolarity and medicine

11  combined with an abundance of alcohol is a jury question to

12  determine what effect that had upon my client's mens rea.

13  So, of course, I ask you to incorporate that in the

14  intoxication charge.   Not to, not to charge intoxication in

15  this case is tantamount to throwing a skunk in the jury box

16  and you instructing the jury to disregard the odor.

17           THE COURT:   Your next request?

18           MR. CANTOR:   Justification of self defense,

19  obviously.   I don't want to elaborate upon that other than

20  to say you must view in the light most favorable to my

21  client.

22           THE COURT:   Do you wish to contest that?

23           MR. ROSENFELD:   Your Honor, there is no

24  evidence -- there is evidence as far as justification goes

25  and it's not called self defense it's called justification.

CHARGE CONFERENCE

1815

1    There is no evidence that the deceased in any way had any
2    attack -- had any weapon in his hand or had any -- let me
3    get my thoughts together.  I mean it was about to use any
4    deadly physical force against the defendant.  The defendant
5    is the one who had the knife.  The defendant is the one who
6    used the knife on the deceased.  The defendant kept saying
7    he thought or I'm sorry, the deceased kept saying if you do
8    something to Margie, if you disrespect Margie, if you in
9    the future.  There was no evidence that the defendant did
10   any of those things.  There is no evidence that the
11   deceased was going to do anything to him.  So, when he says
12   he is justified in using deadly physical force against the
13   deceased:  One, he could have retreated in safety since he
14   said he could have walked out the door and two, there was
15   never any physical force -- deadly physical force about to
16   be used against him by the deceased.  Notice his hands were
17   empty and he said there was nothing in the deceased hands
18   at that time.

19            MR. CANTOR:  What the DA conspicuously omits to
20   bringing to this Court's attention is the writings of the
21   Courts of Appeals in *People vs. Geotz*, which says that
22   justification is a subjective/objective test.  That a jury
23   or a finder of fact must take into consideration the
24   history, the background, the circumstances, the state of
25   the environment and then once they take that all into

CHARGE CONFERENCE

1816

1   consideration my client is not a marine, my client is not a

2   marshal arts fighter, they must take into consideration all

3   of the attending facts that are peculiar and subjective to

4   my client and only then, once they have placed themselves

5   in the shoes of my client, only then must they implore the

6   objection -- the objective portion of justification.  Given

7   all of that it surrounds and it's attendance to and it's

8   part of a history and upbringing of my client, only then

9   and they place themselves, the jurors, in my client's

10  moccasins, only then must they then address the question

11  did under those circumstances Mr. Delgado act reasonably?

12  That is the objective portion, the District Attorney

13  conspicuously fails to mention that.  Not to have a

14  justification charge in this case would be a rank

15  injustice.  A rank injustice.

16          MR. ROSENFELD:  If the Court is, your Honor, just

17  to add to that, if the Court does charge justification it

18  would have to be each and every one of the blows under

19  Del -- I am -- Delbrio (phonetic)

20          THE COURT:  I know.

21          MR. ROSENFELD:  I don't have it in front of me

22  and I am sorry I am mispronouncing it.

23          THE COURT:  It would have to be to each of the

24  five blows.

25          MR. ROSENFELD:  To each of the five.

H-ljb

CHARGE CONFERENCE

1817

1    THE COURT:  Hold on.  Now, Mr. Cantor, you have

2  anything else?

3    MR. CANTOR:  Of course, you are going to have to

4  charge -- no, I await your ruling.  I know that you must

5  charge that the People must prove mens rea beyond a

6  reasonable doubt with respect to murder in the second

7  degree or manslaughter in the first degree, that I know.

8    THE COURT:  Do you have any particular charge

9  that you favor?

10    MR. CANTOR:  I favor a charge that indicates that

11  the mens rea, the state of mind of my client, is an element

12  of murder in the second degree and manslaughter in the

13  first degree and his state of mind must be proven with

14  respect to murder beyond a reasonable doubt -- with respect

15  to murder in the second degree that he intended to kill

16  Sosa and with respect to manslaughter in the first degree

17  that he intended to inflict serious, physical injury on

18  Sosa and I am now entitled because I am about, I don't know

19  10, 15, 20 minutes from leaving this courtroom and

20  preparing my summation, I am entitled by law to know what

21  your Honor favors.

22    THE COURT:  Didn't we answer this earlier?

23    MR. CANTOR:  And you said, yes, you would.

24    THE COURT:  I am going to do it.

25    MR. CANTOR:  And may I be seated with your

H-ljb

CHARGE CONFERENCE

1818

1    permission?

2         THE COURT:  Yes, of course.

3         Now, we turn to the People.  Any particular

4    request for charge over and above the usual charges that

5    are applicable to the case?

6         MR. ROSENFELD:  Well, again, I haven't been

7    before the Court in awhile, I am sure the usual charges

8    include expert testimony, police officers testifying,

9    *People vs. Geotz* must convict.

10        THE COURT:  Over and above.

11        MR. ROSENFELD:  Over and above all of those.

12        THE COURT:  The Regular charges.

13        MR. ROSENFELD:  Except for the fact that People,

14   People have a right to speak with witnesses prior to

15   testimony to discuss --

16        THE COURT:  All part of it.

17        MR. ROSENFELD:  Sometimes it isn't, sometimes

18   it's not.

19        THE COURT:  You may be seated, Mr. Cantor.

20        MR. CANTOR:  I forgot something.

21        THE COURT:  I will allow you to say it.

22        MR. ROSENFELD:  Oh, yes, Judge, I mentioned

23   before that Mr. Cantor in the middle of my cross jumped up

24   about the *Sandoval* issue and said to the jury that the DA

25   was violating the Court's ruling on *Sandoval*, which is a

H-1jb

1   total and improper thing to say in front of the jury.  He

2   can point that out to the Court if he wishes, but however,

3   the fact is that the People did not violate any of the

4   Court's rulings and I would ask that the Court fashion a

5   charge instructing the jury that the DA did not in any way

6   violate any of the Court's rulings involving that issue or

7   any other issues because we haven't.

8           MR. CANTOR:  I am going to speak candidly, Judge.

9   That's a fault that is shared by you and the prosecution.

10  I heard the word parole.  You would not give me an

11  opportunity to go to the sidebar to preclude the rereading

12  of that.  You said at another time, at an appropriate time.

13  There is no need to highlight the fact that the prosecution

14  had heard the word parole.  He was here at the *Sandoval*

15  hearing and breached your ruling with regard to parole.

16  That was never given by cue of permission to the People to

17  question my client by way of parole.  He is a lament.  He

18  mentions it, I hear it and may the People be seated if I

19  have to be seated when asking?  And the People heard the

20  word parole, but of course, if you were not going to

21  entertain an application at that point on the record at the

22  sidebar and grant the People the opportunity to have the

23  question reread it was reread, but there is one very

24  important point:  That a weapon -- you must I am going to

25  suggest respectfully, charge voluntariness both of the

CHARGE CONFERENCE

1820

1   written statement and the Q and A because my client

2   testified, there is an evidentiary basis here that he was

3   not given and read the *Miranda* rights until after he wrote

4   out his statement.  Voluntariness then becomes a factual

5   issue for this jury to determine with respect to the

6   written statement and the videotaped Q and A and they must

7   be charged upon that.  Of course, there is an issue that

8   has now been inserted into this record.

9           Thank you.

10          MR. ROSENFELD:  This kind of becomes a ridiculous

11   argument, your Honor.  The defense keeps on insisting that

12   the People submitted urging or keeps on doing this urging

13   that we didn't.  I am not going to belabor the issue.  He

14   jumped up to the Court, he turned to the jury, I ask the

15   Court to give the appropriate instructions.

16          MR. CANTOR:  I did not turn to the jury, I turned

17   to your Honor.  You are the arbitrator of law.  I've heard

18   so many statements and mischaracterizations by this

19   prosecutor that it would take the *Hayden* laboratory and

20   their telescope to accomplish the sole number of devious

21   and deliberate acts of misconduct.

22          MR. ROSENFELD:  I am not even going -- your

23   Honor, I am tempted to respond to defense counsel's

24   statements.  He has been doing this throughout.  The

25   Court -- in respect to the Court and the record I am not

CHARGE CONFERENCE

1821

1   going to respond to any more, it's absurd.

2           THE COURT:  Anything else, Mr. District Attorney?

3           MR. ROSENFELD:  No, your Honor.

4           THE COURT:  Okay.  With respect to the defense

5   requests for manslaughter in the second degree and reckless

6   homicide the Court will not charge.  Criminal negligent

7   homicide the Court will not charge.  Intoxication the Court

8   will not charge.  Justification the Court will charge on

9   the side of the People, the requests.

10          MR. CANTOR:  How about voluntariness, Judge,

11  because --

12          THE COURT:  Yes, on the *Miranda* the

13  voluntariness.

14          MR. CANTOR:  Yes, my client said he was not

15  read --

16          THE COURT:  He did.

17          MR. CANTOR:  It's willing a evidentiary predicate

18  and it's got to be viewed in the light most favorable to my

19  client.

20          THE COURT:  Yes.

21          MR. CANTOR:  You must, I suggest on the law,

22  instruct the jury on voluntariness.

23          THE COURT:  All right.  I think I left off saying

24  justification, yes.

25          MR. CANTOR:  Yes.

H-1jb

CHARGE CONFERENCE

1822

1      THE COURT:  On the *Miranda* voluntariness.

2      MR. CANTOR:  You have it in the record,

3  uncontroverted.

4      THE COURT:  My inclination is to charge it,

5  that's my inclination.

6      MR. CANTOR:  I need a ruling, Judge.

7      THE COURT:  I will charge it.

8      MR. CANTOR:  Thank you.

9      THE COURT:  I think that covers everything.

10      MR. CANTOR:  Indeed it does.

11      MR. ROSENFELD:  What time tomorrow, your Honor --

12  wait, your Honor, yes, what about that *Sandoval* request I

13  made of the issue regarding his statement about my

14  violating the Court's ruling?

15      THE COURT:  Well, I am not going to make a --

16  fashion any particular charge, but I will include it in a

17  charge having to do with the parole -- the word parole with

18  regard to speculation and so forth so...

19      MR. ROSENFELD:  But will you include the People

20  did not violate the Court's ruling as charged curiously by

21  the defense?  I am asking for that to be included.

22      MR. CANTOR:  I am objecting.

23      MR. ROSENFELD:  I don't want to mislead the jury.

24      MR. CANTOR:  You will not, I am objecting because

25  they certainly did.

CHARGE CONFERENCE

1823

1       THE COURT:  All right.  All right.

2       MR. CANTOR:  They don't even know what *Sandoval*

3   is.

4       MR. ROSENFELD:  Who doesn't?

5       MR. CANTOR:  Judge, I am schooled and not trading

6   verbiage with the prosecutor.  The jury doesn't know what

7   *Sandoval* is.

8       THE COURT:  Yes, I will give some.

9       MR. ROSENFELD:  Thank you.

10      THE COURT:  I will mention it, Mr. District

11  Attorney, not at any length but I will mention it.

12      MR. ROSENFELD:  Very good.

13      MR. CANTOR:  Will you tell them that a

14  stipulation is evidence?

15      THE COURT:  Yes, it is.  Of course, I will.

16      Madam Sergeant?

17      THE SERGEANT:  Yes.

18      THE COURT:  Please have the gentleman up as

19  quickly as you can.

20      Gentlemen, be here at quarter to ten, all right.

21  I want to get on the way as quickly as possible.

22      Both of you has suggested closing statements

23  anywhere from 40 to 60 minutes, which is fine, but let us

24  be timely.

25      MR. CANTOR:  I said 60 minutes, Judge.

H-1jb

CHARGE CONFERENCE

1824

1    THE COURT:  I said 40 to 60 minutes, yes.  He
2    said 40 and you said 60.

3         We will see each other tomorrow, good night.

4         MR. CANTOR:  Give me a moment, Judge.  Give me a
5    moment.  I am constrained by virtue of the denial of the
6    charge manslaughter in the second degree and criminally
7    negligent homicide for you to charge extreme emotional
8    disturbance.

9         THE COURT:  Extreme emotional distress?

10        MR. CANTOR:  Yes.

11        THE COURT:  You saying anything else or is that
12   the request?

13        MR. CANTOR:  That's the request.

14        THE COURT:  Sir?

15        MR. ROSENFELD:  I am not sure the basis for that,
16   your Honor, that the evidence supports that even though
17   there was certainly no expert testimony, no medical
18   testimony, nothing to indicate that the defendant at any
19   time suffered extreme emotional disturbance.

20        MR. CANTOR:  The evidence is replete with factual
21   assertions that would well support that charge.  Now, that
22   doesn't mean that I am asking you not to give the regular
23   ordinary charge with respect -- with respect to murder in
24   the second degree; namely, proof beyond a reasonable doubt
25   as to each and every constituent element including mens

CHARGE CONFERENCE

1825

1   rea.  My application is that in addition to that that you

2   charge extreme emotional disturbance.

3            THE COURT:  I am not inclined to do so.

4            MR. CANTOR:  And I am inclined to take an

5   exception.

6            THE COURT:  Okay.

7            MR. CANTOR:  Thank you, your Honor.

8            THE COURT:  You're welcome.

9            MR. CANTOR:  The third count of possession of a

10  weapon in the fourth degree?

11           THE COURT:  Yes.

12           MR. ROSENFELD:  Not necessary.

13           MR. CANTOR:  You want to know something, Judge, I

14  withdraw that application.  The Indictment stands intact,

15  let it be so charged.  Let it be so charged by your Honor.

16           THE COURT:  Anything you wish to say,

17  Mr. District Attorney?

18           MR. ROSENFELD:  What?

19           THE COURT:  Anything you wish to say?

20           MR. ROSENFELD:  No, your Honor.

21           THE COURT:  You are going forward with that

22  charge?

23           MR. ROSENFELD:  I am sorry, I have not been

24  thinking about it.

25           THE COURT:  Why you don't think about it

CHARGE CONFERENCE

1826

1  overnight.

2        MR. ROSENFELD:  Yes, will you include --

3        MR. CANTOR:  I am entitled, so I am not asking

4  for any -- I've noted my exception.  Also, you have an

5  Indictment with three counts.  I am not asking that any one

6  of those counts be withdrawn for the jury's consideration.

7        MR. ROSENFELD:  Your Honor, I am just going to

8  reserve overnight whether I want that to be included.  We

9  can plan to include and we can take two minutes to adjust.

10        MR. CANTOR:  No, Judge, I have to prepare a

11  lengthy closing summation, I am entitled by law to know now

12  will that be charged?  I am not requesting that it be

13  withdrawn from the charge.

14        MR. ROSENFELD:  I am going to leave it, Judge.

15        THE COURT:  All right.  We will leave it.

16        MR. CANTOR:  Very well.

17        THE COURT:  If you revisit tomorrow morning I

18  will entertain it.

19        MR. CANTOR:  Well, then I won't have an

20  opportunity.

21        THE COURT:  I will entertain it nonetheless.

22        MR. CANTOR:  Well, then I will note my exception.

23        THE COURT:  Of course.

24        MR. CANTOR:  That and its violation of the Sixth

25  Amendment effectiveness of counsel.

H-ljb

CHARGE CONFERENCE

1826A

1      THE COURT:   Yes.

2           (Whereupon the trial is adjourned until Friday,

3      July 6, 2012, at 9:45 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H-1jb

tr/a    Proceedings

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      COUNTY OF BRONX :  CRIMINAL TERM - PART:  T-14
 2    - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
      THE PEOPLE OF THE STATE OF NEW YORK,
 3
                                          Indictment #27/2010
 4
                 - against -              Summation Charge
 5                                              Verdict

 6    DAVID DELGADO,

 7                          Defendant.

 8    - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

 9                         July 6, 2012

10                         265 East 161st Street
                           Bronx, New York 10451
11
      B E F O R E:
12
                    HONORABLE DOMINIC R. MASSARO,
13
                              J U S T I C E
14
      (Appearances same as previously noted.)
15
                         TRICIA L. ROBINSON, CSR, RPR
16                       Senior Court Reporter

17                       (Whereupon, the following takes place, on the

18           record, in open court, in the presence of the Court, the

19           assistant district attorneys, defense counsel, the

20           defendant and the jury.)

21                       COURT OFFICER:  Jury entering.

22                       (Whereupon, the jury entered the courtroom.)

23                       THE COURT:  Good morning to everyone.

24                       JURORS:  Good morning.

25
```

1    THE COURT:  Mr. Clerk.

2    THE CLERK:  This is case on trial, People of the

3    State of New York against David Delgado.  Let the record

4    reflect the presence of the district attorney's office,

5    defense attorney, defendant and all sworn jurors.

6    THE COURT:  Madam forelady, ladies and gentlemen

7    of the jury, we now bring our proceedings to a close with

8    summation by counsel.  The Court will invite each counsel

9    to make his argument and they will each respectively make

10   that argument to you urging upon you their interpretation

11   of the evidence or the lack or insufficiency of evidence,

12   and likewise urging further that you return the verdict

13   they would like you to see.  We will do it now in reverse

14   and I'll call upon defense counsel, Mr. Cantor first and

15   then the district attorney thereupon.

16        When we complete that, the Court will instruct

17   you on the law and you'll be given the case so to speak to

18   begin your deliberations as to the guilt or non-guilt of

19   Mr. Delgado with respect to the charges that the Court will

20   instruct you on.  For closing argument, I call upon Mr.

21   Defense Counsel, Mr. Cantor.

22   MR. CANTOR:  Mr. Justice Massaro, Mr. Delgado,

23   Madam forelady, ladies and gentlemen of the jury, it's an

24   onerous very hard, very difficult task that will be imposed

25   upon you.  I do not envy you.  I do not envy you for a

1   moment.  The weight of my client rests in your good hands.

2   A trial has been described as a search for the truth, but

3   that's not what it really is.  It's a reconstruction of

4   events and episodes and incidents that occurred in the past

5   in this case 30 months ago.

6          It is a rare occasion, rare indeed when you get

7   the full and complete and absolute truth.  Why?  Because by

8   human nature, when we're reconstructing events not of 30

9   seconds ago, but of 30 months ago, we rely upon for the

10  most part human beings who testify under oath.  By nature,

11  human beings' memory tends to recede and fade and change

12  with the passage of time.  That's irrefutable law of

13  nature.

14          So now we have two and a half years later.  There

15  are certain matters here that are beyond contest, beyond

16  challenge.  They really are.  For instance, Sosa received

17  five puncture wounds, four of them would not have killed

18  him or caused serious physical injury.  One of them;

19  however, on the surface, a small puncture wound, also

20  punctured the aorta and the carotid artery.  He bled to

21  death.  Your question, for which I don't envy you, is to

22  determine the state of mind of my client, his intent, in

23  short, at the time of the infliction of the wounds.

24          It is charged by the People in three counts, the

25  first count being murder in the -- murder in the second

1     degree, that upon my client causing those punctures, he did

2     so with the intent, oh, the fancy term, as I told you when

3     I was selecting, as mens rea from the Latin term meaning

4     the state of mind.  The People charge that he did so with

5     the intent to cause the death of Sosa and Sosa died.

6     That's murder in the second degree.

7              People also charge manslaughter in the first

8     degree.  That is when the puncture wounds were rendered.

9     My client was acting with an intent to cause serious

10    physical injury.  The Judge will define serious physical

11    injury.  The loss of a limb is serious physical injury.

12    The wounding of a kidney such that it has to be removed is

13    serious physical injury.  Serious physical injury is what

14    the words say.  Serious.  It's not a cut, or that requires

15    one or two stitches.  It's not a cut or abrasion or a

16    bruise that requires the application of an Ace bandage.  It

17    requires a permanent dismemberment or rendering of the

18    non-function of a key and vital and crucial bodily organ.

19    So the People claim that my client inflicted these puncture

20    wounds acting with the intent to cause the very serious

21    physical injury.

22             Okay.  Then the People as they often do throw in

23    a third count that my client possessed a knife.  He

24    possessed this knife they say with the intent, mens rea, to

25    use it unlawfully against another.  So we have murder in

1     the second degree.  The defense is really two-fold here.

2     One, when my client left, it was completely absent from his

3     mind an intent to kill Sosa.  Second defense, and I'll get

4     to that later on, is justification, which we all know and

5     call self-defense, that he felt that he was about to

6     sustain serious physical injury, if not deadly physical

7     injury and thus he acted accordingly.

8          Same defense holds true with respect to

9     manslaughter in the first degree.  While acting with the

10    intent to cause serious physical injury, my client caused

11    those five puncture wounds which caused the death of Sosa.

12    The defense, my client did not entertain, did not harbor,

13    did not have at the time of the infliction of those

14    puncture wounds an intent to cause serious physical injury

15    to Sosa.

16          The third count, possessed a knife with the

17    intent, mens rea, with the intent to use the same

18    unlawfully against another.  The defense is my client never

19    intended to use it unlawfully against another.  He did

20    intend to use it by way of self-defense, if necessary.  And

21    he never while possessing that knife did it with the mens

22    rea, with the intent, to use it unlawfully against another

23    unless and until circumstances warranted it.

24          So let's get to self-defense because that is a

25    very, very for lay people perhaps complicated defense.  It

1    has two criteria:  One is objective.  What do I mean by

2    objective?  And the other is subjective.  What do I mean by

3    subjective?  Subjective means my own personal thoughts,

4    experience, history.  A subjective thought, like a very

5    bold striking color such as juror number 12 is wearing by

6    way of, be it a scarf or sarape or whatever.  It's

7    subjective.  It's my opinion.  It exists based upon my

8    experience, my interaction, my history.  What is objective?

9    Objective is the summertime usually brings heat.  It's an

10   immutable fact of life.  The wintertime usually brings

11   cold.  So subjective and objective.

12          Do you remember when I was selecting this jury I

13   told you in my voir dire again, legal ease, it just means

14   selecting a jury, questioning a jury and getting answers

15   from a jury.  So I said you have to take your defendant as

16   you find him.  Is he a CEO of a large corporation?  No.  Is

17   he a graduate of a host of Ivy League colleges?  No.  Is he

18   a respected and renowned theologian?  No.  He's David

19   Delgado.  So you have to listen to what makes David Delgado

20   tick.  That's the subjective.  That's the subjective

21   element.  In other words, you have to stand in the shoes of

22   David Delgado as he stood in those shoes on December 25,

23   '09 at the party.

24          What do we know?  We know at the time of the

25   party he was 39 years of age.  We know that he was five

1       foot and still remains five foot six.  You saw him stand.

2       Sosa was six feet tall, half a foot taller.  That's just

3       one factor.  My client mentioned that many times on the

4       stand that he was fearful for his life because this was a

5       larger man, a bigger man.

6               You have to go back a little further.  You have

7       to know David Delgado grew up being sexually abused for

8       three years by his step-father.  What does that mean?

9       There's no sex charge in this indictment.  It means that he

10      was emotionally, mentally scarred for life.  For life.  All

11      of us are unique unto ourselves.  All of us are different.

12      We bring to bear different lives, experiences, different

13      histories, different interactions, different stories.  You

14      judge David Delgado's sincerity and reluctance to testify

15      about that.  It's nothing to be proud of because of shame,

16      integrity.

17              THE COURT:  Would you like some water, sir?

18              MR. CANTOR:  As I once told you earlier, I prefer

19      a gin and tonic, so if you're offering I'm accepting.

20              THE COURT:  I can only offer what I have at hand.

21              MR. CANTOR:  Another day, another time.  So it

22      causes shame and degradation and self humiliation and stays

23      with you for the rest of your life.

24              David Delgado is a troubled soul with a fragile,

25      delicate, almost feeble mind.  Is he sane?  Of course he is

1  sane.  I'm not pleading insanity here.  Ask him where he

2  is, he will tell you he's in a courtroom in Bronx County on

3  the third floor with Justice Massaro presiding over a jury

4  of twelve regular jurors and one alternate.  He's sane as

5  the day is long.  That doesn't mean he has a strong -- he

6  has a mind of iron with a firmament of steel.  Three times,

7  three times he attempted suicide.

8         Remember when I was selecting you as jurors, I

9  told you about a conversation I once had with a physician.

10  He was describing to me the most painful diseases, maladies

11  that can afflict a person, and he said tic doulourex, which

12  is a facial nerve, excruciatingly painful, he said cancer

13  of a vital organ, even more fatal, can't cure it, can't

14  subside the pain and then he said depression.

15         MR. ROSENFELD:  Objection, your Honor.  That's

16  testifying about some possible medical testimony.

17         THE COURT:  The jury will make the final

18  determination.

19         MR. CANTOR:  I said to him depression, how can

20  depression be so painful?  And he said to me, Bob, think

21  about it, depression could be so painful that it can cause

22  an individual to take his or her life.

23         MR. ROSENFELD:  Objection, your Honor.

24         MR. CANTOR:  That's how painful.

25         THE COURT:  It's argument.  The jury will weigh

1    it.

2         MR. CANTOR:  That's how painful it is.  When here

3    we have a young man three times attempted suicide, twice

4    mentally institutionalized, diagnosed with suffering from

5    depression and bipolarity, bipolarity meaning highs and

6    lows, manic in which the word maniac is derived and lows.

7    Manic you could go at it, draw a man or a woman of ordinary

8    income and like Imelda Marcos purchase a hundred shoes in a

9    day, you're manic, you're very low, you're depressed, you

10   won't eat, you won't speak.  You won't get out, you won't

11   interact.

12        MR. ROSENFELD:  Again, I'm objecting to defense

13   testifying as to medical testimony that doesn't exist in

14   this case.

15        THE COURT:  All right.  Be guided.

16        MR. CANTOR:  So you have a man who's both

17   bipolar, swinging through highs and lows, and you have a

18   man who suffers in depression, and depression is not a flaw

19   in character.  It is a flaw in chemistry.  Well, also this

20   brings, there's testimony to this effect, took medications

21   to combat the depression and the bipolarity.  He took mood

22   stabilizers for bipolarity and medication to quell, meaning

23   to snuff out, the depression.  So this is the type of man

24   that you have to put your feet in his shoes with that

25   history, with that background.

1     And then this man, this young man who his six
2     children finally gets lucky a little bit in life.  He meets
3     a woman who he likes, who he enjoys, becomes romantically
4     involved in and her name is Margie, and they start going
5     out for two, three months.  Isn't that wonderful.  Love can
6     virtually, virtually cure many a disease.  Margie and he
7     are invited to a party.  Now, he's depressed Margie says
8     prior to going to the party because he's spoken to his mom
9     and his children over the phone in P.R. and he's depressed,
10    but Margie being a good mate, being a good lover, concerned
11    over her mate, talks him out of it, come on, it will be
12    good for you, you'll meet people, it's Christmas Day, it
13    will bring you up.

14        So notwithstanding his initial reservations about
15    going, he goes with Margie.  And every single civilian
16    witness called by the prosecution, every single one of them
17    had something to say about Sosa, he was mean-spirited, he
18    was angry, he was depressed, he was loud, he was waving his
19    hands back and forth, he was confrontational, he was
20    obnoxious.  A girl 15 years of age, the daughter of the
21    hostess of the party, says you've gotta leave.  You're
22    disrespecting our party and our people and our guests.  And
23    this is a friend to all of the people at the party except
24    for my client.  And thus he's taken from the apartment,
25    loud, obnoxious, rude, interfering with the joy and the

1    meaning of Christmas Day.  He's, in plain English, he's

2    kicked out of the party, kicked out.

3              Okay.  So he's kicked out of the apartment.

4    Before he gets kicked out, Margie as a good mate, as a good

5    lover does, she introduced him because he knows no one at

6    the party.  They're all strangers.  He might have met one

7    or two fleetingly on the street with Margie, might have

8    introduced him and said hi and bye.  So Margie introduces

9    him, and when he extends his hand for the first time to

10   Sosa, Sosa won't take it.  It's Christmas Day.  Sosa won't

11   take it.

12             Here you have my client with a weak, delicate

13   fragile impressionable mind, a stranger at the party, and

14   all of the sudden he's being disrespected.  The same thing

15   that the young girl, the daughter of the hostess had said

16   get out, you're disrespecting the party, you're

17   disrespecting the people here.  And of course the threat,

18   the first threat.  Excuse me.  We have all been to social

19   gatherings.  We have all been to parties, and we have all

20   been to parties and social gatherings where perhaps we

21   don't know most if not all of the people.  We're brought

22   there by a friend, by a mate, whatever, and we try and act

23   on our best behavior, do we not?  It would seem normal.

24   You want to act in your best behavior.  Hello, I'm David.

25   Sosa doesn't take his hand.  And out of the clear blue sky,

1   like a thunderbolt, the first threat.  What has David

2   Delgado done to warrant a threat on his life, a threat on

3   his physical well-being?  What?  What?  He was asked at the

4   party do you behave to Margie in a normal fashion, nice

5   way, kind.  Of course I was, she was my woman.  Of course I

6   was.

7        So now, I ask you good folks to ponder the

8   question why the threat, why the belligerence?  Why the

9   bellicosity?  Why the pugnaciousness?  Plain English.  Why

10   the threat to my client's physical well-being, if not life?

11   But you see you have to deal now with the subjective side

12   of self-defense.  Sosa is not making these threats to a

13   hardened Marine colonel.  He's not making these threats to

14   a mercenary in the Congo.  He's making these threats to a

15   man with a weak, delicate, fragile and feeble mind, a man

16   who suffers from bipolarity, a man who suffers from

17   depression and had taken the medicine at Margie's house

18   before going to the party.  Sosa is not only threatening my

19   client, he's threatening my client's life.  He's pointing

20   his finger at him first.  What has David done?  Read the

21   record.  Have the record read back.  What has David in

22   God's earth done to warrant such disrespect, such

23   threatening behavior?  Nothing.  Nothing.  But this is one

24   of a mind of a man who suffers from bipolarity and

25   depression, his attempted suicide, who's been mentally

1   institutionalized, who's been sexually abused as a

2   youngster, and was smaller than Sosa.

3          I tell you now and I'm going to tell you later,

4   David Delgado on the 24th of December carrying over to the

5   25th of December '09, at that party, once he had the threat

6   and he had that finger pointed at him only had one intent

7   with respect to Sosa, to avoid him, to get ways to remove

8   himself from Sosa, because each and every confrontation,

9   three, and this is according to the People's witnesses,

10  they had three, mind you, was initiated by Sosa.  What pray

11  tell must David have thought?  What had poor David done?

12  Had he antagonized?  Had he humiliated?  Had he

13  disrespected anyone?  No.  Sosa by all accounts was as

14  drunk as a human being could be and still remain on his

15  feet.

16         You heard the medical examiner testify that he

17  had by virtue of blood testing, by blood analysis of the

18  autopsy, he had .27 of one percent of alcohol in his body.

19  Legal limit for driving while intoxicated is .08.  So he

20  had more than three times greater amount of alcohol in his

21  blood than the law allows him to drive in a car.  If you

22  want to go by the urine, the doctor says no, no, we don't

23  go by the urine.  But if you want to go by the urine, he

24  had .39 of one percent, this is five times approximately

25  greater than the legal limit when you're driving.  Sosa is

1    drunk, obnoxious, interfering, endangering, threatening,

2    doing everything short until the final threat when hands

3    are laid on by Sosa.

4              So Sosa comes in, confronts, initiated David a

5    second time, same threats, Margie's a good person, she's a

6    friend, you fuck her up, I'm gonna fuck you up.  One

7    witness said Sosa said, me and my brothers we're gonna fuck

8    you up, we're gonna put you down, we're gonna hurt you.

9    What has David done?  You tell me.  You were here.  You

10   heard the evidence.  Did he disrespect Margie?  No.  Did he

11   disrespect anyone at the party?  He's dealing with a

12   maniac.  He's dealing with a man who is announcing his

13   intent and David does not know when that intent will be

14   effectuated.  Will it be in a minute?  Will it be two

15   minutes?  Will it be five minutes?  Will it be in ten

16   minutes?  But he's being threatened for a second time.  And

17   there's no ifs, ands or buts.  My God, you go to a party,

18   you don't know anyone and someone comes over to you and

19   threatens you with such grievous bodily harm, twice refuses

20   to shake your hand, pointing your finger in your face.

21   What impact must that have had on David's delicate,

22   troubled fragile mind?

23             I'm going to give you a very important piece of

24   information that you heard.  You heard it so listen to it.

25   If David Delgado had the intent to kill Sosa, or if David

1    Delgado had the intent to cause serious physical injury to
2    Sosa, why did David Delgado show Alberto Vasquez the handle
3    of the knife when he was pulling on his belt buckle, do you
4    remember that?  Does everyone remember that testimony?
5    Alberto Vasquez was a stranger.  He was a stranger.  If
6    you're gonna intend to put an end to these threats of
7    violence and killing, why announce it to a stranger who is
8    a very, very, very good friend of Sosa because Sosa had
9    been selling him marijuana for ten, twelve years.
10          And Alberto Vasquez, you know there are times
11    when strange things happen in courtrooms, strange things.
12    He walks into this courtroom with the dark glasses like
13    this is a Hollywood set, like he's having lunch on
14    Hollywood Boulevard with Tom Cruise or something.  He walks
15    in here, this cool dude with his dark glasses, and of
16    course he jumps through hoops.  I'm gonna get everyone's
17    attention.  He jumps through hoops when the DA is examining
18    him, no problem.  Question, answer, question, answer,
19    question and answer.  Mr. Cantor begins cross-examining
20    him, I'm not on trial, I don't have to take this shit, fuck
21    this shit, I'm not here on trial.  What is this all about?
22    Fuck this shit.  I don't care what you do.  I'm leaving.
23    I'm out of here, I'm out of here.  Fuck this shit.  Fuck
24    this shit.  He gets to about right here, the officers bring
25    him back.  He didn't voluntarily return to the stand.

DEFENSE SUMMATION

1842

1      MR. CANTOR:  You see once in a while, not too
2  often you really do see the essence, the concern of truism
3  that exists for the witness, what type of person that is,
4  direct, nice and polite.  You ask him a question he hops
5  through hoops to answer.  Shit, fuck, I am not on trial and
6  I am leaving.  I don't care what you do to me.  Fuck you,
7  I'm out of here.  The reason that we go overall and Alberto
8  Vasquez by any stretch -- by any observations is a man with
9  a long, extensive history of crime.  He is what is known,
10  fancy word, as a recidivist or a sociopath, ones who
11  constantly and continuously places his interests above
12  those of society and you will hear his Honor instruct you
13  that you may consider a person's prior involvement with the
14  law in your evaluations of that person's believability.
15  The fact that he stuck up a restaurant with a shot gun and
16  took a -- all of 900 bucks has nothing to do with the party
17  of December 24th, 25th.  We all know that, but what it does
18  have something to do with is the man's credibility,
19  believability, sociopath, such a recidivist, such a violent
20  person worthy of belief and worthy of trust and finding a
21  reasonable doubt.  That's the reason the law allows us to
22  bring in a person's criminal record, but did I expect that
23  reaction?  I am a terrible liar, yeah, I did.  I did expect
24  a man who takes the stand with those Hollywood-type glasses
25  and, you know, and he's got that tacky sort of jointed, you

B-ljb

DEFENSE SUMMATION

1843

1   know, attitude.  Did I expect that I could get under his

2   skin?  Yeah, I did and guess what, I did get under his skin

3   and he reacted, the true nature of the man.  So you can

4   image that sort of a man at a party amongst friends with

5   alcohol flowing, Vodka, Hennessy and Bacardi flowing Coors

6   Beer flowing, you can imagine that man's attitude.  And he

7   had smoked a blunt.  Now for those of who you don't know

8   what a blunt is it's not a marijuana cigarette, which they

9   call a joint it's the small snubby cigar, you know, like a

10  White Owl Cigar and in that snubby cigar, which is much

11  bigger than a marijuana cigarette you put marijuana and you

12  smoke it and this is a guy who has been doing this four,

13  five times a day for 15 years and he is drinking upstairs

14  at the party.

15          You have to be convinced.  You have to be

16  convinced.  I was going to save this for the end, but I

17  might as well tell you now.  We opened up on this case, did

18  we not, the district attorney opened up and he opened up

19  first.  An opening is not a mere recital of what one side

20  intends to prove in court.  An opening statement is a

21  promise to the jury, it's an IOU and what did

22  Mr. Rosenbaum -- Mr. Roosevelt -- he is as far from

23  Roosevelt as I am.  In any event, what did he say in his

24  opening and I believe when it comes to the end of this case

25  you will see beyond any reasonable doubt that the defendant

B-ljb

DEFENSE SUMMATION

1844

1   is guilty.  Beyond any reasonable doubt what People intend

2   to prove.  I beseech you, I employ you just use your simple

3   common sense, your experience, your schooling, beyond any

4   reasonable doubt the prosecution will prove David Delgado

5   guilty of murder in the second degree, manslaughter in the

6   first degree and criminal possession of a weapon in the

7   fourth degree.  It's a promise, has he kept it?  Well, your

8   verdict will tell us, won't it?  Yeah, your verdict will

9   tell us, will answer that question.

10          So here we go, we go to Melissa Dempsey.  Melissa

11  Dempsey on direct examination and jumping through hoops

12  Melissa Dempsey says -- see, I am taking notes.  I am

13  sitting there, I am taking notes as fast as I can.  I am

14  not a stenographer, but I can write fairly quickly.  So

15  Melissa Dempsey says that Sosa and David were arguing.  I

16  get up and on cross examination and say, were they arguing,

17  David and Sosa?  She said no.  I say, well, did you about a

18  half hour ago tell the district attorney on direct

19  examination that they were arguing?  No.  I mean some

20  witnesses (indicating) it's a joke book, it's a comic book.

21  It means nothing (indicating), it means absolutely nothing.

22  I have to call her back at the end of the People's case,

23  continue my examination because I did not have the

24  transcript (indicating) of what she had said, you know,

25  like 20 minutes earlier in my hand, but the next morning I

B-1jb

DEFENSE SUMMATION

1845

1   had it, right, and sure enough I read to her from the

2   transcript and there, what is the word that she used on

3   direct?  Arguing.  I believe they were arguing.  She had to

4   admit it because it's an official --

5        MR. ROSENFELD:  Objection, your Honor, it was not

6   testimony, a thought --

7        MR. CANTOR:  It was.

8        THE COURT:  All right.

9        MR. CANTOR:  It was an official --

10        THE COURT:  Continue.

11        MR. CANTOR:  -- official certified transcript of

12   a court reporter and she was in a corner and she had to

13   admit it.  I -- I don't understand.  I -- I just -- I can't

14   get into the mind of a witness who has such disrespect and

15   is so insulting of 12 good people, 12 good people didn't

16   hear her say arguing.  So I literally ran it down her

17   throat and, of course, she has to swallow it.  It's a

18   bitter pill and these are the People's witnesses and she

19   was the witness, Melissa Dempsey who would jump through

20   hoops and answer the People's questions.  Question answer

21   question answer, but on cross examination she wouldn't let

22   me finish a question.  Would not let me finish a question

23   before she jumped out with the answer.  She did, however,

24   when pressed by me because I had (indicating), I had it in

25   my hand (indicating), it's the official court transcript.

DEFENSE SUMMATION

1846

1    She had to admit it and she had to swallow that pill.  And

2    you are going to be called upon to assess the believability

3    of and reliability, not just believability, but

4    reliability, accuracy, in other words, of witnesses and one

5    of the ways that you do that is when a witness says, no, I

6    never said that word.  I never said that word.  Never,

7    never, never and then, of course, in black and white she

8    admits it.

9          So we're going to be finish with Melissa Dempsey

10   and we are going to go onto Alberto Vasquez, the next

11   witness called by the People.  Blunt smoking, three or four

12   blunts per day and he had been doing that for 15 years.  He

13   was drinking at the party.  He was high.  He had a buzz.

14   Sosa was upset, having problems with his common-law wife.

15   Sosa was angry, loud and threatening.  I've condensed about

16   50 pages.  I read the transcript twice, but I've condensed

17   it because I can't be up here for three hours.  God knows

18   this phone will ring again and I won't be able to shut it

19   off, but here is the point, I am condensing it, I am giving

20   you the core, the essence, okay.  And then, of course,

21   Alberto Vasquez says, you know, you got people saying the

22   music is loud.  You got people saying the music was medium.

23   You got people saying that the music was not that loud,

24   it's all over the place.  This was a small, confined

25   quarters, one bedroom, one living room, one kitchen, one

B-1jb

DEFENSE SUMMATION

1847

1    dining area.  They're about, I don't know, including kids
2    maybe about 20 people at the -- this party.  It's a very
3    small, condensed apartment and there are lots of people in
4    there.  So I've already told -- I've already told you good
5    people if David Delgado, the People allege that the intent
6    to cause the death of Sosa or have the intent to cause
7    serious physical injury to Sosa that eventuated in his
8    death or possessed a knife with the intent to use it
9    unlawfully against another why in God's name would you put
10   faith in a stranger, in Alberto Vasquez, in a complete
11   stranger to David Delgado, why would you put him on notice
12   with the belt buckle (indicating), so you can see the
13   handle of it?  It doesn't make sense.  It defies logic.
14            THE COURT:  Mr. Cantor.
15            MR. CANTOR:  Yes.
16            THE COURT:  I am sorry to interrupt you.
17   Mr. Rosenfeld.
18            MR. CANTOR:  What?  What?  I am --
19            (Whereupon there is an off-the-record
20   discussion.)
21            THE COURT:  Sir, would you like to be excused for
22   a few moments?
23            (Whereupon a juror exits at this time and there
24   is a pause in the proceedings.)
25            MR. CANTOR:  You got to roll with the punches

B-ljb

DEFENSE SUMMATION

1848

1       folks.

2               MR. ROSENFELD:  That's not necessary, Judge.

3               THE COURT:  Please be seated while we await the

4       juror's return.

5               (whereupon there is a pause in the proceeding.)

6               THE COURT:  Please continue, Mr. Cantor.

7               MR. CANTOR:  I understand.  It's not an easy

8       thing to be defending a man charged with such serious

9       crimes and I put all and I apologize, I put all of my

10      effort, I put all of my being into it and you may agree

11      with me, you may not agree with me, but all I beseech of

12      you is listen to me and then make up your own mind.  Just

13      listen.  whether you remember Mr. Rosenfeld when he was

14      selecting this jury along with me said, well, we don't have

15      the knife and the fact that we don't have the knife we'll

16      let you -- will that prevent you from being fair and

17      impartial and will that stop you if we prove guilt beyond a

18      reasonable doubt, voting guilty and everyone said no, but

19      how about effort to find the knife?  How about that?  This

20      guy, Alberto Vasquez, never saw the cops search for the

21      weapon.  Never.  No witness aside and I will get to the

22      good detective, the good detective.  None of the witnesses,

23      the lay civilian witnesses saw the cops search for a knife.

24              We next go to Mercedes Rodriguez, a woman since

25      1985 was on public assistance and she had asked David how

B-1jb

DEFENSE SUMMATION

1849

1    he met Margie and the defendant was civil and he was
2    courteous and he was not angry and he said we met at a
3    laundromat and we have been going out for two to three
4    months.  Now, Mercedes was not mean or nasty or violent to
5    David and David likewise answered kind and civilly and
6    courteously we have been going out for two, three months
7    and we met in the laundromat.  This is the same woman,
8    Mercedes, who said she ran down the hall and saw a blade of
9    a knife that was approximately three-and a-half inches in
10   length.  Three-and a-half inches in length.  Mercedes was
11   the woman who got on the telephone and called 9-1-1.  She
12   was so discombobulated.  You see she was so upset.  She was
13   so, in her mind, mixed and incapable of carrying on an
14   intelligent conversation because of the horrendous events
15   of seeing her friend Sosa bleeding to death having had six
16   drinks.  This is a woman who had hustled on the street
17   earlier, sold marijuana and heroin and she says that David
18   walked down the hall, didn't run, yet you have to believe
19   me.  I beg you.  Don't believe me ask it to be reread, you
20   are entitled.  You are entitled to have the entire
21   testimony of the entire case reread.  Said David was
22   walking down the hallway.  She said she caught up and David
23   gave her the elbow and Mercedes wouldn't mind if David
24   spends the rest of his life in prison.
25        We come now to the only civilian witness who

B-1jb

DEFENSE SUMMATION

1850

1    didn't drink alcohol, therefore, you can draw an inference
2    that this is a witness with a clear, lucid mind and sense
3    of recollection who doesn't drink alcohol.  Who told you
4    she never drank?  Margie.  Margie.  Before they went to the
5    party Margie told you that David was depressed, it was
6    Christmas, he had spoken to his family in Puerto Rico and
7    David went to the party and she says that after the third
8    threat uttered by Sosa to David and she was right by David,
9    David was scared.  He was shaking.  He was nervous.  Well,
10   who wouldn't be?  If a complete stranger came over to you
11   in a party and made threats to you and poked (indicating),
12   poked you.  You see these four fingers (indicating) in your
13   shoulder and had punched you as David testified.  You see
14   David, if he was going to make up a lie he could have said,
15   oh, this guy Sosa had taken his hands and put it around my
16   throat and was choking me and I was feeling faint and I was
17   feeling on the verge of unconsciousness because David had
18   drank a lot.  Don't forget he had six, six hard liquors and
19   Coors beer.  So if David really wanted to lie he could have
20   made Sosa's physical actions against him much more
21   heightened.  That he grabbed him around the throat and was
22   just squeezing the life out of him, but no, he told you the
23   truth as he recollects it.  You sit in a jail cell for 30
24   months and think about the one thing that's keeping you
25   there and it gets embedded.  It becomes indelible in your

B-ljb

DEFENSE SUMMATION

1851

1    mind and you didn't tell it to the cop or the D.A.  He is

2    in a small room with a cop with a gun, with a D.A.

3    technician and assistant district attorney and even David

4    with his troubled, fragile, delicate mind he must have

5    grasps that the assistant district attorney was a

6    prosecutor and what do prosecutors do?  They prosecute.

7    Their goal is to gain convictions, put people in jail.  You

8    don't think he was nervous?  Well, sometimes nerves

9    admittedly, sometimes nerves are not displayed exteriorly.

10   You know what I mean?  You get the butterflies in your

11   stomach.  Now no one can see that, but you can feel it.

12   Your whole being tenses up.  It's not on your face, but

13   inside.  Did you ever get a knot in your stomach?  You were

14   so nervous, so scared, so frightened?  So this -- he is in

15   this small room.

16           What does Margie also tell you?  Three threats by

17   Sosa and Sosa hit David one or two times on the face,

18   that's what Margie said.  Margie come on -- you see in

19   order to gain your confidence, in order to gain your vote I

20   have to tell you everything, what's good for me and what's

21   bad for me so that you can say in that jury room that

22   Cantor is a candid man, is a frank man, is a forthcoming

23   man.  So she says and she is the only one who hadn't drunk.

24   That Sosa hit him one or two times in the face and jabbed

25   his shoulders.  David admits to you he never told about the

B-ljb

DEFENSE SUMMATION

1852

1    two hits in that little room, you know, the five by ten

2    room where they were taking the statement stenographically

3    and video.  Oh, no, no, it wasn't stenographically it was

4    just video recordings, which is even better than the steno

5    because you can see it on the screen.  See it on the

6    screen.

7              You get Banker a retired Detective.  Banker you

8    are going to get a glimpse of the truth here.  You see if

9    this is a reenactment, this is a reconstruction of what

10   happened 30 months ago.  You saw no person with a knife

11   here.  You saw no person threatening another person here.

12   We are reconstructing events of two-and a-half years ago

13   and Banker is coming across like a sweetheart, he's tanned,

14   he's fit, he is well preserved.  You saw the man and on

15   direct examination he just casually, casually in passing,

16   well, I've retired from the police department.  I hurt my

17   back, I have some fusion surgery.  Mr. Cantor's cross

18   examination, you're out on three-quarters disability.  The

19   witness' low voice, no one can hear him all of a sudden, is

20   talking to the judge.  Court reporter can't even take that

21   down.  Aren't you not suppose to be working if you are on

22   three-quarters disability, sir?  (indicating) his demeanor

23   changes all of a sudden.  He is not the smooth, articulate,

24   retired, slim and fit mustachioed witness is he?  You want

25   to know why, because it's a crime to be working and gaining

B-ljb

DEFENSE SUMMATION

1853

1    money on --

2             MR. ROSENFELD:  Objection, your Honor.

3             MR. CANTOR:  On or off --

4             MR. ROSENFELD:  Objection.

5             MR. CANTOR:  -- full on three-quarters

6    disability.

7             THE COURT:  The Court will give you --

8             MR. CANTOR:  You are double dipping, that's

9    against the law.

10            MR. ROSENFELD:  Objection, that is defense

11   testifying to something that is not in evidence.

12            THE COURT:  Mr. Cantor.

13            MR. ROSENFELD:  That is not true.

14            THE COURT:  Mr. Cantor --

15            MR. CANTOR:  Its against the law.

16            THE COURT:  Mr. Cantor, wait for a ruling.

17            MR. CANTOR:  Yes, he --

18            THE COURT:  Please move on.

19            MR. CANTOR:  I am moving on.  He, Banker, all of

20   a sudden looses his cool and is engaging in his whispering

21   and conversation with the judge.  He is very nervous, very

22   nervous and you want to know why?  Perjury.

23            MR. ROSENFELD:  Objection, your Honor.

24            MR. CANTOR:  Perjury.

25            MR. ROSENFELD:  This is totally improper.

DEFENSE SUMMATION

1854

1      THE COURT:  Yes.

2      MR. CANTOR:  Perjury.

3      MR. ROSENFELD:  Your Honor, he is inclining --

4      MR. CANTOR:  Perjury.

5      MR. ROSENFELD:  Your Honor.

6      THE COURT:  Please, Mr. Cantor, please.

7      MR. CANTOR:  Perjury.

8      MR. ROSENFELD:  He is doing --

9      MR. CANTOR:  I have to comment upon the

10     credibility and believability of witnesses.

11     THE COURT:  You may do that.

12     MR. ROSENFELD:  And it's improper.

13     MR. CANTOR:  And he --

14     MR. ROSENFELD:  I object.

15     MR. CANTOR:  Of course, he is banging on the

16     table.

17     THE COURT:  I will.

18     MR. ROSENFELD:  Thank you.

19     MR. CANTOR:  I told you when I selected this jury

20     you got the law, you bang on the law.  If you have the

21     facts as you say you pound on the fact.  If you have

22     neither the facts or the law you pound the table, that's

23     what this prosecutor has been doing throughout this case.

24     MR. ROSENFELD:  Objection.

25     MR. CANTOR:  Pounding on tables.

B-ljb

DEFENSE SUMMATION

1855

1          MR. ROSENFELD:  It is improper.

2          THE COURT:  Mr. Cantor, please, no

3     personal attacks --

4          MR. CANTOR:  Now to --

5          THE COURT:  -- to the district attorney or anyone

6     else.

7          MR. CANTOR:  Now, we have Banker on cross -- on

8     direct examination, well, he has a different hair do so I

9     wanted to be fair.  I am a fair police officer.  I am so

10    fair I put baseball caps on him and it means nothing.  It

11    means nothing.  It just shows that the 11 times that's he

12    spoke by telephone or in person to A.D.A. Rosenbluth --

13         MR. ROSENFELD:  Your Honor, at least get my name

14    right.

15         MR. CANTOR:  It is Rosenfeld.

16         MR. ROSENFELD:  Three times he has misstated my

17    name.

18         MR. CANTOR:  It's Rosenfeld.

19         MR. ROSENFELD:  Your Honor, this is improper.

20         MR. CANTOR:  What, that I mispronounced his name?

21         MR. ROSENFELD:  He can't remember to get it

22    straight.

23         MR. CANTOR:  I would like to forget his name for

24    all eternity, Judge.

25         THE COURT:  Oh, please, Mr. Cantor.

DEFENSE SUMMATION

1856

1      MR. CANTOR:  In any event --

2      THE COURT:  Try to control yourself.

3      MR. CANTOR:  Baseball -- you heard that,

4  Mr. Rosenfeld, control yourself?

5      MR. ROSENFELD:  Sure, I did.

6      MR. CANTOR:  In any event, baseball caps.  Well,

7  of course, when he looks at the picture it's not baseball

8  caps its just plain ordinary caps, but here, perhaps gives

9  you a insight into the fact that Banker is not a man of

10  integrity and truthfulness and honesty.  I, Cantor, cross

11  examination, was the recovery of the gun important?  No,

12  no, no.  And then the male prosecutor, whose name eludes me

13  now, stands up on his redirect and says question, well, you

14  looked in 3D?  Yeah.  You looked in the hallway?  Yeah.

15  You looked in the stairwell?  Yeah.  You looked in the

16  street?  Yeah.  There comes a time it becomes insulting.

17  You see you 12 people collectively have more intelligence

18  and more wisdom collectively than any one single person who

19  walks in here.

20      (Continues next page.)

21

22

23

24

25

MR. CANTOR:  That's why we have a jury of 12,
collectively.  You're intelligence is being
omni-intelligence of anyone sitting here in this courtroom.
And to say that, then to try and wiggle out of it, it gives
you a notion, it gives you an insight as to the honesty and
liability of the People.

And this male Assistant whose name, again, evades
me, stood up and promised you that   will prove beyond any
reasonable, any reasonable doubt that the defendant is
guilty.

Well, what else do we have?  You see,
conveniently, this assistant district attorney, the male,
gets by way of questioning Detective Banker that there was
a lineup held and various people came and he names them.
You know, he names the people that were present, Melissa
Dempsey.  Alberto Vazquez, Mercedes Rodriguez.

You know, and then it's up to Mr. Cantor.  I said,
well, wait a moment, weren't there other people who came to
look at the lineup?  He says, yes.  And I said give me
their names.  He says can I refresh my recollection?  And
he says Danielle Sely, Wilfredo Cruz, Carolita Jimenez.  I
never -- these names, never saw those witnesses.

It's the People's obligation to call witnesses to
call their case.  I don't have to have call witnesses.  I

1    don't have to put on proof, you know that.  Why not bring

2    out the full truth?  Why not say witness A, B, C, D, E, F,

3    G, H were there at the lineup even if you're not calling

4    half of them?  I don't know what they have to say.  All I

5    know is that there were important enough to be called to a

6    lineup by the police and view a lineup but, yet, not called

7    on the witness stand by the People and they have the burden

8    of proving guilt according to his opening, beyond any

9    reasonable doubt.

10           What is the ME, medical examiner doctor?  She is

11    just a professional witness for the prosecution.  She's

12    testified for the prosecution a 133 times.  The Medical

13    Examiner's Office is an independent office.  It is not

14    attached to a District Attorney's Office.

15           It is not attached to any police department.  It's

16    an independent office.  It's under the auspices of the New

17    York University.  It's a learning and autopsy center.

18    There are conferences and lectures and the art and science

19    of pathology of forensic pathology, anatomical pathology is

20    taught there and some of the greatest pathologists in the

21    world, Dr. Milton Hepburn, Dr. Michael Bodden have served

22    as Chief Medical Examiners.  These are men in the medical

23    field who are beyond contest, beyond the challenge.

24           She tells you that only one wound was fatal, the

25    rest were not fatal.  Of course one wound was fatal.  It

1      severed the artery and severed the carotid and aorta.  It's

2      a small wound on the outside, but it punctured there, and

3      she has the audacity to tell you that no other instrument

4      in the world other than a knife could have caused those

5      five puncture marks.

6              You mean a stiletto couldn't have done that?  You

7      mean a razor, a barber's razor couldn't have done that?

8      Finally I got her to grudgingly, grudgingly admit that a

9      dagger might be able to do it.

10             Look, the People have to prove to you that my

11     client had the intent and I have to prove this, beyond or

12     as this male prosecutor has said, beyond any reasonable

13     doubt that's what he promised you in the opening, they have

14     to prove that given everything that you heard, everything,

15     that my client entertained the intent to cause the death of

16     Sosa.  That's to make out murder in the second degree.

17             If they fail to do that, well, they charge another

18     crime.  Manslaughter in the first where they have to prove,

19     beyond any reasonable document according to the People's

20     opening, that my client inflicted those puncture wounds

21     with an intent to cause serious physical injury and they

22     have to prove in third count criminal possession a weapon

23     in the fourth degree that my client possessed a knife with

24     the intent to use it unlawfully, not to use it defensively,

25     not to use it by way of self defense or justification, but

1    to use it unlawfully against another.

2            So, you see, I'm going to suggest to you that my

3    client acted in inflicting and make no doubt about it, he

4    inflicted the wounds, but that's only the actor, that's the

5    only act.  The act must be accompanied by the mens rea, the

6    intent.

7            What was his intent at the time that he punctured

8    the deceased five times?  His intent, I suggest to you,

9    overwhelmingly shows that he was dealing with a loud,

10   obnoxious, aggressive threatening human being who was a

11   stranger to him, who was taller than him, bigger than him

12   and he brought all that emotional luggage by the party.

13           All of that emotional luggage you have to take

14   that into consideration.  A man who is bipolar.  A man who

15   is depressed.  A man who tried to kill himself three times.

16   A man was who sexually abused by his stepfather for three

17   years.  A man mentally institutionalized twice.  A man who

18   was prescribed medication.

19           You know what I find ridiculous?  You see how a

20   prosecutor can play a game well  Mr. Delgado, on

21   cross-examination, you say you had prescriptions for these

22   meds.  Do you have those prescriptions with you so you

23   could show them to the jury?

24           When you last went to the drug store and you got a

25   prescription and you got the medicine, what did you do with

1    the prescription?  You handed it to the druggist, did you

2    not?  Of course you did.

3         You handed it into the druggist.  They keep it on

4    file because they have to have a an accounting to the State

5    of New York especially when we are dealing with controlled

6    substances.  You don't keep the prescription.  The druggist

7    keeps it.  It's a lot of money up there.  The pharmacist

8    keeps the prescription.  See how unfair a question that is,

9    where is the prescription, Mr. Delgado.

10        He's not a smart, agile quick Smart Alec.  He

11   doesn't have the mind that can snap to and say well, why,

12   of course, the druggist has them.  I handed in the

13   prescription to keep them.  I get the medicine.  I get the

14   medicine, so David Delgado's state of mind is serious.

15        And then the issue of self-defense arises.  You

16   take Delgado as you find him with his history, with his

17   background and then and only then you employ the objective

18   tests, which is, given his background, given his

19   circumstances, given the interactions at the party, given

20   what happened to him at the party, did he act reasonable?

21        Reasonably, see, that's the objective portion of

22   this, but the subjective portion is take a man as you find

23   him.  You got to peer into his mind and you've got to

24   determine, beyond any reasonable doubt according to the

25   district attorneys opening what that intent was.

## Summations - Defense

1   And I'm going to tell you something else, there

2   was an awful lot of drinking going on, an awful lot.  I

3   don't know if any of you have ever consumed six hard liquor

4   drinks plus, 3, 4, 5 cans of beer.  All I could tell you is

5   that it's a reasonable conclusion that one would be unable

6   to formulate the intent to kill or to inflict serious

7   physical injury or to possess a knife with the intent to

8   use it unlawfully on another if one was so drunk.

9   Six larger than a Dixie cup drinks, the hard

10  liquor, Vodka, Bacardi, Hennessy, Coors, combined with the

11  drugs that he takes which forbid alcohol, was he so

12  inebriated, so devoid of common sense that he was unable to

13  formulate any intent to kill, to cause serious physical

14  injury or to use a knife unlawfully against another?

15  That's an issue.  It's an issue.  You have to take into

16  consideration everything.

17  I told you in the beginning that yours is an

18  onerous task and I wouldn't want to be in your seat this

19  morning.  Like William Butler Yates, my favorite, Yates, it

20  is common knowledge that the thought of man shall not be

21  tried for the devil himself knoweth it not the thought of

22  man.  William Butler Yates.  One of my favorites.

23  Well, it's been thrust in your lap.  See, my

24  client doesn't count on the Judge.  He doesn't count on any

25  governmental official to determine whether or not the proof

1    spells out guilt beyond any reasonable doubt.  He relies

2    upon the Jeffersonian principle, Thomas Jefferson who

3    incorporated it into the constitution of this country,

4    trial by jury.

5         You are his neighbors.  You are a cross section of

6    the Bronx.  He relies certainly not upon this Judge.  He

7    relies upon nobody of administrative officials, such as a

8    committee of judges.  He relies on you.

9         And every prosecutor I told you in opening

10   45 years at the bar as always demanded a guilty verdict.  I

11   will ask you for something is the most rare and ephemeral

12   of commodities, something that men have been searching for

13   centuries, I'm ask you for justice.  I'm asking you for

14   justice.

15        David Delgado through me asks you for justice.

16   Thank you for your attention now and throughout the trial.

17   Thank you for your putting up with a cell phone that I know

18   not how to control or operate.  You're good people.  Do the

19   right thing.

20        THE COURT:  Thank you, Mr. Cantor, for your

21   closing argument.

22        Mr. District Attorney?

23        MR. ROSENFELD:  May we approach?

24        THE COURT:  You may.

25        (Whereupon, there is a discussion held off the

1       record, at the bench, among the Court, Mr. Cantor , and the

2       Assistant District Attorney.)

3              THE COURT:   Madam forelady and ladies and

4       gentleman of the jury, we will now take a very short

5       intermission and anybody who wishes to refresh themselves,

6       now is the time to go and the officer will bring you back

7       accordingly.

8              (Jurors leave the courtroom.)

9              (A recess is taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

tr/d    Proceedings

 1            MR. CANTOR:  You intend to let them have lunch at

 2    1 o'clock, do you not?

 3            THE COURT:  No, I do not.

 4            MR. ROSENFELD:  Okay, your Honor.

 5            THE COURT:  All right.  Bring back the jury.

 6            MR. ROSENFELD:  Judge, I ask Mr. Cantor to move

 7    back.

 8            MR. CANTOR:  No, Judge.  You've given me

 9    permission.

10            THE COURT:  I did.  Maybe you can just move away

11    a little back further.

12            MR. CANTOR:  Judge --

13            THE COURT:  Along the side there.

14            MR. CANTOR:  Towards you?

15            THE COURT:  He may want to pace.

16            MR. CANTOR:  Judge, I'm just following your

17    directions.

18            THE COURT:  No.  Move it back next to the side.

19            MR. CANTOR:  Back?

20            THE COURT:  Why don't you get up, Mr. Cantor,

21    carry it back and I'll tell you.  No.  Get up, please.

22    Just carry it back.  I'll tell you where to stop.

23    Apparently, you cannot follow my directions.  Sergeant.

24    She'll place the chair where I want it, alongside the table

25    of the People, yes, this way it's free roam space if Mr.

1    District Attorney, Mr. Rosenfeld wishes to utilize that.

2              COURT OFFICER:  Jury entering.

3              (Whereupon, the jury entered the courtroom.)

4              THE COURT:  Ladies and gentlemen, we now pass to

5    the closing arguments by the People.

6              MR. ROSENFELD:  Good morning, ladies and

7    gentlemen.

8              JURORS:  Good morning.

9              MR. ROSENFELD:  First of all, I want to thank you

10   for accepting your responsibility as jurors in this case.

11   I appreciate your patience, the attention that you've given

12   to this matter and that I hope you will give to it once you

13   get into the jury room.

14             When you first walked into this courtroom two

15   weeks ago, two or three weeks ago, you probably wondered

16   who committed this crime, what happened?  When?  Where?

17   What?  Why?  How?  Well, I think you've seen over the past

18   two weeks that all your questions have been answered.

19   There's no mystery here.  This case is not about a

20   justifiable homicide, justified killing.  This case is

21   about the defendant possessing a knife and stabbing George

22   Talarvera to death.

23             Let's look at the defense claim that the

24   defendant was justified.  There's not one shred of evidence

25   to support his claim of justification or self-defense.  I'm

1    going to ask you to follow the Judge's instructions at the

2    end of this case.  Listen to what the law is.  Nothing that

3    Mr. Cantor says is evidence.  Nothing that I say is

4    evidence.  And you can accept any of our comments on the

5    case or you can reject them or accept parts of them.

6    That's not evidence.

7            When you look at the justification charge that

8    the Judge will read to you, he will tell you that the

9    People are required to prove beyond a reasonable doubt that

10   the defendant was not justified.  And as I go through my

11   summation, you will see that the defendant was not

12   justified.

13           And the charges that the defendant or a defendant

14   may use deadly physical force upon another individual when

15   and to the extent that he reasonably believes it to be

16   necessary --

17           MR. CANTOR:  Judge --

18           MR. ROSENFELD:  --- to defend himself --

19           MR. CANTOR:  Judge, that is the law.

20           THE COURT:  The Court will give the appropriate

21   instruction.

22           MR. CANTOR:  Will you inhibit him from going any

23   further along that line?

24           THE COURT:  At the appropriate moment, if

25   necessary, I shall.

tr/d    Summation - People

1    You may continue.

2    MR. ROSENFELD:   The defendant, when he reasonably

3    believes to be use of deadly physical force.

4    MR. CANTOR:  Objection.

5    THE COURT:  Overruled.

6    MR. ROSENFELD:   When you look at the facts of the

7    case and apply it to the law which is what I'm asking you

8    to do and what the Judge will instruct you to do, you will

9    see that the defendant could not have reasonably believed

10   that he had to defend himself and use deadly physical force

11   because the defendant, David Delgado would have to have

12   believed that Sosa, George Talarvera was using or about to

13   use deadly physical force against him, and that his own use

14   of physical force, stabbing Sosa was necessary to defend

15   himself.

16   Let's look at that first thing.  There is no

17   evidence in this case that Sosa at any time used or

18   threatened to use deadly physical force against the

19   defendant.  The whole time, every witness, including the

20   defendant himself, and Margie said Sosa never had a weapon.

21   They were at a party.  Who would bring a knife to a party?

22   The defendant did.  He brought it to use against Sosa.  It

23   had to be a reasonable person in the defendant's position

24   knowing what the defendant knew and believing the

25   circumstances, the defendant -- you've heard his testimony,

1   you saw him on the video, you heard the statements he made.

2   He was not so drunk that he didn't know what was going on.

3   He said he was a little tipsy and dizzy.  That's it.  He

4   knew exactly what he was doing.  We'll get into that a

5   little later.  You're going to hear the Judge tell you the

6   defendant would not be justified in using deadly physical

7   force if the defendant knew he could with complete safety

8   to himself --

9           MR. CANTOR:  He's instructing the jury on the law

10  and I object.

11          THE COURT:  Overruled.

12          MR. ROSENFELD:  He could with complete safety to

13  himself and others avoid the necessity of using deadly

14  physical force by retreating.

15          Now, Mr. Cantor just spoke to you for an hour.

16  He implored you seek justice for his client.  Did you ever

17  hear him mention once about the fact that the defendant

18  under the circumstances as you've heard it during this

19  trial could have walked out the door and nothing would have

20  happened?  Because that's what this is about.  He could

21  have retreated safely.  Margie, his now common-law wife,

22  said he could have walked right out the door.  The

23  defendant admitted there was nothing stopping him from

24  walking out the door.  So if someone's approaching you and

25  you feel threatened with fingers, walk out the door.  And

1    if he could have done it, he's not justified.  You'll hear

2    this charge in its entirety from the Court.

3          As I go through the evidence, please see how this

4    will prove -- I mean the People will have proven that

5    justification does not exist here.  Remember the defendant

6    said Sosa did not have any weapon and did not threaten him

7    with any weapon, the finger to the face, the hand to the

8    shoulder, grabbing the jacket, if you believe it was Sosa

9    and not Margie who grabbed the defendant.  There's no real

10   threat.

11         Mr. Cantor used the word threat.  I'll use the

12   word statements to the defendant.  The deceased kept saying

13   to the defendant if you disrespect Margie, this is what

14   will happen.  Nobody denied it.  You heard it from the

15   witnesses.  They were arguing.  Sosa was loud, obnoxious,

16   drunk, if you disrespect Margie and whatever the words are,

17   my brothers, my people, I will fuck you up, I will fuck you

18   up in the future.  I asked the defendant did you ever

19   disrespect Margie at the party?  What did he say?  No.  Was

20   there any danger of Sosa doing anything to him?  No.  Why

21   not?  Why not?  Because Sosa was just being loud and

22   obnoxious.  He was a little drunk -- a lot drunk.  He was

23   no threat because the defendant was not disrespecting

24   Margie or hurting her in any way.  He was talking about the

25   future.  He was just being a friend and being loud and

1    obnoxious.  That's all.  The defendant didn't think it was

2    a real threat.  Didn't he tell you it wasn't a concern?  It

3    wasn't a worry.  We'll get to that in a moment.  There was

4    no reason for the defendant to use deadly physical force

5    against Sosa.  It was not a hostile environment.  It was a

6    Christmas Eve party.  There were children, there were men,

7    women.  Defendant realized Sosa's statements were not real,

8    just empty words.  You've heard that expression.

9         The defendant's statements, his testimony here at

10    trial, just weak excuses, just throwing them out to you,

11    hopefully, one of them will grab maybe one or two jurors

12    and you would accept it, and he gives different versions.

13    How many different versions did the defendant give to try

14    to influence you, make you believe he was testifying -- the

15    defense in his opening said defendant saw the knife on the

16    table and grabbed it.  That's not what happened.  There was

17    no evidence of that.  Only one of the defendant's

18    statements.  Only one of Mr. Cantor's statements.  This is

19    not evidence.

20         And one more thing about justification.  The

21    Judge will explain to you that each of the stab wounds,

22    they're not puncture wounds, Mr. Cantor tries to minimize

23    each of the wounds.  You saw the wounds.  Each of those

24    stabbings has to be justified, not just the first one, but

25    the second, the third, the fourth and the fifth.  So even

1    if you believe the first one was justified, and you're

2    entitled based upon your discussions to believe, accept

3    whatever you want of the evidence, you have to look at the

4    second, then continue with the third, the fourth and the

5    fifth.  So even if you believe the first stabbing is

6    justified, it doesn't mean all the others were.  You must

7    analyze each one and must determine what happened.  And if

8    Sosa was no longer a threat after one stabbing or two

9    stabbings, then the third, fourth and fifth were not

10   justified; however, you want to look at the evidence.

11   That's your responsibility.

12          And while Mr. Cantor puts pressure on you, I

13   think his words were onerous job, you have a difficult

14   task, the weight of his client.  Case is fairly

15   straightforward.  You follow the Judge's instructions and

16   look at the evidence and apply the law.  You can reach a

17   conclusion that's based on justice.  The defendant and Mr.

18   Cantor want you to believe their version of the events.

19   You ever hear the word hail Mary pass?  Football or

20   basketball.  It's a desperate attempt by one team that's

21   losing to throw the ball down at the end zone hoping the

22   quarterback throws --

23          MR. CANTOR:  Are we trivializing a murder trial

24   to a football game?

25          THE COURT:  Do you have an objection?

1    MR. CANTOR:  I do.

2    THE COURT:  Overruled.

3    MR. CANTOR:  Exception.

4    THE COURT:  Noted.

5    MR. ROSENFELD:  Makes you laugh, doesn't it?  I

6    mean Mr. Cantor's antics in this courtroom are deplorable.

7    MR. CANTOR:  I object.

8    THE COURT:  Please.

9    MR. CANTOR:  I object.

10   THE COURT:  Yes, please no personal dispersions.

11   MR. ROSENFELD:  The family and friends of Sosa

12   are not laughing.  I am in no way making light of this

13   serious crime that the defendant committed.  Please don't

14   be distracted by defense attorney's comments and actions.

15   MR. CANTOR:  I'm objecting.  His adhomnym remarks

16   are inappropriate.

17   THE COURT:  All right.  Be cautious.

18   MR. CANTOR:  Will you sustain or overrule my

19   objection?

20   THE COURT:  I'll sustain it.

21   MR. CANTOR:  Will you instruct the jury to

22   disregard?

23   THE COURT:  The jury already knows any personal

24   comments about opposing attorney is not evidence of

25   anything at all.  Just disregard it.

1          MR. ROSENFELD:  I was discussing the defense's

2     attempts at the hail Mary pass hoping that someone would

3     grab onto it and score points at the last second.  That's

4     what the defendant's statements are at this trial.

5     Convenient truths that he wants you to believe when this

6     benefits him.  But it's clear that it was just a recent

7     fabrication to influence you.

8          Then he claims confusion.  He sat here in court

9     after 30 months, said for the first time to anybody that

10    Sosa punched him in the head and neck and that's what

11    precipitated the action.  That's to support his

12    justification of why he felt threatened.  Never mentioned

13    it before.  Why?  Because the jury's here now, he wants to

14    influence you.  He wants you to believe that.  But I submit

15    to you there's no basis and credibility or evidence that

16    that happened.

17         Let's look at all the steps and everything that

18    led up to the stabbing of Sosa.  Defendant's version and

19    witness' versions are pretty similar in many parts.  Sosa

20    did approach the defendant two times, and then the final

21    time they did have words, and I don't have to repeat it,

22    you heard all the words, they weren't nice words, but they

23    were words nevertheless.

24         Defendant said he left the apartment and

25    returned.  He says he took a knife from Margie's kitchen.

1    She said he never went in the kitchen.  He went to the

2    bathroom and they left.  Having heard that, he now at trial

3    says to you well, she was actually walking out the door and

4    I went into the kitchen, grabbed the knife and left.  Never

5    any testimony from Margie about that.  He said he put it in

6    his pocket.  Why did he put a knife in his pocket unless he

7    intended to use it.  We'll get back to that in a moment.

8            Defendant returned to the party.  He wasn't

9    concerned about Sosa.  Two times Mr. Cantor makes into

10   these awful threats two times, threats to the defendant.

11   Yet he left and returned to the party.  This time he had a

12   knife with him.  Why?  Because he intended to use that

13   knife against Sosa.  We heard that Sosa approached the

14   defendant.  Witnesses told you what happened.  Defendant

15   took the knife out of his pocket and stabbed Sosa five

16   times in the nose, the ear, neck and back of the head.

17   There was no punching by Sosa.

18           Immediately after he stabbed Sosa, defendant ran

19   off.  He didn't even stop.  He didn't try to see how

20   severely injured Sosa was or try to get help.  He just left

21   him there to die.  He had blood on his hands.  He knew it.

22   Did he call 911, call for help?  React how sorry I am.

23   Margie came out after him.  He took off to save himself.

24   That's his only priority at the moment he stabbed Sosa to

25   now his only priority was to save himself.  He wasn't under

1   arrest.  He got away.  He took a cab to Brooklyn.  He

2   thought he could get away with it.  It was only when he was

3   caught, brought to court does he inject the justification

4   charge.  He says Sosa grabbed my arm.

5           Remember the statement to Detective Banker.  We

6   heard from Margie that she's the one who grabbed his arm.

7   He's not confused.  He's just making up different stories.

8   When the defendant was caught, he didn't know what evidence

9   was against him or what people saw, what they were saying.

10  He tells Detective Banker what happens.  He gives two

11  spontaneous statements in the car.  The first one he says

12  to Detective Banker --

13          (Whereupon, a document is being displayed in open

14  court.)

15          MR. ROSENFELD:   -- at 12:40 when he's arrested,

16  yo, that guy kept fucking with me all night.  He was drunk.

17  They took him outside, and when they came back he grabbed

18  my arm.  What does he say here?  I saw a knife on the table

19  and grabbed it and swung at him.  People in the party

20  grabbed me, then I ran.  There's his first story trying to

21  give some defense, Sosa grabbed his arm.  Never happened.

22          Margie says she grabbed his arm.  There was no

23  knife on the table.  None of the witnesses saw a knife on

24  the table.  He didn't grab a knife suddenly.  He had it

25  with him with the intent to use.  He's already trying to

```
 1     give up trying to prevent anyone from believing that he
 2     just murdered Sosa.  He comes up with a defense.  Now, what
 3     does he say to the detective a few minutes later?  I fucked
 4     up again.  So he realized that's what he did.
 5             The defendant was taken back to the precinct.
 6     Detective Banker, you had an opportunity to look at this
 7     detective on the witness stand, he's a professional, yes,
 8     he's retired.  What three quarters has to do with anything
 9     or Mr. Cantor's attempts to influence you by talking about
10     things totally irrelevant to trial and aren't true I don't
11     know, but again, it's just an attempt --
12             MR. CANTOR:  He can't vouch for the credibility
13     of witnesses and I'm objecting.
14             THE COURT:  It's only argument.
15             MR. CANTOR:  Of course, but he cannot vouch for
16     the credibility of witnesses.
17             THE COURT:  The jury will make its own
18     determination --
19             MR. CANTOR:  Appellate courts --
20             THE COURT:  -- as to credibility.
21             MR. CANTOR:  I'm sorry?
22             THE COURT:  Your objection is overruled.
23             MR. CANTOR:  My exception is noted.
24             THE COURT:  Noted.
25             MR. ROSENFELD:  As I said, you had an opportunity
```

1   to look at the detective and judge his credibility.
2   Credibility is what happened when he was a detective, what
3   he saw and heard, and he followed police procedures.  He
4   read the Miranda warnings to the defendant.  The defendant
5   admitted to you, also in the video he wrote it, he wrote it
6   out, no one forced him.  It was voluntary.  He waived his
7   rights.  Detectives treated him decently.  They gave him
8   food, they took him to the bathroom.  You saw in the video.
9   Did he look like someone who was being pressured?  He
10  freely and voluntarily gave a statement.  Said the
11  detective helped him with spelling, whether that is true or
12  not we don't know.  We know that he was the one who made
13  the cross-outs, but he wrote out those two pages.

14          Remember during the cross exam, Detective Banker,
15  defense attorney asked him why not three pages, one page?
16  Why two pages?  What's the difference?  Come on.  That's
17  how much it took for him to write out the statement.

18          Let's look at that statement, the second
19  statement from the defendant.  First we have the Miranda
20  warnings.  The defendant tried again swaying you by making
21  it seem like a statement was involuntary because he said
22  that first he wrote the statement, then the Miranda
23  warnings.  Detective Banker, an experienced detective,
24  having taken many, many statements, many, many Miranda
25  warnings, knows how to do this.  He did it properly.  He

1    said he wrote on the top the date, the time, 2:55 in the

2    afternoon, he wrote his name there, he read the Miranda

3    warnings, David Delgado signed appropriately.  They all

4    signed it at the bottom, then he gave him the paper.  If

5    you look at the time, 15:05, that's 3:05, so about ten

6    minutes that he started writing out the statement.

7            Let's look at that statement again.  Even he says

8    here telling me that I was going to have problems with him.

9    I got nervous.  He was disrespecting everyone at the party.

10   He came back at me again.  I got feared at him because he

11   was bigger than me.  I was scared at that point that he was

12   going to attack me so I took a knife from the kitchen

13   'cause I was already scared at him.  Well, he's leaving out

14   some parts here.  I was about to leave the party.  He came

15   at me and again told me to remember that if I fuck around

16   with Margie that I was going to get hurt by him.  So when I

17   went to walk away Sosa grabbed me and that's when I took

18   the knife out of my pocket and hit him.  I was already

19   scared and nervous for my safety.  He says he's not the

20   person to do this.  He's sorry for what he did, was scared

21   for his life.  He left the party.  He ran out of the

22   apartment, took a cab.  I don't remember where is the

23   knife.  That's his written statement.

24           Then he gives a video statement to Assistant

25   District DA Erica Weissberg, again, Miranda warnings, and

1   you had an opportunity to look at him on that video.  You

2   can see his demeanor.  He is asked questions.  He answered

3   the questions.  No one forced him.  Defense attorney has

4   said over and over from the beginning of this case that

5   defendant had a feeble, a weak mind and could be

6   manipulated.  Is there any evidence of that here?  Just a

7   normal person.  Yeah, we all have our difficulties.  We all

8   have our challenges, but to say a feeble and weak mind is

9   again trying to influence you, using his words, because

10  there's no evidence of that.  There's no psychiatric

11  psychological evidence, no medical testimony.  Nothing.

12  Just the defense attorney throwing out those words, they're

13  meaningless, they are not evidence, trying to influence you

14  and think that maybe the detective affected him or had

15  something to do with this statement.

16          But let's remember each of the statements.

17  Defendant admitted he's the one who stabbed Sosa.  There's

18  no question here.  There were lineups, the witnesses who

19  testified made the identifications, identified the

20  defendant.  No doubt in their mind.  And they were correct.

21  Other witnesses saw the lineup.  There's nothing here to

22  infer any negativity.  Those witnesses didn't testify so

23  you can't get more into the lineups, the fact that defense

24  attorney mentioned other witnesses like something sinister,

25  like we're hiding something.  No evidence of that.

1    It's not the number, the quantity of the

2    witnesses who testify here.  It's the quality of their

3    testimony.  You have four or five, six people all saying

4    the same thing.  You say it's just repetitive cumulative.

5    We had four witnesses.  They all told you what they saw at

6    the party.  Were there other people?  Yes.  Did other

7    people see the lineup?  Yes.  But there's nothing negative

8    to infer about it, but they didn't come here to testify.

9        Let's look at the defendant's statement and the

10   video.  After the first incident when the deceased

11   approached him, he said to the defendant I'm a man, I get

12   your point.  Okay.  That was it.  Then he said Sosa left

13   the kitchen, went back to dancing.  Nothing more

14   transpired.  He talks about the second time, again,

15   deceased came over to him again with the fingers to the

16   shoulder.  Nothing happened.  Again, statements made that

17   if in the future you disrespect Margie.

18       He then leaves with Margie, goes to her

19   apartment.  He gets a knife from the kitchen, a small steak

20   knife in Margie's kitchen.  He said he was worried.  Okay.

21   So he's back at Margie's house.  He's no longer at the

22   party.  Sosa is not there.  If you're really threatened as

23   Mr. Cantor wants you to believe the defendant was, and had

24   such a weak, feeble mind and easily frightened and all

25   those other things, once you left the party, what do you

1    do?  You don't go back to the party.  If you really are

2    threatened you stay home, say I'm not going back.  You

3    don't take a knife, you don't do it, it's over with, you

4    don't go back to that party, I'm threatened.

5         But the truth is, ladies and gentlemen, I submit

6    to you the defendant was not feeling threatened.  At some

7    point, he said he came back to the party.  He said he

8    wasn't concerned.  He said he was nervous when he went

9    back.  I didn't worry that much.  Those are his words.

10   What is that telling you that these were not real threats

11   by Sosa?  But again, the defendant comes back with a knife

12   on his person.  He had the knife on him because he figured

13   he would use it against Sosa if Sosa was gonna display a

14   weapon and really carry a threat, but that was not gonna

15   happen, ladies and gentlemen.

16        And then when he goes to discuss the incident

17   himself, he said he blacked out.  I don't know how many

18   times he cuts the victim or Sosa.  He reacted, responded,

19   just swung and hit him in the neck and swung again.  He

20   swung five times.  And you saw his motion on the video, how

21   he went at Sosa.  He knew exactly what he was doing and he

22   was aiming for Sosa's face and neck and head.  You saw the

23   injuries, the nose cut open, the ear completely cut

24   through, the stab wound on the right side of the neck, the

25   stab wound to the back of the head, Sosa wasn't even facing

1    him, and the stab wound to the jugular, the carotid that

2    killed him.  It was not justified.

3          He said in the video that Sosa never showed him

4    any weapon.  Sosa put the hand in his face.  That's it.

5    All he was trying to do was relieve his guilt.  He admits

6    his presence at the scene.  He admits stabbing Sosa, admits

7    possessing the knife and using the knife.  There's

8    overwhelming evidence of the defendant's guilt.  Everything

9    you need to convict David Delgado.  You have the transcript

10   of the case.  If there's anything you need, the witness'

11   testimony, you can ask for it.  I'm sure you probably

12   remember it.  It's been a week.  I'm sure it's embedded in

13   your mind, but you can review it if there's a discrepancy.

14   But I submit to you that most of the testimony supports the

15   evidence that the defendant stabbed and killed Sosa.  Did

16   he do it?  Yes, beyond a reasonable doubt.

17         Let's look at the witnesses.  Let's look at the

18   witnesses you heard at trial.  You had an opportunity to

19   learn a little bit about the background, the expert

20   witnesses, their skills, their experiences, their

21   expertise, their professionalism, their certifications,

22   training, schooling.  You heard about police officers,

23   detectives and medical examiners, how medical examiners got

24   involved in the case, what part they played.  Again, it's

25   for you to judge credibility of these witnesses.  Did any

1    of them have a motive to lie?  Something you have to

2    consider.  Yes or no.  Did the police officers have

3    anything to gain, any motive of Detective Florio, Detective

4    Banker, civilian witnesses, anything to gain by coming in

5    here testifying?  I submit to you nothing.

6         In fact, Alberto Vasquez was so upset by the

7    questioning, his statement, i believe he said something how

8    is this relevant to what happened at this incident?  That's

9    right.  How is the questioning by Mr. Cantor of his

10   background in Mr. Vasquez relevant to what happened.  He

11   came in here to tell you about what he saw back on December

12   25, 2009, the murder of Sosa.  This man is only sitting

13   here under pressure being questioned about events that took

14   place, let's be frank, 14 years ago.

15        MR. CANTOR:  Objection, Judge.  There's a valid

16   legal reason.  You know it and he knows it.  I'll object.

17        THE COURT:  The jury will evaluate the

18   credibility as it's entitled to.  Objection sustained.

19        MR. ROSENFELD:  What each of those witnesses is

20   doing is their respective jobs.  Police officers,

21   detectives come in here as witnesses to a crime to tell you

22   what happened.  Mr. Cantor made issue about Alberto

23   Vasquez's criminal background and each of the witness'

24   background and reason they came here to testify.

25        Remember, ladies and gentlemen, you have to apply

1    that same thing to the defendant.  Look at his background.

2    Does he have anything to gain or lose?  The same evaluation

3    that you're asked to give to the civilians, you have to

4    give to the defendant, too.  You promised you would treat

5    him the same way.

6            Let's look at Sosa.  Sosa that night, he was

7    drunk, he was upset about his wife.  He was loud.  He was

8    obnoxious.  Everybody says that.  But he was no real

9    threat.  There was no reaction from anybody else.  Carmen's

10   daughter got upset.  He took him out of the apartment.  Mr.

11   Vasquez, Ms. Dempsey, they took him to their apartment.

12   But each time he approached the defendant, it was if you

13   disrespect Margie this will happen to you, again, in the

14   future.  Nothing was gonna happen at that party.  Each time

15   the defendant stayed there.  He didn't leave the party.

16   And I submit to you he didn't think they were real threats.

17   Yes, Sosa was obnoxious, drunk and he came up to the

18   defendant three times.  Again, remember, he never had a

19   weapon on him, was no real threat that justified the use of

20   deadly physical force.

21           Melissa Dempsey came in here.  She told you what

22   she saw at the party.  She told you about the time Sosa

23   approached the defendant.  She said I thought he was

24   arguing.  That's the testimony from the transcript, I

25   thought he was arguing.  She was asked later by Mr. Cantor

1    if she doesn't remember saying arguing.  She was brought

2    back here.  He read from it.  I thought he was arguing and

3    she said I couldn't hear their words.  Okay.  Accept what

4    you want of that.  She couldn't hear what Sosa and David

5    Delgado were saying.  The music was loud.  But she told you

6    what she saw.

7            Alberto Vasquez, same thing, came in here, told

8    you he was in the kitchen with David Delgado.  At one point

9    while he was in the kitchen saw David Delgado with a knife.

10   He showed it to him.  Why did he show it to him?  To show

11   he had the knife on him, that he was secure.

12           Mercedes Rodriguez, again, came in here, told you

13   what she saw.  She was sitting right there when the

14   defendant ran out.  She tried to grab him to keep him from

15   fleeing.  What does he do?  He pushed her away.  As she

16   fell, she saw the defendant with the knife in his hand.

17   She didn't run after she was down to the floor from the

18   hallway.  She told you her position.  She saw the brown

19   handle with the knife and the knife sticking out of the

20   bottom, still holding it in his hand when he fled the

21   scene.  That's why the knife was never recovered, because

22   the defendant got rid of it.  In fact the police looked for

23   the knife.  They looked in the apartment, the stairwell,

24   whatever, they didn't find it because the defendant got rid

25   of it.  But he had it with him when he left.

1              Finally, you heard from Carmen Matos, Margie,

2       defendant's common-law wife, again, she was very similar to

3       the other witnesses, told you what happened, what she saw,

4       where they went, what they did that day, very

5       straight-forward and clear.  Nothing to gain or lose for

6       any of those witnesses.

7              Let's look at the defendant's testimony.  He's

8       the most interested witness of all, the most to gain or

9       lose by testifying.  The only person he's interested in is

10      himself.  You observed him on the witness stand.  He

11      changed his story right in front of you, said one thing on

12      direct, one thing on cross, right here in the courtroom.

13      Which version of his story do you accept or reject, all of

14      it, part of it, some of it?  Look at the inconsistencies

15      like Mr. Cantor wants you to do with the other witnesses.

16      Look at the defendant's inconsistencies.  He was aware of

17      his actions, he was not drunk, intoxicated while on

18      medication, which was the defense's opening.

19              In fact, Mr. Cantor in his opening said, Page

20      700, about the medication, it even says so on the vial not

21      to be taken with liquor.  Did you see any proof of any

22      medication or vials to back that up at trial?  But he said

23      it.  You can ignore statements made by myself or Mr.

24      Cantor.  They have to be evidence.  And if it's not

25      evidence, you have to ignore it.  There's nothing in this

1    trial about vials saying anything on them.  It's just Mr.

2    Cantor testifying.

3                    MR. CANTOR:  I object.  My client so testified.

4    That's evidence for the jury to assess.  And these

5    misrepresentations are vile, your Honor.

6                    THE COURT:  Your objection is overruled.

7                    MR. CANTOR:  My exception is kindly noted.

8                    MR. ROSENFELD:  Again, I hope you'll ignore these

9    outbursts.

10                   MR. CANTOR:  You see how many attacks.  I defend

11   a man --

12                   THE COURT:  Please.

13                   MR. CANTOR:  It's an objection.

14                   THE COURT:  Please.  Yes, that objection is

15   sustained.

16                   MR. CANTOR:  Will you so instruct the assistant

17   district attorney?

18                   THE COURT:  You just have to say it.  Please sit

19   down.

20                   MR. CANTOR:  I'm trying to, Judge.

21                   THE COURT:  All right.

22                   MR. ROSENFELD:  Defendant knew what he was doing.

23   He stabbed Sosa, fled the scene, disposed of the weapon.

24   He fled back to Brooklyn to hide out.  He knew Sosa was

25   dead and that he killed him.  He had no intention to turn

1    himself in.  I ask you to treat the defendant like the

2    other witnesses.

3         We'll talk about what he said about his

4    background.  Told you he was convicted of a felony.  I

5    submit to you that part of the story is meant to manipulate

6    you into thinking he could not develop an intent to kill

7    Sosa.

8

9         (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PEOPLE'S SUMMATION

1888

1    MR. ROSENFELD:  Even throwing in, as Mr. Cantor

2    did, six children wants your sympathy.  That's to play to

3    your emotion.  He wasn't even living with six children in

4    Brooklyn.  He was living in Brooklyn for a year by himself.

5    I don't know where the six children come in except to put

6    that in your minds to give you some sympathy.

7         Look at the charges -- I'm sorry, motive.  People

8    do not have to prove any motive, no premeditation, it's not

9    a word that's noted here or used here.  People do not have

10   to prove what was in the defendant's mind at any moment

11   prior to the moment he actually stabbed Sosa --

12        MR. CANTOR:  Objection.

13        MR. ROSENFELD:  -- with a knife.

14        THE COURT:  The Court will give the appropriate

15   instruction.

16        MR. CANTOR:  They must consider that.

17        MR. ROSENFELD:  You consider it if it exists.  We

18   heard the defendant took the knife when he returned to the

19   party.  He was intending to use that knife, but the intent

20   could be formed at the moment the defendant stabbed Sosa.

21   Doesn't have to exist in his mind for two minutes, three

22   minutes, four minutes or one minute.  At the moment he

23   pulled out the knife and stabbed Sosa, if you believe he

24   intended to kill him at that moment then he is guilty of

25   murder in the second degree.  Consider again the defendant

1889

1    had that knife on him, pulled it out and stabbed the

2    deceased's head and neck.  He intend -- the intent is

3    demonstrated by the defendant's action.  Look at everything

4    he did.  Look at all the evidence and the results were the

5    natural consequence of his action.  Sosa was murdered.

6         You heard the medical examiner's testimony that

7    the deceased had stab wounds.  Mr. Cantor uses the word

8    puncture wounds, the medical examiner never used the word

9    puncture, she said stab wounds, not small puncture wounds.

10        The defendant wants you to believe that he was so

11   frightened, so scared, such a feeble mind, so weak that he

12   reasonably believed Sosa was going to hurt him.  Well, lets

13   look at the different things that have been put before you.

14   The defendant said he attempted suicide three times.  We

15   only have defendant's say so, not one bit of proof those

16   episodes ever happened, he just said it here.  The

17   defendant's opening was that defendant was confined to

18   mental institution two times.  You heard any evidence about

19   mental institutions, any doctors records, anything to prove

20   the defendant was ever confined to mental institutions two

21   times?  Answer, no.  Mr. Cantor says the defendant was

22   depressed, bipolar.  Well, he is not a medical expert and

23   there has been no evidence whatsoever.  In fact, the

24   defendant said he would produce evidence that the defendant

25   was mentally infirmed.  Did you see any evidence produced

E-1jb

PEOPLE'S SUMMATION

1890

1    here, any medical experts, psychiatrist, psychologist,

2    someone who came in here to talk about a diagnosis of

3    defendant's condition?  Anybody?  I think the answer is no.

4    Any of you want to believe that the defendant was depressed

5    that doesn't stop him from forming the intent to kill Sosa

6    at the time he stabbed him.

7              Defendant said he was sexually abused when he was

8    younger, eight or nine, and he cried on the witness stand.

9    Is there any proof of that, any records, anything at all,

10   any medical expert to testify that that had any effect on

11   the defendant or his weak mind, creating a feeble mind,

12   made him susceptible, any evidence at all?  If you have in

13   the jury room bring it out, but you can go through the

14   whole record that you have before you, you will see no

15   evidence to prove that the defendant committed suicide,

16   that he was confined to mental --

17             MR. CANTOR:  Well, if he committed suicide,

18   Judge --

19             MR. ROSENFELD:  Attempted suicide.

20             MR. CANTOR:  That really defines --

21             THE COURT:  All right.  Please, do you have an

22   objection?

23             MR. CANTOR:  Yes.

24             THE COURT:  All right.  Your objection is noted.

25   Overruled.

E-ljb

PEOPLE'S SUMMATION

1891

1      MR. CANTOR:  Okay.

2      MR. ROSENFELD:  Attempted suicide.  No evidence

3  he was depressed or bipolar.

4      MR. CANTOR:  Judge, I am going to object, there

5  is no evidence in this case from all of that?  From my

6  client's testimony --

7      THE COURT:  The jury is required to review all of

8  the evidence.

9      MR. CANTOR:  And they can credit such testimony

10  and that constitutes evidence.

11      MR. ROSENFELD:  Your Honor, objection to this

12  colloquy.

13      THE COURT:  And discredit as the case may be.

14      MR. CANTOR:  Yes, they can credit.

15      MR. ROSENFELD:  Objection.

16      THE COURT:  Thank you, Mr. Cantor.

17      MR. CANTOR:  So I object --

18      THE COURT:  Your objection is noted.

19      MR. CANTOR:  -- saying there is no evidence.

20  Will you rule on it?

21      THE COURT:  Overruled.

22      MR. CANTOR:  Exception.

23      THE COURT:  Please continue, Mr. District

24  Attorney.

25      MR. ROSENFELD:  Defendant and defense attorney

1   said that he took medication and alcohol.  Well, other than

2   the defendant saying he took a pill that day and he was

3   taking medicine three or four months, did you see any proof

4   that the defendant was on any type of medication other than

5   what he told you?  Any proof about any interaction of that

6   medication with the alcohol that it would affect any proof

7   at all?  Go through the whole transcript.  Have the whole

8   trial read back again.  A statement that the defendant

9   throws out -- the defense attorney throws out to try to

10  negate intent on his part, but there is no proof of that.

11          MR. CANTOR:  I object.  My client's testimony --

12          MR. ROSENFELD:  I said that, Judge.

13          THE COURT:  It is for the jury to determine.

14          MR. CANTOR:  Yes, they can credit it or discredit

15  as you said.  I object.

16          THE COURT:  All right.  Your objection is noted.

17          MR. CANTOR:  Will you rule on it?

18          THE COURT:  Overruled.

19          MR. CANTOR:  Exception.

20          THE COURT:  Please continue, Mr. District

21  Attorney.

22          MR. ROSENFELD:  The defense used the words

23  defendant had a delicate, fragile, weak mind, emotionally

24  suffered, easily frightened.  Well, says who?  The

25  defendant, the defense attorney, he is not an expert.  He

PEOPLE'S SUMMATION

1893

1    can't testify about that and we looked at Mr. Delgado's

2    statement.  He went about his daily activities:  He worked,

3    he dated, he traveled, had a job, he shopped, he bought

4    gifts, where do you see a delicate, fragile, weak mind?

5    There has been no medical, psychiatric, psychological

6    testimony at all to back that up other than the defendant's

7    say so on the witness stand.  Mr. Cantor said that the

8    defendant thought trouble was brewing, bipolarity took

9    over.  Any evidence of that?  Give me a little bit to

10   challenge, give me something, there is none.  Let's be

11   honest, there is no evidence of all these things other than

12   defendant's testimony.

13           Defense wants you to believe that he had no

14   intent to kill Sosa because he did, did not aim for the

15   heart or any vital organs, he swung wildly.  Wait a minute,

16   he struck at the deceased.  He went right for the head, the

17   ear, the neck, the back of the head what is that intent to

18   do?  Remember the defendant left the party and could have

19   stayed back in Margie's apartment if he really thought he

20   was threaten or that any violence was going to be done to

21   him, but he said he didn't worry that much.  At one point,

22   maybe it was at the beginning, the defendant was on the

23   precipice of -- because of what his is stepfather did to

24   him.  There is nothing to make that connection here at

25   trial other than the defendant crying on the witness stand

E-ljb

PEOPLE'S SUMMATION

1894

1    and maybe wishful thinking on his part that you would

2    consider it and have some emotion or sympathy for him.

3    Well, there is no proof of any of that and he is talking

4    about something that happened --

5           MR. CANTOR:  I am going to object.  My client so

6    testified, that is proof for the jury to credit or

7    discredit.

8           THE COURT:  It is for the jury to determine.

9           MR. CANTOR:  Absolutely.

10          THE COURT:  All right.

11          MR. CANTOR:  So there is proof if they credit it.

12          THE COURT:  If they wish to, yes, of course.

13          MR. CANTOR:  Obviously, so I object to that.

14          THE COURT:  All right.  Your objection is noted.

15          MR. CANTOR:  Will you rule on it?

16          THE COURT:  I am reserving.

17          MR. CANTOR:  You're reserving until when, he is

18   now on summation.

19          MR. ROSENFELD:  Your Honor, this constant

20   interruption how can I continue?

21          THE COURT:  I understand.

22          MR. ROSENFELD:  Thank you.

23          MR. CANTOR:  Will you rule?

24          MR. ROSENFELD:  Will you ask him to be quiet and

25   sit down?

PEOPLE'S SUMMATION

1895

1    THE COURT:  Yes, I will.

2    MR. CANTOR:  I will be.  Will you rule?

3    THE COURT:  Overruled.

4    MR. CANTOR:  Exception, respectfully, your Honor.

5    MR. ROSENFELD:  Mr. Cantor just said all you have
6  is the defendant's testimony on the witness stand that
7  these things happened.  Nothing else to support any
8  contention of mental retardation, mental infirmity,
9  depression, bipolarity, liquor mixing with medications,
10  sexual abuse, just throwing it out there for you, ladies
11  and gentlemen.  So that the defendant -- defense attorney
12  can say he has a weak, delicate, impressionable, fragile,
13  feeble mind, there has been nothing to show that at all.
14  At one point in a statement in the trial the defendant
15  comes up with Sosa punching him.  We went through that
16  before, remember that?  Before that he said that Sosa
17  grabbed his arm, but lets look at Carmen's Matos'
18  testimony, his common-law wife.  Question, answer, you told
19  us, page 1345:

20          "And you told us right before lunch what Sosa
21  said to him?

22          "ANSWER:  Yes.

23          "QUESTION:  And then hit him on the area of the
24  shoulder, whatever you showed us before, right?

25          "ANSWER:  Yes.

E-ljb

PEOPLE'S SUMMATION

1896

1    "QUESTION:  Then you said you grabbed David

2    right?

3    "ANSWER:  No.

4    "QUESTION:  You didn't tell us before lunch that

5    at that point you grabbed David?

6    "ANSWER:  Yes, I grabbed -- yes, I grabbed David

7    (indicating.)"

8    She said, "I went like this to him (indicating)."

9    "Indicating the witness has with her right hand

10   grabbed her left wrist and pulled her left wrist across and

11   turned her body to the right."

12   Was that correct?

13   So indicated.

14   Is that what you did?  Question and --

15   "ANSWER:  I just grabbed his wrist and pulled him

16   (indicating.)"

17   And what did the defendant do?  He pulled away.

18   So you had his common-law wife, Margie Matos, testifying to

19   it.  However, the defendant first he says Sosa grabbed him

20   then he says Sosa punched him.  And when it came time for

21   the actual incident and I had mentioned this before on

22   justification is that you will hear in the charge of

23   justification that it's not justification if he could have

24   freely left the area.  And I want to use the proper

25   words --

E-ljb

PEOPLE'S SUMMATION

1897

1      MR. CANTOR:  The proper words are --

2      MR. ROSENFELD:  If he knew --

3      MR. CANTOR:  Objection.

4      MR. ROSENFELD:  Safety.

5      MR. CANTOR:  Giving the jury the law.

6      THE COURT:  The objection is overruled in this

7   instance.

8      MR. ROSENFELD:  If he could with complete safety

9   to himself and others avoid the necessity of using deadly

10  physical force by retreating.  Questions to Carmen Matos,

11  beginning page 1348:

12      "QUESTION:  Thank you.  And you indicated you

13  turned to talk to Mercedes Rodriguez?

14      "ANSWER:  Yes.

15      "QUESTION:  And that you said she was sitting

16  here indicating on a photograph by the door.

17      "ANSWER:  Yes."

18      Page 1349:

19      "QUESTION:  And the door was open?

20      "ANSWER:  Yes.

21      "QUESTION:  If you had wanted to at that point

22  could you have walked out the door?

23      "ANSWER:  Yes."

24      And talking in -- about where David, the

25  defendant, was he was standing right next to her.  There

PEOPLE'S SUMMATION

1898

1  was nothing to prevent the defendant from walking out in
2  complete safety and retreating.

3          Now, ladies and gentlemen, when you look at the
4  charges it's clear reasonable people can differ and have
5  different views of the evidence.  All 12 of you, as the
6  judge will tell you must agree and the choices you make
7  should be based upon a reasonable view of the evidence and
8  proof beyond a reasonable doubt that the defendant
9  committed the crimes and you will hear the elements of the
10  crimes, the judge will explain them to you and you can
11  accept all of the testimony of a witness or part of the
12  testimony.

13          There are two main charges of homicide and a
14  charge possessing a weapon.  In a murder charge there are
15  two elements and I submit to you that the People have
16  proved beyond a reasonable doubt each of these two
17  elements.  What's the first one?  That the defendant caused
18  the death of Sosa, George Talavera, by stabbing him.  Did
19  he do that?  It's very clear, yes, he did.  Two, did the
20  defendant intend to cause his death?  I submit to you that
21  based upon the evidence and a reasonable view of it --

22          MR. CANTOR:  Judge, an attorney is not allowed to
23  interject his personal opinion.

24          THE COURT:  Be guided.

25          MR. CANTOR:  That is an objection, Judge, will

E-ljb

1   you rule?

2           THE COURT:  Sustained.

3           MR. CANTOR:  Will you tell the jury to disregard?

4           THE COURT:  The jury will be so guided.

5           MR. ROSENFELD:  You can look at the evidence and

6   judge whether or not the defendant intended to cause the

7   death of Sosa by looking at how he stabbed Sosa.  The knife

8   stabbing to the neck, face and the back of the head.  So

9   those two elements of murder in the second degree I submit

10  to you you can find by evaluating the evidence and proof

11  beyond a reasonable doubt that the defendant murdered Sosa,

12  but again reasonable people have different views of the

13  evidence.

14          Manslaughter in the first degree has two

15  elements, but they're different and the manslaughter

16  element involves intent to cause serious physical injury.

17  Well, again, reasonable people, ladies and gentlemen,

18  looking at the same evidence may feel that Sosa was trying

19  to seriously injure -- I'm sorry.  The defendant was trying

20  to seriously injure Sosa by stabbing him in the neck, the

21  face and the back of the head.  He could have stabbed him

22  in another part of the body: An arm, a leg, a hand.  You

23  may say, well, he wasn't trying to kill him, he wasn't

24  trying to cause serious physical injury, but he stabbed him

25  through the neck to the jugular vein, the carotid artery.

PEOPLE'S SUMMATION

1900

1    It's as vital as any other part of the body, whether it's

2    in the heart or anything else, lungs you can determine that

3    he intended to kill George Talavera by that or if you

4    interpret the evidence in favor of defense you can decide

5    that he by doing those things tried to -- had the intent to

6    cause physical injury, it's up for you to decide and as for

7    possession of the weapon it's clear that he took the weapon

8    from Margie's apartment with the intent to use it against

9    Sosa if he needed to.

10        You heard, ladies and gentlemen, you can hear all

11    or partial parts of the testimony, but please, I ask you to

12    work together to resolve any inconsistencies.  I mentioned

13    to you at the beginning and ask you to resolve any

14    interioral or minor inconsistencies.  Make piles of what

15    things are important, what things are not important.  Look

16    at the evidence and separate it out.  I submit to you you

17    can easily see that there are parts of the testimony that

18    is not as important as other parts.  Focus on the main

19    points.  Avoid distractions that have taken place at trial

20    and use your common sense to evaluate the witnesses.

21        It's easy to sit here in this courtroom, 30

22    months after the murder and judge these witnesses.  What

23    could they have done?  What could they have said?  What did

24    they say inconsistent with what they remember today?  What

25    they don't remember today?  Did they get angry on the

E-ljb

PEOPLE'S SUMMATION

1901

1    witness stand?  Were they cooperative, uncooperative?

2    What's hard is for a person to get on the witness stand and

3    I hope you consider that, and I hope you give them the same

4    consideration you would want if you were on that witness

5    stand and you had to testify about an event 30 months ago

6    and you came in here just to let everybody know what

7    happened and suddenly you are talking about your past and

8    you feel attacked like Mr. Vasquez was.  It was unfortunate

9    but you know what --

10                MR. CANTOR:  Objection.

11                MR. ROSENFELD:  -- the man --

12                MR. CANTOR:  That's a legitimate line of inquiry.

13                THE COURT:  Certainly.

14                MR. CANTOR:  And I am asking your Honor to

15   instruct the jury to disregard those inappropriate remarks..

16                THE COURT:  The injury will be appropriately

17   instructed.

18                MR. CANTOR:  Can you do that presently since they

19   were presently made?

20                THE COURT:  On this particular item you may

21   disregard it.

22                Move on.

23                MR. ROSENFELD:  I believe Mr. Cantor talked about

24   how Mr. Vasquez got up and was angry and walked out the

25   witness stand.  You all remember Mr. Cantor saying that?  I

PEOPLE'S SUMMATION

1902

1   think you can understand how he felt and I ask you to take

2   that into consideration also.  And finally speak up for

3   Sosa, speak up for the victim, don't let him get lost in

4   all of this.  He is not here to tell his side of the story.

5          MR. CANTOR:  That is pandering to the basic

6   instinct of people, Judge, I object.

7          THE COURT:  Overruled.  You may continue.

8          MR. ROSENFELD:  And I hope you will recognize the

9   courage of the witnesses to take the witness stand and to

10   face the defendant and identify him here in court 30 months

11   after the crime.

12          MR. CANTOR:  Objection.

13          THE COURT:  It's a factor that can be considered.

14          MR. CANTOR:  I'm sorry?

15          THE COURT:  It's a factor they may take into

16   consideration.

17          MR. CANTOR:  Courage?

18          THE COURT:  Not courage.

19          MR. CANTOR:  He called it courage, so that's what

20   I object to.

21          THE COURT:  You will object to his word courage?

22          MR. CANTOR:  Yes, Judge.  Justice is what I am

23   after not courage.

24          THE COURT:  We're all after justice, Mr. Cantor.

25          MR. CANTOR:  I think you are partly right, Judge.

E-ljb

PEOPLE'S SUMMATION

1903

1       THE COURT:  I don't know whether to take that as

2   an expiration to the Court.

3       MR. CANTOR:  No.

4       THE COURT:  Or an attack to the District

5   Attorney, but either would be equally distasteful.

6       MR. CANTOR:  I raise an objection.

7       THE COURT:  You have every right to raise an

8   objection, limited to objections and not editorializing.

9       Please continue, Mr. District Attorney.

10      MR. ROSENFELD:  Remember your promises at the

11  beginning of this case, if proof beyond a reasonable doubt

12  exists to the elements of the charges you must convict the

13  defendant and you said you would do that.  That is your

14  responsibility under the law and to follow the law as the

15  judge gives it to you even if you disagree with it.

16      Review the charges, review the elements and

17  prepare the facts.  If someone brings up an item that

18  wasn't in evidence, maybe it was something I mentioned or

19  Mr. Cantor mentioned or something that someone speculates

20  about please speak up, step forward and remind that juror

21  about the judge's instructions and the law.  Do a reality

22  stop check.  For instance, you promised at the beginning

23  you wouldn't consider sentencing, just one of the examples.

24  There is no question that the defendant was the one who

25  murdered Sosa based upon all of the evidence you have heard

E-1jb

PEOPLE'S SUMMATION

1904

1    here at trial.  You've heard from the defendant's mouth he

2    tried to justify his acts, but the People have proven

3    beyond a reasonable doubt that the defendant was not

4    justified in stabbing Sosa.  He could not have reasonably

5    believed that Sosa was about to use deadly physical force

6    against him.  Sosa had no weapon and the defendant could

7    have retrieved it from safety.  It won't work here, ladies

8    and gentlemen.

9         When the case began the Court gave you an

10   instruction that the defendant is presumed innocent

11   throughout the entire trial.

12        MR. CANTOR:  I'm sorry?

13        MR. ROSENFELD:  And it is up to the --

14        MR. CANTOR:  I am sorry, the defendant is

15   presumed?

16        MR. ROSENFELD:  Not guilty.  Did I say guilty?

17   If I said it I misspoke, the defendant is presumed guilt --

18   not guilty, thank you, throughout the entire trial into the

19   jury room.  It is up to the prosecution to strip away the

20   presumption of innocence.  Well, here we are at the end of

21   the case.  The presumption of innocence still exists until

22   the moment you walk into that jury room and start

23   deliberating and see that People have proved beyond a

24   reasonable doubt all of the elements and I submit to you,

25   ladies and gentlemen, you can go into that jury room and

E-ljb

PEOPLE'S SUMMATION

1905

1   confidently conclude that the evidence supports each and

2   every element of the crimes that will be submitted to you

3   and that they are proven beyond a reasonable doubt and that

4   you can conclude that the defendant is guilty and there is

5   justice, ladies and gentlemen.  Mr. Cantor can call it

6   poetry, he can make inferences about the prosecution's

7   desires, comments during the trial --

8            MR. CANTOR:  Judge, these are honestly attacks.

9   Again, you have warned him repeatedly, I object.

10           THE COURT:  Its argument.

11           MR. ROSENFELD:  But I ask you --

12           MR. CANTOR:  You overruled my objection?

13           THE COURT:  Yes.

14           MR. CANTOR:  Note my exception.

15           THE COURT:  Noted.

16           MR. ROSENFELD:  I ask you to ignore that and

17   concentrate on the evidence.

18           MR. CANTOR:  Judge, I have an obligation to

19   object.

20           THE COURT:  You do.

21           MR. CANTOR:  So when he says you are to ignore

22   that that's contrary to law.

23           THE COURT:  Are you making an objection?

24           MR. CANTOR:  I am to that comment.

25           THE COURT:  Objection is overruled.

E-ljb

PEOPLE'S SUMMATION

1906

1                 MR. CANTOR:  Once again I except.

2                 THE COURT:  It's argument.

3                 MR. ROSENFELD:  I will ask you to ignore that.

4                 MR. CANTOR:  You see, once again --

5                 MR. ROSENFELD:  Focus on the evidence.

6                 MR. CANTOR:  -- he is telling me that I cannot

7  object.

8                 THE COURT:  No, he never said that.

9                 THE JURY:  Sit down.

10                MR. CANTOR:  Ignore it.

11                THE COURT:  He invited the jury to ignore what

12  you said.  Nothing --

13                MR. CANTOR:  You mean I have no right to object?

14                THE COURT:  You did object.

15                MR. CANTOR:  And the jury should disregard --

16                MR. ROSENFELD:  Objection, your Honor, to

17  colloquy.  This is pandering to the jury.

18                THE COURT:  There is no need for continued

19  colloquy, the Court has already ruled and that's it.

20                MR. CANTOR:  Do I have a right to object, your

21  Honor?

22                THE COURT:  You do.

23                MR. CANTOR:  Fine, that's all I want is the right

24  and to exercise it.

25                MR. ROSENFELD:  Thank you, ladies and gentlemen.

JURY CHARGE

1907

1    THE COURT:  Thank you, Mr. Rosenfeld, for your

2    closing argument.

3    Madam Forelady, ladies and gentlemen of the jury,

4    we have now reached that point in the trial when you are to

5    assume the active function for which you have been chosen.

6    You have heard and seen all of the evidence in this case.

7    The Court will now charge you and invite you to begin your

8    deliberations as to the guilt or nonguilt of Mr. Cantor's

9    client, David Delgado, in this case.

10   The charge will be divided into two parts.  The

11   first part will deal with general principles of law, which

12   are applicable to this case and all cases that come before

13   the bench.  The second part will be an analysis of this

14   particular indictment where the Court will briefly explain

15   to you the application of the law to the facts that you

16   will determine and you will be required to deliberate and

17   render your verdict.  You know in a criminal trial the

18   verdict must be unanimous, that is, all 12 must agree as to

19   the guilt or nonguilt of this gentleman.

20   Its not the Court's intention to marshal evidence

21   and any reference the Court may make to any evidence

22   whatsoever in this trial should not be considered by you as

23   more important than evidence that the Court makes no

24   reference to.  All of the evidence in this case you are

25   required to review and any reference by the Court as to any

JURY CHARGE

1908

1    particular evidence or on the other side of the coin
2    non-reference by the Court as to something you think should
3    be evidence is not evidence in this case and should not be
4    considered by you.  It is only you, you will remember we
5    used the expression what is on the table.  That is all you
6    are judging is what is on the table and what is on the
7    table is the testimony of witnesses and the exhibits that
8    have been proffered into and received in evidence and the
9    stipulation between counsel as what they wish you to
10   consider as evidence.  The Court has no power to tell you
11   what facts are to be more important than other facts.  What
12   witness you think is believable as oppose to less than
13   believable.  Who you think is accurate as oppose to someone
14   who shouts is not accurate.  Who is truthful who is
15   reliable.  These are all questions for you to determine
16   from the evidence -- totality of the evidence in this case.
17   Always remember its never the number of witnesses brought
18   forward by either side, rather it is the totality of the
19   testimony of witnesses, the quality of what they tell us
20   regardless of who brought the witness to the witness stand.
21   Never the quantity.
22            You are not bound to accept the arguments of
23   either the People or the defense having been just made to
24   you in their closing argument before you commence your
25   deliberation.  These are, these meaning the evidence and

E-1jb

JURY CHARGE

1909

1    the judgment of the evidence are all matters now for you in
2    your exclusive powers as judges of the facts to determine.
3    Again, you are not bound to accept the argument advanced by
4    either Mr. Cantor or Mr. Rosenfeld.  On the other hand,
5    however, if you find that the argument advanced by either
6    counsel is reasonable and logical and based upon the
7    evidence that you recall that evidence and is consistent
8    with that evidence you are then perfectly free to adopt
9    that argument and make it your own.

10           On the other hand, if you find that any argument
11   or conclusion urged upon you is not based upon the evidence
12   or is unreasonable or illogical or inconsistent with that
13   evidence you may disregard that argument in its entirety if
14   you so choose, but as to the law you already know you must
15   accept the law and you must apply the law exactly the way
16   the Court instructs you so that this gentleman,
17   Mr. Delgado, can be assured of the same application of the
18   same law that is referable to all of us as citizens.
19           (Continues next page.)
20
21
22
23
24
25

E-1jb

JO~F                    **JUDGE'S CHARGE**

1          THE COURT:  Under our system of jurisprudence all

2     cases in court are initiated by way of trial in a charge

3     that's contained in an indictment.  An indictment, you know,

4     is merely a piece of paper, gets things underway, things

5     being what the trial is.  It's not evidence of anything.

6     It's not probative of anything.  Doesn't mean maybe he did it

7     or could have done it or must have done it.  No.  None of

8     those things.

9          You already know, and you've already pledged early

10    on when you were first empanelled that you will not hold

11    against the gentleman the fact that he is here under

12    indictment.  And it is the sworn testimony elicited both on

13    direct and cross-examination plus that of factual judgment

14    admitted into by counsel plus the stipulations that you know

15    was made between and among the counsels that is the only

16    evidence in this case, the only evidence on the table, the

17    only evidence from which you make a final determination as to

18    guilt or none guilt with respect to the crime that the Court

19    will submit to you to consider.

20         Each and every one of you has in his or her power

21    of thinking to draw proper, reasonable, just inferences from

22    the testimony and the exhibits and that stipulation, and to

23    determine the probabilities arising therefrom in this case

24    after carefully analyzing, weighing and considering the

25    testimony of each and every witness and the totality of the

1   testimony of all of the witnesses in addition to the exhibits
2   and the stipulations.

3        The defendant, you know, is entitled to every
4   inference in his favor which reasonably can be drawn from the
5   evidence.  And where two inferences may be drawn, one
6   consistent with guilt and one consistent with none guilt,
7   Mr. Delgado is entitled to the inference of none guilt.

8        Other considerations that may cross your mind such
9   as sympathy, for instance, and on the other extreme some
10  sense of community justice because this is a crime
11  unfortunately in our streets, none of that has any law in
12  here whatsoever.

13       One of your chief function as judges of the facts
14  is to determine the credibility, the reliability, the
15  truthfulness of each and every witness that has come forward.
16  You and you alone have the power to say whether or not a
17  witness is truthful, untruthful, credible or less than
18  credible, reliable or unreliable, and what weight you wish to
19  inscribe or assign to that particular witness.

20       You must study the witness and review that study
21  to come here and testify, the bearing of the witness on the
22  witness stand, the presentation of the witness and the
23  testimony he or she gave.  The carriage, as we say, of how
24  the witness seated therein impressed you.  The witness' means
25  or motive.  The interest or motive the witness coming here to

Case 1:16-cv-01313-ER-DCF   Document 17   Filed 06/10/20   Page 469 of 570   19.?

JO-F          **JUDGE'S CHARGE**

1    testify, if you find any.  The probability or improbability

2    of the witnesses' testimony on its face.  The intelligence or

3    less lack of intelligence of the witness.  The manner of

4    testifying, the attitude, any prior bad acts that you have

5    become aware of.

6         You should ask yourself was the witness neutral,

7    friendly, hostile.  Was the witness frank, honest, reliable,

8    trustworthy, accurate in the recitation of the fact.  Did the

9    witness demonstrate bias perhaps or had some reason to come

10   here and testify the way the witness did or to testify

11   falsely or give us a half truth?  All of these matters are

12   left to you to decide.

13        They are many aides in determining whether or not

14   a person tells the truth.  We use them everyday in matters of

15   serious importance in our own life.  You are invited to apply

16   any little test you feel comfortable with in determining

17   whether you can trust what is being told to you in any matter

18   of serious importance in your own life.  Apply that same

19   little rule you might use to the witnesses that have come

20   here.  There are many aides in determining whether or not a

21   person is telling the truth.  We implore them -- apply them

22   everyday.  Again, I commend to you to implore them here.

23        You have heard them examine and cross-examine.  In

24   deciding you should consider their testimony just as you

25   would in a matter of serious importance in your own life.  In

1   determining the credibility of any witness or the weight you

2   wish to inscribe to a witness' testimony, again, apply those

3   same rules that you use in guiding yourselves in everyday

4   life.

5          You have the right to consider whether any witness

6   is actuated by bias or prejudice or have an interest on the

7   outcome of the case or that might permit him to testify or

8   her to testify to something other than the full truth.

9   Whether to testify falsely or again using the word give us a

10  half true or colored the truth.  You must penetrate and make

11  that determination as to each and every witness that has come

12  here.

13         Remember, there is no legal presumption whatsoever

14  that an interested witness lied such as there is no legal

15  presumption whatsoever that an apparently disinterested

16  witness tells the truth.  The whole question of witness

17  interest in the case, if you find any, is for you to

18  determine and determine how it affects that witness'

19  testimony and how you should treat that testimony in your

20  overall assignment to make a final determination as to guilt

21  or none guilt of Mr. Delgado.

22         If in your deliberations you find that any witness

23  has willfully testified falsely as to any material fact, is

24  unbelievable on his or her face, you are at perfect liberty

25  to disregard the entire testimony of that witness or you may

1    disregard so much of it as you don't think don't come up to

2    the standard that we are looking for and are deviant in

3    testimony, and you may disregard that as the case may be.

4              In this criminal case, as you know, as stated just

5    a few moments ago, it is the quality of the testimony that is

6    controlling never the quantity or the number of witnesses

7    brought by either side, but rather the quality of what each

8    witness imparts to us and the totality of what all the

9    witnesses taken together tell us.

10             Questions, you know, are not evidence.  It's the

11   answers given to questions that constitute evidence.  Do you

12   understand that the section that is obvious is when a

13   question is posed in such a manner as to elicit a positive or

14   negative answer, a yes or no, then you are at perfect liberty

15   to take the question and the answer and consider it as

16   evidence.

17             Consider the testimony of every witness carefully.

18   Determine whether you will accept or reject it in whole or in

19   part.  Whenever you find conflicting testimony which you are

20   not able to reconcile do not hesitate to cast aside that

21   which you deem exaggerated or mistaken or willfully false and

22   accept only that which you deem to be truth.

23             If you find any witness has testified falsely

24   intentionally, testified falsely as to any material fact, you

25   may disregard that witness entire testimony or you may

1   disregard so much that you may find untruthful and accept as

2   much that you find has been truthful and accurate.

3           Some of the factors that you may wish to use and

4   wish to consider in addition to your own little test in

5   evaluating testimony of witnesses are as follows:

6           One, did the witness have an actual opportunity to

7   see and to hear event about that he or she testified?

8           Did the witness have the ability to recall those

9   events accurately in the matter here?

10          Was the testimony of the witness plausible and

11  likely to be true or was it implausible and not likely to be

12  true?

13          Was the testimony of the witness consistent or

14  inconsistent with other testimony or evidence in this case?

15          Did the manner in which the witness testify

16  reflect upon the truthfulness of that witness' testimony?

17          To what extent, if any, did the witness'

18  background, training, educational experience affect the

19  believability of that witnesses testimony?

20          Did the witness have a bias or hostility or some

21  other attitude that might affect the truthfulness of the

22  witness' testimony?

23          You may consider whether a witness has an interest

24  in the outcome of the case or instead whether the witness has

25  no interest in the outcome of this case.

1      You are not required to reject the testimony of an

2      interested witness should you find anyone as an interested

3      witness or accept the testimony of a witness who has no

4      apparent interest in the outcome of the case.

5      You may, however, consider whether an interest in

6      the outcome or a lack of interest in the outcome affects the

7      truthfulness of the witness' testimony.  Remember, again,

8      there is no legal presumption that apparently interested

9      witnesses lie just as there is no legal presumption that an

10     apparently disinterested witness tells the truth.

11     You may consider whether a witness has been

12     convicted or engaged with the criminal authorities and

13     whether if so and to what extent if any it affects the

14     truthfulness of that witness' testimony here.

15     You are not to reject the testimony of any witness

16     who has perhaps had run-ins with the law at an earlier time,

17     convictions or other types of activities of a criminal

18     nature.  You may, however, consider whether the witness'

19     criminal conviction or background or conduct has affected or

20     has affected here the truthfulness of that witness'

21     testimony.

22     You may consider whether or not a witness makes

23     statements at this trial that are inconsistent with each

24     other.

25     You may also consider whether a witness at this

JC-F                    **JUDGE'S CHARGE**

1    trial made previous statements that are inconsistent with the
2    testimony rendered in court.

3            You may also consider whether a witness testified
4    to a fact here at trial that the witness omitted to state at
5    a prior time when it would have been reasonable and logical
6    for the witness to have stated that or those facts.

7            In determining whether it would have been
8    reasonable or logical for the witness to have stated, omitted
9    facts you may consider whether the witness' attention was
10   called to the matter or whether and/or the witness was
11   specifically asked about that matter.

12           If a witness has made such inconsistent statement
13   or left out, made omissions, you may consider whether and to
14   what extend they affect the truthfulness or accuracy of that
15   witness' testimony here at trial.

16           Remember, the contents of a prior inconsistent
17   statement are not proof of what happened.  You may use
18   evidence of prior inconsistent statement only to evaluate the
19   truthfulness or accuracy of the witness' testimony given here
20   at this trial.

21           You may consider whether a witness' testimony is
22   consistent with testimony of other witnesses or with other
23   evidence in the case.  If they were inconninencies by or
24   among witnesses you may consider whether they were
25   significant inconsistencies related to important facts or

CO-F                    **JUDGE'S CHARGE**

1  instead were the kind of minor inconsistencies that one may

2  readily expect from a multitude of witnesses and the passage

3  of time.

4        In this case you have heard the testimony of

5  police witnesses.  You already know that the police are too

6  be given the same evenhanded scrutiny, objectivity and

7  critique as any lay witness.  No more.  No less.

8        You have heard testimony about the prosecutor

9  speaking to a witness about the case before the witness

10  testified here at trial.  There is nothing abscend of that

11  preparation of witness prior to calling witnesses to sit on

12  the witness stand by an attorney.  It's considered as good

13  practice and no aspersion should be cast upon either the

14  District Attorney or the defense counsel in having prepped,

15  if I can use the word, a witness, prepared that is, the

16  witness before the witness took the witness stand.

17        You have heard also that a witness read certain

18  materials pertaining to the case before the witness testified

19  at trial.  Once again the Court --- the law does not prohibit

20  a witness from doing so.

21        Now, some particular conflicting testimony that

22  you will have to take under consideration, you will recall

23  that the police testimony is such that Mr. Delgado gave some

24  statements one of which was the video that you saw and the

25  other one which was a written statement.  And the police

JO-F          **JUDGE'S CHARGE**

1    maintains that prior to eliciting that statement, that is the

2    written statement, they gave certain cautions to the

3    defendant and he understood them.  You heard from the

4    defendant that that didn't happen exactly the way that i just

5    depicted, but rather he was asked to make a written statement

6    and then thereafter was given the warnings that should have

7    been offered before he was invited to make his statement.

8              Under our law before a person in custody may be

9    questioned by the police or an Assistant District Attorney

10   that person first must be advised of his or her rights;

11   second, must understand those rights; and third, must

12   voluntarily waive those rights and agree to speak to the

13   police or to a District Attorney.  If any one of these three

14   conditions is not met a statement made in response to

15   questioning was not voluntarily; and therefore, you must not

16   consider it.

17             There is no particular point in time that police

18   or a District Attorney are required to advice a defendant in

19   custody of his or her rights so long as they do so before

20   questioning begins.  A defendant in custody needs to be

21   advised only once of the rights regardless of how many times

22   or to whom the defendant speaks after having been given such

23   advised.

24             While there are no particular words that the

25   police or the District Attorney are required to use in

JO-F

1    advising a defendant in custody, in sum and substance the

2    defendant must be advised:  (1) did he or she have the right

3    to remain silent; (2) did anything he or she says may be used

4    against him or her in a court of law; (3) that he or she has

5    the right to consult with a lawyer prior to answering any

6    question and the right to the presence of a lawyer during any

7    questioning; and (4) that if he or she cannot afford a

8    lawyer, if that is so, one will be provided for him or her

9    prior to any questioning.

10    Before you may consider as evidence a statement

11    made in this case by Mr. Delgado in response to questioning

12    you must find beyond a reasonable doubt that Mr. Delgado was

13    advised of his or her rights, understood those rights,

14    voluntarily waived those rights and agreed to speak to the

15    police or an Assistant District Attorney.  If you do not make

16    such findings then you must disregard the statements and not

17    consider it.

18    We have an expert witness, the doctor from the

19    medical examiner's office.  Whenever there are matters, what

20    we call in the law beyond the kin of jury, that is beyond the

21    common knowledge as lay person like ourselves to deal with

22    something, in this case medical type testimony, the Court is

23    entitled and has in this case to impanel or recognize in the

24    witness box a person as an expert.  And you will recall we

25    did that with respect to the medical examiner, and you will

JO-F                    **JUDGE'S CHARGE**

1    recall that the medical examiner offered her opinion as to

2    certain matters, technical medical forensic as you yourself

3    saw.

4            The rule is this, if you find evidence different

5    from what the expert relied upon to give and to formulate and

6    to pronounce in court expert opinion, you are at perfect

7    liberty if you find different basis for what it was testified

8    to disregard totally the expert's opinion.  On the other hand

9    as well, if you find from the totality of all the evidence in

10   this case, facts different again from the facts relied upon

11   by the expert, you are at perfect liberty to disregard

12   likewise that expert's opinion.

13           We have other types of witnesses.  We have the

14   defendant.  He testified on his own behalf.  Didn't have to

15   do it.  He did it.  A defendant is, of course, an interested

16   witnesses since he has an interest in the outcome of the

17   trial.  You may, as jurors, wish to keep such interest in

18   mind in determining the credibility and the weight to be

19   given to Mr. Delgado's testimony.

20           Remember, a disinterested witness on the other

21   hand is one who has no interest or an apparent no interest in

22   the outcome of the trial.  A factor you likewise may wish to

23   consider in determining the credibility and weight to be

24   given to that or those particular witnesses.

25           In summary, you should not reject the testimony of

1   an interested witness merely because of such interest nor

2   should you accept the testimony of the disinterested witness

3   merely because of the disinterest.

4                   Again, it's repeated to you there is no real

5   presumption whatsoever that an apparently interested witness

6   lies such as there is no apparent reason whatsoever that an

7   apparently -- let me rephrase that.  Just as there is an

8   apparently disinterested witness tells the truth -- I will

9   repeat that.  No legal presumption whatsoever that an

10  apparently interested witness lies just as there is no

11  apparently -- apparently there is no --

12                  MR. CANTOR:  Legal presumption.

13                  THE COURT:  I can't see to get over it.

14                  No legal presumption that an apparently

15  disinterested witness tells the truth.

16                  Presumption.  You know as he sits there, right, he

17  is presumed innocent.  That presumption stays with him

18  throughout the trial.  You all promised regularly when the

19  Court inquired of that.  He still enjoys it.  He enjoys it at

20  this moment.  When you go into the jury room you begin by

21  saying Mr. Delgado is presumed innocent, and that presumption

22  still stays with him unless and until a jury in its wisdom

23  in deliberation, sequestered alone in the jury room decides

24  because of the evidence that has been played on the table to

25  strip away that presumption, to take off that cloth.

JO-F                    **JUDGE'S CHARGE**

1       The burden, of course, never shifts.  He has no

2   obligation to do anything.  You know that.  The burden is

3   totally on the state.  Totally on the government.  Totally on

4   the People to convince you in the first instance beyond a

5   reasonable doubt, which we will explain momentarily, that

6   burden never shifts.  No defendant is required to prove

7   anything let alone his innocence.  And each element of the

8   crimes to be submitted to you, as will be defined

9   momentarily, must be proven by the People beyond a reasonable

10   doubt.

11       There have been some verbal exchanges during the

12   course of this trial between counsel, between the Court and

13   counsel.  You disregard those totally.  Disregard those.

14   They have nothing to do with evidence in this case.  They are

15   not to be constituted as evidence that colloquy back and

16   forth.

17       Attorneys have the obligation, indeed it is

18   commendable if it's done appropriately, to be exuberant, to

19   be enthusiastic for what it is that he or she represents and

20   we have seen examples of that during the course of the trial.

21   Never should that be held against any party at trial.  It's

22   just a give and take of the fire.  Let us say that often

23   times at trial you get caught up in the enthusiasm of

24   representing different interest, different body and different

25   expectations.

JO-F                    **JUDGE'S CHARGE**

1          The Court likewise had colloquy.  Once again, the

2     Court's ruling for or against Mr. Cantor or Mr. Rosenfeld as

3     to objections sustaining them or not, as the case may have

4     been, should never be considered by you as any type of

5     leaning by the Court one way or the other.  Attorneys have

6     obligations to stand and to object.  You've seen that.  And

7     the Court's ruled; you've seen that.  And, therefore, you are

8     to create no aspersion as to any counsel who is exercising

9     what he should be doing, the right to object and the right to

10     see proper procedure is to follow it.

11          With regard to certain suggestions that may have

12     come out along those issues about witnesses who are not here

13     and so forth and so on, the People have no obligation

14     whatsoever to produce any other witness except for those they

15     wished to produce, and in the order they wish to produced.

16          You heard reference to certain technical matters,

17     legal matters, Sandoval ruling, and you heard the word parol

18     or on parol.  You know the defendant, it's come out, has been

19     incarcerated for many months prior to this trial, three

20     years, 30 months I should say.  They were certain comments

21     made about whispering here at the bench.  I assure you none

22     of that is evidence and you are not to consider it and should

23     not sway you in anyway.

24          And for the record, the police officer did bend

25     over and said, must I answer that?  And I said, yes.  That

1  was whispered, I guess, and as you can see it was not

2  anything to affect one way or the other the outcome of this

3  trial, and you already know the Court has no feeling as to

4  the outcome of the trial.  That's why you are here.

5          The rule, reasonable doubt.  Let us go over again

6  what does the law mean by reasonable doubt.

7          What is a reasonable doubt?

8          Reasonable doubt is a doubt for which you can give

9  a reason and at the same moment you believe yourself acting

10  reasonably in entertaining that doubt in light of what has

11  been presented to you.

12          Let us repeat.  Reasonable doubt is a doubt for

13  which a reason can be given and at the same moment you

14  believe that you are acting reasonably in entertaining that

15  doubt.  Not based on a guess or surmise some vague feelings

16  not used to do what might be unpleasant to convict someone of

17  a very high crime.

18          It's not a requirement of proof beyond all doubt.

19  It doesn't mean that the People must come here and proof

20  guilt to some impossible status beyond a shadow of a doubt as

21  in television.  Beyond a mathematical earnestly or scientific

22  certitude.  Impossible standard.

23          Proof of guilty beyond a reasonable doubt is a

24  doubt for which a reason can be given and at the same time

25  that you entertain that doubt you believe you are acting

JO-F                **JUDGE'S CHARGE**

1   reasonably in light of what has come forward.  It's not

2   preponderance of the evidence; that you know is the standard

3   in the civil side of our court.  Rather it's the highest

4   standard we have, proof of guilt beyond a reasonable doubt.

5           Therefore, the standard of reason must always

6   prevail and when you are convinced, you have no doubt in

7   reaching defendant's guilt, that is sufficient and you must

8   come back and find him guilty of any one or more of the

9   crimes as the Court will further explain for your

10  consideration of it.

11          On the other hand, if your minds are wavering and

12  you have a reasonable doubt arising out of the credibility,

13  evidence or lack of insufficiency of such evidence, the

14  benefit of that doubt must be given to the defendant and your

15  verdict must be not guilty as to any one or more or all of

16  the crimes that the Court will be giving to you for your

17  consideration.

18          Momentarily, subject to punishment, you already

19  know all about that.  It has nothing to do with your fact

20  finding.  You find facts.  You come back to a decision.  You

21  make your verdict.  You are thanked and you are excused.

22          Subject to punishment, if any punishment is to be

23  made out here or what kind of punishment if indeed any

24  punishment needs to be meted out.  It's not for to you

25  speculate, not to burden, not to overpower you, not to come

JO-F                    **JUDGE'S CHARGE**

1   up during the course of your deliberations.  Nothing

2   whatsoever to do with your deliberations.

3            Now, we've come to the second part of the charge.

4   The Court will instruct you with respect to the material

5   elements with which the defendant has been charged in being

6   the three crimes that we are speaking of.

7            Remember, the Court does not have to marshall

8   evidence or any referenced evidence the Court should make

9   should not be considered by you more important that all of

10  the evidence.  You know all of the evidence, all of the

11  testimony, all of the exhibits and the stipulations must be

12  considered by you.

13           Now, with respect to the three crimes that the

14  Court will be assigning to you for your consideration is

15  murder in the second degree, manslaughter in the first

16  degree, criminal possession of a weapon in the fourth degree.

17           With respect to the first two counts, murder in

18  the second degree and manslaughter in the first degree, which

19  you will consider in the alternative, and the Court will

20  explain that to you momentarily, the defendant has raised the

21  defense of justification.  More commonly known as

22  self-defense.

23           The defendant, however, is not required to prove

24  that he was justified.  It is the People's who are required

25  to proof beyond a reasonable doubt that the defendant was not

1    justified in each of those strikes, those five strikes that

2    you heard during the course of testimony.

3                Under our law a person may use deadly physical

4    force upon another when and to the extent that he is

5    reasonably believing it to be necessary to defend himself

6    from what he reasonably believes to be the use of imminent,

7    deadly physical force against him.

8                (Continued onto the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Let's go over some terms.  Deadly

2    physical force means physical force which under the

3    circumstances in which it is used, is readily capable of

4    causing death or other serious physical injury.

5        Serious physical injury means impairment of a

6    person's physical condition which creates a substantial

7    risk of death, or which causes death or serious and

8    protracted disfigurement, protracted impairment of the

9    health or protracted loss or impairment of the function of

10   any bodily organ.

11       The determination of whether a person reasonably

12   believes deadly physical force to be necessary to defend

13   himself from what he reasonably believes to be the use or

14   imminent use of deadly physical force by another individual

15   against him must meet a two-test application that you must

16   give that applies to this case:  One, the defendant in this

17   case Mr. Delgado must have actually believed that Mr. Sosa

18   was using or was about to use deadly physical force against

19   him, and that the defendant Mr. Delgado's own use of deadly

20   physical force in each of those five knife blows was

21   necessary to defend himself from deadly physical force;

22   second, a reasonable person in the defendant's position

23   knowing what the defendant knew, and being in the same

24   circumstance would have had those same beliefs about the

25   use of deadly physical force against him.

1            Thus, under our law of justification, it is not

2    sufficient that the defendant honestly believed in his own

3    mind that he was faced with defending himself against the

4    use or imminent use of deadly physical force against him.

5    An honest belief no matter how genuine or sincere may yet

6    be unreasonable.  To have been justified in the use of

7    deadly force, the defendant Mr. Delgado, you must have

8    honestly believed that each of those strikes as necessary

9    to defend himself from what he believed honestly to be the

10   use of imminent physical deadly force by Mr. Sosa against

11   him, and a reasonable person in the defendant's position

12   knowing what the defendant knew and being in the same

13   circumstances would also have believed.

14           On the question of whether the defendant

15   reasonably believed that deadly physical force was

16   necessary to defend himself from what he reasonably

17   believed to be the use or imminent use of such force

18   against him by Mr. Sosa, it does not matter that the

19   defendant was or may have been mistaken in such belief,

20   provided that such belief was both honestly held and

21   reasonable, notwithstanding the defendant would not be

22   justified in using deadly physical force under any of these

23   circumstances, one, the defendant would not be justified in

24   using deadly physical force if he, Mr. Delgado in this

25   instance, was the initial aggressor.

1  Initial aggressor means the person who first

2  attacks or threatens to attack.  That is the first person

3  who uses or threatens the use of imminent offensive

4  physical force.  The actual striking of the first blow or

5  inflicting of the first wound; however, does not

6  necessarily determine who was the initial aggressor.

7  A person who reasonably believes that another is

8  about to use deadly physical force upon him need not wait

9  until he is struck or wounded.  He may in such

10  circumstances be the first to use deadly physical force so

11  long as he reasonably believed it was about to be used

12  against him.  He is then not considered to be the initial

13  aggressor even though he is the one who strikes the first

14  blow or inflicts the first wound.  Arguing, use of abusive

15  language, calling a person names, any of those types of

16  things, unaccompanied by physical threats or acts does not

17  make a person an initial aggressor and does not justify

18  physical force.

19  Two, the defendant would not be justified in

20  using deadly physical force if he knew that he could with

21  complete safety to himself avoid the necessity of using

22  deadly physical force by retreating from the circumstances.

23  Three, the defendant would not be justified if

24  his conduct was provoked by the defendant himself with

25  intent to cause a physical injury.

1    In this case, if you so find on Mr. Sosa, the

2    People are required to prove beyond a reasonable doubt that

3    this defendant was not justified in using deadly physical

4    force.   It is thus an element of each of the crimes that we

5    will be speaking about.   As a result, if you find the

6    People have failed to prove beyond a reasonable doubt that

7    the defendant was not justified, then you must find the

8    defendant not guilty of all counts.

9         With respect to the three crimes that we will now

10    be taking, murder in the second degree, the indictment

11    reads the defendant David Delgado on or about December 25,

12    2009, in the county of the Bronx, with intent to cause the

13    death of a person, Mr. Sosa, did cause the death of George

14    Talarvera, Mr. Sosa by stabbing him with a knife, this is

15    covered by Penal Law 125.25 (1) which quote reads, a person

16    is guilty of murder in the second degree when, with the

17    intent to cause the death of another person, he causes the

18    death of such person.

19         The term intent used in this definition has its

20    own special meaning.   Intent means conscious aim or

21    objective.   Thus a person acts with the intent to cause the

22    death of another when that person's conscious objective or

23    purpose is in fact to cause the death of another.

24         In order for you to find the defendant Mr.

25    Delgado guilty of this particular crime, murder in the

1    second degree, the People are required to prove to your

2    satisfaction from all of the evidence in this case and

3    beyond a reasonable doubt the following three elements:

4    One, that on or about this same date in this same county,

5    this defendant Mr. Delgado caused the death of Mr. Sosa;

6    two, the defendant did so with the intent to cause the

7    death of Mr. Sosa; three, that the defendant was not

8    justified in his actions.

9         Therefore, if you find that the People have

10    proven beyond a reasonable doubt each of those three

11    elements, you must find the defendant guilty of the crime

12    of murder in the second degree as charged in the first

13    count that the Court is submitting to you.

14         On the other hand, if you find that the People

15    have not proven beyond a reasonable doubt either one or

16    more of those elements, you must find the defendant not

17    guilty of the crime of murder in the second degree.

18         The second count the Court submits to you is

19    manslaughter in the first degree.  This you will consider

20    in the alternative as the Court will further explain and as

21    it will appear on the jury sheet.

22         The second count manslaughter in the second

23    degree, the indictment reads as follows --

24         MR. CANTOR:  Manslaughter in the first degree.

25         THE COURT:  Thank you, Mr. Cantor.

1        MR. CANTOR:  You're welcome, your Honor.

2        THE COURT:  Strike that.  The defendant, David

3   Delgado on or about December 25, 2009, in the county of the

4   Bronx did cause the death of George Talarvera, Mr. Sosa

5   while acting with intent to cause serious physical injury

6   to that person by stabbing him with a knife.  This is

7   covered by Penal Law Section 125.20 (1) quote, a person is

8   guilty of manslaughter in the first degree when, with

9   intent to cause serious physical injury to another person,

10   he causes the death of such person.

11        Serious physical injury means impairment of

12   physical condition which creates a substantial risk of

13   death, or which causes the death or serious and protracted

14   disfigurement, protracted impairment or protracted loss or

15   impairment of the function of any bodily organ.

16        As you already know, intent likewise as we've

17   already gone over, means any conscious objective or

18   purpose.

19        Thus a person acts with intent to cause serious

20   physical injury to another when that person's conscious

21   objective or purpose is to cause serious physical injury to

22   another.

23        In order for you to find the defendant guilty,

24   Mr. Delgado of this particular crime, manslaughter in the

25   first degree, the People are required to prove from all of

1    the evidence in the case beyond a reasonable doubt the

2    following three elements:  One, that on or about this same

3    date in this same county, this same defendant Mr. Delgado

4    caused the death of Mr. Sosa; two, that the defendant did

5    so with the intent to cause serious physical injury to Mr.

6    Sosa; three, that the defendant was not justified in his

7    actions.

8         Therefore, if you find that the People have

9    proven beyond a reasonable doubt each of those elements,

10   you must come back and find him guilty of the crime of

11   manslaughter in the first degree as charged.

12        If on the other hand, you find that the People

13   have not proven beyond a reasonable doubt either one or all

14   of those elements, any one of them is sufficient, just like

15   in the murder charge, then you must come back and find the

16   defendant not guilty of the crime of manslaughter as

17   charged in the second count.

18        Thirdly and finally, criminal possession of a

19   weapon in the fourth degree.  Let me just to refresh you,

20   with regard to murder in the second degree, remember that's

21   intent to cause death, which does cause death.

22        With regard to manslaughter in the first degree,

23   it's intent to cause serious physical injury which not

24   withstanding ends up causing death.  That's the

25   distinguishing feature between those two crimes of murder

1    in the second degree and manslaughter in the first degree,

2    which the Court invites you to consider in the alternative.

3    This Court will have more to say in a moment.

4         And the final criminal possession of a weapon in

5    the fourth degree.  The indictment reads the defendant,

6    David Delgado on or about December 25, 2009, in the county

7    of the Bronx did possess a knife with intent to use the

8    same unlawfully against another.

9         You already know from an earlier instruction

10   there's no requirement for the People to bring in that

11   knife, to have recovered that knife.  It's sufficient if

12   you believe beyond a reasonable doubt that a knife was used

13   that night and was used in the manner in which it was

14   claimed to have been used.

15        Criminal possession of a weapon in the fourth

16   degree, the knife, covered by Section 265.01 (2) of the

17   Penal Law, a person is guilty of criminal possession of a

18   weapon in the fourth degree when that person knowingly

19   possesses a knife or other dangerous or deadly instrument

20   or weapon, here we are only talking about the alleged

21   knife, with intent to use same unlawfully against another.

22        Possess means to have physical possession of or

23   to otherwise exercise dominion and control over tangible

24   piece of property, the knife, if you so believe.

25        A person knowingly possesses the knife when that

1   person is aware that he is in possession of the knife.

2            Intent you already know means conscious objective

3   or purpose.  Thus a person acts with intent to use a knife

4   unlawfully against another when his or her conscious

5   objective or purpose is to use it unlawfully against

6   another.

7            In order for you to find the defendant guilty of

8   this particular crime, the People are required to prove to

9   your satisfaction and from all of the evidence in the case

10  beyond a reasonable doubt, each of the following three

11  elements:  One, that on or about this same date in this

12  same county, this same defendant, Mr. Delgado possessed a

13  knife; two, that the defendant did so knowingly; three,

14  that the defendant did so with the intent to use it

15  unlawfully against another.

16           Therefore, if you find that the People have

17  proven beyond a reasonable doubt each of those elements,

18  you must find the defendant guilty of the crime of criminal

19  possession of a weapon in the fourth degree as charged.

20           On the other hand, if you find that the People

21  have not proven beyond a reasonable doubt any one or more

22  of those elements, you must find the defendant not guilty

23  of the crime of criminal possession of a weapon in the

24  fourth degree.

25           Now, ladies and gentlemen of the jury, thank you

1    for your patience.  I want to take a moment to confer with

2    both counsel to see if there's something the Court perhaps

3    did not state as clearly as it should have stated or

4    omitted to say or something that should be corrected.  So

5    give us just a few moments.

6            Counsel, madam reporter.

7            (Whereupon, the following takes place, on the

8    record, at the sidebar, among the Court, the assistant

9    district attorneys, defense counsel, and outside the

10   hearing of the defendant and the jury.)

11           THE COURT:  Do you waive the presence of your

12   client?

13           MR. CANTOR:  I do.

14           THE COURT:  Very good.  Gentlemen, now, any

15   omissions, corrections?

16           MR. CANTOR:  Exceptions.

17           THE COURT:  Exceptions?

18           MR. CANTOR:  You told this jury -- I'd like to be

19   where the prosecutor is, Judge.

20           THE COURT:  Can you change, please?

21           MR. CANTOR:  You told this jury that a defendant

22   only be advised of his constitutional Miranda rights one

23   time and waiving such before making a voluntary statement.

24   What you didn't tell the jury is if they credit the

25   defendant's version that he made a written statement, and

1    it was only after that written statement that he was read

2    and signed a Miranda waiver form that a second

3    administration of Miranda rights would have to be given

4    before this jury could conclude that the videotape

5    statement of my client was voluntary.  What you told this

6    jury was a misstatement of law.

7              If they credit my client's testimony he was only

8    Mirandized after he made the written statement, then that

9    may very well carry over, taint the administration of

10   Miranda rights as reflected on the videotape by the

11   assistant district attorney.  You must most respectfully

12   suggest and inform this jury that if they credit the

13   defendant's testimony that he was only Mirandized after the

14   written statement, it would require a second administration

15   of Miranda rights by an assistant district attorney and

16   knowing waiver thereof before they could consider the

17   videotape statement of my client as evidence.

18             THE COURT:  Okay.

19             MR. CANTOR:  There are multiple administrations

20   should my client's testimony be credited, and that is not

21   to say that even the administration of a second Miranda

22   warning by an assistant district attorney would remove the

23   taint should they believe my client's testimony that he was

24   Mirandized after the written statement.  It would be a

25   obvious statement that the People versus Bethea that would

1    run afoul, a mandate of the U.S. Supreme Court's decision

2    in Lyons versus Oklahoma promulgated the doctrine, the cat

3    out of the bag, once the cat is out of the bag, absent

4    attenuation, no further statements are admissible as

5    voluntary so I make that exception.  I so make that

6    request.

7               THE COURT:  Mr. DA.

8               MR. ROSENFELD:  I believe what the Court read to

9    the jury is what's written in the CJI.

10              THE COURT:  I believe the Court did say the

11   context of what he said and what you maintained.

12              MR. ROSENFELD:  I think any more would be

13   marshaling the evidence.  I think the CJI is sufficient.

14              The only thing People would request is you didn't

15   mention spontaneous statements.

16              THE COURT:  I did not because he was in the car.

17              MR. ROSENFELD:  Right.  Spontaneous statements do

18   not require Miranda.  The jury may consider it if they

19   believe the officer did not influence the defendant or ask

20   any questions, they may accept that without Miranda

21   warnings.

22              THE COURT:  All right.  As to your objection, I

23   think it was sufficient what I gave.

24              MR. CANTOR:  Note my exception.

25              THE COURT:  Your exception is noted.

1          MR. CANTOR:  And my request?   I made a request

2     for a charge, a curative charge.

3          THE COURT:  Yes, denied.

4          MR. CANTOR:  Excepted.

5          THE COURT:  And the application about what took

6     place in the car, I'm not going to address that.

7          MR. CANTOR:  Secondly, in defining intent, you

8     never told this jury what -- in instructing this jury on

9     intent, you never told this jury what the courts have told

10     juries concerning intent virtually from time and

11     memorialize that intent is the secret, silent operation of

12     one's mind, and that we do not have an X-ray machine to

13     peer into a defendant's mind.  An intent can only be

14     determined by a defendant's statements, the circumstances

15     surrounding the incident.  Period.

16          That has been the standard.  That has been a

17     standard instruction since I've been practicing and I take

18     exception to your charge on intent.  That's the key element

19     in the defendant's case, that he did not and was not posed

20     of the intent to kill, nor to inflict serious physical

21     injury.

22          We ask your Honor to make a charge to this jury

23     that indeed intent is the secret, silent operation of one's

24     mind and intent can only be determined by a defendant's

25     statements and the circumstances attending to the fatal

tr/g     Proceedings

 1     event.

 2                     MR. ROSENFELD:  Your Honor, the Court read from

 3     the CJI and certainly tells the jury what the meaning of

 4     intent is.

 5                     THE COURT:  Intent on three occasions and they

 6     were all from the CJI.

 7                     So your exception is noted.

 8                     MR. CANTOR:  And my request is denied?

 9                     THE COURT:  Yes.  DA, anything?

10                     MR. ROSENFELD:  No.

11

12                     (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1     (Whereupon, the following takes place on the

2     record, in open court, in the hearing and presence of the

3     jury.)

4          THE COURT:  Madam forelady, ladies and gentlemen

5     of the jury, when you enter the jury room to deliberate you

6     will have various opinions advanced by various number of your

7     fellow jurors.  You must make every effort to harmonize,

8     crystalize your thought so you speak as one as to the fact of

9     this particular case.  You must not go into the jury room

10    with a closed mind.  That's why the Court is urging you to

11    keep an open mind even at this second or at this moment as to

12    the guilt or none guilt of this gentleman without listening

13    to your fellow jurors and then coming to a final

14    determination.

15         You have every right, if you believed you are

16    right, to stick to your argument and your conclusions.  All

17    that's being said is not to close your mind so as to

18    prejudice the outcome conclusion to be considered by you, to

19    be arrived by you.  To at least listen to the other jurors

20    with courtesy, considering just along in the interest of

21    coming to a fair, honest decision in the interest of justice

22    and under the law.

23         Make every effort consistent with your conscious

24    and evidence to harmonize, crystalize who speaks truth.  This

25    is the question that you are to determine.  You do so to the

1    best of your abilities.  You will apply commonsense, good

2    judgment, impartially fairness.  You do not let yourself be

3    swayed by sympathy or prejudice in any way in analyzing the

4    testimony.  Decide this case wholly, totally, solely and

5    exclusively on the evidence or lack or insufficiency thereof.

6              Your verdict shall be as follows:

7              Murder in the second degree:  Guilty or not

8    guilty.  If you find him guilty of that you stop.  You do not

9    consider manslaughter in the first degree.  You consider

10   criminal possession of a weapon in the fourth degree.

11             Let us assume you find him not guilty of murder in

12   the first degree you --

13             MR. ROSENFELD:  Sorry.  I think you meant second.

14             THE COURT:  Murder in the second degree you then

15   proceed to manslaughter in the first degree in the

16   alternative and you make your determination there.  If you

17   find him not guilty of manslaughter in the first degree then

18   you proceed to criminal possession of a weapon in the fourth

19   degree.

20             So you consider murder in the second degree, and

21   manslaughter in the first degree in the alternative.  And if

22   you find him guilty of either one you stop, that's fine.  If

23   you find him not guilty of both of them then you just

24   consider criminal possession of a weapon in the fourth degree

25   as indicated on the verdict sheet.

1       Let me share the verdict sheet with counsel to see

2   if they approve of the verdict sheet.

3           Counselors, would you come back please.

4           (Whereupon, the following takes place on the

5   record, at side bar, out of the hearing of the jury.)

6           THE COURT:  Mr. Cantor.

7           MR. ROSENFELD:  The defendant's presence?

8           THE COURT:  You waive?

9           MR. CANTOR:  Yes.

10          As to murder in the second degree --

11          THE COURT:  Murder in the second degree first

12  count.

13          MR. CANTOR:  I have no problem with the annotation

14  if you find the defendant guilty of count one stop and report

15  your verdict to the Court.  If you find defendant not guilty

16  as to count one then consider count two.  However, under

17  count two, manslaughter in the first degree, you must have

18  another annotation.  If you find the defendant guilty of

19  count two, stop.  However, if you find the defendant not

20  guilty of count two, manslaughter in the first degree, go on

21  to consider the third count --

22          THE COURT:  Well, in any case --

23          MR. CANTOR:  -- criminal possession of a weapon in

24  the fourth degree.

25          THE COURT:  Just for clarification, with regard to

1     the third one, they consider it in either case.

2                     MR. ROSENFELD:  That's not what you are saying in

3     the first part.

4                     MR. CANTOR:  That's not what I am saying.  This

5     annotation which is in murder in the second degree is

6     correct.  Another annotation which is required under

7     manslaughter in the first degree along the same line.  If you

8     find the defendant guilty as to count two stop and report

9     your verdict to the Court.

10                     THE COURT:  No, they still have to consider

11    criminal possession.

12                     MR. CANTOR:  They don't.  It's a conclusory count.

13    You see, it's a very mischievous count.  But look at this, if

14    you have guilty verdict either on count one and count two and

15    not guilty verdict on count three, you are going to have a

16    repugnant verdict because each of the first two count is a

17    constituently element requiring the cause of way by way of a

18    knife.  But if this jury finds either count one to result in

19    a guilty verdict and count two manslaughter in the first

20    degree of a guilty verdict, but goes on to consider count

21    three and finds the defendant not guilty, that negates the

22    position of the knife which is an element of man one and

23    element of verdict two.

24                     THE COURT:  You want to say?

25                     MR. ROSENFELD:  I don't think possession of the

1   weapon, attempted, is an element of either of those two

2   crimes, but your Honor say -- just said as to count No. 1,

3   murder in the second degree, that if you find the defendant

4   to be guilty to stop and you are then saying go to Count

5   No. 3.  Here it says stop and report.

6           THE COURT:  Yes, I know.

7           MR. ROSENFELD:  So if you can correct that.

8           MR. CANTOR:  Count three.

9           THE COURT:  It's suggesting --

10          MR. CANTOR:  It's mischievous.

11          THE COURT:  I agree with you.  When I say I agree

12   with you I mean about the importance of this.  Here they stop

13   and we forget about criminal possession.

14          MR. CANTOR:  Criminal possession of a weapon in

15   the fourth degree.  What I am --

16          THE COURT:  They can still consider criminal

17   possession of a fourth independent of these two elements.

18          MR. CANTOR:  What happens -- excuse me.  The

19   element of both murder and manslaughter is death by stabbing.

20          THE COURT:  Yes.

21          MR. CANTOR:  What if they find he didn't commit

22   the crime, but contained a weapon and used against another?

23   That negates the element of murder two and man one.

24          THE COURT:  Now, are you saying here stop?

25          MR. CANTOR:  Stop.

1     THE COURT:  End of story?

2     MR. CANTOR:  If you find not guilty there.

3     THE COURT:  If guilty stop end of story?

4     MR. CANTOR:  Right.

5     THE COURT:  If you find not guilty.

6     MR. CANTOR:  Go to two, stop.

7     THE COURT:  If you find not guilt on one to stop

8  end of story.

9     MR. CANTOR:  You find not guilty on two --

10    MR. ROSENFELD:  Go to three.

11    MR. CANTOR:  -- end of story.  Delete three.

12    THE COURT:  I can go with that.

13    MR. ROSENFELD:  I see what you are saying.

14    THE COURT:  I thought about that last night.

15    MR. ROSENFELD:  Okay.

16    MR. CANTOR:  Delete it.  And you will tell them to

17  stop and report to the Court.  You can tell them that it's

18  the Court's decision in the interest of clarity and lucidity

19  for this jury's deliberations you are withdrawing from their

20  consideration count three of criminal possession of a weapon

21  in the fourth degree, and you just take this -- this

22  annotation and you repeat it on the man one if you find him

23  guilty.

24    THE COURT:  What do you want it to say?

25    MR. CANTOR:  If you find defendant guilty or not

1    guilty, stop, period.

2               MR. ROSENFELD:  So you don't have to repeat

3    anything.

4               THE COURT:  If you find defendant guilty of murder

5    in the second degree stop and report your verdict.

6               MR. ROSENFELD:  That's correct.

7               THE COURT:  And if you find the defendant not

8    guilty as to count one which we just say --

9               MR. CANTOR:  -- go on --

10              THE COURT:  -- to consider count two manslaughter.

11              MR. CANTOR:  Yes.

12              THE COURT:  Now, the annotation?

13              MR. CANTOR:  Look, Judge, this is a very

14   mischievous count, count three.  Very mischievous.  It can

15   lend to an agonistic --

16              THE COURT:  No, they can find -- believe that he

17   had the knife prior to, possessed to justify.

18              MR. ROSENFELD:  That's what I thought.

19              MR. CANTOR:  But no one argued that.  No one

20   argued that, and it's your discretion.  If you think it's

21   confusing or mischievous, and it's a misdemeanor and he

22   already served the maximum sentence on it.

23              THE COURT:  So it should say if you find defendant

24   guilty as to count --

25              MR. CANTOR:  Two.

1        THE COURT:  -- as to count two stop.

2        MR. CANTOR:  If you find the defendant guilty or

3   not guilty as to count two stop.

4        THE COURT:  Well, there is nothing more to do.

5        MR. CANTOR:  Delete three for purposes of clarity.

6        THE COURT:  Sh, sh, sh.

7        MR. CANTOR:  Tell them for purposes of clarity and

8   lucidity in attending the jury deliberations.

9        THE COURT:  So we really don't have to put any

10  little addition there just leave it as that and take that out

11  cause it say goes to two.

12       MR. CANTOR:  Yeah, you are going to correct it.

13  You are going to tell them for clarity --

14       THE COURT:  I am not concern about that.

15       MR. CANTOR:  -- and lucidity.

16       THE COURT:  We agreed on that?  Do you object?

17       MR. ROSENFELD:  So you are going to say I thought

18  along --

19       THE COURT:  This --

20       MR. ROSENFELD:  -- manslaughter in the first

21  degree, if you find him guilty stop, don't go any further.

22  If you find him not guilty you are going to say stop.

23       THE COURT:  No, we don't have to say anything.  We

24  just delete that.

25       MR. ROSENFELD:  By deleting they are going to

1   infer it's proved separate.

2              MR. CANTOR:  If you find guilty on count two,

3   render your verdict accordingly.  After count two you can put

4   a command after that, render your verdict accordingly and

5   then delete three.

6              THE COURT:  As to count two stop and report your

7   verdict to the Court, okay.  You got that?

8              THE CLERK:  No.

9              MR. CANTOR:  Look, do we have another copy of

10  this?  I'll just write it up there.  Can I remark this?

11  Okay.  Give me a moment.

12             THE COURT:  Mark it.

13             (Whereupon, there was a brief pause in the

14  record.)

15             THE COURT:  I can't read what you wrote.

16             MR. CANTOR:  Let me read it out loud.  It says if

17  you find -- if you find guilty or not guilty as to count two,

18  manslaughter in the first degree, stop and report your

19  verdict to the Court.  This is taking out -- you are

20  exercising your discretion.

21             THE COURT:  Yes, another clarity.

22             MR. CANTOR:  To promote clarity and lucidity.

23             THE COURT:  Yes.

24             MR. CANTOR:  That's your discretion.

25             THE COURT:  You have any objection to that?

1          MR. ROSENFELD:  I am trying to read it.

2          (Whereupon, there was a pause in the record.)

3          MR. ROSENFELD:  Again, as the Court just indicated

4     you will explain to the jury for clarity and no other reason.

5          THE COURT:  Yes, yes.  And then we will get

6     together and clean it.

7          MR. CANTOR:  Print up a new one.

8          THE COURT:  And we will mark it.

9          MR. CANTOR:  And I will put my signature on that.

10    Should be fine.  You are welcome.

11         (Whereupon, the following takes place on the

12    record, in open court, in the hearing and presence of the

13    jury.)

14         THE COURT:  All right.  Madam Forelady, and ladies

15    and gentlemen of the jury, the Court in its discretion is

16    going to give two crimes to consider.  Murder in the second

17    degree, we've gone over that.  If you find him guilty you

18    stop, you come back.  If you find him not guilty you go on to

19    manslaughter in the first degree.  Guilty or not guilty you

20    come back.  You don't have to consider the weapon's

21    possession charge, okay.

22         Now, we have a little situation.  We will give you

23    a quick time to get a sandwich or whatever before you begin

24    your deliberations.  Once those sandwich people come back

25    upstairs to the jury room and you have all your jurors, then

1  at that moment you commence your deliberations; do you

2  understand?

3           THE JURY:  Yes.

4           THE COURT:  I will now give you over to the

5  sergeant.  Why don't we say be back here, those who want to

6  go, no later than three o'clock.  The door will be opened.

7  You can just gather and when you have all 12 jurors you may

8  begin your deliberations.

9           The Court stands ready to assist you in any way.

10  After many years of presiding here I can tell you that

11  sometimes the jury asks for testimony of "X," and we bring

12  the jury in and we agree to the testimony of "X," and after

13  half hour of reading "X's" testimony and people shaking their

14  heads cause all that they really wanted to know was what did

15  "X" say about such and such.  So try to narrow your questions

16  so as we can answer promptly.  On the other hand we are

17  prepared to read back the entire trial if you think it's

18  necessary.  So whatever is your pleasure.

19           You may follow the sergeant.  The alternate,

20  please stay in place.

21           (Whereupon, the jury exits the courtroom.)

22           THE COURT:  Madam alternate, you may also go have

23  lunch and then come back here okay.

24           THE JUROR:  Okay.

25           THE COURT:  But see the officer and the sergeant

1      will give you the place that you will be put.

2                      THE JUROR:   Thank you.

3                      THE COURT:   Thank you, ma'am.

4                      (Whereupon, the alternate exits the courtroom.)

5                      THE COURT:   All right.   Having -- the jury having

6      been excused, I would like, just by way of housekeeping,

7      would you both agree after actually marking everything that

8      all of it will be turned over, that is exhibits, to the care

9      of the clerk?   And if needed, with the exception of the tape,

10     if needed, they be sent up and furnished.   Any objections to

11     that?

12                     MR. CANTOR:   I have none as long as I am notified

13     as soon as possible.

14                     THE COURT:   Yes, of course.

15                     MR. CANTOR:   I am now turning over my only exhibit

16     to the clerk.

17                     THE COURT:   But that's the other part.

18                     MR. CANTOR:   I am sorry?

19                     THE COURT:   Please give to the clerk the number

20     where you can be reached at momentarily.   Should you not hear

21     from the Court beginning on a half hour -- starting at 3:30,

22     then call the Court every half hour to see if there is any

23     update.   I will have the clerk to transcribe this verdict

24     sheet and once we have it we will all initial it.

25                     (Whereupon, there is a brief luncheon recess taken

JO-H                    **JUDGE'S CHARGE**

1        and the case adjourned to 3:00 p.m. with the jury to commence

2        deliberations.)

3                    (Continued onto the next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings

1      (Whereupon, the following takes place, on the

2  record, in open court, in the presence of the Court, the

3  assistant district attorneys, defense counsel, the

4  defendant and outside the presence of the jury.)

5      THE COURT:  Good afternoon.  Mr. Clerk.

6      THE CLERK:  Case on trial, People of the State of

7  New York against David Delgado.  Let the record reflect the

8  presence of the district attorney's office, defense

9  attorney and defendant.  Sworn jurors are not present at

10 this time.

11     THE COURT:  All right.  We have before us a note,

12 which the Court marked as its own Exhibit Number 2,

13 "description on what is the elements on murder and

14 manslaughter."  Period.  "We would like to see physical

15 damage photos that were done on Sosa and the sketch of the

16 stab wounds."  You've seen this note?

17     MR. ROSENFELD:  Yes, your Honor.

18     THE COURT:  You've seen it?

19     MR. CANTOR:  Yes.

20     THE COURT:  Both have seen it.  All right.

21     MR. CANTOR:  The sketch and the photographs have

22 been supplied by a court officer --

23     THE COURT:  They have.

24     MR. CANTOR:  -- to the jury.  And with respect to

25 the definition of murder and manslaughter, it's my position

Proceedings                                                              1954

1      that you give the jury the full charge that you initially

2      gave concerning the constituent elements of each and every

3      charge.

4                    THE COURT:  Do you have anything to say?

5                    MR. ROSENFELD:  No, your Honor.  I'll leave it to

6      the Court.

7                    THE COURT:  The Court will give them the

8      elements, yes, on both of those crimes, but I don't think

9      we're going to do it now.

10                    MR. CANTOR:  Judge, it's 12 to 5.

11                    THE COURT:  That's correct.

12                    MR. CANTOR:  It's a ten minute readback.

13                    THE COURT:  Actually, there is a very real reason

14      which is court policy not to go beyond 5 o'clock for

15      reasons having nothing to do with this court of course, but

16      a general order has been issued.  I tried to get an

17      extension, but I was not successful.  So we'll bring the

18      jury out, we'll send them on their way and we'll see them

19      on Monday morning.

20                    MR. ROSENFELD:  Your Honor, the only thing I

21      would appreciate, I would ask the Court to add to the jury

22      to not try to use the Internet or Google to find anything

23      about the case.

24                    THE COURT:  Well, you heard what I say about not

25      being detectives, researchers, all of that business.

Proceedings

1    MR. ROSENFELD:  I understand.  But if you could

2    add --

3    THE COURT:  All right.  I'll add it.

4    MR. ROSENFELD:  It has happened on another case.

5    That's the only reason I bring it to the Court's attention.

6    THE COURT:  All right.  Yes, fine.

7    MR. CANTOR:  Do you have that note?  May I get a

8    copy?

9    THE COURT:  Sure.

10   Handing.)

11   COURT OFFICER:  Jury entering.

12   (Whereupon, the jury entered the courtroom.)

13   THE COURT:  Madam forelady, ladies and gentlemen

14   of the jury.  Mr. Cantor, you may be seated.  Good

15   afternoon.  The Court is in receipt of your note, which the

16   Court marks as its own Exhibit Number 2 indicating

17   "description on what the elements on murder and

18   manslaughter," and then "pictures physical damage that were

19   done on Sosa and the sketch of the stab wounds," both of

20   which have been delivered to you.

21   With regard to the elements, of course we'll give

22   you the elements, but not now.  The day has come to an end.

23   It's the end of the business day for the court.  So we're

24   going to recess until Monday morning at 9:30, Monday

25   morning at 9:30.

Proceedings

1    MR. CANTOR:  Judge, I hate to interrupt.  May we

2    step up with Mr. Rosenfeld?

3    (Whereupon, there was a discussion held, off the

4    record, at the bench, among the Court, the assistant

5    district attorneys, defense counsel, and outside the

6    hearing of the defendant and the jury.)

7    (Whereupon, the following takes place, on the

8    record, in open court, in the presence of the Court, the

9    assistant district attorneys, defense counsel, the

10   defendant and the jury.)

11   THE COURT:  And of course on that day I will give

12   you the elements.  You are to cease your deliberations.

13   You will only commence your deliberations again, madam

14   forelady, when your jury is here.  On Monday morning, we'll

15   prepare to read you back these elements and we will do it,

16   and I direct you all to be here at 9:30.  If you have a

17   problem, sir, you can see the clerk, he will help you.

18   And so I bid you a good weekend.  Remember all

19   the cautions.  No discussions with anyone, not amongst

20   yourselves.  In the unlikely event anyone approaches you,

21   report it to the Court.  Remember you are not detectives,

22   researchers, investigators.  There's no need to check the

23   books or use Google or anything like that to find out

24   information.  The Court has given you everything you need

25   to know or will repeat what it is you asked like the

Proceedings

1  elements in the murder and the manslaughter and anything

2  else you may desire.

3          So that is where we stand.  Have a pleasant

4  weekend.  Come back as I say Monday morning 9:30.  At that

5  time, madam forelady, when all your jurors are gathered,

6  you'll recommence your deliberations.  Alternate likewise

7  is now excused.  Follow the officer.  We'll see you then.

8  If anybody has anything they wish to discuss, they can see

9  the clerk.  Good day.

10          COURT OFFICER:  Jury exiting.

11          (Whereupon, the jury left the courtroom.)

12          THE COURT:  Counselors, call the court every half

13  hour if you're not here.  You don't have to be here at

14  9:30, but do call the court every half hour on the half

15  hour if the court doesn't call you.

16          MR. ROSENFELD:  Have a good weekend.

17          THE COURT:  Make sure we retrieve the jury sheet,

18  the verdict sheet.

19          (Whereupon, the trial is continued and the case

20  is adjourned to Monday, July 9, 2012, at 9:30 a.m.)

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF BRONX :   CRIMINAL TERM - PART:  T-14
 2
     --------------------------------------------- X
 3
     THE PEOPLE OF THE STATE OF NEW YORK,
 4
                                         Indictment #27/2010
 5
           - against -                   Proceedings and Verdict
 6

 7

     DAVID DELGADO,
 8
                             Defendant.
 9
     --------------------------------------------- X
10
                         July 9, 2012
11
                         265 East 161st Street
12                       Bronx, New York 10451

13
     B E F O R E:
14
                 HONORABLE DOMINIC R. MASSARO,
15
                               J U S T I C E
16

17   (Appearances same as previously noted.)

18
                         TRICIA L. ROBINSON, CSR, RPR
19                       Senior Court Reporter

20             (Whereupon, the following takes place, on the

21      record, in open court, in the presence of the Court, the

22      assistant district attorneys, defense counsel, and outside

23      the presence of the defendant and the jury.)

24             COURT OFFICER:  All rise.

25             (Whereupon, the Court entered the courtroom.)
```

Proceedings

1       MR. CANTOR:  Judge, I would like to put something

2   on the record.  It pertains to his dress.

3       THE COURT:  Bring him out.

4       (Whereupon, the defendant entered the courtroom.)

5       THE COURT:  You may be seated.

6       MR. CANTOR:  Friday night, corrections comes to

7   his cell and confiscates all of his property, not just his

8   clothes.

9       THE COURT:  That has nothing to do with this

10  trial.

11      MR. CANTOR:  It certainly does.  I'm not going to

12  have him appear --

13      THE COURT:  One second.

14      MR. CANTOR:  He's in a T-shirt and shorts now.

15      THE COURT:  The seizure of whatever they seized

16  in his cell, that has nothing to do with this case.  You're

17  complaining that's the result of it?

18      MR. CANTOR:  Yes.

19      THE COURT:  Okay.  Fine.

20      MR. CANTOR:  Let me fine tune it a bit.  I'm

21  sorry.  I spoke too broadly.  The result of the

22  confiscation of his clothes presently in the state of a

23  T-shirt and shorts.  I asked him for the reason.  He knows

24  not why.  But I'm certainly not going to have him appear at

25  this critical juncture appearing as if these deliberations

1    are meaningless to him, that he's insouciant, indifferent

2    to what the jury is doing.  I don't know why.  Your Honor

3    doesn't know why.  I dare say the People don't know why.

4                 THE COURT:  Why what?

5                 MR. CANTOR:  The confiscation of his property.

6                 THE COURT:  There was an incident last week, I do

7    not know for certain, but I suspect it might be in

8    connection with that.  But however, anything else you wish

9    to say?

10               MR. CANTOR:  Yes.

11               THE COURT:  Well, you've already said it.

12   Anything else?

13               MR. CANTOR:  Yeah, he says his family can come

14   and bring him clothes this evening.  And I'm certainly not

15   going to have him here, have him appear in front of this

16   jury at this critical juncture.

17               I'm suggesting the following by way of a

18   suggestion:  That your Honor tell in the absence of anyone

19   that you're unable to proceed with the answer to their

20   query or queries on account of a Department of Correction

21   action.

22               THE COURT:  Okay.  Thank you for that suggestion.

23               Anything you wish to say, sir?

24               MR. ROSENFELD:  Yes, your Honor.  People would

25   object to any delay in the court's proceeding.  We're all

Proceedings

1    aware that the jury has been here for quite some time.

2    Many of them are expecting to get back to work immediately.

3              THE COURT:  You may be seated.

4              MR. ROSENFELD:  Defendant is seated.  He's

5    sitting with his shirt, nothing dirty, what happens to be a

6    clean Polo shirt.  I can't see how in any way that would

7    affect the jury's perception.  I would object to the delay.

8    Certainly, Judge, People have no idea about the dress or

9    clothing.

10             THE COURT:  The Court is inclined to accept that

11   line.  I think he's appeared here before without a shirt

12   and tie.

13             MR. CANTOR:  Never when the jury was here.

14             THE COURT:  Oh, yes.

15             MR. CANTOR:  He's had dungarees.  He's never had

16   shorts.

17             THE COURT:  All right.  I will address it.

18             MR. CANTOR:  He is not --

19             THE COURT:  I will address it.  Please be seated.

20   Number one, there's no offense with that T-shirt.

21             MR. CANTOR:  There is.  Tattoos are displayed.

22             THE COURT:  Number two, I think very easily we

23   can camouflage the fact that he has Bermuda shorts, let us

24   say, rather than slacks, and that's just simply by

25   adjusting the position of the seating.  If he is seated at

Proceedings

1   the end where you are now seated, it's impossible to see

2   through that desk.  It will be completely non-objectionable

3   because no one will even know what he's wearing.

4              MR. CANTOR:  I would like a shirt for him.

5              THE COURT:  Well, I'd be happy to get a shirt for

6   him if we have, but we're not in the clothing business.

7              MR. CANTOR:  I understand he's in the business.

8              THE COURT:  I told you how I'm going to resolve

9   it.  Your objection will be noted.

10             MR. CANTOR:  He's not gonna remain in the

11  courtroom.

12             THE COURT:  Who decides that?

13             MR. CANTOR:  He does, Judge.  He can absent

14  himself from the courtroom.

15             THE COURT:  If he wishes, that's his business of

16  course.  I'm telling you what I offer.

17             MR. CANTOR:  Okay.  Can he sit here presently so

18  I can see whether your offer is violated?

19             THE COURT:  I'm sure you can.  Sergeant, please

20  arrange it.

21             MR. CANTOR:  Yes, that's satisfactory.  Now all I

22  need is a long-sleeve shirt.

23             THE COURT:  We don't have it.  And if he keeps

24  his arms down just the way they are I see no tattoos.  He's

25  had short-sleeve shirts before.

Proceedings

```
 1              MR. CANTOR:  Can he pull his arms in?
 2              THE COURT:  So it's up to him to make that
 3    determination.
 4              MR. CANTOR:  He's never had a short-sleeve shirt
 5    in front of this jury.
 6              THE COURT:  That is not true.  He came in one day
 7    without a tie and an open shirt.
 8              MR. CANTOR:  Yes, and a pair of jeans.
 9              THE COURT:  And a pair of jeans, that's true.
10    And he came in another time with jeans or dungarees,
11    however.
12              But let's get over that.  You agree that you
13    cannot see his feet in any way, shape or form?
14              MR. CANTOR:  Can he lower his arms?  Can he move
15    in closer?
16              THE COURT:  He can do whatever he does.
17              MR. CANTOR:  Move in closer please, lean forward
18    a bit.  May he do that?
19              THE COURT:  Yes, he may.
20              MR. CANTOR:  All right, Judge, you're right.
21              THE COURT:  I'm not insensitive to what you're
22    saying, but there's other ways of correcting it.  This is a
23    two minute read before the jury.
24              MR. CANTOR:  A what?
25              THE COURT:  Two or three minute read as you know
```

1   and they will be gone.

2            All right.  Let us bring out the jury.

3            Is that comfortable with you, sir?

4            THE DEFENDANT:  It is.

5            THE COURT:  All right.

6            Both of you have seen this from last week?

7            MR. ROSENFELD:  Same note.

8            MR. CANTOR:  It is.  Did they receive the

9   exhibits back this morning?

10           THE CLERK:  Yes.

11           THE COURT:  Another note from the jury, "Melissa

12  testimony, Tango testimony, David testimony, video and

13  transcript, Sosa and David criminal records of conviction."

14           MR. CANTOR:  Transcript?

15           THE COURT:  If possible.  So they want all the

16  testimony.

17           MR. CANTOR:  What transcript?

18           THE COURT:  Video and transcript.  I guess that's

19  the written statement.  I'll check.  It's video and

20  transcript, Sosa and David.  Anybody want to venture to

21  guess?

22           MR. CANTOR:  I just want you to ask what they

23  mean by the transcript.  I have no problem with Melissa's

24  testimony.

25           THE COURT:  What about David and Sosa?

1              MR. CANTOR:  David and Sosa criminal records of

2     conviction.

3              THE COURT:  If possible.

4              MR. CANTOR:  Of course it's possible.  It's in

5     the record.  But it's the word transcript that throws me.

6     They say video and transcript.

7              THE COURT:  All right.  We'll ascertain it.

8              Let's bring them out.

9              COURT OFFICER:  Okay.

10              THE COURT:  I'm going to give them the answer

11     they wanted on Friday and then we'll address this.

12              COURT OFFICER:  Jury entering.

13              (Whereupon, the jury entered the courtroom.)

14              THE COURT:  Madam forelady, ladies and gentlemen

15     of the jury, the Court is in receipt of your new note which

16     is marked as juror note number two and Court Exhibit Number

17     3.

18              First we'll treat with the note that was left

19     over from the other day where I know you asked for several

20     things, all of which were delivered to you as the case may

21     be, and then you wanted a definition of the elements on

22     murder and manslaughter.  We will do those first.

23              As you know, the Court has submitted to you for

24     your deliberation two charges, murder in the second degree

25     and manslaughter in the first degree.  Each one has three

Proceedings

1    elements which we'll go over as to the law.  You know that

2    you are to consider these charges, murder in the second

3    degree and manslaughter in the first degree in the

4    alternative.  If you find guilty of one, you don't have to

5    address the other.  If you don't find any guilt of course,

6    then there's nothing to report except your verdict of not

7    guilty.

8              Murder in the second degree according to Penal

9    Law 125.25 (1) reads as follows:  A person is guilty of

10   murder in the second degree when, with intent to cause the

11   death of another, he causes the death of such person.

12             Intent means conscious objective or purpose.

13             Thus a person acts with intent to cause the death

14   of another when that person's conscious aim or objective is

15   to cause the death of the other.

16             In order for you to find the defendant Mr.

17   Delgado guilty of this particular crime, the People are

18   required to prove from all of the evidence in this case and

19   to your satisfaction beyond a reasonable doubt the

20   following three elements:

21             One, that on or about this same date, in this

22   same county, this same defendant caused the death of Mr.

23   Sosa; two, that the defendant did so with intent to cause

24   the death of Mr. Sosa; three, that the defendant was not

25   justified in doing so.

1       Therefore, if you find that the People have

2   proven beyond a reasonable doubt each of those three

3   elements, you must find the defendant guilty of the crime

4   of murder in the second degree.

5       On the other hand, if you find that the People

6   have not proven beyond a reasonable doubt any one or more

7   of those three elements, you must return a verdict of not

8   guilty.

9       Manslaughter in the first degree now, again

10  remember, you're considering in the alternative, if there's

11  any guilt at all, manslaughter in the first degree comes

12  under the purview of Penal Law 125. 20 (1) reads as

13  follows:  A person is guilty of manslaughter in the first

14  degree when, with the intent to cause serious physical

15  injury to another, he causes the death of that person.

16  There's the distinguishing feature.  One is the intent to

17  cause death of a person and causes death.  This one,

18  manslaughter in the first degree, is intent to cause

19  serious physical injury, but it results in death.

20      Serious physical injury means impairment of a

21  person's physical condition which creates a substantial

22  risk of death, or which causes the death or serious and

23  protracted disfigurement, protracted impairment of health

24  or protracted loss or impairment of the function of any

25  bodily organ.

1          Intent you already know is conscious aim or

2     objective.

3          Thus a person acts with intent to cause serious

4     physical injury to another when that person's conscious aim

5     or objective is to cause serious physical injury to another

6     despite the fact that it results in death.

7          In order for you to find the defendant guilty of

8     this particular crime, murder in the -- excuse me.

9     Manslaughter in the first degree, the People are required

10    to prove from all of the evidence in this case beyond a

11    reasonable doubt the following three elements:  One, that

12    on or about this same date, in this same county, this same

13    gentleman caused the death of Mr. Sosa; two, that the

14    defendant did so with the intent to cause serious physical

15    injury to Mr. Sosa; three, the defendant was not justified

16    in so doing.

17         Therefore, if you find that the People have

18    proven beyond a reasonable doubt each of those elements,

19    three elements, you must find the defendant guilty of the

20    crime of manslaughter in the first degree.

21         On the other hand, if you find that the People

22    have not proven beyond a reasonable doubt any one or more,

23    but any one is sufficient, of those elements you must find

24    the defendant not guilty of the crime of manslaughter in

25    the first degree.

Proceedings

1          All right.  That completes the response to your

2     earlier note.

3          Now we go to the new note.  "We the jury want,"

4     it's not here, but it's obvious, "the testimony of Melissa,

5     Tango testimony, David testimony, video and transcript,

6     Sosa and David criminal records of conviction."

7          Just one clarification, and I address you, madam

8     forelady, to speak on behalf of your jury, when you say

9     video and transcript, what do you mean by transcript?

10         MR. CANTOR:  Judge, I ask for a written response

11    to your question by the jury.

12         THE COURT:  Give them a chance to deliberate on

13    it?

14         MR. CANTOR:  Yes.

15         THE COURT:  Unless they all agree here.

16         MR. CANTOR:  No.  I object to it and I ask that

17    they respond in writing to your question, to your inquiry

18    what do they mean by transcript.

19         THE COURT:  I'll ask what do you mean by

20    transcript?

21         MR. CANTOR:  Note my objection.

22         THE COURT:  If you know.

23         MR. CANTOR:  Deliberations in the courtroom are

24    forbidden, Judge.

25         THE COURT:  Yes.

Proceedings

1    MR. CANTOR:  And I'm objecting.

2    THE COURT:  We're not deliberating at this

3    moment.  If you know.

4    THE FOREPERSON:  We're interested in hearing his

5    testimony and seeing the video and one of the other jurors

6    asked for a transcript.

7    THE COURT:  You really just want the video?

8    THE FOREPERSON:  The video.

9    THE COURT:  Juror number two, is that what is

10   meant?

11   A JUROR:  The video and the transcript of his

12   testimony.

13   MR. CANTOR:  Judge, I'm objecting to your --

14   THE COURT:  Well, now --

15   MR. CANTOR:  -- to your inquiry.

16   THE COURT:  Please keep quiet when I speak.

17   MR. CANTOR:  I'm going to make a record.

18   THE COURT:  I said keep quiet when I speak.

19   MR. CANTOR:  I've made my objection.

20   THE COURT:  You can make a full record, but keep

21   quiet when I'm speaking.

22   I'm going to allow you to go back into the jury

23   room, see, because now he has a little different

24   interpretation and I'm sure if I went down the line it will

25   be more different.  I don't want to go over the boundary,

Proceedings

1   so I'll let you go back.  You may send another note

2   clarifying what you mean by video and transcript, okay?

3              THE FOREPERSON:  Okay.

4              THE COURT:  Okay.  Very good.  Follow the

5   officer.

6              (Whereupon, the jury left the courtroom.)

7              THE COURT:  All right.  The jury having been

8   excused, Mr. Cantor, I implore you please do not try to

9   speak louder than me to make your point.  I'm always fair.

10   I give you all opportunity to make it, even extend and

11   reserve for you.  There's no need to try to speak louder

12   than me because in the final analysis you know the reporter

13   when two people are speaking only takes what I say, not

14   anybody else, so you're making no progress.

15              MR. CANTOR:  I'm just impelled by motion of

16   preservation when you hear with respect to Juror Number one

17   in my opinion and in what you did to Juror Number one and

18   only my opinion was wrong and then it became evident when

19   you asked Juror Number two.  The appropriate way is to do

20   it by way of having the jury to return and discuss in en

21   masse, put together a note, return to your Honor, your

22   Honor show it to Counsel and then formulate whatever the

23   Court deems an appropriate response.  That's the right way

24   and that's the lawful way.

25              THE COURT:  You made your record.  Anything you

Proceedings

1       wish to say?

2                   MR. ROSENFELD:   No, your Honor.   I believe that

3       asking one question to clarify a word is fine.   I have no

4       objection to that.   I do have to ask the Court the last

5       part of the note says something I believe Sosa and David.

6                   THE COURT:   Criminal records.

7                   MR. ROSENFELD:   Well, there is --

8                   THE COURT:   Of conviction.

9                   MR. ROSENFELD:   There is no Sosa criminal record

10      of conviction in this case.   There's a transcript of David

11      Delgado's testimony that contains questions from the

12      defense and questions from the People of his record of

13      conviction so that actually is included in their request

14      for the testimony of the defendant.   There is nothing

15      separate.

16                  I would ask the Court to indicate to the jury

17      that they're going to hear the testimony of the defendant

18      which will include that, but there's been zero -- there

19      isn't any record of conviction of Sosa.

20                  MR. CANTOR:   Can I see that?

21                  (Handing.)

22                  MR. CANTOR:   There is reference -- oh, what an

23      unclear note.   This is the second sentence -- Sosa and

24      David, and then there's writing which is erased out that's

25      about an inch and a half in length, and then the word

1    criminal records of conviction and then if possible.

2              THE COURT:  Yes.  Okay.

3              MR. CANTOR:  I don't know what that blank space

4    is.

5              THE COURT:  I don't either.

6              MR. CANTOR:  We're gonna get a note that's gonna

7    hopefully shed some light on this.

8              THE COURT:  Okay.

9              MR. CANTOR:  Criminal records of conviction.

10             THE COURT:  Did Mr. Sosa    did he have a record?

11             MR. CANTOR:  Yes.  Mr. Alberto Vasquez testified

12    for over ten years he bought marijuana from Mr. Sosa, but

13    there was no testimony.

14             THE COURT:  That's not a criminal record, Mr.

15    Cantor.

16             MR. CANTOR:  No.  If you'll allow me to finish,

17    but there is no testimony on the record of a criminal

18    record of Sosa.

19             THE COURT:  Okay.  Fine.

20             MR. CANTOR:  But don't you find that odd that

21    gap?

22             THE COURT:  No, I do not.

23             MR. CANTOR:  All right.

24             (Handing.)

25             THE COURT:  It's been erased, whatever it was she

1    erased it.

2         MR. CANTOR:  Hopefully, we'll get some

3    elucidation.

4         THE COURT:  Perhaps we will.  Perhaps we will

5    not.

6         MR. CANTOR:  Well, certain parts of that note are

7    very clear.

8         THE COURT:  In any event, I'm not going to

9    delineate what could have said, what not.  On the practical

10   side, ma'am, I think you should go down and get your entire

11   record.  Everything is clear enough what has to be read.

12   We'll go over the criminal record part of it at the

13   appropriate moment.  But we can begin as quickly as we can

14   begin on all of these other people, Melissa, Tango, David.

15        MR. CANTOR:  Judge, the reporter -- I'm only

16   speaking for myself, you'll make the ultimate

17   determination, the reporter usually does that by reading

18   the record and then exercising that which has been

19   sustained and stricken, Judge.  To do that

20   contemporaneously with the reading is an impossible task.

21        THE COURT:  But it's a more practical approach.

22        MR. CANTOR:  You'll have unusually lengthy gaps

23   of silence from the reporter.  The reporter knows the

24   methodology that is most utilitarian and she's told you

25   that she would suggest she go back to her quarters and go

Proceedings

1   over the transcript and redact that which is not part of

2   the record by way of your sustaining objections.

3            THE COURT:  Would you like to weigh in?

4            MR. ROSENFELD:  Well, obviously, I'm gonna leave

5   it up to the experts, to the court reporter or the Court.

6   But my suggestion would be whatever method is used, that

7   perhaps we do, the first person requested was Melissa

8   Dempsey, so if the court reporter feels she can't do it

9   contemporaneously, needs to do it in advance, that she do

10  Melissa Dempsey, then read to them Melissa Dempsey, then

11  take a break because after, the reading will take an hour,

12  an hour and a quarter, take a break, then she can do the

13  next witness and do whatever redaction is necessary.

14           MR. CANTOR:  Who's the next witness?

15           THE COURT:  Tango.

16           MR. ROSENFELD:  Then have that read back so we're

17  not at least left with an hour or so gap, my suggestion,

18  Judge.  Whatever the Court wishes.

19           MR. CANTOR:  By the way, Judge, a readback of

20  Tango, they don't ask for Tango's criminal record, I have

21  no problem with that.  Let her read.  Let her go over

22  Melissa Dempsey.  Let her forthwith, return, let her read

23  Melissa Dempsey.

24           THE COURT:  We'll see how it goes.

25           MR. CANTOR:  We should wait a reasonable period

Proceedings

1    of time I'm suggesting presently for any note that comes

2    forward.

3              THE COURT:  Yes, I would concur.

4              MR. CANTOR:  If you want to send the reporter --

5              THE COURT:  Yes, why don't you go down.

6              MR. CANTOR:  -- to begin her chores.

7              THE COURT:  Yes, do that.

8              MR. CANTOR:  I want this on the record.

9              THE COURT:  Please make a record.

10             MR. CANTOR:  The court reporter has suggested she

11   return to her office and take up Melissa's testimony and

12   redact that which is not an appropriate part of the record.

13   I suggest we adhere.  She's the expert to that.  When she's

14   finished with that, she can return and read the permissible

15   Melissa's testimony.  Once that is done, she can return to

16   her office and continue to her office, the next one is

17   Tango, let her do the same thing in her office with Tango,

18   read it, excise that which is not part of it, come back to

19   the court, read it, the jury then leave again and deal

20   with, is it David is the third one?

21             THE COURT:  Yes.

22             MR. CANTOR:  Let her go back to her quarters in

23   her office, deal with the redaction of David, come back and

24   read it.  I thought I heard correctly from the reporter,

25   maybe she's changed her mind, I don't remember.

1        THE COURT:  She did say exactly what you said.

2        MR. CANTOR:  Then let her do that.  By all means,

3   if it meets with your approval.

4        THE COURT:  No.  I think that it will be very

5   much more time consuming.  It's voluminous testimony.  I

6   would like her to read it and as she goes along edit it.

7        (Whereupon, there was a brief recess.)

8        THE COURT:  It's 1 o'clock.  Let us bring back

9   the jury.  I'm going to excuse them for lunch.

10        Here is the note, madam reporter (handing).

11        THE COURT:  Here is the note, "the jury cannot

12   reach a unanimous verdict on murder charge.  Can we

13   deliberate on the manslaughter charge now?"

14        MR. CANTOR:  The answer is yes.

15        THE COURT:  The answer is yes.  Okay.  Bring them

16   out.

17        (Handing.)

18        MR. CANTOR:  My position is in view of note

19   number three, is the jury still asking for the Court's

20   compliance with note number one, or does note number three

21   supersede the contents of note number two?

22        THE COURT:  I take it to not supersede, but

23   rather ask permission to begin deliberations on the

24   manslaughter while not having to wait for the response to

25   note number two, which is the only outstanding thing at

1    this point.  That's my belief.  What do you think, Mr.

2    Rosenfeld?

3            MR. ROSENFELD:  I haven't seen the note yet.

4            (Handing.)

5            MR. ROSENFELD:  Your Honor, just if you look at

6    the verdict sheet, the way you worded the verdict sheet,

7    they have to deliberate murder in the second degree.  If

8    they find guilty, you said to stop and report the verdict

9    to the Court.  If they find not guilty, to deliberate on

10   manslaughter in the first degree.  What this note seems to

11   indicate is that they haven't come to a decision on murder

12   and I know they're not supposed to tell you.

13           THE COURT:  No.  But I would concur with that.

14   The answer is yes.

15           MR. ROSENFELD:  I understand.  But they're going

16   to have to report nevertheless on the verdict sheet.

17           THE COURT:  Oh, yes, if they reach a unanimous

18   verdict one way or the other.

19           MR. ROSENFELD:  Okay.

20           THE COURT:  We don't know which way they're

21   speaking.  But there's nothing to prevent.  The answer is

22   yes, simple yes, and that's it.

23           MR. CANTOR:  Okay.  You see what I'm concerned

24   about, we can save an awful lot of time, does that note, a

25   simple note, which the answer is one word yes.

1       THE COURT:  I will inquire.

2       MR. CANTOR:  And ask them to write a note back to

3   you as to whether or not they want note number two

4   answered, or does note number three supersede number two --

5       MR. ROSENFELD:  I join in that.

6       MR. CANTOR:  -- and make it moot.

7       MR. ROSENFELD:  I join in that.

8       COURT OFFICER:  Would the note be after lunch?

9       MR. ROSENFELD:  The reporter is gonna have a

10   thousand pages if she doesn't have it finished, at least

11   you can give her the courtesy of knowing that.

12       THE COURT:  Yes.

13       MR. CANTOR:  Let them fashion the note whether it

14   supersedes the contents of number two.

15       COURT OFFICER:  Jury entering.

16       (Whereupon, the jury entered the courtroom.)

17       THE COURT:  Madam forelady, ladies and gentlemen

18   of the jury, the Court is in receipt of your note number

19   three, which it marks as its own Exhibit Number 4, which

20   reads as follows -- the note having been shared with

21   counsel as in the previous instances, correct, Mr.

22   Rosenfeld?

23       MR. ROSENFELD:  Correct.

24       THE COURT:  Correct, Mr. Cantor?

25       MR. CANTOR:  Of course.

1   THE COURT:  "The jury cannot reach a unanimous

2   verdict on murder charge.  Can we deliberate on the

3   manslaughter charge now?"  The simple answer to that is

4   yes, you may.  You may consider them any way you wish once

5   you're in the jury room.

6   The question that the Court has which now raises

7   another question which I will ask you to take a few minutes

8   to deliberate on and respond, does this note -- in other

9   words, can we deliberate on the manslaughter charge?  Now,

10   the answer being yes, does this note supersede the one for

11   all of the testimony, or do you wish for us to still work

12   on that while you're deliberating?  So you have to think

13   about that.  We're going to send you inside back again so

14   this way you can take a poll, madam foreperson, and see how

15   you want that question answered.

16   THE FOREPERSON:  Can you just explain that

17   question?

18   MR. CANTOR:  Judge, I can't hear that.  There

19   shouldn't be any discussion.

20   THE COURT:  No.  A question is being asked.

21   THE FOREPERSON:  Just explain that a little

22   better.  What do you mean by that?

23   THE COURT:  I'll explain it again.  This last

24   note, you can't reach a unanimous verdict at this point on

25   murder, can you now deliberate manslaughter.  The answer is

Proceedings

1   yes.   You can always deliberate actually on both of them

2   the same time or you can proceed one from the other, and

3   you know the overall instruction which is on the face of

4   the jury verdict sheet.

5           The question now is:   Do you still want us to

6   prepare all of this testimony for you to consider or does

7   this note supersede?

8           A JUROR:   Supersede.

9           THE COURT:   You have to go back and write another

10  note, so take a minute.

11          (Whereupon, the jury left the courtroom and there

12  was a brief recess.)

13          COURT OFFICER:   (Handing.)

14          THE COURT:   Please mark it.

15          COURT OFFICER:   Jury entering.

16          (Whereupon, the jury entered the courtroom.)

17          THE COURT:   Madam forelady, ladies and gentlemen

18  of the jury, the Court is in receipt of your note number

19  four, which is marked as its own Exhibit Number 5, "yes, it

20  supersedes the prior request."

21          Okay.   Gives guidance to the Court in preparing

22  what it is you may or may wish to have in the future, but

23  not necessarily now.

24          All right.   Now, we're going to break for lunch.

25  Have a nice lunch.   Come back after lunch quickly as you

Proceedings

1   can.  Once you have everybody back, madam forelady, you

2   will recommence your deliberations which will cease at this

3   point until they are all re-gathered after the luncheon

4   recess.

5                   MR. CANTOR:  Judge, may we go to the sidebar with

6   the reporter, please?

7                   THE COURT:  Sure.

8                   (Whereupon, the following takes place, on the

9   record, in open court, in the presence of the Court, the

10  assistant district attorneys, defense counsel, and outside

11  the hearing of the defendant and the jury.)

12                  THE COURT:  Mr. Cantor.

13                  MR. CANTOR:  The law provides that once they've

14  commenced deliberations they cannot be separated.  They

15  must remain sequestered except for to the end of the

16  court's session when they can go home or whenever they

17  choose.  At this point in time, they cannot co-mingle with

18  the outside world.  The law is clear.  They must be kept

19  together.

20                  THE COURT:  I'm not certain of what you're

21  relying on for that, but, Mr. District Attorney.

22                  MR. ROSENFELD:  Have you ordered lunch for them?

23  Is that why we are taking a break?

24                  THE COURT:  No, I didn't order any lunch.  I'm

25  separating them to have lunch.

Proceedings

 1          MR. ROSENFELD:  With instructions to the

 2     deliberations or discussions?

 3          THE COURT:  I just said that.

 4          MR. ROSENFELD:  We don't sequester anymore.

 5          THE COURT:  No, we don't.

 6          MR. CANTOR:  We can't.

 7          THE COURT:  We know.

 8          MR. CANTOR:  I'm well aware.  You cannot break up

 9     a jury once they have begun deliberations.  You can however

10     non-sequester them at the end of the court's session and

11     that is send them home.  You do this, Judge, at your peril.

12     I'm just taking my position, noting it on the record and

13     that's that.

14          THE COURT:  Do you have any authority?

15          MR. CANTOR:  You have the CPL here?

16          THE COURT:  No.

17          MR. CANTOR:  Is it in your robing room?

18          THE COURT:  No.

19          MR. CANTOR:  That's my position.

20          MR. ROSENFELD:  Honestly, Judge, I'd have to

21     check on it.  I wasn't aware of any procedure.  I know the

22     procedure in this courthouse because of union rules we have

23     to end the court's session in the morning at a certain

24     time.  We're actually ending the court's session for the

25     morning.

Proceedings

1        THE COURT:  But he's going further.  He's saying

2    at the point of ending they cannot be separated.

3        MR. ROSENFELD:  I'm aware in the past they've

4    ordered lunch in for the jurors.  I'm not familiar with

5    this, Judge.  I'd have to leave it to the Court.  I don't

6    know.

7        MR. CANTOR:  I will take my exception.

8        THE COURT:  You want to check it out?

9        MR. ROSENFELD:  This is a court administration.

10        THE COURT:  I don't know there's a rule.

11        MR. CANTOR:  Judge, I've said all that.  I said

12    that the law commands that they remain together.  I have

13    nothing further to say.  If you rule in favor of me, so be

14    it.  If you rule in disfavor of me, I will note my

15    exception.

16        THE COURT:  I will do it the way I always did it.

17        (Whereupon, the following takes place, on the

18    record, in open court, in the presence of the Court, the

19    assistant district attorneys, defense counsel, the

20    defendant and the jury.)

21        THE COURT:  All right.  As the Court indicated,

22    we are now going to recess for lunch.  Your deliberations

23    are to stop.  Do not have any discussion about the case

24    with or amongst yourselves.  You know that rule.  Do not

25    discuss with anyone until you are all gathered together

Proceedings

1     again after the lunch hour in the jury room.  At that

2     point, when you have everyone as before, you will commence

3     or re-commence your deliberations.

4             All right.  You may follow the officer.

5             COURT OFFICER:  Jury exiting.

6             (Whereupon, the jury left the courtroom.)

7             THE COURT:  Jury having been excused, please be

8     back here -- well, you don't really have to be back here,

9     stay in touch with the Court, but if you wish to come back

10    here, you may come back here at 2:15.  Okay.

11            MR. CANTOR:  Thank you.

12            (Whereupon, a luncheon recess was taken.)

13            A F T E R N O O N   S E S S I O N

14            (Whereupon, following a luncheon recess taken,

15    court stands in recess awaiting jury's verdict.)

16            (Whereupon, the following takes place, on the

17    record, in open court, in the presence of the Court, the

18    assistant district attorneys, defense counsel, the

19    defendant, and outside the presence of the jury.)

20            COURT OFFICER:  All rise.

21            (Whereupon, the Court entered the courtroom.)

22            THE COURT:  Good afternoon.  Counsel, please

23    approach.

24            (Whereupon, there was a discussion held, off the

25    record, at the bench, among the Court, the assistant

Proceedings

1    district attorneys, defense counsel, and outside the

2    hearing of the defendant and the jury.)

3         THE COURT:  We're ready.  Please mark this.

4         COURT OFFICER:  Okay, Judge.  Jury entering.

5         (Whereupon, the jury entered the courtroom.)

6         THE COURT:  Good afternoon.

7         JURORS:  Good afternoon.

8         THE COURT:  Madam forelady, ladies and gentlemen

9    of the jury, the Court is in receipt of your note, number 5

10   which it marks as its own Exhibit Number 6 indicating you

11   have reached a verdict, is that correct?

12        THE FOREPERSON:  Yes.

13        THE COURT:  Please give the verdict sheet to the

14   sergeant.

15        THE FOREPERSON:  (Handing.)

16        COURT OFFICER:  (Handing.)

17        THE COURT:  (Handing.)

18        COURT OFFICER:  (Handing.)

19        THE COURT:  Mr. Clerk, you can proceed to take

20   the verdict.

21        THE CLERK:  Okay.  This is People of the State of

22   New York against David Delgado.  Let the record reflect the

23   presence of the defendant, his attorney, the district

24   attorney and all of the sworn jurors.

25        Will the jury foreperson please rise -- first,

1    members of the jury, have you reached a decision as to

2    count number one?  Yes or no?

3              THE FOREPERSON:  No.

4              THE CLERK:  Okay.  How say you as to count number

5    two charging the defendant with manslaughter in the first

6    degree, do you find the defendant guilty or not guilty?

7              THE FOREPERSON:  Guilty.

8              THE CLERK:  The verdict stands recorded, your

9    Honor.

10              THE COURT:  Do you wish for the jury to be

11    polled, Mr. Cantor?

12              MR. CANTOR:  Yes.

13              THE COURT:  Please poll the jury.

14              THE CLERK:  Okay.  Members of the jury, you have

15    said through your foreperson that you find the defendant

16    guilty of manslaughter in the first degree.  Juror No. 1,

17    is that your verdict?

18              THE FOREPERSON:  I'm sorry.  Repeat that.  I

19    wasn't listening.

20              THE CLERK:  Okay.  Members of the jury, you have

21    said through your foreperson that you find the defendant

22    guilty of manslaughter in the first degree.  Juror No. 1,

23    is that your verdict?

24              THE FOREPERSON:  Yes.

25              THE CLERK:  Juror No. 2, is that your verdict?

1    JUROR NO. 2:  Yes.

2    THE CLERK:  Juror No. 3, is that your verdict?

3    JUROR NO. 3:  Yes.

4    THE CLERK:  Juror No. 4, is that your verdict?

5    JUROR NO. 4:  Yes.

6    THE CLERK:  Juror No. 5, is that your verdict?

7    JUROR NO. 5:  Yes.

8    THE CLERK:  Juror No. 6, is that your verdict?

9    JUROR NO. 6:  Yes.

10   THE CLERK:  Juror No. 7, is that your verdict?

11   JUROR NO. 7:  Yes.

12   THE CLERK:  Juror No. 8, is that your verdict?

13   JUROR NO. 8:  Yes.

14   THE CLERK:  Juror No. 9, is that your verdict?

15   JUROR NO. 9:  Yes.

16   THE CLERK:  Juror No. 10, is that your verdict?

17   JUROR NO. 10:  Yes.

18   THE CLERK:  Juror No. 11, is that your verdict?

19   JUROR NO. 11:  Yes.

20   THE CLERK:  Juror No. 12, is that your verdict?

21   JUROR NO. 12:  Yes.

22   THE CLERK:  Members of the jury, listen to your

23   verdict as it stands recorded.  You and each of you say

24   that you find the defendant guilty of manslaughter in the

25   first degree and so say you all.

Proceedings

1      THE COURT:  Madam forelady, ladies and gentlemen

2   of the jury, when we first came together, now it seems like

3   a long time ago, you've been here for several weeks.  When

4   we first came together, you recall we spoke about that

5   gentleman who lived just close by, Gouveneur Morris,

6   described in our constitutional document, the sacrosanct

7   and sacred right of trial by jury.

8      Your participation, your deliberation, your

9   attendance to your civic duties, your rendering of a

10   verdict continues to breed life into that right.  You leave

11   with the profound thanks of the Court.  You are free to go.

12   You may follow the officer.

13      COURT OFFICER:  Jury exiting.

14      (Whereupon, the jury left the courtroom.)

15      THE COURT:  Jury having been excused, Mr.

16   District Attorney.

17      MR. ROSENFELD:  Yes, your Honor.  I don't believe

18   we marked the last note from the jury a court's exhibit.

19      THE COURT:  I believe we did.

20      MR. ROSENFELD:  For the record, I've looked at it

21   and I believe defense counsel looked at it also.

22      THE CLERK:  Yes.

23      MR. ROSENFELD:  Okay.

24      THE COURT:  Okay.  It's done.  Applications?

25      MR. ROSENFELD:  Before August 1st, your Honor, if

Proceedings

```
 1          it's possible.
 2                    MR. CANTOR:  The earliest you can do it, Judge.
 3                    THE COURT:  The earliest would appear to be
 4          September 20th.
 5                    MR. ROSENFELD:  September?
 6                    THE COURT:  I mean August 20th.
 7                    MR. ROSENFELD:  I'm not going to be here, Judge.
 8          There's no way we can do before August 1st?
 9                    THE COURT:  They'll never have the report.
10                    MR. CANTOR:  It's a in case.
11                    THE CLERK:  We can try it.
12                    THE COURT:  You want to try?
13                    MR. CANTOR:  Yeah, sure.
14                    THE COURT:  How's Thursday, August 2nd?
15                    MR. ROSENFELD:  That's good for the People.  Can
16          we ask for 2 o'clock please, that way we know if the
17          defendant is produced in the morning?
18                    MR. CANTOR:  Can I have August 1st?
19                    THE COURT:  Yes.
20                    MR. CANTOR:  Thank you.
21                    MR. ROSENFELD:  August 1st is Wednesday.
22                    THE COURT:  Yes, let me doublecheck.  Is that
23          okay for you, Mr. District Attorney?
24                    MR. ROSENFELD:  Can we do it at 2 p.m.?
25                    MR. CANTOR:  Judge, at 2 p.m.  I'll come here at
```

1        noon.

2                        MR. ROSENFELD:  Noon.

3                        THE COURT:  Okay.  Is that okay?

4                        MR. CANTOR:  I'll come here at noon.

5                        Just for the record, it's our position that by

6        virtue of the guilty verdict of manslaughter in the first

7        degree, under the doctrine of implied acquittal, the first

8        count is deemed an acquittal, that being murder in the

9        second degree.  But that is something for another court for

10       another day and I would just put it on the record now.

11                       THE COURT:  All right, Mr. Cantor, Mr. Rosenfeld,

12       August 1st, noon.

13                       MR. ROSENFELD:  I have 12 o'clock, August 1st.

14                       THE COURT:  That will be the day.

15                       MR. CANTOR:  What is that?

16                       THE COURT:  That will be the day.

17                       MR. CANTOR:  Thank you for your courtesies.

18                       MR. ROSENFELD:  Thank you.

19                       (Whereupon, this concludes the trial.)

20

21       THE FOREGOING IS CERTIFIED TO BE

22       A TRUE AND ACCURATE TRANSCRIPT.

23

24       _____
         TRICIA L. ROBINSON, CSR, RPR

25       Senior Court Reporter

1     SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF BRONX :   CRIMINAL TERM - PART:   T-14

2

3     ------------------------------------------- X

       THE PEOPLE OF THE STATE OF NEW YORK,

4

                                      Indictment #0027/2010

5

           - against -                  Sentence

6

7

    DAVID DELGADO,

8

                Defendant.

9

    ------------------------------------------- X

10                  August 1, 2012

11

               265 East 161st Street

12              Bronx, New York 10451     **FILED**

13     B E F O R E:                 APR 3 0 2013

14                 HONORABLE DOMINIC R. MASSARO,   SUP. COURT, APP. DIV
                                               FIRST DEPT.

15

16                       J U S T I C E

17     A P P E A R A N C E S:

18              ROBERT T. JOHNSON, ESQ.,
              District Attorney - Bronx County

19              BY:  PAUL ROSENFELD, ESQ.,
              Assistant District Attorney

20

21              ROBERT CANTOR, ESQ.
              Attorney for the Defendant

22

23

                 TRICIA L. ROBINSON, CSR, RPR

24                 Senior Court Reporter

25

```
 1                    (Whereupon, the following takes place, on the

 2          record, in open court, in the presence of the Court, the

 3          assistant district attorney, defense counsel and the

 4          defendant.)

 5                    COURT OFFICER:  Coming out.

 6                    MR. CANTOR:  Judge, I need him un-handcuffed.  He

 7          has to sign some documents.

 8                    THE COURT:  Please.  All right.  Call the case.

 9                    THE CLERK:  This is sentence matter on the

10          calendar --

11                    THE COURT:  Is he uncuffed, the gentleman?

12                    COURT OFFICER:  No.

13                    THE COURT:  You just want him uncuffed to sign

14          the piece of paper?

15                    MR. CANTOR:  No.

16                    THE COURT:  For the sentencing?

17                    MR. CANTOR:  Yes.

18                    COURT OFFICER:  Judge, I'm not comfortable with

19          that.

20                    THE COURT:  We're not able to uncuff him.

21                    THE CLERK:  This is 0027 of 2010, David Delgado.

22                    Appearances, please.

23                    MR. CANTOR:  Robert Cantor for Mr. Delgado.

24                    MR. ROSENFELD:  Paul Rosenfeld for the People.

25                    THE COURT:  Do you need a little more time?
```

1          MR. CANTOR:  No.

2          THE COURT:  Mr. Clerk.

3          THE CLERK:  David Delgado, you're being arraigned

4     for sentence on your conviction of manslaughter in the

5     first degree.

6          Before the Court pronounces judgment, the Court

7     will accord the district attorney, your attorney and

8     yourself an opportunity to make a statement with respect to

9     any matter relevant to the question of sentence.

10          People.

11          MR. ROSENFELD:  Yes, your Honor.  Before the

12     People begin, Ms. Sherry Talavera who is the sister of the

13     deceased George Talavera would like to present a statement

14     to the Court.  It will be two statements, one is on behalf

15     of the deceased's daughter Nylah Talavera who is a young

16     girl, she's nine years old.  She'll read to her behalf.

17          I submitted to the Court a copy of the three-page

18     statement that Ms. Talavera would like the Court to

19     acknowledge.  She won't read the whole statement even

20     though she would like to.  She'll just read the first and

21     last paragraphs.  And I submit to the Court the entire

22     statement to the Court.

23          THE COURT:  You have done that and the Court has

24     read over both statements; however, the lady is certainly

25     welcome to add anything she wishes at this moment.

Sentence

1       MS. TALAVERA:  Good afternoon, your Honor.

2       THE COURT:  Good afternoon, ma'am.

3       MS. TALAVERA:  This is in regard to my niece

4  Nylah Talavera.

5       THE COURT:  Yes, ma'am.

6       MS. TALAVERA:  "My name is Nylah Talavera."

7       THE COURT:  Start all over.  Put your name.

8       MS. TALAVERA:  My name is Sherry Talavera.  I'm

9  speaking for Nylah, George Talavera's daughter.

10      THE COURT:  Yes.

11      MS. TALAVERA:  "My name is Nylah Talavera.

12  George Talavera was my father.  He always had a smile on

13  his face and never doubted anything I said.  He loved me

14  and took me places.  For my first and second birthday, he

15  rented me a clown, a pony and even a magician.  This party

16  was at Pelham Bay.  I miss walking and taking the bus with

17  him.  Dad always picked me up from school and dropped me

18  off.  Every time I saw him in the yard to pick me up, I'll

19  tell my teacher and then I would run to him.  He would

20  carry me on his shoulders.  In the summer I went fishing

21  with him and would have my own fishing rod.  On one

22  vacation to Florida, I caught baby fish and my dad was so

23  proud of me.  We would always take long walks to Pelham Bay

24  and sit on the rocks by the beach.  Now we can't do all the

25  fun things we done" -- excuse me.

1              THE COURT:  Take your time.

2              MS. TALAVERA:  "Every night I look at pictures of

3    him and I think in my head why did this happen to such a

4    good person.  Why?  He was the best father in the world and

5    no one can replace his number one spot -- his number one

6    spot in first place.  I miss him so much.  When my mom

7    first told me, I told her these exact words, you're lying,

8    then she put on the news and then I saw the newspaper and I

9    really thought I was dreaming it.  I just sat there crying

10   on Christmas Day.  From that day on, I hated Christmas

11   wanting to have nothing to do with it because on Christmas

12   all I think about is my dad.  I hate Christmas and I always

13   will.  No one will stop me from that."

14             THE COURT:  Thank you.  Thank you for reading

15   that one.  Yes, ma'am, anything further?

16             MS. TALAVERA:  I have me and my sister's

17   statement.

18             THE COURT:  Yes.

19             MS. TALAVERA:  "I would like to reintroduce my

20   brother George Talavera.  He was born on July 16, 1976.  He

21   was killed on December 25, 2009.  In the early hours around

22   3:20" --

23             THE COURT:  Just take your time, ma'am.

24             MS. TALAVERA:  -- "we received a call.  I didn't

25   answer the phone.  It was our sister-in-law on the other

1    end of the phone and I heard her when she stated that

2    George was killed.  I jumped out of my bed and screamed,

3    no, no, this cannot be happening.  I got dressed, left my

4    home in Pennsylvania and drove to the Bronx.  The police

5    didn't want to give us information.  The first stop was 900

6    Fteley Avenue in the Bronx at the 43rd Precinct.  When I

7    arrived at the precinct, the officers told us to wait until

8    the officer comes back from the crime scene.

9         We were seated for 45 minutes to an hour which

10    felt like three hours with no answer until Officer McSloy

11    calls my husband and I into the office.  He stated that

12    George was in an altercation and as a result he was fatally

13    stabbed in the neck which caused his death.  My heart sunk.

14    It was true.  Our brother is gone.  I asked why.  What

15    happened?  Who did this?  Three questions with no answer.

16    I remember McSloy stated they were going to work really

17    hard on the case.

18         I asked Officer McSloy where is my brother's

19    body.  I need to see.  He stated you won't be able to see

20    him.  I said you don't understand.  I need to see my

21    brother.  So as soon as I left the precinct I drove to

22    Parkchester.  I seen a cop car, went in the building on

23    2033 McGraw Avenue in the Bronx.  As I waited for someone

24    to open the door, I went to open the door.  From the

25    stairwell, I seen the cops and the medical examiner

1    carrying George down the stairs.  I told them that he was

2    my brother and I need one minute with him and I quickly

3    leaned on his chest and said our family prayer Psalm 23,

4    the Lord is my Shepherd.

5          Once I finished I walked away.  I caught myself.

6    I can't leave.  I can't turn my back on my brother.  Our

7    love for one another is too strong for me to just walk away

8    so I turned around and walked with the cops and the medical

9    examiner until they put my brother's body in the van.  That

10   was when reality hit me.  He's gone, our best friend, our

11   hero, our brother is gone."

12         And the last --

13         MR. ROSENFELD:  She's going to read the last

14   paragraph.

15         THE COURT:  Yes, ma'am.

16         MS. TALAVERA:  "It's been a long journey.  Every

17   moment that goes by is still hard.  We have our days full

18   with rain, tears and heart break.  It sometimes feels like

19   a nightmare and I find myself questioning myself.  Is it

20   real?  And then everything comes back to me.  It's not a

21   dream, it's reality.  Our brother is gone.  And all we have

22   is the things he left behind.

23         I thank God for his daughter.  We are a big part

24   of her life.  We take her every summer for a couple of

25   weeks.  We do family things, parks, beach, pool, shopping

1    and our favorite amusement parks.  Last year we went to

2    Dorney, this year we went to Sesame Place and next year

3    we're going to Disney.  George would have done the same

4    thing for my kids.  Growing up that's one place we always

5    wanted to experience.  Next year it will be a dream.  It

6    will become a reality and I will experience it with his

7    daughter.  We learn life is short, live for today.  He --

8    David, you may have took our holidays, but he didn't take

9    our dream.  My family will never forgive you even though

10   the Bible tells us to.  You have a nice life in jail."

11   That's it, your Honor.

12              THE COURT:  Thank you for your statement, ma'am.

13   You may be seated.

14              MS. TALAVERA:  Thank you.

15              THE COURT:  Mr. District Attorney.

16              MR. ROSENFELD:  Thank you, Ms. Talavera.  The

17   Court is aware of this defendant's background.  November

18   1991 he was convicted of attempted robbery in the third

19   degree and sentenced to one to three years; however, he

20   bench warranted, wasn't sentenced until 2005.  In 2006, he

21   had a parole violation, was re-admitted January 19 of 2007.

22   As the Court also heard the whole entire Sandoval

23   application and is aware that in Puerto Rico in 2007 he had

24   a conjugal abuse case in Puerto Rico.

25              I won't re-hash the facts of this case, your

1        Honor.   This was Christmas Eve.   This was a day of

2        celebration, December 25, 2009, men, women, children were

3        at a party at 2033 McGraw Avenue doing nothing more than

4        anticipating Christmas morning.

5                The defendant was an invited guest of one of the

6        people who was friends with everybody, everyone else.   He

7        was at that party.   The Court heard the confrontation

8        between the defendant and the deceased.   I won't go into

9        it.   I'll just incorporate what the Court heard as facts at

10       the trial.

11               The defendant actually left the party and then

12       went to another apartment, took a knife and returned to the

13       party.   He continued to stay at the party.   When the

14       deceased confronted him another time, it's clear the

15       deceased was drunk and he was loud, but nevertheless the

16       deceased was harmless.   He never threatened, physically

17       never threatened the defendant physically with any type of

18       weapon, never struck the defendant in any way.

19               The defendant had no reason to believe that the

20       deceased would cause him any harm.   And as we know, the

21       deceased wasn't harmed, but this defendant had a knife on

22       him.   He could have walked right out of that apartment at

23       the moment he struck the deceased, but he chose to remain

24       there and he pulled out the knife with no reason to use the

25       knife and he stabbed the deceased five times around his

1    head and face, most specifically in the jugular, the

2    carotid artery right in front of the children, the women

3    and the men at this party.

4            Then what did the defendant do?  He left George

5    Talavera to die at the party.  He left the apartment.  He

6    took a cab, went back to the safety of his own home in

7    Brooklyn and hid out there until the police came to arrest

8    him the following day.

9            This was a senseless murder, your Honor.  The

10   jury heard all the evidence.  They found him guilty of

11   manslaughter in the first degree.  And it's the People's

12   position, your Honor, prior to trial the Court is aware the

13   defendant had been offered 24 years on a manslaughter

14   charge by the People to spare the family the trauma of

15   going through the witnesses and the defendant, as is his

16   right, chose to go to trial and the jury convicted him of

17   manslaughter in the first degree.

18           The maximum sentence for manslaughter in the

19   first degree is 25 years in prison.  The People urge this

20   Court to sentence the defendant to the 25 years maximum

21   sentence, plus five years of post-release supervision.

22           THE CLERK:  Would defense counsel like to make a

23   statement?

24           MR. CANTOR:  I would, please, your Honor.

25           THE COURT:  Yes, sir.

1       MR. CANTOR:  Judge, I don't envy the duty that

2   you have to perform this afternoon.  It is undoubtedly the

3   hardest thing that a Judge must do.  And I appreciate your

4   care, your concern, your compassion for both sides in this

5   case.  To be plain about it, it's not a simple thing that

6   you're about to do.

7       I think in structuring a just sentence, your

8   Honor has to consider both the defendant and the deceased,

9   their individual characteristics, their history and the

10   behavior that attended to the fatal event.

11       David Delgado presently has a history that's very

12   sad.  As a young man, he was sexually abused by his

13   step-father.  He told the jury that.  And that your Honor

14   can appreciate as a jurist of long-standing, you can

15   appreciate the impact that that must have had on Mr.

16   Delgado.  Three times he attempted suicide.  We know now

17   because it wasn't until the mid 1990's that he was

18   diagnosed suffering from bipolarity and depression.  We

19   know now what drove him to such extreme acts.  You're

20   dealing with a man who was twice mentally institutionalized

21   and who has lived with depression and bipolarity for most

22   of his life.

23       The probation report is a farce.  The probation

24   officials in this sort of a case should themselves be tried

25   for criminal negligence.  It provides your Honor with no

1    insight.  It is empty of anything.  It speaks to the

2    entirety of the issue that you will soon resolve, mainly,

3    the extent of the sentence.

4          My client has for a long period of time been on

5    mood stabilizers and anti-depressants such as Depakote and

6    Risperdal.  These are strong medicines.  These are given to

7    people who have serious flaws in chemistry.  The fact that

8    my client suffers from depression is not a flaw in his

9    character, but a flaw in his chemistry.

10          We move to December 24, 25, 2009.  My client from

11    all of the evidence adduced at trial did not enter that

12    party with any intent to do harm, with any intent to cause

13    any injury to any attendee at that party.  As a matter of

14    fact, the evidence indicates from his girlfriend at the

15    time who testified as the People's witness that he was

16    reluctant to go to the party.  One of the aspects of

17    depression is isolation.  And you know that as I said being

18    a jurist and a practitioner yourself of long-standing, but

19    it was for his girlfriend so he went.

20          What the district attorney fails to mention in

21    his oral presentation to the Court, it's unclear whether it

22    was three, four or five times, but on each occasion at the

23    party the deceased confronted and threatened my client to

24    do him physical harm.  Over what?  Over my client's

25    hypothetical disabuse and disrespect of his girlfriend who

1   was known to the deceased?  No doubt the deceased was

2   drunk, also had traces of marijuana, had significant amount

3   of alcohol.  Significant.  More than three times the legal

4   limit for driving while intoxicated.  Did my client in any

5   way, shape, manner or form cause these confrontations?  No.

6   Did my client in any way, shape, manner or form solicit

7   these confrontations?  No.  But yet they occurred.

8        And each time they occurred, given his

9   impressionable mind, given his mental state, given his

10  notions that perhaps are exaggerated due to his depression

11  and bipolarity when he became convinced that he was a ripe

12  target for physical harm and perhaps all serious physical

13  harm, do I count taking a knife from Margie's apartment?

14  No, no.  But I don't stand nor did I stand in the shoes of

15  a depressed individual, a bipolar individual, an individual

16  who has been youthfully sexually abused, who had attempted

17  suicide three times and twice been mentally incarcerated.

18        My father is an immigrant from Eastern Europe.

19  His English was halting.  So when you describe someone who

20  was troubled by that which makes my client, he would say he

21  was not a finished product.  And Mr. Delgado is not a

22  finished product.  He carries all of this, all of this

23  history and present mental impairment with him.

24        So we have the deceased provoking him.  I'm not

25  here to desecrate.  I'm not here to destroy or disseminate

1   the image or the figure of the deceased, but I'm here to

2   tell you that the deceased, although physically perhaps not

3   the aggressor was certainly confrontational, repeatedly the

4   aggressor in threatening serious physical harm to my client

5   who himself had consumed a sufficient degree of alcohol.

6   The evidence is clear on that, yet your Honor decided not

7   pursuant to my application to charge intoxication.  We

8   noted our exceptions.  This is a trial issue.  I say no

9   more about it here.

10      My client had no intent as he testified to kill

11  the deceased.  He had no intent to inflict serious physical

12  harm upon the deceased.  He did have a fervent and fixed

13  and focused intent to distance himself from the deceased

14  and so he swung out wildly as he said on the stand.  On the

15  stand in his very mundane words, he just wanted to get

16  away, he wanted to get out of harm's way.  And so he

17  perceived the deceased as immediately and then presently

18  threatening to his welfare, his bodily welfare so he swung

19  out wildly.  He said he sort of blacked out, but no doubt

20  he struck five times.

21      He's not a physician.  He's not a pathologist.

22  He doesn't know where the carotid artery is or where the

23  jugular vein is.  He just struck out wildly.  He will speak

24  for himself.  But I'm going to suggest the evidence does

25  not manifest and does not demonstrate an intent to cause

1   serious physical injury because that's what the jury found.

2   They acquitted him.  So when the DA uses the word murder in

3   his presentation, that's contrary to the jury's verdict in

4   this case.  He was not convicted of murder.  He was

5   convicted of manslaughter in the first degree, which

6   embodies an intent to inflict serious physical harm so he

7   struck out wildly because he was in fear of his own

8   welfare, his own physical well-being.

9         He didn't flee New York.  He was scared.  He was

10   frightened.  He was bipolar.  He's depressed.  He didn't

11   seek to evade the authorities.  He went home and stayed up

12   all night.  As he told you on the witness stand the police

13   within 24, 36 hours apprehended him and what did he do?  He

14   behaved like a gentleman.  According to Detective Banker,

15   he followed all police directives.  He went further than

16   that.  He according to the evidence made oral and written

17   videotaped statements to the authorities.

18         He has a criminal record, Judge.  He's a man with

19   a feeble mind.  Impressionable, yes.  Troubled, yes.

20   Flawed, yes.  And there was no charge.  Then you denied my

21   application for manslaughter in the second degree based on

22   the theory of reckless.  You denied my application for a

23   charge with respect to criminally negligent homicide.  His

24   actions based upon the totality of the record speak more to

25   those two charges than they do to manslaughter in the first

1    degree.  But of course the jury had no opportunity to

2    consider manslaughter in the second degree, reckless

3    homicide or criminally negligent homicide.  Your Honor

4    simply denied my application to charge that.

5          The truest strain, Judge, of justice can only

6    encompass an element of clemency, the truest purest form.

7          I'll end my remarks and I'll tell you what I

8    would do.  The then district attorney of Bronx County was

9    Burton Bennett Roberts, and a former district attorney of

10   Queens County Thomas Meckell had been indicted and the

11   special prosecutor was trying the case in the old

12   historical courthouse in Long Island City.  I'm sure your

13   Honor is well aware of that structure, its historical

14   significance.

15         And the then district attorney Burton Roberts

16   testified as a character witness on behalf of a former

17   district attorney of Queens County Thomas Meckell and he

18   was besieged by the press as he was leaving that

19   courthouse, and he was asked by the press what he had done.

20   What was his purpose?  What was his purpose in being there

21   that day?  And the then district attorney of Bronx County

22   simply replied to the camera, people and the reporter,

23   though I've injected hopefully a strain of mercy because

24   justice in its purest sense must incorporate a strain of

25   mercy and he left.

1          And the post-script to that story is that the

2     special prosecutor wrote a letter to the disciplinary

3     committee accusing Mr. Roberts then of impeding and

4     impairing the course of justice, and yet as often as he

5     told us, as I worked under him at that time, he was seeking

6     to do justice that day for the erstwhile district attorney

7     of Queens County and I ask you to do justice here this

8     afternoon for Mr. Delgado.  Thank you.

9          THE COURT:  Mr. Clerk.

10         THE CLERK:  Mr. Delgado, would you like to make a

11    statement?

12         THE DEFENDANT:  Yes, I would.

13         THE COURT:  Please.

14         THE DEFENDANT:  Your Honor, I never thought I

15    would find myself in a situation like this and sometimes I

16    just wish I was dead.  My intention was never to take his

17    life or to harm him.  All I just want him to get off of me.

18    I didn't know what I was doing at the time.  I'm very, very

19    sorry for what happened to George.  I just hope one day his

20    family will forgive me, you know, there's nothing I could

21    say that is gonna comfort to them.  The only person that

22    could do that is God.  I just hope one day God and I will

23    pray that he will and I just, I'm very, very sorry for the

24    loss of your brother.  It wasn't my intentions to do that.

25         THE COURT:  Thank you.  Thank you, sir.  David

1     Delgado, you having been found guilty by a jury of your

2     peers to the crime of manslaughter in the first degree with

3     the intent to cause serious physical injury which resulted

4     in death.  This was a dastardly crime.

5     The Court is intimately aware of the evidence

6     brought against you and the arguments otherwise amplified

7     to by your counsel on your behalf, and yet it's difficult

8     for the Court to overlook the fact that your vicious crime

9     has snuffed out a life, a man, everything that he was,

10     everything that he could have been to himself, to his loved

11     ones.  Society cannot tolerate the kind of reaction that

12     resulted in your criminally culpability as determined by

13     the jury.

14     The Court does sentence you to a period of

15     durance the maximum as requested by the People 25 years,

16     visits upon you at the time should you come to be released

17     five years of post-release supervision, visits upon you as

18     is required by law the mandated fees of three hundred and

19     twenty-five dollars to be deducted from all earnings at one

20     hundred percent while incarcerated until fully paid.

21     The Court delivers you over for transportation to

22     the appropriate penitentiary so that you may complete your

23     sentence, assigns to you whatever credits heretofore of

24     incarceration can be credited in remission of the sentence

25     of 25 years.

1              Gentlemen, thank you.

2              MR. ROSENFELD:  Thank you, Judge.

3                *                *                *

4    THE FOREGOING IS CERTIFIED TO BE

5    A TRUE AND ACCURATE TRANSCRIPT.

6

7              TRICIA L. ROBINSON, CSR, RPR

8              Senior Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25